# In The Matter Of:

*Richard Weyland & Jennifer Weyland v
Peter Birkholz and Birkholz & Company*

---

*June 26, 2006*

---

*An/Dor Reporting & Video Technologies, Inc.*
*179 East Maxwell Street*
*Lexington, Kentucky  40508*
*(859) 254-0568     (800) 837-5702*

Original File 5-26-06.txt, Pages 1-187

Richard Weyland vs. Peter Birkholz & Company — Case No. 5:05-cv-00375-JBC    Document 29-16    Filed 01/15/2007    Page 2 of 39

Richard Weyland and Jennifer Weyland vs.
Peter Birkholz and Birkholz & Company

June 26, 2006



**Page 1**

[1]         UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
[2]              LEXINGTON KENTUCKY

[3] RICHARD WEYLAND and      )
    JENNIFER WEYLAND,         )
[4]                          )
         PLAINTIFFS   ) DEPOSITION TAKEN ON BEHALF
[5] vs                ) OF THE DEFENDANT,
                      ) BY:  NOTICE
[6] PETER BIRKHOLZ and BIRKHOLZ )
    & COMPANY,        )
[7]                   ) WITNESS:
         DEFENDANTS   ) RICHARD WEYLAND
[8]
[9]
[10]
[11]     The deposition of RICHARD WEYLAND was taken before
[12] Kimberley Keene, Registered Professional Reporter and Notary
[13] Public in and for the State of Kentucky at Large, at the
[14] offices of Stoll, Keenon & Ogden, Suite 2100, 300 West
[15] Vine Street, Kentucky on Friday, the 26th day of June 2006,
[16] commencing at the approximate hour of 10:05 a.m.  Said
[17] deposition was taken pursuant to Notice, heretofore
[18] filed, to be read and used on behalf of the Defendant at the
[19] trial in the above-captioned action and for all other purposes
[20] as permitted by the Federal Rules of Civil Procedure.
[21]
[22]              * * * * * * * * * * *
[23]
[24]
[25]

**Page 3**

            AN/DOR COURT REPORTING & VIDEO TECHNOLOGY
[1]              A P P E A R A N C E S
[2]
[3] FOR THE PLAINTIFF:        STOLL KEENON & OGDEN
                              David Royce, Esquire
[4]                           Suite 2100
                              300 West Vine Street
[5]                           Lexington, Kentucky  40507
[6]
    FOR THE DEFENDANT:        BOEHL, STOPHER & GRAVES
[7]                           Ronald Green, Esquire
                              444 West Second Street
[8]                           Lexington, Kentucky  40507
[9] ALSO PRESENT:            Jennifer Weyland
[10]
[11]              ***   ***   ***
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 2**

         AN/DOR COURT REPORTING & VIDEO TECHNOLOGY
[1]            INDEX TO EXAMINATION
[2]
[3]    Examination by Mr. Green.................... 5
       Examination by Mr. Royce.................... 181
[4]
[5]
[6]            INDEX TO EXHIBITS
[7]
    None.
[8]
[9]       INDEX TO CERTIFIED QUESTIONS AND/OR REQUESTS
[10]
    None
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1]     **MR. GREEN:**  We've just talked briefly, and -- and
[2] there are a lot of documents that have been produced by both
[3] parties in this case.  They're all Bates stamped.  And we may
[4] talk about some of them today.  And we'll try to refer to them
[5] as Bates stamp, but we won't be attaching them as exhibits,
[6] partly to keep from cluttering our record and then, also, to
[7] keep from cluttering the court's record.
[8]     Should the time come when any of them or all of them
[9] are important in terms of any motion or whatnot, we both
[10] understand that we'll be able to attach them in an appendix.
[11] Having been Bates stamped, of course, that just shows where
[12] they were produced.
[13]     The documents that I've produced begin with "PB,"
[14] and the documents that Mr. Weyland has produced begin with
[15] "W."  And we'll be both make a point of -- as additional
[16] matters come, we'll Bates stamp them differently.  But that
[17] just keeps us from having to make huge exhibits in this thing
[18]     **MR. ROYCE:**  Agreed.
[19]     **MR. GREEN:**  You're welcome to swear the witness, if
[20] you would like, and we'll get it started.
[21]              ***  ***  ***
[22]     RICHARD J. WEYLAND, called on behalf of the
[23] Defendants, after having been duly sworn, was examined and
[24] testified as follows:
[25]

**Page 5**

## EXAMINATION

BY MR. GREEN:

[3] Q. Sir, would you state your full name and your current [4] address for the record, please?

[5] A. My full name is Richard Joseph Weyland. My address [6] is 2366 New Layer Road, Cynthiana, Kentucky.

[7] Q. Okay. Before we go any further, I know you've [8] spoken with your attorney at some length of what to expect [9] here.

[10] Have you ever given a deposition before?

[11] A. Once, yes.

[12] Q. Okay. In what -- what context was that?

[13] A. It was in regard to the sinking of the [14] SuperServant II in the Congo River.

[15] Q. Okay. I don't know.

[16] Was that in the United States court or elsewhere?

[17] A. Yes.

[18] Q. Okay. An Admiralty proceeding of some kind or --

[19] A. Yes.

[20] Q. Okay. Just in case they're different, let me tell [21] you.

[22] We're -- we are in Federal court here, so it's [23] probably the same kind of court, although this is probably not [24] in magnitude in terms of the numbers of depositions and the [25] numbers of questions and so forth.

**Page 6**

[1] Let me just tell you that this is very informal. It [2] is being taken down, of course, as you know, and that creates [3] a couple of things that we need to have an understanding [4] about. And I'll be the first to tell you that I'm the one [5] that's probably going to violate some of these, but I'll try [6] not to.

[7] We need to both talk separately. And I have a [8] tendency to maybe start before you're finished or think you're [9] finished and you're not. You might have -- might or might not [10] have the same tendency. She can only take one of us at a [11] time, so we'll both have to kind of keep each other honest on [12] that.

[13] She'll need an audible answer. A lot of times, you [14] want to shake your head, and I know exactly what you mean. [15] But she doesn't have a head nod button on her thing, so she [16] needs a yes or a no, or something unambiguous. Uh-huh [17] sometimes could be a yes or a no, and they can't tell on [18] paper. So, we just need to watch that.

[19] As far as how I do these, I like to keep them very [20] informal. I would prefer that you're comfortable. I didn't [21] come here to put words in your mouth or to try to trick you in [22] any manner. I'm interested in finding out what you know and [23] what you don't know.

[24] In accordance with that, we are going to be here for [25] a little while. If you need to take a break -- and we'll take

**Page 7**

[1] some breaks in the regular course of things, but if you need a [2] break for whatever reason, just say so. I would only ask that [3] if I have a pending question, that we go ahead and try to [4] answer that before we take a break.

[5] If you need to talk to your attorney -- there may be [6] issues that come up today about attorney-client privilege or [7] other things.

[8] If you're at all concerned about whether you should [9] answer something, I would prefer that you go ahead and talk to [10] your attorney before you answer so we don't have some squabble [11] about it, okay?

[12] A. Uh-huh.

[13] Q. I want to make sure -- and this is always a [14] difficult proposition -- I want to make sure that you [15] understand my questions. In other words, I know what I'm [16] asking, and I want to try to make sure that you know what I'm [17] asking and it's the same thing.

[18] Obviously, if you're convinced that you know what [19] I'm saying and it's different, you don't have any way of [20] knowing that, but I want you to be comfortable that you know [21] what I'm saying.

[22] If you have any doubt or any question, because I do [23] ask bad questions sometimes, we all do, take me to task. You [24] will not hurt my feelings in any way. I will not get mad. I [25] will not make the questions harder or meaner, or anything like

**Page 8**

[1] that. I can take constructive criticism.

[2] So, if there's any ambiguity or if you feel like [3] I've phrased something that you're uncomfortable with, say so. [4] Because at the end of the day, when this is all written down, [5] I'm going to assume that when I asked Question A, you answered [6] Question A and that was your -- your -- you meant for that to [7] be your answer. So -- and so, feel free to stop me about [8] anything like that.

[9] Other than that, I'm just going to ask you some [10] questions, and all you need to do is answer, and you don't [11] need to be nervous or anything like that, okay?

[12] A. Yes, sir.

[13] Q. And if -- if she needs a break, she'll tell us as [14] well.

[15] What I would like to do first is kind of get a [16] little personal history.

[17] Let me start out with: Do you have any relatives in [18] Kentucky?

[19] A. My wife.

[20] Q. Okay. I mean, outside of your immediate family.

[21] A. No, sir.

[22] Q. Okay. Do you know if your wife does?

[23] A. Yeah. I know. She does not.

[24] Q. Okay. The only reason I'm asking is, is none of us [25] want a lot of relatives on the jury, okay? So, if you don't

Page 9

[1] have any, then I don't have that problem.

[2]   A.  Yes, sir.

[3]   Q.  I know, from what I've looked at, that you've moved
[4] around some.

[5]       Let me start with:  How old are you today?

[6]   A.  I'm 55.

[7]   Q.  Okay.  Probably off the record, I want to get, like,
[8] Social Security and date of birth and stuff, but I -- you
[9] know, with HIPAA and everything, we'll leave it out of the
[10] record.

[11]   A.  Okay.

[12]   Q.  Where were you born?

[13]   A.  I was born in Medford, Massachusetts.

[14]   Q.  Okay.  Were you educated there?  Graduated high
[15] school there?

[16]   A.  No.  Actually, I graduated in high school in North
[17] Reading, Massachusetts.

[18]   Q.  Okay.  When did you go from Medford to North
[19] Reading?

[20]   A.  Actually -- let's see, my parents moved from
[21] Medford.  The year I was born, they moved to Everett.  And
[22] then we moved to North Reading in the early '60s.

[23]   Q.  Okay.

[24]   A.  I went to high school in Tewksbury.

[25]   Q.  Oh, very nice.  My mother currently lives in

Page 10

[1] Reading, but I've been to North Reading a number of times, but
[2] anyway.

[3]       You graduated from high school, then, in North
[4] Reading, and then did you go to college?

[5]   A.  Yes.

[6]   Q.  Okay.  And where did you attend?

[7]   A.  Massachusetts Maritime Academy.

[8]   Q.  Okay.  So, you knew at a fairly early age you wanted
[9] to go the sea route --

[10]   A.  Yes, sir.

[11]   Q.  -- career wise?  Okay.

[12]       And where -- where is that located?  Where is their
[13] campus?

[14]   A.  Buzzards Bay, Massachusetts.

[15]   Q.  What kind of program is that?  How many years and --

[16]   A.  It's a four-year accredited degree in marine
[17] transportation.

[18]   Q.  Okay.  And I assume you received the degree?

[19]   A.  Yes, sir.

[20]   Q.  Did you then go to work, or did you continue your
[21] education?

[22]   A.  No.  I went to work, sir.

[23]   Q.  Okay.  Where did you begin working?

[24]   A.  I worked for Empressa Hundrurian De Vaporas.

[25]   Q.  I, of course, understand exactly what you said, but

Page 11

[1] the court reporter might want you to kind of spell that.

[2]   A.  It means Hundrurian Steam Ship Company.

[3]   Q.  And with a four-year degree, what type of position
[4] do you start in, in the industry?

[5]   A.  Third mate.

[6]   Q.  Okay.  And on what kind of ship?

[7]   A.  It was approximately a 500 foot steam powered reefer
[8] ship.

[9]   Q.  I'm going to come back and ask you about ships and
[10] such because -- and I'll tell you right up front, I don't know
[11] much other than what I've seen on T.V. in war movies and such,
[12] so -- but I would like to go ahead and kind of get your
[13] employment history first.

[14]       About when did -- when was it you graduated from the
[15] maritime academy?

[16]   A.  1971.

[17]   Q.  Okay.  And did you then immediately go to work, or
[18] did -- was there anything intervening there?

[19]   A.  Immediately went to work, sir.

[20]   Q.  Okay.  So, you started there in '71, then?

[21]   A.  Yes, sir.

[22]   Q.  And how long did you work for the Hundrurian
[23] company?

[24]   A.  One year, sir.

[25]   Q.  Okay.  And then where did you go?

Page 12

[1]   A.  I went to a small container company, Maritime
[2] Coastal Containers.

[3]   Q.  What was your position there?

[4]   A.  Third mate, sir.

[5]   MR. GREEN:  Okay.  And off the record.

[6]       (There was a brief recess.)

[7] BY MR. GREEN:

[8]   Q.  Okay.  How long did you work for Maritime Coastal?

[9]   A.  Four months.

[10]   Q.  Okay.  And did you leave there to take a better job
[11] or --

[12]   A.  No., Ron.  They sold the vessel, and --

[13]   Q.  Okay.

[14]   A.  -- the people that were working on board were laid
[15] off.

[16]   Q.  Okay.  And then where did you go?

[17]   A.  I went to a company called Sea Horse, Inc.

[18]   Q.  Okay.  Third mate?

[19]   A.  Actually, there I was just a mate.  I was -- it's a
[20] different class of vessel.

[21]   Q.  Okay.  What -- what kind?

[22]   A.  It was a supply vessel working in the oil and
[23] mineral industry.

[24]   Q.  Is that the first job that you had on a vessel that
[25] was connected with energy?

Peter Birkholz and Birkholz & Company
June 26, 2006

---

**Page 13**

[1]    A.  Yes, sir.

[2]    Q.  Okay.  And how long did you work for Sea Horse?

[3]    A.  Approximately one year.

[4]    Q.  Okay.  Then who was your next employer?

[5]    A.  Zapata Marine Service.

[6]    Q.  Okay.  Now, if I'm figuring this right, Zapata,

[7]  then, would have begun in 1973?

[8]    A.  Actually, it was --

[9]    Q.  Or you think it was '74?

[10]    A.  It was -- it was '75, I think.

[11]    Q.  '75.  Okay.

[12]    A.  I'm not sure.

[13]    Q.  So, the Hondrurian was one year plus -- well,

[14]  Hondrurian and Sea Horse were probably one year plus, or were

[15]  they an even year?

[16]    A.  Yeah.  Well, there was -- there was a time period of

[17]  unemployment between each.

[18]    Q.  Okay.  When was that?  In between which of these?

[19]    A.  How long?

[20]    Q.  First, in between which employments.

[21]    A.  It was probably about -- I'm not sure at this point.

[22]  I think three to four months of unemployment between each.

[23]    Q.  Okay.  Was that after Maritime --

[24]    A.  Yes.

[25]    Q.  -- you were laid off?

---

**Page 14**

[1]    A.  Yes.  Both.

[2]    Q.  Okay.

[3]    A.  It was a long time ago.  I can't give you the exact

[4]  times.

[5]    Q.  Yeah.  And -- and I'm not -- I don't mean to suggest

[6]  that I'm going to add these up and if -- and call you a liar

[7]  if they don't add up.  I'm just trying to get the best I can.

[8]    A.  Uh-huh.

[9]    Q.  And so, I was trying to estimate.

[10]    A.  Uh-huh.

[11]    Q.  Okay.  And then you began with Zapata Marine.

[12]      Why did you leave Sea Horse?

[13]    A.  They wanted me to do some things that were

[14]  unethical, so I just walked.

[15]    Q.  Can you give me a rough idea of what kinds of things

[16]  those were?

[17]    A.  They wanted me to sign on the vessel as master and

[18]  let somebody else run it, because the person that was going to

[19]  run it did not have a license to do that.  I had the license.

[20]  They wanted their other man to run the boat.

[21]    Q.  Okay.

[22]    A.  In other words, I would be taking the

[23]  responsibility, and he would be getting --

[24]    Q.  And for all you know, having the drink?

[25]    A.  Well --

---

**Page 15**

[1]    Q.  Yeah.  I know --

[2]    A.  They said they would give me five dollars a day

[3]  more.

[4]    Q.  Okay.  And at that time, you were a mate on that

[5]  ship, but they wanted you to --

[6]    A.  Yes, Ron.

[7]    Q.  -- to be the master?  Okay.

[8]    A.  Yeah.

[9]    Q.  And for the jury -- I think I've picked up a little

[10]  bit from this stuff that I've read, but tell the jury what a

[11]  master is?

[12]    A.  A master is the man that runs the vessel.  He's the

[13]  manager of the vessel.

[14]    Q.  Okay.  That your average layperson would think of

[15]  the captain.

[16]      Would that be the -- the equivalent?

[17]    A.  Yes, Ron.

[18]    Q.  From a cruise ship or something?

[19]    A.  Yeah.

[20]    Q.  And then you've got different degrees of mates?

[21]    A.  Normally, on most ships, large ships, yes.  The

[22]  smaller vessels, like supply vessels, generally you have a

[23]  very much reduced crew manning level, so you're going to have

[24]  fewer people to do the same number of jobs.

[25]      On supply vessels, we work a 12-hour day.  Usually,

---

**Page 16**

[1]  the master and one mate run the -- run the vessel.

[2]    Q.  Okay.  I would like to get as much as you remember,

[3]  and I realize 1975 is a long time ago.

[4]      Precisely -- okay.  You were working for Sea Horse.

[5]      Did you quit before you had anything lined up with

[6]  Zapata, or did you look for employment and find Zapata while

[7]  you were still employed?

[8]    A.  I left -- I left Sea Horse before I even started

[9]  looking for employment.

[10]    Q.  Okay.  Because you had a problem?  You just didn't

[11]  want to work with them anymore, for the ethical reason?

[12]    A.  That's correct.

[13]    Q.  Okay.

[14]    A.  It was unethical what they asked me to do, and I --

[15]  I was happy there up until that point, and I just left.

[16]    Q.  I understand.

[17]    A.  Because I wouldn't do that.

[18]    Q.  I understand.

[19]    A.  And -- and so, there was some -- it may have been

[20]  brief, but some period of unemployment between Sea Horse and

[21]  Zapata, then, as well?

[22]    A.  Yes, sir.

[23]    Q.  Okay.  Now, how did you -- how did you come in

[24]  contact with Zapata?  How did you learn that there was an

[25]  opening, or how did you -- who did you first talk to?

---

**Page 17**

[1]      Give me an idea, just in your own words, of how that
[2] came about.
[3]      A. Actually, I don't remember.
[4]      Q. Okay. Well, that's a perfectly good answer.
[5]      Can you remember generally if you responded to an
[6] ad, or was it word of mouth that you learned that -- or did
[7] you just send out resumes to everybody, or --
[8]      MR. ROYCE: If you recall.
[9] BY MR. GREEN:
[10]      Q. If you recall.
[11]      A. I don't recall, but the process is normally, you
[12] talk to people, you send out resumes, and you look in the
[13] professional publications. You do all of it.
[14]      Q. Okay. Now, at that time, what was Zapata Marine's
[15] primary -- what did they do? What -- are they specialists, or
[16] are they -- in one type of marine work, or do they do a lot of
[17] different things?
[18]      A. Zapata Marine, the division that I went to work for,
[19] was in the oil and mineral service industry.
[20]      Q. Okay. And did -- did that division have a name?
[21]      A. Zapata Marine Service.
[22]      Q. Okay. And what was the name of the umbrella, the
[23] company?
[24]      A. Zapata Corporation.
[25]      Q. Just Zapata Corp.? Okay.

**Page 18**

[1]      Because I don't know how it was in '75, but there's
[2] a number of Zapatas, so I'm just trying to figure out which
[3] ones.
[4]      Okay. Zapata Marine Service.
[5]      Now, when -- however you came in contact with them,
[6] before you were hired, did you interview with somebody?
[7]      A. Oh, boy. The process there was, I got the job and I
[8] had to go down for a physical, I believe. So, I went to the
[9] Houston office, and I was employed right away and sent to a
[10] vessel at the -- at that visit, at the time of that visit.
[11]      Q. Okay. Presumably, you passed your physical?
[12]      A. Yes, sir. That I did.
[13]      Q. Okay. Now, prior to that, had you spoken in person
[14] with anybody from Zapata?
[15]      A. On the telephone?
[16]      Q. I mean -- no. Face to face.
[17]      A. No, sir.
[18]      Q. Okay. Everything was by telephone or mail?
[19]      A. Yes, sir.
[20]      Q. We're not talking e-mail back then, I don't guess.
[21]      A. No, sir.
[22]      Q. Were the people that you talked to, in terms of if
[23] you -- on the telephone about the job prospects, I assume they
[24] asked you questions, was that person also in the Houston
[25] office?

**Page 19**

[1]      A. Yes, Ron. That's correct.
[2]      Q. And was Houston their primary headquarters,
[3] Zapata's primary headquarters, at that time?
[4]      A. Yes, Ron.
[5]      Q. Okay. They sent you to a vessel.
[6]      Do you recall which vessel was your first with
[7] Zapata?
[8]      A. No. I do not recall.
[9]      Q. Okay. Do you recall what kind of vessel?
[10]      A. Yes.
[11]      Q. What kind was it?
[12]      A. It was an oil and mineral supply vessel, sometimes
[13] called an anchor handling tug supply vessel.
[14]      Q. Okay. Now, the work that this vessel does, is that
[15] related to drilling rigs, or is it -- what does it -- what
[16] does it service in the oil and energy field, oil and mineral
[17] field?
[18]      A. Supply vessels provide all marine support for
[19] offshore oil operations.
[20]      Q. Okay.
[21]      A. Anything that needs to be transported can be
[22] transported by a supply vessel. Plus, we do towing, anchor
[23] handling, and survey operations.
[24]      Q. Okay. I've seen the phrase "anchor handling"
[25] perhaps in some memos that you wrote at one time.

**Page 20**

[1]      What is anchor handling?
[2]      A. Anchor handling is -- is placing the mooring gear on
[3] the ocean floor for moored offshore oil exploration rigs.
[4]      Q. Okay. On your first vessel, what was your position?
[5]      A. Mate.
[6]      Q. Okay. Did you enter into any kind of written
[7] contract at that visit with Zapata in the 1975 time frame?
[8]      A. I don't remember.
[9]      Q. If you did, you don't have a copy today going
[10] that far back, I take it?
[11]      A. No. No, I don't.
[12]      Q. Okay. And just -- just so we're clear, your
[13] attorney is exactly right. If you don't remember, that's a
[14] perfectly valid question (sic). It's -- don't think that I
[15] imply anything from it other than you don't recall, especially
[16] when we're talking 20, 30 years ago.
[17]      In your meeting at the Houston office, where you
[18] were, I guess, actually hired and passed the physical,
[19] et cetera, did you fill out paperwork?
[20]      Let me be more specific: Did you fill out paperwork
[21] relating to -- I can't think of the form now -- like W-4,
[22] things like that?
[23]      What was your understanding with Zapata about your
[24] status relative to this?
[25]      A. I was an American employee for an American company,

Page 21

[1] if that is what you're asking.

