Richard Weyland & Jennifer Weyland v. Peter Birkholz and Birkholz & Company
Case 3:05-cv-00373-JBC    Document 29-17    Filed 01/15/2007    Page 1 of 9
June 26, 2006

### Page 153

[1] is -- who satisfies the proper criteria?
[2] MR. GREEN: Well, I don't know. I mean, if there is
[3] criteria, I've been --
[4] MR. ROYCE: Okay.
[5] MR. GREEN: Well, I'm not aware of any criteria.
[6] MR. ROYCE: It's what this case is about.
[7] MR. GREEN: Forty quarters?
[8] MR. ROYCE: You can --
[9] THE WITNESS: Let me put it this way.
[10] MR. ROYCE: Well --
[11] THE WITNESS: Okay. Go ahead.
[12] MR. GREEN: I'm not sure where the 40 quarters comes
[13] in.
[14] MR. ROYCE: Well, okay. He just needs to ask you
[15] questions, and you need to answer them. I -- I -- I think
[16] that that's an issue in this case.
[17] MR. GREEN: But you're telling me that that's a
[18] statement that is -- directly relates to your claim?
[19] MR. ROYCE: I believe so.
[20] MR. GREEN: Okay.
[21] MR. ROYCE: I believe it's at least an issue.
[22] MR. GREEN: Okay.
[23] MR. ROYCE: But you can ask him -- I mean, all you
[24] asked him was: Do you think that's true or not? I mean,
[25] that's a legal question, but he can say whatever --

### Page 154

[1] MR. GREEN: But his understanding isn't a legal
[2] question.
[3] MR. ROYCE: That's why I didn't object.
[4] MR. GREEN: Yeah.
[5] THE WITNESS: The question was put to Peter to get a
[6] clarification of that.
[7] MR. GREEN: Okay. And --
[8] THE WITNESS: So, therefore -- therefore, if my wife
[9] got a response from Peter, then I think the question should be
[10] put to her what Peter's response was in that case.
[11] BY MR. GREEN:
[12] Q. Okay. Did your wife tell you that she got a
[13] response?
[14] A. Yes, she did.
[15] Q. And what did she tell you the response was?
[16] A. She said that Peter had said something -- something
[17] to the effect that -- that "The I.R.S. will catch up to these
[18] people. They have to pay."
[19] Q. Okay. Do you recall any further discussion with
[20] your wife about it?
[21] A. No.
[22] Q. Okay. Is that the first conversation that you had
[23] with -- well, you didn't have it.
[24] Is that the first time you had a question about
[25] Social Security taxes?

### Page 155

[1] A. Yes.
[2] Q. Okay.
[3] A. No. Wait. No. I think it came up a couple of
[4] other times, earlier.
[5] Q. Okay. And when -- give me some kind of point of
[6] reference for when that would have been, in what context.
[7] A. Would have been sometime right after I first went
[8] overseas, because other people were talking about this sort of
[9] thing.
[10] Q. Okay. Are you talking before '88?
[11] A. I think my first overseas trip was around 1980.
[12] Q. Okay. Tell me about that.
[13] What -- what came up? Who said what to whom?
[14] A. 1980?
[15] Q. Uh-huh.
[16] A. I don't remember who it was.
[17] Q. Okay. Do you remember --
[18] A. It was a long time ago.
[19] Q. Was it just another employee or --
[20] A. Just another guy on another boat.
[21] Q. Okay. And do you remember what was discussed?
[22] A. Yeah. I was talking -- we were talking about the
[23] advantages of working overseas.
[24] Q. Okay. Did you have any conversations with
[25] Mr. Birkholz about that?

### Page 156

[1] A. Yes.
[2] Q. Okay. When was that?
[3] A. It was around the same time period.
[4] Q. Okay. What was your conversation?
[5] A. We talked about the -- the advantages of working
[6] overseas, what -- what could be done, what could not be done,
[7] what was -- what the tax laws were.
[8] Q. Okay. And --
[9] A. He was looking into things for us.
[10] Q. Okay. And what did he come up with? What did he
[11] tell you?
[12] A. Well, he -- he started preparing our taxes in -- in
[13] ways that people do these things overseas. I mean, I'm not a
[14] tax expert.
[15] Q. Did you talk about Social Security in that
[16] context?
[17] A. I'm sure I did.
[18] Q. Okay. What was discussed?
[19] A. What advantages there were for working overseas.
[20] Q. Okay.
[21] A. And the Social Security.
[22] Q. And what did he tell you about Social Security being
[23] an advantage or disadvantage?
[24] A. Well, you know, not really sure what was discussed
[25] at that time. I mean, it's been a long time.

