1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
NO. 05-375-JBC

RICHARD WEYLAND AND
JENNIFER WEYLAND,

    PLAINTIFFS,        DEPOSITION TAKEN
                        ON BEHALF OF
                        DEFENDANTS
                        BY:  NOTICE
VS.

PETER BIRKHOLZ AND BIRKHOLZ &
COMPANY,

    DEFENDANTS.
                  WITNESS:

          JENNIFER WEYLAND

       . . . . . . . . . .

      The deposition of JENNIFER WEYLAND,
was taken before Barbara C. Kargel, CCR (KY),
Notary Public, in and for the State of Kentucky
at Large, on July 14, 2006, at 1:00 p.m. and
August 1, 2006, at 9:00 a.m. at Stoll,
Keenon & Ogden, 300 West Vine Street, Suite
2100, Lexington, Kentucky.  Said deposition
was taken pursuant to Notice, heretofore filed,
for any and all purposes consistent with the
Federal Rules of Civil Procedure.

       . . . . . . . . . .

---

2

             APPEARANCES:

          Hon. Ronald L. Green
          BOEHL, STOPHER & GRAVES
          444 West Second Street
          Lexington, Kentucky  40507

       ATTORNEY FOR DEFENDANTS

          Hon. David T. Royse
          STOLL, KEENON & OGDEN
          300 West Vine Street
            Suite 2100
          Lexington, Kentucky  40507

       ATTORNEY FOR PLAINTIFFS

---

3

              I N D E X

       WITNESS:  JENNIFER WEYLAND

JULY 14, 2006

DIRECT EXAMINATION
   BY:  MR. GREEN       4-137

AUGUST 1, 2006

DIRECT EXAMINATION
   BY:  MR. GREEN     137-202

REPORTER'S CERTIFICATE     203

         EXHIBIT INDEX

NUMBER         DESCRIPTION

Defendant's
Exhibit No. 1   Certificate of Resolution

Defendant's
Exhibit No. 2   Lists

---

4

      Thereupon, the Witness, JENNIFER
WEYLAND, after having been first duly sworn,
was examined and testified as follows:

         DIRECT EXAMINATION

        BY: MR. GREEN:

    Q.   Ma'am, I'm Ron Green, and we've met
before today.  You attended the deposition of
your husband as well as the deposition of
Mr. Birkholz, correct?

    A.   Yes, sir.

    Q.   So you're an old veteran at this
sort of thing now?

    A.   Oh, sure.

    MR. GREEN:  You've heard both of us
give a little spiel on some of the dos and
don'ts just to make it a little smoother.

    THE WITNESS:  Uh-huh (affirmatively).

    MR. GREEN:  I hesitate to repeat them
much, but one is no uh-huhs.

    THE WITNESS:  Sorry.  I just realized
it.

    MR. GREEN:  It's okay.

    THE WITNESS:  How about yeps?

    MR. GREEN:  Yeps may be better, but
she probably would prefer yes.

5

1    THE WITNESS: It might just slip out
2  as a yep.
3    MR. GREEN: It's okay. It's not a
4  big deal. It's just we got to make sure it
5  gets on the record.
6    THE WITNESS: Right, and it might be
7  spelled Y-E-P or Y-U-P. I'm not sure.
8    Q.  Would you state your full name and
9  your address for the record, please?
10    A.  I'm going to ask you if you -- I'm
11  not sure it's important. My name is different
12  on my license than it is --
13    MR. GREEN: It doesn't matter, just
14  whatever you're comfortable with.
15    A.   The only difference is my driver's
16  license is my maiden name.
17    MR. GREEN: If the only thing I can
18  find is your name on your license is different
19  than the name you give me, then you're in good
20  shape.
21    THE WITNESS: I'm just telling you
22  because when I make airline reservations and
23  stuff, I have to use my driver's license name.
24  I'm checking with you to make sure.
25    MR. GREEN: Just go with what you

6

1  normally go by.
2    A.   Jennifer Marie Reid -- I'm sorry.
3  Jennifer Marie Weyland.
4    Q.  I take it Reid's your maiden name?
5    A.  Yes, sir. Spelled R-E-I-D.
6    Q.  Did you give me your address there?
7    A.  I'm sorry. 2366 New, as in brand
8  new, Lair, L-A-I-R, Road, that's Cynthiana,
9  Kentucky, 41031.
10    Q.  And you're the spouse of Richard
11  Weyland?
12    A.  Yes, sir.
13    Q.  And you're one of the two
14  plaintiffs in a lawsuit brought here against
15  Peter Birkholz and Birkholz & Company?
16    A.  Yes, sir.
17    Q.  Now, your husband testified, and
18  I'm not sure we're done with his deposition,
19  but that aside, to the extent that we did get
20  through some things, a lot of times he
21  indicated that you were the primary liaison or
22  between your family and Mr. Birkholz; is that
23  generally correct?
24    A.  Yes, sir.
25    Q.  Let me just start with one of the

7

1  key things. I want to go through, and we've
2  got a lot of years to cover is one thing that
3  makes this complicated, but I'll try not to be
4  too burdensome with that, but let me kind of
5  go to one of the points with you. What's your
6  understanding of who employs your husband at
7  this point and time?
8    A.  Tidewater Crewing Limited.
9    Q.  And why do you think that, or what
10  is it -- who told you that, I guess?
11    A.  I can see it on his pay stubs. I'm
12  sure Richard told me.
13    Q.  And what's your understanding of
14  him first being employed by Tidewater Crewing
15  Limited?
16    A.  1984.
17    Q.  Now, we've obtained some documents
18  from the Tidewater Companies; have you seen
19  those?
20    A.  I'm not sure.
21    MR. GREEN: Let me show you one.
22    MR. ROYSE: Did she say 1984 or '94?
23    MR. GREEN: She said '84. She may
24  have meant '94.
25    THE WITNESS: No. I said 1984, I

8

1  meant 1984.
2    MR. GREEN: Well, I'm real sure
3  that's wrong, but that's okay. We'll look at
4  it later.
5    THE WITNESS: You asked me what my
6  understanding was.
7    MR. GREEN: Your understanding may
8  have been that.
9    THE WITNESS: Right.
10    MR. GREEN: One of the things that --
11  this is Bates stamped 3. I gave you Bates
12  stamped copies, didn't I?
13    MR. ROYSE: I've got them, yes.
14    Q.  This is something put together by
15  somebody who says he's assistant secretary of
16  Tidewater, Inc., a Michael Goldblatt. This
17  was in response to a subpoena, and he called
18  it a certificate of resolution. I'm not sure
19  what that means, or maybe in Louisiana that
20  means something, but if you would -- have you
21  seen this document before? It's Bates stamped
22  T00003.
23    A.  Not that I'm aware of.
24    Q.  Would you look at the third
25  paragraph and read that, please?

9

1    A.   I have no idea what this means.
2        MR. ROYSE:  He didn't ask you a
3    question yet.
4    Q.   Would you read that, please?
5    A.   Richard J. Weyland is currently an
6    employee of Tidewater Marine, LLC since 1997,
7    and has never been an employee of Tidewater,
8    Inc.
9    Q.   Do you know who Tidewater Marine,
10   LLC is?
11   A.   No.
12   Q.   To your knowledge -- but that's
13   not consistent with your understanding?
14   A.   No, sir.
15       MR. GREEN:  Let me see that back.
16   Actually, this is one, let's go ahead and make
17   this an exhibit, Exhibit 1.
18       (REPORTER MARKS A COPY OF CERTIFICATE
19       OF RESOLUTION AS DEFENDANT'S EXHIBIT
20       NO. 1 FOR PURPOSES OF IDENTIFICATION,
21       AND THE SAME IS ATTACHED HERETO AND
22       FILED HEREWITH)
23   Q.   Let me ask you to look at this.
24   This will be Bates stamp -- let's see.  That's
25   Marine Service.  Do you know who Tidewater

10

1    Marine, Inc. is?
2    A.   No.
3    Q.   Do you know if they're different
4    than Tidewater Marine, LLC?
5    A.   No.  I wouldn't know the
6    difference.
7    Q.   Let me ask you to look at Bates
8    stamp T, and skip the zeros, T207.  Now, I
9    believe this relates to the mailing of some
10   stuff regarding licensure and so forth.  Take
11   a look at it; do you recall ever seeing that
12   before including after the production?
13       THE WITNESS:  I'm sorry.  What was
14   the last comment?
15   Q.   Including after the production, I
16   mean, prior to today, prior to right now, have
17   you ever seen it before?
18       THE WITNESS:  Could you repeat the
19   question, please?
20   Q.   Yes.  Have you ever seen that
21   document before?
22   A.   No, sir.
23   Q.   Do you recall a time in -- what's
24   the date on that, something '94?
25       MR. ROYSE:  April '94.

11

1        THE WITNESS:  You're doing better
2    than me.  I can't see it.
3    Q.   Do you recall a time when your
4    husband had to get a visa for Angola?
5        THE WITNESS:  I'm sorry.
6    Q.   Do you recall your husband having
7    to get a visa for Angola at some point in
8    time, particularly in April '94?
9    A.   As for the specific date, no.
10   Q.   No, just the general date, and I'm
11   sure you don't remember what day; I'm not
12   asking you that.  I'm asking do you remember
13   about 1994, your husband getting a visa to go
14   to Angola?
15   A.   I'm not sure I understand the
16   question.
17   Q.   The question is do you remember
18   that; do you remember him ever having to get a
19   visa for Angola?
20   A.   Yes, sir.
21   Q.   Would that have been in 1994?
22   A.   Possibly.
23   Q.   Well, this appears from the context
24   of the documents, and if it will help, I'll
25   show you T208 as well, which is a letter that

12

1    has Tidewater Crewings heading on it, but it's
2    got a New Orleans address and relates to that
3    visa, correct?
4        MR. ROYSE:  Ron, I'm not going to
5    have her testify as to what their documents
6    that were produced are, but I'll concede on
7    the record that those two sequential documents
8    certainly appear to go together based on what
9    Tidewater produced.
10   A.   I would have said I don't know, you
11   know, I'm reading this.
12   Q.   Well, I'm trying to get you to see
13   if in '94 you recall it being when he needed
14   the visa.  Let me just skip to my next
15   question; do you know why this would have been
16   done by Tidewater Marine, Inc.?
17   A.   I have no idea.
18   Q.   And you don't know who they are?
19   A.   No.
20   Q.   Has anybody from any of the
21   Tidewater Companies told you he was an
22   employee at any time of Tidewater Crewing
23   Limited?
24   A.   I'm not sure I understand the
25   question.

13

1    MR. GREEN:  Would you read it back to
2  her?  I think it was pretty clear.
3         (READ BACK BY COURT REPORTER)
4    THE WITNESS:  Do you mean did
5  somebody call me up?
6    Q.  No, I mean just what I said.  Has
7  anybody with any of the Tidewater Companies
8  ever told you that?  I don't care how they
9  told you.
10   A.  I mean, it wasn't a subject of
11  discussion.
12   MR. GREEN:  But I need an answer to
13  my question.
14   A.  No.
15   Q.  Other than what may have appeared
16  on paychecks, do you have any other basis for
17  thinking he was ever employed by Tidewater
18  Crewing Limited?
19   MR. ROYSE:  He's just asking for your
20  personal knowledge.
21   A.  It just wasn't a subject that came
22  up a lot.
23   Q.  But my question is other than what
24  you saw on paycheck stubs, do you recall
25  seeing anything else that made you think that

14

1  your husband was an employee of Tidewater
2  Crewing Limited at any time?
3    A.  It's -- I'm going to have to say
4  no.
5    Q.  And there were times when you would
6  contact people about him in terms of trying to
7  get ahold of him and that sort of thing?
8    A.  Yes, sir.
9    Q.  And you didn't call Tidewater
10  Crewing Limited, did you, you called another
11  Tidewater Company or people with Tidewater,
12  Inc. or Tidewater Marine?
13   A.  I had a list of phone numbers that
14  had a list of people to call in different
15  areas, and the list doesn't -- if it shows
16  some kind of Tidewater thing on there, I
17  didn't look at that.  I was looking for
18  wherever my husband was located and whose
19  extension it was I needed to call.  I always
20  had to call overseas.
21   Q.  Well, we'll look at those in a
22  minute.  Now, I want to kind of just jump
23  ahead.  Tell me the procedure that -- and I
24  know it may have changed through time, but the
25  procedure generally that you went through in

15

1  terms of preparing, submitting, tax
2  information to Mr. Birkholz, and then once
3  that's done, what would happen when he was
4  done and had returns, and you would receive
5  them, what would you do with them?
6    THE WITNESS:  Well, you asked quite a
7  few questions there, so which thing do you
8  want me to answer first?
9    MR. GREEN:  Well, as I said in my
10  question, I'd like for you to start with what
11  you did to prepare information and contact
12  Mr. Birkholz with information, and when you're
13  done with that, tell me what you did with
14  returns that he sent you.
15   A.  Okay.  I had my own business, and I
16  kept track of receipts, expenses, paid bills,
17  kept track of bank statements, credit card
18  statements, that sort of thing, and then
19  Peter's advice was because Richard had the
20  computer, Richard would take care of the
21  actual tax work.
22   Q.  Did you hear that advice be given,
23  or is that something Richard told you?
24   A.  Hear, I'm sorry, I don't understand
25  the question.

16

1    Q.  Did you hear Mr. Birkholz tell
2  Richard that?
3    THE WITNESS:  Tell Richard to prepare
4  the taxes?
5    Q.  What you just said that he made a
6  recommendation about how to do that; did you
7  hear that recommendation, or is that something
8  your husband told you?
9    A.  I guess, I'm still -- I'm sorry.
10   MR. GREEN:  Could you read her back
11  her answer, and then maybe she'll understand
12  my question.
13        (READ BACK BY COURT REPORTER.)
14   A.  Peter gave me the advice.
15   Q.  So he didn't give it to Richard, he
16  gave it to you?
17   A.  Well, yes.
18   Q.  Do you know when that was?
19   A.  From the beginning.
20   Q.  Pre 1988?
21   A.  Yes, sir.
22   Q.  Wasn't that before he had a
23  computer?
24   A.  Yes, sir.
25   Q.  So it couldn't have been from the

17

1  beginning?
2      A.  Well, Richard has prepared the
3  taxes since we've been married.  Go ahead.
4      Q.  Maybe I don't understand what
5  you're talking about now.  I assumed when you
6  talked about, when you were talking about the
7  use of the computer, you were talking about
8  the preparation of spreadsheets versus the use
9  of the organizer, but that's not what you're
10  talking about?
11     A.  It was the first thing that
12  occurred to me, but Richard has always
13  prepared the taxes.
14         MR. GREEN:  But I'm talking about the
15  advice about using the computer.
16         THE WITNESS:  Peter -- I'm sorry.
17  Can you clarify that a little bit?
18     Q.  Yeah.  I got confused.  Are you
19  saying Peter told you that Richard should use
20  the computer to do the taxes?
21     A.  Yes, sir.
22     Q.  And when was that?
23     A.  I can't remember when Richard got
24  the computer.
25     Q.  Was it about the same time he

18

1  started doing spreadsheets?  Let me rephrase
2  the question.  Do you recall your husband ever
3  doing spreadsheets before he had a computer?
4      A.  I couldn't say for sure.
5      Q.  So Richard prepared the
6  information?
7      A.  Yes, sir.
8      Q.  And there were several years in the
9  '90s where the information came to Peter a
10  year or two years late; is that true?
11     A.  No.
12     Q.  That never happened?
13     A.  No.
14     Q.  And so if your husband said it
15  happened in a letter, then he's incorrect?
16     A.  I'm not sure what you're referring
17  to.
18         MR. GREEN:  I'm just asking ever.
19         THE WITNESS:  You asked me if the
20  information ever got to Peter late?
21         MR. GREEN:  Uh-huh (affirmatively).
22         MR. ROYSE:  What do you mean late?
23         MR. GREEN:  Too late to file the
24  return timely.
25         MR. ROYSE:  By April?

19

1      Q.  Or October.  Do you recall a big
2  rigamarole?  And we'll go through it in more
3  detail, so if you don't remember right now,
4  I'll refresh your memory as we go through it.
5      A.  I remember.
6      Q.  There were a lot of penalties with
7  not filing the returns on time, correct?
8      A.  I'm imagining, yes, there probably
9  was.
10     Q.  And that was from all the data not
11  being given to Peter, correct?
12     A.  No.
13     Q.  What do you think it was from?
14     A.  I know it was from the fact that we
15  sent him the data, we sent it before the
16  deadline of the extension, and somebody in
17  Peter's office filed it in the file cabinet
18  before Peter prepared a return.
19     Q.  Do you have anything that would
20  support that, any document or anything that
21  would indicate that you mailed it on time?
22     A.  No, sir.
23     Q.  And any statements and letters from
24  you our your husband to the contrary would
25  then be incorrect?

20

1          THE WITNESS:  I'm sorry?
2      Q.  Statements and letters to the
3  effect that I'll get you the information you
4  need, that sort of thing, well after the fact,
5  you're saying those were just incorrect?
6          THE WITNESS:  That my husband said
7  that?
8      Q.  Well, I'll tell you what, let's
9  just hold off on that, and we'll get in to the
10  letters.  Now, he prepares the return, and he
11  would ordinarily return those to you and your
12  husband at whatever address he had along with
13  a sheet that said here's your return, here's
14  your estimated payment, that sort of thing,
15  correct?
16     A.  Correct.
17     Q.  Now, what would you do with the
18  return?
19     A.  There would be little -- I forget
20  what those things are called, little tabs,
21  sticky tabs that would be on the pages where
22  we needed to sign.  The instructions would be
23  sign returns and put them in the mail; that's
24  what I did, sign, date, put them in the mail.
25     Q.  Would you sign your husband's name

21

1   to them?

2     A.   Yes, sir.

3     Q.   Did you have a power of attorney?

4     A.   Yes, sir.

5     Q.   Did you read them before you signed

6   them?

7     THE WITNESS:  The returns?

8     MR. GREEN:  Uh-huh (affirmatively).

9     A.   No, sir.

10     Q.   Do you recall through all the years

11   prior to, let's say, prior to 2003, do you

12   recall ever looking and actually reading what

13   was on a form called a 2555?

14     A.   No, sir.

15     Q.   Would you have found it alarming if

16   you had done that and noted that according to

17   your husband, his employer was a company

18   called Tidex, I'm not sure how you pronounce

19   it, Nigeria Limited?

20     A.   I'm not sure what you're asking me.

21     Q.   Well, you'll agree that what I just

22   described is not Tidewater Crewing Limited?

23     A.   I will agree with you, yes.

24     Q.   So would you have found it alarming

25   if your husband had said that if you thought

22

1   that his employer was Tidewater Crewing

2   Limited, would you have found it alarming that

3   his tax returns say that it was a different

4   company?

5     MR. ROYSE:  Object to the form.  Go

6   ahead and answer.

7     THE WITNESS:  Alarming?

8     MR. GREEN:  Uh-huh (affirmatively).

9     A.   No.

10     Q.   Wouldn't have bothered you that

11   false information was given to the IRS?

12     MR. ROYSE:  Object, object to the

13   form.

14     MR. GREEN:  I'm not going to read it

15   at trial.  I just want to know.

16     MR. ROYSE:  She hadn't said that,

17   number one, it was false, Ron.  You can't put

18   that in a question.

19     MR. GREEN:  We know it's false.

20   These documents show it's false.  She said

21   it's Tidewater Crewing.  We know she's not

22   Tidex Nigeria.

23     MR. ROYSE:  But she didn't fill out

24   the form.

25     MR. GREEN:  But she didn't read it.

23

1   I'm talking about the reading of it.

2     MR. ROYSE:  Well, she's made clear

3   she didn't read it, she acknowledged it.

4     MR. GREEN:  I know, and I'm wanting

5   to see what the effect would have been had she

6   read it.

7     MR. ROYSE:  She said that she

8   wouldn't have realized there was any issue.

9     A.   It wouldn't have made any

10   difference to me, you know, it wouldn't have

11   had any impact on me at all.

12     Q.   So you weren't concerned about

13   that.  Did you ever have any conversations,

14   specific conversations prior to, and I hope

15   I'm picking the right cutoff date -- well,

16   let's say the end 2002, any specific

17   conversations with Peter Birkholz about who

18   employed your husband?

19     A.   Not to my recollection.

20     Q.   Do you recall, and I understand

21   some of this goes way back, okay, and I also

22   understand that all of this puts you in a

23   difficult situation, but your husband has said

24   you're the one that knows this stuff, okay, so

25   I've got to find out just what you know and

24

1   what you don't know, so if I'm asking you

2   questions you think are ridiculous, it's

3   because I need to know you don't know them.

4   Somebody needs to know them, and I need to

5   find out who.  Do you recall a time when your

6   husband received 1099s from an employer?

7     A.   No.

8     Q.   Never?  Do you recall a time when

9   they did withholdings?

10     A.   Yes.

11     Q.   When was that, and what company; do

12   you remember?

13     A.   Zapata Marine.  I'm not sure of the

14   exact --

15     Q.   Gulf and Marine?

16     THE WITNESS:  Yeah, it could be

17   Zapata Gulf Marine, and you're asking for the

18   years?

19     MR. GREEN:  Well, whatever you can

20   tell me.  I need to know what you remember.

21     A.   Well, he was working for Tidewater

22   Marine when we got married in 1980.

23     MR. ROYSE:  You just said Tidewater.

24     THE WITNESS:  I'm sorry.

25     Q.   Zapata Gulf and Marine?

25

1    A.    Zapata.
2    MR. GREEN:  I get confused, too.
3    A.    Yeah, it was Zapata, and they were
4  taking withholding at that time.
5    Q.    And do you have any -- you said
6  1980?
7    A.    Right.
8    Q.    Any feel for how long they
9  continued to do that?
10    A.    I know things changed drastically
11  in 1984.
12    Q.    When you say things changed
13  drastically, what changed, and I assume we're
14  talking about his employment, not things with
15  you personally or anything?
16    A.    Well, things changed with the
17  company Zapata Gulf Marine.
18    Q.    What changed?
19    A.    They were being taken over, and I'm
20  not sure that's the correct term, but they
21  were being taken over by Tidewater.
22    Q.    And do you recall having any
23  conversations with Peter Birkholz or anybody
24  in his office about that change?
25    A.    Peter Birkholz specifically.

26

1    MR. GREEN:  Tell me what you recall
2  being the conversation.
3    A.    I don't know if I recall specific,
4  you know, I can remember the topic of
5  discussion.  We were concerned about how this
6  was going to affect the, you know, the fact
7  that Richard's paycheck looked different, so
8  we wanted to know how this was going to affect
9  his returns.
10    Q.    What do you mean by look different?
11    A.    There was no withholding.
12    Q.    And how did you have, in what form
13  did you have this conversation?
14    THE WITNESS:  What form?
15    MR. GREEN:  Uh-huh (affirmatively).
16    THE WITNESS:  Can you be more
17  specific?
18    MR. ROYSE:  Did you have it in
19  person, did you have it over the phone,
20  written?
21    A.    I wanted to make sure.  We'd had it
22  in person.
23    Q.    Where was it at?
24    A.    The best of my knowledge, it was in
25  Natick, Massachusetts.