[2] A. Well, that's --

[3] A. I'm not really sure if that's what you're asking.

[4] Q. Okay. I -- the word "employee" --

[5] A. If you could rephrase the question.

[6] Q. The word "employee" is -- I wasn't really looking

[7] into whether it was American or not at this point, but -- so,

[8] you were an actual employee. They -- it was an employment

[9] contract rather than as -- you were acting as a contractor at

[10] that time.

[11] Is that your understanding?

[12] A. Yes.

[13] Q. Okay.

[14] MR. ROYCE: Ron, let me interpose a clarification

[15] more than an objection. You're asking him what are

[16] technically legal questions, but I think you're asking him

[17] just as to his understanding.

[18] MR. GREEN: Exactly.

[19] MR. ROYCE: So long as that applies to all of these

[20] questions, I won't interpose that clarification.

[21] MR. GREEN: That applies to all of them, and I

[22] surely wouldn't ask for a legal conclusion. And if factually

[23] it's not supported, then it's factually not supported. I just

[24] want to know what his understanding was.

[25] MR. ROYCE: I understand.

Page 22

[1] BY MR. GREEN:

[2] Q. Did you sign up -- did they have benefits for you at

[3] that time that they offered you?

[4] A. Yes, Ron. They did.

[5] Q. Okay. What kind of benefits?

[6] A. Medical insurance.

[7] Q. Okay.

[8] A. And a stock program.

[9] Q. Okay. Was Zapata a publicly traded company at that

[10] time? Do you know?

[11] A. Yes. It was.

[12] Q. So, the stock program, was that a -- was that an

[13] employee purchase-type thing, or was that your retirement

[14] plan?

[15] A. I believe it was a retirement program.

[16] Q. Okay. What would -- did -- I assume they made some

[17] contributions on your behalf to that, but did you also

[18] contribute? Was it set up like that?

[19] A. So long ago, I don't remember.

[20] Q. Okay. Do you recall the name of your first vessel

[21] with Zapata?

[22] A. I can tell you what class it was.

[23] Q. Okay. Good enough.

[24] A. It was the Constitution Service class. It was

[25] either the Constitution Service, the Independence Service, the

Page 23

[1] Pioneer Service, or the Liberty Service, one of those four.

[2] Q. Okay. You were a little faster than I can write.

[3] You got Constitution?

[4] A. Constitution, Independence, Pioneer, Liberty, all

[5] suffixed with "service."

[6] Q. Okay. Almost sounds like a fund-raising program.

[7] Okay. What I would like to do, because I have no

[8] idea what this means, and whoever reads this may not, is: Can

[9] you start with Constitution, and work your way towards

[10] Liberty, and just give us a rough idea of what basically that

[11] means, what it tells you about a particular ship, and how

[12] they're different?

[13] A. Doesn't tell you anything about the ship.

[14] Q. Okay.

[15] A. It's just a name.

[16] Q. Okay.

[17] A. It's a label.

[18] Q. Okay. What -- is this a -- is this an industry

[19] label, or is this a Zapata label?

[20] A. It's -- all ships are named. It's part of the

[21] registering process. You just can't have that hull out

[22] there.

[23] Q. Okay. Well, maybe I'm misunderstanding what -- I

[24] was understanding this was a class of ships, or are you saying

[25] these were ships?

Page 24

[1] A. These are all ships.

[2] Q. Oh, okay.

[3] A. And they're all of the same class. They were all

[4] built from the same series.

[5] Q. I see.

[6] A. Like you would have a Toyota Corolla, they're all

[7] the same.

[8] Q. I'm with you. Okay. I misunderstood. I

[9] misunderstood.

[10] So, these are four ships that -- did you work on all

[11] of them at any given -- at some particular time, or you said

[12] you started out with the Constitution Service?

[13] A. I didn't say I started out with the Constitution

[14] Service. I said I started out on that class. That's the

[15] first one of the class, Constitution, and then the

[16] Independence was built.

[17] Q. Okay. The class being made up of Constitution,

[18] Independence, Pioneer, and Liberty?

[19] A. Yeah. But there were more. There were eight

[20] vessels of that class.

[21] Q. Okay. All right. What was the name of the vessel

[22] that you started on?

[23] A. I'm not sure.

[24] Q. Okay.

[25] A. I don't remember which one it was.

Page 25

[1]  Q. And your first position was mate?
[2]  A. Yes.
[3]  Q. Okay. How long -- when did you cease becoming an
[4]  employee of Zapata?
[5]  A. It was when the merger, buyout, whatever it was,
[6]  between Tidewater and Zapata took place.
[7]  Q. Okay. Are there still companies that derive from
[8]  the original Zapata that exist at this time? Do you know?
[9]     That's a bad question.
[10] A. I'm not sure. But several years ago, there was a
[11] Zapata Corporation. I believe all they had was some offshore
[12] gas holdings.
[13] Q. But they're not related to Tidewater?
[14] A. No.
[15] Q. Okay. Are there any Tidewater subsidiaries that are
[16] still called Zapata?
[17] A. At the present time, I don't know of any.
[18] Q. Okay. And at the time that this merger occurred,
[19] you were still an employee of Zapata Marine Service? I mean,
[20] immediately proceeding the merger.
[21] A. Well, they had changed the name by that time. It
[22] was Zapata Gulf Marine at that time.
[23] Q. Okay. Do you recall when that happened, just
[24] roughly?
[25] A. Not really.

Page 26

[1]  Q. Do you remember what -- which decade? '80s? '90s?
[2]  A. It was either late -- the late -- late '70s or the
[3]  early '80s.
[4]  Q. Okay. And we may come up with some documents that
[5]  will help you, but as we sit here today, on the merger between
[6]  Zapata and Tidewater, was that in the '90s?
[7]  A. I believe it was in the mid '80s.
[8]  Q. Mid '80s?
[9]     At the time that -- well, let's see.
[10]    So -- well, what was your position with Zapata at
[11] the time that the change occurred between -- with the merger?
[12] A. I was a captain.
[13] Q. Okay. Now, in that context, is a captain different
[14] than a master, or is it another word for the same thing?
[15] A. Actually, a captain is a man that commands a vessel.
[16] A master is a -- is a rating that -- that you -- of license,
[17] okay?
[18] Q. Okay.
[19] A. I hold a license as master mariner. When I'm signed
[20] on a vessel, I'm -- I'm a captain. But when I'm not signed on
[21] a vessel, I'm only a master mariner.
[22] Q. Let's talk about that for a minute.
[23]    Who would -- particularly with respect to the master
[24] certification, who makes that certification?
[25] A. United States Coast Guard licensing.

Page 27

[1]  Q. Okay. Are there other -- in the licensing process,
[2]  are there other categories below master?
[3]  A. Yes, Ron. There are.
[4]  Q. Could you give me an idea of -- where would your
[5]  first certification have been?
[6]     What would you have been certification wise?
[7]  A. My first certification, coming out of the
[8]  Massachusetts Maritime Academy, was third mate, steam and
[9]  motor vessels, any gross tonnage, upon oceans.
[10] Q. So, the third mate, second mate thing is also part
[11] of the certification process?
[12] A. Yes, Ron.
[13] Q. Okay. And then it's qualified by certain types of
[14] vessels, and I assume that as they get bigger, then you move
[15] up to the next category of certification?
[16] A. It's sort of like airplanes. You can get different
[17] classes of licenses and different types of vessels.
[18] Q. Okay.
[19] A. So, I move straight -- directly from mate's license,
[20] third mate's license, to a master 500 ton oceans license.
[21] Q. And when do you think your certification as master
[22] was?
[23]    When did you first become certified?
[24] A. That would have been -- I believe I just finished
[25] with Sea Horse when I took my master's examination. And that

Page 28

[1]  was the reason why I left, because I had gotten the
[2]  examination done, went back to work. They said, "You work as
[3]  mate. We'll put another man on as master."
[4]  Q. And use your -- yeah.
[5]  A. So, I said, "No."
[6]  Q. So, that was '74, '75?
[7]  A. Something like that.
[8]  Q. Yeah. Okay.
[9]  A. I'm not sure.
[10] Q. Very early in your career, then?
[11] A. Yeah.
[12] Q. Now, the third mate certification, is there a test
[13] involved with that, or is that pretty much automatic after
[14] graduating from a maritime academy with --
[15] A. There is -- there is an extensive test that's
[16] involved in all licensing.
[17] Q. Okay. So, it's like your version of the bar
[18] examination.
[19]    You -- going through school isn't enough; you've got
[20] to pass the test?
[21] A. Yes, Ron. That's correct.
[22] Q. Okay. And can you give me some idea of the process
[23] for the master? Is it a one-day thing? Is it oral? Written?
[24] Both?
[25] Q. Tell me -- tell me what you had to go through to get

Page 29

[1] that.

[2] A. It took me -- let me think. I think it was the

[3] better part of two weeks testing to get that exam.

[4] Q. Eight hours a day or --

[5] A. Oh, no. No.

[6] Q. Okay.

[7] A. Sometimes they would only allow me in for four to

[8] the exam center. But every day, I would — go down and

[9] take a test.

[10] Q. Now, is it -- I assume it's not typical for somebody

[11] to go from third mate to master, particularly four or five

[12] years out of school?

[13] A. Yes, it is.

[14] Q. Is it?

[15] A. If it's -- if you did it my route, yes.

[16] Q. Okay.

[17] A. Because I went with limited tonnage. I was a

[18] 500 ton master.

[19] Q. Okay.

[20] A. Later I upgraded to 1,500 tons, and then now I hold

[21] a 3,000 ton master's license.

[22] Q. Okay. When did you do the 1,500? Do you recall?

[23] A. I don't recall.

[24] Q. Okay. Can you give me a rough idea?

[25] A. Sorry. No.

Page 30

[1] Q. Okay. How about the 3,000? Do you recall when that

[2] was?

[3] A. I don't recall that, either.

[4] Q. Do you recall if that was before or after the merger

[5] with Tidewater?

[6] A. I don't recall when it was. It was not a -- as

[7] intense an exam as the other one.

[8] Q. Okay. It's -- it's occurred to me that when you

[9] said 500 ton, and I thought huge, and that was fairly small

[10] for what you ultimately ended up doing; is that true?

[11] A. Well, presently, I'm working on a -- on a nearly

[12] 3,000 ton ship.

[13] Q. Okay.

[14] MR. ROYCE: It's all relative.

[15] MR. GREEN: Yeah. I mean, that's why I jumped to

[16] the conclusion, boy, that seems awful quick, but, yeah. Yeah.

[17] Okay.

[18] THE WITNESS: Well, it depends upon which, you know,

[19] course you go. If you're like a pilot, and you start out in

[20] big airplanes, okay? You're going to be copilot for a long

[21] time, okay? But if you go from copilot of a really large

[22] airplane and you jump into a small two-engine plane, you might

[23] be able to qualify as a pilot rather quickly --

[24] BY MR. GREEN:

[25] Q. Okay.

Page 31

[1] A. -- would be the analogy that I would give you to

[2] explain how I went from third mate all the way to master in

[3] one quick jump.

[4] Q. Okay. Actually, I just thought it was probably

[5] because you were start. I didn't know.

[6] MS. WEYLAND: He's being -- what's the word?

[7] MR. GREEN: Modest?

[8] MS. WEYLAND: Modest, yeah.

[9] BY MR. GREEN:

[10] Q. Okay. What's the -- do you have the highest master

[11] certification that you can get, or is there more to achieve?

[12] A. There's more.

[13] Q. Okay.

[14] A. But I'm limited by a ceiling because I am only

[15] working on vessels up to 3,000 tons. I cannot qualify for

[16] vessels over 3,000 tons.

[17] Q. You would have to go work on one of those vessels in

[18] another capacity?

[19] A. Yes.

[20] Q. Okay. If we -- let's limit ourselves to the kind of

[21] work that you do, which, as I understand it, since you went to

[22] Zapata, has all been related to the oil, energy, mineral type

[23] of area; is that true?

[24] A. Since Sea Horse.

[25] Q. Right.

Page 32

[1] A. Sea Horse was in the same industry.

[2] Q. Okay. In that subsection of the entire maritime

[3] industry, is -- is there really a need for a certification

[4] over 3,000 tons?

[5] Does that industry use ships bigger than that?

[6] A. At the present time, yes, it does.

[7] Q. Okay.

[8] A. But I'm not working on one of them.

[9] Q. Okay. With the certification you've got, for some

[10] reason, I was under the impression that there weren't a lot of

[11] you, people with your certification.

[12] Is that a mistaken impression?

[13] A. You're correct. There aren't a lot of people that

[14] do what I do.

[15] Q. Okay.

[16] A. It's -- it's very specialized.

[17] Q. Okay. And is that specialized because of the master

[18] 3,000 status, or specialized because of the work in the oil

[19] and mineral industry?

[20] A. It's the uniqueness of the work in the oil and

[21] mineral industry.

[22] Q. Okay. Skipping way ahead to today, could you give

[23] me a thumbnail sketch of what your current occupation

[24] involves? And I would like to look at it from a couple of

[25] different angles.

Richard Weyand, Jennifer Weyland
Peter Birkholz and Birkholz & Company
June 26, 2006

**Page 33**

[1] One is, is where you do your work. Two is, what
[2] kind of work you do and what kind of work your ship does.
[3] Is that too much?
[4] A. That's covering a lot --
[5] Q. Yeah.
[6] A. -- of ground.
[7] Q. I just want a real thumbnail sketch, but I would
[8] like just a little feel for it.
[9] A. Okay.
[10] Q. If you had to get up in front of your son's class
[11] and explain why you're man of the week, what would you tell
[12] them?
[13] A. Okay. Well, let's start with the vessel that I work
[14] on.
[15] Q. Okay.
[16] A. Okay. Presently, I work on a 60 meter by 17 meter
[17] 4,000 horsepower vessel that specializes in offshore marine
[18] support.
[19] Am I going too fast for you?
[20] Q. No. Go ahead.
[21] A. Okay. We have on deck a 105 ton crane for platform
[22] construction work. We support two ROVs, "ROV" meaning remote
[23] operated vehicle, which is a miniature submarine which runs on
[24] a cable.
[25] We provide hotel services for the oil field support

**Page 34**

[1] personnel. Our vessel has 100 births on board. We can supply
[2] power, welding services, fabrication plant services,
[3] underwater construction support, and we even have a hospital
[4] on board.
[5] And we're occasionally used as a heavy lift ship,
[6] for transporting special cargo, extra heavy lifts, from ports
[7] in Angola to the oil rigs and platforms.
[8] Q. Is Angola where, currently, your primary focus is?
[9] A. Yes, Ron.
[10] Q. How long has that been the case?
[11] A. Approximately eight years now.
[12] Q. Okay. So, one of the functions that -- I assume a
[13] lot of these offshore rigs have, in addition to foreign
[14] employees, they have Americans working as well?
[15] A. Every rig is different.
[16] Q. Okay.
[17] A. You're talking about international conglomerates,
[18] okay? Most of the time, you -- you go to a job and you can be
[19] working with any nationality on the globe. There is no
[20] telling who you're going to meet when you go to one of these
[21] rigs.
[22] Q. Okay.
[23] A. Or who is going to join your vessel.
[24] Q. And one of your ship's functions is to provide
[25] R&R-type things to the people working on the offshore -- no?

**Page 35**

[1] A. No, sir. We do not do rest and recreation.
[2] Q. Okay.
[3] A. We're there for work, work, work.
[4] Q. Okay. Well, you mentioned hotel services.
[5] What are those for?
[6] A. If you have a construction crew on a platform, we
[7] provide the extra bunking so that the people can have a place
[8] to sleep at night --
[9] Q. Okay.
[10] A. -- a place to eat their food, a place to be when
[11] they're not working.
[12] Q. So, that's strictly accommodations, then?
[13] A. Sometimes, yeah.
[14] Q. Okay. Then do they, from time to time, go to port?
[15] I mean, do you -- do you ferry them to port for
[16] their -- where do they get their R&R? I assume they've got to
[17] do something for fun every now and then.
[18] A. No.
[19] Q. None?
[20] A. None.
[21] Q. Okay.
[22] A. No. There's no R&R in the oil industry.
[23] Q. Okay. Well --
[24] A. You're either at work or you go home.
[25] Q. Well, let me tell you where my mind is coming from,

**Page 36**

[1] and then what I want to know is if there's something analogous
[2] in this context.
[3] When I was a kid, it was in the Air Force, and I --
[4] I remember us living in Taiwan. And there would be
[5] organizations, facilities, et cetera, where Americans would
[6] get together, and they would socialize, or whatever.
[7] In your industry, whether in port or on your ship,
[8] do you have anything to do with any of that? Do you know
[9] where -- where, if at all, expats would go?
[10] A. Malongo is a work camp.
[11] Q. Okay.
[12] A. It's -- people go there to work.
[13] Q. Okay.
[14] A. They work. They sleep. When they're finished
[15] working and sleeping, they go home.
[16] Q. Okay.
[17] A. There's -- there's nothing to do there.
[18] Q. There is nothing?
[19] A. Yeah. It's a work camp.
[20] Q. Okay. And that's true on your ship as well?
[21] A. Chevron does not provide -- no. There is -- there
[22] is a recreation room on the ship.
[23] Q. Okay.
[24] A. Which means that you can go in and watch T.V. or you
[25] can go lift weights. That's all we have.

---

Page 37

[1] **Q.** Okay. So, it's worse than the Air Force.

[2] **MR. ROYCE:** Sounds like it's just a ton of fun.

[3] **BY MR. GREEN:**

[4] **Q.** Okay. Have you been -- since the merger that we
[5] talked about, Zapata and Tidewater, have you been in -- did
[6] your employment just change over to Tidewater? All of a
[7] sudden, Tidewater was the one that was responsible for paying
[8] you, that sort of thing?

[9] **A.** Yes, Ron.

[10] **Q.** Okay. Tidewater has subsidiaries.

[11] Do you recall specifically who you were employed
[12] by?

[13] **A.** The exact whom I was employed by, I am not quite
[14] sure.

[15] **Q.** Okay. Do you know -- I assume that you have, with
[16] Tidewater, somewhere, a personnel file. I don't know if you
[17] know whether you do or not. I assume you know.

[18] **A.** Yes, sir.

[19] **Q.** Do you know where that would be located?

[20] **A.** I am not sure.

[21] **Q.** Okay. If you had a question about your employment
[22] status, say your check was the wrong amount, who would you
[23] call?

[24] **A.** I would call the Malongo office of Tidewater. It's
[25] called Sonatide.

---

Page 38

[1] **Q.** Okay. And do you know how they would find out?
[2] What's at the Malongo office?

[3] **A.** It's the operations manager that I work for. Port
[4] captains, port engineers, a few administrative personnel.

[5] **Q.** Okay. What's the operations manager that you
[6] currently work for? What's his name?

[7] **A.** Shawn Nicholson.

[8] **Q.** Do you know where he's from?

[9] **A.** I believe he's presently living in Thailand.

[10] **Q.** Okay. But do you know where he's from?

[11] **A.** From? Someplace in the south. I'm not really
[12] sure.

[13] **Q.** Okay.

[14] **A.** Of the United States, by the way.

[15] **Q.** We people that don't get out of the country much
[16] assume that.

[17] **A.** Well --

[18] **Q.** It's a bad assumption.

[19] Okay. Do you know who he would check with if there
[20] were a problem with your check?

[21] **A.** No, sir.

[22] **Q.** Okay. Do you know where your checks are issued?

[23] **A.** I'm not really sure.

[24] **Q.** Okay. Since the merger of Tidewater, have they come
[25] from the same place, or has that changed through time?

---

Page 39

[1] **A.** I'm not really sure.

[2] **Q.** Okay. Do you -- you spent a lot of time -- we
[3] haven't got into that.

[4] On average, how much time do you spend out of the
[5] country?

[6] **A.** Three to four months at a stretch, and then usually
[7] home a month to month and a half.

[8] **Q.** Okay. And does Tidewater pay your expenses to go to
[9] the site, or do you pay to go?

[10] **A.** Tidewater pays, Ron.

[11] **Q.** Okay. Did Tidewater ever issue you either -- well,
[12] 1099s?

[13] **A.** 1099?

[14] **Q.** Which is a form for an independent contractor saying
[15] we paid you "X" number of dollars.

[16] **A.** I don't believe, but I'm not sure.

[17] **Q.** Okay. Are you paid monthly, or biweekly, or --

[18] **A.** No. I'm paid twice a month. Bimonthly.

[19] **Q.** Okay. If you're on the ship, off of Angola, let's
[20] say, where does your check go? Does it go to you, or does it
[21] go to your home?

[22] **A.** It goes to my home here in Kentucky.

[23] **Q.** Okay. And I assume you have arrangements made with
[24] the bank, power of attorney, or whatever, to where your wife
[25] can then cash that or deposit it, or whatever?

---

Page 40

[1] **A.** Yes, sir.

[2] **Q.** Okay. So, is it -- so, generally, or at least
[3] often, you don't actually see the physical check that you get.
[4] You just know that they paid you.

[5] Is that true?

[6] **A.** That is true. My --

[7] **Q.** Okay.

[8] **A.** My wife handles the checks.

[9] **Q.** Let me kind of break off and go back to -- to an
[10] issue that I want to try to work out in terms of where your
[11] residence has been through time.

[12] We've established that you lived in Massachusetts
[13] through high school, you lived in Massachusetts through the
[14] maritime academy.

[15] Let me ask you: When did you get married?

[16] **A.** 1980.

[17] **Q.** Okay. Prior to that, was your residence anywhere
[18] than in Massachusetts?

[19] **A.** No.

[20] **Q.** Okay. When you -- and I take it you've been married
[21] once?