**Page 157**

[1] Q. Okay. So, you don't recall --
[2] A. The exact conversation? No, sir.
[3] Q. Well, I'm not asking you for an exact conservation.
[4] I'm asking you -- I mean, you're making a claim that
[5] goes back that far, and I -- you know, if you have any idea
[6] what was discussed and --
[7] A. Okay.
[8] Q. If he made a representation to you, I need to know
[9] what it was.
[10] A. Well, I need to -- I just -- when I started working
[11] overseas and we were using -- when we were using Mr. Birkholz,
[12] we -- we tried to disclose what I was doing to him so that we
[13] could get the maximum advantage out of the laws that were
[14] available to us.
[15] Q. Okay. But I'm interested in if you discussed Social
[16] Security.
[17] I understand you discussed the 2555s and they were
[18] filed all those years, but did you discuss Social Security
[19] with him?
[20] A. Yes.
[21] Q. Okay. And tell me what you-all discussed.
[22] What did he tell you about it?
[23] A. I don't remember exactly what we told -- what he
[24] told me about it.
[25] Q. Okay.

**Page 158**

[1] A. I was hoping that he was handling it in a proper
[2] manner.
[3] Q. Okay. You've got -- we've talked about the -- the
[4] note that your wife sent and his response to that.
[5] When was the next time that the subject of Social
[6] Security came up?
[7] A. I don't recall.
[8] Q. Okay. Do you recall filing an amended return
[9] concerning your Social Security?
[10] A. Yes.
[11] Q. Okay. And was that in '03?
[12] A. I'm not sure of the year, but all I can -- all I --
[13] all I remember for sure is that it included the year 1999 --
[14] Q. Okay. Well, let me show you the document marked
[15] PB340 --
[16] A. -- for the three-year return.
[17] MR. ROYCE: See, he talks over your answers just
[18] like he said he was going to do.
[19] MR. GREEN: I'm a man of my word.
[20] BY MR. GREEN:
[21] Q. Okay. PB340, just take a look at that and see if
[22] that's what you recall.
[23] A. Yeah. That's the -- looks like the papers that
[24] Peter filed for us.
[25] Q. Okay. And if that's in '03, then was that about the

**Page 159**

[1] time when the subject first came up next between you and your
[2] wife and Peter?
[3] A. I'm not really sure how many times it came up and
[4] exactly when.
[5] Q. Okay. Well, let me narrow it then.
[6] A. It has come up.
[7] Q. When did it come up with you, personally?
[8] MR. ROYCE: What's "it"?
[9] MR. GREEN: The subject of self-employment tax.
[10] THE WITNESS: The subject of self-employment tax was
[11] something that was determined by Mr. Birkholz as the way we
[12] had to file. And that's the way we've been doing it because
[13] of his determination.
[14] BY MR. GREEN:
[15] Q. Okay. But my question is, is when --
[16] A. When?
[17] Q. -- when did you have a conversation with him about
[18] it? Let's say at all.
[19] A. I'm not sure. I couldn't give you a date.
[20] Q. Have you had a conversation with him about it?
[21] A. Of course, yes.
[22] Q. Okay.
[23] A. We've had several meetings.
[24] Q. Give me a context, then, so I can figure out when it
[25] was.

**Page 160**

[1] A. A context?
[2] Q. Tell me what -- tell me about your conversation.
[3] Tell me what -- how it came up, when you had it, where you
[4] were, whatever you need to tell me to give me some idea of
[5] what you're talking about.
[6] A. It would have to be back in the time when -- when
[7] the -- when the -- when the taxes were -- were -- when the
[8] Federal taxes were no longer being taken out of my income.
[9] Q. Are you talking about in the '80s?
[10] A. Whenever that's -- whenever that happened.
[11] Q. Okay. Okay.
[12] A. And the W-2s stopped coming.
[13] Q. I'm talking in terms of -- okay.
[14] We just established that in 2003, he prepared for
[15] you some amended returns, okay?
[16] A. Uh-huh.
[17] Q. My guess is, there are conversations that led up to
[18] that. I don't know if they were with you.
[19] My first question, and I'll repeat it again: Did
[20] you have conversations with him about self-employment tax that
[21] led up to an amended return being filed?
[22] MR. ROYCE: Oh, okay.
[23] THE WITNESS: Ron, that's --
[24] MR. ROYCE: Hold on. Hold on. Hold on. That's a
[25] different question than what you asked.