27

1    Q.    And what was in Natick,
2  Massachusetts?
3    A.    His office.
4    Q.    And who was present?
5    A.    Peter Birkholz.
6    Q.    Who else?
7    A.    As far as I know, there was nobody
8  else.
9    Q.    Just you and he?
10    A.    And Richard.
11    Q.    That's what I asked.  Anybody else;
12  Richard was there?
13    A.    I'm sorry.  I thought you meant,
14  like, a secretary or something.  Myself,
15  Richard, and Peter Birkholz.
16    Q.    Now, how sure are you about the
17  1984?
18    THE WITNESS:  1984?
19    MR. GREEN:  Being the time of the
20  change.
21    THE WITNESS:  Being the time of the
22  change?
23    MR. GREEN:  Uh-huh (affirmatively).
24    THE WITNESS:  You mean when things
25  changed with Zapata Gulf Marine?

28

1    MR. GREEN:  Uh-huh (affirmatively).
2    A.    Fairly certain.
3    Q.    Let me ask you to look at, this is
4  marked as what's marked a T14, and this is --
5  I don't know exactly what to make of it.  I
6  don't know if you've ever seen it before.
7  Before I get into this, let me ask you, what
8  if anything did you look at to prepare for
9  your deposition today?
10    A.    There was a multiple sheet of
11  instructions.
12    MR. ROYSE:  I'm going to object to
13  any conversations we had about giving a
14  deposition.
15    Q.    I sure don't want that.  What I'm
16  asking is what documents did you look at?
17    A.    There was a multiple sheet of
18  instructions.
19    MR. ROYSE:  No.  He's asking what
20  documents in this case did you review.
21    A.    There was the '03 letter from
22  Mr. Birkholz, August '03, we looked at.
23    Q.    So you didn't go through the
24  documents, for example, that you produced or
25  the documents Mr. Birkholz produced to refresh

29

1    your memory?

2        A.   No, sir.

3        Q.   Let me show you what's marked T14.

4    It's titled employee earnings deduction

5    register; have you ever seen this before?  If

6    you didn't look at the Tidewater documents,

7    you might not have.

8        MR. ROYSE:   Just so we're clear, Ron,

9    she can tell you whatever you want to ask her

10   about what her understanding was from time to

11   time, but you've got these Tidewater documents

12   in a subpoena to Tidewater, and I think you

13   noticed a deposition of a 30(b)(6) to ask them

14   about what these things mean.  So she can tell

15   you what her understanding is, she can tell

16   you what she thinks from time to time, but I

17   just want to interpose to make clear that

18   she's not going to interpret Tidewater

19   documents whether she's reviewed them or not.

20       MR. GREEN:   I'm not asking her to.

21   This is inconsistent with what she just said.

22   Anybody can be a year off or two years off or

23   whatever.  I'm just wanting to know if any of

24   this jogs her memory.

25       THE WITNESS:   You mean have I seen

30

1    it?

2        MR. GREEN:   That was my question on

3    the table, but that's not where I'm headed, I

4    mean, that's not the end of it.

5        A.   I don't recall ever seeing

6    something like this.

7        Q.   Now that indicates that if they're

8    using employer in the term that we are, which

9    I don't know that that's true, that indicates

10   that Zapata Golf and Marine was his employer

11   in at least part of '85, correct?

12       A.   I wouldn't --

13       MR. ROYSE:   He's asking you does this

14   indicate --

15       THE WITNESS:   Yeah.

16       MR. ROYSE:   -- Zapata Gulf Crews or

17   Zapata Golf Marine was his employer.

18       THE WITNESS:   Are you asking which

19   one it was?

20       MR. ROYSE:   No.  He's just saying

21   does it indicate Zapata --

22       A.   It looks that way.

23       MR. ROYSE:   That's all he's asking.

24       Q.   So could the date that you were

25   talking about have been in '85 instead of '84?

31

1        A.   Possibly.

2        Q.   Now, do you know who Zapata Gulf

3    Crew is?

4        A.   No.

5        Q.   Is it possible that the actual

6    Tidewater transaction was much later than '85,

7    and that this was simply a shift within

8    Zapata?

9        A.   I couldn't tell you.

10       MR. ROYSE:   Ron, I'm going to do this

11   on the record, but I'd be happy to do it off

12   because I don't want you to think I'm

13   testifying for her.  I think what she's

14   telling you is that change of the withholding

15   stuff happened in '84, and kind of a

16   watershed moment.  Because I'm like you, I

17   think the actual change to formal Tidewater

18   came later, and I don't think she's trying to

19   mislead you about.

20       MR. GREEN:   Oh, I know.  I just want

21   to know what she knows, and I wanted to give

22   her a chance to refresh her memory because she

23   hasn't reviewed anything, but frankly, just

24   from that record, it appears that '85 is the

25   year that they changed withholding by

32

1    switching to Zapata Gulf Crew, but Tidewater

2    came much -- really two different things --

3        MR. ROYSE:   I think you're right.

4        MR. GREEN:   -- and anybody can mix

5    things up 15 years ago, I understand that.  I

6    just want to get this as clear as I can and

7    know if there's a contest about it.

8        THE WITNESS:   As far as I know, I've

9    never seen that before.

10       MR. GREEN:   Well, I wish you had, and

11   it would make this a lot easier if you would

12   have looked at these before the depo, but

13   that's okay.  We'll go through them.

14       MR. ROYSE:   We don't have to fight

15   about that.

16       MR. GREEN:   I'm not.

17       MR. ROYSE:   She's prepared to give

18   her deposition, Ron, and she's not required to

19   testify about what Tidewater's produced.

20   She's prepared to give her deposition.

21       MR. GREEN:   No, but I'm told that she

22   is the one that has communicated with Peter

23   Birkholz, since she's the one that knows about

24   --

25       MR. ROYSE:   That's not a

33

1  communication with Peter.

2      MR. GREEN: -- and she knows about

3  this stuff, Richard didn't know much of

4  anything, and if she doesn't know, that's

5  fine. I just need to know.

6      MR. ROYSE: Richard didn't know much

7  of anything. He gave a deposition that lasted

8  all day.

9      MR. GREEN: I know, and most of it

10  was I don't know, you'll have to ask my wife.

11      MR. ROYSE: Okay.

12      MR. GREEN: You know, so I just need

13  to know what she knows, and it may turn out

14  that it's not anything close to what I think,

15  and then I'll move on.

16      MR. ROYSE: And that's fine.

17      MR. GREEN: But I want to know.

18      MR. ROYSE: And she's not a

19  30(b)(6). She's here to tell you what she

20  knows, and I'm not going to let her feel like

21  she should have been made to learn a bunch of

22  stuff about Tidewater.

23      MR. GREEN: I don't care. It's your

24  protocol about whether you did or not. I'm

25  not saying you should have, I'm just saying it

34

1  would have been helpful.

2      MR. ROYSE: I'm not sure it would

3  have, but go ahead.

4      THE WITNESS: I'm with him.

5      MR. ROYSE: This is us having our

6  discussion.

7      Q.  We're the only ones that have

8  looked at the documents, but I don't want to

9  make a fight out of this. It was just a

10  statement, I think it would have been helpful,

11  but, again, he's right. I'm not saying you

12  should have, you had to. I think it would

13  have been helpful you would have known what I

14  was coming about. So you don't know who

15  Zapata Gulf Crew is or whether that was the

16  employer of your husband for some period of

17  time?

18      A.  I couldn't say for sure. I mean,

19  it's -- I'm really not grasping the question.

20      MR. GREEN: All I know is, is that

21  documents that we got from Tidewater indicated

22  that, and I'll tell you what, we can go a

23  little further with it. Let's see, 86 is --

24  88, T88 -- no, no, I'm sorry. It's T15.

25      MR. ROYSE: Go ahead.

35

1      Q.  Yeah, I mean, I'm just saying we

2  got these documents that say that, I don't

3  know if it says who the employer is, but it

4  says the company paying him is Zapata Gulf

5  Crews in '86. It's not a Tidewater Company, I

6  don't think, but you've never heard of Zapata

7  Gulf Crews?

8      A.  If you're asking if I've ever heard

9  of Zapata Gulf Crews, I couldn't tell you for

10  sure.

11      Q.  Do you recall ever discussing with

12  Peter Birkholz that your husband's employment

13  had changed from Zapata Gulf and Marine to

14  Zapata Golf Crews? I have trouble saying

15  that. I'm sorry. Zapata Gulf Crews.

16      A.  I don't recall.

17      Q.  So if we find ourselves at trial,

18  is it safe that you're not going to tell the

19  jury that you told Peter Birkholz that your

20  husband's employment changed from Zapata Gulf

21  and Marine to Zapata Gulf Crews in 1985; you

22  don't know one way or the other whether you

23  discussed that with him, correct?

24      A.  I'm going to say no.

25      MR. ROYSE: You ask a question like

36

1  that, that's the answer you get.

2      Q.  That's true. No, I can't assume

3  that? Let me ask you this, there's

4  different -- let me tell you where I'm coming

5  from. There's different kinds of I don't know

6  or I don't remember. It's I don't remember

7  whether I did, or I specifically remember not

8  doing that. Are you just telling me you can't

9  recall one way or the other if you had any

10  discussions involving the changes Zapata Gulf

11  Crews, assuming there was one, with Peter

12  Birkholz?

13      MR. ROYSE: You mean specifically

14  referring to those entities? She's told you

15  she had that meeting, but you mean

16  specifically talking about those names?

17      Q.  But now we're not sure which time

18  frame that meeting is because it was talking

19  about Tidewater, I don't know which it was

20  dealing with, but you had a meeting -- let me

21  go back and try to clear this up. You had a

22  meeting discussing, I think, you said that the

23  paychecks were different --

24      A.  Right.

25      Q.  -- and the effect of that where

37

1    they weren't withholding?
2        A.   Yes, sir.
3        MR. GREEN:  Now, I think we've
4    established that probably could not have
5    been also about a change to Tidewater if these
6    documents mean what it looks like they mean.
7        THE WITNESS:  I don't recall.
8        Q.   In that meeting, do you have a
9    recollection of telling Mr. Birkholz that the
10   person -- the company writing the check had
11   changed from Zapata Gulf and Marine to Zapata
12   Gulf Crews, Inc.?
13       THE WITNESS:  Do I recall us telling
14   him that?
15       MR. GREEN:  Yeah.
16       A.   No, I don't.
17       Q.   And do you recall what he told you
18   about the effect of changing the withholding;
19   what did he tell you that would do to you?
20       A.   He said, oh, you're an independent
21   contractor, you're going to have to pay both
22   halves of the self-employment tax.
23       Q.   And what did you all say?
24       A.   I don't recall.
25       Q.   Now, was there any discussion at

38

1    that time about how that might give you
2    another deduction?
3        THE WITNESS:  Another deduction?
4        MR. GREEN:  Uh-huh (affirmatively).
5    You have to pay it, but you deduct part of
6    it.
7        THE WITNESS:  I don't understand.
8        Q.   Was there any discussion of how
9    that might affect the other side of your
10   income tax?  Let me make it short.  That
11   didn't happen until '90, I just wanted to see
12   if you discussed it.
13       THE WITNESS:  It didn't happen until
14   '90.  What didn't happen?
15       MR. GREEN:  They changed the law
16   about deducting Social Security, half of
17   Social Security payments.
18       THE WITNESS:  I have no idea.
19       Q.   So you all didn't discuss anything
20   like that?
21       A.   Not that I recall.
22       Q.   Do you recall ever discussing an
23   offsetting deduction that you get if you pay
24   self-employment tax?
25       A.   No, I don't recall.

39

1        Q.   Now, do you not have copies, do you
2    and your husband not have complete copies of
3    your tax returns as you sent them in to the
4    IRS; did you not normally make a copy of
5    those?
6        A.   We got a copy from Peter.
7        Q.   And you signed it, and you sent it
8    on; did you keep a copy?
9        A.   He sent two copies, a client copy,
10   and a copy to sign and send on to the IRS.
11       Q.   Do you still have any of those?
12       MR. ROYSE:  We produced them.
13       MR. GREEN:  Not many, not all of
14   them, but maybe all they have.  That's what
15   I'm trying to see is what they have.
16       THE WITNESS:  We kept pretty much
17   everything.
18       Q.   But you would not have kept a copy
19   of the signature and date and things like that
20   to where we would know when they were sent
21   off?
22       A.   No, and I asked Peter about sending
23   things certified, and he told me not to do it.
24       Q.   To the IRS?
25       A.   Correct.

40

1        Q.   Right, you don't do that.  But you
2    didn't keep any kind of log or anything to
3    make a note anywhere about this was mailed to
4    the IRS on such and such a date?
5        A.   No, sir.
6        Q.   Did you have any involvement at
7    all, I'm going to show you just a copy, it
8    happens to be 1998, of a form called a 2555;
9    did you do that, or was that pretty much
10   exclusively your husband's bailiwick?
11       THE WITNESS:  Are you asking me if I
12   filled this out?
13       Q.   I'm saying, did you have anything
14   to do with providing the information or
15   filling out one of those forms?
16       A.   No.
17       Q.   Was that something your husband
18   took care of?
19       A.   I would assume so.
20       Q.   In this particular one, which is,
21   for the record, PB917, it shows -- the box is
22   checked for the employer being a U.S. company,
23   but it's blank as far as who the employer's
24   supposed to be; you would have never read this
25   even before you signed them, correct?

41

THE WITNESS: Is my signature on there?

Q. Well, nobody signs this particular document. As we just talked about, we don't have any copies that are signed, so we don't know, but as part of the return that you would have signed if you did it like you described earlier, and you've indicated you didn't go and read through it?

A. No.

Q. So you would have never even really seen this type of form?

A. Probably not, no, no, sir.

Q. You may not -- I just need to know if you know about this, PB954, and let me just, as a prelude to this question, refresh your memory that Peter had indicated in his deposition, and you were present for that, but you may not remember this, that your husband, as far as you knew, your husband would fill out a 2555 kind of in handwriting, and then it would be typed up as he did it, and I'm going to show you what's been marked as PB954 and ask you first of all if that's husband's handwriting, or is that yours?

42

A. It's not mine.

MR. ROYSE: Object to the form just on the characterization of the testimony, it's inconsistent, but go right ahead and answer it.

THE WITNESS: Answer you said?

MR. ROYSE: Answer what he asked you; is that your handwriting or Richard's?

A. It doesn't look like either of our handwriting.

Q. Now, this is '87, but you don't know where that information would have come from then, but it wasn't from you?

THE WITNESS: You mean did I provide this information?

MR. GREEN: Uh-huh (affirmatively), whether over the phone or anything else.

A. No.

Q. And just to show you briefly PB930 through PB943, appears to be for December 30, 1998, a letter to you with what we can call a tax organizer; do you recall seeing something like that? I know it's been a long time.

THE WITNESS: Are you asking if I've seen these before?

43

MR. GREEN: Uh-huh (affirmatively).

MR. ROYSE: He asked you if you'd seen that one.

MR. GREEN: Right.

A. This one specifically, I couldn't say for sure.

Q. Do you recall getting something like that from time to time?

A. Yes, sir.

Q. Now, was that something that your husband handled in terms of filling those out when they were filled out?

A. To the best of any knowledge, yes.

Q. Would you look at that one, and there's some handwriting on it, I believe; will you see if that's something that you would recognize as your's or your husband's handwriting?

A. This looks like Richard's handwriting. It could be my husband's handwriting.

Q. And speaking very generally, is it correct that early on, you all used these organizers and then switched to a spreadsheet format?

44

A. I don't remember when Peter started sending organizers.

Q. I'm not asking about that. Initially, communication was done through the organizer, and then it went to, like, a spreadsheet format, correct?

A. I'm not sure which came first.

Q. And the spreadsheets, whenever they are, those were things that were prepared by your husband and not you, correct?

A. Correct.

Q. You only prepared information about your business, correct?

A. Well, and the household, in other words, mortgage information, car payments.

Q. Personal family stuff?

A. Canceled checks, bills, that kind of thing.

Q. Let me ask you to take a look at a document. It's been Bates stamped W7; do you recall seeing that letter?

A. No.

Q. This was a document that you and your husband produced; would your husband have taken care of things like this, or would you

45

1  have been involved when you get mail
2  concerning his employment benefits and that
3  sort of thing?
4      A.   If I opened this, which I don't
5  remember if I did, I would have put it in his
6  mail pile.
7      Q.   Which he would then look at when he
8  got back?
9      A.   That's right.
10     Q.   So this stuff about them forming
11 Zapata Gulf Marine and all that, that would
12 have been something that didn't concern you
13 back at that time?
14     A.   No.
15         MR. GREEN:   Let me -- take a look at
16 PB948, maybe just to make it quicker, in
17 conjunction with 963.  I'm going to show you
18 these two documents and ask you if you recall
19 seeing those, if you recognize those and
20 whether or not you believe they go together
21 because they're both involving the tax year
22 1988, I believe.
23         THE WITNESS:   Okay.  What about
24 this?
25     Q.   Do you recall seeing those?

46

1      A.   I wrote it.
2      Q.   You didn't write the IRS notice,
3  did you?
4      A.   No, I didn't write that, no, but I
5  wrote this letter.
6      Q.   Right.  And do you have any reason
7  to think that's not the notice that you were
8  attaching?
9      A.   I don't remember.
10     Q.   And this is just an indication that
11 the amount that you had indicated on your
12 return that had been paid and estimated is
13 actually greater than the amount actually
14 paid; is that correct?
15     A.   Say that again, that they're -- I
16 mean, I remember the inheritance.  I don't
17 remember the specifics about what was paid and
18 all that other kind of stuff.
19     Q.   Well, do you recall having a
20 problem from time to time when the IRS would
21 correct your returns because the information
22 that you gave to Mr. Birkholz concerning how
23 much had been paid and estimated was different
24 than what the IRS showed as having been
25 actually been paid or allocated?  Usually

47

1  that's just an allocation issue.
2      A.   I'm not sure what you're referring
3  to in regard to this.
4          MR. GREEN:   Let me see it again, make
5  sure I'm correct.  If you'll look under
6  corrections explanations, I think you'll see a
7  statement is pretty much what I just said.
8          THE WITNESS:   Corrections,
9  explanations.
10         MR. ROYSE:   I'm sorry, Ron.  Maybe
11 I've lost track now.  What's the actual
12 question on the table?
13         MR. GREEN:   If there was a problem
14 from time to time where the information that
15 was given to Peter concerning the amount of
16 estimated taxes paid was different than what
17 the IRS indicated that was actually paid.
18         MR. ROYSE:   Do you remember that
19 happening from time to time?
20         THE WITNESS:   No.
21         MR. GREEN:   Are you saying you have
22 no recollection of this event, I mean, if
23 there's another explanation, that's what I
24 would like to hear.
25     A.   I have no idea.  I'm really not

48

1  sure what this is about.
2      Q.   I don't expect you to have a
3  specific memory of what happened in 1989.  I
4  really, I think this recurs through a number
5  of years.  I'm just wondering if you generally
6  remember a problem with the information you
7  giving to Mr. Birkholz not matching up with
8  the IRS --
9      A.   No, I don't remember.
10     Q.   -- leading to notices the different
11 years?
12     A.   No.  I don't remember.  If you're
13 asking me if I remember specific things, no, I
14 don't.
15     Q.   Do you remember generally that
16 being a problem?
17         THE WITNESS:   That we got notices?
18         MR. GREEN:   That changed the amount
19 that, for example, reduced your refund or
20 required you to pay more because the estimated
21 payments were adjusted.
22         THE WITNESS:   Okay.
23         MR. GREEN:   Go ahead.
24         THE WITNESS:   You go ahead.
25         MR. ROYSE:   No.  Let her answer if

49

1  you know what he means.
2       THE WITNESS: If you're -- let me put
3  it this way. Are you asking me, and I'm just
4  trying to make sure, that because we made
5  estimated payments, did we get notices from
6  the IRS at the end of the year saying you
7  either paid too much or you paid too little;
8  is that what you're asking me?
9       MR. GREEN: Not really.
10       THE WITNESS: Oh. That's what I'm
11  hearing.
12       Q.  I'm talking about the amounts the
13  IRS says you paid were different than the
14  amounts that you told Peter Birkholz that you
15  had paid and he put on the return; that's what
16  that is about. Let me ask you this, we'll hit
17  some more of these, and maybe it will jog your
18  memory. Who was responsible between you and
19  your husband for providing that piece of
20  information to him, the amount that you had
21  paid towards your income taxes and Social
22  Security?
23       A.  This has got a tape on it. We
24  never got -- this is -- apparently, I typed in
25  a ridiculous number, it's 35,000.00. I think

50

1  it's supposed to say $3,500, not $35,000, but
2  I don't remember.
3       MR. GREEN: Well, we'll mark you down
4  as a poor typist.
5       THE WITNESS: Yeah.
6       MR. ROYSE: Let's take a break, Ron.
7  You at a good spot?
8       MR. GREEN: I reckon.
9       (RECESS 2:00 - 2:17 P.M.)
10       Q.  We were talking about these two
11  documents, which, I believe, are 948 and 963,
12  and, again, I just want to make sure. As we
13  sit here today at this point anyway, you don't
14  have a recollection of there being a problem
15  with the numbers that you were giving Peter
16  about your estimated payments not matching up
17  with what the IRS had?
18       MR. ROYSE: In that instance or just
19  generally?
20       Q.  Just generally. And I'll show you
21  some more, I think, as we go, and if it --
22       THE WITNESS: I apologize. I think
23  what you're asking me is if in the course of
24  making estimated payments, was there -- are
25  you saying that the IRS is saying that they

51

1  didn't credit us the correct payment?
2       MR. GREEN: That's a possible
3  explanation, or your records were wrong, or
4  something -- they didn't match up.
5       MR. ROYSE: There were discrepancies
6  in what you all thought you paid versus what
7  the IRS thought you paid.
8       A.  Yes, yes.
9       Q.  And that happened on a number of
10  occasions?
11       A.  Yes, sir.
12       MR. GREEN: You saved us hours of
13  questions.
14       THE WITNESS: I'm sorry. I was
15  trying to -- the thing that threw me was this
16  business with my inheritance, and I couldn't
17  understand what that had to do with --
18       MR. GREEN: No. The first sentence
19  is all that I was really asking you about.
20       MR. ROYSE: The rest of that was
21  totally unrelated.
22       THE WITNESS: Oh, okay.
23       Q.  I assume this case doesn't have
24  anything to do with inheritance taxes?
25       A.  No.