[22] **A.** That's correct.

[23] **Q.** Do you have children?

[24] **A.** No.

[25] **Q.** Okay. After you got married, where was your initial

---

---

**Page 41**

[1] residence? And by "residence," I just mean your regular
[2] dwelling. I don't want to get anything legal about it.
[3]    A. Ashland, Massachusetts.
[4]    Q. That doesn't ring a bell.
[5]      Is that in western Massachusetts, or is that --
[6]    A. Let's see, where is Ashland? It's -- you know where
[7] Framingham is?
[8]    Q. Yeah. Okay.
[9]    A. Okay. It's one town over from Framingham.
[10]    Q. Okay. And how long did you live there?
[11]    A. I'm not really sure.
[12]    Q. Okay. Is it while you lived there that you came in
[13] contact with Mr. Birkholz?
[14]    A. My wife made the initial contact with
[15] Mr. Birkholz.
[16]    Q. Okay. But was that while you lived there in
[17] Ashland?
[18]    A. Yes, it was.
[19]    Q. Because I'll have to tell you, it's not common to
[20] find folks in Kentucky with an accountant in Framingham,
[21] Massachusetts. So, I'm interested in how you came to -- I'm
[22] not saying it's wrong. I'm just saying it's unusual.
[23]    A. Okay.
[24]    Q. Okay. And you don't recall when you -- when you
[25] moved from Ashland or how long you were there, but where did

**Page 42**

[1] you go next in terms of your residence?
[2]    A. We went to New Jersey.
[3]    Q. Okay. Do you recall about when that was?
[4]    A. No. Not really.
[5]    Q. Okay. Was that in the '80s?
[6]      We can probably -- the tax returns may help you with
[7] that when we get to them.
[8]    A. I couldn't give you a date.
[9]    Q. Okay. And how long did you live in New Jersey?
[10]    A. Roughly, a decade.
[11]    Q. Okay. Did you live in the same place in
[12] New Jersey?
[13]    A. Yes, Ron.
[14]    Q. And during that period of time, you maintained your
[15] relationship with Mr. Birkholz?
[16]    A. Yes, Ron.
[17]    Q. Okay. And then did you move from New Jersey to
[18] Kentucky?
[19]    A. Yes, Ron.
[20]    Q. Okay. What prompted you to move to Kentucky?
[21]    A. The area was very nice. We loved the area. And my
[22] wife wanted to get involved in the equestrian art business.
[23] This is a very good location for that.
[24]    Q. That's true. She's probably looking forward to
[25] this -- I forget now what it's called that's coming up and

**Page 43**

[1] Lexington landed. The --
[2]     **MS. WEYLAND:** World games.
[3]     **MR. GREEN:** World games?
[4] **BY MR. GREEN:**
[5]    Q. Have you vacationed here before that or --
[6]    A. No, sir.
[7]    Q. Did you know people from here? How did --
[8]    A. No, sir.
[9]    Q. I mean, how did it get on your radar screen, I
[10] guess?
[11]    A. My wife was the first to suggest it. She brought me
[12] down here. We looked at a property. We purchased it.
[13]    Q. Okay. Do you recall when that was?
[14]    A. Roughly, mid '90s.
[15]    Q. And your residence has been the same since you moved
[16] to Kentucky?
[17]    A. Yes, Ron.
[18]    Q. Okay. And we've talked some about what you do, but
[19] your wife is an artist; is that --
[20]    A. Yes, Ron.
[21]    Q. Okay. And self-employed?
[22]    A. Yes, Ron.
[23]    Q. Okay. What -- what prompted you to move to
[24] New Jersey? Do you recall, from Massachusetts?
[25]      Having lived in Massachusetts, I don't see that as a

**Page 44**

[1] step up, but, you know, I don't understand New Jersey.
[2]    A. My wife was interested in doing book jacket
[3] illustration, and living close to New York City was a
[4] prerequisite to doing that sort of work.
[5]    Q. Okay. So, the real attraction was New York City,
[6] not New Jersey.
[7]      That's just a place to live near New York?
[8]    A. That's right, Ron.
[9]     **MR. GREEN:** Okay. Let's -- it's been just about an
[10] hour. Let's take about five minutes, and then I want to start
[11] in on your -- some of the documents and stuff.
[12]     **MR. ROYCE:** Okay.
[13]     (There was a brief recess.)
[14] **BY MR. GREEN:**
[15]    Q. It may turn out that an awful lot of my questions
[16] are going to end up more appropriately directed to your wife,
[17] depending on how you answer these, but I need to still go
[18] through the process of finding out what you know or don't
[19] know. So, if this becomes tedious sounding, it's -- there's a
[20] purpose to it.
[21]      I'm not doing it just to keep you here, okay?
[22]      But I do need to know what you know and what you
[23] recall about your -- how you first became involved with
[24] Mr. Birkholz and when you think that might have been.
[25]    A. My wife made the initial contact.

---

Page 45

[1]    Q.   Okay.

[2]    A.   And the time frame, I could not give you an idea of

[3]  that.

[4]    Q.   Yeah.  I understand that.

[5]         Can you tell me if you lived in Massachusetts at the

[6]  time the initial contact was made?

[7]    A.   That's correct.

[8]    Q.   Okay.  Do you recall whether Mr. Birkholz provided

[9]  any services while you still lived in Massachusetts?

[10]   A.   Yes, he did.

[11]   Q.   Okay.  The reason I ask is:  The -- and this only

[12]  reflects, of course, things that he still has records of.

[13]        In the documents that we produced, the earliest tax

[14]  return that I have is for 1998.

[15]        Did he do returns before that for you and your wife,

[16]  or am I wrong --

[17]        MR. ROYCE:  '98?

[18]        MR. GREEN:  '88.  '88.

[19]        Did I say '98?

[20]        MR. ROYCE:  Yeah.

[21]        THE WITNESS:  Yes, you did.

[22]  BY MR. GREEN:

[23]   Q.   I looked at '88 and said '98.  I apologize.

[24]   A.   I'm not sure.

[25]   Q.   Okay.  At that time, you were living in New Jersey,

Page 46

[1]  is the reason I was asking.  So, I'm just trying to get a feel

[2]  for -- I mean, it's been -- that's -- that, by itself, is

[3]  quite a while ago, so it wouldn't surprise me if somebody just

[4]  didn't have records.  I'm just wanting to know if there might

[5]  be more out there.

[6]        But in 1988, when the returns were filed, this

[7]  showed you and your wife as living at Road Number 6, Box 341A,

[8]  Newton, New Jersey.

[9]        Does that sound like the residence you had in

[10]  New Jersey?

[11]   A.   Yes, it does.  Yes.

[12]   Q.   Okay.  And it also shows her as an illustrator.

[13]        So, at that point, she was working, as you described

[14]  earlier, in terms of her desire to become involved with doing

[15]  book jackets and so forth; is that correct?

[16]   A.   Yes.  That sounds correct.

[17]   Q.   Okay.  Now, I only brought one copy of these.  I

[18]  think, for obvious reasons, but I want to show you what -- let

[19]  me, first of all:  The -- the 1988 tax return information that

[20]  was provided by Mr. Birkholz is PB912 through PB967.

[21]        And I want to show you, and I'll show your attorney

[22]  first, the Schedule C from that return.

[23]        MR. ROYCE:  Give me just a second, Ron.

[24]        Off the record.

[25]        (There was a brief recess.)

Page 47

[1]  BY MR. GREEN:

[2]    Q.   Now, I'm not even going to ask you if you remember

[3]  this because it was too long ago, but I'm kind of curious.

[4]         This shows -- shows you as a self-employed mariner

[5]  and gives the business address as -- I can't read that from

[6]  here, but it's not the United States.

[7]    A.   Uh-huh.

[8]    Q.   At that point in time, were you working for Zapata

[9]  or for Tidewater?  Do you know?

[10]   A.   I'm not really sure what that was.

[11]        I'm not really sure.  You know, that's somewhere in

[12]  that '80s area when the changeover took place, so --

[13]   Q.   Okay.

[14]   A.   I'm not really sure what -- whether that would have

[15]  been Zapata or Zapata Gulf Marine Service or Tidewater at the

[16]  time.

[17]        MR. ROYCE:  We're looking at PB915.

[18]        MR. GREEN:  Yes.  I appreciate that.

[19]  BY MR. GREEN:

[20]   Q.   Now, in that general time frame, and, again, I don't

[21]  expect you to remember 1988 to be precise, but the general

[22]  time frame, were you making estimated tax payments at that

[23]  time, quarterly?

[24]   A.   Yes.

[25]   Q.   Okay.  Was there ever a time when you -- well,

Page 48

[1]  after -- after beginning with Zapata, was there ever a time

[2]  when you did not make quarterly payments, where they withheld

[3]  taxes?

[4]    A.   I believe Zapata withheld taxes.

[5]    Q.   And then Tidewater didn't?

[6]    A.   And Tidewater didn't.

[7]    Q.   Okay.  Would that help us, then, that perhaps the

[8]  Tidewater merger had happened sometime before tax year 1988?

[9]    A.   Yes.  That would be a good assumption.

[10]   Q.   Okay.  Tell me how -- from the standpoint of your

[11]  position, how -- how did that change occur?

[12]        What did they tell you to trigger you to go from

[13]  being an employee with taxes withheld to a person who had to

[14]  pay estimated and calculate your taxes as self-employed?

[15]   A.   They just told us they weren't going to take any

[16]  money out of our pay for taxes.

[17]   Q.   Okay.

[18]   A.   After the changeover.

[19]   Q.   And I mean, how did they do that?

[20]        Did they send out a memo, or was it a --

[21]   A.   I don't remember exactly.

[22]   Q.   Okay.  Do you recall if you shared that -- if it was

[23]  in writing, assuming it was in writing, do you recall if you

[24]  shared that with Mr. Birkholz?

[25]   A.   I recall that we went to a meeting to discuss the

Richard Weyand v. Jennifer Weyand v.
Peter Birkholz and Birkholz & Company
June 26, 2006

**Page 49**

[1] new tax situation with Mr. Birkholz.

[2]    Q.   Okay.

[3]    A.   And I explained what they were doing, and that's --
[4] that's as far as -- that's -- that was my part.  You know, I
[5] just went to him and said, "What do we do now?"

[6]    Q.   Okay.  Tell me -- tell me what you explained to him
[7] they were doing.

[8]         How -- as best you remember.

[9]    A.   Okay.  I told him I was working in Nigeria at the
[10] time, and they weren't taking taxes out.  "What are we going
[11] to do now, Peter?" sort of thing.

[12]    Q.   Okay.  And then what did he tell you?

[13]    A.   Well, I'm not really remembering exactly what the
[14] conversation was, but the outcome of it was, we were filing
[15] the Schedule C forms after that.

[16]    Q.   Okay.  Now, once that started, how did you -- what
[17] did you give him to show how much you had earned so he would
[18] know the numbers?

[19]    A.   Spreadsheet.

[20]    Q.   Okay.  Is that something that your wife prepared?

[21]    A.   I would do the spreadsheets annually.

[22]    Q.   Okay.  And where did you get the information as to
[23] how much they had paid you?

[24]    A.   The payroll stubs that are -- they're around
[25] someplace.  We've got them, I believe.

**Page 50**

[1]    MR. GREEN:  Was that in the -- that's in the -- that
[2] stack of documents?

[3]    MR. ROYCE:  I assume it's in that stack.  It was in
[4] the production documents.  It was that notebook.

[5]    MR. GREEN:  The ledger?  Or the checkbook?

[6]    MR. ROYCE:  No.  It was that binder that had all of
[7] the payroll stubs in it.  You -- you've reviewed it, and I
[8] think you had it produced.

[9]    MR. GREEN:  Yeah.  Okay.

[10] BY MR. GREEN:

[11]    Q.   Well -- so, you're talking about the stubs that came
[12] with your checks?

[13]    A.   That's correct.

[14]    Q.   Okay.  At the end of the year, Tidewater didn't send
[15] you a thing saying, we have paid you "X" number of dollars?

[16]    A.   You mean W-2?

[17]    Q.   It would actually be a 1099.

[18]    A.   No.

[19]    Q.   Okay.  Did they send you any kind of -- well, let me
[20] jump out of my order here just for a second.  I think it's at
[21] the very top.

[22]        I did see, and this may be what you're referring to,
[23] for some years, a statement, and I'm going to show you W3.
[24] This is Bates stamp numbered W3, not tax form W-3.  But let me
[25] show you a W3 as an example.

**Page 51**

[1]        At some point, did you begin getting those from
[2] Tidewater?

[3]    A.   Tidewater would send me these, yes.

[4]    Q.   Okay.  Was that true for the entire time, or just
[5] more in the '90s?

[6]    A.   Sometimes I wouldn't see these.

[7]    Q.   Okay.

[8]    A.   And I don't recall if I was getting these things the
[9] whole time, but I did receive these sometimes.

[10]    Q.   Now, you would -- you would -- whether you
[11] calculated -- well, let me ask you this:  When you did get
[12] these, did you use this as the number for your spreadsheet?

[13]    A.   No.  What I would do is, I would calculate from my
[14] payroll stubs what they paid me and then compare it to this.

[15]    Q.   Okay.  Did it -- do you recall it ever being
[16] different?

[17]    A.   No.  I cannot recall that.

[18]    Q.   Okay.  And then whether you received one of these or
[19] whether you had to rely entirely on your payroll stubs, what
[20] you would send Mr. Birkholz was your spreadsheet, correct?

[21]    A.   Yes.

[22]    Q.   And it would set forth on there the income?

[23]    A.   Yes, sir.

[24]    Q.   I mean, you wouldn't forward him a copy of things
[25] like W3?

**Page 52**

[1]    A.   I don't believe I did.

[2]    Q.   Okay.  And through this entire period of time that
[3] you were with Tidewater, it's your testimony they did not send
[4] you 1099s.  So, I was going to show you some documents where
[5] he would send something, and one of the things it asked for is
[6] 1099s and things like that.

[7]    A.   Uh-huh.

[8]    Q.   If I can accelerate this a little bit, I assume
[9] your -- your response to my questions about those are going to
[10] be, you didn't send 1099s because you weren't sent 1099s.

[11]        Does that sum that up?

[12]    A.   I had no 1099s to send.

[13]    Q.   Okay.  And so, what you sent was your spreadsheet,
[14] which had -- did your spreadsheets contain information about
[15] just your situation, or did they also include your wife's
[16] business?

[17]        Is that separate?

[18]    A.   They contained all of our financial information.

[19]    Q.   Okay.

[20]    MR. ROYCE:  Ron, I -- I don't -- I'm going to
[21] interpose this even though I hate to interject.

[22]        He's talking about doing these spreadsheets, and you
[23] are talking about it, and I think you're talking about the
[24] time frame all the way back to '88.

[25]        Before we keep doing that over and over and over,

Page 53

[1] you may want to clarify whether he's done the spreadsheets all
[2] the way back to '88. I don't know the answer to that. I
[3] think the answer --
[4]     MR. GREEN: I have no problem with clarifying.
[5]     You don't have to worry about it. This isn't one of
[6] those --
[7]     MR. ROYCE: I know. I just -- I don't want there to
[8] be a misunderstanding because of the time period you're
[9] talking about.
[10]    MR. GREEN: Yeah. And that is a good question based
[11] on something I remember Pete telling me.
[12] BY MR. GREEN:
[13]    Q. And I know you're not going to remember the year,
[14] but I'm kind of told that -- that there was a point at which
[15] you kind of went computerized, you and your wife did, and
[16] these spreadsheets started.
[17]    A. Yes.
[18]    Q. Can you give me a rough idea of when that was?
[19]        Is that as far back as '88, or was that even before
[20] Tidewater?
[21]    A. I couldn't -- I couldn't tell you because I've been
[22] operating with computers for a very long time. So, I'm not
[23] really sure when I started doing the spreadsheets.
[24]        The reason I gave him spreadsheets was because he
[25] felt that it was an easy format for him to be able to work

Page 54

[1] with. It was a matter of convenience between myself and
[2] Mr. Birkholz.
[3]    Q. Okay. Do you recall if -- and I'll tell you what
[4] I'll do here is, I will show you the entire set of documents
[5] that we described earlier as being PB912 to PB967, which I'll
[6] represent to you was given to me by Mr. Birkholz as his file
[7] for that year.
[8]        Just glance through those real quick and see if
[9] anything in there appears to be what you would call a
[10] spreadsheet that you prepared.
[11]    A. Okay. PB945 -- 44, 45, 46, and 47 appear to be
[12] printed out copies of a spreadsheet as I had made at that
[13] time. It appears to be the type of thing that I would have
[14] done.
[15]    Q. Okay. And so, it appears that, at least as of '88,
[16] you were sending your information to Mr. Birkholz in the form
[17] of the spreadsheet?
[18]    A. An electronic spreadsheet, yes, sir.
[19]    Q. Okay. Did you print that out and mail it to him
[20] or -- in '88? Gosh.
[21]    MR. ROYCE: Al Gore hadn't invented the Internet yet
[22] at that point, Ron.
[23]    MR. GREEN: Well, yeah. But some other people had
[24] invented something close to it, but you had to be pretty
[25] clever to know how to use it. CompuServe may have started

Page 55

[1] about then.
[2]    THE WITNESS: My recollection would be, I would have
[3] sent it on a disk, mailed it or delivered it in person on a
[4] disk.
[5] BY MR. GREEN:
[6]    Q. Okay. Would you -- and I want to talk about the
[7] early stages of this.
[8]        At this point, you're -- you're -- he's in
[9] Massachusetts, and you're in New Jersey.
[10]        Would you, once a year, visit personally about your
[11] taxes, or were there -- were there -- would a lot of this be
[12] done by phone, mail and, as you mentioned, on a disk?
[13]    A. I couldn't say that we went up regularly, but we
[14] have seen Mr. Birkholz on occasion.
[15]    Q. Okay.
[16]    A. Because we have relations and friends in
[17] Massachusetts that we go up. And if we went up there, we
[18] would see Mr. Birkholz if there was a need.
[19]    Q. Okay. I'm going to show you now documents PB869
[20] through PB911, and I'll represent to you that that's -- this
[21] is his file for 1989.
[22]        And I'll specifically keep separate something
[23] beginning on 892, and ask you if that's the same kind of
[24] spreadsheet, or appears to be to you.
[25]        And if you would, if you would hand me that one

Page 56

[1] page, I think that goes in the other stack.
[2]    A. Yes, it does.
[3]        PB892 through 895 appears to be another paper copy
[4] of an electronic spreadsheet that I would give Peter.
[5]    Q. Okay. And I'm -- off the record just for a second.
[6]        (There was a brief recess.)
[7] BY MR. GREEN:
[8]    Q. You may need that just for a few minutes.
[9]        Look at 869, and do you have any reason to doubt
[10] that that's the transmittal letter that you would have made
[11] that year?
[12]    A. That looks like something I would write.
[13]    Q. Okay.
[14]    A. Probably did, because it's got my signature.
[15]    Q. And that does appear to be your signature?
[16]    A. Yep.
[17]    Q. Okay. There is a comment here. It says you put
[18] some things on some of the forms, and that's no big deal. It
[19] says, "The spreadsheet will have to be amended for 1990, as
[20] you have recommended."
[21]        Do you recall what that would have referred to?
[22]    A. Sorry. No.
[23]    Q. Okay. It's possible there will be something in the
[24] '90 documents that will jog your memory.
[25]        And then, again, and I think this is probably true

Page 57

[1] going forward, then, your income was treated as
[2] self-employment, self-employed -- self-employed business
[3] income?
[4]   A.  I believe that's the way -- the way they were
[5] handling it.
[6]   Q.  Okay.  You've looked at what he says is in his file.
[7]       Do you have any reason to believe that there were
[8] other documents that you sent to him that are not in that
[9] file?
[10]   A.  I'm not sure.
[11]   Q.  Okay.  But, I mean, is there anything that pops out
[12] at you, like, no, I'm sure I would have sent something else?
[13] Anything like that?
[14]       I understand you don't have a direct memory.
[15]       I'm just saying, as we sit here, did you see -- did
[16] you feel like something was missing that you would have
[17] normally sent?
[18]       Just so we're clear, if we come across a letter
[19] that's in -- you know, in the time frame, we're not going to
[20] say, well, you fibbed or anything.  I just want to know if
[21] looking at it, it looks -- you have any reason to think there
[22] was more being discussed.
[23]   A.  To the best of my knowledge, I can't see anything
[24] that's missing.
[25]   Q.  Okay.  Now, if you'll look with me at 885, it's a

Page 58

[1] form called a 2555, or 2555.
[2]   A.  885, foreign earned income?
[3]   Q.  Yes.  And it's a 1988 form.  And it's in the '89
[4] file, but I noticed that the '88 file has an '87 form, so
[5] maybe that's the way it's supposed to be.
[6]       But do you recall any conversations at this point in
[7] time with Peter about this particular form and what it was
[8] about and so forth?
[9]   A.  About the only thing that I can remember about
[10] this -- this form, and not this year, but generally he was
[11] always concerned about arrival and departure dates from the
[12] United States.
[13]   Q.  Okay.
[14]   A.  But other than that, I can't think of anything
[15] specific that he was asking about.
[16]   Q.  If you'll look at -- just a -- it's kind of -- you
[17] see how it's kind of broken into two parts?
[18]       Above the Part 1 there --
[19]   A.  Uh-huh.
[20]   Q.  -- where it says "complete either," it says, list
[21] your tax -- well, I can't read my computer version very
[22] good -- "List your tax home, or homes, during your tax year
[23] and dates established," and it shows "1 Swamp Road, Warri,
[24] Nigeria."  I assume that's May 16th, '85, to present.
[25]   A.  Uh-huh.