Page 161

[1] First you said, have you just had questions -- have
[2] you just had discussions about self-employment tax? He said,
[3] yes, we've had a lot. And you said, tell me when. He took
[4] you back.
[5] MR. GREEN: But all of that's after this -- after
[6] this --
[7] MR. ROYCE: If what you're focused on is the
[8] discussions about self-employment tax that led up to the
[9] amended return, that's a totally different time frame, and you
[10] ought to limit it to that.
[11] MR. GREEN: Okay. Well, for now, we'll limit it to
[12] that.
[13] BY MR. GREEN:
[14] Q. The questions have been -- and I thought I made it
[15] clear. Maybe I didn't. We talked about a letter that your
[16] wife wrote about the -- some guy named Butch that said, you
[17] know, whatever.
[18] And my questions were between then and the -- but
[19] that's what I meant for them to be. If I didn't make that
[20] clear, I apologize.
[21] So, now in -- just in an effort to try to find out
[22] if there was a conversation, let's just limit it to anything
[23] that -- that you felt triggered the idea that you were going
[24] to do an amended return.
[25] Did you personally have a conversation with

Page 162

[1] Mr. Birkholz about self-employment tax that -- that led to an
[2] amended return being filed?
[3] A. No.
[4] Q. Okay. Was it your wife that had those
[5] conversations?
[6] A. Yes.
[7] Q. Okay. Has she related to you what those
[8] conversations were?
[9] A. Yes.
[10] Q. Can you tell me what she related to you?
[11] A. She started throwing things at me. She was angry.
[12] Q. Started throwing things at you?
[13] A. Yeah.
[14] Q. Okay. Now, what did she tell you that she had said
[15] to Mr. Birkholz or Mr. Birkholz had said to her that caused
[16] her to do this?
[17] A. She said that we had been overpaying for years and
[18] that we were -- we were -- that, you know, she -- she wanted
[19] to know why I was -- why I was stuck in a dead-end job and --
[20] that's what --
[21] Q. Okay. Well, I don't want to get personal on you,
[22] you know. I mean, you can if you want. I'm just not asking
[23] you to do that.
[24] A. Okay. You asked the question, and I gave you the
[25] answer.

Page 163

[1] Q. Okay. But my question is different than that.
[2] My question was: What did she say that she told
[3] Mr. Birkholz or Mr. Birkholz told her?
[4] I mean, I'm sure Mr. Birkholz didn't say that she
[5] had been overpaying for years, or did he?
[6] A. I'm not really sure what Mr. Birkholz told her.
[7] Q. Okay. Well, I'm only asking you what she told you,
[8] and if you don't remember that, that's fine.
[9] I just need to know if some day you're going to
[10] testify that she told you something. I need to know about it.
[11] A. Okay. No. To the best of my recollection, she did
[12] not tell me what -- exactly what Mr. Birkholz told her.
[13] Q. Okay. So, all you know is, she had a conversation
[14] with him?
[15] A. She had a conversation with Mr. Birkholz, and it --
[16] the end of it was the amended return.
[17] Q. Okay. And I know I just asked you this, but I want
[18] to make sure: And you did not personally have any
[19] conversations with Mr. Birkholz about that, about that
[20] issue --
[21] A. Not --
[22] Q. -- prior to the amended return?
[23] A. Not that led up to the amended return.
[24] Q. Okay. Did you have any other conversations between
[25] the time that we -- and I'll get the date for you if you need

Page 164

[1] it -- that we have the conversation with Butch and the filing
[2] of the amended return in '03?
[3] Any other conversations with Mr. Birkholz about the
[4] subject?
[5] A. You mean between '97 and '03?
[6] Q. About Social Security.
[7] A. No. I do not recall any.
[8] Q. Okay. So, the conversations you might have had
[9] personally were after the amended return was filed?
[10] A. Yes. Possibly.
[11] Q. Okay. At what -- at some point, you and your wife
[12] retained Mr. Smith?
[13] A. Yes.
[14] Q. Okay. Do you recall when that was?
[15] A. I do not recall the exact date, no.
[16] Q. Do you recall an approximate date?
[17] And you can use, as a frame of reference, that --
[18] you know, that fall of '03 is when you did the amended
[19] returns, if that helps you.
[20] A. Mr. Smith was -- Mr. Smith came into this thing when
[21] we found out that there was definitely a problem with the --
[22] with the taxes.
[23] Q. Okay. And how did you find out there definitely was
[24] a problem with the taxes?
[25] A. My wife told me that Peter Birkholz called and asked

Page 165

[1] if I was a foreign employee, and she told me that she replied,
[2] "Yes. He's always been a foreign employee."
[3] And then he mentioned that there may have been
[4] overpayments.
[5] Q. Is this before the amended return was filed?
[6] A. Yes.
[7] Q. Okay. Was this the conversation where she then
[8] threw things at you, or were there more than one?
[9] A. I think that was a different conversation.
[10] Q. Okay. Are you sure she said was a "foreign
[11] employee," as opposed to an employee of a foreign company?
[12] A. The exact wording I am not certain of.
[13] Q. Okay. But if the amendments were in fall of '03,
[14] when did you first engage Mr. Smith?
[15] MR. ROYCE: If you know.
[16] THE WITNESS: I am not sure of the date.
[17] BY MR. GREEN:
[18] Q. Okay. Was it within a year of that?
[19] A. You'll have to -- you'll have to speak to my wife
[20] about when she engaged Mr. Smith.
[21] Q. Okay. So, you did -- did you ever have any
[22] conversations with Mr. Smith, just yes or no?
[23] A. Yes.
[24] Q. Okay. Is there going to be an issue about
[25] attorney-client privilege on him?