52

1       Q.  So that's your business, I don't --
2       MR. ROYSE: If it keeps going on, it
3  might.
4       THE WITNESS: All right.
5       MR. ROYSE: You've answered it.
6       MR. GREEN: Yeah.
7       THE WITNESS: Sorry. I got mixed up
8  with that other part.
9       MR. GREEN: I swore I'd try to keep
10  these things in order unlike the last time.
11  This is W93 -- never mind. I didn't know that
12  that was state tax. I'm not particularly
13  interested this that. Sorry. Now, let me
14  talk with you just a little bit about 1989,
15  and of the file materials that we have
16  available, if you'll look at 869, which
17  I'll -- although -- okay, 892 is where the
18  actual spreadsheet is.
19       MR. ROYSE: 92?
20       Q.  Yeah, 869 thought is what I'm going
21  to ask her about. It's just a letter about
22  892. Now, this letter is from your husband,
23  so, but this is the first indication that I
24  have seen concerning the preparation of the
25  transmittal of information to Peter Birkholz

53

1  through the use of a spreadsheet; do you have
2  any reason to doubt that's the first year, and
3  I don't know because we don't have '87, we
4  don't have '86, but in '88 there was no
5  spreadsheet; I can tell you that with some
6  certainty.
7        THE WITNESS:  I'm sorry.  Would you
8  repeat the question?  You're asking me if this
9  is the first time we were sent a spreadsheet?
10       MR. GREEN:  Actually, I'm giving you
11  a little more benefit of doubt than that.  I'm
12  saying that from my review, this is the first
13  instance I can find where a spreadsheet was
14  used.
15       THE WITNESS:  Spreadsheet was
16  completed, right.
17    Q.    Do you have any reason to think
18  that's not the first time?
19    A.    No.
20    Q.    And that would be in '89 -- or
21  actually, what's that letter dated, May 1990
22  for the '89 tax year; that fits with your
23  general recollection of when these things
24  happened when you got a computer, that sort of
25  thing?

54

1    A.    As I explained before, I don't
2  remember what year we got the computer.
3    Q.    Good enough.  And maybe ask you
4  about 872, which is a cover letter for your
5  '89 tax returns.  It's dated October 9th,
6  1990.  I don't expect you to remember seeing
7  that specific document, but do you recall in
8  that time frame receiving, and various times,
9  receiving a cover letter with your returns
10  saying, you know, here's your returns, here's
11  what you need to do for estimated next year,
12  this is what you pay, that kind of thing; see
13  anything there look out of the ordinary to
14  you?
15    A.    Looks like it.
16       MR. GREEN:  And, of course, I assume
17  that the returns would have been due no later
18  than October 15th.  I don't know if that's
19  stated in that.
20       THE WITNESS:  Yeah, it says right
21  down here (indicating).
22    Q.    Okay.  I take it you don't have any
23  memory of actually if they were filed by the
24  15th or any reason to think they weren't?
25    A.    No.

55

1    Q.    Because I didn't see any indication
2  of any penalties or anything.  You don't
3  recall going that far back why you would have
4  needed extensions that year?
5    A.    Usually an extension was filed
6  because Richard was out of the country.
7    Q.    And I know that you've already told
8  me that you didn't look at these forms, but
9  if -- let me show you 907, which is, again,
10  the 2555, and I'm just going to ask you if you
11  know why something is.  On the 2555 for 1989,
12  and this is a handwritten document -- first
13  let me ask you; is that either your's or your
14  husband's handwriting?
15    A.    It's possibly Richard's, but it
16  looks funny, so I couldn't tell you for sure.
17    Q.    You'll notice that it shows on
18  there Zapata Gulf and Marine as the employer?
19    A.    Okay.
20    Q.    You see it?
21    A.    Yeah.
22    Q.    And this is, of course, well after
23  the change we talked about with Zapata Gulf
24  Crew and all that, but that's okay.  But what
25  struck me as odd, if I remember correctly from

56

1  just seconds ago, isn't that now checked as
2  Zapata Gulf and Marine being a foreign company
3  or a foreign affiliate?
4    A.    It looks like it is.
5    Q.    I'm not aware of any change in
6  their status; are you aware of anywhere they
7  changed their country of origin?  They were
8  initially a U.S. company out of Texas; do you
9  have any memory of them changing?  Forget
10  about them being bought by somebody.  Do you
11  remember them actually changing their office
12  or anything else prior to being bought by
13  Tidewater?
14    A.    I'm trying to think.
15       MR. ROYSE:  He's asking you if you
16  have any particular knowledge that they
17  changed from a U.S. entity to a foreign entity
18  in these years; do you have any specific
19  knowledge?
20       THE WITNESS:  No, no.
21    Q.    So you don't know why that would
22  have changed or if that's a mistake or what;
23  you just don't know?
24    A.    No.
25    Q.    This may be less important, but

57

1  I'll go ahead and ask you just briefly. This
2  is, I believe, similar to that last notice.
3  It's PB804. It's for the tax year 1990. It's
4  dated March 30th, '92, and it basically again
5  just says that the amount that was put on the
6  return as having been paid was different than
7  what the IRS had, but you've already indicated
8  that happened from time to time; I assume that
9  got resolved? Let me help you with another
10 document 806, which is your note that goes
11 with it, I believe. I believe all those go
12 together.
13     A.    Okay. We got a refund check.
14     Q.    But you also got a notice that says
15 you owed money or that they were making an
16 adjustment, I should say. I don't know. I
17 didn't look closely. Do those three things go
18 together with that note, those two things go
19 with that note?
20     THE WITNESS: I'm not sure I'm seeing
21 the date. Is this 12-90, on this check, is
22 that the year, '90?
23     Q.    What's the date on the handwritten
24 note?
25     A.    April 24th, 1992.

58

1      MR. GREEN: Yeah, I'd say not. Let
2  me see the check again. I'd say 3-27-92 is
3  the date up here, but I don't know that. I
4  can't read their stuff any more than you can.
5      THE WITNESS: If you are having a
6  hard time, trust me, I'm not going to --
7      Q.    But your handwritten note talks
8  about you got a check, right?
9      A.    Yeah.
10     Q.    And all I know is that's the only
11 one in that file, in Pete's file for that
12 year, so, and then you also got a notice about
13 the estimateds, correct?
14     A.    That's what this looks like, yes.
15     Q.    To your knowledge, did all that get
16 resolved?
17     THE WITNESS: As far as I know,
18 yeah. Did I answer your question for you?
19     MR. GREEN: Yes. And if you'll look
20 at 819, Mr. Birkholz wrote you a letter which
21 either is patronizing or complimentary, I'm
22 not sure which.
23     THE WITNESS: Right. I was going to
24 tell you that he has commented on the fact
25 that I don't run to the bank and cash out a

59

1  refund check and go and blow it on stuff. I
2  hold on to it until I'm sure everything is
3  okay.
4      Q.    I think that's probably said more
5  than once. But do you have any independent
6  recollection of what the discrepancy was; that
7  letter may or may not help you refresh your
8  memory?
9      THE WITNESS: Discrepancy?
10     Q.    In terms of what you had reported
11 to Peter, when I say you, I mean, you and your
12 husband, had reported to Peter as the amount
13 you had paid in estimated versus what the IRS
14 had recorded; do you remember what the problem
15 was?
16     MR. ROYSE: This goes with what you
17 just showed her, right?
18     MR. GREEN: Uh-huh (affirmatively).
19 It's a response to those things, and I'm just
20 letting her see it to see if it refreshes her
21 memory.
22     THE WITNESS: It sounds like we
23 overpaid, that's what it looks like, but
24 you're asking me if the amount that we told
25 Peter was higher?

60

1      Q.    It doesn't matter whether it was
2  higher or lower; it was just different than
3  what the IRS had?
4      A.    It's possible.
5      MR. GREEN: Well, I mean, the IRS
6  statement says that's the case. I'm just
7  remembering if you recall what caused the
8  discrepancy.
9      THE WITNESS: What caused the
10 discrepancy. I'm going to say that it's
11 possible that when -- I'm trying to think.
12 I'm not sure why in this year.
13     Q.    Okay. That's fine. Let me show
14 you the 2555. It's a handwritten version for
15 the 1990, it's 814, 815; can you tell me
16 whether you recognize the handwriting on that
17 form?
18     A.    It's possible it's Richard's, but I
19 couldn't tell you for sure.
20     Q.    Would you read there for the record
21 what's listed as the employer for 1990?
22     A.    This says Zapata Marine Service
23 Nigeria Limited.
24     Q.    Have you ever heard of that name
25 before?

61

1    A.    Occasionally.
2    Q.    In what context?
3    A.    Well, Richard worked in Nigeria for
4    a long time, and I probably heard it in
5    reference to him working over there.
6    Q.    Was there a time when there was
7    another employment change that you're aware of
8    to go from Zapata Gulf Crew to -- I mean, do
9    you know why this changed?
10    THE WITNESS:    Why Zapata Marine?
11    MR. GREEN:    Why your husband put a
12    different name down this time than he did in
13    '89.
14    THE WITNESS:    I have no idea.  If
15    that's who filled it out.
16    MR. GREEN:    Well, I mean, even if
17    somebody in Peter's office filled it out, I
18    mean, that would be tough just to make up.  I
19    assume there is a company of that name.
20    THE WITNESS:    As far as I know, yeah.
21    Q.    And their main office is in
22    Houston, Texas?
23    A.    I have no idea.
24    Q.    I mean, there's some -- I think in
25    some of the documents you all produced, as

62

1    well as Tidewater did, there's a letter or two
2    that relates to business in terms of what's
3    going on in a ship.  You wouldn't have been
4    privy to any of that; he wouldn't have copied
5    you on that sort of thing?
6    THE WITNESS:    My husband?
7    Q.    Yeah.  And the reason is, is the
8    only source that I can find in the Tidewater,
9    collective Tidewater documents that refers to
10    Zapata Marine Service, Nigeria, is a single
11    letter in 1993 which your husband wrote
12    involving somebody steeling a sextant, and you
13    wouldn't know anything about that?
14    A.    I don't recall anything.
15    Q.    In staying in tax year 1990, I'll
16    ask you to look at 837 briefly.  It's a letter
17    you wrote to, Dear IRS, unless you've got a
18    relative named Irs, and I couldn't, from what
19    I'd seen, put that into any kind of context.
20    Do you recall what that was about; what was
21    the delay?
22    A.    Looks like I was sick.
23    Q.    But what did you delay doing that
24    you were telling everybody you were sorry
25    about?

63

1    A.    Couldn't tell you.  I don't even
2    see a date on here.
3    Q.    Let me ask you to look at W19.
4    Again, when it says W, those are documents
5    that either you or your husband put together
6    for us.  And it's a letter on Zapata Gulf
7    Crews, Inc., stationery dated June 14, 1990,
8    saying that Zapata Gulf Marine Corporation is
9    increasing it's daily compensation; do you
10    recall ever seeing that?
11    A.    No.
12    Q.    And you wouldn't have any idea why
13    in the same year that Zapata Gulf Marine was
14    writing to your husband on Zapata Gulf Crews
15    stationery he was putting a different name
16    down as an employer on his tax return?
17    A.    I have no idea.
18    Q.    When was it that you moved from New
19    Jersey, to Kentucky?
20    A.    1997.
21    MR. GREEN:    So it was later than
22    that.  Let me ask you to look at the document
23    that starts with 854.
24    THE WITNESS:    Do you need this back,
25    by the way?

64

1    Q.    Probably better, huh?
2    A.    Yeah.
3    Q.    Thank you.  And it looks like it
4    goes to 868.  It's the 1990 income tax
5    organizer, and -- well, first of all, let me
6    let you take a look at it and see if you
7    recall having seen that, and were you involved
8    in filling it out?
9    A.    Well, usually when these came in,
10    I'd put them in Richard's mail, so I would not
11    open them up, I mean, if I did open it, I'd
12    look at it, and say, oh, that's what that is,
13    and put it in Richard's mail.
14    Q.    If you'll look inside, does that
15    appear to be Richard's handwriting?  And if he
16    says it's not, then I won't hold you to it if
17    you say it looks like it.  I just want to know
18    if I'm chasing a dead horse.
19    A.    It does.  That does anyway.
20    Q.    Let me look at that just a second.
21    The thing that I had a question about, I
22    didn't write the page number down, so let me
23    find it real quick.  If you'll look at the
24    page that's marked 858, there's two bits of
25    handwriting on there, there's some up here in

65

1  parentheses, and then there's what is filled
2  in the form. Am I correct in assuming that
3  what's filled in the form is your husband's,
4  and what's up there may be something
5  different, somebody's else's?
6      A.   This looks like his handwriting.
7  I'm not sure about this.
8      Q.   What's in parentheses up there?
9      A.   Right.
10     Q.   And that's not yours in
11 parentheses?
12     A.   No.
13     Q.   And, again, would you have seen
14 this before it was sent to Mr. Birkholz?
15     A.   No, not necessarily.
16     Q.   So you don't know why he put Zapata
17 Gulf Marine down as his employer in that year?
18     A.   No.
19         MR. ROYSE:  You mean as opposed to
20 Zapata Crewing.
21     Q.   Or Tidewater or anybody else, or
22 what was it?
23     A.   Zapata Nigeria.
24         MR. GREEN:  Zapata Nigeria.
25         MR. ROYSE:  Got ya.

66

1      Q.   And then, do you have any reason to
2  believe that that organizer wasn't sent on by
3  him to Mr. Birkholz since we know it showed up
4  in his file?
5      A.   To the best of my knowledge, it got
6  sent to him.
7      Q.   Well, this is in the category of
8  where I just need to know if you don't know,
9  but look at 772, which is the 1991. I'm just
10 going to show you the first page. If you want
11 to see the whole thing, you're welcome to,
12 2555 that's in handwriting; does that appear
13 to be Richard's handwriting?
14     A.   No.
15     Q.   Does that show Zapata Gulf Marine
16 as the employer that year?
17     A.   Looks that way.
18     Q.   And you wouldn't have any knowledge
19 as to why it switched from Zapata Nigeria back
20 to Zapata Gulf Marine?
21     A.   Have no idea.
22     Q.   I don't know, just tell me if you
23 know anything about the subject matter of that
24 letter. Your husband indicates -- I'm sorry,
25 what's the Bates stamp, 771, said you got a

67

1  new computer and hadn't had time to do a
2  spreadsheet, and he used some tax program; do
3  you remember any of that, or did he do that
4  kind of on his own?
5      A.   I don't really remember him doing
6  this.
7          MR. GREEN:  That's fine. If you
8  can't shed any light, then I don't need to
9  worry you with it. Let me show you, and I
10 really kind of want you to compare, title
11 letter document T20, and, again, just so the
12 record's clear, when I say Tidewater document,
13 that doesn't mean any particular Tidewater
14 Company or Zapata or anybody else. It's just
15 the ones we got in the production, just so in
16 case anybody reads this. This particular
17 document, T20 is another employee earnings
18 statement which indicates Zapata Gulf Crews,
19 and I want to ask you to look at that in
20 comparison with W20, T20 and W20, and the
21 combination of documents raises a number of
22 questions, but I'll let you look at them first
23 so you're comfortable with them.
24         THE WITNESS:  Okay.
25     Q.   First of all, his paycheck,

68

1  according to that one document, is coming from
2  Zapata Gulf Crews, but Zapata Gulf Marine is
3  giving him a bonus; do you have any knowledge
4  as to why that would be?
5      A.   This says Zapata Gulf Marine out of
6  Great Yarmouth, Norfolk.
7      Q.   But they put a lot of addresses on
8  their letters, but you don't have any reason
9  to know why that would be, why one company
10 would be giving him a bonus and another
11 actually issuing his checks?
12     A.   I have no idea.
13     Q.   And then the other part of this is
14 does that letter refresh your memory as to
15 when the Tidewater Zapata acquisition or
16 merger or whatever --
17     A.   Yeah. I have a different
18 recollection of how things went.
19     Q.   Than is reflected in that letter?
20     A.   Yes, sir.
21         MR. GREEN:  Well, tell me how your
22 recollection is different.
23     A.   I remember there was a big change
24 in 1984, and in 1984, '85, and part of '86, we
25 were living in New Jersey and getting ready to

69

1  buy a home, and this was when things started
2  to, you know, when there was a real big change
3  in Richard's paycheck, and in the process of
4  getting ready to buy a home, he received a
5  substantial pay cut because of something that
6  was going on with Zapata Marine, Crewing
7  Limited, Nigeria Limited, I couldn't tell you
8  which one, and we had serious doubts about
9  whether or not we could afford to buy a house
10  because of this huge pay cut.
11      Q.    Do you think that began in '84?
12      A.    Yeah, in '84, because I remember we
13  decided we could do it and bought a house in
14  New Jersey in 1986.
15      Q.    But you don't know if all that
16  change was as a result of Tidewater versus
17  something going on in Zapata internally?  I
18  know that initially you thought it was
19  Tidewater because we went over that bridge,
20  but as we sit here now, do you see that the
21  Tidewater part is later?
22      A.    I see what that says, but my
23  recollection is that there were things going
24  on long before what that letter indicates.
25          MR. GREEN:  Well, I don't have, and

70

1  therefore, I'm pretty sure your attorney
2  doesn't have, any data from the Tidewater
3  Company that goes back to '84.  '85 is the
4  earliest that I can see here.  Here's a check
5  in '83.  This deals with the stock ownership
6  plan.
7          MR. ROYSE:  Ron, she is not trying to
8  contest that the actual merger or the official
9  change from Zapata to Tidewater happened in
10  '92.  What she is saying is she remembers that
11  there was changes in the works, and she
12  remembers that it was affecting him.  Prior to
13  that, and her recollection is that it may have
14  even involved some upcoming merger even years
15  before it actually happened, but I don't want
16  you to think she's trying to --
17          MR. GREEN:  Oh, no.  I understand
18  that she's concerned that this is maybe a
19  little at odds with her memory, and I think
20  that she's entitled to have her memories.
21          MR. ROYSE:  But I don't think she's
22  contested that that is when the actual merger
23  took place.
24      Q.    And, I guess, this is as good as
25  point as any to revisit the question that the

71

1  conversation or conversations with
2  Mr. Birkholz, and you know the one we're
3  talking about we talked about at the very
4  beginning.  The other conversation where they
5  were doing withholdings, they didn't do
6  withholdings, the check looked different, you
7  went to him and says how does this affect us,
8  and he said you're self-employed?
9      A.    Yes.
10      Q.    You're pretty sure that that was in
11  the '84 or '85 time frame.  I think we
12  established '85 is actually when that change
13  occurred, but forget about that for a minute.
14  With your memory, that's the time frame that
15  you had that conversation, correct?
16      A.    I would say yes because that was
17  the kind of thing that we would immediately
18  contact Peter about.
19      Q.    Whenever it occurred, without
20  asking you to commit to any particular time
21  frame for that, when this merger occurred and
22  there was a change over in ownership or
23  whatever, obviously, that didn't affect how
24  things were being taken out of your check, or
25  maybe it did, but do you recall having a

72

1  second conversation with Mr. Birkholz about
2  that change, you personally?
3      A.    No, I don't.
4      Q.    Let me ask you real quickly, is one
5  of your notes, it's 793, and, I think, it's
6  dated February 24, '93.  I believe it's
7  relating to the '91 tax year because it's in
8  that file, but let me just ask you if you
9  recall that, and I'd just kind of like to know
10  generally, in other words, what that was
11  about; what was the problem there?
12          THE WITNESS:  And you're asking me
13  what this is about?
14      Q.    Yeah.  What were you discussing
15  with him, if you remember?
16      A.    It sounds like a refund and what to
17  do with it.  Let's see.  Just asking a simple
18  question.
19      Q.    So you think you'd gotten a refund
20  check?
21      A.    I started getting refund notices
22  and checks, and I was asking him should I
23  deposit the checks or hang on to them.
24      Q.    Give me the date of that; is that
25  February '93?

73

1    A.    Yes, sir.
2         MR. ROYSE:  Go off the record.
3         (OFF THE RECORD.)
4    Q.    Did you ever find out why they were
5    giving you refunds, or did that turn out to be
6    a problem, or did that get resolved?
7    A.    I can't remember.
8    Q.    Now, the letter that we just talked
9    about that it dealt with the bonus, but it
10   also talked about the merger of Zapata Gulf
11   Marine and Tidewater, do you have any reason
12   to believe you forwarded that to Mr. Birkholz?
13   A.    I couldn't tell you.
14   Q.    And let me show you, I know you're
15   going to be tired of seeing 2555 considering
16   that you said that you didn't review them, but
17   let me show you this one for '93.  It's got
18   some handwriting; does that appear to be your
19   husband's handwriting?
20        MR. ROYSE:  What's your number there?
21   A.    No.  This is not his handwriting.
22        MR. GREEN:  718.
23   A.    I'm not 100 percent sure, but this
24   does not look like his handwriting.
25   Q.    You don't know why that shows as

74

1    the employer as Zapata Gulf Marine?
2    A.    Don't know why.
3         MR. ROYSE:  Hold on.  That's not 718.
4         MR. GREEN:  709.  I'm sorry.
5         MR. ROYSE:  I really just wanted it
6    for the record, Ron.
7    Q.    I'm maybe trying to speed a little
8    bit too much.  Let me show you a document
9    marked PB744.  It's a letter dated December 4,
10   1993.  It's actually from your husband to
11   Mr. Birkholz, but let me ask you first of all
12   if you recall ever seeing that letter?
13   A.    No.
14        MR. GREEN:  Do you recall him having
15   a -- he describes a situation in there where
16   he lost his passport or visa or something, see
17   at the very beginning, or maybe it's in the
18   fifth paragraph.  I'm not sure.
19        THE WITNESS:  Number five.
20   Q.    Do you recall that happening and
21   being a problem?
22   A.    Vaguely.
23   Q.    But this is providing information
24   for the 1992 tax year?
25   A.    Looks like it.

75

1    Q.    Do you know why that's being done
2    in December '93?
3    A.    Probably because he was out of the
4    country.  I don't know for sure, but that
5    would be my assumption.
6    Q.    Is it true that the '92 tax return
7    was filed late?
8         THE WITNESS:  I don't know.  Was it?
9         MR. GREEN:  Well, it would have been
10   due October 15th, 1993, at the latest, and
11   this is December '93, so...
12        THE WITNESS:  I don't know that I can
13   tell from this.  I'm sorry.  Does it say here
14   that he was late?
15   Q.    Well, doesn't it say there that
16   he's providing information for the tax
17   returns?
18   A.    It says --
19        MR. GREEN:  If you don't know, that's
20   fine.
21        MR. ROYSE:  This is in December, it
22   would have been due in October.  All he's
23   asking is do you recall it being late that
24   year.
25        THE WITNESS:  No.