Page 59

[1]   Q.  Was there any time when your wife was with you in
[2] Nigeria?
[3]   A.  No.
[4]   Q.  Okay.  So, this is a -- this is a place -- this is
[5] where you were staying?  You had an apartment or something --
[6]   A.  No.
[7]   Q.  -- in Nigeria?
[8]   A.  No.
[9]   Q.  What is this address?
[10]   A.  I had a foreign residence permit.
[11]   Q.  Okay.
[12]   A.  And the address on the foreign residence permit was
[13] 1 Swamp Road.
[14]   Q.  Okay.
[15]   A.  Any American that worked in Nigeria had to have a
[16] foreign residence.
[17]   Q.  Okay.
[18]   A.  So, that was the -- the address on the permit.
[19]   Q.  Okay.
[20]   A.  It was a legal requirement.
[21]   Q.  If you'll look under Part 1, and this is what I
[22] understand to be the test for whether you can use the
[23] residence.  It has checked "quarters furnished by employer."
[24]       Was at that address a -- was there at that address a
[25] residence that you stayed at?

Page 60

[1]   A.  No.  I didn't stay there.
[2]   Q.  Okay.
[3]   A.  But that's where the staff that worked the shore did
[4] stay.
[5]   Q.  Okay.
[6]   A.  It was a compound.
[7]   Q.  If I can have those back, I'll swap you.
[8]   A.  Okay.
[9]   Q.  I'll give you what -- well, let me -- let me tell
[10] her what they -- I'm sorry.
[11]       This is PB804 through PB868, which I'll kind of
[12] represent to be a copy of Mr. Birkholz's file for the 1990 tax
[13] year.
[14]       And let's start with:  Can you see if you can
[15] identify any kind of spreadsheet, or so forth, that he
[16] provided for that tax year?
[17]   A.  I do not see a copy of the electronic spreadsheet in
[18] this series of documents.
[19]   Q.  Okay.  Do you believe that you would have sent one
[20] for 1990, or would you have had, from time to time, a
[21] different method of transmitting financial information?
[22]   A.  Normally, I always sent one.  But to be perfectly
[23] honest with you, I couldn't say if I did send one or not.
[24]   Q.  Well, and I can't tell you --
[25]   A.  I have no recollection.

Page 61

[1]   Q.  I can't tell you that there's not one in your
[2] documents.  I'm just -- this is just his file, so --
[3]   A.  Yeah.  I have no recollection of that particular
[4] year sending one.
[5]   Q.  Okay.  Well, I'm going to ask you a question or two
[6] about the 2555 again.  It's in that same stack, but it's
[7] PB814, and I'll open this to it for your convenience.
[8]       And this is for the year '90.  It shows the name of
[9] employer as Zapata Marine Service --
[10]   A.  Nigeria, Limited.
[11]   Q.  -- Nigeria, Limited.
[12]       Is this a subsidiary of Zapata gulf and marine,
[13] or --
[14]   A.  It's a joint venture company.
[15]   Q.  Okay.  Had your -- had your employment changed
[16] between '89 and '90?
[17]   A.  No.  The way a joint venture company works, it's an
[18] independent entity that exists under the law of the country in
[19] which it's in -- i.e., Nigeria, okay?
[20]       You can't just dissolve these companies at the drop
[21] of a hat, because under Nigerian law, sometimes it's difficult
[22] to do these things.
[23]       I'm not familiar with the ins and outs of law, or
[24] even -- or anything about the Nigerian law, but the way that
[25] it was explained to me was, it was an independent entity in

Page 62

[1] itself, so --
[2]   Q.  Okay.
[3]   A.  And that was what my residence permit was listed as.
[4] So, in order to not mix things up with the residence permit,
[5] for justification for my overseas employment, I had to use the
[6] same name that was on the residence permit.
[7]   Q.  Okay.  But -- but it's a different name, if I'm not
[8] mistaken, than was used previously.  And that's what I'm --
[9] I'm just trying to see what changed, if anything, or if this
[10] is a bookkeeping thing.
[11]   A.  I think it was probably sloppy bookkeeping on my
[12] part.
[13]   Q.  Well, I wouldn't be so quick to blame yourself.  It
[14] might have been Zapata.
[15]   A.  Well, no.  It's me.  I -- I'm lackadaisical about
[16] these things sometimes.  I'm not the neatest person in the
[17] world.
[18]   Q.  Okay.  Do you think, then, that -- that the prior --
[19] previously, and I'll go back and show you, for example, '88,
[20] it shows Zapata Gulf Marine Corp., which you had previously
[21] indicated was -- had, at one point, changed to that, your
[22] employment had changed to that.
[23]       And then in '90, which is two years later, I'm not
[24] sure where '89 is, it shows Zapata Marine Service, Nigeria,
[25] which you've already said was a joint venture and a separate

Page 63

[1] entity.
[2]   A.  As far as how your check was made out, any of that
[3] kind of stuff, did any of your stuff change between those two,
[4] or was that just a matter of the title put on the --
[5]   A.  I couldn't -- I couldn't actually tell you.  I'm not
[6] sure.
[7]   Q.  Okay.  But there wasn't a time where you just -- you
[8] went and was actually terminated from one and re-employed with
[9] another entity?
[10]   A.  No.
[11]   Q.  Okay.  This is just the best information you were
[12] given from -- by Zapata?
[13]   A.  Well, there's so many names that fly around
[14] overseas, you -- every ship is a different company.
[15]   Q.  Okay.
[16]   A.  And so --
[17]   Q.  Well, there's zillions of names that fly around in
[18] these documents, so I sympathize with that.
[19]   A.  I -- I -- it's a mind-boggling maze.
[20]   Q.  Okay.
[21]   A.  So, if I put one name down one time, and another
[22] name down the other time, I could probably sit here and
[23] justify it to you for half an hour.
[24]   Q.  Okay.  Well, I'm not so much --
[25]   A.  I don't want to.

Page 64

[1]   Q.  I'm not so much worried about which one is correct,
[2] if at all, I'm just wanting to know if anything dramatic
[3] changed --
[4]   A.  No, sir.
[5]   Q.  -- to cause that.  Okay.
[6]       And the last couple we've looked at involved
[7] extensions and so forth.
[8]       Was that pretty normal to at least go the first
[9] extension and sometimes the August to October extension?
[10]   A.  Yes, sir.
[11]   Q.  Is that because you were out of town -- or, out of
[12] the country so much or --
[13]   A.  Certainly.
[14]   Q.  Okay.  And from time to time, there would be
[15] penalties, and I think this may be one of those times --
[16] penalties and interest where the extensions, the right amount
[17] hadn't been paid.
[18]       I take it -- I mean, do you fault Mr. Birkholz for
[19] any of those situations?
[20]       MR. ROYCE:  Repeat the question, please.
[21]       MR. GREEN:  Yeah.  I'll be clearer.
[22] BY MR. GREEN:
[23]   Q.  In the packet for 1990, for example, there were some
[24] penalties and interest assessed for -- because the full amount
[25] hadn't been paid even though there was an extension.  And as

Page 65

[1] you know, you got to pay at the certain time. The extension
[2] is just to file the return.
[3]      And I'm just wondering if part of your claim relates
[4] in any way to those kinds of assessments where you paid
[5] late?
[6]      MR. ROYCE: I'll -- let me answer for him, Ron.
[7]      We're not -- if there was an amount due that accrued
[8] interest or penalty that was due because the Weylands didn't
[9] file something on time or didn't provide Mr. Birkholz
[10] something on time, we're not laying that liability at his
[11] feet.
[12]      MR. GREEN: Okay. Yeah. That's all my question is.
[13] And if there's something else, then there's something else,
[14] but -- okay.
[15]      MR. ROYCE: Is that a fair characterization?
[16]      THE WITNESS: Yeah. I think that would be
[17] reasonable.
[18]      MR. GREEN: Well, off the record.
[19]      (There was a brief recess.)
[20]      MR. ROYCE: Let me clarify further.
[21]      To the extent that there was a penalty incurred on
[22] an amount that we say never should have been paid to begin
[23] with, then I guess that would also be a part of the claim.
[24]      MR. GREEN: Yeah. That's not what I'm talking
[25] about.

Page 66

[1]      MR. ROYCE: I understand you're not, but I think
[2] that -- that clarification is --
[3]      MR. GREEN: Yeah. And I can be more specific.
[4]      If you look in this 1990 packet, there's a notice, a
[5] notice of adjustment, for example, from the state of
[6] New Jersey, that makes an adjustment for interest for failure
[7] to pay all or part of any required estimated tax payments on a
[8] timely basis. And it makes changes.
[9]      And then there's -- if you look at the other
[10] documents, there's -- that's ultimately resolved. It's that
[11] kind of thing specifically that I'm referring to. I mean --
[12]      MR. ROYCE: We're on the same page.
[13]      MR. GREEN: Okay. Very good.
[14] BY MR. GREEN:
[15]      Q. The 1991 file, Mr. Birkholz, is PB761 through 803,
[16] and I'll ask you to just kind of skim through this again and
[17] if you can identify what you might have provided him
[18] information wise.
[19]      And if there's something you think is glaringly
[20] missing from the file that you think you submitted, if you
[21] would let me know what that might have been.
[22]      This is year -- I wasn't sure which one. If you
[23] look at 771, that may help you.
[24]      A. 771?
[25]      Q. Right. Which is a little bit of a letter.

Page 67

[1]      MR. ROYCE: There you go. Right there.
[2]      THE WITNESS: Yeah. It looks like something that I
[3] wrote. It has my signature on it.
[4] BY MR. GREEN:
[5]      Q. So -- so, that may help you.
[6]      The form of -- and so, what I need to know, to the
[7] extent you can, is if you can identify what it was you
[8] provided him versus what he prepared --
[9]      A. Well, that was --
[10]      Q. -- with the understanding that it's going to be a
[11] different form than we had.
[12]      A. I believe that was one year that I tried using a
[13] computerized tax return form.
[14]      Q. Yeah. That's what I read from the --
[15]      A. Never do that again.
[16]      Q. Can you identify them?
[17]      A. No. Sorry.
[18]      Q. Okay. But they would have been in the form of the
[19] actual tax returns from your computer program, if that's the
[20] right year?
[21]      A. I'm not really sure of whether that was the year or
[22] not. The letter would indicate that it was, but I can't sit
[23] here and testify under oath that it --
[24]      Q. Okay. Let me -- let me just change the parameters a
[25] little bit. Let's forget about which year it was.

Page 68

[1]      But the year that you did that, instead of a
[2] spreadsheet, I take it, with this tax program, you would have
[3] plugged in some numbers, and it would have printed it out in
[4] the form of a tax form. It just wouldn't have been executed
[5] and final.
[6]      Is that right?
[7]      A. That's --
[8]      Q. Whatever year that was?
[9]      A. Best of my recollection, yeah, that's -- that's --
[10] that's what it was. And I -- it was -- it was a total
[11] fiasco that year, as far as I'm concerned. I went back to the
[12] spreadsheet after that, I believe. I'm not really sure.
[13]      Q. Okay. We'll find out in a second.
[14]      A. One or two years. But it had less than favorable
[15] results, if I remember correctly, with both myself and
[16] Peter.
[17]      Q. Okay. But I just want to make sure --
[18]      A. He wanted the spreadsheet.
[19]      Q. But I just want to make sure that whatever year that
[20] was, what we're going to see is, in lieu of a spreadsheet,
[21] things in the form of tax returns but not executed.
[22]      A. Yes.
[23]      Q. It would be typewritten and not handwritten,
[24] correct? The machine would have done all that?
[25]      A. Yeah. I believe so.

Case 5:05-cv-00375-JBC    Document 29-16    Filed 01/15/2007    Page 19 of 39
Richard Weyland & Jennifer Weyland v.
Peter Birkholz and Birkholz & Company

June 26, 2006

Page 69

[1] **Q.** Okay.

[2] **A.** Unless there was amendments made later on.

[3] **Q.** Okay.

[4] **A.** I don't know.

[5] **Q.** And --

[6] **A.** I don't remember.

[7] **Q.** -- and leaving aside that you may have had something
[8] that he doesn't have, you didn't see anything like that in
[9] that stack, correct?

[10] **A.** I couldn't identify it, to tell you the truth.

[11] **Q.** Okay. No, no.

[12] Any amendments, any handwritten letters from you, or
[13] anything like that, you didn't see anything in writing that
[14] you had sent him in there changing any numbers?

[15] **A.** No. I did not.

[16] **Q.** Okay. So, if you did, it was oral?

[17] **A.** I believe so, yeah.

[18] **Q.** Okay. I'll go ahead and put those up, and we'll --

[19] **MR. ROYCE:** Off the record.

[20] (There was a brief recess.)

[21] **MR. ROYCE:** Well, on the record.

[22] Just so there's no question, I'm sorry -- Ron, I
[23] don't want to get you off where you are, but I'm looking at
[24] that very first document of that stack that you just had, and
[25] right up at the top of the right of the first page -- Richard,

Page 70

[1] look at what I'm talking about -- it says, "Prepared by
[2] Richard Weyland."

[3] I didn't know if you saw that and wondered if that
[4] might just help while he's got it in front of him.

[5] **MR. GREEN:** It may. I assume that's Peter's
[6] handwriting, so I'm really -- you know, I don't -- at this
[7] point, I wanted to know if there's any --

[8] **THE WITNESS:** It's not my handwriting.

[9] **MR. GREEN:** Yeah.

[10] **MS. WEYLAND:** That's a lousy copy.

[11] **MR. ROYCE:** Yeah.

[12] I'm sorry. I just -- I thought before you went on,
[13] I might point that out.

[14] **MS. WEYLAND:** It's not my handwriting, either.

[15] **MR. GREEN:** Yeah. Because I think that's probably
[16] what's going to turn out to be the ones. I just want to see
[17] if --

[18] **THE WITNESS:** You're right. It's unexecuted,
[19] unsigned. No client stamps on any of this, which Peter puts
[20] on his client copies, so --

[21] **BY MR. GREEN:**

[22] **Q.** So --

[23] **A.** This might -- this might be what I generated, but I
[24] can't --

[25] **Q.** Let me ask you this: Barring some --

Page 71

[1] **A.** I can't say 100 percent.

[2] **Q.** Barring something that pops up that makes us think
[3] otherwise, do you have any reason to think that's not what you
[4] prepared and sent?

[5] **A.** I -- I have no -- no reason to think otherwise.

[6] **Q.** Okay. Perfect. Say, that's as good as you can do
[7] or be asked to do.

[8] We'll next look at what purports to be his file for
[9] '92. For the record, it's PB706 through PB760.

[10] And I'll ask you just to -- let's initially just --
[11] I'll just ask you to take a look through there and see if you
[12] can identify what it was that you provided to him with your
[13] data and information.

[14] And there's a letter, I think, at the top of the
[15] memo. No, no. It may not.

[16] **A.** Okay. Well, the ones that I can say for sure and I
[17] probably provided were PB744, PB743, PB742, PB716. But this
[18] is odd because PB717 looks to be part of the same document
[19] done differently. I'm not really sure what this is or how
[20] this was done. I have no recall what happened there.

[21] PB718 would be something I would have provided.
[22] PB719. I'm not sure about PB732 through 737, but they appear
[23] to be part of a computerized tax program, again.

[24] I may have done that. It looks familiar, but I
[25] can't say for sure.

Page 72

[1] **Q.** Okay. There's several interesting things in this
[2] year that I want to ask you about.

[3] **A.** Uh-huh.

[4] **Q.** And let's go with -- you just mentioned them, and
[5] you've got them right in front of you, so if you would look at
[6] 718 and 719 for a minute.

[7] **A.** Uh-huh.

[8] **Q.** I notice in the documents you produced, there were
[9] some of these where it's like a typewritten statement, and I
[10] think we talked briefly about one minute ago -- at the very
[11] beginning.

[12] But this is the earliest that I think I've seen one,
[13] and there's actually two of them, but this is a typewritten
[14] statement of how much you earned.

[15] These would have been provided to you by your
[16] employer?

[17] **A.** Yes.

[18] **Q.** And what's particularly interesting to me, not
[19] knowing the details on this, is that it splits your not
[20] necessarily in half, but among two different companies.

[21] Is -- is it possible that this is the year that the
[22] merger took place?

[23] **A.** To say for sure, I do not know.

[24] **Q.** Okay. Was there a year where you worked part of the
[25] year for Zapata Gulf Cruise and then the other half for

Page 73

[1]   Tidewater Crewing, Limited?

[2]   A. We're getting into the maze of names again.

[3]   Q. Okay.

[4]   A. Okay? And I am not sure exactly where the paychecks
[5]   came from. What I know is when I was in Nigeria, I was
[6]   working for a company that had a sign outside that said
[7]   "Zapata Nigeria, Limited," when I was in Nigeria.

[8]        When I moved to Angola, the sign outside the office
[9]   said "Tidewater," until a few years ago, when they put up the
[10]  sign that said "Sonatide." But as I found out through the
[11]  various pieces of education I've gotten lately on
[12]  international financing, I'm paid by Tidewater Crewing,
[13]  Limited.

[14]  Q. Okay. And again, '92 is still 14 years ago, so I
[15]  understand that.

[16]  A. Uh-huh.

[17]  Q. I mean, other than the fact that we've got on paper
[18]  two different names, did anything change about your job in
[19]  '92?

[20]  A. No. Not as far as I can recall, no.

[21]  Q. Okay. When you -- when you got these in the mail --
[22]  well, I assume you got them in the mail. They may have handed
[23]  them to you.

[24]       But when you got these, did you ask anybody about
[25]  any of this? In other words, why you were getting things with

Page 74

[1]   two different names on them.

[2]   A. I don't recall asking anybody. That doesn't mean
[3]   that I didn't do it.

[4]   Q. Okay. Now, at -- in '92, would -- maybe it will
[5]   help if we go to your 2555, which I'll give you the Bates
[6]   number of in just a second -- I believe that starts on 727.

[7]   A. 727. 727.

[8]   Q. And this goes back to using Zapata Gulf Marine, and
[9]   we've already talked about that issue.

[10]       But in terms of the foreign address, it still shows
[11]  Nigeria, which is what we've been looking at in the past few
[12]  years.

[13]       Did you, in '92, do you think, work part of the time
[14]  in Nigeria and then part of the time in Angola, or --

[15]  A. '92? To the best of my recollection, I don't
[16]  believe I left Nigeria until '95.

[17]  Q. Okay.

[18]  A. But that could be off by a year or two.

[19]  Q. But you -- so, you don't think that this -- this
[20]  issue of having 718 and 719 with two different names on it,
[21]  has anything to do with physically moving where you were
[22]  working?

[23]  A. I do not believe that I moved, no.

[24]  Q. Okay.

[25]  A. Not that year.

Page 75

[1]   Q. Okay.

[2]   A. I'm almost positive.

[3]   Q. Okay. Now, did you see anything that -- well,
[4]   you've listed the documents that you think you provided, and
[5]   with the exception of the two documents, 718 and 719, they
[6]   didn't seem to have to do specifically with giving information
[7]   to plug into the tax returns.

[8]        So, do you think 718 and 719, unless we find
[9]   something else in your stack, was what you provided that
[10]  year?

[11]  A. One moment.

[12]       MR. ROYCE: What is the question again, Ron? What
[13]  he provided that year?

[14]       MR. GREEN: Yeah. I -- and to put it into context,
[15]  okay, we've -- we've went up to '91 with spreadsheets. In
[16]  '92, we think in '92, based on the letter, that we tried
[17]  the --

[18]       THE WITNESS: Computer program?

[19]       MR. GREEN: -- computer program.

[20]       And I don't really see either in this batch, so I'm
[21]  wondering -- but I do see these two documents, 718 and 719.

[22]  BY MR. GREEN:

[23]  Q. So, I guess I'm wondering just if you have any
[24]  memory or can puzzle out if you provided any other information
[25]  than --

Page 76

[1]   A. I believe -- I'm not 100 percent positive, but I
[2]   believe that this -- that the documents that I mentioned
[3]   earlier, which were the ones with these gray borders -- I
[4]   believe may have been --

[5]   Q. 732 to 37?

[6]   A. 732 to 37. I believe they may have been computer
[7]   program things. And I'm not really sure, but it might have
[8]   been.

[9]   Q. Okay. Yeah. I mean, I think I agree with you, they
[10]  came from a computer program. I'm just not sure if they're an
[11]  accountant's program or the --

[12]       MR. ROYCE: He's not, either.

[13]       THE WITNESS: I'm not sure.

[14]  BY MR. GREEN:

[15]  Q. Okay.

[16]  A. It looks like something that -- that was generated
[17]  that -- it's not something -- I don't believe it's anything
[18]  that Peter generated, but --

[19]  Q. Okay.

[20]  A. But that's -- that may have been the documentation
[21]  that I provided.

[22]  Q. Okay.

[23]  A. I'm not trying to be evasive. I'm just -- I'm just
[24]  not sure.

[25]  Q. Well, your attorney -- neither your attorney nor I

Richard Weyland & Jennifer Weyland
Peter Birkholz and Birkholz & Company

June 26, 2006

Page 77

[1] want you to say you know something you don't know, so --
[2] **A.** Right.
[3] **Q.** -- that's -- don't feel like you're being evasive.
[4] Take a look at the documents that begin with 709
[5] just for a second.
[6] **A.** 709.
[7] **Q.** Towards the front. Maybe the fourth document,
[8] fourth page.
[9] **A.** Got it.
[10] **Q.** Is -- is that your handwriting on that document?
[11] **A.** I don't believe so.
[12] **Q.** Okay. And then you mentioned the -- I'll give you
[13] the number in a second here -- 716 and, I think, 717.
[14] What this looks like to me is, is 717 is a -- a
[15] letter that you wrote to Mr. Birkholz dated May 25, and it
[16] looks like 716, you just reprinted the prior letter along with
[17] some additional stuff.
[18] Does that look right?
[19] **A.** Yes. I believe your summation is correct.
[20] **Q.** Okay. It says here, "The same thing happened to me
[21] last year."
[22] Do you recall what that referred to?
[23] **A.** No, sir.
[24] **Q.** Okay. And there's some correspondence I want to ask
[25] you about. I'll get you the number here in a second.