Page 166

[1] MR. ROYCE: Yeah. On some stuff. I mean,
[2] obviously, I can't selectively. But the fact of
[3] representation, obviously, is privileged.
[4] I think Jennifer can give you -- Jennifer was the
[5] one who retained him and took the lead on that.
[6] There were some discussions, as he's told you, later
[7] with him, but as to the fact of engagement and the time of
[8] engagement, Jennifer can give you the specifics on that.
[9] BY MR. GREEN:
[10] Q. Okay. After the amended returns were filed, did you
[11] personally have any conversations with Peter, or anybody else
[12] at Birkholz & Company, concerning the self-employment tax
[13] issue?
[14] A. I do not believe I did.
[15] Q. So, those discussions would have been between either
[16] Birkholz and your wife or Birkholz and Mr. Smith, depending on
[17] if he was on the case at that point?
[18] A. Yes. I believe so.
[19] Q. Okay. Have you had any personal conversations with
[20] the I.R.S. about any of these issues?
[21] A. I did speak to one I.R.S. representative once on the
[22] telephone.
[23] Q. And this would have been after the amended returns,
[24] and so it would have been after fall of '03?
[25] A. It was a discussion that I had to have in regard to

Page 167

[1] an audit.
[2] Q. Okay. Do you recall where that I.R.S. agent was
[3] from?
[4] A. Here in Kentucky.
[5] Q. Lexington? Okay.
[6] You don't recall the name, do you? Do you know?
[7] MR. ROYCE: Cindy Fife.
[8] MR. GREEN: Okay.
[9] THE WITNESS: Thank you.
[10] BY MR. GREEN:
[11] Q. I know it doesn't sound like it, but I'm really not
[12] here to give you a hard time.
[13] A. Well, I wish I had a better memory, but --
[14] Q. You're doing fine.
[15] A. Are we trading paper again?
[16] Q. No. I'm trying to speed this up.
[17] When do you go back out to sea, or back out to
[18] work?
[19] A. I'm waiting for the call. I should be due as of the
[20] first.
[21] Q. Of June?
[22] A. Yes, sir.
[23] Q. Okay. And as we speak, you know, we've gone through
[24] a number of these, and I think they stay the same in terms of
[25] the 2555s.

Page 168

[1] In terms of the information from your permit, has
[2] that all stayed the same to date?
[3] A. Yes, sir.
[4] Q. You're operating under the same permit?
[5] A. You mean the Nigerian work permit?
[6] Q. Yes.
[7] A. Okay. To date, no. Negative.
[8] Q. Okay.
[9] A. It does not. I am now working out of the Malongo
[10] office, okay?
[11] Q. When did that begin?
[12] A. I couldn't tell you for sure.
[13] Q. Over a year ago?
[14] A. Yeah.
[15] Q. Over two years ago?
[16] A. Yeah.
[17] Q. Over three?
[18] A. More than three.
[19] Q. Over four?
[20] A. Probably more than four. More -- probably more like
[21] six.
[22] Q. Okay. But does that change your permit?
[23] A. My permit? No. I'm still --
[24] Q. Let me just show you a page, PB240. These are 2000
[25] returns.

Page 169

[1]   Is that information still --
[2] A. 1 Swamp Road? No. It's not applicable today.
[3] Q. Okay. Well, there's a quick way to find that one.
[4]   And what -- what causes that to change?
[5] A. I'm no longer working in Nigeria. I'm working in
[6] Angola now.
[7] Q. Okay. That sounds like a good reason.
[8]   Any -- does that represent a change in terms of who
[9] your employer is?
[10] A. I work out of the Sonatide office now.
[11] Q. What is that?
[12] A. That's just another name in the maze of names.
[13] Q. Okay.
[14]   MR. ROYCE: I'll tell you that his -- that his pay
[15] stubs have continued to come from Tidewater Crewing, Limited,
[16] up through the end of '05, from what I can tell, Ron.
[17] BY MR. GREEN:
[18] Q. Let me ask you generally, while I'm looking for
[19] that: Through, I guess, 2004, 2005, or whatever, there were a
[20] lot of communications back and forth between Mr. Smith,
[21] Mr. Birkholz, and I assume that you guys were involved in some
[22] of those.
[23]   Was that all handled by your wife?
[24]   I mean, did you have any participation in the back
[25] and forth between Mr. Smith and Mr. Birkholz about trying to