76

1    Q.    Let me show you a letter that, I
2    think, I probably should have shown you first,
3    745, 746.  This is probably what that's
4    responding to, it's November 3, '93.  Did you
5    have any involvement with the '92 tax year
6    providing information for the returns, I
7    guess, something I should ask you?
8    A.    Well, I usually provide it, you
9    know, if Richard had any questions, I provided
10   information as best I could.
11   Q.    Okay.  But at the beginning of the
12   depo, you indicated that you were never late,
13   and if you were late, it was because somebody
14   in Pete Birkholz's office filed things away;
15   remember that?  And, I think, we're going to
16   get to where the IRS was sending notices which
17   ended up -- and sent a brochure and everything
18   else saying that returns hadn't been filed
19   timely, and this is where it starts, but
20   you're telling me, and if this doesn't refresh
21   your memory, fine, but you're telling me you
22   do not recall whether the '92 tax return was
23   filed timely?
24   A.    I don't recall, no.
25   Q.    Well, we'll come back to that when

77

1  it's appropriate. And this is something your
2  husband took care of obviously; would you have
3  any input into responding to that letter?
4      A.  I don't remember. Well, it looks
5  like this says we paid in advance.
6      MR. GREEN: But that's different than
7  filing the return.
8      THE WITNESS: Okay. But we paid, and
9  Peter told us paying was a good thing even if
10  the return's late.
11     Q.  But he didn't say that it was an
12  excuse for filing a return late, correct?
13     A.  No. That wasn't -- no.
14     Q.  Just better than not filing the
15  return and not paying?
16     A.  Right.
17     Q.  Let's go to, I guess, first I'll
18  show you, it's 655 through 673, and it appears
19  to be an organizer for 2003, and it's just the
20  very first two pages, I think, are the only
21  ones that have anything written on them, but
22  could you identify the handwriting on there,
23  if you know whose it was?
24     A.  It could be Richard's.
25     MR. GREEN: I mean, see if you're

78

1  comfortable that the first two pages are all
2  that's filled out. There's nothing in there
3  about a change to Tidewater or any Tidewater
4  Company becoming an employer is what my
5  question is going to be.
6      MR. ROYSE: Stipulate there's nothing
7  in that document reflecting that.
8      MR. GREEN: Perfect.
9      THE WITNESS: Do I need to keep --
10     Q.  No. He's taken care of it. Let's
11  see here, 674. This particular -- I'll have
12  to give you something else to go with it, but,
13  I guess, first of all, I'll just ask you, it's
14  July 31, '94; do you recall writing that note?
15     A.  1994, I'm not sure which brochure
16  was in there.
17     Q.  I'll help you with that. That's
18  you're handwriting?
19     A.  Yeah, yes, sir.
20     MR. GREEN: I don't think I have a
21  copy of the actual brochure, but I do have --
22  apparently Mr. Birkholz knew what you were
23  talking about. I'll ask you if you remember
24  receiving 675 which is an August 15th, '94
25  letter to you.

79

1      THE WITNESS: Are you -- I'm sorry.
2  Are you asking me if I remember what this is
3  about?
4      Q.  Well, initially I'm just asking if
5  you remember seeing that, getting that
6  letter?
7      A.  It looks familiar.
8      Q.  And does that refresh your memory
9  about the brochure that you we're talking
10  about, or you were talking about?
11     A.  It looks like the brochure was --
12  had to do with a late return or a return not
13  being filed.
14     Q.  Then let me show you 676, which is
15  an August 15th, letter. It's unsigned but
16  indicates it's from you to the IRS; do you
17  recall drafting that letter and sending it to
18  the IRS?
19     A.  I'm going to -- I would say that
20  Richard -- not Richard, but Peter probably
21  coached this letter, and I'm thinking that
22  this was a year that the return didn't get
23  filed because the information we sent to Peter
24  didn't get put into a return.
25     Q.  Actually, it's the year we were

80

1  just talking about, correct, where your
2  husband was providing information in December?
3      A.  I remember Richard providing the
4  information, filling it all out, and we sent
5  it off, and then I got a call from Peter
6  asking where was our stuff, and I contacted
7  Richard about it or asked him about it
8  somehow, and he said we sent it, and it turned
9  out that somebody in Peter's office had filed
10  it away in a file cabinet before he prepared a
11  return. Now, I'm not sure what year it was,
12  but this sounds like that's the year that it
13  happened.
14     MR. GREEN: I think we're going to
15  find we had a lot of years that we were late.
16     THE WITNESS: It happened more than
17  once.
18     Q.  And do you have anything in writing
19  indicating that you ever thought that at the
20  time?
21     THE WITNESS: Thought?
22     Q.  That somebody had filed away
23  something; do you have any documents that
24  would support that?
25     A.  No. When I talked with Peter, he

81

1   told me what happened.

2     Q.  Do you have an explanation for why

3   after the return is due that your husband

4   would have been providing information and

5   didn't say something like why didn't -- I

6   already provided this or anything else?

7     A.  Well, when we got notices from the

8   IRS, or when Peter called, we realized there

9   was a problem. We sent the information, and

10  no return was prepared. No return was

11  prepared because somebody in his office put

12  our stuff in the file cabinet.

13     Q.  Let me pull those letters out again

14  because you'll notice that they were before

15  all this; what were they?

16     MR. ROYSE:  They were December '93,

17  and then this is August '94, showing IRS still

18  hadn't received a return.

19     MR. GREEN:  Right, but they're saying

20  it was late anyway.

21     MR. ROYSE:  No.

22     MR. GREEN:  Are they saying they

23  still hadn't received a return?

24     MR. ROYSE:  That's why it's never too

25  late. I think the brochure is saying we don't

82

1   have a return from you. I'm sorry.

2     MR. GREEN:  That's okay, I don't have

3   a problem with discussing it, and, I think,

4   one of the things was, if you look at his

5   letter, he couldn't provide information for

6   the 2555. I don't know where that ultimately

7   came from.

8     MR. ROYSE:  But then that's that

9   response letter you showed Mr. Bill Birkholz

10  writes in November 1993.

11     MR. GREEN:  What were the numbers?

12     MR. ROYSE:  I'm sorry. It would have

13  been '90 --

14     MR. GREEN:  '92 file?

15     MR. ROYSE:  Yeah.

16     MR. GREEN:  Okay. It's 744, and

17  745. I'll get those out for you.

18     THE WITNESS:  This one's not even

19  signed.

20     MR. GREEN:  That's why I'm asking you

21  if you sent it.

22     THE WITNESS:  No. This is from them,

23  this is from Birkholz & Company, and they

24  didn't sign it.

25     MR. GREEN:  When we went off in this

83

1   tangent, my question that I had for you was do

2   you recall sending that August 15th letter to

3   the IRS, and you told me that Peter had

4   written it, but that wasn't really my

5   question.

6     THE WITNESS:  I don't remember

7   sending it, but I remember the problem.

8     Q.  I mean, do you remember if it was

9   sent, or do you have any way of knowing?

10     A.  Oh, it was sent. To the best of my

11  knowledge, it was sent.

12     Q.  To put this in perspective, I'll

13  let you look at these, 744 is the response

14  letters, these are in reverse order, November

15  3, '93, is Peter's request for additional

16  information to try to complete the return, of

17  course, this is after it was the last

18  extension that you could get. December 4th,

19  your husband responded, but in paragraph four,

20  he says that he can't help with the dates, he

21  was in the U.S., and he's going to extract

22  those records. I assume at some point those

23  were extracted, but are these two things not

24  connected, the late return in '92, and the

25  question about the return being filed in '94?

84

1     THE WITNESS:  The late return in

2   '92?

3     MR. GREEN:  It hadn't been filed as

4   of December.

5     THE WITNESS:  Right, okay. And then

6   you're saying there's something to do with

7   '94?

8     Q.  These letters in '94, are they not

9   connected?

10     A.  They could be.

11     Q.  And do you know if your husband

12  ever provided the information for the --

13     A.  Oh, yeah, I mean, to the best of my

14  knowledge, eventually he provided it.

15     Q.  And do you have any reason to think

16  that once that was provided that the return

17  wasn't filed?

18     A.  It's possible.

19     Q.  I assume that what he's describing

20  in paragraph five is a difficult thing, I

21  mean, he's lost his best source of

22  information, and he's got to go extract it

23  from payroll, and I assume that's a bit of

24  trouble?

25     A.  I have no idea.

85

1    Q.    So that's best addressed to him?

2    A.    Yeah, you know, wouldn't have

3  anything to do with me.

4    Q.    You'll agree that his letter to

5  Peter doesn't mention that, oh, I thought this

6  return was filed or anything like that?

7    A.    No.  We had a discussion about it.

8    Q.    Who is we?

9    A.    Richard and I.  He was rather upset

10  about it, and I covered for Peter, I said, you

11  know, he's a good guy, let's not make an issue

12  out of this.

13    Q.    How can it be Peter's problem when

14  you still can't provide your information after

15  the return's already due?

16    A.    I'm not exactly sure that this is

17  pertaining to that specific thing.  I don't

18  remember the exact years that the returns were

19  late.  There were two of them that were late

20  due to the fact that Peter or somebody in his

21  office put our information that we sent off to

22  him ahead of schedule into the file cabinet.

23  The second time it happened, Richard wanted to

24  fire him, and, again, I stuck up for him.

25    Q.    So you think that -- you don't know

86

1  which year?

2    A.    No, no, I don't recall exactly.

3    Q.    And you'll agree with me that this

4  particular year, you had not provided all the

5  information before they were due?  When I say

6  you, I mean you and your husband, not

7  necessarily you personally.

8    A.    I would say that's what it looks

9  like.

10    MR. GREEN:  Fair enough.  I'm not

11  even saying it's a bad thing.  I just want to

12  see what happened.

13    MR. ROYSE:  These are yours.

14    THE WITNESS:  I think these are his,

15  too.

16    MR. GREEN:  I'm on the path to file

17  lock here.  I think I've maybe scrambled my

18  files here.

19    MR. ROYSE:  Take your time.

20    MR. GREEN:  '92's too thick, and this

21  one isn't thick enough.  Off the record.

22    (OFF THE RECORD.)

23    THE WITNESS:  Is it possible to add

24  something?

25    MR. GREEN:  Sure.  I only want the

87

1  truth.

2    A.    I remember those events happening

3  in terms of the returns not being filed

4  because our information that we sent in got

5  put in the file cabinet by somebody in Peter's

6  office.  As to the sequence of the letters and

7  all that stuff that you've shown me, I don't

8  remember the sequence exactly the way it

9  happened.  I do remember though that it

10  happened at least twice because of that

11  reason, and in regard to sending a letter

12  saying something negative to Peter about it, I

13  know I did not do that.  We'd known him a long

14  time, he was, you know, we considered him a

15  good friend, and let it go at that.

16    Q.    This got quite distressful for you,

17  didn't it?

18    A.    The year -- well, there was --

19  yeah, it was stressful, yeah.

20    Q.    But it was never mentioned that he

21  had any culpability in it?

22    A.    He mentioned it over the phone.

23    Q.    By you, it was never mentioned in

24  any of your letters; you wrote a lot of

25  letters about this, right, handwritten notes?

88

1    A.    Well, we were inquiring about what

2  happened to our stuff, why wasn't this filed

3  or what happened to the file or why are we

4  getting notices from the IRS saying that we

5  didn't file that kind of thing, so, yeah, I

6  wrote letters about that.

7    MR. GREEN:  Let's see here.  I'm

8  going to ask you to look at 678 dated March

9  25th, '93.  I believe this relates to the '93

10  tax year, and see if you recall receiving that

11  letter.  Actually, this may have been with it,

12  679, and 680.

13    MR. ROYSE:  Do you remember seeing

14  that?

15    THE WITNESS:  Do I remember what this

16  is about?

17    Q.    Do you remember seeing that; does

18  it look familiar to you?

19    A.    I don't remember seeing it.  It

20  doesn't mean that I didn't see it at one

21  point.

22    Q.    At least for the '93 tax year at

23  this point, he didn't have the information to

24  do the returns, and he was doing an extension

25  and sent you forms; is that right?

89

1      MR. ROYSE:  Stipulate that's what
2  that letter says.
3      A.  Yes.
4      Q.  But you were living in Kentucky at
5  that point, correct?
6      A.  No.  It says New Jersey.
7      Q.  Oh, I'm sorry.  I'm looking at the
8  '97 thing.  You're right.  And I assume as we
9  sit here, you won't know when any of these
10  were in the '90s, so they're closer, but
11  they're still ten years ago, you won't know
12  when any of these tax returns were actually
13  filed; you don't have anything to refresh your
14  memory on that?
15      A.  No.
16      MR. GREEN:  This is 681, is a letter
17  dated April 23, '97.  It's in his '93 file, so
18  I assume it -- let me look real quick to see
19  if there's something that puts this into
20  context.
21      MR. ROYSE:  It's 653.
22      MR. GREEN:  Yeah, 653 maybe, because
23  I'm looking at the very first page.  Yeah,
24  good point.  Let's see if you agree that these
25  go together, 681 and 653, the dates would kind

90

1  of indicate that's possible, but I'm not sure
2  the text matches up.
3      MR. ROYSE:  He's asking do you think
4  those two are related to one another; do you
5  remember?
6      A.  They're a lot of years apart -- oh,
7  okay, I see.  Yeah, they could be related.
8      MR. GREEN:  In your handwritten note,
9  the reason I was wondering about that is your
10  handwritten note expresses a lot of concern,
11  and I'm reading the IRS notice, it's just
12  another instance where the estimated that was
13  reported to Peter was different than what the
14  IRS had record of, and it wasn't something
15  saying that you'd forgotten to file a return
16  or anything, but you think they -- if you're
17  comfortable that they match up, I'm
18  comfortable.
19      THE WITNESS:  You're asking me if I
20  think they're related; yeah, it's possible.
21      MR. GREEN:  Okay, good.  Let's credit
22  David with a big assist on that one.
23      MR. ROYSE:  I just kept seeing '97.
24  On the first page, it was '93, and I couldn't
25  figure out why.

91

1      Q.  Well, that's another thing that
2  throws you off, and on top of that, the Bates
3  stamps are backwards, but I'm pretty sure
4  that's not Jennifer's problem.  Let me show
5  you 701.  I think that's all you need -- no,
6  let's start with 703 here, please.  It's a
7  letter from Mr. Birkholz from his file, and I
8  ask if you recall seeing that letter, and tell
9  the record, is it October 25th?
10      MR. ROYSE:  25th, 1995.
11      MR. GREEN:  '95.
12      THE WITNESS:  I'm sorry.  The
13  question was?
14      Q.  Do you recall receiving that
15  letter?
16      A.  Specifically, no, but I'm sure I
17  received it.
18      Q.  Now, this would have been a year
19  and ten days after the '93 returns would have
20  been due, and ten days after when the '94
21  returns would have been due, and you'll agree
22  that he's asking for more information to
23  complete those, the '93 return, correct?
24      A.  It sounds like he's asking for the
25  information rather lately.  He's asking for

92

1  more information on October 25th.
2      MR. GREEN:  Right.
3      THE WITNESS:  Okay.
4      Q.  Now, did you respond to this
5  letter?
6      A.  I'm sure we did because the return
7  got filed.  Now, as to it being filed late,
8  this could easily be one of the years that our
9  stuff got put in the file cabinet.
10      Q.  Then would you look at 701, which
11  is, for the record, dated May 16th, '96, and
12  tell me if you recall getting that?
13      A.  Well, this is for May.
14      Q.  Of '96?
15      A.  Right, for --
16      Q.  It's a follow-up to the --
17      A.  Yeah.  It looks to me, I would say
18  that he was -- he -- he had the stuff, and
19  he's waiting for the information that we
20  already sent.
21      Q.  And six months later, he still
22  didn't have it?
23      A.  That's what he says, he had it.
24      Q.  Did you write a letter back saying
25  you already had it?

93

1    A.   We talked on the phone because I
2  remember.
3    Q.   Do you have anything to indicate
4  that that occurred?
5    A.   No.  I remember the phone call.  I
6  called him up, and I said we sent this stuff a
7  long time ago, and he said -- he made some
8  kind of comment, and either during that call
9  -- more likely he called me back and said, oh,
10  we found it in the file cabinet.  Somebody put
11  it in the file and filed it away before I
12  prepared a return.
13    Q.   After which of these letters was
14  that phone call?
15    A.   I don't remember.
16    MR. GREEN:  Let me show you 702 and
17  ask you if you received this invoice and if
18  you recall whether you paid it.
19    THE WITNESS:  You're asking if I
20  recall receiving this?
21    MR. GREEN:  And whether you paid it.
22    A.   I would assume that I did pay it.
23  I don't remember.
24    Q.   You didn't question the charge in
25  November '05?

94

1    A.   Question the charge, no, I didn't
2  question it.
3    Q.   Okay.  Do you deny that there was a
4  conversation in November '95 to discuss the
5  data needed to complete the '93, '94 tax
6  returns?
7    THE WITNESS:  No.  I don't -- do I
8  deny that the phone call took place?
9    Q.   Right, and that that's what was
10  discussed, I mean, was it that, or was it, oh,
11  my God, we forgot all your stuff, would you
12  send it again?
13    A.   That could have happened.
14    MR. ROYSE:  Let her see that, if you
15  don't mind, Ron, to give her a chance.
16    MR. GREEN:  Sure, no, I don't mind.
17    A.   No.  I don't dispute it.
18    MR. ROYSE:  Tell me if you want me to
19  stop, but I think it's helpful to move us
20  along.
21    MR. GREEN:  Yeah, in general, I don't
22  usually mind that.  It depends on if it's
23  something real sensitive.  Although -- off the
24  record.
25    (OFF THE RECORD.)

95

1    Q.   Do you want to take a little
2  break?  It's been over an hour, about an hour
3  and a half.
4    A.   Yeah.
5    (RECESS 3:40 - 3:50 P.M.)
6    Q.   You ready?
7    A.   Yes.
8    MR. GREEN:  Do you recall just before
9  the break, we were talking about this invoice,
10  and I'll put it back in front of you in case
11  you want to look at it, and specifically the
12  11-28 entry of '95 discussed data needed
13  to complete '93 and '94 tax returns, and we'd
14  already talked about how that's after both the
15  '93 and '94 would have been due at the
16  latest.  Let me show you three documents
17  beginning with PB617, and I'm basically -- I
18  think they kind of -- it kind of speaks for
19  itself to me, but I want to give you an
20  opportunity to explain why if the problem was
21  that somebody had filed the information away
22  and that's why the returns weren't filed, why
23  on November 29th, you provided in handwriting
24  some information for the '93 and '94 tax
25  returns?

96

1    A.   Okay.
2    MR. ROYSE:  Read that before you
3  answer.
4    MR. GREEN:  Yeah, take your time and
5  look at it.  It's important.
6    THE WITNESS:  So my understanding is
7  the question is why is this letter being sent
8  in 1995 in reference to the tax years '93 and
9  '94?
10    MR. GREEN:  Uh-huh (affirmatively),
11  if it's not because he's called and said I
12  don't have the information, and you said, oh,
13  I'll get it to you, if there's an explanation
14  that's different than that.
15    THE WITNESS:  If this was -- if a
16  return was filed late because information had
17  been filed away in his file cabinet, and it
18  wasn't realized until too late, and this is to
19  the best of my recollection.  He didn't look
20  at it, he didn't see that information.
21  Somebody took the information that we sent to
22  his office and just put it in the file
23  cabinet, so after the fact, this is what I'm
24  gathering from looking at this, he looks at
25  the information we sent, and it's not enough

97

1  stuff, so he asks me for more information, and
2  that's what this looks like, is additional
3  information that he requested.
4      Q.   So you're saying that it wasn't
5  until this time frame that you realized that
6  you had not gotten the 1993 tax return; did
7  you not inquire about that?
8      A.   Well, I don't remember exactly when
9  the IRS sent a notice saying we don't have
10  your return.
11      MR. GREEN:  Well, forget about the
12  notice, I mean, you had the notice that nobody
13  sent you one to sign and sent to the IRS, if
14  that's the case.
15      THE WITNESS:  Well, what I remember
16  is Peter calling and saying where's the
17  information, we need to file the return, and
18  --
19      Q.   And that's what this says?
20      A.   And the conclusion was that we had
21  sent it.
22      Q.   It doesn't say that there, correct?
23      A.   No.  I'm not sure, as I mentioned
24  before, the sequence of events.  I'm not sure
25  when it took place, but it did happen at least

98

1  once.
2      Q.   But on this occasion, first of all,
3  in October '94, you would have known that you
4  didn't get a return for '93, correct, a year
5  before this?
6      A.   It was Peter who called me, and I
7  don't remember when he called.
8      Q.   But, I mean, a lot of things come
9  and go.  With tax returns, people usually keep
10  their eye on.  You had the notice that you had
11  not signed and sent off a tax return for '93
12  without somebody telling you that, correct?
13      A.   He did tell me, he called.
14      Q.   In '95?
15      A.   I don't remember.  I remember the
16  phone call.  He was calling to ask where was
17  our information, where was, you know, this
18  spreadsheet or whatever it was, and it turned
19  out that we had sent it.
20      Q.   If you had sent it, then why did
21  you need to send it again?
22      A.   This doesn't look like a
23  spreadsheet to me.
24      MR. GREEN:  No, but it's all your
25  information going back to '93.

99

1      THE WITNESS:  Well, if he found the
2  stuff in the file cabinet, and there wasn't
3  enough of what he needed, then this is
4  possibly that information.
5      Q.   Or it's possible that you all
6  hadn't provided the information, and he asked
7  you for it, and you sent it?
8      A.   This is only part -- this is just
9  stuff that has to do with details about my
10  business.  There was something in one of his
11  letters that said don't summarize, which is
12  possibly what happened in the original set of
13  information, and he wanted more specific
14  stuff.  This is it, more specific stuff.
15      Q.   Do you have a copy of what you sent
16  him before that?
17      A.   I don't know.  This is not a
18  complete -- this information here is not a
19  complete set of information for a tax return,
20  unless I'm mistaken.
21      Q.   Right, which is why he sent another
22  letter in '96 saying I still need more
23  information, but that's what you sent him in
24  response to that phone call in November '95
25  saying I need the information for '93, '94,

100

1  correct?
2      A.   I don't remember the sequence.
3      MR. GREEN:  Well, look in front of
4  you; they're right there.
5      THE WITNESS:  All right.  It says
6  discussed data needed to complete 1993 and '94
7  tax returns.
8      Q.   And the next day, you sent that
9  three-page letter with all the data, correct?
10      A.   That's what it looks like, but this
11  doesn't say anything about, gee, we found your
12  stuff in the file cabinet.
13      MR. GREEN:  Yeah.  I wonder why that
14  is.
15      THE WITNESS:  Well, yeah, I wonder
16  why.
17      Q.   I'm sorry.  That was a smartass
18  thing for me to do, and I shouldn't have said
19  that.  Let me show you just briefly --
20      MR. ROYSE:  Note my objection to his
21  course language.
22      MR. GREEN:  Well, that was used in
23  the genteel form of the expression, kind of
24  the same way they describe fans.  Okay, 629 to
25  652.

101

1    THE WITNESS:  Well, what I will point
2    out is I certainly was accommodating and
3    turned this around as quickly as I could is
4    what it looks like.
5    Q.    This appears to be an organizer for
6    1994, and do you recognize the handwriting?
7    A.    Looks like Richard's handwriting.
8    Q.    I mean, would you have had any
9    input into that information, preparation of
10   that?
11   A.    He may have asked me for my Social
12   Security number.
13   Q.    You don't know why he put on there
14   that he was self-employed, correct?
15   A.    Yeah.  Why he would put that he was
16   self-employed, because Peter told him he was
17   self-employed.
18   Q.    Not why he did, why he would have
19   -- not why he would have, why he did.  Did he
20   discuss that with you; do you know why it
21   changed that year?
22   A.    I would say Peter told him to put
23   that in there.
24   Q.    Do you know that, or is that
25   something you would say?