Page 78

[1] Okay. If you'll look at -- we'll start with 745.
[2] It's a letter asking for some information. And then
[3] I think that you mentioned 744 as one of the documents you
[4] recognized. That appears to me to be a response to that.
[5] So, you might want to look at those two together.
[6] **A.** Uh-huh. Go ahead.
[7] **Q.** Okay. Now, reading between the lines, when -- when
[8] you responded to this, you were not in the United States. You
[9] were working.
[10] Is that right?
[11] **A.** That's impossible to tell where I was, to tell you
[12] the truth.
[13] **Q.** I thought I saw something in your response.
[14] Presently, I'm in the -- if you look in Paragraph 5,
[15] "Presently, I'm in the Cabinda Enclave in west Africa."
[16] **A.** Okay. Yeah.
[17] **Q.** What is the Cabinda Enclave in west Africa? Is that
[18] in Nigeria?
[19] **A.** No. It's a -- it's a strip of land that lies --
[20] well, at the time, it was called Zaire.
[21] **Q.** Okay.
[22] **A.** It lies on the -- on the seacoast of Zaire, but it
[23] was an Enclave that was owned by Angola. It was in the
[24] possession of Angola.
[25] **Q.** Okay. And -- and --

Page 79

[1] **A.** My ship moves -- sales up and down the coast
[2] sometimes.
[3] **Q.** And -- and this is one of the reasons I -- now let
[4] me take you back to 718 and 719.
[5] Since it appears that in -- by '93, you were in an
[6] Enclave that appears to have something to do with Angola, let
[7] me go back and see if that helps you any with respect to
[8] during '92, did you go from Nigeria to Angola.
[9] **A.** My ship moves all over the place.
[10] **Q.** Okay.
[11] **A.** Okay? We're in the transportation business.
[12] Sometimes we went to another port, and then you go back.
[13] **Q.** So, the fact that you were, at this particular
[14] moment, in this Enclave has nothing to do with where you were
[15] based?
[16] **A.** That's correct.
[17] **Q.** So, as far as you know, you were still based in
[18] Nigeria?
[19] **A.** That's correct.
[20] **Q.** Okay. And the first paragraph of your response
[21] talks about the computers -- he had asked you questions about,
[22] you know, why -- you're listing as a mariner. He wanted you
[23] to explain why you needed a computer, and you're explaining in
[24] that paragraph why.
[25] **A.** Yeah.

Page 80

[1] **Q.** One other thing. He notes that your wife had
[2] showed -- shown no income expenses and so forth for that year,
[3] and you indicate that it was a slow year.
[4] Was she active at all that year, or did she take
[5] some time off, or do you recall what was involved with that?
[6] **A.** I don't recall.
[7] **Q.** Okay. The -- you say, "The computer is used for
[8] Tidewater paperwork."
[9] **A.** Uh-huh.
[10] **Q.** And then you talk about that they won't supply you
[11] with one.
[12] Did Zapata supply you with one?
[13] **A.** No.
[14] **Q.** Okay. So, when you say "It was extremely hard to
[15] function without one," you're saying under Zapata?
[16] **A.** Whoever I was working with at the time. I
[17] specifically mention Tidewater here, so evidently I was
[18] working either on a Tidewater-owned vessel or -- or I was
[19] being paid by Tidewater at the time, or I was working for a
[20] subsidiary of Tidewater at the time.
[21] I do not recall exactly, but I'm mentioning
[22] Tidewater here, so obviously I was working under the Tidewater
[23] flag at that time.
[24] **Q.** The reason I bring it up is, is going back to my
[25] question of we've got the two different documents, 718, 719.

Page 81

[1] And again, I'm not trying to trap you. I'm just seeing if
[2] this will help refresh any memories.
[3]       Is it possible that that signal, the change from a
[4] Zapata craft to a Tidewater craft, and that by the time you
[5] got to this, you're working on a Tidewater ship or -- or are
[6] these -- am I just -- these just don't have anything to do
[7] with each other? I'm not sure why we're going from Zapata to
[8] Tidewater. I'm just kind of trying to figure that out.
[9]    **A.** Okay. Let me -- let me explain it this way:
[10] Every -- every boat is an individual company.
[11]    **Q.** Okay.
[12]    **A.** Okay? That's to limit liability and accidents.
[13]    **Q.** Okay.
[14]    **A.** So, if -- if you have a major collision and there's
[15] a major claim, then the company can only be taken for its
[16] assets.
[17]       And if each one of these vessels is worth just
[18] off -- just say, for sake of argument, 5 million dollars, that
[19] would be the liability for the company, okay?
[20]       So, every single one of these boats has papers on
[21] board that names an owner, okay? And then you fly the house
[22] flag for that particular owner. Sometimes I worked on a
[23] Tidewater vessel, which would be, like, Tidewater Panama,
[24] Tidewater Camen Islands, Tidewater you name it. They have
[25] dozens of names. As many names as they have boats.

Page 82

[1]       Same with Zapata. Zapata did the same thing. They
[2] limited their liability. So, instead of changing all of these
[3] hundreds of company names, they kept these company names for
[4] each of the vessels. That doesn't mean that the -- that the
[5] corporation still existed, okay?
[6]       It was bought out or merged, or whatever they did.
[7] I don't know. I'm not a lawyer. I'm not an accountant. I
[8] don't know the fancy stuff that you people do. It's all magic
[9] to me.
[10]    **Q.** Or we wish we did.
[11]    **A.** Okay. It's all magic to me.
[12]       So, here I am sitting here. One day I'm on a
[13] Tidewater vessel. Next month I'm on another -- different
[14] vessel for Zapata again. And then back to Tidewater, back to
[15] Zapata. And so, I've got this maze of names that I'm living
[16] in.
[17]    **Q.** Okay. I think I understand that.
[18]       And I guess what makes me, in my mind, think this is
[19] different is just unlike prior years, where you may have gone
[20] from ship to ship, this time they changed who was paying you.
[21]    **A.** Yeah. Well, that's --
[22]    **Q.** And I'm just asking why that happened.
[23]    **A.** That's just part of the maze of the names. I don't
[24] know. It's part of the magic.
[25]    **Q.** Okay.

Page 83

[1]    **A.** Okay?
[2]    **Q.** But as far as you can recall, in this tax year, '92,
[3] there was not anything that -- that changed from your
[4] standpoint? You were just doing the same job and reporting to
[5] the same people?
[6]    **A.** Of course. Yes.
[7]    **Q.** Okay.
[8]    **A.** Exactly.
[9]    **Q.** And your -- your health insurance and retirement
[10] plan and all, that hadn't changed, as far as you know? And
[11] we'll look at some documents.
[12]    **A.** It may have. I'm not sure. I could not say for
[13] sure on that.
[14]    **Q.** Okay. Well, we'll -- we'll deal with that a little
[15] later.
[16]    **A.** We'll have to look at documentation on that.
[17]    **Q.** Okay. But you're pretty comfortable that it's
[18] incorrect to imply, from these two documents, that this was
[19] the time of the merger and it all -- everything changed?
[20]       Okay. Good enough for now.
[21]    **MR. ROYCE:** He's gesturing that he doesn't know.
[22]    **MR. GREEN:** Yes.
[23]    **THE WITNESS:** I don't know.
[24]    **MR. GREEN:** Okay. If we can gather those up, we'll
[25] move on.

Page 84

[1]    **MR. ROYCE:** Here, just give them to me, and I'll get
[2] them back in order.
[3]    **THE WITNESS:** Okay.
[4] **BY MR. GREEN:**
[5]    **Q.** This is what purports to be the -- his file, Pete's
[6] file, for 1993. And if I can do this without getting a paper
[7] cut, it's PB00653, through PB705.
[8]       And just take a quick gander through that and see if
[9] you can identify what you provided him in the way of
[10] information for that tax year that's in that file.
[11]       Before you formulate a precise answer, I'll change
[12] the question a little bit, but I wanted to give you a chance
[13] to familiarize yourself with that, okay?
[14]    **A.** Uh-huh.
[15]    **Q.** The original question was: Is there anything in
[16] there that shows what you sent?
[17]       This is the year that, I think, changed, and I want
[18] to confirm that with you, where he sent a brochure -- or, not
[19] a brochure, a schedule and forms form you to fill out; is that
[20] correct?
[21]    **A.** As best I remember, Peter always sent a packet.
[22]    **Q.** Okay.
[23]    **A.** Okay? But --
[24]    **Q.** Is this the first time you used that packet to
[25] provide the information, then, I guess is the question.

Page 85

[1] **A.** To the best of my recollection, I started by -- when
[2] we first worked with Peter, by filling out these packets. But
[3] I had done most of my work on a spreadsheet, and as I remember
[4] it, I had mentioned to him that I was using a spreadsheet to
[5] formulate this, and I believe it was his suggestion that I
[6] give him a copy of the electronic spreadsheet.
[7] He said it would be -- it would facilitate matters
[8] for him to be able to manipulate the data more easily on a --
[9] in a spreadsheet format than to take it from a hard copy on
[10] paper.
[11] **Q.** Okay.
[12] **A.** So, I've gone from doing it on paper, to doing it in
[13] spreadsheet, to trying a computer program. And obviously,
[14] here, with PB655 through PB658, it appears I've filled out
[15] part of one of his spreadsheets and sent him back some data.
[16] **Q.** Okay. And -- and -- well, let me ask you the
[17] open-ended way: Did you find any indication of a spreadsheet
[18] you performed in addition to this material in that group of
[19] documents?
[20] **A.** In this group of documents --
[21] **Q.** Right.
[22] **A.** -- I did not see anything.
[23] **Q.** And did you see anything that indicated that this
[24] year, also, you did your tax program and printed out kind of
[25] dry run forms in terms of providing information?

Page 86

[1] **A.** I didn't recognize anything like that.
[2] **Q.** Okay. And so, you've indicated that you had -- he
[3] had sent out these forms before, and earlier you used them.
[4] Now, we've only been looking from '88 on, and you
[5] have not seen a form like that that you filled out in that
[6] time frame, correct?
[7] The very first one I think had a spreadsheet.
[8] **A.** That's correct, yes.
[9] **Q.** So, if you filled out those forms, it was before
[10] '88?
[11] **A.** Yes. I -- I believe you are correct in that
[12] assumption.
[13] **Q.** Okay. Let's see what David is concerned about that.
[14] **MR. ROYCE:** I'm not sure that's right, Ron, because
[15] I thought in the documents you've been going through, I saw
[16] some documents called "income tax organizer."
[17] **MR. GREEN:** I think this is the first year, but I
[18] could be wrong.
[19] **MR. ROYCE:** Okay. Well, go ahead, and I'll look
[20] here. I thought I had seen it in some of the packets we just
[21] went through.
[22] **MR. GREEN:** To be honest, if it's one year or two
[23] years off, it's not critical to me.
[24] **MR. ROYCE:** Okay.
[25] **MR. GREEN:** I think I -- I'm just looking here real

Page 87

[1] quick. There are worksheets, but I think those are Pete's
[2] worksheets.
[3] **MR. ROYCE:** Well, if you look at, like -- look back
[4] to the very first set that you had, which was PB912,
[5] et cetera. If you go to PB930 --
[6] **MR. GREEN:** Okay. Well, you're right.
[7] **MR. ROYCE:** I think that there are similar documents
[8] to that in each packet.
[9] **MR. GREEN:** Well, I didn't --
[10] **MR. ROYCE:** I don't see one for --
[11] **MR. GREEN:** There wouldn't have been in the recent
[12] ones. Let's see. Maybe the early ones.
[13] See, '89 has a spreadsheet in it.
[14] **MR. ROYCE:** Uh-huh.
[15] **MR. GREEN:** Yeah. I don't see one in '89.
[16] **MR. ROYCE:** Yeah. And then on the next set, look at
[17] starting at PB854.
[18] **MR. GREEN:** Well, right. But that's the only --
[19] from the first page.
[20] **MR. ROYCE:** Keep flipping behind it, after 854.
[21] **MR. GREEN:** Well, you're right. So, we missed
[22] those.
[23] **BY MR. GREEN:**
[24] **Q.** Just to -- then to clear up the record, where
[25] there's an organizer that's filled out, we can add those to

Page 88

[1] the documents that you provided him?
[2] Is that correct, Mr. Weyland?
[3] I'll help you. It's correct.
[4] **MR. ROYCE:** You or your wife probably ought to
[5] clarify, him or his wife.
[6] **MR. GREEN:** Yeah. That's true. But we went through
[7] these, and he pulled out documents that he thought he had
[8] provided, and so we'll just add those.
[9] **THE WITNESS:** Okay.
[10] **MR. GREEN:** We'll understand that those are included
[11] within your answers.
[12] **THE WITNESS:** It's been a long time.
[13] **MR. GREEN:** Yeah. Yeah.
[14] **BY MR. GREEN:**
[15] **Q.** Okay. So, scratch the whole -- you received one of
[16] these each year as far back as you can remember; is that
[17] fair?
[18] **A.** That's a fair assumption, yes.
[19] **Q.** And then we'll just rely on the documents as to when
[20] they were filled out and so forth.
[21] But, again, you did not find a spreadsheet in this
[22] one, correct?
[23] **A.** I did not find a spreadsheet. Not in this -- these
[24] papers.
[25] **Q.** Okay. If you'll look at 654, which is, I believe,

Page 89

[1] the second page there. And maybe you need to look at 653 with
[2] it. And maybe you don't know the answer to this. Maybe it's
[3] your wife.
[4]     But there's a note primarily talking about the
[5] application of a thousand dollar refund.
[6]     Do you know anything about that?
[7] A.  No.
[8] Q.  Then there's a series of documents. I'll start you
[9] at 674. But you may or may not remember. Again, I think your
[10] wife was primarily involved in this, but I would guess it's
[11] something you would have heard about.
[12]     Apparently, you and your wife received a brochure
[13] from the I.R.S. about, it's never too late, and there was
[14] communications back and forth concerned about whether a return
[15] had not been filed.
[16] A.  I think you better talk to my wife about this
[17] because I'm not directly involved in some of this stuff
[18] because of my absence from the country.
[19] Q.  I understand. And I wasn't -- because of that, I
[20] wasn't going to get into a lot of detail with you about it,
[21] but I do have a couple of questions bearing on it.
[22]     I just wanted to know: Do you remember that coming
[23] up and being concerned about a brochure like that?
[24] A.  I don't recall it.
[25] Q.  Okay. Do you have any knowledge of ever finding out

Page 90

[1] that a return was not filed?
[2]     Did that turn out to be a false alarm, I guess I'm
[3] asking you, as far as you know.
[4] A.  I can't remember ever having not filed, ever.
[5] Q.  Okay. And let me ask you about the procedure for
[6] this.
[7]     We've been talking primarily on the information that
[8] you gave to Mr. Birkholz and then his preparation of the
[9] returns.
[10]     But procedurally, what was your -- how did this
[11] work?
[12]     He would prepare the forms.
[13]     Did he then mail them to you for execution?
[14] A.  What do you mean "execution"? You mean --
[15] Q.  Signature.
[16] A.  Signature? Just signature?
[17] Q.  Yeah.
[18] A.  Yes.
[19] Q.  You have to sign them before you can file them.
[20] A.  Yes.
[21] Q.  And then would you go ahead and send them to the
[22] I.R.S. or would you return them to him?
[23] A.  The best of my recollection, he would send us a
[24] client copy and a copy to send to the I.R.S., and we would
[25] mail directly to the I.R.S.

Page 91

[1] Q.  Okay. The -- and you've got to understand that as
[2] an attorney, I -- we tend to be a nervous sort.
[3]     So, in case there's an issue about filing, I mean,
[4] actually putting -- physically putting them in the mail after
[5] they're signed, is something that either you or your wife did
[6] routinely, correct?
[7] A.  That's correct.
[8] Q.  I'm going to want to take you now to the
[9] 2555. I'll give you the number here in a minute. It's 691.
[10]     Do you have it there?
[11] A.  Uh-huh.
[12] Q.  Up here, where we talk about foreign address and
[13] employer's name and, in fact, the employer's foreign address,
[14] this is all totally different from the prior year.
[15] A.  Port Harcourt, Nigeria, yeah. What happened was, I
[16] got -- I was issued a new work permit out of Port Harcourt.
[17] Q.  Okay. And that's a new work permit from the
[18] government of Nigeria?
[19] A.  Yes, Ron.
[20] Q.  Okay. If I had to guess, I would have said it was
[21] one of those different ship things, but -- okay. So -- so,
[22] there was a change there.
[23]     Now, other than an issuance of a permit, what -- did
[24] anything physically change with your employment or --
[25] A.  No. I'm still working on boats, still working out

Page 92

[1] of Nigeria.
[2] Q.  Reporting to the same people?
[3] A.  Going to various ports, reporting to the same
[4] people.
[5] Q.  Okay. You may have told me something that should
[6] tell me the answer to this, and maybe I'm just slow, but:
[7] The -- the employer's foreign address changes to this Bentinim
[8] Opara Road, Port Harcourt, Nigeria. But down here, it says,
[9] list your -- I can't read it -- "List your tax homes during
[10] your tax year end and dates established." But it's still
[11] 1 Swamp Road, Warri, Nigeria, which was the address on your
[12] prior permit.
[13]     What -- does that mean anything to you? Do you know
[14] why that is?
[15] A.  Well, we're still working, basically, out of one
[16] port. The operations manager is still in 1 Swamp Road. My
[17] boss is still there. The permits are now issued from another
[18] place. So, I've got to -- I've got to follow the permit for
[19] this -- for -- you know, for -- to keep things in line, I
[20] believe. Foreign address. So, I've got to follow the
[21] permit's address for where the -- for the -- the
[22] authorization, if you want to call it that, authority.
[23] Q.  Okay.
[24] A.  The authority is drawn from the office that issues
[25] the permit, but most of the time, I may have been in Warri

**Page 93**

[1] with the vessel.

[2]    Q.   Okay.

[3]    A.   I could have been working for Chevron or Shell out

[4] of Warri at that time.

[5]    Q.   Okay.  You wouldn't have had two permits at the same

[6] time, one would supercede the other?

[7]    A.   Oh, no, no, no, no, no, no, no, no.

[8]    Q.   Okay.  But why would the permit change your employer

[9] name?

[10]    A.   We're back into the maze of names again.

[11]    Q.   Okay.

[12]    A.   Okay?

[13]    Q.   Okay.  I don't want to go too deep in there.  I

[14] might not be able to get back out.

[15]        Now, Tidex Nigeria, Limited, is that a joint venture

[16] or a particular ship or --

[17]    A.   That's another joint venture.

[18]    Q.   Okay.  Is it a Tidewater versus a Zapata joint

[19] venture or --

[20]    A.   Yes.  It is.

[21]    Q.   Is there any chance that this is post merger?

[22] I think you were saying you thought that was '95 or

[23] so.

[24]    A.   Oh.  I'm not sure.  It's --

[25]    Q.   Okay.

**Page 94**

[1]    A.   I'm not sure when we -- when we're going to start

[2] talking about this merger.

[3]    Q.   Okay.  For the information on the 2555, and we can

[4] focus on this time frame, if you want, how would Pete have

[5] known about this change?

[6]        What -- what would have -- what would you have given

[7] him to tell him that this is the thing to put in that blank,

[8] or would you have filled out a form and had that already typed

[9] in, based on what you had been sent?

[10]    A.   Well, these are -- these are actual addresses and

[11] names of places that I worked in, or things that I've been

[12] involved with over the years.

[13]        So, I know that the addresses are correct.  Old

[14] Power Road is -- is where the Port Harcourt compound is

[15] located.

[16]    Q.   Okay.  I'm not questioning that.

[17]        I'm just wondering:  How would Peter have known

[18] these addresses?

[19]    A.   I must have given him the information one way or the

[20] other.  I'm not sure exactly how I did that.

[21]    Q.   And that sort of thing could have been done

[22] orally?

[23]    A.   It could have been done orally.

[24]    Q.   Okay.  Okay.

[25]        MR. GREEN:  David, it's 12:47.  Do you -- what do

**Page 95**

[1] you want to do?  You want to take just a short break, or do

[2] you want to take a half hour and grab a sandwich?

[3]        MR. ROYCE:  If you are at a good point, why don't we

[4] just grab something quick to eat.

[5]        MR. GREEN:  Yeah.  I would just as soon take as

[6] little time as possible just because there's so much here,

[7] but --

[8]        MR. ROYCE:  Yeah.  Because we're running up against

[9] that 3:00 hearing we got to do with Judge Collins.

[10]        MR. GREEN:  Yeah.

[11]        MR. GREEN:  Why don't we just --

[12]        MR. GREEN:  Yeah.

[13]        MR. ROYCE:  Why don't we -- you want to just meet

[14] back here at 15 after?

[15]        MR. GREEN:  Or just as quick as we can.

[16]        MR. ROYCE:  Yeah.

[17]        (There was a brief recess.)

[18] BY MR. GREEN:

[19]    Q.   While we're in -- I guess, for the record, we just

[20] came back from a little short lunch break, and while we're in

[21] the year 1993, I'm going to jump over to the stack that

[22] you-all provided to me and ask you about a document.  It's

[23] W329 and 330.

[24]        It's this '93 working agreement.

[25]        MR. ROYCE:  Okay.

**Page 96**

[1] BY MR. GREEN:

[2]    Q.   And for starters, let me just ask you to take a look

[3] at that and see if you can identify that for me.

[4]    A.   Uh-huh.  It looks like a work agreement for -- that

[5] I signed or I had during '93.  Tidewater.

[6]    Q.   Okay.  That's -- that's the -- well, first of all,

[7] if you look at the second page, it's not executed, or it

[8] doesn't appear to me to be executed.

[9]        Did this all get executed?

[10]    A.   Oh, yeah.  They just -- they just sort of like send

[11] these things to you in an envelope when you're offshore.

[12]    Q.   Okay.  So --

[13]    A.   Sometimes I never went -- I never even got -- go

[14] into the office, because the office would be in one place and

[15] I'll be joining the boat in another.

[16]    Q.   Okay.

[17]    A.   And then the office is in Warri, which is 80 miles

[18] away.

[19]    Q.   Okay.

[20]    A.   So, I may just get this in an envelope coming down

[21] from the office, and that's it.

[22]    Q.   All right.  This is the earliest one I -- I have

[23] seen.

[24]        Do you think before '93 that you had executed

[25] working agreements like this?