Page 170

[1] resolve whatever they were trying to resolve?
[2]   Did you leave that to your wife as well?
[3] A. It was -- it was all in my wife's hands.
[4] Q. Okay.
[5]   MR. ROYCE: So that he gives a complete answer, Ron,
[6] I think that there were certain items, documentation, that he
[7] was requested to provide. Jennifer would say, "We need this,"
[8] and he would get that stuff.
[9]   And is that fair?
[10]   THE WITNESS: Yeah.
[11]   MR. ROYCE: That you would then produce that?
[12]   THE WITNESS: Yes.
[13]   MR. ROYCE: So, he was involved to that extent.
[14]   MR. GREEN: Okay. Yeah.
[15]   THE WITNESS: She was -- she was -- she was managing
[16] the issue.
[17] BY MR. GREEN:
[18] Q. That's fine.
[19]   Well, what I'm really looking more for is: Are you
[20] a witness to conversations, for example, that Mr. Smith and
[21] Birkholz may have had, or e-mails back and forth, or
[22] discussions they might have had with your wife?
[23]   I mean, were you off working while this was
[24] happening or --
[25] A. Ninety percent of the time, 99 percent of the time,

Page 171

[1] I was off working while this was all going on.
[2] BY MR. GREEN:
[3] Q. Okay. Let me show you PB20.
[4]   Is that -- that's about Oil Typhoon.
[5]   Is that -- tell me what that is.
[6] A. Oil Typhoon is an anchor handling supply vessel.
[7] It's registered in the Marshall Islands. This is a photocopy
[8] of a -- of a document for one of these -- for this vessel. I
[9] don't remember the exact reason why, but they needed --
[10] somebody needed to see some evidence that I was actually on a
[11] foreign flag vessel.
[12] Q. Okay. The main reason I -- I ask is, is I -- in
[13] terms of your more recent change of your registration in
[14] Angola, is this ship related to that change?
[15]   Is that where you went to, onto this ship, or --
[16] A. I've been on many ships.
[17] Q. Okay. So, there's just not a -- I can't draw a
[18] connection like that? I'm --
[19] A. Well, somebody wanted an example of -- well, a
[20] vessel that I had been on, and so I brought back a piece -- a
[21] photocopy of one of the vessel documents to prove that.
[22] Q. So, it's meant to be an example?
[23] A. It was a registration document for a foreign
[24] vessel.
[25] Q. Okay. Do you have any personal knowledge as to

Page 172

[1] what -- what was actually provided to the I.R.S. by Mr. Smith
[2] or your wife, or Mr. Birkholz, in connection with this
[3] issue?
[4] A. I'm not sure exactly what was provided.
[5] Q. Okay. I mean, I know you know what you provided to
[6] them, but you weren't there, correct, so --
[7] A. That's correct.
[8] Q. Okay. Kind of like when you can't find your glasses
[9] and they're on your nose.
[10]   Okay. I guess I want to ask you about this as more
[11] of an example.
[12]   What I've pulled out is Bates stamp W00125, and this
[13] particular one is December 28, 2000. But it's basically a
[14] letter saying -- with the tax organizer and so forth, and
[15] saying what he needs.
[16]   Is that typical of the letter that would come with
[17] the tax organizer, at least in the later years?
[18] A. That's pretty much the standard type of letter that
[19] he sent.
[20] Q. And through this entire period of time, that being
[21] '88 -- we've talked from '88 on. I know you had stuff before
[22] that -- but you didn't have W2s or 1099s to provide, or K1s,
[23] correct
[24] A. That's affirmative.
[25] Q. Okay. Let me ask you to look at 126, which I think

**Page 173**

[1] goes with 125. You can look at both of them, if you like.
[2]     Do you recall seeing a form like that?
[3]   A. Nope. I don't remember this one at all. This W126,
[4] I do not remember that.
[5]   Q. Okay. So, to your knowledge, you've never signed
[6] one or --
[7]   A. I cannot remember ever signing a W126.
[8]   Q. Okay. Let me show you what has been marked as W200
[9] and 201.
[10]     MR. ROYCE: 201 is actually the first page of a
[11] ten-page document, I think, Ron.
[12]     MR. GREEN: Okay.
[13]     MR. ROYCE: You're showing 200 as a cover letter,
[14] and then 201 through 210 are an attachment.
[15]     MR. GREEN: I guess it is, but -- yeah, okay. I can
[16] give you the whole thing. I don't think you want to read
[17] it.
[18]     MR. ROYCE: He doesn't need to.
[19]     MR. GREEN: I just have, like, two questions about
[20] it.
[21] BY MR. GREEN:
[22]   Q. There you go. Just to make that complete. It's an
[23] article that continues, and I think the first page probably
[24] tells you what it's about.
[25]     And my real question is: This is a letter to your