102

1    A.    I remember Peter telling him he was
2    self-employed a long time ago.
3    MR. GREEN:  Well, I understand that.
4    But the prior year, your husband wrote down
5    that he was working for Zapata Nigeria or
6    something like that, and this year he wrote
7    something different; I'm just wondering if you
8    know why.
9    A.    I would guess, the best of my
10   knowledge, Peter told him to put it in there
11   that way.
12   Q.    And that could be a really good
13   guess, but I need to know; do you know?
14   A.    For sure?  Based on --
15   Q.    Let me rephrase the question.  Did
16   Richard tell you why he changed that?
17   A.    No.
18   Q.    Did you talk to Mr. Birkholz about
19   that change?
20   THE WITNESS:  No, sir -- you talking
21   me personally?
22   MR. GREEN:  Yes.
23   A.    No.
24   Q.    Thank you.  And this is one, maybe
25   I missed it, but I didn't see a date on this

103

1    in terms of when it was prepared or when it
2    was sent, and I don't think there was a copy
3    of it in the documents that you produced, but
4    if you had a copy that was dated or something,
5    that would be in the documents you produced;
6    is that fair?
7    MR. ROYSE:  Nod affirmatively.
8    MR. GREEN:  By the ancillary witness.
9    MR. ROYSE:  Objection.
10   MR. GREEN:  Off the record.
11   (OFF THE RECORD.)
12   Q.    Let's go to '95 real quick here,
13   and when I say that, I mean, Mr. Birkholz's
14   file for '95 -- well, let me jump a little
15   bit, if I don't, I'll forget this.  The T142,
16   and this reminds me that you had said
17   previously that you weren't sure who you
18   called when you needed to call somebody, but
19   you had a list of contacts, and you weren't
20   worried about what company they were with; do
21   you remember that or something close to that?
22   MR. ROYSE:  Do you remember telling
23   him that?
24   A.    I'm sorry.  Yes, I remember telling
25   him that.

104

1    Q.    Do you still have that list?
2    A.    It's changed over the years.
3    Q.    Do you have any old lists?
4    A.    I have a new list.
5    Q.    Did you keep any of the old lists?
6    A.    It's possible.
7    MR. GREEN:  Let me show you T142, and
8    you would not have seen this if you didn't
9    look at the Tidewater documents, but you may
10   recall the circumstances.  That's dated
11   3-11-96.
12   THE WITNESS:  Is that bullet holes in
13   there?
14   MR. GREEN:  No.  An incompetent hole
15   puncher, one of my pet peeves.  Off the
16   record.
17   (OFF THE RECORD.)
18   THE WITNESS:  You're asking me if I
19   know what this is?
20   Q.    No.  Actually, I know you haven't
21   seen it, but do you recall, did that happen
22   from time to time that you would call somebody
23   and try to get ahold of your husband when he
24   was out of the country?
25   A.    Yes, sir.

105

1   Q.   And would -- that refers to a Matt
2   Comotto?
3   A.   Yes, sir.
4   Q.   Is that who you would have called?
5   A.   At that time.
6   Q.   And is he in New Orleans?
7   A.   No, sir.
8   Q.   Where is he at?
9   A.   Right now, I'm not sure where he
10  is. At the time of this, the date on here, I
11  can't remember whether he was in Angola or
12  some other West African office.
13  Q.   I'm sorry. I've got this
14  backwards. He's the one that this is directed
15  to, but it came from a 504 area code. Isn't
16  that where whoever you called would have
17  been? Can you read the signature down at the
18  bottom?
19  A.   It looks like Phyllis.
20  Q.   Does that ring a bell for you?
21  A.   No.
22  Q.   But this fax was sent from the
23  United States over to Nigeria?
24  A.   It's possible that if I couldn't
25  get through, I called this local, you know,

106

1   this number in New Orleans. I'm not sure why,
2   if I've tried a number of times, and I can't
3   get through, that may be why I called this
4   person in New Orleans.
5   Q.   This is '96, but you wouldn't have
6   your contact list still that would have been
7   in effect at that point in time?
8   A.   It's possible, I may have it.
9   Q.   Could you take a look and see if
10  you have things like that? That could be real
11  helpful for me to get an idea of who was where
12  and that sort of thing, and may help your
13  attorney, too.
14  A.   I'll look.
15  MR. GREEN: Sorry. Matt Comotto's
16  the wrong guy. C-O-M-O-T-T-O.
17  THE WITNESS: I don't even think
18  that's the correct spelling.
19  MR. GREEN: Well, that's the spelling
20  on the fax, so we'll blame
21  Tidewater/Zapata/Nigera. Let me show you
22  T143. I think this is an internal document
23  that you might not have ever seen, but let me
24  ask you if your husband would have seen this in
25  monitoring your husband's financing and so

107

1   forth. It's a personal action form. I think
2   it's giving him a raise. It's -- but it lists
3   the company name as Tidewater Marine.
4   THE WITNESS: Says from Tidewater
5   Egypt.
6   MR. GREEN: Look where it says
7   company.
8   THE WITNESS: I see it now.
9   Q.   I'm not asking you to figure all
10  this out who's who. Would you have received
11  copies of things like that, or would your
12  husband have received?
13  A.   If he received them --
14  MR. ROYSE: Let me just interpose.
15  Ron, this may be a fluke. Look at the name,
16  it's Albert J. Weyland. I don't think this is
17  the right one.
18  THE WITNESS: Yeah. I'm wondering,
19  and then who's this guy down here? I don't
20  know who this guy is.
21  MR. ROYSE: Well, but you wouldn't
22  know that.
23  THE WITNESS: Well, what I'm saying
24  is, this doesn't mean anything.
25  MR. GREEN: This could have got in

108

1   the wrong file you're saying?
2   MR. ROYSE: I'm just guessing that
3   maybe -- let me look at the Social Security
4   number, and I'll tell you.
5   THE WITNESS: No, it's not.
6   MR. GREEN: Another assist for the
7   big guy. Well, we're taking that raise right
8   back then, missy. He just talked him out of a
9   raise.
10  MR. ROYSE: Yeah, that's not his
11  Social Security number.
12  THE WITNESS: No.
13  Q.   We'll note that, and put that aside
14  then. But typically, would you have gotten
15  things like this or seen him where he would
16  have gotten them, and I don't know that he
17  would have gotten them; have you ever seen
18  stuff like this before?
19  A.   No, sir.
20  MR. GREEN: We'll blame that one on
21  Phyllis again.
22  THE WITNESS: I don't think that was
23  Phyllis's signature on there.
24  MR. GREEN: But she probably misfiled
25  it.

109

1    MR. ROYSE: That's right. She's not
2  here to defend herself.
3    MR. GREEN: Let's see. Let me ask
4  you about 517. This a letter dated -- well,
5  it's not dated, I don't think, but it was put
6  in the '95, tax file, and there maybe
7  something here that -- this is regarding the
8  '95 and '96 returns, okay, and it's got you
9  and your husband down here, but, I think, it's
10  your husband that signed it, but just tell me
11  first of all, if you recall sending that
12  letter.
13    THE WITNESS: And the question was?
14    MR. ROYSE: Do you recall sending
15  that letter?
16    A.  No. I don't recall sending it, no.
17    Q.  Do you recall if your husband
18  showed it to you before he sent it?
19    A.  It's possible.
20    Q.  It says here I have been remiss in
21  the past in filling out these papers for the
22  taxes; do you dispute that?
23    A.  No. He was being apologetic
24  because he's a nice guy, and he should have
25  said I've been late filing because I've been

110

1  out of the country.
2    MR. GREEN: Well, he said he'd been
3  out of the country, and he had malaria.
4    THE WITNESS: Right.
5    MR. GREEN: But he also admitted that
6  he had been late in getting the things filled
7  out.
8    THE WITNESS: He was being
9  apologetic.
10    Q.  Well, that's appropriate, isn't it,
11  if you, in fact, were late in getting the
12  things filled out?
13    A.  Right, but there was a good reason.
14    MR. GREEN: No, but, I mean, I'm
15  speaking in the context of you were testifying
16  before that it was Mr. Birkholz's fault that
17  these things were filled out late.
18    THE WITNESS: In some cases it was.
19    Q.  Now, this is undated, so we don't
20  know what the significance is, but it relates
21  to, he's sending some information for the '95
22  and '96 tax returns, correct?
23    A.  That's what it says.
24    Q.  You don't have any reason to
25  dispute that?

111

1    A.  No, sir.
2    MR. GREEN: Let me show you 518 which
3  is dated June 10th, 1997, and it's to the both
4  of you, but let me ask you if you recall
5  seeing that.
6    THE WITNESS: And you're asking me if
7  I remember this?
8    MR. GREEN: Receiving or reading
9  that.
10    A.  I don't remember.
11    Q.  Do you doubt that you did; I mean,
12  do you think it's a fake or anything?
13    A.  No, I don't.
14    Q.  And you'll notice in there that he
15  specifically states that the returns had not
16  been filed because he doesn't have
17  information, and that it needs to be taken
18  care of, correct?
19    A.  Yes, sir. As I said earlier
20  though, the filing of our information into the
21  file cabinet happened more than once.
22    Q.  But there's nothing where you
23  didn't respond to that and say, oh, well, it
24  must be in your filing cabinet, or we already
25  sent it in; instead, your husband said he was

112

1  remiss for not filing things, correct?
2    A.  He says -- this is from Peter
3  Birkholz, so Richard's not saying anything in
4  here.
5    MR. GREEN: Well, in the letter we
6  just looked at.
7    THE WITNESS: On occasion, Richard
8  was remiss.
9    Q.  Okay, and --
10    A.  Peter didn't help anything by
11  putting our stuff in the file cabinet though.
12    Q.  What's the date of that letter?
13    A.  June, 1997.
14    Q.  And you'd known for some time that
15  the '95 return had not been filed, correct,
16  when you got that?
17    A.  I don't remember what year.
18    MR. GREEN: Let me let you look at
19  W478, and that notice from the IRS tells you
20  they haven't gotten your '95 return.
21    MR. ROYSE: What's the question?
22    Q.  Isn't that a notice telling you
23  that they don't have your '95 return?
24    A.  That's what it is, yes.
25    Q.  And you received it, correct?

113

1    A.   As far as I know, yes.

2         MR. GREEN:  And it was in the

3    documents you all produced to me.

4         THE WITNESS:  Okay.

5    Q.   Do you have any reason to think

6    that you sent that to Mr. Birkholz or talked

7    to him about it?

8    A.   I'm sure we sent a copy.  I sent

9    copies of everything from the IRS to

10   Mr. Birkholz.

11   Q.   Is there any letter saying what

12   happened to the information we gave you or

13   anything like that?

14   A.   If I sent this to him asking what

15   does this mean, I may not have put together

16   that, once again, he may have filed our stuff

17   in the file cabinet.

18   Q.   There are notes, and some of them

19   are undated and so forth, so let's go through

20   them and see what, if anything, can be tied to

21   this, okay, because I want to get clear what

22   communications were back and forth about this

23   issue, okay?

24   A.   Uh-huh (affirmatively).

25   Q.   Let's start, I guess, with 534, and

114

1    you may want to keep these out as we go

2    because you may want to cross-refer to them to

3    put things in context.  Now, this is an

4    undated letter, so all I know is that it was

5    in his 1995 file, and the fax banner indicates

6    it was August 22, '97, but do you recognize

7    that as being your handwriting in something?

8    A.   Yes, sir.

9    Q.   Is that your fax banner where you

10   sent that to Mr. Birkholz?

11   A.   Looks like it, yes, sir.

12   Q.   Now, to put that in context, that's

13   six months after the IRS told you that you

14   didn't have a '95 return, correct?

15   A.   This is just a letter telling him

16   how tired I am.

17   Q.   I'm just asking you --

18        MR. ROYSE:  The date of this is five

19   and a half months after that; is that correct?

20        THE WITNESS:  Yes.

21   Q.   And it's after he told you he had

22   no data for '95 or '96?

23   A.   Yes.

24   Q.   Is there any phone conversation

25   that this -- that you can recall that would

115

1    help explain what this is about, I mean, there

2    had to be a reason that you're saying that

3    you're covered up and busy.  Had he requested

4    your information or anything like that?

5    A.   It's possible.

6    Q.   Just no recollection as we sit

7    here?

8    A.   There were a lot of things that

9    took place on the telephone.

10   Q.   Now, 535 is a handwritten letter,

11   August 19, '97, it's got the same date for the

12   fax banner though, 819 -- was this 819?

13   A.   It's 822.

14   Q.   So this actually precedes this, and

15   it appears that you all have been trying to

16   communicate and whatnot, but do you recall, is

17   that your handwriting, and did you send him

18   that note in that time frame?

19   A.   Yes, sir.

20   Q.   And would that banner in its

21   similarity to the other banner indicate to you

22   that that's probably when the other letter was

23   dated?

24   A.   Yes, sir.

25   Q.   Now, let me show you what's 537,

116

1    538, appears to be a signed power of attorney

2    dated July 9, '97; can you verify if that's

3    your's and your husband's signature on that?

4         MR. ROYSE:  Ron, can you introduce

5    those however you want, but I think those are

6    a part of document 539.

7         MR. GREEN:  Well, they may be.  I

8    assumed they weren't because he would have had

9    that to do this.

10        MR. ROYSE:  He specifically refers to

11   them in 539.

12   Q.   Right.  He would have needed that

13   to do this, but they would have signed it

14   before this, I think.  What's the date on the

15   signature?

16   A.   07-09-97.

17        MR. GREEN:  That's the same day.

18   Well, you may be right.  Let me go ahead and

19   let you look at 539 as well.  Maybe that was a

20   letter for you to send at the same time.  You

21   tell me what you think it is.  Although, those

22   may have been faxed.  He could have done a

23   letter the same day.

24        THE WITNESS:  And -- I'm sorry.  Your

25   question about this is?

117

Q. Is that your's and your husband's signature on the power of attorney?

A. Looks like it.

Q. Well, how about your's?

A. Yeah, mine's on here.

Q. Do you recall why he asked you for a power of attorney?

A. I'm thinking that it's because he needed a power of attorney in order to deal with something with the IRS.

Q. And was that something the fact that '95 tax returns hadn't been filed?

A. I don't know.

Q. Let me see those again real quick, and I'll give them back to you. The more I look at this, I think, David may have been half right, and I may have been half right. Does 539 appear to be a letter that he drafted for you to sign to send to the IRS?

A. Yes, sir.

Q. And did you sign this and send it on to the IRS?

A. I would think so.

Q. And it says data was mailed to our accountant in Boston June 25th, '97, to repair

118

the returns; is that an untrue statement?

A. I couldn't say.

Q. Well, you wouldn't have signed it and sent it to the IRS if it was false, would you?

A. No.

Q. You would have read it before you signed it?

A. Right, but I don't remember.

Q. But if your data was mailed to your accountant in June 25th, '97, then the returns weren't late because something was in the file cabinet; it was because the data was late, correct?

A. I'm not sure what years.

Q. Well, '95 would have been due at the latest October 15, '96, so if you send the data in in '97, then he didn't have the data to do any returns in time, correct, for '95?

A. If that's true, yes.

Q. And you signed it and sent it to the IRS?

A. As best I can recall.

MR. GREEN: This is another handwritten 544, it's undated, but it's the

119

same kind of fax banner, 8-11-97. I just ask if that's your handwriting -- I'm sorry. I think this is the second page of that fax. Sorry, I keep doing that. I held it out there, and then I look at it again, you'd think I'm trying to keep it out of your fingers.

MR. ROYSE: That's -- 545 is the second page?

MR. GREEN: Yeah.

MR. ROYSE: I'm sorry, Ron. What did you ask her?

Q. My first question was, I think it was, is that your handwriting on that?

A. On this, yes.

Q. And when it says in there, you attached to that a copy of another notice from the IRS, but it's from a different office than before, correct?

A. I think so, yes.

Q. And when you say should I send the same letter to Philadelphia, the same letter you're talking about is this one that was 539 that we were talking about whether you actually sent it, correct --

120

A. I think so.

Q. -- the one that Mr. Birkholz prepared for you?

A. That would be my guess, yes.

Q. At least, time sequence-wise, that makes sense?

A. Correct.

Q. And I'm not sure, but you tell me if this has any significance, 546 is an undated handwritten note, but the fax banner says 7-28-97, seems to have to do with payment vouchers and a question that you had about that, but it also deals with the Philadelphia thing. Would the Philadelphia address thing again be related to where to send things or --

A. I'm sorry. I get caught up reading these things, and then I don't remember what you asked.

MR. GREEN: That's okay.

MR. ROYSE: You're not the first person.

Q. That's just part of being an unremarkable speaker. I mean, to me, this is a totally separate question than what we've been talking about except for the mention of

121

1  Philadelphia; you're the one who wrote the
2  notes, and I know it's been awhile, but does
3  that have some significance to you as dealing
4  with what we've been talking about, that is
5  the filing of '95 and '96, or is that a
6  separate question that came up?
7      A.  I think this is a separate issue.
8      Q.  Then we don't have to worry about
9  it.  Now, I'm going to show you a document
10 stamped 551, still from the '95 file of
11 Mr. Birkholz, and it's a handwritten note
12 dated June 25, '97.  To put this in context, I
13 think the date of the first IRS notice that we
14 saw was -- I'm not very good at reading upside
15 down, but what's the date on that, the date of
16 the notice rather than the tax?
17     A.  03-97 is the date of this notice.
18     MR. GREEN:  So it's March, and this
19 is in June.  Apparently, there had been a
20 phone conversation, but take a look at this,
21 refresh your memory, and then I might have a
22 question or two for you about it.
23     THE WITNESS:  And the question was?
24 I'm sorry.
25     Q.  The initial question is, is that

122

1  your handwriting; do you recall sending that
2  note?
3      A.  Yes, sir.
4      Q.  Let me look at it again real
5  quick.  Now, this is related to the same
6  question of whether you have to pay -- well,
7  actually, excuse me.  This relates to your
8  concern about penalties on estimated taxes; is
9  that what that says?
10     A.  That's what it says, yeah.
11     Q.  And there's talk here about we've
12 talked about in various years problems with
13 the IRS numbers not matching up with what your
14 records showed in terms of estimated payments,
15 and you talk here about I expect this
16 situation with payments going to the wrong
17 year will carry over to '95 and '96; can you
18 tell me what it is you're referring to there?
19     A.  I'm thinking that they got the
20 payments for -- the quarterly payments, and
21 they applied them to the wrong quarter.
22     Q.  And here it talks about a payment
23 plan being necessary, and you had mentioned
24 earlier there was a period where your
25 husband's earnings decreased dramatically.

123

1  This indicates that it was in '97; is that
2  correct?
3      A.  I don't recall about his earnings
4  as far as that year is concerned.  The payment
5  plan was in reference to Peter saying, you
6  know, basically, if the IRS says you owe them
7  money, you're going to have to pay it, and it
8  turned out, we didn't owe them any money.
9  They had just applied the wrong quarter or
10 they applied money to the wrong quarters.
11     Q.  So that dealt with the potential
12 penalties for if you had not paid sufficient
13 estimateds, not whether or not you were going
14 to be penalized for failing to file the
15 returns?
16     A.  As far as I can understand and
17 remember, yes.
18     Q.  Now, this was in June 25, '97, and,
19 of course, we've already established in March
20 is when you learned that there was no '95 tax
21 return filed.  You state here I want to
22 express my appreciation for your invaluable
23 help, knowing you're on the job puts my mind
24 at ease, I really love it here, and I'm
25 probably oversensitive to this kind of

124

1  challenge, and then it talks about the flood,
2  and, I think, we agree there was a huge flood.
3  At this point in time, you didn't think you
4  had sent him documents, and they got filed
5  away, correct?
6      A.  I would say that what was I going
7  to do, yell at the guy and say, you know, rag
8  on him after he'd done something like that?  I
9  didn't bring it up.
10     MR. GREEN:  Well, I'm not going to
11 suggest the possibilities, but there are a lot
12 other than saying he's doing a great job.
13     THE WITNESS:  Well, it's better to be
14 encouraging when you want somebody to help you
15 than to say hey, bonehead, you need to fix
16 this.
17     MR. GREEN:  Well, we'll keep going
18 and see if we can find one that says
19 anything.  552, July 9, '97.  Actually, let me
20 just give you these all together because we
21 may want to try to get them in order, 553,
22 554, there's a notice 555, and then, I think,
23 a fax that this letter's going to refer, July
24 8, '97, begins at 556, and it's lengthy.  I'm
25 not sure where it ends.

125

1    MR. ROYSE:  It's 567.

2    MR. GREEN:  Yeah.  Let's do this one

3 first.  I've got it to 574.

4    MR. ROYSE:  There's copies in there.

5 It stops at 567 the first time.  There's some

6 duplications.

7    MR. GREEN:  Some duplicates, okay.

8 Well, then there's a June 24, there's a

9 separate deal here.  Okay.  Let's start with

10 -- this makes sense.  Let's start with 554,

11 it's dated June 23, '97.  It's a handwritten

12 note from you dated the same day and attached

13 as a notice from the IRS dealing with the

14 estimated issue that we talked about before;

15 is that your handwriting?

16    A.  Yes, sir.

17    Q.  And you sent that letter by fax, et

18 cetera -- you're right, there's two of those.

19 Let me go next to 570, and it looks like to me

20 571 is actually the first page of the same

21 fax, but take a look at that and tell me if

22 you think that's wrong.  Take a look at that,

23 if you would, for a moment.  Was that June

24 10th, '97?

25    A.  Yes, sir.

126

1    Q.  Okay.  And this says that you

2 understand what went wrong with the taxes or

3 something.  Can you paraphrase in your own

4 words what your understanding was?  And when

5 we say taxes, we're talking about the

6 estimateds.

7    THE WITNESS:  You're asking me what

8 this means?

9    MR. GREEN:  No.

10    THE WITNESS:  I can tell you what it

11 means.

12    MR. GREEN:  Your note.  Feel free to

13 tell me anything you want to.

14    MR. ROYSE:  Answer his question.

15    THE WITNESS:  This?

16    MR. ROYSE:  What does that mean?

17    A.  What I explained earlier about the

18 IRS crediting quarters to the wrong year or

19 the wrong quarter, crediting payments to the

20 wrong quarter, and we had overpaid, that's

21 what it looks like it says here, we overpaid,

22 and we're due a refund, and I was asked if I

23 wanted it credited towards our future taxes or

24 did I want a refund, and I chose that I wanted

25 to credit it towards our taxes, and

127

1 apparently, we made an overpayment that was

2 never credited.

3    MR. GREEN:  And then let me -- I

4 think related to that is 568, the following

5 day, that relates to the same thing, or if it

6 doesn't, tell me what you think it relates

7 to.

8    THE WITNESS:  Are you asking me if

9 this relates to this (indicating)?

10    Q.  Yeah.  Does it follow-up to that

11 (indicating)?

12    A.  It's possible.

13    Q.  It's the only fax I could find from

14 the prior day including in your documents

15 assuming that's correct; do you have any

16 reason to think it's not?

17    A.  I couldn't say for sure.

18    Q.  Was it normal to fax him to see if

19 you could call him, or were you just checking

20 to see if he'd be in?

21    A.  I wanted something in paper, that's

22 what I'm thinking is, I sent something in

23 paper.  Sometimes he wasn't there, sometimes

24 he was on another line or some other kind of

25 thing, so I would send a fax.

128

1    Q.  What were you wanting on paper?

2    A.  That I sent this.

3    MR. GREEN:  Okay.  Let me look at

4 that real quick.  We've got, I believe, let's

5 see, what's the date here?  Those were what,

6 June 10th.  Here's a June 9th one as well.

7 This is 575 through 597, and it says they're

8 faxing those again, although, I'm not sure

9 I've seen anything faxing them before, but

10 when you sent faxes, would you keep a copy?

11    THE WITNESS:  As a rule, yes.  And

12 you're asking me about all these documents, or

13 by document by document?

14    Q.  No.  I just want -- is that a

15 letter you sent on that day?