Richard Weyand & Jennifer Weyand
Peter Birkholz and Birkholz & Company                                          June 26, 2006

**Page 97**

[1]     A.   I could well have, yes.  But documents received
[2]  overseas are -- are -- I hadn't -- I hadn't -- I don't have as
[3]  good of file on documents I received overseas as I do
[4]  documents received in the United States.
[5]     Q.   That's what I'm getting at, is:  I'll tell you, and
[6]  then I'll show you when we get to it, that I saw three of
[7]  these called -- things called working agreements.  The other
[8]  two were in '95.
[9]          And so, I'm kind of curious about if they were of
[10]  some special significance, or were they routine?
[11]     A.   They were routine, and we were required to have them
[12]  on board for all employees on the vessel.
[13]          Now, part of the problem is:  On the vessels, most
[14]  of the time, we don't have copy machines.
[15]     Q.   Okay.  So, every time you went on a vessel, you
[16]  would be under one of these working agreements?
[17]     A.   Yes.
[18]     Q.   Okay.  And -- and would that go all the way back to
[19]  your initial employment, or was there a time when that
[20]  started?
[21]     A.   No, it did not go back all the way to the initial
[22]  employment.
[23]     Q.   Okay.  Did it go with the Zapata companies?  These
[24]  are all -- that we have copies of, are all Tidewater Crewing.
[25]     A.   I -- I don't remember doing a working agreement with

**Page 98**

[1]  Zapata Marine Service.
[2]     Q.   Okay.  And keeping in mind that this is the year
[3]  where we have two different documents, one of them from
[4]  Tidewater Crewing and one from Zapata, would the Tidewater
[5]  document that showed your earnings from Tidewater reflect
[6]  these -- this Tidewater agreement?
[7]     MR. ROYCE:  Hold on.  '95?
[8]     MR. GREEN:  '93.
[9]     MR. ROYCE:  You're look --
[10]     MR. GREEN:  We're --
[11]     MR. ROYCE:  I'm sorry.  You're on 329.
[12]     MR. GREEN:  Yeah.
[13]     MR. ROYCE:  Okay.  Sorry.
[14]     MR. GREEN:  There are two of them in '95, but I just
[15]  referred to them, but I didn't bring them out.
[16]     MR. ROYCE:  Are you sure that -- that that's the
[17]  same year that the two -- I thought that was '92.  And I don't
[18]  want to change your question, Ron.  It's just you had
[19]  indicated in your question, so I didn't want to be
[20]  incorrect.
[21]     MR. GREEN:  No.  Take a look at it so you --
[22]          Are you talking about -- was it the same year that
[23]  we had those two documents?
[24]     MR. ROYCE:  That's what you were saying, I thought,
[25]  in your question, and that was '92.

**Page 99**

[1]     MR. GREEN:  Was it?
[2]     MR. ROYCE:  If you look at PB719.
[3]     MR. GREEN:  Okay.  Could be.
[4]          So -- so, then -- so, that's a very good point,
[5]  then.
[6]  BY MR. GREEN:
[7]     Q.   So, this does not match up with -- with the two
[8]  documents that we looked at where you had a part of the year
[9]  was Zapata and part of the year was Tidewater, because this --
[10]  this would have been for work done in '93, not '92.
[11]     A.   Normally, the work agreement date on the top is the
[12]  date that they -- they fill this out.
[13]     Q.   All right.
[14]     A.   And then the -- basically, the -- it -- it -- it
[15]  sets the day rate for -- for us that work on the boats, more
[16]  than anything else.  Because if you read it, it's -- I once
[17]  asked somebody to read this, and he laughed at it, and he
[18]  threw it down, and he said, "That's not really a legal
[19]  document," you know.  It's -- don't worry about it.
[20]     Q.   Okay.  If -- if '92 shows that you did some work for
[21]  Tidewater Crewing, I guess, do you suppose that there's one of
[22]  these for '92; you just don't have a copy of it?
[23]     A.   I don't know.
[24]     Q.   Okay.  Were there circumstances where you would do
[25]  work for Tidewater and not have a working agreement in

**Page 100**

[1]  place?
[2]     A.   Yes.
[3]     Q.   Under what circumstances?
[4]     A.   Managerial inefficiencies.
[5]     Q.   Okay.  In other words, screw ups?
[6]     A.   No.  When I was working in Nigeria -- not Nigeria,
[7]  excuse me -- when I was working in Malongo, one manager in
[8]  particular did not fill these out.  More recently -- well,
[9]  I've been receiving them again.  But he was lax in his duties,
[10]  and pay raises were given in amounts agreed upon verbally
[11]  before joining the vessel.  But a work agreement would not be
[12]  executed.
[13]     Q.   Okay.
[14]     A.   So, it depended upon the quality of the individual
[15]  running the office.
[16]     Q.   When this says -- and this has rate of pay and that
[17]  sort of thing on it, but when this says that it's envisioned
[18]  to have 90 days -- let me get the precise --
[19]     A.   Ninety and 30.
[20]     Q.   Yeah.
[21]     A.   The leave rotation -- not in stone --
[22]     Q.   Ninety days of work followed by 30 days of unpaid
[23]  leave, that envisions 120 days.
[24]          If that were normal, would you expect one of these
[25]  to be -- assuming we don't have managerial inefficiencies, you

Richard Weyland, Jennifer Weyland v. UBC
Peter Birkholz and Birkholz & Company
June 26, 2006

Page 101

[1] would expect to find one of these somewhere for every
[2] 120 days?

[3]    A. No.

[4]    Q. Okay. How often would this be executed normally?
[5] Something like this. Not this particular document.

[6]    I tell you what, in your own words, tell me how this
[7] works. What does this mean to you, and what does this have to
[8] do with -- what does this tell me?

[9]    A. My own words, what does it mean to me?

[10]    It sets the day rate, and it sets the bonus rate.

[11]    Q. Okay.

[12]    A. That is all.

[13]    Q. Doesn't give you any idea about when you're supposed
[14] to work or --

[15]    A. You see the 90 days there, work? That is a minimum.

[16]    Q. Okay.

[17]    A. They will not let you off before then, unless it is
[18] compassionate leave.

[19]    Q. So, if we think of the 90-30 as a cycle, okay, just
[20] visualize it with me as a cycle, this one agreement could be
[21] multiple cycles of 90-30; is that right?

[22]    A. I would not say that.

[23]    Q. Okay.

[24]    A. Quite often, I've had to work 120 or more days on --
[25] on a single work cycle, okay? Because in my occupation, you

Page 102

[1] cannot leave the vessel without a proper relief.

[2]    Q. Right.

[3]    A. So, I am obliged to stand by -- well, stand by --
[4] continue to work until my employer provides me with a
[5] qualified licensed relief, even if I have to train him.

[6]    Q. Okay. Let me rephrase the question just a little
[7] bit.

[8]    Let's think of "X" days work, "Y" days off as a
[9] cycle. Forget about which -- the precise numbers those are.

[10]    Would one written agreement cover a multitude of
[11] cycles, or would you normally have a specific agreement each
[12] time you came off of your -- your off days and began a new
[13] work session, however many days that turned out to be?

[14]    A. One work agreement has covered multiple cycles in
[15] the past.

[16]    Q. So, it could be either way?

[17]    A. Yeah.

[18]    Q. You can't read from this that this is this period of
[19] time, and then there would be another one at a certain time?
[20] Okay.

[21]    A. No, sir.

[22]    Q. All right. Let me stick that back in here before I
[23] lose it.

[24]    I'm going to show you a -- what purports to be the
[25] file for 1994 beginning with PB598. I apologize for some of

Page 103

[1] these being on yellow paper. It's just where the copier ran
[2] out of white, probably. Going to PB652.

[3]    Let me ask you just to look through that, first of
[4] all, and then we'll ask you some questions. Again, we're
[5] going to be interested in what you -- the method by which and
[6] what you sent to Mr. Birkholz in terms of information for your
[7] tax returns.

[8]    You've gone through those, and tell me what you've
[9] isolated there, and then we'll go from there.

[10]    A. Okay. It would appear that PB629 through PB652 is
[11] one of Peter Birkholz's organizers, tax organizers, for the
[12] year 1994. And some of it has been filled out, and it appears
[13] to be my handwriting

[14]    Q. Okay. And then there's other material that relates
[15] to your wife's business, correct?

[16]    A. Uh-huh. And then --

[17]    Q. Which I assume while it's important, it's not
[18] necessarily relevant to what we're talking about here.

[19]    A. Three more pages --

[20]    Q. Okay.

[21]    A. -- pertaining to your question --

[22]    A. Yeah.

[23]    A. -- of things that I recognize. PB618, PB625, and
[24] PB626.

[25]    They appear to be summaries. The first two are

Page 104

[1] summaries of I.R.S. payments, and then PB626 is a summary of
[2] time spent overseas and in the United States, a breakdown of
[3] my time.

[4]    Q. Okay. Let me ask you about the -- the file we're
[5] looking at is '94, but this is all happening in '95, of
[6] course.

[7]    Let me ask you about a document that you-all
[8] produced. It's W467.

[9]    And do you recall we talked about the -- the
[10] brochure, the communication back and forth, about it's not too
[11] late and whether or not a tax -- let me show you this document
[12] here and ask you if that refreshes your memory at all about if
[13] there was a missing tax return or -- or an issue about a
[14] missing tax return, or an allegedly missing tax return, I
[15] should say.

[16]    A. It does not jog my memory.

[17]    Q. Okay. So, you don't know what came of that issue?

[18]    A. I don't remember.

[19]    Q. Okay. And for the tax year -- and feel free to look
[20] at any of these that you need.

[21]    For the tax year '94, had there been any changes at
[22] all in your employment or anything that you think you
[23] communicated to Mr. Birkholz about any changes in your
[24] employment?

[25]    Everything looks the same to me, but I want you to

Page 105

[1] have a chance to refresh your memory as much as possible.
[2]   A.   We were doing the same things the same way.
[3]       Peter Birkholz was aware of what I -- what I did,
[4] where I -- when I came into the country, when I left, how I
[5] was paid. He knew that I didn't get U.S. tax papers. It's
[6] still the same.
[7]   Q.   Okay. The -- I believe it is the prior year, was
[8] the year that you couldn't give when you came in and when you
[9] came out because your Visa had been stolen or lost.
[10]      Do you recall that?
[11]  A.   Passport was stolen? Oh, yes.
[12]  Q.   Passport, yes.
[13]  A.   I was robbed.
[14]  Q.   Okay. When -- when you reported to Mr. Birkholz
[15] that you couldn't provide that information, what did -- did he
[16] tell you what he thought was significant or not significant
[17] about that?
[18]  A.   I don't recall.
[19]  Q.   Okay. Do you recall any conversations about
[20] those -- missing that information on that tax year?
[21]  A.   No.
[22]  Q.   Do you recall it being any kind of problem holding
[23] up the preparation of your tax returns?
[24]  A.   I don't recall that.
[25]  Q.   Okay. And you -- and -- okay.

Page 106

[1]       And if you'll look at, just briefly, the 2555. It's
[2] the same information that we just talked about on the last
[3] one. The Tidex, where you changed your permit.
[4]   MR. ROYCE:   What number?
[5]   MR. GREEN:   I'm looking for the number right now.
[6] I just had it a minute ago. Here we go.
[7]       If you look at PB -- beginning on PB608. This time
[8] it's a slightly different form. You're filing a 2555EZ form.
[9] So, it looks a little different, but it still talks about
[10] Tidex, or however you pronounce it -- Tidex Nigeria, Limited,
[11] at Bentimium Opara Road.
[12]  A.   Yes.
[13]  Q.   Is that the same -- same -- there's no change there
[14] in terms of the prior year?
[15]      That's based on your new permit, correct?
[16]  A.   It would be, yes.
[17]  Q.   All right.
[18]  A.   The -- the -- the address is always based on -- on
[19] the work permit.
[20]  Q.   Okay. And here it says, it -- when it says "enter
[21] the date your bona fide residence begin," previously, it had
[22] been, like, 1985. This now says "11-19-93."
[23]      Is that because that's when your permit changed?
[24]  A.   I don't know. I'm not sure. I don't remember.
[25]  Q.   Okay. In what respect, in '93, would your

Page 107

[1] residence -- your bona fide residence have changed, other than
[2] that?
[3]   A.   It would be with the issuance of a -- of a new
[4] permit.
[5]   Q.   Okay. That's what I thought you had said earlier.
[6]       So, would that indicate that's when your permit
[7] changed?
[8]   A.   I'm not sure.
[9]   Q.   Okay.
[10]  A.   I don't remember the -- the circumstances for that
[11] number being put down there.
[12]  Q.   Okay. Was there anything else that changed in '93
[13] concerning your residence, that you can think of?
[14]  A.   I don't believe so.
[15]  Q.   Okay.
[16]  A.   I don't remember anything changing.
[17]  Q.   Okay. Let me ask you generally: When -- when you
[18] would receive the forms that have been prepared and they're
[19] ready for your signature, before you signed them, did you look
[20] at them? Read them? Check them? Do anything?
[21]  A.   Of course, it's -- I would scan over them, take a
[22] look at them, and -- and -- and then sign them, if -- if I
[23] didn't see anything that I thought was a mistake.
[24]  Q.   Okay. Did you, on occasion, find what you thought
[25] was a mistake and call Peter up and say, you know, what's the

Page 108

[1] deal on this, anything like that?
[2]   A.   To be quite honest with you, I don't remember.
[3]   Q.   Okay. Let me have those back, and we'll move right
[4] along.
[5]       Okay. I'll show you what has been Bates stamped
[6] as -- well, the "PB" disappeared on a few of these, but it's
[7] 00517 to PB00596. And it purports to be the 1995 file of
[8] Mr. Birkholz.
[9]       If you'll take a quick gander at those. And
[10] initially, again, I'm interested in anything that you think
[11] you provided to him in the way of information to prepare those
[12] returns.
[13]  A.   I've looked at it briefly. Go ahead.
[14]  Q.   Yeah.
[15]      Can you identify what information you sent to Peter
[16] for the tax year 1995 that's reflected in his file?
[17]  A.   This first letter here is mine, which is PB517.
[18]  Q.   Okay. Well, let's -- let me break this down a
[19] little bit.
[20]      This is a little different because it -- while it's
[21] the tax year '95, there's -- apparently, there were a lot of
[22] issues with '95. And -- well, some of -- that's got
[23] correspondence as late as '97 in dealing with it.
[24]      But that letter, I don't think the -- 517 doesn't
[25] have a date; is that correct?

---

**Page 109**

[1]   A.   That's correct.  There is no date on there.

[2]   Q.   Okay.  It does indicate, however, a Cynthiana,

[3]   Kentucky address.

[4]        Would that put you in '97?  Do you think?

[5]   A.   Yeah.  I believe we were there in '97, yes, at least

[6]   part of the year.

[7]   Q.   Okay.  And in '95, when the tax return was filed --

[8]   or, the year for which the tax -- you were in New Jersey,

[9]   correct?

[10]  A.   Yes.  That would be our previous residence.

[11]  Q.   Okay.  When you say you had been "remiss in the past

[12]  in filling out these papers for the taxes," are you talking

[13]  about the -- the forms that Peter sends, or are you talking

[14]  about something else?

[15]  A.   I'm not sure.  It was a long time ago.

[16]  Q.   Okay.  It talks about having malaria and being out

[17]  of the country working the last few years.  Then it says,

[18]  "That is no excuse for not filing on time."

[19]       Are you talking about the tax returns being filed?

[20]  A.   I would imagine getting the papers to him would be

[21]  what I was referring to.

[22]  Q.   Okay.  Says, "But you've been paying the government

[23]  as required."

[24]       Now, an issue that came up regarding this tax

[25]  year -- and this may have more to do with your wife, and, if

---

**Page 110**

[1]   so, just tell me.  I just need to know what, if anything, you

[2]   know about it.

[3]        Apparently, the I.R.S. was questioning the amount of

[4]   estimateds that were paid compared to the number of

[5]   estimated -- the amount of estimated that was claimed.

[6]        Do you recall anything about that for the tax year

[7]   '95?

[8]   A.   No.

[9]   Q.   Did any of that refresh your memory?

[10]       Did you see notes and so forth from your wife to

[11]  Peter about that and tax I.R.S. forms?

[12]  A.   I didn't have time to read it all.  I'm -- I would

[13]  like to defer to Jennifer about things that she wrote.

[14]  Q.   Okay.  If this letter that -- and we're still

[15]  talking about the first one on -- on the first page, being

[16]  517.

[17]       If this is in '97 -- it says, if you look at the

[18]  last paragraph, "I hope the enclosed information is all you

[19]  need for the '95 and '96 returns."

[20]       Do you recall the '95 returns being late?

[21]       Is that what this is talking about?

[22]  A.   I don't recall what that was about.

[23]  Q.   Okay.  If you'll look at 518, which is a letter from

[24]  Mr. Birkholz to you and your wife, it says -- and this is the

[25]  last paragraph -- "Regarding the second notice on 1995, the

---

**Page 111**

[1]   I.R.S. is requesting you file a return.  We have no data to

[2]   prepare a return for '95 or '96 in our files."

[3]        Does that ring any bells about whether you timely

[4]   filed in '95?

[5]   A.   I know I made paperwork out every year for this --

[6]   for taxes.

[7]   Q.   Okay.

[8]   A.   So, if this letter was issued in '97 about '95, then

[9]   this has to be incorrect.  Because every year, even if I'm

[10]  late, I do the taxes, every year.

[11]  Q.   Okay.  Do you recall, in '95, the I.R.S. being

[12]  concerned that they hadn't gotten a tax return?  Or, actually,

[13]  it would have been in '96 or '97, but --

[14]  A.   I don't recall that.

[15]  Q.   Okay.  Are you sure that this letter we talked about

[16]  first, which is 517, is not in response to the letter we were

[17]  just talking about, which is 518?

[18]  A.   Am I sure?

[19]  Q.   Yeah.

[20]  A.   No.  I'm not sure.

[21]  Q.   Okay.  Could it be that when you -- when it says

[22]  here, "I hope the enclosed information is all you need for '95

[23]  and '96," that that was in response to the I.R.S. saying, we

[24]  haven't heard from you for '95?

[25]  A.   I have no idea.

---

**Page 112**

[1]   Q.   Okay.  You'll agree that if you were providing

[2]   information in '97 for the '95 tax year, it was too late to

[3]   file it timely, correct?

[4]   A.   If that were the case, yes.

[5]   Q.   Okay.  You're just not sure because we don't have a

[6]   date on that letter?

[7]   A.   Uh-huh.

[8]        MR. GREEN:  Okay.  Go off the record for a minute.

[9]        (There was a brief recess.)

[10]  BY MR. GREEN:

[11]  Q.   I'm going to ask you to take a look at the document

[12]  beginning 00528, which is the 2555 for that year, for '95.

[13]       And I'll tell you that it looks to me to be

[14]  identical to the one we just looked at for '94, and I just

[15]  want to know if -- if -- from your recollection, if anything

[16]  changed about your employment at all during the calendar year

[17]  1995, and if this accurately reflects the -- your status at

[18]  that time, and your permit that was in place at that time.

[19]  A.   To the best of my recollection, yes.  That's --

[20]  Q.   Okay.

[21]  A.   -- correct.

[22]  Q.   And when I say it's the same, I should point out

[23]  that Part 3 is where you were in and out of the country.

[24]  Those obviously changed.  But they don't -- that's not what --

[25]  A.   Uh-huh.

---

Richard Weyand, et al. v. John C. Maginnis, JBC     Document 29-16     Filed 01/15/2007     Page 30 of 39
Peter Birkholz and Birkholz & Company

June 26, 2006

---

Page 113

[1] **Q.** Okay. Now, if you'll go with me to the document
[2] beginning at 00532. And your attorney may very well be
[3] correct that you have to defer on this. I just need to know
[4] if you know anything about all of this. And if you don't,
[5] that's -- that's perfectly fine.
[6] This is a power of attorney that was executed in
[7] August of '97, and I'm assuming that this was to allow
[8] Mr. Birkholz to work with the I.R.S. on the issues that we
[9] just talked about with the '95 return.
[10] But do you have any recollection of -- of, number
[11] one, signing this; and, number two, recalling why?
[12] **A.** I have no recollection of -- of signing it or why.
[13] **Q.** Okay. If you'll look at 00533, would you look and
[14] tell me if that appears to be your signature above your
[15] wife's?
[16] **A.** Yeah. It looks like my signature, yes.
[17] **Q.** Okay. Does that appear to be your wife's signature,
[18] assuming that you would recognize it?
[19] **A.** Yes. Yes, sir.
[20] **Q.** Okay. Now, there's a series of handwritten notes
[21] from your wife to Mr. Birkholz, and beginning -- beginning
[22] with 00534, relating to these -- for example, this note on
[23] that page refers to the I.R.S. situation.
[24] Prior to today, had you ever seen those
[25] communications, or were you aware that your wife was working

---

Page 114

[1] with Mr. Birkholz in '97 to try to resolve the '95 tax issues
[2] at that time?
[3] **A.** I seem to recall that we were having problems, but I
[4] don't recall what they were because my wife handles all of
[5] this stuff while I'm away.
[6] **Q.** Okay. And in August of '97 -- I think we just
[7] looked at something that said you were leaving in August, so
[8] you think you might have been gone to work at this point in
[9] time, in '97?
[10] **A.** My wife was handling this, and --
[11] **Q.** Okay.
[12] **A.** -- I prefer that you ask her about this stuff.
[13] **Q.** Well, wait a minute. Wait a minute. Wait a minute.
[14] No. She's leaving for Texas. Okay. She had a show coming up
[15] in Texas, apparently.
[16] Would you look at 00539 quickly, or briefly, please.
[17] This is in July of '97. It's a letter your wife wrote to the
[18] I.R.S.
[19] And it says, "Data was mailed to our accountant in
[20] Boston June 25th, '97, to prepare the returns." And you'll
[21] see it's regarding the status of the '95 tax return.
[22] "We expect returns will be completed for '95 and '96
[23] prior to August 15, '97."
[24] Assuming that's true, I take it you'll agree with me
[25] that the '95 return was filed late, and the information hadn't

---

Page 115

[1] been provided to Mr. Birkholz?
[2] **MR. ROYCE:** Object to the form. You've asked two
[3] questions. One is that it was filed late; and, two, that the
[4] information hadn't been provided to Mr. Birkholz.
[5] **MR. GREEN:** I've done that almost every question.
[6] Yes. It's two questions. We'll do it one at a time.
[7] **BY MR. GREEN:**
[8] **Q.** Assuming that what's in this letter, written by your
[9] wife -- and it's not signed, to be fair, but based on this,
[10] would you agree that the '95 return was not filed on time?
[11] **A.** It would appear, yes, that it was not filed on
[12] time.
[13] **Q.** And would you also agree that the information had
[14] not been sent to Mr. Birkholz for '95 in a -- in a time frame
[15] which would allow him to prepare them on time?
[16] **A.** I don't know if I can agree with that. I have no
[17] recollection of when it was done.
[18] **Q.** Okay. But you would agree that if it was sent
[19] June 25th, '97, that it was too late to prepare them on
[20] time?
[21] **A.** If it was sent on June 5th, '97 (sic), that would be
[22] correct.
[23] **Q.** Okay. And you just don't have any -- you don't have
[24] any personal knowledge one way or the other?
[25] **A.** I don't remember. I do not recall.