**Page 174**

[1] wife.
[2]     Did you ever see this article before today or before
[3] dealing with this litigation?
[4]   A. I think she showed this to me.
[5]   Q. Okay. Do you know what prompted this to be sent?
[6]   A. No. Not really.
[7]   Q. Okay. And I'm not asking you what made Pete
[8] Birkholz -- what he was thinking.
[9]     I assume that your wife had some conversation.
[10]     Do you know anything about what they were talking
[11] about that he sent her this?
[12]   A. No. It would only be speculation, what I would be
[13] telling you about that.
[14]   Q. Okay.
[15]   A. I can't -- I can't speculate.
[16]   Q. I don't want you to speculate, but did your wife
[17] tell you anything about it?
[18]   A. I can't recall what was said about that --
[19]   Q. Okay.
[20]   A. -- exactly.
[21]   Q. You did not personally have any conversations with
[22] Mr. Birkholz about this in 2001, correct?
[23]   A. I don't recall if I did or not.
[24]   Q. Okay. Do you think you might have?
[25]   A. 2001? No. I cannot recall.

**Page 175**

[1]   Q. Okay. The health care that you have, do you -- is
[2] that entirely paid for by your employer, or do you participate
[3] in paying for it?
[4]   A. I participate.
[5]   Q. Okay. Is that just deducted from your checks?
[6]   A. Yes, Ron.
[7]   Q. When you -- when you've got -- okay, and you've got
[8] it coming up. They're going to tell you that you've got to
[9] report to "X" place and -- will you do a working agreement for
[10] the next stint, or do you know?
[11]   A. Usually.
[12]   Q. Okay. How do -- they pay for your travel, your
[13] expenses to get to the place, correct?
[14]   A. Yes, Ron.
[15]   Q. How do they pay for that?
[16]     Do they just give you -- do they give you the
[17] tickets, or do they reimburse you or --
[18]   A. It's an e-ticket. They pay for it.
[19]   Q. Okay. Does that come to you in the mail?
[20]   A. No. I usually call Amelia.
[21]   Q. Okay.
[22]   A. Or I call Angola direct and talk to the people
[23] there. They give me a locator number and a flight number, and
[24] I go to the airport and pick it up.
[25]   Q. Okay. Now, who -- if you're calling Amelia, who

**Page 176**

[1] would you talk to? I mean, I'm talking about just now. I
[2] mean, forget about 2001, or whatever.
[3]     But now, who would you talk to if you had an issue
[4] that you wanted to take care of with Amelia?
[5]   A. Jimmy DeVille.
[6]     MR. GREEN: Okay. Off the record.
[7]     (There was a brief recess.)
[8] BY MR. GREEN:
[9]   Q. Okay. Go back on.
[10]     Just a second here.
[11]     Have you lived -- since you've been in Kentucky,
[12] have you lived at the same place in Cynthiana, or have you
[13] moved to different places?
[14]   A. Lived in the same place.
[15]   Q. Okay. Did you finance any portion of your home in
[16] Cynthiana?
[17]   A. Yes.
[18]   Q. What -- what bank or institution did you finance it
[19] with?
[20]   A. The first financing was at Farmer's National Bank.
[21]   Q. Okay. And who was the second with?
[22]   A. Fifth Third.
[23]   Q. Okay. Do you recall -- and what would that time
[24] frame have been? I think -- I'm trying to think back when we
[25] decided you came to Kentucky.

Page 177

1  A. Farmer's National Bank would be the -- would have
2  been in '97.
3  Q. You're right. Okay.
4      Do you recall who -- who you put down on your
5  application for that as your employer?
6  A. No. Not offhand.
7  Q. Okay. I think I -- this also relates to your wife,
8  but I guess I need to know if you have anything to add to it
9  or know what it -- this relates to the 2003 tax return and
10 penalties.
11     And -- well, did you look at it? It's W00361.
12     I guess, first of all, let me ask you if you've seen
13 that before.
14 A. Have I seen it before? Yes. Jennifer showed me a
15 copy.
16 Q. At the time, or is it more recent?
17     Did you see it at the time it went out?
18 A. I don't remember if I was home or not at the time
19 that she sent -- she -- she sent it, but she showed it to
20 me --
21 Q. What -- if you know, or if she told you, what is it
22 that she's referring to as betrayal?
23 A. Okay. Peter would normally file an extension for us
24 every year because he knew that my tax preparations would come
25 in late. And that is what I believe she's referring to as

Page 178

1  betrayal because he failed to do it that year, and he didn't
2  inform us until well after the fact.
3  Q. Okay. Now, would that have been the -- the
4  automatic extension that you would file April 15th?
5     So, that would be --
6  A. I believe so, yes.
7  Q. That would be April 15th, '04?
8  A. I believe so, yes.
9  Q. Okay. Would this not be after the conversation that
10 you had with your wife where she was throwing things?
11 A. I'm not sure.
12 Q. Okay. If the amended returns were filed six months
13 before that -- I mean, was your initial conversation with your
14 wife about all of this pretty close in time to when the
15 amended returns were filed?
16 A. I'm not really sure exactly when the amended returns
17 were filed.
18 Q. Okay.
19 A. I wasn't present.
20 Q. Well, they were prepared -- I believe they were in
21 August of --
22     MR. ROYCE: They were submitted October 10th of
23 2003.
24     MR. GREEN: Okay. Okay. Yeah. I think they may
25 have been prepared -- yeah. That's fine. So, about six