16    A.  Yes.

17    Q.  And it was faxed.  Were those

18 documents behind it faxed with it; can you

19 tell?

20    A.  Looks like it, yes, because they

21 have a banner at the top.

22    Q.  And this is something you received

23 from the IRS?

24    A.  Sure looks that way.

25    Q.  Does it show a date that it was

129

1  sent out?
2      A.    December 31st --
3      MR. ROYSE:  No.
4      A.    I'm sorry.  It's March 17th, 1997.
5      MR. GREEN:  They do that just to
6  trick you, put the tax year up there.
7      THE WITNESS:  And you want me to look
8  through them all?
9      MR. GREEN:  No.  You sent that on to
10  Mr. Birkholz on that day, that's the real
11  question.
12      THE WITNESS:  Here's one that says I
13  have written three times, sent copies of stuff
14  from the IRS, did you receive them.
15      Q.    Then I've given you more than one
16  thing.  What's the Bates stamp of the last
17  page there?
18      MR. ROYSE:  581.
19      Q.    Does that indicate that that's the
20  last part of that fax, or have we moved on to
21  another fax?  I don't have them in front of
22  me.
23      A.    0607, and this is 0609.
24      MR. ROYSE:  Hold on.  Wait a second
25  here.  The last page of the prior document was

130

1  580.  This is all new stuff.
2      THE WITNESS:  I don't know even know
3  if it's all the same stuff.
4      MR. GREEN:  Let me look at it again.
5  They're out of order, these just switched
6  around.
7      MR. ROYSE:  There you go.
8      Q.    And then this June 7th, '97; is
9  that something you sent?  You said you hadn't
10  heard, faxed stuff, and, I think, we've looked
11  at all that.
12      A.    Looks like I sent it.
13      Q.    And that related again to the
14  notices that we just talked about?
15      A.    Well, I see the notices here, at
16  least this one here (indicating).
17      MR. GREEN:  Right, but, I think, it
18  refers to more than just that.
19      THE WITNESS:  Right, I agree.
20      Q.    And then, before I do this to you,
21  let's make sure I haven't -- here's a note
22  that begins 556, and attachments, I believe,
23  in 560; did you send that fax?
24      A.    If you're asking if this is my
25  handwriting, yes, this is my handwriting.

131

1      Q.    And you sent that as a cover sheet
2  to the fax that you're holding?
3      THE WITNESS:  This is my handwriting,
4  and it looks like it was sent on the same day,
5  same time, and, I'm sorry, can you -- I've
6  looked at these, and the question is?
7      Q.    And you mailed those.  Let me take
8  a quick look at the notices that were
9  attached, and this notice relates to the fact
10  that the '95 tax return had not been filed,
11  correct; is that what that's -- you were -- it
12  was a repeat of the notice that you got in
13  March?
14      A.    Right, they kept sending.
15      Q.    Because it still wasn't filed,
16  right?
17      A.    I'm not sure.  What I remember is
18  getting a notice -- I'm trying to think.  I'm
19  not sure which situation this is -- there was
20  a situation where we had an underpayment and
21  an overpayment year.  First we got notices
22  about -- for underpayment for a certain year,
23  and I called Peter about it, and we discussed
24  it, and my recollection is I had made the
25  payments, but they credited them to the wrong

132

1  year.  Then he -- I kept getting notices,
2  called Peter again every time I got one, and
3  he said don't worry about it until you get one
4  that comes certified mail.  So to answer your
5  question, I don't know that this necessarily
6  is -- this says your tax return is overdue.
7  I'm not sure our tax return was overdue.
8      MR. GREEN:  I think we already
9  established that.
10      MR. ROYSE:  The return, not the
11  payment, that they're saying, they received
12  the return.
13      THE WITNESS:  Right, and I don't
14  recall whether or not the return was done or
15  not.  I just remember that they were saying we
16  owed them a big bunch of money.  That was what
17  I was remembering.
18      MR. GREEN:  Now, let me get this
19  straight.  You got them in March '97, you got
20  a notice that there was no '95 return filed,
21  okay, we've established that.  And then this
22  last notice was -- sorry, share with me the
23  date on that again.
24      THE WITNESS:  This one here says
25  07-08.

133

1    MR. GREEN: No. The date on the
2  notice.
3    THE WITNESS: Let's see, 07-07-97.
4    Q. Okay. And then on June 10, we've
5  already talked about this, and I can pull it
6  up for you again if you want, and this is from
7  your documents W489, Mr. Birkholz wrote you a
8  letter saying that I can't file a '95 return
9  because you haven't given me the data for '95
10  or '96, correct?
11    A. I assume that's correct, I mean, I
12  remember seeing the paper that you handed me.
13    MR. GREEN: Yeah. I don't mind
14  getting it out if I put it back.
15    THE WITNESS: Well, this refers to
16  '92, '93, and '94.
17    MR. GREEN: Look at the bottom.
18  There's a problem in every year.
19    THE WITNESS: That's right. There
20  was apparently, and as I stated before, it's
21  possible that he had the information, and it
22  was filed away.
23    Q. Well, we're still looking for that,
24  but here he's telling you that he doesn't have
25  the data to do one, correct, in June, in

134

1  response to your second notice from the IRS?
2    A. That's what it looks like.
3    MR. GREEN: And then we've already
4  talked about the letters where information was
5  provided. I think my '95 file is worse off
6  then Humpty Dumpty; it's not going back
7  together. Let's take a look at 465, I think.
8  I guess, what I better do is gather all those
9  up.
10    THE WITNESS: Yeah, if you want to
11  get these back.
12    MR. GREEN: I give up on that. I'm
13  just going to try to keep them in the same
14  general stack, and I'll let somebody do that.
15  Off the record.
16    (OFF THE RECORD.)
17    Q. On 465, it's dated October 14th,
18  '97. This is a cover letter for your '96
19  return; do you recall getting your '96 return
20  in a timely fashion and getting it filed?
21    A. I don't remember. This looks like
22  a cover letter for our federal income tax
23  return on October 14, 1997, for a 1996 return.
24    Q. Uh-huh (affirmatively), but you
25  don't remember if you received it or not?

135

1    A. No.
2    MR. ROYSE: Off the record.
3    (OFF THE RECORD.)
4    MR. GREEN: I'm going to show you
5  some documents, and I'm making an assumption
6  these are together, so you may have to help me
7  on that, and 487 through 494, I put together,
8  but what causes me a problem is, I guess,
9  these were mailed because there's no fax
10  banner, and it's also undated, but there is an
11  article dated March 4, '97, concerning the
12  flood, and there's an IRS statement dealing
13  with the estimated tax issue for the tax year
14  '93, dated March 17, '97, and a notice dated
15  March 3, '97, which, I believe, we've already
16  seen for the tax year '95, saying that your
17  tax return has not been filed. So I don't
18  know if that -- see if you can tell what goes
19  with that. I know the article does, and it
20  refers to some notices. It's not real clear
21  to me whether both of the notices go with
22  that, but if you can help find it, if not,
23  then you've done your best.
24    THE WITNESS: I want to make sure I
25  understand. Your question is?

136

1    Q. Can you help me with what would
2  have come with that note?
3    THE WITNESS: Of this note?
4    MR. GREEN: Yeah. Potentially, if
5  all I'm going on is the order of the file, all
6  of those could be responsive. If you can't
7  tell, I understand, but if you do know, if the
8  context of that letter gives you some context
9  to tell what you sent with it, I'd appreciate
10  knowing that.
11    THE WITNESS: Oh. I'm going to say
12  it's this stuff, and it looks like the same
13  stuff they sent before because they sent it,
14  if I remember correctly, they sent it many
15  times.
16    Q. And that's dealing with the
17  estimated tax issue from '93, and then the no
18  return from '95?
19    A. Something like that.
20    MR. GREEN: And just briefly, if you
21  can look at this note, September 9, '97, it's
22  497, appears to be talking about the estimated
23  issue again. If you can confirm that, that
24  that's what that's dealing with, that helps
25  me.

137

1    THE WITNESS: Well, this looks like
2  I'm referring to something I asked him about
3  before, and I'm asking again.
4    Q.   But that's dealing with the
5  estimated tax issue?
6    A.   Yes.
7    MR. GREEN:  Okay.
8    THE WITNESS: These are two separate
9  things.
10    MR. GREEN:  Yes, they are.  Thank
11  you.  Well, I think this is as good as place
12  as any.  I mean, if you want to go more, we
13  can, but I agree with you that it's -- even if
14  it were fruitful to do that, I'm sure she's
15  getting as tired as I am, and that's when we
16  start getting grumpy.  We agree to adjourn?
17    MR. ROYSE:  Yeah.
18    (WHEREUPON, THE DEPOSITION OF
19  JENNIFER WEYLAND WAS CONCLUDED FOR THE DAY AT
20  5:10 P.M. AND CONTINUED ON AUGUST 1, 2006,
21  9:00 A.M.)
22    DIRECT EXAMINATION
23    BY: MR. GREEN:
24    Q.   Yes, ma'am, I'm Ron Green again.
25  How are you?

138

1    A.   Hi.
2    MR. GREEN:  And this is a resumption
3  of your deposition between the other day.  I
4  just want to remind you, you're still under
5  oath from the prior deposition, so we don't
6  have to go through all that again.  I just
7  want to remind you that you are, and I know
8  that won't make a lot of difference because
9  you're going to tell the truth anyway.
10    THE WITNESS: Yes, sir.
11    Q.   I just want to remind you on the
12  record, and as I mentioned before, I'm going
13  to try real hard not to backtrack anything,
14  but, I believe, we had just at the end of the
15  day finished up with '96 tax returns, we were
16  talking about those.  So I'm going to go to
17  some '97 documents relating to the '97 tax
18  returns, and, I believe, was it '97 when you
19  moved to Cynthiana, or maybe when you sold
20  your house in New Jersey, or have you lived in
21  two places in Cynthiana?
22    A.   Oh, no.
23    Q.   Just one?
24    A.   Only one place, and I'm thinking.
25    Q.   It's tough when the first question

139

1  is a date question, but --
2    THE WITNESS:  I'm thinking, wasn't
3  the flood in '97, I mean --
4    MR. ROYSE:  That's even a harder
5  question.
6    A.   We'd been there for something for
7  like four or six weeks.
8    MR. GREEN:  I can answer that
9  question for you.  Normally I don't answer
10  questions in depos, but I will this one
11  because there was an article we talked about
12  at the end of the depo the other day about the
13  flood, and it was in the '96 file, but that
14  doesn't mean it happened in '96.  I'll show
15  you a document we looked at last time.  It
16  says flood of '97, so it's document 488, I
17  guess, it should be of the Weyland documents.
18    A.   Yeah.  We just -- I remember we
19  moved in in January, and that was also why it
20  was kind of hard to remember because it was
21  the beginning of the year, and I was pretty
22  sure it was '97, but I wanted to clarify it
23  with this.
24    Q.   So if there's references in the
25  file to you having sold a house, it's your

140

1  house in New Jersey that was sold in '97?
2    A.   I would assume so.
3    Q.   Let me show you a document marked
4  as -- I'm sorry, that would have been PB
5  instead of Weyland document, that article we
6  looked at.  PB416, if I can find it real
7  quick, and we'll include 417 and 418 which, I
8  believe, were attached, but we'll let the
9  witness verify that.  So 416 through 419; do
10  you have those?
11    Q.   It's a handwritten note that refers
12  to a Social Security statement, and, I
13  believe, the subsequent pages are a Social
14  Security statement; is that correct, do those
15  go together?
16    A.   I'm still looking at them.
17    MR. GREEN:  I thought you were
18  looking at me.  I'm getting a lot of glare on
19  your glasses, so I can't see your eyes.
20    THE WITNESS:  Okay.  So are you
21  asking do these papers go together?
22    MR. GREEN:  Yes.
23    A.   It looks as though they do, yes.
24    Q.   And your note indicates that, I
25  think, the word is screwed up?

141

1   A.   Yeah.

2   Q.   What was the problem you were

3   discussing there?

4   A.   I don't remember.

5   Q.   You can't tell from the notice or

6   the memo?

7   A.   Well, I'm just reading what it

8   says, which is I don't know what happened to

9   all the money we've been sending them.  It

10  looks as though nothing has been straightened

11  out.  I'm sorry.  I don't remember what that

12  was in reference to.

13  Q.   When you say -- I guess, the reason

14  I'm asking the way I'm asking is because this

15  is Social Security as opposed to the IRS, but

16  is this back to the issue you were making

17  payments, and they were allocating to the

18  wrong years, that kind of thing?

19  A.   I don't remember.  I'm sorry, I

20  don't remember.

21  MR. GREEN:  Good enough.  And let me

22  back up just a little bit.  The note itself is

23  undated, but it's got a fax banner of 7-18-97,

24  it's PB409, 410 and 411, which, I believe, go

25  together.  Why don't you look at those, and

142

1   then ask you if you can identify those as

2   something you sent to Mr. Birkholz.

3   THE WITNESS:  You're asking do they

4   go together?

5   Q.   Yeah.  Can you identify that as

6   something you received from the IRS and sent

7   to Mr. Birkholz?

8   A.   I would say so, yes, sir.

9   Q.   These were showing amounts due,

10  this was just for his information, or -- the

11  note doesn't say a lot, so what were you

12  contemplating in doing about those?

13  A.   Any time I got something from the

14  IRS, he told me to send him copies of it.

15  Q.   But were you expecting him to do

16  something with him or just wanted to be aware

17  of them?

18  MR. ROYSE:  Let me interrupt you just

19  for a second.  I'm sorry, Ron.

20  MR. GREEN:  Sure.

21  MR. ROYSE:  You've given her 409, is

22  that right?

23  MR. GREEN:  Yes, 409, through 411.

24  MR. ROYSE:  For some reason, I don't

25  have 409, but 408.

143

1   MR. GREEN:  408.

2   MR. ROYSE:  I don't have 409, but

3   that's probably my problem.  I just want to

4   make sure that what I was looking at didn't go

5   with that, and it doesn't.

6   MR. GREEN:  Or a copy was skipped?

7   MR. ROYSE:  Yeah.  You're fine.

8   Q.   So this is really no more than you

9   received these from the IRS and then forwarded

10  them on to Birkholz?

11  A.   As he has instructed me to do, yes,

12  sir.

13  Q.   I'm going to show you what's been

14  marked as 412 and 413, again, PB.  The note

15  has no date, and there's no fax banner, but

16  it's with a March 17, '97, tax notice which

17  indicates that for a particular year, you'd

18  overpaid five dollars.  Again, can you

19  identify that as something you sent

20  Mr. Birkholz, and was there any significance

21  to this, or was it simply you were advising

22  him you received this notice?

23  A.   This is my handwriting.

24  MR. GREEN:  Right.

25  THE WITNESS:  You're asking if I sent

144

1   these to him?

2   MR. GREEN:  Yes.

3   A.   Yes, I did.

4   Q.   And would that have been, again, in

5   just the ordinary course of keeping him

6   advised, or would you have expected him to do

7   something with this?

8   A.   The ordinary course of keeping him

9   advised, and if he needed me to do something,

10  I would expect him to tell me.

11  Q.   Well, on the last ones we looked

12  at, those were ones where they were saying you

13  owed money.  You didn't need him to tell you

14  what to do with those, did you?

15  A.   I didn't owe them money as it

16  turned out.

17  Q.   And how is that determined; tell me

18  about that?

19  A.   They ultimately, if my memory

20  serves me correctly, determined that I had

21  overpaid another year because they allocated

22  quarterly payments to the wrong years.

23  Q.   Again, the problem we were just

24  referring to where the IRS was misallocating

25  your payments?

145

1    A.    To the best of my memory, yes, sir.
2    Q.    And who was it that got that
3    resolved?
4    A.    Peter.
5    MR. GREEN:  This is a note dated
6    January 29, 1998, it's marked PB408.  I guess,
7    first of all, if you can verify that that's a
8    note that you sent to him.
9    THE WITNESS:  This is my handwriting.
10    Q.    And what's the reference to where
11    it says hooray, talks about making a payment,
12    the, I think, the last full paragraph above
13    the signature?
14    A.    I'm looking at this and assuming
15    that I paid the fourth quarter.
16    Q.    On time?  Hadn't there been a
17    problem with them being untimely; isn't that
18    what you're referencing that this one was on
19    time?
20    A.    Could be.  I don't remember.
21    Q.    And then down at the bottom, let's
22    see, what was the date on that again?  I'm
23    sorry.  I've given you the only copy.
24    A.    January 28, 1998.
25    Q.    And we're talking about the '97 tax

146

1    year, so you had received materials, and you
2    were waiting for Richard to get back from
3    overseas; is that what that's talking about?
4    A.    That's what it looks like, yes,
5    sir.
6    Q.    Very good.  Show you what's been
7    marked as 414.  I asked you about the house
8    before.  Is this what you provided to
9    Mr. Birkholz regarding capital gains on the
10    sale of that house in New Jersey?
11    A.    This is not my handwriting.
12    Q.    Do you know whose it is?
13    A.    I have no idea.
14    Q.    Do you recall having a conversation
15    with Mr. Birkholz about the sale of the house
16    and reporting the capital gains?
17    A.    Yes, sir.
18    Q.    Does this information appear
19    accurate based on your memory?
20    A.    Looks that way.
21    Q.    So this may be Peter's notes of
22    your conversation or a conversation?
23    A.    It could be.  I have no idea.
24    MR. GREEN:  These documents are PB412
25    and PB413.  I may have showed you these

147

1    already.
2    MR. ROYSE:  Uh-huh (affirmatively).
3    Q.    Yeah, I showed you these.
4    Nevermind.  Getting out of order already.
5    Let's look at 432.  I'll show you a document
6    that's marked as 432, which are some forms
7    relating to, I assume, Mr. Weyland's pension;
8    have you ever seen that before?
9    A.    No, sir.
10    Q.    Do you know one way or the other
11    whether you sent that to Mr. Birkholz?
12    A.    I didn't send it, but I don't
13    recall sending this to him.
14    Q.    Do you know one way or the other if
15    your husband did?
16    A.    It's possible.
17    Q.    Did you ever have any involvement
18    with the pension or pension documents Richard
19    was participating in?
20    A.    Not that I can recall.
21    Q.    I know we talked about last time,
22    but I can't remember if we talked about
23    specific years or talked generally.  Your
24    copies of all the tax returns are also
25    unsigned like Mr. Birkholz's, correct, you

148

1    don't have any signed copies that show what
2    date they were sent or anything like that, I
3    mean, for, let's talk now from '97 on?
4    A.    I'm not sure.  I don't think so.  I
5    think the copies that I have are the customer
6    client copies provided by whoever was
7    preparing taxes.
8    Q.    I'm going to ask you to take a look
9    at a document marked PB370, it's dated May 6,
10    '98, and, I believe, this is relating to the
11    '98 tax year; could you identify that, first
12    of all?
13    A.    This is my handwriting.
14    Q.    And do you know what check you're
15    talking about there?
16    MR. ROYSE:  Does it go to 371?
17    MR. GREEN:  It's possible.  I'll let
18    you look at that because it didn't say it
19    included a document, I don't think, but it
20    could have.
21    MR. ROYSE:  Yeah, it does, second
22    paragraph.
23    A.    No, I don't.  I'm sorry.
24    Q.    Did the State of Kentucky audit
25    your '98 return?

149

1    A.   No, Sir.

2    Q.   Let me show you a document marked
3    PB374, and maybe audit's the wrong word.  Does
4    that jog your memory or can you tell me what
5    the state was doing with your '98 tax return?

6    A.   I don't remember this.

7    Q.   So as far as you know, nothing ever
8    came of that?

9         THE WITNESS:  No, sir, not that I can
10   remember.  You want these?

11        MR. GREEN:  Yeah.  Thank you.

12        MR. ROYSE:  Off the record.

13        (OFF THE RECORD.)

14        MR. GREEN:  I'm going to ask just a
15   couple questions about '99 tax year.  I'll
16   show you a letter or note from you to
17   Mr. Birkholz dated February 28, 2000, must
18   have been about the time we went from 606 to
19   859.  Take a look at that, first of all, and
20   tell me if you recognize that.

21        MR. ROYSE:  What's the PB number,
22   PB360?

23        MR. GREEN:  Yeah.

24   A.   Yeah, that's my handwriting.

25   Q.   When you say you enclosed a check

150

1    for future stuff, what's that talking about?

2    A.   I have no idea.

3    Q.   And then it mentions that you may
4    be able to -- when it worked out, was there an
5    annual appointment with Peter that you would
6    have?

7    A.   No, not an annual appointment, no.

8    Q.   What's that referring to when it
9    says it looks like I may be able to make our
10   appointment this year?  And I'm paraphrasing
11   because I don't have that in front of me.

12        MR. ROYSE:  This says but I think I
13   should have an appointment to see you some
14   time this year -- I think I should make an
15   appointment to see you some time this year.

16   A.   Yeah.  If we were scheduling a trip
17   up that way.

18   Q.   Then you'd pop in?

19   A.   Yeah.

20   Q.   Did you do that, do you know, did
21   you make an appointment in 2000?

22   A.   I'm not sure what year it was, but
23   we have been up there since we've moved to
24   Kentucky to see him.

25   Q.   Would you have anything that would

151

1    show when that was, any kind of document at
2    home?

3    A.   It's possible.

4    Q.   Would you do me a favor -- well,
5    you don't have to do it as a favor, but take a
6    look, and if you can identify the times that
7    you went to Massachusetts and you think you
8    spoke to Mr. Birkholz or anybody else in his
9    office, just let your attorney know when those
10   were, and you can put that in a letter or
11   whatever; would that be okay?

12   A.   Yeah, sure.

13   Q.   Now, after you moved to Kentucky,
14   how many times do you think you did that?

15   A.   At least twice.

16   Q.   Focusing on the first time, can you
17   recall any of the specifics of what was
18   discussed at your meeting, or was it formal or
19   informal?  Let me ask you that first.

20   A.   They were usually informal because
21   we've known each other for a long time, so
22   other issues would come up.  On one occasion,
23   it was wintertime, there was snow on the
24   ground, and we'd been in his office talking
25   for probably two hours, and we had our dogs

152

1    with us, and I remember this occasion in
2    particular because we had a barrier, but it
3    didn't go all the way up to the roof of the
4    van, and this one dog apparently had wanted to
5    climb into the front seat.