---

Page 116

[1] **Q.** Okay. If you'll look at -- and this is another one
[2] that you did not draft, but I'll just ask you to look at
[3] 00551.
[4] And as I said, this is something that was written by
[5] your wife. I assume that maybe you didn't even see it at the
[6] time.
[7] But would you look at it? And this has to do with
[8] underpayment, overpayment penalties on an estimated return.
[9] Do you know what this was talking about and what --
[10] I mean, at the time, were you involved at all in talking to
[11] your wife about what the issue was here?
[12] **A.** Basically, I think what you're trying to address is
[13] why my pay fluctuates; is that correct? Am I making an
[14] assumption?
[15] **Q.** No. I'm just trying to figure out what the concern
[16] is here, what's -- I mean, we know that there were penalties
[17] assessed and so forth. We've got the notices in here. And I
[18] just want to know if you were involved at all.
[19] Is this something that you-all felt like Peter had
[20] messed up, or is this just something relating to the fact that
[21] your pay fluctuated and you were out of the country?
[22] I'm just seeing if this is a problem I need to be
[23] concerned with, if you know.
[24] And just out of curiosity, I kind of wondered
[25] what -- if you-all had a flood the first year you were in

---

Page 117

[1] Kentucky. That's a terrible way to start.
[2]    A. We did. We did.
[3]       MS. WEYLAND: The flood of '97.
[4]       THE WITNESS: Yeah. You'll see that some of our
[5] documents are water stained.
[6] BY MR. GREEN:
[7]    Q. Okay. I was going to ask if it affected your
[8] documents.
[9]    A. Yes, it did. Some of them --
[10]   Q. Did you lose any?
[11]   A. -- were destroyed. Yes.
[12]   Q. But -- but since you mentioned it, that's a good
[13] question: It does suggest that you would be making less this
[14] year, which I assume is '97, than you had in prior years.
[15]       Is that just a matter of the assignments that are
[16] available, or did your arrangements change with the company?
[17]   A. No.
[18]   Q. Okay.
[19]   A. The arrangements didn't change. It -- it's -- it
[20] usually -- the amount of money I make is directly
[21] proportionate to the number of days that I -- I am on a ship,
[22] okay?
[23]       So, if somebody quits, somebody gets sick, they have
[24] a special job that they need done and I'm the guy that does
[25] it, then I get more days at work. So, that's why my pay

Page 118

[1] fluctuates.
[2]    Q. Okay.
[3]    A. It isn't that I get raises or -- or get reductions
[4] in salaries.
[5]    Q. So, this is not a complaint; it's an explanation.
[6]       Is that the way you understand it, or -- and again,
[7] I'll ask your wife.
[8]    A. That's the way I'm looking at it.
[9]    Q. Okay.
[10]   A. But you'll have to speak to my wife about exactly
[11] what she meant about what she wrote.
[12]   Q. Yeah. I'm only looking for your understanding.
[13]   A. English is not my forte.
[14]   Q. Me, either. I just speak Kentucky.
[15]       Okay. I think the rest of it we'll probably just
[16] wait and ask your wife about it when the time is right.
[17]       Okay. We can put those to rest. You will recall I
[18] did promise you this would be tedious.
[19]       Let's do the same drill with '96. Let me identify
[20] them.
[21]       '96's file is PB390 through -- and the "PB" is
[22] missing again, but it's 00516. I think you'll find something
[23] that meets your criterion on the very first page, so that will
[24] make it a little easier.
[25]   A. Okay.

Page 119

[1]    Q. Okay. Are you -- have you made it through those?
[2] Tell us what you found that you believe you sent to
[3] Mr. Birkholz for tax year 1996, you or your wife?
[4]    A. For '96. Okay.
[5]       Okay. We have here, labeled 1996 income, PB00499, I
[6] guess it is. And 500, 501, 502, 503, 504, and it would appear
[7] to be 505. That's it for the '96 batch.
[8]    Q. Okay. In the tax year 1996, or leading up to the
[9] preparation of the '96, had anything changed about your
[10] employment as far as really affected you?
[11]   A. No.
[12]   Q. Yeah. I mean, you might have been at a different
[13] port or whatever, but I'm talking about in terms of who
[14] employed you and that sort of thing.
[15]   A. As far as I know, no. Nothing had changed.
[16]   Q. Okay. So, you would have related no changes to
[17] Mr. Birkholz, other than the amounts and the stuff that we've
[18] talked about here for that tax year?
[19]   A. Uh-huh.
[20]   Q. Okay. Would you look with me at PB478?
[21]   A. 478.
[22]       MR. ROYCE: It's not in that stack.
[23]       MR. GREEN: Huh?
[24]       MR. ROYCE: 478 is not in that packet you just gave
[25] him.

Page 120

[1]       MR. GREEN: Are we -- we're still on '96, aren't we?
[2]       MR. ROYCE: 390 to 441.
[3]       THE WITNESS: 390.
[4]       MR. ROYCE: You may have skipped '96 and gone to
[5] '97.
[6]       MR. GREEN: Maybe what I've got on paper doesn't
[7] match what's in the computer.
[8]       MR. ROYCE: I think that's probably true.
[9] BY MR. GREEN:
[10]   Q. I tell you what, let me take a look and see at this,
[11] and I'll see if I can figure out what's going on.
[12]   A. There you go.
[13]   Q. I believe this is 390 to 516.
[14]   A. Oh, okay.
[15]       MR. ROYCE: Well, then, you've clipped two years
[16] together. 390 --
[17]       MR. GREEN: No. Because '97 starts with 410 and
[18] ends with -- 397 to 410. We're going backwards, but -- this
[19] is '96.
[20]       MR. ROYCE: Okay. I hear you. I don't want to --
[21] it's your deposition, Ron, but 390 is what he's got in front
[22] of him.
[23]       MR. GREEN: Right.
[24]       MR. ROYCE: 390 is what I think you also just lifted
[25] up and looked at there.

Page 121

[1] Look at 390. I mean, it talks summary of '97
[2] checking account.
[3] **MR. GREEN:** Okay.
[4] **MR. ROYCE:** I think maybe you're — you've got two
[5] years stacked together. My sets that were produced are
[6] clipped by you, from 390 to 464.
[7] **MR. GREEN:** Well, now, wait a minute. Now, '97
[8] is -- begins at 410 and goes to -- there's 414 -- they are out
[9] of order. 464.
[10] Now, what are these? 414. These are just
[11] duplicates.
[12] **BY MR. GREEN:**
[13] **Q.** Okay. So -- so we're clear, I think -- see if --
[14] see if what you have is 465 through 516.
[15] **A.** 465.
[16] 465. I have a Page 465.
[17] **Q.** Okay. Through 516 would be the last page. And I
[18] think it would be in your other stack there.
[19] **MR. ROYCE:** That's 1996?
[20] **MR. GREEN:** Yes.
[21] **MR. ROYCE:** That's -- that's correct.
[22] **MR. GREEN:** Okay.
[23] **MR. ROYCE:** But that's not all that is before him.
[24] You've got more than that before him. You've also got '97 in
[25] front of him.

Page 122

[1] **MR. GREEN:** Do you have anything between 410 and 464
[2] in front of you? Because that's '97.
[3] **THE WITNESS:** 464. I've got 390 through 409 right
[4] here.
[5] **MR. GREEN:** Well, somebody has put some extra pages
[6] in here. I don't know if they're duplicates or what.
[7] Let me see what you're -- what are you talking about
[8] that are -- that are out of that range?
[9] Oh, maybe what we're talking about is this sheet got
[10] put in the wrong place.
[11] Are these all '97? Tax period '96. Tax period '96.
[12] So, the -- what -- what you were going on was the
[13] fact that we've got a summary of '97 checking account; is that
[14] right?
[15] **MR. ROYCE:** Well, I mean, that was part of it. But,
[16] also, mine is -- the way mine is clipped together is, 390 to
[17] 441 is a set.
[18] Do you want to do this off the record so we can get
[19] it all put --
[20] **MR. GREEN:** Sure.
[21] (There was a brief recess.)
[22] **MR. GREEN:** We're in '96.
[23] **MR. ROYCE:** Documents PB465 to 516, according to
[24] what I've got and what he's got in front of him.
[25] **MR. GREEN:** Yeah. Yeah. That's what I meant for us

Page 123

[1] to be in. I don't know how the other documents got to you.
[2] **MR. ROYCE:** All right.
[3] **BY MR. GREEN:**
[4] **Q.** And so, what I need for you to do is look at 478.
[5] **A.** 478.
[6] **Q.** Do you see that?
[7] **A.** Yeah.
[8] There appears to be a mistake here.
[9] **Q.** Okay. That's why we're here.
[10] Tell me what you believe to be a mistake.
[11] **A.** It appears that Zapata Gulf Marine Corp. was written
[12] in, and it shouldn't have been.
[13] **Q.** Okay. And this is -- this is a -- a worksheet, or
[14] whatever, prepared by Mr. Birkholz's firm, or is this
[15] something that you got from Zapata, or whomever?
[16] **A.** This is from Mr. Birkholz's firm, I believe.
[17] **Q.** Okay. Do you know the source for that
[18] information?
[19] Is there anything in the documents that you sent
[20] that would refer to your employer?
[21] **A.** It should not be there. It was bad information.
[22] **Q.** Okay. And so, let's find out --
[23] **A.** I did not provide that information.
[24] **Q.** Okay. What did -- what -- did you provide any
[25] information as to who the employer was for that year?

Page 124

[1] **A.** Peter Birkholz knew that I was working for Tidewater
[2] at that time.
[3] **Q.** Okay. But my question is, is: Did you provide any
[4] documents for '96 about what -- where -- who your employer was
[5] for that year?
[6] And you've identified the documents that you had
[7] provided. Just if you'll look in there and see if any of
[8] those --
[9] **MR. ROYCE:** Well, can't we just say that the -- that
[10] the documents will reflect whether he told him to put that
[11] or -- I mean, I think what you're asking him, Ron, is: Did
[12] you give him any documents that told him to put Zapata? He
[13] says he doesn't know. And you said, well, you've identified
[14] the documents you gave him.
[15] Can't we just say that the documents will say what
[16] they say?
[17] **MR. GREEN:** Yeah. If we can agree that that's all
[18] the documents that were provided, I guess that's true.
[19] **MR. GREEN:** Well --
[20] **MR. GREEN:** I mean, this is just a worksheet, so it
[21] really -- it's not like a part of the tax return. I -- I just
[22] was curious as to where it had come from or if there had been
[23] discussions about it, but --
[24] **THE WITNESS:** Okay. Refer to PB476, please.
[25] **BY MR. GREEN:**

Page 125

[1]  **Q.** Okay.
[2]  **A.** Section 2.
[3]  **Q.** Okay.
[4]  **A.** Block six.
[5]  **Q.** Part 2?
[6]  **A.** Yes.
[7]  **Q.** Okay.
[8]  **A.** Okay?
[9]       Clearly states: "Tidex Nigeria, Limited."
[10]  **Q.** Oh, I understand that.
[11]  **A.** Okay. So, there you go. There's the correct
[12]  information there.
[13]  **Q.** Okay. But this isn't something you provided him?
[14]  **A.** No. I did not provide him with this information
[15]  about Zapata Gulf Marine Corp.
[16]  **Q.** So -- so, my question is, is: Did you provide him
[17]  any information as to who your employer was in 1996, as being
[18]  any way different than prior years?
[19]  **A.** There's no change in my employment at the time.
[20]  **Q.** Okay. Now, while we're on 476, that appears to me
[21]  to be identical to the prior year's 2555EZ, and I think you
[22]  just indicated that that would be correct, your information
[23]  would not have changed in terms of your employer, your permit,
[24]  et cetera, between '95 and '96, correct?
[25]  **A.** I believe that it was all the same.

Page 126

[1]  **Q.** Okay.
[2]  **A.** To the best of my recollection.
[3]  **Q.** Okay. If you'll take a quick look at 481. This is
[4]  a note from your wife, so, again, I understand that we'll need
[5]  to talk to her about it, but in terms of any knowledge you may
[6]  have.
[7]       It says, "This time I know they are wrong."
[8]       Do you know -- do you have any idea what was going
[9]  on?
[10]  **A.** You'll have to talk to her about this.
[11]  **Q.** Okay. And if you'll look at -- start with 482.
[12]       You'll see an I.R.S. final notice. It's actually
[13]  dated August '97, which is kind of in the same time frame we
[14]  were looking at in the last tax year, but it indicates that
[15]  it's got 1,400 and some change that they're planning to levy
[16]  on for the '93 tax year.
[17]       Do you -- did you understand that to be a problem at
[18]  that time?
[19]  **A.** I don't recall this.
[20]  **Q.** Okay. And so, you would not have had any
[21]  conversations with Mr. Birkholz about it?
[22]  **A.** I did not have any conversations with Mr. Birkholz
[23]  on this type of issue. This is something that my wife would
[24]  have handled.
[25]  **Q.** Okay. And if you'll look at 483, just tell me if

Page 127

[1]  that's the same answer for the same kinds of questions.
[2]       This is for tax year '94, apparently about
[3]  5,100 dollars they were about to levy on.
[4]  **A.** You'll have to speak to my wife on that also.
[5]       **MR. GREEN:** Okay. Off the record.
[6]       (There was a brief recess.)
[7]       **MR. GREEN:** Okay. Well, let's go ahead to '97.
[8]  I'll trade you, if you would, but first let me tell
[9]  them: '97's, and we've kind of talked about this, is marked
[10]  as Bates stamp PB390 to PB464.
[11]       Does that jive with what you've got?
[12]       **MR. ROYCE:** Mine is 441. I have a gap. I don't
[13]  have any documents from you-all 442 through 465. But we can
[14]  deal with that later. Let's -- you do what you need to do.
[15]       **MR. GREEN:** Yeah. I mean, they're -- they're actual
[16]  returns.
[17]       **MR. ROYCE:** Yeah. They're just -- it's not in the
[18]  set that I got. I can make a note. 442 to 464.
[19]       **MR. GREEN:** Well, then, I'll let you take a look at
[20]  them too.
[21]       **MR. GREEN:** Actually, it's 2:59, so I kind of expect
[22]  the phone to ring any second.
[23]       **MR. ROYCE:** Yeah.
[24]       Before we do, before she calls, let me say this:
[25]  I'm thinking, Ron, in the interest of time, and in fact, we've

Page 128

[1]  got a witness here who is about to leave the country for
[2]  several months again, you go through your outline however you
[3]  want to do it. I'll give you my word that Jennifer is going
[4]  to be able to give you a lot more information about these
[5]  packets and go through the exercise that you're doing with him
[6]  right now than he is.
[7]       If you want to go through every one of these and
[8]  have him look through every page and then tell you what they
[9]  sent, he can do his best. I think you're going to get more
[10]  reliable information from her and not being as under as much
[11]  time pressure.
[12]       **MR. GREEN:** Yeah. Ultimately, I mean, until we get
[13]  into, perhaps, more recent things, the main thing -- my main
[14]  point is to try to pin down what, if anything, was provided to
[15]  him. I'm only concerned that if I don't let him see what
[16]  we've got to refresh his memory, then later, because if his
[17]  memory gets jogged and he's -- there's something new. That's
[18]  my only real -- I'm not doing this just to bore everybody.
[19]       **MR. ROYCE:** No. I know. But I think that -- that
[20]  what he's doing is, he's looking through here and picking out,
[21]  as he sits here in 2006, what looks to him, based on his best
[22]  recollection, of something that he might have been involved in
[23]  sending.
[24]       And I think that Jennifer can do the same thing for
[25]  you, and they're both -- and she is probably the one who sent

**Page 129**

[1] it, in most cases.

[2]     MR. GREEN: Well, but my method in asking him to do

[3] that is to make sure that he's had a chance to look at it, and

[4] so his memory is as fresh as it can be.

[5]     MR. ROYCE: That's fine.

[6]     MR. GREEN: Now, you know, if -- if -- you know, if

[7] there's some kind of -- if the fact is that -- other than the

[8] documents in here, that he didn't have anything to do with

[9] communicating with Birkholz about numbers, employment,

[10] et cetera -- I think later we'll get into some stuff where he

[11] may have. There may have been some discussions.

[12]     But I guess I can -- I can push ahead past that if I

[13] know that to be the case. But if I were him, I wouldn't want

[14] to make that kind of a blanket statement.

[15]     MR. ROYCE: Well, and I don't think he is. But

[16] that -- you really haven't been asking him -- have you had

[17] about conversations. You've asked him, look through these

[18] documents and tell me what you sent to him.

[19]     MR. GREEN: Beginning in '96, I did. I said, "Did

[20] you give any information of any change in any employment?"

[21] And that's going to be a question from now on.

[22]     MR. ROYCE: Okay. Well -- and I think you can do

[23] that without -- and again, it's your deposition. I want you

[24] to do whatever you want to.

[25]     MR. GREEN: Yeah.

**Page 130**

[1]     MR. ROYCE: I'm just trying to think of a way to get

[2] finished with this today.

[3]     MS. WEYLAND: I don't think it's going to.

[4]     MR. ROYCE: Well, the --

[5]     MR. GREEN: I'm -- I mean, going in, I wasn't sure

[6] that would happen. What I was interested in was making sure I

[7] needed -- got what I needed first, initially.

[8]     MR. ROYCE: Yeah. Well -- let's go off the record.

[9]     MR. GREEN: Yeah.

[10]     (There was a brief recess.)

[11] BY MR. GREEN:

[12]     Q. Okay. If you'll look at -- yeah, take a look at

[13] that.

[14]     That first sheet is the summary of '97 checking

[15] account.

[16]     Is that something that you prepared or your wife

[17] prepared?

[18]     Is that for your wife's business, or is that for

[19] your income?

[20]     A. This is -- this is everything. This is --

[21]     Q. A combination?

[22]     A. -- my wife's business, my income, her -- all of our

[23] family expenditures. Everything.

[24]     Q. Okay. So, are we back to doing kind of a

[25] spreadsheet-type thing for him at this point?

**Page 131**

[1]     A. Yes, Ron.

[2]     Q. Okay. And was that at his request, or did you

[3] decide to do it that way, or how did that happen? Do you

[4] know?

[5]     A. As best I can remember, he liked this format.

[6]     Q. Okay. All rightee. Let's put that one back here, I

[7] think.

[8]     Or did we -- I can't remember now what we've done on

[9] '97.

[10]     MR. ROYCE: I think it may have been --

[11]     MR. GREEN: That's where we were getting ready to

[12] start, wasn't it? Okay.

[13]     MR. ROYCE: Yeah. But I can't remember. It may

[14] have been in the pack that he went through with '96. I

[15] just -- oh, hell if I know.

[16]     MR. GREEN: Yeah. I don't think we actually went

[17] through it. Let me see here.

[18] BY MR. GREEN:

[19]     Q. Now, let's -- let me ask a couple of questions as of

[20] the end of '96, okay?

[21]     Do you know if the Tidewater Zapata merger happened

[22] before or after that?

[23]     A. I'm fairly sure that it happened before that.

[24]     Q. Okay. Having gone through any of these, do you --

[25] has your memory been refreshed about when that would have

**Page 132**

[1] been?

[2]     Would that have been in -- you said earlier it might

[3] have been in the '80s, but we had Zapata on there for some

[4] period of time, and I understand that later you said it was

[5] erroneous to be on one of the worksheets.

[6]     But do you have any better memory at this point of

[7] when you think that was, even within a few years?

[8]     A. You're getting back into the maze of names again.

[9]     Q. Okay. But I'm talking about just between Zapata

[10] companies and Tidewater companies and their merger, when that

[11] happened.

[12]     A. The best I can do is sometime in the '80s.

[13]     Q. So, the timing of your change of your permit

[14] won't have anything to do with that issue.

[15]     Did the -- did the merger change your working

[16] relationship in any way? Did it change who you reported to,

[17] where your -- I'll tell you what, let's do this: Just going

[18] back a little bit, I'm going to show you what's marked as --

[19] what's Bates stamped as W003.

[20]     You'll remember the one year we had a -- a -- an

[21] income -- a report of earnings from a Zapata-type company and

[22] a Tidewater-type company? We talked about all that?

[23]     A. Uh-huh.

[24]     Q. This is from '93. This is in the records that --

[25] that you produced.