Page 179

1  months earlier.
2  BY MR. GREEN:
3  Q. So, my question is, is: Was your conversation with
4  your wife that you related about this pretty close in time to
5  when the amended returns were filed?
6  A. I'm not sure.
7  Q. Okay. Was it before the amended returns were
8  filed?
9  A. I'm not sure.
10 Q. Okay. Did she indicate to you that she had just had
11 this conversation with Mr. Birkholz whenever it occurred?
12 A. Are you -- are you referring to the fact that
13 he's -- this betrayal thing, or are you talking about the
14 amended returns?
15 Q. Oh, that's a good point.
16     No. I am -- right now, I'm trying to go back and --
17 you related to me a conversation where she said that we've
18 been overpaying all of these years and was throwing things at
19 you, and that's the one, remember, I said, you know, you don't
20 feel -- don't feel obligated to tell me personal stuff.
21 A. Okay.
22 Q. That conversation, was that not pretty close in time
23 to when the amended returns were done, if not before then?
24 A. The -- you know, it was around the time that the
25 amended returns were done. Whether it was before or after,

Page 180

1  I'm not sure.
2  Q. Okay.
3  A. I couldn't say.
4  Q. But this conversation is where she just found out
5  that she thought there was a problem, right?
6  A. It was -- it had something to do with when Peter
7  asked about this foreign employee thing status, whatever it
8  was. I'm not really sure exactly what the time frame was.
9  Q. Okay. Guess what I'm getting at is: Is if -- if
10 the -- well, let me ask you: This conversation that your wife
11 had with you and she was upset with you, did she -- I mean, do
12 you have any knowledge, was she not mad at Mr. Birkholz?
13     I mean, if she was that mad at you, I assume she was
14 equally mad at him.
15     I mean, do you have any insight in that?
16 A. Yes. I believe she was angry at Mr. Birkholz.
17 Q. Okay. Did anybody check with him to see if he
18 was -- with all of that under the -- with all of that water
19 going under the bridge, if he was still planning to do an
20 extension?
21 A. I'm not sure. My wife was handling the --
22 Q. That's fair.
23 A. -- the --
24 Q. Let me change the question.
25     Did you personally check with Mr. Birkholz to see if

### Page 181

[1] he would do an extension for '03 taxes?
[2] A. No.
[3] Q. Did your wife tell you that she did?
[4] A. I do not recall her saying anything about that.
[5]   MR. GREEN: Okay. Off the record.
[6]   (There was a brief recess.
[7]     EXAMINATION
[8] BY MR. ROYCE:
[9] Q. Mr. Weyland, I remember Mr. Green asking you a
[10] question, a general question, about one of the tax returns
[11] that was actually prepared and then sent back to you.
[12]   And I think you indicated that the normal procedure
[13] was that -- that Mr. Birkholz and his company would provide
[14] the final form to you-all, and then you-all would sign it and
[15] send it in yourselves. And I think that you said that you had
[16] reviewed all of those, at least made a brief review of them,
[17] to see if there was anything that jumped out at you.
[18]   Are you always there to review and sign and send out
[19] that tax return?
[20] A. No.
[21] Q. Okay. Do you know that you've done that for each of
[22] the years?
[23] A. I try to look at them when I come home.
[24] Q. Okay. Have they gone out at that point?
[25] A. Yes.

### Page 182

[1] Q. Okay.
[2] A. My wife has power of attorney.
[3]   MR. ROYCE: Okay. I think I just wanted to clear
[4] that up. That's all I've got.
[5]   MR. GREEN: Just a little follow up.
[6]     RE-EXAMINATION
[7] BY MR. GREEN:
[8] Q. So, I got the impression, from some of those
[9] letters, that at least on some occasions, they were filed late
[10] because you had not been there.
[11]   But there were times when your wife will sign as
[12] your power of attorney?
[13] A. Yes.
[14] Q. And I -- and if we were to obtain -- if somebody
[15] thought it was necessary and we obtained actual signed copies,
[16] then -- so, it may show her signature as agent and not
[17] actually show your signature at all?
[18]   Some of them might; is that correct?
[19] A. I'm not sure what -- what are you talking about, my
[20] agent?
[21] Q. Well, she wouldn't, like -- she wouldn't, like, sign
[22] it as though -- she wouldn't try to forge her signature.
[23]   She would sign her name as power of attorney,
[24] right?
[25] A. Isn't that how it's supposed to be done?