6         MR. GREEN:  As any good dog would
7    want to do.

8    A.   This one's got a little, you know,
9    she's a piece of work, and she got her foot
10   caught between the barrier and the cooler that
11   we had there.  We figured with the cooler
12   there also, this would really deter, you know,
13   which it did, it deterred everybody except
14   her, and so apparently, she got her foot
15   caught, I mean, I was trying to put it
16   together later on when I was able to study the
17   injury, and when she pulled it out, she got an
18   injury to her leg in such a place that -- and
19   she curled up on the front seat and bled all
20   over everything, and when I say all over
21   everything, I mean, all over, and we were on
22   our way to visit a friend of mine in New
23   Hampshire, and I had described that to her the
24   same way, and she didn't really comprehend
25   when I said all over.  The sheepskin sheet was

153

1  completely, I mean, the whole area where you
2  would sit was soaked with blood. My husband's
3  overcoat that he'd left in the van, soaked
4  with blood. I suspect if we'd been in his
5  office any longer, she may have bled to death,
6  but as soon as I got out to the van and saw
7  it, I remember running back in, and Peter
8  called his veterinarian, and we got an
9  emergency appointment and took her in
10  immediately. We had to carry her in.
11      MR. GREEN: Sound like she cut an
12  artery or something.
13      THE WITNESS: She did. I was in
14  there with the vet when they were working on
15  her. I can usually be assistance -- be of
16  assistance to a veterinarian in something like
17  this because I know my dogs, and I was
18  watching them work on her, and it wasn't just
19  an exterior type of laceration. They had to
20  go in and sew up, I can't remember, it had to
21  be a vein because it was on the outside as
22  opposed to something much deeper, but they had
23  to close that to stop the bleeding and then
24  sew up the outside of her leg, and then we
25  spent the time while I was up visiting my

154

1  friend in New Hampshire watching her very
2  carefully, and having to -- but we had to feed
3  her, like, beef. I had to get hamburger for
4  her so she could build up her --
5      Q.  Red blood cells?
6      A.  Yeah, because the vet felt that she
7  had probably lost quite a bit of blood, and I
8  remember we had to pull -- well, we had pull
9  all the -- we had pulled the seat covers off
10  because we had to, and using my friend's
11  bathtub to soak and try to clean. So I
12  remember that occasion quite vividly because
13  of that.
14      Q.  Well, tell me about the meeting
15  before you discovered the puppy, I mean, I
16  know you're not going to remember every detail
17  of what was discussed, but specifically, was
18  there any discussion about who Richard's
19  employer was, the kinds of issues we're
20  talking about in this case?
21      A.  No. It was general issues having
22  to do with the stuff that we've always been
23  dealing with, taxes and just the usual stuff.
24  I think we primarily scheduled an appointment
25  to see him at that time because we could and

155

1  felt as long as we were up that way, and we
2  were up during business hours, that we would
3  stop in and see him.
4      Q.  Do you have any specific memories
5  of a second meeting whether or not it was
6  before or after the winter meeting? And I can
7  see why that one sticks out.
8      A.  No. I'd have to think, I'd have to
9  really think and separate and try to remember
10  what time of year.
11      Q.  Do you have any specific
12  recollection of that meeting having anything
13  to do with determining who -- determining who
14  your husband's employer was, those kinds of
15  issues?
16      A.  No. Most of the conversation was
17  -- I'm trying to think of the right word. Not
18  candid, but the kind of conversation you'd
19  have with a friend just talking about how
20  things are going, what's it like in Kentucky,
21  how's the business going, you know, my
22  business going, you know, he seemed to be
23  interested in how my career was going and what
24  I was doing, what shows I went to, that kind
25  of thing.

156

1      Q.  Yankees always ask you about the
2  Derby; did he ask you about the Derby?
3      A.  No. I don't recall that he did.
4      MR. GREEN: Just kidding. Like, of
5  course, you went, oh, yeah, and I know
6  everybody there, too.
7      THE WITNESS: I went to the Derby
8  party.
9      MR. GREEN: Let me ask you about 364,
10  it's PB364. Let me ask you, first of all, if
11  that's a note you sent.
12      THE WITNESS: Yeah, I sent this.
13  It's my handwriting.
14      Q.  I saw a lot of references in here
15  to problems with changes and change of
16  address; what ended up being the problem
17  there?
18      A.  In about four years, Cynthiana, I
19  don't know whether it was Cynthiana or the
20  State of Kentucky, changed our address three
21  times.
22      Q.  To the wrong address?
23      A.  No, no. They changed our address.
24      Q.  Oh. They changed the address of
25  your location?

157

1   A.   Right.  And we started out as,
2  like, this was the second address, our eight
3  box 104.
4   Q.   Well, my main concern is -- so this
5  is a problem that you and Pete were having,
6  not a problem that Pete was causing you?
7   A.   They were having trouble keeping up
8  in their database.  I would send them a change
9  of address or let them know there was a change
10  of address, and then it would take forever to
11  get them to change it in their, I'm assuming,
12  the term is database.
13   Q.   You're talking about the Birkholz
14  database?
15   A.   Right, yes, sir.
16   Q.   But this was something whoever
17  decides what your house number or street
18  name's going to be was doing?
19   A.   I'm sorry.  Could you --
20   Q.   Whoever decides your house number
21  and street name, those kinds of things,
22  they're changing you all the time, you're not
23  moving around; they're changing you?
24   A.   Oh, no.  We were in the same
25  location, and in some period, like, three to

158

1  four years, our address changed three times,
2  our address at the same place.  We didn't move
3  anywhere.
4   Q.   Those guys that make the markers
5  for outside your house; it's a conspiracy with
6  them?
7   A.   Yeah.  We don't have one, so, I
8  think, it's a conspiracy with the people that
9  print up business cards or letterhead because
10  every time I had a business card with the new
11  address on it, two weeks later, I'd get a
12  notice from the post office saying, oh, by the
13  way, your new address is such and such, or the
14  phone company was changing the area code.
15   Q.   And this indicates you didn't have
16  any estimated tax forms, and -- let me see.
17  And 365 to 368 are a set of forms; in response
18  to that letter, did Peter send you some new
19  forms for your estimated vouchers?
20   A.   It's possible.
21   Q.   What would tend to change, your box
22  number or your route number?
23   A.   Box number, route number, and then
24  ultimately, we got a street address because of
25  911.

159

1   Q.   The New Lair Road?
2   A.   Yes, sir.
3   Q.   So you've got friends at the post
4  office I take it?  It says here you chewed
5  them out more than once.  You're sure they're
6  not changing your address because they're mad
7  at you?
8   A.   Can I say something off the record?
9    MR. GREEN:  Yes.
10    (OFF THE RECORD.)
11   Q.   Let me ask you a general question
12  using this as more as an example, I'll
13  reference PB295 through 304, but it's just a
14  spreadsheet type thing which said something
15  that -- and these are a number of years, and
16  these deal with your business and other types
17  of deductions, correct?
18   A.   I assume so, yes.
19   Q.   Now, is that something you or
20  Richard prepared?
21   A.   Richard.
22   Q.   Do you still have those in
23  electronic form in the computer?
24    THE WITNESS:  I'm not sure.  I
25  couldn't tell you for sure.  Do you know what

160

1  year this is?
2    MR. GREEN:  That is '99, I think.  I
3  think it says in the upper left-hand corner.
4    THE WITNESS:  Is that it, because
5  it's '98?  He's had more than one computer
6  over the past six years.
7   Q.   Would he copy files over onto the
8  new one when he got one, or are these
9  questions I should direct to him?  What I'm
10  getting at is -- let me back up.  Do you know
11  what software he used?
12   A.   I couldn't say for sure.
13    MR. GREEN:  What I'm getting at,
14  Dave, is I wonder if there is a computer file
15  which would show a last modified date that
16  could give us a clue as to when these were
17  prepared, and if you don't mind, if you'd just
18  talk with her about however you might verify
19  that without changing it or anything.  Just
20  let me know what you find out.
21    MR. ROYSE:  Can you flag that, Barb?
22   Q.   And then whatever's there is there.
23  I'm going to show you 189, which is a letter
24  from Birkholz & Company to you and your
25  husband dated April 2, 2001, relating to your

161

1   2000 tax returns; any reason to doubt that
2   that's when the returns for 2000 were sent to
3   you?
4        THE WITNESS:  You're asking me?
5        Q.   Any reason to doubt that that's
6   when the 2000 returns were sent to you and
7   your husband?
8        A.   No.
9        Q.   I notice that it was before April
10  15th, of the year following the tax year which
11  didn't seem to happen very often in these.
12  Was there any discussion leading up to that in
13  terms of the information getting there in time
14  to actually file before the 15th?
15       A.   It has a lot to do with Richard's
16  schedule.
17       Q.   And he just happened to be
18  available that year to get everything done?
19       A.   You know, maybe one out of six
20  years he's home for Christmas, that kind of
21  thing.
22       Q.   Let me show you what's marked as
23  202 dated April 11, 2001; looks like you're
24  asking a question about your IRA?
25       A.   That's what it looks like.

162

1        Q.   And the note at the bottom, my
2   reading of that is that he then called you
3   that afternoon; is that right, is that what
4   that's referring to, or am I misreading it?
5        A.   It could be, yeah, it could be.
6        Q.   And you don't have any memory of
7   him being slow to answer this or whatever?
8        A.   No.  I don't remember.
9        MR. GREEN:  Well, let me show you a
10  document marked PB222 -- well, I'm going to
11  include with it up through 232 maybe -- yeah.
12  But what I'm interested in is actually 222,
13  ask you if you recall receiving that letter
14  and the attachment.
15       THE WITNESS:  Are you asking me do I
16  remember receiving this?
17       MR. GREEN:  Uh-huh (affirmatively).
18       A.   No -- well, no, not really, no.
19       Q.   Then that may be the answer to the
20  rest of them, but do you have any recollection
21  of what led up to this letter?
22       A.   It's possible we've been asking
23  over the years why Richard was paying, and
24  other employees doing the same job were not
25  paying; that could be it.

163

1        Q.   You say over the years.  This is
2   the first time I see a written reference of
3   it.  Do you think that that came up in the
4   context of this is in response to that
5   discussion?
6        A.   It's possible.
7        Q.   I didn't -- the stack's pretty good
8   sized, so I'm not swearing, but I didn't see
9   anything, like, in a handwritten note saying
10  hey, what about this, why are we paying Social
11  Security or whatever; is this even about
12  Social Security, or is this about the income
13  exemption?
14       A.   I'm not sure.
15       Q.   But you don't recall a specific
16  conversation that you had that generated that
17  response?
18       A.   No, sir.
19       MR. ROYSE:  Just so we're clear,
20  I don't think she's denied that that
21  happened.  She just said she doesn't remember.
22       MR. GREEN:  Yeah.  I mean, if there
23  was a conversation, I want to know whatever
24  you can tell me about the conversation, but if
25  you don't have a memory of a specific

164

1   conversation, then you can't tell me that;
2   that's what I'm getting at.  I don't want to
3   later hear that there was this extensive
4   conversation, and then this letter followed.
5        THE WITNESS:  I don't recall.
6        Q.   Thank you.  Let me show you a
7   document, this is out of the Birkholz files
8   for the tax year 2001, show you a document
9   marked 129, which it looks like it was faxed
10  from your studio April 9, 2002, and
11  specifically, it looks like this is a 2001
12  estimated payment as the check, but it's got
13  written on it World Trade Center problem; do
14  you know what that refers to?
15       THE WITNESS:  Can I talk with my
16  attorney?
17       MR. GREEN:  Sure.  I'll tell you
18  what, I'll leave.
19       (OFF THE RECORD.)
20       A.   Yeah, Peter told me to put that on
21  there.
22       Q.   And in what context?
23       A.   I'm not really sure.  I don't
24  remember exactly.
25       MR. GREEN:  Let me have that.

165

1    THE WITNESS:  Sorry.
2        MR. GREEN:  Unless you've got more
3    answer.
4        THE WITNESS:  No.  I was thinking
5    about 2001.
6        Q.   Let me show you what's been marked
7    as 166.  It's dated August 21, 2002, and it
8    says it was attaching the 2001 federal income
9    tax return, I guess, the state tax return as
10   well; do you have any reason to doubt that
11   that's the time frame that the returns were
12   sent to you for tax year 2001 and August 2002?
13       THE WITNESS:  You're asking me if
14   this was done?
15       MR. GREEN:  I'm wanting to know -- I
16   mean, this indicates that that's when you sent
17   your tax returns.
18       THE WITNESS:  Yeah.  I would say
19   that's correct.
20       MR. GREEN:  And let me show you real
21   quickly what I think is -- not sure where it
22   ends, show you documents marked as 130 through
23   148, and you just tell me whether it was you
24   or your husband that filled that out.
25       THE WITNESS:  It's not me.  It wasn't

166

1    me.
2        Q.   So you think Richard would have?
3        A.   It's possible.
4        MR. ROYSE:  You mean the handwriting
5    on it?
6        MR. GREEN:  Yeah.
7        MR. ROYSE:  As opposed to the typed
8    entries?
9        THE WITNESS:  Is there handwriting?
10       MR. ROYSE:  Look through the whole
11   thing.
12       MR. GREEN:  I don't know if
13   checkmarks have distinct characteristics or
14   not.
15       THE WITNESS:  This sort of looks like
16   Richard's handwriting.  It wasn't me, that's
17   all I know for sure.
18       Q.   First of all, I'll ask you to look
19   at what's marked as PB46, dated October 7,
20   2003, and it's kind of the same question; do
21   you have any reason to doubt that that's when
22   your returns were sent to you for the tax year
23   2002?
24       A.   No.  I think I answered your
25   question.

167

1        Q.   You don't have any reason to doubt
2    it?
3        A.   No, I have no reason to doubt it,
4    no, sir.
5        MR. GREEN:  There was some charts and
6    other types of materials relating to your
7    business that I hadn't seen anything like it
8    in other years.  Let me just show you them,
9    and let you tell me what they are.  It's 120
10   through 128.
11       THE WITNESS:  Do you want this?
12       Q.   Yeah.  Thank you.  Can you just
13   tell me what those are, and why you would have
14   sent those to Mr. Birkholz?
15       A.   I can tell you I didn't produce
16   them.
17       Q.   Okay.  Do you know who did?
18       A.   For sure, no.
19       MR. ROYSE:  Tell him what you think.
20       THE WITNESS:  I think it's possible
21   that Richard may have produced this.  What
22   year was this?
23       MR. GREEN:  This is out of the 2002
24   file, but it looks more business planning type
25   information, I mean, to me, and I'm just

168

1    curious where it came from and why it was
2    there, if you know, and if you don't know,
3    that's fine.
4        THE WITNESS:  I don't know.
5        MR. ROYSE:  That's 120 through 122
6    that you're talking about?
7        MR. GREEN:  As far as the charts go,
8    and then there's a reproduction agreement.
9        THE WITNESS:  I believe this is a
10   contract.
11       Q.   Right.  And why would you have sent
12   that to Peter?
13       A.   I'm not sure.
14       Q.   Let me ask you to look at a
15   document marked PB1, and, I think, PB2 is an
16   attachment to it; do you recall receiving that
17   letter?
18       A.   Yes.  I remember this.
19       Q.   Do you recall what discussions led
20   up to that letter or preceded that letter?
21       A.   A phone call.
22       MR. GREEN:  Tell me about it.
23       THE WITNESS:  I believe he was
24   calling to ask questions about the 2002
25   return, and in the middle -- the conversation

169

1    was going along, and then kind of out of the
2    blue, he said, gee, is Richard a foreign
3    employee, and my initial reaction was, well,
4    he works in a foreign country, yeah, he's
5    probably a foreign employee, and then there
6    was kind of an, ahoy, whatever.  He could be
7    exempt from paying Social Security, and then
8    there was kind of a discussion about what that
9    meant, and then he sent this letter regarding
10   that situation.
11        Q.    What's the date on that letter?
12        A.    August 8, 2003.
13        Q.    So was that pretty close in time to
14   this conversation you just related?
15        A.    Yeah.  I would say so.
16        Q.    And he initiated the call?
17        A.    Yes, sir.
18        MR. GREEN:  We had produced some
19   records; have you been able to determine when
20   that call was?
21        MR. ROYSE:  The day before -- well,
22   leave it on the record.  What I saw, Ron, was
23   that there was a phone call the day before and
24   three days before.
25        MR. GREEN:  So on the 7th and the

170

1    4th?
2         MR. ROYSE:  Hold on.  Let me tell you
3    for sure, 8-4-03, there's a telephone call,
4    and 8-5-03, and, I think, there's one --
5    that's it, 8-4 and 8-5.  I'm not obviously
6    testifying that that was the phone call;
7    that's what I got from the record.
8         MR. GREEN:  No.  This is just an
9    informal.  I'll go -- it will be my job to go
10   look and verify or whatever.
11        MR. ROYSE:  That's what I saw in the
12   records.
13        Q.    Just seeing if you'd save me some
14   time because I have to admit, I haven't
15   studied them.  And then you received this
16   letter, like, the 9th or the 10th, I take it?
17        A.    I think so, yes.
18        Q.    Within regular mailing time; is
19   that usually a day or two?
20        A.    It depends.
21        Q.    Three?
22        A.    Could be.  I've had things take
23   three days to get to me from Louisville.
24        Q.    In your discussion on the telephone
25   call of the 7th, I think, we think that this

171

1    is, but whenever it was, you had a discussion
2    of what that meant and that that had to do
3    with it; was there a discussion about if his
4    employer was a foreign company, or was it
5    talking about whether he worked overseas?
6         A.    The term I remember was he was
7    asking me is Richard a foreign employee.
8         Q.    And he suggested that being a
9    foreign employee would have something to do
10   with Social Security?
11        A.    Yes, sir.
12        Q.    Now, as you left that phone call
13   before you got this letter, how did you leave
14   it in terms of what either of you was going to
15   do?
16        A.    He asked me to find out from
17   Richard what the status was.
18        Q.    His status or his employer's
19   status?
20        A.    Well, he wanted -- he wanted me to
21   get information from Richard.
22        Q.    Did he describe any specifics,
23   like, documents that he wanted, anything like
24   that?
25        A.    I don't remember him asking for any

172

1    documents.
2         Q.    And at this time, was Richard
3    overseas?
4         A.    Yes, sir.
5         Q.    And then you got this letter.  Now,
6    what did you do following this conversation?
7         A.    I put in a call to Africa.
8         Q.    And were you able to get ahold of
9    your husband?
10        A.    Eventually.
11        Q.    How long did that take?
12        A.    I couldn't tell you.  I don't
13   recall.
14        Q.    I mean, was it a week or months?
15        A.    It could have been a matter of
16   days, it could have been a matter of weeks.  I
17   couldn't tell you for sure.
18        Q.    And we talked briefly about this
19   connection with some Tidewater documents.  You
20   had a list of numbers, and you already
21   indicated you weren't really concerned with
22   who they belonged to, they were the people you
23   got in touch with about things.  So you call
24   them, and say I need to talk to my husband,
25   and then they try to get him to call you; is

173

1  that how that works?

2      A.  Yes, yes, sir.

3      MR. GREEN:  Bear with me just a

4  second.  I want to take a look at the

5  Tidewater.

6      MR. ROYSE:  Ron, what I'm doing

7  there, you asked her at that last deposition

8  to look at and see if she had those phone

9  lists that you just referenced.  She was able

10  to find at least a couple of them, and I'm

11  having her to go run and make a copy so you

12  can look at those if you want to ask her about

13  them, that way, you've got them at that point

14  in the deposition.

15      MR. GREEN:  Yeah.

16      MR. ROYSE:  I didn't Bates number

17  those.

18      MR. GREEN:  Let's go ahead and make

19  these an exhibit to the depo, and then we'll

20  all know what they were.  We'll go ahead and

21  mark these as 2, and we'll come back.  I may

22  or may not have questions.

23          (REPORTER MARKS A COPY OF LISTS AS

24      DEFENDANT'S EXHIBIT NO. 2 FOR

25      PURPOSES OF IDENTIFICATION, AND THE

174

1          SAME IS ATTACHED HERETO AND FILED

2          HEREWITH)

3      Q.  I was just looking here real quick

4  to see if, you know, last time we talked about

5  it, there was a couple sheets where somebody

6  with one of the Tidewater companies had a fax

7  going to somebody saying that you needed him

8  to call you, and we talked about some of

9  those, and I was just looking to see if there

10  was one for this time frame, and I don't see

11  one, but, so after this letter, you called the

12  people you call, and then he called you back?

13      A.  Eventually, yes, sir.

14      Q.  And we've established we're not

15  sure how much time elapsed, but in between the

16  time that you talked to Mr. Birkholz and he

17  said to contact him, and when he called you

18  back, did you have any other conversations

19  with Mr. Birkholz in that interim period?

20      THE WITNESS:  If I'm to understand

21  you, you're asking if there were any

22  conversations between the time, like, when I

23  talked with Richard?

24      Q.  No.  When you talked to Peter.

25  Between the time you talked to Peter, and he

175

1  said get me the status in the time that

2  Richard called you back; were there any other

3  discussions?

4      A.  I don't recall.

5      MR. GREEN:  Then Richard called you;

6  tell me about that conversation, what you can

7  remember.

8      THE WITNESS:  I remember asking him,

9  you know, Richard, are you a foreign employee,

10  and his immediate reaction was, yes, I'm a

11  foreign employee, and then I recall explaining

12  to him something about him being exempt from

13  self-employment tax, and that's the most I can

14  remember.

15      Q.  Was there any discussion in that

16  conversation between you and Richard as to who

17  Richard's employer was?

18      A.  I think there may have been a

19  discussion about whether or not Richard was

20  working for a foreign company.

21      Q.  Do you recall what he told you?

22      A.  Yes.  I work for a foreign company.

23      Q.  Did he say which one?

24      A.  I don't recall asking.

25      Q.  I'm going to show you what we've

176

1  marked as Exhibit 2, which you and your

2  attorney were kind enough to locate for us,

3  and for this situation, who would you have

4  called; who would you have called to say I

5  needed to talk to Richard?

6      A.  I think he was in Malongo at the

7  time, and I didn't call all that often, so I'm

8  not sure.  Usually the process was you call

9  this -- a number that goes to England, and

10  then you ask for Malongo and then give them an

11  extension number.

12      Q.  Which number are you talking about,

13  the one that goes to England?  Just so that if

14  somebody else reads this depo, they'll be able

15  to tell from that chart what you're talking

16  about.

17      A.  Well, it looks like the number

18  changed because at the top, there's a number

19  that says 011-44-122-429-3000, and then

20  there's another number here, and I remember

21  the number changed, 011-44-207-487-8100.

22      Q.  You wouldn't at that number ask for

23  any particular person, you'd just ask to be

24  relayed on to?

25      A.  The instructions are asked for.

177

1    Here's one that says ask for Malongo and then
2    an extension number, and here's one that says
3    ask for Angola and then an extension number.
4        Q.   And then the other phone numbers
5    and so forth would be for different things,
6    like, if you had a question about, say, you
7    had a question about his pension, who would
8    you call?
9        A.   I never called about his pension.
10       Q.   But is there information on there
11   that would tell you who to call?
12       A.   No, sir.
13       Q.   So this is strictly how to contact
14   Richard?
15       A.   That's all I used it for.
16       Q.   Is this a set of documents that
17   Richard may have had other uses for that you
18   weren't involved with, I mean, this was given
19   out by somebody to, I assume, him?
20       A.   All I know is I got a copy of this
21   to use if I needed to contact him.
22       Q.   After your conversation with
23   Richard then, what did you do?
24       A.   I don't recall if I called Peter or
25   not.  It would seem like a logical thing to

178

1    do, but I couldn't tell you for sure.
2        Q.   Well, other than calling Peter,
3    what else did you do?
4        A.   I remember calling my prepaid legal
5    service.
6        Q.   Is that how you came up with
7    Mr. Smith?
8        A.   Yes, sir.
9        Q.   And who is your prepaid legal
10   service?
11       A.   O'Koon & Hintermeister.
12       Q.   You don't happen to know how to
13   spell that, do you?
14       MR. ROYSE:  It's Marvin O'Koon, I
15   think, in Louisville.
16       Q.   Who did you send your -- I take it
17   you enrolled in the prepaid legal service as
18   planned?
19       A.   Yes, sir.
20       Q.   Who did you send premiums to, who
21   was your agreement with; was it the firm?
22       A.   I have an automatic deduction made
23   on my credit card.  When I call the 800
24   number, I get O'Koon & Hintermeister and a
25   message that says your prepaid legal provider.