Page 133

[1] And that shows Tidewater Crewing, Limited,
[2] correct?
[3] A. Uh-huh.
[4] Q. And that's a subsidiary of Tidewater, Inc., or
[5] whatever the main company is for Tidewater? That's one of
[6] their subsidiaries?
[7] A. Yeah. Let's see, most of the time, we refer to
[8] Tidewater as Tidewater Marine International, LLC.
[9] Q. Okay.
[10] A. When we're sailing up and down the coast. So, there
[11] is another name for you.
[12] Q. Okay. Now, this document here, is this something
[13] you would have just used to prepare your worksheet or
[14] spreadsheet?
[15] You would not have provided this to Mr. Birkholz?
[16] Because there wasn't a copy of this in his file.
[17] Do you --
[18] A. Not an official document, as far as I can tell.
[19] Q. Okay.
[20] A. So, I just -- I used it to check my numbers against
[21] what they were saying. You know, my -- my -- my pay stub
[22] summaries against that.
[23] Q. Okay. So, if he doesn't have a copy in his file,
[24] you're not surprised? I mean, that's what I'm getting at.
[25] A. I may have provided it some years. I may not have

Page 134

[1] provided it some years.
[2] Q. Okay. And then you've got '94 and you've got '96.
[3] And if we're missing years like that, is that
[4] because of the flood, do you think, or --
[5] A. It might be, and it might be poor bookkeeping on my
[6] part. And it may be that it got lost in the mail. That's
[7] hard to tell.
[8] Q. Okay.
[9] MR. ROYCE: Let's go off the record for just a
[10] second.
[11] MR. GREEN: Yes. Sure.
[12] (There was a brief recess.)
[13] BY MR. GREEN:
[14] Q. Let me show you what has been marked as W7, 007.
[15] It's a September 30th, 1985 letter to you and addressed to New
[16] Jersey and ask you, first of all, if you recall seeing that.
[17] A. I don't recall seeing it, but, obviously, it's to
[18] me.
[19] Q. Okay. And it's talking about your -- at the very
[20] beginning, we talked about it -- if I recall correctly, that
[21] the umbrella was Zapata Corporation; is that right?
[22] A. Yeah.
[23] Q. And -- and I think you mentioned that at some point,
[24] you became an employee of Zapata Gulf Marine. And this
[25] indicates that they're terminating the Zapata Corporation

Page 135

[1] pension plan at the beginning. I assume the Zapata Gulf
[2] Marine pension plan.
[3] Is that your recollection of what happened?
[4] A. I can't recall exactly what happened, but if it's
[5] there, it's there.
[6] Q. Okay.
[7] A. I'm not going to deny it.
[8] Q. Well, I'm -- I'm, again, trying to get into when all
[9] of this happened. This -- that's '84.
[10] So, at least as of '84, you're still working for
[11] Zapata, correct? The Tidewater merger had not happened at
[12] that point.
[13] A. No. Not at that point.
[14] Q. Okay. In your pension plan, have you, from time to
[15] time, seen documents about it, whether it's Zapata, Zapata
[16] Gulf Marine, Tidewater, whatever it's called through the
[17] years?
[18] Have you seen -- do they send you documents from
[19] time to time about it?
[20] A. Yeah.
[21] Q. And I mean, is it a -- is it a qualified plan
[22] under American law do? You know?
[23] Have you seen words to that effect or?
[24] A. I would have to go look.
[25] Q. Okay. I'll show you W10. It's a document you

Page 136

[1] produced, also regarding your pension plan after the last
[2] letter.
[3] And the main thing is, there's a human resources
[4] office listed on it.
[5] Do you see that?
[6] A. Yeah. I see the human resources.
[7] Q. Is that the same Houston office that you talked
[8] about before, where you went and had your physical, and they
[9] hired you, et cetera?
[10] A. This is listing a post office box.
[11] Q. I'm sorry.
[12] A. So, I'm -- I couldn't tell you if that was the same
[13] building or not.
[14] Q. Okay. When you -- when you were working for Zapata,
[15] is the human resources in Houston where you would take your
[16] issues with if you had them for human resources?
[17] A. All of the offices for Zapata were in Houston except
[18] for the local port offices.
[19] Q. Okay. Is -- is Tidewater a publicly traded company?
[20] I know you said Zapata was.
[21] A. Yes, it is.
[22] Q. Is it symbol TDW?
[23] A. TDW, I believe, yes.
[24] Q. Okay.
[25] A. It's traded on the New York Stock Exchange.

Page 137

[1] Q. Okay. So, if this -- is this their web site? Maybe
[2] I'll take you back to --
[3] A. It certainly looks like it. The Ebb Tide. Yes. I
[4] know the Ebb Tide.
[5] Q. Does that sound right?
[6] A. Yeah. I know the EBB TIDE.
[7] Q. Okay.
[8] A. Never worked on it, but I know it.
[9] Q. And did -- Tidewater's primary office is in
[10] New Orleans; is that correct?
[11] A. Corporate headquarters is in New Orleans.
[12] Q. Okay. Well, on the web site, they call it worldwide
[13] headquarters.
[14] Have you ever heard it referred to as that?
[15] MR. ROYCE: I'm going to make a clarification.
[16] You're saying "Tidewater," and we've talked about
[17] all kinds of different Tidewaters today; Tidewater Crewing,
[18] Limited; Tidewater Corporation, all of that.
[19] Are you just talking about what you're viewing as
[20] the big umbrella, so to speak?
[21] MR. GREEN: Tidewater Corporation is the way I -- or
[22] Tidewater, Inc. I'm not sure.
[23] MR. ROYCE: It's just you said Tidewater, and I
[24] don't want him to get hamstrung with later you said, well, you
[25] said Tidewater was a New Orleans company.

Page 138

[1] MR. GREEN: Oh, okay. No. No. I'm talking about
[2] this -- according to their web site, it's Tidewater, Inc.
[3] BY MR. GREEN:
[4] Q. Does that -- do you take any quarrel with that?
[5] A. Yes. I do. Because they call themselves Tidewater,
[6] LLC, in most of their literature.
[7] Q. Okay. Well, you can't publicly trade an LLC.
[8] A. Well, that's what they call it.
[9] Q. You would know more than me, but --
[10] A. Well, maybe I'm talking about a different
[11] Tidewater.
[12] Q. Okay. That's what I'm trying to pin down.
[13] A. Maybe this is part of the -- the -- the -- our
[14] wonderful mosaic of an international conglomerate.
[15] Q. Well, is it possible that a -- that Tidewater,
[16] whatever, LLC, is a partnership or a venture that Tidewater
[17] has with somebody and they've called it that?
[18] A. I think you're going to have to talk to somebody in
[19] Tidewater Corporation.
[20] Q. Okay. But one thing that I cannot do today is leave
[21] here without knowing what Tidewater to talk to.
[22] MR. ROYCE: Well, let me see if I can help you
[23] clarify that.
[24] MR. GREEN: Okay.
[25] MR. ROYCE: If you look -- if you look at the sheet,

Page 139

[1] Ron, that you just showed him -- w3 is one of them, but you
[2] saw a couple others.
[3] MR. GREEN: Of course, those are Zapata, but --
[4] MR. ROYCE: No. Not WO3.
[5] MR. GREEN: Oh, okay. Yeah.
[6] MR. ROYCE: It's Tidewater Crewing Limited.
[7] MR. GREEN: Yeah. That's a subsidiary.
[8] MR. ROYCE: Now, what I've shown you -- well, that's
[9] your word. I'm not sure that's technically right, but --
[10] MR. GREEN: Okay.
[11] MR. ROYCE: What I showed you, and I think -- I
[12] don't know if this was part of what you had produced or not
[13] from us, but I've got payroll stubs upon payroll stubs here
[14] from Tidewater Crewing, Limited. Every payroll stub he's got,
[15] that I can see here, back to 1992, is Tidewater Crewing,
[16] Limited, is the entity on every one.
[17] MR. GREEN: Okay.
[18] MR. ROYCE: That '92, when you -- when you showed
[19] that in, I think, '92, where he had one from Zapata and then
[20] one from tide -- that was Tidewater Crewing, Limited.
[21] MR. GREEN: I agree.
[22] MR. ROYCE: So, I just want to be clear when we talk
[23] about Tidewater, that's who he was being paid by, was
[24] Tidewater Crewing, Limited. And I think that maybe when he
[25] says "LLC," or "Limited," that could be part of what he's

Page 140

[1] talking about.
[2] MR. GREEN: Could be. I -- and that's what -- I
[3] mean, that's what I need to know.
[4] MR. ROYCE: I understand.
[5] MR. GREEN: Because -- well, let's -- let's see if
[6] this takes us anywhere first.
[7] BY MR. GREEN:
[8] Q. Let me show you W12, which is -- we're jumping ahead
[9] to 1992. These are documents, again, that you produced.
[10] And specifically, it talks about Tidewater Crewing,
[11] Limited, but it's on Tidewater, Inc. stationery.
[12] And first let me ask you if you recall receiving
[13] that or anything like that.
[14] MR. ROYCE: If these documents were produced from
[15] our files, which this is, we'll stipulate that this has come
[16] through Richard or Jennifer's hands. It had to have.
[17] THE WITNESS: Okay.
[18] MR. GREEN: Okay.
[19] BY MR. GREEN:
[20] Q. Yeah.
[21] A. One thing I would like to point out to you is, the
[22] address down here, on the bottom left-hand corner of W012, is
[23] not correct anymore.
[24] Q. Yes. They -- they --
[25] A. They moved from this 1440 Canal Street. They're no

**Page 141**

[1] longer there.

[2] Q. Right. I noticed their web site had a different
[3] current address.

[4] A. Yeah.

[5] Q. But in 1992, that was the correct address,
[6] correct?

[7] A. I believe so. Yeah. They were there at one time.

[8] Q. Okay. And let me see if the bottom of this one says
[9] the same thing so I won't -- and -- and if -- and it says at
[10] the bottom, "If you have any questions concerning the
[11] information on this statement, please contact your personnel
[12] department."

[13] A. Uh-huh.

[14] Q. And that's the address and phone number for the
[15] personnel department at that time, correct?

[16]        1440 Canal Street, New Orleans?

[17] A. Actually, no. That's not the number that I use.

[18] Q. Okay. But is that the address?

[19] A. I have an 800 number. No. Actually, I -- the
[20] personnel department is -- is now located in Morgan City,
[21] Louisiana. Yeah.

[22] Q. Personnel department?

[23] A. That's pretty -- pretty close.

[24] Q. Well, let's see if -- but, now, in '92, was it in
[25] New Orleans on Canal Street?

**Page 142**

[1] A. I've never talked or gone to New Orleans for -- for
[2] anything, or talked to anybody in New Orleans. It's always
[3] been someplace like -- like Morgan City.

[4] Q. Morgan City?

[5] A. Could be listed as Larose. It's a town next to
[6] Morgan City. Something similar to that.

[7] Q. Okay. Now we'll get to where I'm confused.

[8]        Let me show you -- I'll just go ahead and show you
[9] 15 and 16 at the same time. Maybe there's there's

[10]        And this kind of ties in where you indicated that --
[11] that Peter was erroneous in having Zapata gulf and marine on
[12] some of those sheets.

[13] A. Uh-huh.

[14] Q. These are in the '90, '91 time frame, which, as I
[15] understand it, was after the merger and after you became an
[16] employee of Tidewater. Yet, you're still getting stuff from
[17] Zapata Gulf Marine.

[18]        And I'm just wondering if you can explain to me why.

[19]        Let's take a look at -- oh, let me tell them. It's
[20] 15 through 20. W15 through 20.

[21]        MR. ROYCE: I'm going to object to the form. And I
[22] don't think you're trying to pin him down, Ron, but he -- he
[23] said he doesn't remember when the merger was. He has given
[24] you his best guess. And now you're asking him to explain why
[25] this came after the merger. I'm not sure that it necessarily

**Page 143**

[1] was, but he's answered the best he knows.

[2]        MR. GREEN: Okay. And if he thinks it's correct,
[3] then I'll accept that. I -- I do not mean to pin him down on
[4] that. You're correct.

[5]        THE WITNESS: Okay.

[6] BY MR. GREEN:

[7] Q. Does that help you in terms of -- or, do you know
[8] why, in the '90, '91 range, you would have been getting
[9] materials from Zapata Gulf Cruise, and I think another one was
[10] gulf marine?

[11] A. Well, I've looked through this stuff, and I'll point
[12] this out to you because you're going to see it anyway sooner
[13] or later, of course.

[14]        Obviously, I was mistaken about the date of the
[15] merger because there is a reference to the up-and-coming
[16] merger right here in this document, which is W20.

[17] Q. Okay.

[18] A. The second from the last paragraph. If you read
[19] it --

[20] Q. Okay. I saw that earlier and it escaped my --
[21] you're right.

[22] A. That is -- that, obviously, is the time frame when
[23] the merger took place.

[24] Q. Okay. So, it was worth something. We -- because
[25] you never said you were positive, so it was not a --

**Page 144**

[1] A. I was not positive, but now we have found written
[2] evidence of when it was -- or --

[3] Q. Or close?

[4] A. -- coming up -- coming up to the point of the
[5] merger. It actually did happen.

[6] Q. Perhaps sometime in '92, or whatever.

[7] A. Okay.

[8] Q. Anyway, okay.

[9]        So, with that time frame, that explains those
[10] documents. That's no problem.

[11]        Now, in the general time frame when this occurred,
[12] when you got word that there was going to be a merger, and I
[13] take it your employer prior to that was Zapata, or this -- one
[14] of the Zapata companies, or whatever?

[15] A. Yeah. There was -- there were many.

[16] Q. Yes. I understand.

[17]        What, if any, conversations did you personally have
[18] with Mr. Birkholz about this merger, whether it was that it's
[19] coming up, how it impacted you, anything like that, other than
[20] what we've seen in writing?

[21] A. I'm sure my tax status had changed well before that,
[22] because I've been paid by an overseas entity, because I've
[23] been paying self-employment tax for a long time by that
[24] point.

[25] Q. Okay. Now, I'm not really talking about

Richard W. Case & Jennifer W. & InsBC   Document 29-16   Filed 01/15/2007   Page 38 of 39
Peter Birkholz and Birkholz & Company

June 26, 2006

Page 145

[1] self-employment tax. I'm -- I'm talking about -- well, let me
[2] just retract what I just said and say that I need to go back
[3] to my question.
[4]     What, if any -- when you heard there was going to be
[5] a merger, or there was a merger and you became aware that it
[6] was, what, if any, conversations did you have with
[7] Mr. Birkholz about the merger and the impact it might have on
[8] you?
[9]   A.  I recall telling Mr. Birkholz that there was going
[10] to be a change in companies.
[11]   Q.  Okay.
[12]   A.  But what exactly I said, I do not remember.
[13]   Q.  Okay.  Fair enough.
[14]     Let me get those back before I lose them.
[15]   A.  Okay.  There you go.
[16]   Q.  Thank you.
[17]     And then just for continuity, W12 is a statement of
[18] account, September 30th, '92, and it's on Tidewater
[19] stationery.  We may have even talked about it some.
[20]     But that indicates that sometime in '92, the -- you
[21] went from Zapata to Tidewater, because prior to that, your
[22] pension was Zapata gulf and marine, correct?
[23]   A.  It would appear so.
[24]   Q.  Okay.  Now, I'm going to show you what has been
[25] marked as W22.  It's also on -- well, no.  It's not also on --

Page 146

[1] it's on Tidewater Marine stationery, okay?  It's Tidewater
[2] Marine, Inc.
[3]     And do you know if that's a subsidiary of Tidewater,
[4] Inc.?
[5]   A.  I'm not sure.
[6]   Q.  Okay.
[7]   A.  I'm -- we're looking at the maze of names again.
[8]   Q.  Okay.  Now, you mentioned Morgan City and Larose, I
[9] believe.
[10]     Could it be Amelia?
[11]   A.  Amelia, yeah.
[12]   Q.  Okay.
[13]   A.  Yeah.
[14]   Q.  So, when you said Morgan City before, and Larose --
[15]   A.  Amelia is very close to Morgan City.  It's in the
[16] same general area.
[17]   Q.  Okay.  The important thing to me is, that's what you
[18] were referring to, it turns out, Amelia, having seen this
[19] document?
[20]   A.  Yeah.
[21]   Q.  Okay.  So, I don't need to go looking in Morgan City
[22] for anything, is what I'm getting at.
[23]   A.  Well, if you were in Morgan City, all you would have
[24] to do is take a cab for two dollars and you would be in
[25] Amelia.

Page 147

[1]   Q.  Okay.  And this appears to be a guy in a department,
[2] international personnel.
[3]     At this point in time, was Tidewater Marine, Inc.,
[4] your employer, as far as you know?  Or do you know?
[5]   A.  I don't know.
[6]   Q.  Okay.  He's inquiring about your coast guard license
[7] and -- what's a Z card?
[8]   A.  A Z card is a seaman's document card.  It contains
[9] information like your Social Security number, your picture,
[10] your current address, your status as a mariner, whether you're
[11] deck engine.  It gives you ratings, whether you're -- when
[12] you're a lifeboat man, tanker man, various other ratings.
[13] It's just a few examples.
[14]   Q.  What's your STCW78?
[15]   A.  That is an international requirement for a watch
[16] keeping officer.
[17]   Q.  Okay.  I assume you had those and got them to them,
[18] or whatever?
[19]   A.  I've got all that stuff.
[20]   Q.  Do you -- did you ever find out why they didn't have
[21] these on file?  Had they moved?
[22]     In other words, at some point, they went from -- I'm
[23] sorry.
[24]   A.  I'm not sure where they -- why they wouldn't have
[25] them on file.  They should have had all of my stuff on the

Page 148

[1] Zapata entities before.
[2]   Q.  Well, at some point, it looks like to me, and you
[3] correct me if you think it's different -- it appears to me
[4] that in '92, they're sending you stuff on Tidewater, Inc.
[5] stationery with a -- the heading "Tidewater Crewing, Limited,"
[6] like David referred to, in -- actually, in New Orleans.  And
[7] then by '99, which is seven years later, they're talking to
[8] you out of a different office with a different name.
[9]     Did they -- did -- what changed between these two,
[10] if anything, that you know of?
[11]   A.  I don't know.
[12]   Q.  Okay.  All you know is, all of a sudden, Amelia,
[13] Louisiana, was more important than New Orleans to your
[14] personnel business, or --
[15]   A.  New Orleans was never important to my personnel
[16] business.
[17]   Q.  Okay.  Well, your -- your retirement plan was there.
[18]   A.  Yeah.  Well --
[19]   Q.  That's pretty important.
[20]   A.  My entire -- my retirement plan is handled by
[21] Merrill Lynch.
[22]   Q.  Okay.  Your health care came out of there, right?
[23]   A.  I guess so.
[24]   Q.  Did that change too?  Did that go to Tidewater
[25] Marine, Inc., in Amelia?

Page 149

[1] A. My health care is taken care of, was taken care of,
[2] at the time, by Blue Cross Blue Shield of Louisiana.
[3] Q. Okay. Well, who purchased --
[4] A. Those are the people that I -- Tidewater
[5] something.
[6] Q. One of the tide -- but you don't know if it
[7] changed --
[8] A. Tidewater something.
[9] Q. Okay. Do you recall it changing to a different
[10] policy at some point or --
[11] A. Yeah. It just changed last year.
[12] Q. Okay. From what company to what company?
[13] A. Blue Cross Blue Shield of Louisiana to --
[14] Q. No. I don't mean that.
[15] I mean --
[16] MR. ROYCE: He's trying to ask which -- which --
[17] which Tidewater entity was supplying your insurance, and what
[18] I think you've said --
[19] THE WITNESS: I don't know.
[20] MR. ROYCE: -- several times is, you don't know
[21] which entity was doing it.
[22] THE WITNESS: I don't know.
[23] BY MR. GREEN:
[24] Q. Okay.
[25] A. Yeah.

Page 150

[1] Q. Okay. Kind of out of curiosity, as much as anything
[2] else, while I'm looking at them, there are some photos that
[3] I've got photocopies of, and I think they were actually
[4] scanned.
[5] What are these of?
[6] MR. ROYCE: Jennifer's office.
[7] MR. GREEN: Okay.
[8] BY MR. GREEN:
[9] Q. Okay. Let me show you what has been marked as W187.
[10] This is a note from your wife to Peter Birkholz, but
[11] I want to ask -- it refers to you, so I want to know what, if
[12] anything, it's referring to.
[13] Let you take a look at it.
[14] Do you recall ever seeing that before?
[15] A. This particular letter?
[16] Q. Yeah.
[17] A. No.
[18] Q. Okay. Do you recall having a conversation with --
[19] were you looking for work at that time frame?
[20] A. We're always looking for work, you know? We ask
[21] around.
[22] Q. Okay. But were you specifically talking to a
[23] potential employer in that time frame?
[24] A. I make inquiries occasionally. I could have at that
[25] time.

Page 151

[1] Q. Okay. Did you specifically talk to somebody who
[2] told you that after working 40 quarters, you were totally
[3] vested and didn't have to pay any more Social Security?
[4] A. Under certain conditions, yes.
[5] Q. Okay. Who told you that?
[6] A. A fellow mariner that works in west Africa.
[7] Q. A fellow mariner?
[8] A. Uh-huh.
[9] Q. Is he a potential employer?
[10] A. No. But you asked me who told me that.
[11] Q. Okay.
[12] A. You didn't ask me if a potential employer --
[13] Q. No. But that's what we're talking about.
[14] A. Okay. Well, I didn't understand it that way.
[15] Q. Okay. Well, the -- the note says, "Also, a
[16] potential employer told Rich."
[17] A. She got it wrong.
[18] Q. Okay. Fair enough, then.
[19] What's his name?
[20] A. That would be Butch, Butch Calais.
[21] Q. C-A-L-A-I-S?
[22] A. I'm sorry.
[23] Q. Is Butch his real name?
[24] A. I talked to -- I talked to --
[25] Q. Maybe that's --

Page 152

[1] A. That's all I've ever called him. I've met the man
[2] once in person. I talk to him on the VHF radio.
[3] Q. Okay. Is this just a casual conversation you had,
[4] then, and she thought it was --
[5] A. He told me that he doesn't pay Social Security taxes
[6] because he's fully vested.
[7] Q. I wish that were true.
[8] A. He worked for a company called Bourbon Offshore.
[9] Q. Okay. Do you recall what, if any, response you or
[10] your wife got to this?
[11] A. I don't recall any response.
[12] Q. Okay. As we sit here, do you have any reason to
[13] believe that's true, that after you paid 40 quarters into
[14] Social Security, you don't have to pay any more?
[15] A. Well, Butch said that it was true, that he didn't
[16] pay. I mean, that's -- I can only tell you what the man said,
[17] so --
[18] Q. Okay. But my question --
[19] A. I passed it -- obviously, I passed it on to my wife,
[20] and my wife has passed the question on to Peter.
[21] Q. And my question is: As we sit here today, do you
[22] have an understanding, one way or another, on whether it's
[23] true?
[24] I understand the guy said it, but --
[25] MR. ROYCE: You mean -- you mean, for somebody who