### Page 183

[1] Q. I don't know.
[2] A. I don't know.
[3] Q. But what I'm getting at is: Would we be able to
[4] look at the signed copies and tell when you signed it and
[5] looked at it and when you didn't? And that's all I'm really
[6] getting at.
[7]   Or do you even know?
[8] A. I thought she had -- if she had power of attorney,
[9] she had the right to sign my name.
[10] Q. Oh, I don't know. I'm -- I don't want to imply
[11] anything like that.
[12] A. I don't know.
[13]   MR. ROYCE: He's not -- he's not really getting into
[14] that. His question was just: If we had the signed documents,
[15] could we tell which ones you signed yourself and which ones
[16] she signed? It doesn't sound like you know, but --
[17]   THE WITNESS: Well, I think -- I think if she
[18] signed -- signs for me, she signs my name.
[19]   MR. ROYCE: Okay.
[20]   THE WITNESS: I think -- I think that's what she
[21] does.
[22] BY MR. GREEN:
[23] Q. Does it look the same as when you sign it? Do you
[24] know?
[25] A. Pretty much.

### Page 184

[1] Q. Is she good at it?
[2]   So, if we should need to know that, then we've got
[3] to find out your schedule for the years?
[4] A. If she -- if she -- if she -- if she wants me -- if
[5] she wants to sign something for me, she has my -- my
[6] blessings, as well as my power of attorney.
[7] Q. Okay.
[8] A. She's my wife.
[9] Q. I'm not challenging that.
[10]   What I'm -- the thing that occurred to me, when --
[11] when you were asked the question and answered it, is: Suppose
[12] down the road we think it's important to find out if you
[13] actually signed it or if she signed it, and that's why I was
[14] directing my questions.
[15]   And I guess you're telling me that if we need that,
[16] we're going to have to find out where you were on the date
[17] that it was signed. We can't just go by the returns.
[18]   Is that fair?
[19] A. That's fair.
[20] Q. Okay. Do you have records that would show like in,
[21] say, if we needed to know in 1991 whether you were there in
[22] August of --
[23] A. You know, the tax returns for the next year, okay,
[24] if you go and you look at that -- what is it, 2555 form? It
[25] gives the dates that I'm in the country and the dates I'm out.

Page 185

[1]  Q. That's true. Okay.
[2]     Except for that one year, right?
[3]  A. Except for that one -- well --
[4]  Q. You had lost your -- your mud, remember, and --
[5]  A. Well, I -- yeah. I was robbed at gunpoint.
[6]  Q. Yeah. So, that would be one exception.
[7]     But other than that, I can look at that and tell?
[8] Okay.
[9]  A. Yeah. Pretty much.
[10] Q. Okay.
[11] A. So, you have a record of when I was in the country
[12] and when I wasn't in the country. But you'll have to bounce
[13] back and forth from one tax return to another.
[14] Q. I hope it never matters. I just want to be
[15] prepared.
[16] A. Okay. There you go.
[17] MR. GREEN: Thank you.
[18] MR. ROYCE: Thanks.
[19] (Deposition concluded at 4:57 p.m.)

Page 186

[1] STATE OF KENTUCKY    )
                        ) SS:   ERRATA
[2] COUNTY OF JEFFERSON  )
[3]
[4]
[5]     I HAVE READ THE FOREGOING PAGES, AND THE STATEMENTS
[6] CONTAINED THEREIN (SUBJECT TO CORRECTIONS, ADDITIONS, AND
[7] DELETIONS CONTAINED IN THE ADDENDUM ANNEXED HERETO, IF ANY),
[8] AND THEY ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

                    _____
[14]                   RICHARD J. WEYLAND

[15]    SUBSCRIBED AND SWORN BEFORE ME THIS DAY BY
[16] _____, THIS____DAY OF_____, 2006.

[17]            MY COMMISSION EXPIRES:_____

                    _____
[20]                      Notary Public

Page 187

[1] STATE OF KENTUCKY    )
                        ) SS
[2] COUNTY OF JEFFERSON  )
[3]     I, Kimberley Ann Keene, a notary public, within and for
[4] the state at Large, do hereby certify that the foregoing
[5] deposition of
[6]                    RICHARD J. WEYLAND
[7] was taken before me at the time and place and for the purpose
[8] in the caption stated; that the witness was first duly sworn
[9] to tell the truth, the whole truth and nothing but the truth;
[10] that the deposition was taken before me stenographically and
[11] transcribed by me; that the foregoing is a full, true and
[12] complete transcript of the said deposition so given; that
[13] there was no request that the witness read and sign the
[14] transcript; that the appearances were as stated in the
[15] caption.
[16]    I further certify that I am neither counsel or of kin to
[17] any of the parties to this action, and am in no way interested
[18] in the outcome of said action.
[19]
[20]    Witness my signature this 7th day of June, 2006.  My
[21] Commission Expires on August 29, 2007.

                       _____
                          Kimberley Ann Keene
[24]                Registered Professional Reporter