179

1        Q.   Is there a company that runs the
2    plan and then hires them, or are they running
3    the plan?
4        A.   I honestly couldn't tell you.
5        Q.   How did you first get enrolled in
6    this?
7        THE WITNESS:  Are you asking me how
8    did I find out about them?
9        MR. GREEN:  Yeah.
10       A.   A friend of mine who lived in
11   Pennsylvania told me about it with a small
12   business, and she had the service, and she was
13   telling me how convenient it was to handle a
14   lot of, you know, kind of small things that
15   come up when you're dealing with customers and
16   that sort of thing.
17       Q.   And how did she know -- is this a
18   Kentucky plan, or is this a nationwide thing?
19       A.   I believe it's nationwide.
20       MR. GREEN:  And my guess is that that
21   firm has got an agreement with whoever runs
22   the plan to do stuff in Kentucky, so I'm
23   trying to get a feel for who runs the plan.
24       THE WITNESS:  I'm not sure.  She gave
25   me -- gee, I can't remember if she gave me a

180

1    general 800 number or a number that was in
2    Pennsylvania because it was something to do
3    with them getting credit for referring a
4    customer to the prepaid legal service, so
5    there was a specific number I called, and a
6    specific -- I think, it was an attorney, I'm
7    not sure, who basically did the sign up, and
8    then I got referred out to O'Koon &
9    Hintermeister.
10       MR. ROYSE:  Ron, it's pretty clear to
11   me that she doesn't understand or doesn't know
12   how the thing's run.  If I did, I'd tell you,
13   but if you want us to, if Barb will flag that,
14   I'll find out the answer to your question.
15       MR. GREEN:  Yeah, if you can just
16   take a look at any information you have, and
17   then give me some clue as to who's involved in
18   it.  It's not a bad thing, I mean, I work with
19   the policemen's prepaid thing.
20       MR. ROYSE:  I'll find out for you.
21       THE WITNESS:  I honestly don't know.
22   All I know is I called that 800 number, and
23   that's who I talked to.
24       Q.   If you can find something on it
25   fine, but, I guess, the important thing here

181

1  is that ultimately that then led you to
2  Mr. Smith?
3      A.   Yeah.
4      Q.   And that would have been shortly
5  after you talked to your husband, or can you
6  give me some feel for, and feel free to use
7  this August 8, 2003, as a point of reference,
8  we know it's after that, but do you have a
9  feel for how long after that?
10     THE WITNESS:  That I talked with
11 Mr. Smith?
12     MR. GREEN:  Or the attorneys at the
13 prepaid.
14     A.   You have to give me a minute.  I'm
15 trying to remember.
16     MR. GREEN:  No problem.
17     A.   I talked with Richard, and then I
18 called prepaid legal pretty quickly, and they
19 gave me a referral.  I wanted a tax attorney,
20 and I can't remember the length of time.
21     MR. ROYSE:  His question is how long
22 after this roughly did you call an attorney,
23 if you recall.
24     THE WITNESS:  I'd say within a couple
25 of weeks.

182

1      Q.   Prior to you doing that, had you
2  had any other conversations with Mr. Birkholz?
3      A.   I can't recall.
4      Q.   Now, we're going to get -- you can
5  see that your attorney is sitting at the front
6  of his seat because we're going to get into
7  stuff that's potential privilege and so forth,
8  and he's paying close attention now, which is
9  good.  No matter how I phrase a question, it's
10 not my intent to try to encroach upon
11 privilege, okay?
12     THE WITNESS:  I'll just be listening.
13     MR. ROYSE:  And you answer his
14 question that he asked you, period, because
15 that will help me.  I don't want you to go off
16 into something -- he may ask you a question
17 that doesn't involve the privilege, and in the
18 course of answering it, you may get
19 sidetracked and start talking about privilege,
20 and I'll have to stop you, so I just want you
21 to pay attention to what he asks.
22     THE WITNESS:  All right.
23     Q.   And for the record, I don't know
24 that ultimately, I mean, I may take the
25 position that privilege doesn't apply for

183

1  whatever reason, but for today's purpose,
2  we'll just assume it does, but I want to know
3  a little bit about how this all came about.
4  So let me ask you, you called the prepaid,
5  they then gave you the number for the O'Koon
6  firm, or how did you get Mr. Smith's name,
7  from who?
8      A.   From O'Koon & Hintermeister.
9      Q.   Did they call you?
10     A.   No.  They sent me a letter.
11     Q.   Do you still have a copy of the
12 letter?
13     A.   I think so.
14     Q.   And that letter told you you need
15 to contact Mr. Smith?
16     A.   Yes, sir.
17     Q.   And gave you a phone number and so
18 forth?
19     A.   Yes, sir.
20     Q.   And did you do that promptly?
21     A.   Yes, sir.
22     Q.   Did you decide to retain him?
23     A.   Yes, sir.
24     Q.   How did, to your knowledge -- at
25 some point, did you tell Mr. Birkholz that you

184

1  had retained Mr. Smith?
2      A.   Yes, sir.
3      Q.   Do you know when?
4      A.   I believe it was in July '04.
5      Q.   Was that on the phone?
6      A.   Yes, sir.
7      MR. GREEN:  Tell me about the
8  conversation to the extent you remember.
9      THE WITNESS:  I believe we were in
10 the middle of an audit with the IRS, and, I
11 think, Peter had called me and needed
12 information for the audit, and that's when I
13 told him that I'd had a tax attorney do the
14 research.
15     Q.   What did he say?
16     A.   He said I did the research, too.
17 And then, at some point, I gave him
18 Mr. Smith's phone number and just said you
19 need to talk to him.
20     Q.   Now, the audit that was ongoing,
21 was that for 1999?
22     A.   Yes, sir.
23     Q.   And is that related to the filing
24 of an amended return?
25     A.   Yes, sir.

185

1    Q.    So prior to July '04, Mr. Birkholz
2   would not have known that Mr. Smith was
3   involved on your behalf, correct?
4    A.    I'm going to say, yes, sir; no, he
5   didn't know.
6    Q.    Prior to that, had Mr. Smith been
7   involved at all with the IRS on your behalf?
8    THE WITNESS:  Directly in contact
9   with them?
10    MR. GREEN:  Yeah.
11    A.    No, sir.
12    MR. GREEN:  Let me show you a
13   document marked PB3 and 4.  It's a letter
14   dated September 7, 2004.  Let me ask you if
15   you know one way or the other whether you
16   received that letter from Mr. Birkholz.
17    THE WITNESS:  Yes.  I remember
18   receiving this.
19    Q.    In paragraph three, he's asking
20   about information for the audit; was that the
21   same information that he was talking about in
22   the July 4 conversation?
23    A.    It's possible.
24    MR. ROYSE:  July 4th conversation?
25    Q.    I'm sorry.  July '04 conversation.

186

1   I just thought I'd sneak something in showing
2   he was hard working.  When you got this letter
3   September 7th, 2004, what did you do?
4    A.    Actually, I think, if my memory
5   serves correctly, I think, I heard from
6   Mr. Smith before I got this letter telling me
7   that he basically bailed out.
8    Q.    Because he was shown as a recipient
9   of copy, correct?
10    THE WITNESS:  A recipient of copy?
11    Q.    He's shown on the cc?
12    A.    Oh, yes, sir.
13    Q.    And what did -- well, after you
14   talked to Mr. Smith, what did you do?
15    THE WITNESS:  What did I do?
16    Q.    After you talked to Mr. Smith and
17   you received a copy of this letter, what did
18   you do?
19    A.    Well, I needed to get somebody to
20   handle the audit, and I don't remember whether
21   Mr. Smith said he would do it or whether I
22   needed to ask him to do it.  I don't recall.
23    Q.    What about, this mentions a return
24   has not been filed, and no data's been
25   received; what did you do about that?

187

1    A.    That was the first we knew that
2   after all these years of him automatically
3   filing an extension that he hadn't filed one.
4   He hadn't filed one, and he didn't tell us he
5   hadn't filed one.
6    MR. ROYSE:  His question's and what
7   did you do.
8    THE WITNESS:  Oh, and what did I do?
9    MR. ROYSE:  Uh-huh (affirmatively).
10    A.    Oh, we needed to get a tax guy
11   right away, so we asked Jeff Smith to
12   recommend somebody.
13    Q.    And who did you get?
14    A.    A guy named Ron Haas.
15    Q.    Where is he from?
16    A.    Kentucky.
17    Q.    Whereabouts in Kentucky?
18    A.    I believe his office is over on
19   Monarch Drive.
20    Q.    In Lexington?
21    A.    In Lexington.
22    Q.    Is he with a firm?
23    A.    I believe so.  I think it's Facts,
24   LLC.
25    Q.    F-A-C-S?

188

1    A.    F-A-C-T-S.
2    Q.    That's an accounting firm?
3    A.    I'm not sure.
4    Q.    And what returns did Mr. Haas
5   prepare for you?
6    A.    2003.
7    Q.    Has he prepared subsequent returns
8   for you?
9    A.    I think he did 2004.
10    Q.    Have you filed 2005 yet?
11    A.    Yes, sir.
12    Q.    And who prepared that?
13    A.    I think they're called Breeding --
14   Dulworth, Breeding, & Cox.
15    Q.    From Lexington also?
16    A.    Yes, sir.
17    Q.    With respect to Mr. Haas, have you
18   discussed with him this case, and has he
19   shared with you opinions or anything?
20    A.    Not really.
21    Q.    How about, I guess, you didn't say
22   which fellow at Dulworth, Breeding, but have
23   you talked with them about this case, or do
24   you consider them a witness for you in this
25   case?

189

1      MR. ROYSE:  No.
2      MR. GREEN:  Your voice got deep there
3  for a minute.  Okay.
4      MR. ROYSE:  I figured I was in a
5  position to make that stipulation to save you
6  time.
7      Q.  Now, in your 2003, 2004, 2005
8  returns, do you know who was listed as your
9  husband's employer?
10     A.  No.  I couldn't say.
11     Q.  Do you know if Social Security was
12 paid in those years?
13     A.  Yes, it was -- well, I'm not sure.
14 I'm really not sure.
15     MR. GREEN:  Do you have, and if
16 they're in here, just tell me; do you have
17 copies of those returns?
18     MR. ROYSE:  I don't think so, Ron.
19     MR. GREEN:  I don't remember seeing
20 them.
21     MR. ROYSE:  I'll make a note here,
22 2003 to 2005, returns.  Let me look real
23 quick.  I believe the answer to your question
24 you just asked, by the way, is taxes have been
25 withheld since that time, Social Security is

190

1  actually withheld now.  I don't see anything
2  after '02.
3      MR. GREEN:  I don't remember ever
4  seeing anything other than the amended return
5  for '99.
6      MR. ROYSE:  Yeah, and everything I
7  had was copied.  Well, we can get those to
8  you.
9      Q.  Okay.  Did your husband's
10 employment status change at some point?
11     A.  I'm not sure exactly what happened.
12     Q.  Does he now get, what are they,
13 W2's?
14     A.  I believe so, yeah.
15     Q.  Do you know when that started?
16     A.  I think it was 2005.
17     Q.  So in 2003 and 2004, there would
18 not have been withholdings, you don't think?
19     A.  I don't think.
20     Q.  But you think you did pay Social
21 Security tax?
22     A.  Yes, sir -- well, I'm not really
23 sure.  I couldn't tell you for sure.
24     Q.  I mean, I understand anything you
25 say is going to be subject to what the returns

191

1  say.  I'm just trying to get a feel on what I
2  can do here on the subject.  Did you
3  participate in any of the discussions between
4  Mr. Smith and Ms. Pfeiff or anybody else at
5  the IRS concerning the '99 tax year?
6      THE WITNESS:  You mean, like, was I
7  there?
8      MR. GREEN:  Yeah.
9      A.  Oh, no, sir.
10     Q.  Or participated by phone?
11     A.  No, sir.
12     Q.  So you have no firsthand knowledge
13 of what Mr. Smith told the lady from the IRS
14 or anything like that?
15     A.  No, sir.
16     Q.  Would you have been present or
17 participated by phone in any conversations
18 Mr. Birkholz had with Ms. Pfeiff or anybody
19 else at the IRS concerning your audit or your
20 returns?
21     A.  No, sir.
22     Q.  Same question.  Do you have any
23 firsthand knowledge of what he told them or
24 what they told him?
25     A.  No, sir.

192

1      MR. GREEN:  Let me show you a
2  document which is one you and your husband
3  produced, W360, dated May 30th, 2005,
4  addressed to the IRS, and ask you if you
5  recognize that.  If I can get those back and
6  get them in my stack before I -- those go to
7  the court reporter.  Thank you.  I'll put
8  these back while you're looking at that.
9      THE WITNESS:  You're asking me if I
10 sent this?
11     MR. ROYSE:  He's asking you to review
12 it.
13     THE WITNESS:  Oh, okay.
14     MR. GREEN:  And if you can identify
15 it.
16     A.  Oh, I can identify it.  I did this
17 letter.
18     Q.  Do you recall when your 2003 return
19 was filed?
20     A.  Not exactly, no.
21     Q.  The letter that we looked at, and
22 if you need to look at it again, just tell me,
23 as of September, Mr. Birkholz said that he
24 didn't have the data for the year 2003; was
25 that an accurate statement?

193

1    A.   Yes.

2    Q.   So he couldn't have filed the

3  return.  You're saying he should have filed an

4  extension?

5    A.   Yes, sir.

6    Q.   Do you know if, at the time of this

7  letter you're looking at now, you had filed

8  the return?

9    A.   Yes, sir, I believe so.

10    Q.   There were a number of emails back

11  and forth between Mr. Birkholz and Mr. Smith

12  in the summer of 2004 that don't show a copy

13  to you; did Mr. Smith tend to forward those on

14  to you, or do you know if you ever saw them

15  before this case?

16    A.   I think I have.

17    Q.   You think he would have then

18  forwarded the emails on to you as they came

19  in?

20    A.   I believe so.

21    Q.   Do you know what -- did the IRS

22  assess a penalty for 2003 based on late

23  filing?

24    A.   Yes, sir.

25    Q.   Do you recall how much that was?

194

1    A.   I would be -- it would be a guess.

2    Q.   What would be your guess

3  understanding that it is just that?

4    A.   Oh, like, $3,000.

5    Q.   Now, was that entirely for late

6  filing, or was that also including late

7  payment?

8    A.   I don't recall.

9    Q.   If we have a copy of the IRS notice

10  concerning the tax year 2003, I missed it.  It

11  could very well be in the stack, but it

12  doesn't show up in my list.  Could you take a

13  look, and if you have that, make sure your

14  attorney has a copy of it?

15    A.   Okay.

16    MR. GREEN:  Whatever notices you got

17  for the tax year 2003.

18    THE WITNESS:  Okay.

19    Q.   And then you would have had

20  Mr. Smith handle those in terms of other than

21  this letter, would he have dealt with him

22  about that; did he try to negotiate that down

23  or anything like that?

24    A.   What he told me to do was --

25    MR. ROYSE:  Hold on.  I don't want

195

1  you to testify what he told you to do.  His

2  question to you is did Jeff Smith deal with

3  that penalty with the IRS.

4    THE WITNESS:  No.

5    Q.   You handled that yourself?

6    A.   Yes, sir.

7    Q.   Other than this letter, did you

8  have any discussions or so forth with the IRS

9  about it?

10    A.   No, sir.

11    Q.   So you paid it as they assessed it,

12  or did they negotiate it down?

13    A.   They gave me an abatement.

14    Q.   So you didn't have to pay it?

15    A.   I had to pay the interest.

16    Q.   But you didn't have to pay the

17  actual penalty?

18    A.   No, sir.

19    Q.   Was that reflected in a notice or

20  anything from them; did they send you one back

21  saying we're correcting our prior notice, this

22  is what you owe?

23    A.   Yes, sir.

24    Q.   Could you also see if you have

25  copies of those?

196

1    A.   Yes, sir.

2    MR. GREEN:  Just any copies you have

3  in connection with how the 2003 tax returns

4  were handled, I would appreciate it if you

5  could see what you have, and just contact your

6  attorney.

7    THE WITNESS:  Yeah.

8    MR. ROYSE:  Ron, I gave you their

9  2003 file which is why I'm not sure if there's

10  anything else, but we'll look, though.

11    Q.   Yeah, again, I could have missed

12  it, but it's just not showing up on my chart,

13  and I'll look, too, to make sure it's not in

14  here.  I'll call you so you don't waste your

15  time.  After the September 7th, 2004, letter

16  from Mr. Birkholz in which he says he's

17  withdrawing his representation other than the

18  '99 return, you know the letter I'm talking

19  about?

20    A.   I believe so.

21    Q.   Did you subsequent to that have any

22  other conversations with Mr. Birkholz or

23  anybody associated with Birkholz & Company?

24    A.   No, sir.

25    Q.   So from that point on, any

197

1  conversations relating to you or your husband
2  were through Mr. Smith or the IRS or some
3  third person?
4      A.  Yes, sir.
5      Q.  Did you file any additional amended
6  returns for any of the years prior to 2003?
7      A.  Yes, sir.
8      Q.  Do you recall for which years?
9          THE WITNESS:  Well, it was too late
10  to file for 2000.  Can I talk to my attorney?
11         MR. GREEN:  Yes.  Here, let me step
12  out.
13         (OFF THE RECORD.)
14     A.  And I have to confess that I'm
15  stupid because when Peter told me that the
16  amended returns could go back to 1999 and that
17  we could recover 1999, 2000, and 2001, I
18  assumed when he overnighted these returns,
19  there were two envelopes, and the one he
20  explained for 1999 had to be mailed
21  immediately, and he instructed me to get a
22  certificate of mailing, which I did.  The
23  other envelope, I assumed, had the 2000 and
24  2001 returns in them, he said didn't need to
25  be mailed by, you know, there was time left on

198

1  them.  So I sent them both at the same time,
2  they show up on the receipt of the certificate
3  of mailing, and I had always assumed that he
4  had done the amended returns for 2000 and
5  2001, and that they had been sent in.
6      Q.  Did you sign the returns before
7  they went?
8      A.  Yes, sir.
9      Q.  So you signed the returns in both
10  envelopes?
11     A.  Yes, sir.
12     Q.  And just didn't notice that they
13  were -- what does it turn out the other
14  envelope was, just another copy of the '99?
15     A.  I'm not sure.  I think it was
16  probably the 2002 return.
17     Q.  The actual return?
18     A.  I'm -- you know, that's what I'm
19  thinking happened.
20     Q.  So the 2001 and 2002, no amended
21  return was filed?
22     A.  No, 2000 and 2001 didn't get
23  amended.
24     Q.  That's what I'm saying.  There was
25  no amended returns for those years?

199

1      A.  Yeah, that's correct.
2          MR. ROYSE:  '00 and '01?
3      A.  Yeah, '02 got done.
4      Q.  '02 did get amended.
5      A.  Well, okay, yeah.
6      Q.  There was an amended return, but
7  '01 did not, and that's the story you just
8  told me; you thought that the other envelope
9  was '00 and '01 or whatever?
10     A.  Yes, yes.
11     Q.  But you had pulled them out, and
12  you did sign them before you sent them?
13     A.  Yes.  I was in a hurry because the
14  deadline was, like, within a matter of days.
15     Q.  Do you still have a copy of the
16  letter that would have come with those
17  envelopes that would have explained what to do
18  with them and so forth?
19     A.  I believe he told me over the
20  phone, but, no, I don't remember seeing a
21  letter.
22     Q.  And who prepared the '02 amended
23  return?
24     A.  He did, Peter did.
25     Q.  So there are no amended returns

200

1  other than those that Peter prepared?
2      A.  That's correct.  Okay, what
3  happened was, I assumed that Peter had done
4  them, and we came to find out later that they
5  had not been done, so -- well, Mr. Smith
6  attempted, because of the way the receipt was,
7  I assumed that the 2000 and 2001 amended
8  returns were in that envelope, and based on
9  that, Mr. Smith wrote a letter to the IRS
10  saying that, you know, what happened to these
11  returns, they were amended, something to that
12  effect.
13     Q.  And do you have a copy of that
14  letter?
15     A.  I think so.
16     Q.  Let me ask you, it's my
17  understanding that Mr. Smith has departed for
18  colder grass or whatever, Michigan or some
19  whereabouts.  Prior to his leaving, did you or
20  did anybody for you secure a copy of his file
21  that related to you?
22         MR. ROYSE:  I did.
23         MR. GREEN:  Okay.  I haven't seen
24  that, have I?
25         MR. ROYSE:  I don't think so.

201

        MR. GREEN:  Well, we can talk about
that off the record.
        MR. ROYSE:  Okay.
        MR. GREEN:  But as far as you know,
you've got a complete copy of what Mr. Smith
had at the time that he departed?
        MR. ROYSE:  Correct, and, Ron, maybe
we can talk about it when we go off the
record.  I don't -- I think anything in there
that looked pertinent, it was either
duplicative of things you already -- it wasn't
produced separately, but I'll go back and look
at it and make sure there's not anything there
based on what you're asking about now.
    Q.   Okay.  Did you discuss with
Mr. Smith the subject of amended returns,
without what you talked about, did you bring
up that subject, or did you limit your
discussions with him about the audit?
        MR. ROYSE:  You discussed the '01 and
-- excuse me, '00 and '01 amended returns with
Jeff?
        THE WITNESS:  Yes, sir.
    Q.   Did you engage him to try to --
well, you mentioned there was a letter written

202

that explained what you described here about
the packages?
    A.   Yes, sir.
        MR. GREEN:  Mr. Smith wrote that, and
then copied you, and would that be in that
file, do you know?
        MR. ROYSE:  I don't remember seeing
it, but it may be.
    Q.   Okay.  I think I just have one more
question.  How would you like to get some
lunch?
        THE WITNESS:  Is that it?  We're
done?
        MR. GREEN:  Yeah.  I'm done.
        (WHEREUPON, THE DEPOSITION OF
JENNIFER WEYLAND WAS CONCLUDED AT 12:00 P.M.)

203

STATE OF KENTUCKY)

COUNTY OF BOYLE)

        I, BARBARA C. KARGEL, CCR (KY), the
undersigned Notary Public in and for the State
of Kentucky at Large, certify that the facts
stated in the caption hereto are true; that at
the time and place stated in said caption,
JENNIFER WEYLAND hereto personally appeared
before me, and that after being by me duly
sworn, was examined by counsel for the
parties; that said testimony was taken down in
realtime stenotype by me and later reduced to
transcription by me, and the foregoing pages
is a true record of the testimony given by
said witness.  No party to said action nor
counsel for said parties requested in writing
that said deposition be signed by the
testifying witness.

        My Commission Expires:  November 9,
2007.  IN TESTIMONY WHEREOF, I have hereunto
set my hand and seal of office on this the
_____ day of _____, 2006.


        _____
        BARBARA C. KARGEL, NOTARY PUBLIC,
        STATE AT LARGE, KENTUCKY