O'BRIEN & LEVINE

Court Reporting Services

YOUR BOSTON CONNECTION...WORLDWIDE

# Richard Weyland, et al. v. Peter Birkholz and Company

**Transcript of the Testimony of:**

# Peter Birkholz

## June 19, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130 888.825.DEPO(3376)

Nicole E. Guilbert 19686

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

LEXINGTON DIVISION

--------------------------------x

RICHARD WEYLAND and JENNIFER WEYLAND,

Plaintiffs

Civil Action

vs. No. 05-375-JBC

PETER BIRKHOLZ AND COMPANY,

Defendant

--------------------------------x

DEPOSITION OF PETER BIRKHOLZ, a witness called by and on behalf of the Plaintiffs, taken pursuant to Federal Rules of Civil Procedure, before Nicole E. Guilbert, a Notary Public in and for the Commonwealth of Massachusetts, at Club Quarters, 161 Devonshire Street, Boston, Massachusetts, on Monday, June 19, 2006, commencing at 8:15 a.m.

APPEARANCES

DAVID T. ROYSE, ESQUIRE
Stoll Keenon Ogden
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507
(859) 231-3000
Counsel for the Plaintiffs

RONALD L. GREEN, ESQUIRE
Boehl, Stopher & Graves
444 West 2nd Street
Lexington, Kentucky 40507
(859) 252-6721
Counsel for the Defendant

RICHARD BLAND, ESQUIRE
Law Office of Richard Bland
110 Pleasant Street
Marlborough, Massachusetts 01752
Counsel for the Defendant

Also Present: Jennifer Weyland

INDEX

| WITNESS | EXAMINATION |
|---|---|
| PETER BIRKHOLZ | |
| (By Mr. Royse) | 5 |
| (By Mr. Green) | 173 |

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| 1 | Curriculum Vitae | 15 |
| 2 | Hand-written Notes | 67 |
| 3 | Letter | 70 |
| 4 | Tax Preparation Form | 72 |
| 5 | Cover Letter | 74 |
| 6 | Cover Letter | 74 |
| 7 | 1988 Tax Return Documents | 76 |
| 8 | 1989 Tax Return Documents | 79 |
| 9 | Letter | 84 |
| 10 | 1990 Tax Return Documents | 85 |
| 11 | 1991 Tax Return Documents | 86 |
| 12 | 1992 Tax Return Documents | 88 |
| 13 | Letter | 88 |
| 14 | Letter | 90 |
| 15 | Report of Earnings Letter | 95 |
| 16 | 1993 Tax Return Documents | 96 |
| 17 | 1994 Tax Return Documents | 98 |
| 18 | Time Table | 99 |
| 19 | 1995 Tax Return Documents | 100 |
| 20 | 1996 Tax Return Documents | 100 |
| 21 | 1997 Tax Return Documents | 100 |
| 22 | 1998 Tax Return Documents | 102 |
| 23 | 1999 Tax Return Documents | 103 |
| 24 | 1999 Tax Return Documents | 108 |
| 25 | Phone Memo | 111 |
| 26 | Hand-written Notes | 114 |
| 27 | Hand-written Note | 116 |

| (Exhibits Continued) | | PAGE |
|---|---|---|
| 28 | Letter | 117 |
| 29 | Letter | 119 |
| 30 | 2000 Tax Return Documents | 120 |
| 31 | 2001 Tax Return Documents | 121 |
| 32 | Federal Statement | 123 |
| 33 | Application for Extension | 124 |
| 34 | Application for Extension | 124 |
| 35 | Letter | 126 |
| 36 | Hand-written Notes | 129 |
| 37 | E-Mail | 131 |
| 38 | Letter | 133 |
| 39 | Letter | 134 |
| 40 | Letter | 136 |
| 41 | E-mail String | 141 |
| 42 | Correspondence | 147 |
| 43 | Letter | 152 |

(Exhibits were given to the court reporter to attach to the transcript.)

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent shall have thirty (30) days in which to read and sign the deposition transcript, after which time it shall be deemed to have been signed, and that the filing and sealing of the deposition transcript are waived.

It is further stipulated and agreed that all objections, except objections as to the form of the question, and all motions to strike shall be reserved until the time of trial.

PETER BIRKHOLZ, having been satisfactorily identified by the production of his driver's license and duly sworn by the Notary Public, was examined and testified as follows in answer to direct interrogatories:

BY MR. ROYSE:

Q. Good morning, Mr. Birkholz. My name is David Royse. I'm with the law firm of Stoll Keenon Ogden, and I represent Richard and Jennifer Weyland in this matter.

We're here for your deposition today, and I will talk to you a little bit here before we start about some ground rules that may make things go a little easier or at least more quickly.

Have you ever given a deposition before?

A. Yes.

Q. More than once?

A. I don't think so. Just one.

Q. In what setting did you give a deposition?

A. What do you mean by "setting"?

Q. I mean what context. Were you in a case -- were you a defendant? Were you a witness in another civil case or --

A. I gave the deposition for a client.

Q. As an expert witness?

A. No. I wasn't an expert witness. I was -- it was my client and they asked me to answer some questions.

Q. What kind of case was that?

A. Had to do with a client that was purchasing a business and elected not to go through with the purchase.

Q. You weren't a party in that matter I assume; is that right?

A. Pardon?

Q. You were not a party to that matter; is that

right?

A. I was brought into it at a later point in time.

Q. And what claim was made against you?

A. I'm not even sure I understand. I think -- I think they suggested I conspired with the client to -- I don't know what the word is -- you know, that we were planning on -- from day one of not buying the business, etc.

Q. I understand. How did that ultimately get resolved, if it did?

A. Well, I wasn't involved with the case all the way through, but I think it eventually was overturned in my client's favor.

Q. Did you have any liability in that case?

A. My insurance company.

Q. What was the -- if you recall, what was the name of case or what was the -- who were the parties?

A. I don't recall.

Q. You don't remember the name of the plaintiff?

A. Well, he's no longer a client. Rockwell, something like that.

Q. Roughly when was that? Last five years? Ten years?

A. Back a ways.

Q. Think it was more than ten years?

A. Could be.

Q. Let me back up and I'll have about -- quit asking that question to start because sometimes we got off into things like that. What I wanted to say first was: In the way of ground rules, you haven't done this much, so let me tell you a few things. Number one, I want you to be comfortable today. You've got two good lawyers with you. They'll give you advice, if necessary, but don't ever feel like you can't take a break if you want to. If there's something you need to do, you just let me know. We're going to be comfortable if nothing else.

Secondly, this is not an endurance test. So we'll try and pace ourselves. I am going to leave here at four o'clock today to get on a plane. I have every reason to believe that we'll finish by then. We'll move at a good pace, and I'll try and do my best, but you need to give full and complete answers and not get rushed just because I've got to leave. If we don't finish, we'll deal with it. But I -- like I say, I have every reason to believe we will.

In the way of ground rules, first I'll tell you that because the court reporter is here and she has to take down everything we say, it's natural in conversation for us

to anticipate what one another are saying and sometimes talk over each other. You'll start answering before I'm done questioning or vice versa. It's impossible for her to get down both people at once. So if we can, I'll do my best, but if you'll try and keep that in mind not to talk over one another.

Secondly, if there's a question that I ask you that you don't understand, please just tell me. There's no jury here. We don't have to be that formal. So if you don't understand something, I certainly want you to tell me. If you answer, I'm going to assume that you understood the question. Is that fair?

A. Yes.

Q. That was going to be my next one was you, like me and everyone else, nods and does, you know, turns our head for yes and no. She can't take that down. So if you'd please just say yes or no. What is your business address?

A. 434 Old Connecticut Path, Framingham, Mass.

Q. And how long has your business been at that address?

A. '92, '93, somewhere around there.

Q. Where were you before that?

A. About three blocks around the corner.

Q. Do you remember that address?

10

A. Speen Street. I don't remember the --
Q. You said Spain Street?
A. Speen, S-p-e-e-n.
Q. And how long, roughly, were you at that address?
A. Approximately three years.
Q. Are you from Massachusetts?
A. You mean originally, no.
Q. How long have you lived here?
A. Since 1970.
Q. Have you lived anywhere other than Massachusetts since 1970?
A. No.
Q. What is your -- what's the highest level of education you've attained?
A. Master's.
Q. And where did you obtain your master's?
A. Bentley College.
Q. Where's that?
A. Waltham, Massachusetts.
Q. And when did you obtain that degree?
A. 1975.
Q. And what about your bachelor's, where did you obtain that?
A. Marquette University.

11

Q. And when?
A. 1970.
Q. Do you have any certifications that are attached to your profession? For example, are you an enrolled agent?
MR. ROYSE: Let's go off the record.
(Jennifer Weyland entered the room.)
MR. ROYSE: Let's go back on the record, please. Can you read back the last question.
(The question was read.)
Q. (By Mr. Royse) For example, are you an enrolled agent?
A. Yes.
Q. Tell me what it means to be an enrolled agent.
A. I don't understand the question.
Q. Okay. I don't know nearly as much about tax practice as you do. So if you were to say to me you're an enrolled agent, and I say, what does that mean, how would you explain it?
A. It's a professional certification. In order to get it, you have to take a three-day exam before the Internal Revenue Service on all tax issues, and you have to maintain continuing education credits every year. It falls

12

under the same practice requirements as an accountant Circular 230.
Q. How long have you had that status?
A. I don't know. Somewhere around the same time I got my master's.
Q. Aside from your master's and your bachelor's and the studying that you did to get your status as an enrolled agent, and the continuing education that you do, have you had any other kind of specialized or formal training?
A. No, not to my knowledge.
Q. Can you -- you mentioned accountant a minute ago. Can you explain to me the difference between a CPA and, for example, an enrolled agent and a tax lawyer. How are those three different or the same?
A. Well, I'm not sure about the tax lawyer, but the CPAs and enrolled agents can be accountants. And I am an accountant and we just -- we take different exams and follow different certifications. CPA can deal largely with financial statements and certifying their correctness. Enrolled agent does not do that, depending on the different state charters. As far as the tax attorney, I can't help you there.
Q. I understand. You say that you're also an accountant. Are you a CPA or CMA?

13

A. No.
Q. What type of entity is Birkholz & Company?
A. A partnership.
Q. Who are the partners?
A. Peter Birkholz and Bill Birkholz.
Q. And roughly when was that partnership formed?
A. Which partnership?
Q. Birkholz & Company.
A. With the present partners?
Q. Sure.
A. I'd have to guess seventy -- maybe '81.
Q. Your answer leads me to ask was there a prior partnership known as Birkholz & Company?
A. Yes.
Q. And who were the partners in that?
A. Arthur Birkholz and Peter Birkholz.
Q. Okay.
A. Later joined by William Birkholz.
Q. Who is Arthur?
A. My father.
Q. Is Bill your brother --
A. Yes.
Q. -- or William your brother? Have you always worked for Birkholz & Company since attaining your master's

degree?
A. No.
Q. Who did you work for before -- immediately before Birkholz & Company?
A. I don't know how to answer that question. I worked for somebody at the same time.
Q. Okay. Explain to me.
A. I worked for a company called Multi-Tax.
Q. And was that a company that you had an ownership interest in?
A. No.
Q. You were an employee?
A. Yes.
Q. And what did that company do?
A. Offered a computerized tax preparation product to accountants --
Q. Roughly --
A. -- accountants, lawyers, etc.
Q. Excuse me. Roughly what time period did you work for Multi-Tax Corporation?
A. 1970 through 1983.
Q. And when did you first start with your father in Birkholz & Company?
A. 1970.

Q. Have you ever left Birkholz & Company between 1970 and the present?
A. No.
Q. Have you ever worked for any other companies since 1970 other than Multi-Tax Corporation?
A. Not that I can recall.
Q. Do you have an ownership interest in any other entities besides Birkholz & Company?
MR. GREEN: Are you -- did you say an ownership in any other companies?
MR. ROYSE: I mean --
MR. GREEN: Relating to accounting or you want his stock portfolio here?
MR. ROYSE: I don't want your stock portfolio.
THE WITNESS: Thank you. No.
Q. (By Mr. Royse) Mr. Birkholz, I'll hand you what the court reporter will mark as Exhibit 1.
(Exhibit 1, Curriculum Vitae, marked for identification.)
Q. (By Mr. Royse) Mr. Birkholz, I've handed you what was attached as Exhibit A to some discovery responses that you and your attorney provided in this case. Is that your current CV?

A. Yes.
Q. Take a second to review it. I'm sure you probably have before, but, to your knowledge, is everything there complete and accurate?
A. Some of the affiliations are no longer, such as Framingham Rotary Club.
Q. Okay. Anything else you see?
A. Not off the top.
Q. Can you describe for me what services that Birkholz & Company provides.
A. Tax and accounting services, divorce services. Those are encompassing terms.
Q. I understand. Do you also do some sort of business valuation work or does Birkholz & Company?
A. I no longer do that.
Q. Okay. I --
A. I didn't see it on here.
Q. That's okay. I'm going to strike through business valuations, too, then. Will that be accurate to take that off?
A. Yes. The allied professional consultations, I still provide those. I omitted that.
Q. What is an allied professional consultation?
A. Practitioners call me up and ask questions, and I respond to them or they ask me to do research.

Q. Are those on tax and accounting matters?
A. Yes.
Q. And I assume that your divorce work is also with respect to tax and accounting?
A. Little wider. They're tax, accounting, and I sometimes do role plays with attorneys.
Q. What are the types of tax and accounting services that Birkholz & Company provides?
A. Tax preparation, tax consultation services, bookkeeping. That's all that comes to me right now.
Q. Do you know -- well, strike that. Do you represent both individual and corporate clients?
A. Yes.
Q. Do you have a rough idea of how many individual clients you presently have?
A. Roughly, 650 -- excuse me. Clarify that. Is that individual clients?
Q. Yes.
A. Six-fifty.
Q. And what about corporate clients roughly? And by corporate, I mean business clients.
A. Explain that. You mean business meaning noncorporation?

18

MR. GREEN: Nonindividual, is that what you mean?
MR. ROYSE: That's what I mean.
Q. (By Mr. Royse) I said corporate and, of course, I would include partnership, sole proprietorship, businesses.
A. Trust?
Q. Sure. Roughly how many nonindividual clients?
A. I'm not real sure, maybe 50 to 70.
Q. I understand. Are you familiar with the provisions of the U.S. tax code?
A. What do you mean by "familiar"?
Q. I mean do you have a general working knowledge of the provisions of the United States tax code?
A. Yes.
Q. Do you have any particular area of expertise within the tax code; for example, individual income tax versus corporate tax?
A. There's probably more emphasis on individuals because I have more of them.
Q. In your role as a -- strike that. Is there any certification required by the State of Massachusetts, as far as you know, to be a tax preparer?
A. No.
Q. Any requirement by the federal government as far

19

as you know?
A. No.
Q. What about to provide accounting services, is there any requirement of a certification to do that for a non-CPA or CMA?
A. Well, there are requirements with regard to accounting services, but they have to do with who you hold the product out to.
Q. How do you mean?
A. A certified public accountant can hold his product out to the public in general. An accountant may not.
Q. Okay. Who may an accountant hold his services out to?
A. A client.
Q. Forgive my lack of understanding of the field, but bookkeeping services, I assume you rely on your accounting background somewhat to do that; is that right?
A. Yes.
Q. You're going to provide bookkeeping services for Acme Company. How do you get that engagement without holding yourself out to the public?
A. Maybe I missed something here but I don't do the bookkeeping. Birkholz & Company provides bookkeeping.
Q. Okay. Is there someone at Birkholz & Company who

20

is a CPA who does bookkeeping?
A. No.
Q. Then help me understand how Birkholz & Company does bookkeeping for Acme Company without holding itself out as a CPA?
A. Acme Company -- almost all of our clients have software called QuickBooks. We don't actually do the punching in the software of the data. The client does that. We assist them in helping them with consultation to properly categorize the items for tax purposes.
Q. Are you required to maintain a familiarity with the provisions of the U.S. tax code in order to maintain your status as an enrolled agent?
A. I'm required to take continuing educational courses.
Q. Let me ask it this way: If someone is an enrolled agent with the Internal Revenue Service, to your knowledge, is that person required to be familiar with the tax code?
A. Yes.
Q. How did you first come to know Richard or Jen Weyland, if you recall?
A. I don't recall. They lived in Massachusetts at one point.
Q. Do you recall whether you knew them on a personal

21

basis before a professional basis?
A. No, I don't.
Q. And you don't recall how they came to be clients, then, I assume?
A. No, I don't.
Q. Do you know roughly how long you've done tax work for the Weylands?
A. Not exactly.
Q. Roughly?
A. Seventies, eighties I'm guessing.
Q. Do you recall if you started doing work for one of them and then the other or if they came in as a couple to begin with?
A. I don't recall. I think I met them as a couple.
Q. Who are the other employees of Birkholz & Company that provide services to clients besides you and William Birkholz?
A. There are two: Jeff Prost --
Q. Yes, sir.
A. -- P-r-o-s-t; and a receptionist who works part-time.
Q. Does he or she provide services to clients?
A. Well --
Q. Aside from answering the phone?

A. Answers phones, you know, may assist, assembles the tax return. That's a service.
Q. Who is that?
A. I'm blanking right now. Jennifer --
Q. We won't tell her. Jennifer is good enough.
A. Thank you.
MR. GREEN: When you're not trying, it will come to you.
MR. ROYSE: I know. Oh, man.
Q. (By Mr. Royse) I asked an interrogatory about whether anyone -- let me just find it. I asked who provided tax advice and preparation of tax returns for Mr. and Mrs. Weyland. You all interjected an objection on the grounds that you didn't do anything other than preparation of tax returns. Let's put that aside. In terms of preparation of tax returns, you indicated that the only person that provided those services was yourself.
Is that correct to the best of your knowledge?
A. Yes, other than the ministerial duties, you know, assembling a return.
Q. I saw William Birkholz's name on some documents, and we may get to them in a little while, but, for example, I know that one place I saw him was on requesting extensions. Would you consider that just a ministerial

task as opposed to substantive services?
A. I prepared it. Bill puts the extensions in the mail. So he would -- he may sign for me but I'm the only one that worked on the Weylands.
Q. Has Birkholz & Company ever been accused in a civil suit or an administrative action of negligence in preparation of tax returns?
A. Not that I can recall.
MR. GREEN: Just for the record, I assume you mean prior to this case?
MR. ROYSE: Absolutely.
Q. (By Mr. Royse) Your answer is not that you recall. What about you personally? I assume if Birkholz & Company hasn't, you haven't; is that right?
A. Correct.
Q. I am -- I want to ask you briefly some questions about your liability insurance, and Ron has already told me you may or may not know some of this stuff. So this isn't a test. I can get this by way of document production. I'm just trying to find out what you know, and I can deal with the rest with these fellas. Do you presently maintain liability insurance for Birkholz & Company?
A. Yes.
Q. And who is that with?

A. Philadelphia Insurance Companies, I think.
Q. And does that insurance cover you and the members and employees of Birkholz & Company or is that individual insurance?
A. I think it covers Birkholz & Company.
Q. Roughly, how long have you had coverage in place with Philadelphia?
A. I believe they -- I don't know for sure. A few years.
Q. Okay. Do you recall who your carrier was before that?
A. A company I think known as New York Marine.
Q. Do you recall roughly how long you were with them?
A. No.
Q. Was it more than a year or a few years?
A. I don't deal with the insurance.
Q. I understand. Who does?
A. We have an insurance broker. They send over the forms. We sign them.
Q. Who is that insurance broker?
A. Wayside Insurance.
Q. Are they here in Massachusetts?
A. Yes.
Q. What town?

A. Framingham.
Q. Can you recall, besides what we think is New York Marine and Philadelphia, do you recall any other insurance companies that have provided coverage?
A. No.
Q. I believe I've seen a document where New York Marine or whatever that marine company was indicates that they were notified of the claim underlying this case. Did you make that notification?
A. Yes.
Q. About when, if you recall?
A. I don't recall.
Q. Do you recall what spurred you to make that claim or make that notice?
A. I don't recall the exact thing. I'd have to guess.
Q. What is your best recollection?
A. A conversation with Attorney Jeffrey Smith or could have been a conversation with Richard Weyland.
Q. Do you recall substantively what -- generally what was said that would have spurred that?
A. Said to who or whom?
Q. Either way. I'm asking what part of the conversation, what general concept came across that caused

26

you to notify the carrier?
A. That the -- that Richard -- we had filed returns for Richard with self-employment tax on it, and there was a question as to whether he was subject to it.
Q. Okay. Do you recall whether any lawsuit had been threatened at that point?
A. No.
Q. It had not or you don't recall?
A. I don't believe it was threatened, and I don't recall.
Q. Am I correct, as far as you know, that that New York Marine or whomever it was was the insurance company that was notified as opposed to Philadelphia?
A. No. I notified both.
Q. At the same time?
A. No.
Q. Okay. Who was it that you notified in the conversation we just talked about?
A. Talked to the insurance broker. Insurance broker said let's notify Philadelphia, my -- at the time, my present carrier.
Q. Okay. So then Philadelphia was notified first, and you did that as opposed to the broker?
A. I don't recall. I had a conversation with

27

somebody at Philadelphia. The broker may have done the paperwork on it and sent it over for me to sign. My recollection is they called and we had a conversation.
Q. What do you recall about that conversation?
A. That they weren't going to cover it.
Q. Why?
A. Because they were not liable to cover it.
Q. Did they say why?
A. Because on the application, we should have listed the Weyland case as -- I don't know how to put this -- you know, as --
Q. An existing potential claim?
A. Yeah. As we applied for the insurance, and we did not. I later learned that even if we did, they'd exclude coverage on it.
Q. Why was that?
A. I don't know why. I just know that they don't cover it either way.
Q. Because they're an insurance company, right? That's what they do. They're not in the business of paying claims. I'm teasing.
MR. GREEN: No profit in paying claims.
MR. ROYSE: That's right. So I hear.

28

Q. (By Mr. Royse) What about New York or Mutual Marine, did you later have a conversation with them?
A. I'm a little vague on the recollection, but I think I had a conversation but there was some correspondence going back and forth.
Q. I understand. What was Mutual Marine's communication to you in terms of whether they were going to provide coverage?
A. The same, they weren't going to provide coverage.
Q. And why did they say they wouldn't provide coverage?
A. I don't -- I don't understand why but, you know, in my mind, they're not covering it.
Q. I'm certainly not asking you to agree with them. I was just trying to get a feel for what your understanding of what their allegation was as to why there was no coverage. You say you don't know?
A. Yeah. Insurance is not my bag.
Q. Do you know whether you or Mr. Bland presently has taken any action to contest that decision by Mutual Marine or New York Marine?
A. We had some correspondence back and forth.
Q. Is that ongoing?
A. Yeah.

29

Q. That's good enough for me for right now.
A. To my knowledge, Mr. Bland filed a lawsuit to question their not covering.
MR. GREEN: I mean I haven't seen it but that's my understanding. I just think that was probably responsive to what you asked.
MR. ROYSE: Sure. I appreciate you adding that.
Q. (By Mr. Royse) Based on your experience/relationship with the Weylands over the past several years, do you know if either of them has any knowledge or expertise with respect to tax preparation?
A. I don't know how to answer that. They came to me to do their returns, so I would have to say no, they don't have the expertise.
Q. Did you hold yourself out to them to be an expert in tax preparation?
A. I held myself out as a tax preparer, period. I don't believe I ever put the word "expert" in.
Q. And you were deriving a distinction there that I was going to ask you about. It would be your testimony that you've never represented yourself as an expert, then?
A. I need to explain something. I might have missed

it before. Under my licensure as an enrolled agent and as an accountant in the Commonwealth, to be an accountant in the Commonwealth of Massachusetts, we may not put a modifier in front of it, like expert accountant; and there's even some question whether we could have in the past used the initials E.A. because it might be acute -- confused with the term "expert accountant." That's since been decided, so we can now put E.A. on our letterhead.

So you're asking me if we held ourselves out ever as an expert, if I did, it was inadvertent and would not be allowed under my licensure.

**Q. And it would be inadvertent in the sense of using E.A. and that could be misconstrued?**

A. Well, that's not so much the problem because the E.A. -- that case has been decided. We can do that.

**Q. Okay.**

A. But the word "expert" I don't believe we put that any place. If we did, shame on me.

**Q. Did you ever tell the Weylands that you had been involved in creating tax software?**

A. Yes.

**Q. And you have been involved in creating tax software, correct?**

A. Yes.

**Q. Did you ever tell the Weylands that you teach tax courses?**

A. Yes.

**Q. And you do teach tax courses?**

A. Yes.

**Q. Did you ever tell the Weylands that you're not a CPA but that you teach CPAs from time to time?**

A. I don't recall that specific statement.

**Q. Is that true?**

A. That's true.

**Q. Do you recall ever saying anything to the Weylands along the lines of you're not a CPA but you have to fix CPAs' mistakes?**

A. Excuse me. Can I back up?

**Q. Absolutely.**

A. You asked two questions. I reacted to one of them. You asked if -- did I ever tell the Weylands I was a CPA or --

**Q. That you're not a CPA but that you teach CPAs.**

A. I may have had a conversation with them and there would be times when I'm busy and I say I'm teaching and it might have gotten around to that, but I teach -- you know, that's what I'm reacting to. Yes, I do train CPAs in taxation.

**Q. I understand. Did you ever say anything to the Weylands along the lines of the fact that you're not a CPA but that you have to fix CPAs' mistakes?**

A. I don't recall that.

**Q. Is that something that would be typical for you to maybe say?**

A. No.

**Q. Is it true?**

A. Is what true?

**Q. That you are not a CPA but that you do have to fix CPAs' mistakes?**

A. There's two questions there. I'm not a CPA.

**Q. I understand.**

A. And do I fix CPA mistakes?

**Q. Uh-huh.**

A. Vis-a-vis the Weylands?

**Q. Just in general.**

A. It's a very broad question. I don't know how to answer it.

**Q. Throughout the time that you were engaged by the Weylands, was it your understanding that they were playing trust -- placing trust and confidence in you to diligently prepare their tax returns?**

A. Can you state that again? I don't understand what

you're asking.

**Q. Sure. What I'm asking is during your engagement with the Weylands, was it your understanding that they were placing trust and confidence in you to diligently prepare their tax returns? Did you have that understanding?**

A. I don't think I ever thought about it. I know that they requested me to prepare their return. I don't know what they were thinking.

**Q. Well, let me make it a little more broad. In your role representing some, approximately, 650 individual clients, do you believe that those clients are placing trust and confidence in you to diligently prepare their tax returns.**

A. Yes.

**Q. Do you think that's an expectation they reasonably have?**

A. Yes.

**Q. And if that is the expectation the Weylands had, is that a reasonable expectation?**

A. Yes.

**Q. In preparing a tax return for an individual client in general, if you think that there's a particular issue that might be questionable or need further information or raise a question, how do you deal with that individual**

34

**client on that?**

A. If there's sufficient time, we would contact them and ask them a question either by phone or by e-mail or by letter.

**Q. In preparing the tax return, if you identify something that seems facially inconsistent, would you take that up with the client generally?**

A. Generally, yes.

**Q. Were there occasions with the Weylands when you saw issues or had questions where you raised those with the Weylands?**

A. Yes.

**Q. During your years of representation of the Weylands, did they meet with you in person on occasion?**

A. Yes.

**Q. And did they meet with you to discuss certain issues with respect to their tax preparation or were these just social visits?**

A. Some were social. I don't recall too many meetings where we -- you know, in the later years because they're in Kentucky. I'm in Massachusetts. In the earlier years, they were close enough. You know, it would be part social, and they might have tax questions that would come up in a meeting that we would have.

35

**Q. And let me ask that. Did you maintain a social relationship, a friendship with the Weylands over the years?**

A. Not that we'd go out and do things together, etc., but I'm friendly with all my clients.

**Q. I understand. Do you recall any particular issue that the Weylands would have ever brought up with you in face-to-face meetings about their tax issues?**

A. No.

**Q. On occasion, would the Weylands call you to discuss issues about their tax preparation?**

A. Yes.

**Q. Do you recall any particular issues that they called you about?**

A. Yes.

**Q. Tell me -- first, I want to just jot down a little laundry list here of issues that you remember being raised in calls with them, and then we're going to go through them and discuss them. So if you can just give me the topics that you recall, and I recognize we're talking about a long period of time. I'm not testing your memory. Just tell me what you remember.**

A. I don't remember exactly the time frame. I think it was 2002 I had a conversation with Richard when I

36

learned it the first time that the company he was working for was foreign owned, and he mentioned that his shipmates were thinking it was stupid to be paying social security taxes. And so I collected some information but not all information, took a preliminary look at the statute. I then sent him a letter.

**Q. And what statute are we talking about?**

A. That I looked at?

**Q. Mm-hmm.**

A. Well, I looked at several. I looked at four -- Section 1402 and I looked at Section 3121.

**Q. Do you remember what you concluded about the issue?**

A. I haven't made a conclusion yet.

**Q. As we sit here today? That's a yes?**

A. Yes. I'm sorry.

MR. GREEN: Just note that the "I'm sorry" was related to nodding, not to not having reached a conclusion.

MR. ROYSE: Always on the ball.

**Q. (By Mr. Royse) Do you -- based on what you just said, which is that you still haven't made a conclusion, I assume it's fair to say that you didn't reach a conclusion at that point in 2002 when you looked at the issue; is that**

37

**right?**

A. I didn't have sufficient data to reach a conclusion.

**Q. Do you recall ever having a conversation with either Richard or Jennifer, him raising this issue that you've described about shipmates thinking it's stupid for paying these taxes, and you saying something to the effect of: Don't worry about them. The IRS will catch up with them eventually?**

A. No.

**Q. Is it possible you said that?**

A. I would think it highly unlikely if I hadn't really looked into the statute to begin with. You mean in that conversation?

**Q. In that conversation or a conversation about that topic.**

A. That would not be a statement that I would normally make.

**Q. I sense what you're saying is that you wouldn't make a statement like that because it infers that you know what the tax outcome of that issue is; is that right?**

A. I don't understand your question.

**Q. Okay. It was poorly asked. Let me say it this way: You said you didn't think it was likely you would**

make a statement like that because you hadn't researched it yet; is that right?
A. No.
Q. Okay. Correct me.
A. You made the statement would it be likely for me to deal with somebody else's tax issue in a comment; and if I'm talking for the first time and learning for the first time about this before I really even know what's behind it, I think it highly unlikely in that conversation that I would have said anything about somebody else.
Q. To your knowledge, what is Mr. Weyland's profession?
A. A captain of a vessel.
Q. Has that been the case as long as you've known him?
A. I can't think back that far.
Q. As far as you know --
A. Yes.
Q. -- has he ever held another job?
A. Yes.
Q. Has it been your understanding, generally, over the years that he performs his duties as a ship captain outside of the U.S.?
A. I'm not sure I really, you know, knew until the

later years, but in -- certainly, I think, from in the eighties sometime and it may even have been before that.
Q. Do you recall -- you indicated that roughly around 2002, you had this conversation with Richard about his shipmates saying they weren't paying taxes --
A. If I have the right year.
Q. I understand. What I was going to ask you was do you recall any discussions prior to that one?
A. About that issue?
Q. Uh-huh.
A. I don't recall any.
Q. I think you just indicated that it was maybe around the eighties when you came to get an understanding that Richard performed his services outside the U.S., and you qualified and said maybe it was before. Whenever that was, did you have a general understanding of where he performed those services?
A. Generally.
Q. Where generally?
A. Generally outside the United States.
Q. No more specific than that though?
A. If I looked at the returns, I probably could refresh my memory.
Q. Okay. Are you familiar with Section 3121 of the

U.S. tax code?
A. Yes.
Q. Have you just become familiar with that section in the last few years or is that something you've always been generally familiar with?
A. What do you mean by "familiar"? I know what's in the statute.
Q. Okay.
A. It's a very, very long section.
Q. What does it generally deal with?
A. Deals with liability for social security taxes for employees.
Q. Is that a section that you have had to refer to over the years on occasion due to a particular client's tax situation?
A. Yes.
Q. And what I'm getting at is I've got the impression that the Weylands weren't the first time you ever had to look at Section 3121; is that fair?
A. Yes.
Q. Is Section 3121 of the code a provision that you are required to be familiar with in order to obtain your certification as an E.A.?
A. I don't recall. That was a long time ago for the

exam. You know, it is in the internal revenue code. I covered every code section.
Q. And you indicated you're required to take continuing education in order to maintain your status as an enrolled agent. Do you know if, in the course of the various continuing education you've taken over the years, that Section 3121 has ever been covered?
A. Yes.
Q. Do you remember any particular course or issue that was addressed?
A. Yes. I took a course on payroll issues.
Q. When did you take that roughly, if you recall?
A. Prior to giving my course.
Q. And I understand you give a course on payroll issues?
A. Employment issues.
Q. When did you start?
A. I gave that course. I no longer give it.
Q. When did you start giving that?
A. That was really a one-year-only around 1975 -- '95 rather, excuse me. On my resume is 1995. I'll go with that to help my memory.
Q. That's National Society of Public Accountants seminar on employment issues designed and taught by you; is

that what you're referring to?
A. Yes.
Q. Under your "Boston Tax Institute" heading, Number 5 I see is "payroll and information reporting"?
A. Yes.
Q. Is that similar type issues as what we're describing?
A. No.
Q. Section 3121 would not be involved in that course?
A. 3121 would be but --
Q. Not before --
A. -- the issue that they have isn't something that would have been covered in that course.
Q. Okay.
A. Can I clarify that?
Q. Please.
A. If we go way back to the first years I started preparation, I always used to receive documents from the Weylands to prepare their returns, 1099s, etc. I received 1099s from Zapata Marine that would put the Weylands in a different status as an independent contractor still subject to the same social security taxes under Section 1402.
Q. Okay.
A. At some point in time, they stopped sending

documents and sent a spreadsheet instead of that.
Q. Okay. What is self-employment tax or SE tax? What is that to a layman?
A. To a layman, social security taxes.
Q. Is it FICA?
A. Yeah.
Q. On my paycheck probably looks like FICA?
A. Yeah, except on your paycheck, you pay one-half, your employer pays the other half. For self-employed individuals, you pay both halves.
Q. I'm with you. What is your understanding, as we sit here today, as to what is required to qualify for exemption from self-employment tax for a ship captain who operates abroad?
MR. GREEN: Just for the record, let me object to the form because I think that's a very difficult question. I mean the code -- this is pretty complicated and has a lot of angles. I mean I'm not going to tell him not to try and answer, but I don't know if that's enough information.
MR. ROYSE: I think that's a fair objection.
Q. (By Mr. Royse) And here's what I'm trying to get

at. Let me qualify it a little bit because I'm not trying to give you a trick question. What I'm trying to get at are, in your mind, what are the walking around type of elements that you know have to be satisfied, if you know?
A. Well, certainly I've looked at these, but I think I'm much more comfortable with the statute, if you know what I mean.
Q. I understand. Do you have -- and perhaps you've already answered this but let me ask it again, do you have an understanding, as we sit here today, that Mr. Weyland qualified at some point for an exemption from SE tax, at least for some of the years for which you prepared his returns?
A. I do not have an understanding.
Q. And tell me why you don't.
A. Because I don't have all the facts.
Q. Okay.
A. And I didn't then.
Q. And what are the facts that you don't have?
MR. GREEN: I mean by definition, he wouldn't necessarily know that.
MR. ROYSE: I know but he says that there's certain facts he would have to know in order to make a decision or a conclusion

or a recommendation. So what I'm trying to find out is what are those questions that you need to have answered, what are the facts that would satisfy your inquiry.
MR. GREEN: Or what type of facts. Is that fair?
MR. ROYSE: Fair.
THE WITNESS: Well, I put some of them in a letter back, I'm thinking -- right after that conversation with him, and I requested information which I never got from them. Did get a couple sheets of paper from Jeff Smith but they didn't -- they didn't satisfy me.
Q. (By Mr. Royse) Okay. Do you remember, as you sit here today, or can you tell me, as you sit here today, what type of facts you would need in order to make a determination whether he's qualified for an exemption?
A. We're dealing with a very -- very, very esoteric question and I -- no. I'd have to refresh my memory.
Q. You say we're dealing with a very, very esoteric question. How do you mean?
A. You put this question to the average person on the street, he wouldn't have any idea that Section 3121 comes

into play; and if they did, they wouldn't know what provision -- you know, the provision that exists; and if they knew the provision -- remember, it's a very long code section, lot of pages -- it would be difficult to interpret whether somebody is exempt from social security tax under that statute.

Q. Okay. Let's take your answer and say instead of asking a person on the street, we ask a reasonably prudent tax preparer who's an enrolled agent whether the provision even comes into play and whether the exemption applies. Could that person, in my hypothetical, a reasonably prudent tax preparer, make that determination with the proper facts?

A. With the proper facts, you know, yes. I would think that somebody that's proficient and has the facts could make a determination.

Q. Could you make that determination with the proper facts?

A. I could try.

Q. Are you qualified to make that determination with the proper facts?

A. Yes.

Q. Is it your understanding that the IRS has made a final determination, at least with respect to one year of

tax returns, that Mr. Weyland was exempt?

A. Yes.

Q. Is the IRS the final authority as to a person's eligibility for the exemption?

A. No.

Q. Who is the higher authority?

A. Well, courts, Supreme Court, Congress.

Q. Congress in the sense that they could revise the code, right?

A. And they do, yes.

Q. Sure. But aside from that, my question is: In a particular setting, if the IRS rules in favor of the taxpayer on an issue, presumably the taxpayer is not going to appeal. Presumably the IRS isn't going to appeal its own determination. Is that the -- is there any reason to think that's not the final authority in a situation like that?

A. Well, it might not be correct.

Q. Okay. In your opinion?

A. No. It might not be correct. You're asking a general sense here. The IRS allows things many times but they're incorrect.

Q. Okay. I'm asking -- I understand what you're saying.

A. Okay.

Q. They're incorrect as you see them --

A. You're posing a situation where you think the IRS is -- once they say something, that it goes over the law, and I can't agree with that. The law is the law.

Q. With respect to the taxpayer's liability, that individual taxpayer's liability, the IRS decision is the final authority assuming no appeal, correct?

A. Assuming no appeal, yes.

Q. Have you ever been employed by the IRS?

A. No.

Q. If Mr. Weyland paid -- strike that. If Mr. Weyland was exempt from self-employment tax in a particular year but nonetheless paid it, would you agree that he paid a tax he was not required to pay?

A. If he was --

Q. If he was exempt.

A. If he was exempt, yes.

Q. If three years passed from that time, is it your understanding -- and he doesn't do anything to correct it, is it your understanding that he's barred from then seeking a refund for that overpayment?

A. That he is exempt -- barred from it, yes. And there may be some -- you know, there may be some unique

factors but I don't think it exists here.

MR. GREEN: David, would it be close to a good time to take -- it's been about an hour and fifteen minutes --

MR. ROYSE: Yes.

(A brief recess was taken.)

MR. ROYSE: Back on the record, please.

Q. (By Mr. Royse) Mr. Birkholz, I'm going to ask you a hypothetical question here and just assume that I'm providing you with the facts that you need to know to make this determination. I want to ask you, based on your understanding, as you sit here today, of Section 3121(b)(4), if a person was employed by a non-U.S. company, he didn't enter into an employment contract in the U.S., and he did not serve on any boat at any time that it touched a U.S. port, if those facts were true, do you believe that person would be qualified for the exemption under that section?

A. You're asking me if you've oversimplified this and, you know, do I believe that's the case -- I think the -- it's a little more involved.

Q. Okay. That's what I'm looking for. Explain to me how.

50

A. Well, entering into a contract in the U.S. is not the only indication. I think the term in there is "American employer." You know, American employer can encompass a lot of things. So based on those facts, if somebody put that question, I wouldn't even hazard an answer.

**Q. So if I gave you the facts that my generic person was employed by a non-U.S. company, did not enter into an employment contract in the U.S., and did not serve on any ship that any time touched a U.S. port, you would not hazard an answer as to whether they were exempt based on those facts?**

A. You said just the contract? Because you're saying something different than I believe is in the statute, and I haven't looked at it in a little while but I thought I remember the term "American employer." An American employer is not indicated by where you enter into a contract.

**Q. That's why I began --**

A. It may be but --

**Q. And let me --**

A. There are a number of factors.

**Q. I'm giving you a few factors here, so let me be clear. The first factor I gave you was a person who is**

51

**employed by a non-U.S. company and did not enter into an employment contract in the United States. So I'm assuming a non-American employer and did not serve on any boat at any time that touched a U.S. port. Would that be enough facts for you to make a decision?**

A. Not having looked at 3121 recently, that sounds vaguely like a good set of facts but, again, you're asking me to answer without looking at the statute.

**Q. Okay. Do you recall ever discussing with Mr. Weyland whether he might qualify for an exemption from the SE tax?**

A. Whether he might?

**Q. Mm-hmm.**

A. There was some discussion in that conversation I mentioned earlier. I said I'll look at the statute and, you know, see if it might happen. And I think that's the -- I think that's the last time I talked to Richard about that, but I don't really recall.

**Q. That would have been this conversation that you think roughly happened around '02?**

A. Yeah. That sounds like the right time period, maybe August, somewhere around there.

**Q. And you don't recall having discussions with him about that issue before then, right?**

52

A. No. I definitely do recall and I don't recall discussing it -- the specific issue about the exemption from social security tax?

**Q. Yes.**

A. That's the first time it came up.

**Q. So you're saying you specifically recall that you did not ever discuss that before that time?**

A. Yes, because that's the first time I learned he had a foreign employer.

**Q. Was there ever any occasion during your tax preparation work for Mr. and Mrs. Weyland where you would have asked to see a pay stub from Mr. Weyland's employer or the company that he was working for?**

A. Can you be more specific with the time frame. You mean prior to that conversation?

**Q. Let's start with that, prior.**

A. Prior to that conversation, I thought he was self-employed.

**Q. So the answer, then, would be prior to that conversation, you would not have asked to see a pay stub?**

A. Correct.

**Q. And after that conversation, would you have asked to see a pay stub?**

A. Would I have?

53

**Q. Or did you?**

A. I may have but I -- you know, you do this in slices. I never got the answers to the first range of questions, so I could never get to the Nth range of questions.

**Q. And let me -- I understand what you're saying. Let me ask it more specifically though. Do you recall ever asking him for a pay stub?**

A. I don't recall.

**Q. Okay. Do you recall ever asking him where he entered into the contracts with the companies that he worked with or worked for?**

A. How do I answer this? In 2002 I had the conversation with Richard. That was the last conversation. I sent a letter because he left town. I could not ask the question, and I waited for the responses to the preliminary questions and never got them. So I never -- I never got to the other facts that may have been helpful in making the determination.

**Q. Okay. Let me probe this a little further. What I hear you saying is that this issue came up with Richard in or about 2002 and that the questions that you posed as a result of the issue coming up were put in a letter by you to Richard and Jennifer, and that would encompass the only**

questions you ever asked about this, and you didn't get a timely response. Is that a fair characterization of what you're saying?
A. That sounds -- that sounds fair.
Q. And the reason --
A. I may have missed something there. You know, I hope you're not trying to trick me.
Q. I'm not trying to trick you. I'm trying to make sure that I don't have to come back and do this and make you go through it -- if you say something, I want to make sure -- I may not be as sharp as you are, so I'm going to try and understand, and it forces me to sometimes repeat what I think I'm hearing.
I was going to ask you the question: Did you ever take any steps to determine whether the countries where Richard worked had totalization agreements with the U.S. and I believe the answer to that would be that if you did ask that question, it would be in that correspondence you sent; is that right?
A. Everything -- everything sent to clients and received from clients should be in my files.
Q. Okay. And just so we're clear, it's your recollection that the only time the Weylands ever inquired whether Richard might be entitled to some exemption from

self-employment tax was in this occasion around 2002?
A. Can you state that again, please.
Q. Is it your testimony that the only time that the Weylands inquired about whether he might be entitled to that self-employment tax was on this occasion around 2002?
A. Entitled to the self-employment -- you mean the exemption?
Q. Entitled to the exemption.
A. Yes, because that's the -- up to that point, I thought he was a 1099 and that's the first time I learned. So that it couldn't have happened before that.
Q. In your experience with the Weylands, do you recall ever a time when you identified to them or directed them as to how a certain item needs to be reported on a tax return where they disregarded your advice and insisted that it be reported some other way?
A. If I insisted that it be handled one way and they said they --
Q. Disregarded your advice.
A. Well, I'm the one preparing the returns. So I don't understand your question.
Q. Well, they're signing the returns, right?
A. Correct.
Q. So all I'm asking is did you all ever have a fight

about Peter says we need to report X this way on the return and the Weylands say, no, we think it ought to be reported Y? Do you ever recall anything like that?
A. No.
Q. You rely on your clients to provide you with accurate information to prepare their returns; is that correct?
A. Yes.
Q. Do you ask them certain questions and rely on their answers in preparing those returns?
A. Yes.
Q. How do you decide what questions are appropriate to ask a client in the preparation of a return?
A. I'm confused. You know, we send an organizer out to clients with the general categories of information and recap of what they had in their return for the prior year to assist them in collecting their data, and they choose to send that back to us when we prepare the return based on that data.
Q. Okay. I'm going to come back to that in a second. So the first thing we have is the organizer you send them. In the course of preparing their returns, I think you indicated earlier that certain questions may come up that you need to address with them; is that also accurate?

A. Yes.
Q. With respect to the general categories of information that you said you ask in that tax organizer, how do you decide what questions to put in there?
A. I don't.
Q. Who does?
A. That's a software product. It prints out questions or information based on what was in the software file from the prior year.
Q. Is that a third party's software that you use or is that software that you have some proprietary interest in?
A. Third party software. Excuse me, can I -- prior, you know, in the early years, we had software that we created but it was owned by somebody else. Well, I guess that would still be third party software, yes.
Q. What about the software that you use now, is it software that you created?
A. No.
Q. So to follow up on that question, here's what I'm getting at. I assume that within this tax questionnaire or organizer, it will ask a question like: Do you own your home; do you have a mortgage; did you pay mortgage interest. Is that fair, something along those lines?

58

A. Well, it doesn't really ask the question. It might have a category that says, home mortgage interest, and space to fill in; and because we may have that information from the prior year, the category, you know, let's say you had XYZ mortgage company, that may appear there and there'd be a blank for this year and then there'd be a column for the prior year amount. It's just to assist the taxpayer.

It does not mean that that -- that every client I have fills that out. We just send it out as a -- as an aid.

**Q. I have -- I use Turbo Tax, maybe to my detriment, but it will ask me a question like: Did you own a hybrid car this year. So it can determine if I'm entitled to that credit. Does your tax organizer ask questions like that?**

A. Yes. There's maybe two sheets that have questions.

**Q. And do you know how those questions are arrived at that are included in that section? I mean I assume there's certain things that are asked about and some that aren't?**

A. We broke or we turned down into the types of items that almost everybody has. The question portion of it would be items that are harder to handle, and they don't necessarily envision that somebody's going to fill out

59

everything. They're questions to know whether somebody is in an area and then you have to develop from there.

**Q. And when you say you would have to develop from there, is that done through follow-ups with that client or is it done actually in that tax organizer document?**

A. Do you want an example?

**Q. Sure. Please.**

A. In the Weylands' case, Richard works overseas and there's a separate provision in the statute that says if you earn income abroad, you can -- earned income, you can exclude a portion of it from income taxation as opposed to social security tax. We're talking about the income taxes. There's a form that's submitted to back that up. It's Form 2555.

Richard normally prepared that and sent it, you know, in the earlier years. That data would be in the computer. And from year to year, he'd just have to update the changes to it. If that gives you an idea how the process works. So at some point in time before that, you know, we may have -- we would have to have had a conversation about the existence of the statute that allows you to exclude foreign income under, you know, if you qualified for it.

**Q. Let me ask you a question. You've said that**

60

**Richard sometimes would fill out either a spreadsheet or even fill out a mocked up 1040 or whatever the particular tax form --**

A. Not a 1040.

**Q. Okay.**

A. Just a 2555.

**Q. Oh, okay.**

A. It has a lot of questions that are -- I mean it -- they're, you know, how many days were you out of the United States or in the United States, you know, something that the taxpayer would have to come up with.

**Q. All right. So he would not or they would not try and pencil in items on the 1040 --**

A. No.

**Q. -- to send to you? That's what you would then do for them?**

A. Yes. And if he did, I'd have them in the files, and there's nothing like that in my files.

**Q. Okay.**

A. Except for -- I think there's a 2555 in there.

**Q. From time to time when these issues come up in the tax organizer or if you're otherwise made aware of issues that may exist on the client's tax return, are there occasions when you'll ask them for further documentation so**

61

**that you can figure out an issue?**

A. Yes.

**Q. And does that depend on the particular circumstance of a client?**

A. Yes.

**Q. I believe you testified that on one occasion, Mr. or Mrs. Weyland -- I think Mr. Weyland specifically inquired to you about why he was being required to pay certain taxes and some of his shipmates were not; is that right?**

A. Yes.

**Q. It's your recollection that occurred on one occasion and only one?**

A. That's my recollection.

**Q. Okay. And it's your recollection, at that point, you took a look at the statute and provided a writing to them with some questions about --**

A. Some preliminary questions, yes.

**Q. You indicated that you had roughly 650, roughly, individual clients; is that right?**

A. Yes.

**Q. Is it fair to assume that you prepare roughly 650 individual tax returns every year?**

A. Yes.

Q. Do you prepare every one of those carefully and diligently?
A. What do you mean by "prepare"?
Q. Do you prepare each of those tax returns carefully and diligently?
A. There's two phases to preparation.
Q. Explain please.
A. We use software, so entering the data in a computerized system, and then there's a review process. For the 650, I'm -- I do not do most of the input into the software. I am -- I do more review.
Q. Okay.
A. Except in the Weylands' case.
Q. Okay. In the Weylands' case, did you do both?
A. Yes.
Q. Who does -- aside from the Weylands' case, who generally does the entry in the computerized system, that first phase you described?
A. The other people in the office, Jeff Prost and Bill Birkholz.
Q. And you review every return that your name goes on as preparer; is that correct?
A. I can't make that statement.
Q. Are you required to?

A. If I take a material position -- material part in the return, I'm required to sign the return.
Q. If you sign the return, are you indicating that you took a material part in the preparation?
A. Yes.
Q. My question was: Do you prepare every return carefully and diligently, and you, then, explained to me a little better that there's two phases to preparation. So let me ask it this way: To your knowledge, is every tax return that is prepared by Birkholz & Company in terms of the entry in the computerized system done carefully and diligently?
A. Yes.
Q. To the extent that you review tax returns, do you review every tax return carefully and diligently?
A. Yes.
Q. Help me understand. To your knowledge, when Birkholz & Company prepares a tax return, is it intended to be done in such a manner that the taxpayer pays the least amount of taxes that they're reasonably expected to owe?
A. Yes.
Q. I think I understood from your interrogatory answers that you all do not have any sort of written policies or procedures at Birkholz & Company; is that

correct?
A. Relative to?
Q. Tax preparation, treatment of clients.
A. Correct.
Q. Do you have written policies and procedures for other matters?
A. We have policies and procedures regarding employment issues, such as vacation days and sick days and --
Q. I understand.
A. -- things of that nature.
Q. With all due respect, I don't care about those. Do you recall -- strike that. Do you know what Jennifer Weyland's profession is?
A. I believe she's an illustrator and an artist.
Q. And what is her tax status? That's a bad word, but what I'm trying to say is, is she an independent contractor, her own business, an employee of somebody? How do you --
A. She's an independent contractor, self-employed.
Q. Okay. As part of that, is she required to keep records, fairly detailed records as to expenses and business expenses and things like that?
A. Yes.

Q. To your knowledge, has she been careful in her dealings with you in terms of providing those kind of documents?
A. How do you mean "careful"?
Q. I mean --
A. Has she provided the documents that I would have liked to have seen?
Q. Yes.
A. No.
Q. Tell me what she has not provided, generally, that you --
A. Well, it's easier to say what she has provided.
Q. Okay.
A. A spreadsheet with numbers representing expenses.
Q. And what would you have liked to have had instead of just that spreadsheet? Receipts?
A. Backup.
Q. Were there times when you requested that backup?
A. Yes.
Q. Did you ever do that in writing?
A. Yes.
Q. And that would be in your files if you requested it in writing, correct?
A. No.

66

Q. Why not?
A. It's part of the tax organizers, the cover sheet that goes out. They never sent the organizer back in, so I wouldn't get that letter. It's a general letter that goes out to clients.
Q. Okay. I'm following --
A. It's part of that tax organizer package.
Q. So this standard tax organizer document that goes to everyone has a cover letter that says, please send backup, or something along those lines?
A. Yeah. It asks for 1099s and things like that.
Q. Do you recall ever having any discussion verbally or in writing with Jennifer asking her to provide backup other than that general standard cover letter?
A. I don't recall.
Q. If it was in writing, it would be in the file, right?
A. Right, but not everything goes in writing.
Q. I understand. If Mrs. Weyland recalls you complimenting her on her recordkeeping and her thoroughness, do you think that her recollection would be incorrect?
A. Well, I don't recall that, so yes.
Q. Do you recall ever saying anything to her along

67

the lines of you wish that more of your clients were like her in their recordkeeping?
A. No.
Q. And is a statement like that inconsistent with your feelings about her recordkeeping?
A. Yes.
Q. When you put your name on a tax return as preparer, what are you attesting to?
A. To the best of our knowledge, everything is true and correct.
Q. This stack of documents looks worse than it is. We'll make it through pretty quickly.
MR. GREEN: That's right up there with: I only have one more question.
MR. ROYSE: Will you mark that, please.
(Exhibit 2, Hand-written Notes, marked for identification.)
Q. (By Mr. Royse) I'm going to hand you what I have marked as Exhibit 2 -- excuse me, what the court reporter has marked as Number 2 to your deposition, and this is a -- let me go ahead and tell you. Those documents that have a "PB" down in the bottom right were from the files that you produced to us. So if we're looking at a document and you

68

see the PB, you can be assured that that came from your files.
Is that your handwriting at the top?
A. Looks like it.
Q. I see there at the top 1988 "Weyland" and over written at the side is "3/15/89"?
A. Yeah.
Q. Would it be a fair assumption that this is a conversation that took place 3/15 of '89 with respect to an '88 tax return based on those notes?
A. I -- no. It could be. It might not be. It might just be notes, you know, as I'm reviewing the return.
Q. Okay. That phone number up there, "201-579-7620," is that a phone number you're familiar with?
A. No.
Q. That's not a business phone of yours?
A. No. It looks like a New Jersey -- I think 201 is New Jersey.
Q. If you go down there under Number 4, you see, "1 Swamp Road, Nigeria"; "pay taxes to Nigeria"; "paid direct"; "don't know if it's gross or net"; establish residence 10/87." Do you have any recollection of what any of that was about?
A. I don't have recollection but I could tell from

69

looking at the notes what it may be about.
Q. Okay. Tell me as best you can.
A. Pay taxes to New Jersey may be about Section 901 foreign tax credits.
Q. Nigeria?
A. Nigeria.
MR. GREEN: Same difference.
MR. ROYSE: I haven't been in either so --
MR. GREEN: Sorry about that.
THE WITNESS: And the second item, "don't know if it's gross or net," is that what you're asking?
Q. (By Mr. Royse) Yeah. Just that section there.
A. Established residence, that may be about the foreign income exclusion.
Q. And what is a foreign income exclusion, just to a layman?
A. It's what I mentioned earlier. It's the ability on foreign earned income to have it excluded from U.S. taxes.
Q. What's that -- down by an arrow, it says, "Paid est," I believe that's estimated, "tax to fed"?
A. Paid estimated taxes to federal. And the part to

the right probably goes with that, two thousand -- it could be 2000 or 2001 per quarter. Check -- check in file. That might be look in the file. That may be a note, check to see if they paid it. It's, you know...

Q. I'll hand you what we'll mark as Exhibit 3.

(Exhibit 3, Letter, marked for identification.)

Q. (By Mr. Royse) Mr. Birkholz, I've handed you a document that appears to be a letter from Richard Weyland, and I will tell you that this comes from your 1989 tax file -- excuse me, your 1988 tax year file. So I would have reason to believe this was probably written sometime in 1989, and I'm not asking you to confirm that but just to give you some context. Do you have a recollection of why this letter would have been sent to you?

A. Well, I see by the instructions, you know, that it was in response to a question asked, and I can tell by the data that it's for the foreign income exclusion we just talked about.

Q. That's the 2555?

A. Yes.

Q. And why are these dates important or --

A. There's a request for them on the tax return, on the Form 2555.

Q. Do those dates determine your qualification for that exclusion?

A. They may.

Q. Does it depend on how long --

A. They may knock your qualification out.

Q. Okay. The issue is when and how long you were in and out of the country; is that what this goes to?

A. That's one of the issues, but it's not -- it may not be applicable in Richard Weyland's case because two ways to qualify for it: One is to be a resident of a foreign country where they are actually residents; and the other is physical presence.

Q. He goes through here and lays out the days that he was in Nigeria or departed for Nigeria, and he says down there, if you follow through those indented, and he gets back to regular spacing and says, "The number of days in the U.S. on business is nil. The income earned in the U.S. is none." Does that indicate that he's -- that all of his income is coming outside of the U.S.?

A. All his earned income?

Q. Yes.

A. Yes.

Q. Go down a couple and he says, "For line 6B, a Residents Visa and STR Work Permit from the Nigerian

Government was issued." Do you know what that's about or why is that important?

A. It's questions on the form.

Q. And all of this relates to the potential exclusion of foreign earned income; is that right?

A. From --

Q. From income tax?

A. Yes.

Q. And was that an issue that you identified to Mr. Weyland that there may be this potential, we need to gather this information?

A. Yes.

Q. I'll hand you what we'll mark as Exhibit 4.

(Exhibit 4, Tax Preparation Form, marked for identification.)

Q. (By Mr. Royse) Certainly take as long as you want to look at that but what I want to ask you is just what this document is, and you get ready to answer.

A. In a generic sense, this is what we call our control sheet. We make notations here of time, although the office isn't very good about filling it in diligently, questions that we may have of the taxpayers so that we need to only call them back once to get all the questions together.

Q. Do you all still use these type of forms?

A. Yes.

Q. Missing data down there on the bottom right I assume are information that you need from the person, data you need from the person to be able to further complete the return?

A. Yes.

Q. It says there, "2555 Qualification Data," and it has a check under "Arrived." Would the letter that we looked at as Exhibit 3 perhaps be what we're referring to there?

A. Perhaps.

Q. Look up above that and under "Special Notes for Cover Letter," it says, "Jennifer, Please fill in name and address of Richard's employer on Form 2555." This document does not go to the client, correct?

A. No, it does not.

Q. What would -- when it says, "Special Notes for Cover Letter," what is -- what's that for? I think I know.

A. When the tax return is delivered to the client, there's a cover letter on it with instructions, filing instructions, and I would -- Jennifer is my receptionist. We would have asked her to put a note on the cover letter such as I said in there.

74

Q. Show you what's marked as Exhibit Number 5.
(Exhibit 5, Cover Letter, marked for identification.)
Q. (By Mr. Royse) Is this such a cover letter?
A. Yes.
Q. What's the stamp at the top right "Reviewed"? What does that indicate?
A. Reviewed is -- that stamp is only in my office. It means that I reviewed the return that -- the draft return that I prepared.
Q. This letter is dated February 2, 1989. Do you see anywhere in that letter -- and I've looked at it -- I don't see, do you see anywhere where it follows the special notes for cover letter, fill in name of -- and address of Richard's employer?
A. No.
Q. I'm going to show you Exhibit 6.
(Exhibit 6, Cover Letter, marked for identification.)
Q. (By Mr. Royse) And you might want to keep 5 handy there. Five was February 2, '89. This is April 1, '89. It's another cover letter. Both of them begin by saying, "Enclosed are your completed federal and state income tax returns for 1988." Can you explain to me why there would

75

be a subsequent letter like this?
A. Yes.
Q. Okay. Please do.
A. These are software generated, so they're boilerplate-type letters. The one that is marked "Reviewed" is one that I print out to review the return, meaning the one marked reviewed did not go out the door to the Weylands. The one that isn't marked with review may have gone out with the return.
Q. I'm not sure I'm understanding the procedure about what you were just describing. When it's stamped "Reviewed," it means you need to still review the return?
A. No. It would mean that I've gone through a preliminary review. That may not be the final return. I've just reviewed it and I may request additional data from there.
Q. Okay.
A. And, you know, normally the letter that goes to the client does not end up in the file.
Q. You don't keep a copy of the letter that goes to the client?
A. When the software prints out returns, in the older days there would be three copies printed. One copy to stay in our records, one for their records, and one the

76

government filing copy. There would be a cover letter on it. Normally, the software on the review copy would not put out. If you look at all the files that exist, let's say in the Weylands' case, I don't think you'll find too many cover letters in the file. That's because it isn't -- we can select which items -- I don't normally review the cover letter per se because it's boilerplate items.
Q. Okay. If you look at what we marked as Exhibit 6, will you agree with me there's no reference in there to filling out the employer name and address; is that correct?
A. That's correct.
Q. I'm going to hand you what we'll mark as Exhibit 7.
(Exhibit 7, 1988 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) And let me say before I go on, I'm going to do this with several of these documents. In a previous deposition that Ron and I did, we didn't even put these documents in the record. We just referred to the number. What I've done for ease of reference is copied a piece of the return so that we would have it in front of us to discuss. I've got the original returns here with me. So if there's one that you say, well, I don't agree that that's actually what was in the return, I can pull it out

77

and you can look through it. I'm happy to do that.
But what I've done for ease of reference and so that we don't have no 600-page record is to pull out just the pertinent portion that I'm interested in. This first document, this is a -- is this a Schedule C?
A. Yes.
Q. And what is a Schedule C for?
A. This is a document that is required to be filed with the return to detail income and expenses for an individual that's self-employed.
MR. GREEN: Just a second, you said this document is a Schedule C, but it's actually two things. That may confuse --
MR. ROYSE: I'm talking about the first page. I'm sorry. I'm just talking about the first page.
Q. (By Mr. Royse) If line A references principal business or profession -- it has name of proprietor, Richard J. Weyland; principal business, mariner; business name and address, Richard J. Weyland, 1 Swamp Road, Nigeria. Would it be typical for a person who is self-employed for the business name and address to be that person's name?
A. You're asking in a general sense?

Q. Yeah.
A. Yeah.
Q. Okay. Unless they have some kind of DBA or sole proprietorship like, you know, We Do Windows or something, that they just are personally, right?
A. Correct.
Q. So there's nothing -- all I'm getting at, Mr. Birkholz, is there's nothing that facially jumps off of the page about the fact that you've got a name of proprietor, Richard J. Weyland, or name of business, Richard J. Weyland?
A. No.
Q. If you flip over to the third page, is this document the 2555 that you've been referring to some? Is it a 2555?
A. Well, there may be multiple pages to this form, but it's the first page of the 2555, yes.
Q. All right. Again, that indicates foreign address, 1 Swamp Road, Nigeria; occupation, mariner. Down at the bottom, it says, "Spouse lives in U.S. Taxpayer lives in Nigeria," and it gives a New Jersey address there. Am I correct that at this time, at least at the time that this document was prepared, you were well aware that Mr. Weyland spent time in Nigeria or maybe even lived in Nigeria?

A. Yes.
Q. Okay. And also that he was a mariner, right?
A. Well, that's the information from him, so I relied on it, yes.
Q. It says, "Employer is (check all that apply)"; "A U.S. company." Do you know how that determination was made?
A. No. That's probably a default in the software.
Q. Now I'll move onto Exhibit 8.
(Exhibit 8, 1989 Tax Return Documents, marked for identification.)
THE WITNESS: Excuse me, can I correct that?
Q. (By Mr. Royse) Please.
A. I'm just looking at the responses here. It says the employer is a foreign entity, a foreign affiliate, self, a U.S. company, other. The one thing that I always -- and I recall this all the way through all the 2555s that I prepared, that it's -- they really aren't measured for -- made for the self-employed individual, so you have to get the information in. We know under the statute that earned income includes self-employment income, but I -- you know, you don't really see a lot of self-employment-type setup here.

You see the word "employer"?
Q. Mm-hmm. What about the box "self"?
A. I see the box "self."
Q. That would be a reasonable interpretation that that's for self-employed, isn't it?
A. Mm-hmm.
Q. Let's move to Number 8. I have now moved to your tax file for tax year 1989. Is this first page another Schedule C --
A. Yes.
Q. -- for Mr. Weyland?
A. Yes.
Q. Again, it indicates what we saw in the last one, which is Richard Weyland, mariner, and business name is Richard Weyland, right?
A. Yes.
Q. If you'll flip over to the fourth page of this document, I think the last page, now -- and this is a 2555, correct?
A. Yes.
Q. It has Richard Weyland, name of taxpayer; foreign address, 1 Swamp Road, Narri, Nigeria; and then it provides name of employer, Zapata Gulf Marine Corp., and it gives a U.S. address, a foreign address, and identifies it as a

foreign affiliate of a U.S. company is now checked.
My first question is: Do you recall how that determination was made to input that information?
A. No. I don't think I made a determination on it.
Q. Well, how -- then how did it --
A. Either, you know, it just may have been -- these are little checks in the computer, you know, and we might not have been that careful on which box got checked here.
Q. What about the Zapata Gulf Marine Corporation for name of employer, do you remember how that got -- how that decision was made to include that?
A. Richard told me.
Q. Can you explain to me how a person who is self-employed filing a Schedule C would likewise identify an employer on the 2555?
A. I'm not sure I can explain it. I'll try to give some backup on this.
Q. Please.
A. Zapata Marine, in the earlier years -- and I testified earlier that I received 1099s from Richard -- classified people working for them as independent contractors. Now, I make no judgment whether that is correct or not, because on Richard's return, you know, if, in fact, he has been put into that status, he's subject to

social security taxes. And if the IRS wants to question it, then they will question Zapata Marine and, you know, Richard then can -- actually, the IRS would automatically correct that situation.

But, you know, that's the status that he gave us way back when, so -- and we're filing Schedule Cs to go consistent with the fact that he received 1099s and, you know, do -- well, the statement says what it says.

Q. I understand.

A. So it's difficult to explain this.

Q. I guess my question remains, and if you can't answer it, I -- that's fine. Even based on what you just said, why would you identify an employer on the 2555 if he's self-employed? I recognize Zapata may have him as an independent contractor sending him 1099s but they wouldn't be his employer. I mean, that's certainly a term of art, right?

A. Yes. It was an oversight. You can see the oversight in two years. I mean, it can't be both. It was an oversight.

Q. It couldn't be both, that he was self-employed and had an employer, at least with respect to this same income?

A. I can't -- you know, you got a 1099. They're treating him as though he's self-employed and that's the

status. It's not my job to question Zapata Marine.

Q. You're an independent tax preparer who's never seen this fella, never seen this document. Your buddy tax preparer walks in and hands you this and says, could you just look at this and see if you see any errors. Would it -- would you say there's a question here? You're identifying this guy as a Schedule C self-employed person but you're identifying an employer over here. Is that something that would be facially inconsistent that you might say there's a problem here?

A. I'd say yes and no. I mean is it inconsistent, yes; is it a problem, maybe not.

Q. You would at least inquire further?

A. Well, I'm not sure it's going to change the result; and if this particular return came late in the season and we're fighting to get it in, I'll tell you, a little check box on the form, the worst that could happen is the IRS says is that true and you correct it at that point in time.

Q. I understand. And all I'm trying to get at is -- and I'm not just talking about the check mark. I'm talking about including employer information. I'm just asking are those two facially inconsistent?

A. Yes.

Q. Okay. That's fair enough. I'll hand you what we'll mark as Exhibit Number 9.

(Exhibit 9, Letter, marked for identification.)

Q. (By Mr. Royse) And I can be very quick here but take all the time you want to look at it. My question is simply that the first sentence indicates that Peter or -- Richard has just returned from Nigeria and has created a 1989 spreadsheet. Is that the spreadsheet that you referred to from time to time that he would send you?

A. Once a year, yes.

Q. And again, it has a note at the bottom, "Working Nigeria," and it has a note. Do you have any idea what that would have referred to?

A. Where is that note?

Q. At the bottom, you'll see a hand-written note down there.

A. Looks like my writing and I have no idea.

Q. It just says, "Working Nigeria." I assume you have no clue what that referred to?

A. No.

Q. But we've established that, at least in that 1988 return, you were aware he was working in Nigeria, right?

A. Well, I don't know that for a fact. I mean I just

have to depend on his statement, yes.

Q. Move on to your 1990 tax year file. Exhibit 10.

(Exhibit 10, 1990 Tax Return Documents, marked for identification.)

Q. (By Mr. Royse) I apologize for this copy. That's about the state that I got it in. But if you'll just look at that document for a moment. This is for tax year 1990, and I believe that first page is another Schedule C; is that correct?

A. Yes.

Q. It identifies Richard Weyland as the individual, and mariner as his profession, and then business name is Richard Weyland; is that right?

A. Yes.

Q. If you'll flip over to the third page, again, I acknowledge that it's fairly difficult to read. I think this is a 2555, isn't it?

A. It appears to be. I can't see the --

Q. It says, "Foreign earned income"?

A. I can't make out the form but it looks like a 2555 from 1990.

Q. It says, Richard Weyland; foreign address, 1 Swamp Road; name of employer, Zapata Gulf Marine; employer is, and again it has checked a foreign affiliate of U.S.

company. That is similar to the information we saw in the last document, correct?
A. Correct.
Q. And would you agree that, again, at least on its face, that appears inconsistent?
A. Yes.
Q. What -- please educate me. What is a tax home? When it says list your tax home during your tax year?
A. Well, it's a term of art. I'm not sure I can educate you because there's probably a technical definition which I don't know off the top of my head, but it's the home that is looked at for tax purposes that you work out of.
Q. Go to tax year '91 file. This will be Exhibit 11.
(Exhibit 11, 1991 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) Again, this is a -- the first page is a Schedule C. I think it has the same information as the last in terms of the business and the business name. And then the third page is another 2555 -- excuse me, the fourth page is another 2555 identifying Zapata Gulf Marine as the employer and identifying as a foreign affiliate of a U.S. company. Again, this is similar to the documents we've looked at before. Would you agree that's facially

inconsistent?
A. Well, they're all the same because it's being brought forward from the statute. So because I said they were consistent in prior years, it would be inconsistent.
Q. When you say it's being brought forward from the statute --
A. I believe that data is one of the -- I mean we have -- you know, not only does the information print out of those tax organizers, but some of the data from year to year that repeats will stay in what's called the pro forma file. Good example might be the taxpayer's name, address, social security number. This information, I mean, once it got in there, if it was an oversight to begin with, we may never see it to change it.
Q. You mean brought forward from the software?
A. Yes.
Q. You said from the statute. I didn't --
A. Oh, I'm sorry.
Q. Brought forward from the software. But nonetheless, you would review the document every year, right?
A. Yes.
Q. Go to tax year '92 and show you what we'll mark as Exhibit 12.

(Exhibit 12, 1992 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) Again, it appears that the same information appears on these documents. It would appear to be facially inconsistent, I think you would agree, and I think your answer is that it may have gotten carried forward from the software entries. Is that all fair?
A. The inconsistency isn't the software's problem. You know, the -- what we're talking about is the inconsistency as a self-employed individual who works overseas and qualifies for an exclusion on earned income. Because they put employer's name and it's filled in and they're self-employed, that's the inconsistency.
Q. I'm with you. What I meant was the software carried it forward. I thought that was --
A. I believe so. I see it's the same three years running here. That's probably why. I'm not sure that we ever get into -- the way this data comes in, there's no time to -- you know, you do the best job you can. There's no time to check this. So I can see if it was in there one year, it will probably just -- a carried forward item.
Q. Hand you what we'll mark as Exhibit 13.
(Exhibit 13, Letter, marked for identification.)

Q. (By Mr. Royse) This is a letter from your file, Mr. Birkholz, that appears to be dated November 3. I notice it's signed by William Birkholz?
A. Yes.
Q. And it raises some questions to be asked. My first question is this: Is this the type of inquiry that we discussed earlier, where if you see a client's return has certain issues or there's certain data you need, you would inquire like this?
A. Yes.
Q. And the second question is: Your brother's involvement in that, is that a typical ministerial duty for him or is this somewhere where he was standing in for you or --
A. Well, he actually is a better letter writer than I am. I may have given him the questions and prepped it for him, prepped the letter because I may have been involved. This is -- November 3rd is in my teaching season, so I could be pretty jammed up for time here, meaning I don't think we can infer that Bill is involved in these issues. I don't recall him ever working on their return. He may have helped me with a letter.
Q. Okay. I'll hand you what we'll mark as Exhibit 14.

90

(Exhibit 14, Letter, marked for identification.)

Q. (By Mr. Royse) This is a letter from Mr. Weyland back to Bill about a month after the prior letter that was Exhibit 13. From what I can see here, it appears that he's responding to Bill's questions; is that a fair representation?

A. It appears so.

Q. The first question he identifies there, he says, "The computer is used for Tidewater paperwork." Are you familiar with what Tide -- with who Tidewater is generally?

A. Am I familiar now?

Q. Mm-hmm.

A. Was I familiar then?

Q. Well, let's ask it now.

A. Yes.

Q. What's your understanding now as to who Tidewater is generally?

A. It's a company that bought Zapata Marine.

Q. Did you know at that time what or who Tidewater was?

A. I had a conversation around this time with Richard about Tidewater, and I'm not sure I ever understood that -- at that time that they took over because he said it's just

91

a name change. Everything is exactly the same as it was with Zapata. And I carried that all the way until the 2002 conversation when I learned that they were a foreign company.

Q. So Tidewater was the new entity that he was working for, but your understanding was that it was simply a -- your understanding from him was it was simply a name change and no real substantive change; is that fair?

A. Well, we talked about it, and he said everything is exactly the same.

Q. Okay. Do you recall how that issue arose? I mean, you say you talked about it --

A. My recollection is that we were talking about the 2555; and he said, you know, you've been carrying Zapata Marine on that form and it's actually -- the name of the company changed.

And I said, What's that all about?

He said, It's just a name change. Nothing is different.

So that -- the same context as I said before.

Q. So it was not, to the best of your recollection, as if Richard came in or called and said, I've had kind of a change here in terms of my corporate body that I work with. We need to investigate whether there's any tax

92

issues with this?

A. No.

Q. You don't recall any such meeting?

A. To the contrary. It was, you know, I took out of it, you know, we had a conversation and he assured me everything was the same and that, you know, I'm still thinking of him as a self-employed individual.

Q. Was -- do you recall whether that conversation was in person?

A. I believe it was on the phone.

Q. Okay. Let me just take a little detour here and ask you, we're looking at a couple letters from November and December '93 talking about a 1992 tax return. Was it fairly regular for the Weylands' tax return to be filed much later than Ron and I file ours every year, right, on April 15th?

A. I don't know -- oh, you file yours -- thank you for putting that in. Yes.

MR. GREEN: He apparently doesn't know when I file mine either.

Q. (By Mr. Royse) Do you know why it was usually late?

A. Well, they normally got the information to us very late.

93

Q. Do you know why?

A. No.

Q. Do you think it had anything to do with the fact that -- let me ask you this way: Did you know that Richard was at sea for sometimes four or five, six months at a time?

A. Yes.

Q. Did you know whether the delay in getting information to you and preparing filing the returns was in any way related to that?

A. I don't know. You know, it always -- it, over time -- earlier it was early and then it got later and later and sometimes even after the extended due date. Yeah.

Q. In any event, that was a practice that you were fairly familiar with with the Weylands; is that fair?

A. Fair --

Q. Late information?

A. Yes.

Q. Would you file extensions for them on a regular basis?

A. Yes.

Q. Would you do that only at their request or would you do that as a normal practice?

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

A. I would only file it at the request if I had information, because you can't file an extension unless you make a reasonable attempt to ascertain the tax. It's not a good extension.

**Q. So if an extension was requested in any given tax year, is it your testimony that it was at the specific request of the Weylands?**

A. Yes.

**Q. Was that request ever in writing?**

A. No. It was normally a phone call. I don't know if it was in writing, maybe there's something in the file, but I have it in my head that normally I'd receive a phone call, you know, telling me to file an extension because the data wasn't ready.

**Q. In any event, is your testimony that you never would have unilaterally obtained an extension for them knowing that they were usually late?**

A. I wouldn't -- no. I wouldn't normally do that, no.

MR. ROYSE: I'm going to pass this one around before I hand it to you because I'm afraid I only have one copy and it's my original and I'm going to put it in the record.

(Exhibit 15, Report of Earnings Letter, marked for identification.)

**Q. (By Mr. Royse) Mr. Birkholz, that is a letter that came from your file for the same tax year 1992, and the heading at the top is "Tidewater Crewing Limited" and it says, Report of earnings to employees for year ending '92. To your knowledge, is that a document that would have been provided to you by Mr. Weyland?**

A. I don't recall this document. If you're telling me it came from my file, it had to come from him because I -- I wouldn't type it up myself.

**Q. Right. What does that -- and perhaps you've never seen it before, but based on what you're seeing there, if you got a document like that for a client, what kind of statement is that? What does that information show you?**

A. Well, it would seem to show wages, you know, and it's not a traditional type of pay stub but it, you know, it has the term "regular wages" on it.

**Q. If you got a document like that that said Tidewater Crewing Limited and had Cayman Islands up at the top, would that be of any significance to you at all in making a determination about the self-employment tax issue?**

A. Well, it might except I had a conversation that I just talked about with Richard and he told me there was

nothing -- nothing was different. I really don't recall -- are you sure this came from my files?

MR. ROYSE: You can look on your computer and make sure.

**Q. (By Mr. Royse) But he's going to confirm that that number at the bottom --**

A. All right. I don't recall seeing it.

**Q. If you'll hold that out so Ron can look at it there. It's going to take his computer a minute to get going. I'm going to move on to tax year '93, and I'll hand you what I marked as Exhibit Number 15.**

MR. GREEN: That was 15.

MR. ROYSE: Thank you. Sixteen.

(Exhibit 16, 1993 Tax Return Documents, marked for identification.)

**Q. (By Mr. Royse) On the first page of this -- this is a -- is this a Form 2555 on top here?**

A. First page, yes.

**Q. This one shows employer name, Tidex Nigeria Limited. Is that information that Richard would have provided to you?**

A. Yes.

**Q. And it identifies it as a foreign entity. Do you know how that determination --**

A. No.

**Q. -- would have been made?**

A. Excuse me, no.

**Q. Flip over, if you would, to the last page. Can you tell me what this document is?**

A. It is a statement that gets attached to the return.

**Q. This identifies Zapata Gulf Marine wages. Do you have any recollection, as you sit here, as to why that would have been on there with the employer being shown as Tidex on the front?**

A. I seem to remember a change in the -- how the software handled the 2555s and trying to get this, you know, the income in to be excluded. So we may have put it under a different cell.

**Q. Okay.**

A. Do you follow what I'm saying? In the software, there are little places that you put information.

**Q. Is that -- in any event, that's facially inconsistent, isn't it?**

A. Facially inconsistent with?

**Q. The employer on the first page and the wages on the last page --**

A. Yes.

98

Q. -- appear different? Let me go to your '94 file, and I will show you a document we'll mark as Exhibit 17.
(Exhibit 17, 1994 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) This is -- the first page of this document, Mr. Birkholz, is a little different than what I've been seeing on those Form 2555s. This is an EZ -- what's the -- do you know why the difference?
A. This may have been the service trying to simplify the 2555 forms, so they created an EZ form. It's automatically selected by the software. So I don't recall getting in any decision process 25 -- should we use a 2555 EZ or a 2555.
Q. I hear you. It's got employer's name, T-E-D-I-X. I'm assuming that's just probably an entry error. The last one was T-I-D-E-X. I think that's probably correct?
A. Probably, you know, looking at Richard's writing, that's the way it went in.
Q. The last page, is this a statement also that the software generates for attachment to the return?
A. Yes, and here's an -- the Zapata Marine that you asked before that shows there is an example of something that carries forward from year to year.
Q. That wouldn't be the fault of Richard's

99

handwriting, I assume?
A. No, but it may have been that -- the way it originally got in there as -- when he saw it, he didn't bring it to my attention, because I -- I know that was the 2555 issue that we were carrying Zapata Marine and probably because this was in two places and we only got one of them.
Q. When you review those returns -- you say he didn't bring it to your attention. Is it the client or the tax preparer's ultimate responsibility to make sure that a tax return is facially consistent?
A. Both.
Q. I'll hand you what I'll mark as Exhibit 18.
(Exhibit 18, Time Table, marked for identification.)
Q. (By Mr. Royse) And very quickly, my only question here, Mr. Birkholz, is this another one of these documents that shows his time working outside the U.S. for purposes of that 2555?
A. It appears to be, yes.
Q. Is this a document you would have relied on in preparing the return to some extent?
A. Yes. It's information that we normally would either attach or include in if they requested it.
Q. I'll move on to tax year '95 file, and I'll hand

100

you what I'll mark as Exhibit 19.
(Exhibit 19, 1995 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) And, again, my only question here is in 19 -- in tax year 1995, calendar '96, we're still identifying Tedix/Tidex as the employer on the first page of the document 2555 EZ and Zapata Gulf Marine as the source of the foreign earned income on that last document; is that correct?
A. Yes.
Q. Move on to tax year '96 and show you Exhibit 20.
(Exhibit 20, 1996 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) I would ask the same question and I assume the answer would be the same?
A. Yes. On the Tidex and the --
Q. Yes.
A. -- Zapata, yes.
Q. I'll move on to tax year '97 and show you Exhibit 21.
(Exhibit 21, 1997 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) If you would flip to the fourth page of this and it has PB447 at the bottom.

101

A. Yes.
Q. That's the application for an extension; is that correct?
A. Yes.
Q. And it's your testimony that you would have only filed this type of extension request if the Weylands had specifically directed you to?
A. That's my recollection.
Q. If you'll flip to the next page, this is one of those attachments for the returns from 1997, and it says, wages, employer, Zapata Gulf, pensions, taxpayer, Whitax Tidewater Inc. Do you know what that would have been about, that Tidewater?
A. The Whitax Tidewater Inc.?
Q. Mm-hmm. That's under pensions.
A. Well, it's a pension that was given, you know, to Richard and appears based on this.
Q. And the payer was Tide -- Whitax Tidewater. Is that what that indicates?
A. Well, that's what it indicates.
Q. The employer that we're showing still for tax year 1997 is Zapata Gulf Marine Corp. Just so we're clear, your testimony was that you knew several years before that, according to Richard, that the name of the employer had

changed; is that right?
A. Yes.
Q. I'll go to tax year 1998 file and show you Exhibit 22.
(Exhibit 22, 1998 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) First, I would just ask you the same question I've been asking; and that is, there's an inconsistency between the first page of the documents I've handed you showing Tedix Nigeria as employer and the last page showing Zapata Gulf Marine; is that correct?
A. Yes.
Q. And the page before that last page is an application for an extension, and it says, "Explain why you need extension: Awaiting requested data from third party in order to prepare proper return." Again, it's your testimony that you would have only done this at the specific direction of the Weylands; is that right?
A. This is a second extension.
Q. Okay.
A. The first extension would have been at the request. The second extension, we may have been waiting for the dates for the 2555.
Q. Okay. What -- Question Number 3 says, "Have you

filed Form 4868 to request an automatic extension of time filed for this tax year?" What is that?
A. 4868, we looked at previous, is the first requested extension to go beyond April 15th to the second extension due date.
Q. And the first extension doesn't require any justification. The second does; is that right?
A. It doesn't require justification. The first one requires a request for extension but it can be null and voided -- if that's proper English -- null and voided if reasonable attempt isn't made to ascertain the tax.
Q. I'm going to move to tax year 1999 and hand you what I'll mark as Exhibit 23.
(Exhibit 23, 1999 Tax Return Documents, marked for identification.)
Q. (By Mr. Royse) I'm just showing you the first page of this one because my question relates to the information there at the bottom. It's the same as what we've been seeing and it still says Tedix Nigeria as the employer's name. My question is, right under that under Question 9, "Employer is," and it identifies three boxes. The one that's checked is a foreign business. Do you have any idea how that determination was made?
A. No.

Q. Do you know how it came that Richard stopped filing Schedule Cs for self-employment or did he continue to file Schedule Cs?
A. In my mind, he was subjected to self-employment tax all the way through because I -- because of the inconsistency in the documentation that the -- his employer gave him a 1099.
Q. So there will be, with each one of these that we're looking at, a Schedule C as well in the return?
A. There should, but there might not be because that still doesn't -- you know, if you're subject to self-employment tax, there are situations -- I can't think of one off the top of my head -- where you might have a Schedule SE but not a Schedule C.
Q. Okay. How do you make a determination whether a taxpayer who is one of your clients is an independent contractor or an employee? Is that simply a matter of do they get 1099? Do they get W-2s?
A. It's lesser of all evils here. You know, if they're given a 1099, we will follow through with that and present it on a Schedule C. Now, that doesn't necessarily say that they're subject or not subject. For instance, if I'm an employee of a corporation and I'm a real employee but they give me a 1099, you have a choice of not putting

that on a Schedule C, in which case there'll be an inquiry from the Internal Revenue Service. That may bring up an issue and now they go back to your employer and, you know, it may affect your work status.
So there are -- I'm not saying that happened here but there are -- there is some factual determinations and there's, you know, nothing to stop an individual from -- hard to explain this. I mean, I've always had problems with the 1099 from Zapata on, but, you know, the determination of whether they're self-employed is whether they provide services for a fee.
Q. Do you have that issue come up with other clients from time to time?
A. Yes.
Q. Do you ever, either in conjunction with the client or on your own, make an inquiry to the employer or the company that they're working with to try and figure that out?
A. Normally I talk to the taxpayer because that may be a very sensitive issue with an employer that might affect their employment status.
Q. I understand. Do you ever say to a taxpayer, why don't we call this employer, or whatever it is, and figure this out?

A. You're asking me to generalize here because it -- it has come up in the past with other clients. You know, number one, I can't talk to an employer unless I've been given permission from the taxpayer. So normally I'd be talking to the taxpayer.

Q. I understand. And what I'm getting at is it seems reasonable to me that from time to time if this came up, the taxpayer says, hell, I'm just a bricklayer; I don't know all that; that it might make sense to say, well, let's talk to your employer and find out whether it makes sense or not. All I'm asking is have you ever had a situation like that where you would do that kind of thing, call up the employer with the taxpayer or make an inquiry in writing with the taxpayer to the employer?

A. I don't think I've had a taxpayer that's given permission for me to have a conversation about that issue with the employer.

Q. Have you ever given information or questions to a client and said you need to go to your employer and have these specific questions answered. I don't understand their structure. I don't understand what they're doing. You need to have these answered?

A. Yes.

Q. Did you ever do that with Mr. Weyland, as far as

you recall?

A. My recollection is we talked early on, but I don't know when that was.

Q. Do you recall ever putting anything in writing to him to that effect?

A. I can't remember back that far.

Q. If you did, it would be in your file; is that fair to say?

A. No. These files only start from '88 forward or somewhere around there. There were files before that.

Q. Okay.

A. We used to receive a 1099 from Richard. I know it would have come up, because I would have said, what's this all about. I don't remember the exact context of the discussion but I know it had to be well before 1988.

Q. Where are the files prior to '88? Do you know why those are not around anymore?

A. I'm only required to keep three years.

Q. My question is: Do you know why the files before '88 aren't around; and if what you're saying is, as a practice, you destroy them, that's fine. I just need to know?

A. There's a lot of bulk. We -- we actually maintain files for longer than we're required to. We shred it

because we ran out of space.

Q. That's the answer to my question. They don't exist anymore is what I wanted to know. Exhibit 24 -- and the reason I'm giving this to you now is because I want to stay in your tax file the way they're organized. This is tax year '99.

(Exhibit 24, 1999 Tax Return Documents, marked for identification.)

MR. GREEN: Probably wouldn't be a bad idea to take a break whenever is convenient for you.

MR. ROYSE: Let's do that right after this document. Good idea. I could use one.

Q. (By Mr. Royse) Mr. Birkholz, this is the first part of a 1040X or amended return for tax year 1999. Is that a document that you prepared?

A. Yes.

Q. If you look at the date down there, I think at one time it said 10/10/00, but it actually now says 10/10/03 that's hand-written in there. Is that --

A. Yes.

Q. -- roughly when you think you would have filed this document?

A. Yes.

Q. Is this a document that you prepare and file yourself or do you send it for the taxpayer's signature?

A. We send it to the taxpayer for signature.

Q. On that box where it says, "Check if self-employed," that's talking about you, isn't it?

A. Yes.

Q. The second page is the explanation page for the change. Just take a second and read that paragraph that's typed in there. It says, "Claimant (Richard Weyland) initially filed returns subjecting Foreign wages to self employment tax. Claimant captains a non American vessel that does not dock at a U.S. port and works for a foreign employer. See copy of 1040-1 & 2 plus Schedule SE."

What basis did you make that statement on?

A. Can you explain that?

Q. What factual basis did you make that --

A. I didn't make it on a factual. I made it on the conversation I had with Richard and the fact that the statute of limitations was about ready to expire. This was a protective amended return.

Q. Okay. But did you believe at the time you filed this, that statement under part 2 to be correct to the best of your knowledge?

A. I didn't have the facts to make that statement. I -- what I believed at the time was if we didn't file this, the statute would toll, and they wouldn't have a shot at it. I also believe that, because this is a fairly unique situation, definitely was going to get audited, so we'd have time to get the facts, etc. I looked up the statute, and I just took verbatim out of the statute 3121.

**Q. Okay. I understand. And I don't want to get in an argument with you about this, but I have to believe that somebody of your credentials and your experience would not just put something on a document that you file with the IRS without at least having a good faith belief that the facts were, in fact, true, and what I'm asking is did you have that good faith belief or did you just simply put down what was necessary in order to satisfy the statute of limitations, true or not?**

A. I didn't -- I filed this as a protective, meaning -- take a look at the date, October 10th. The statute tolls, I believe, October 15th. I've got to get this back to them and get it in. I didn't have time to do the research. I didn't have time to explore the facts. I'm not even sure Richard was in the country to discuss the facts. And I believe that around this time, I sent a letter to him asking for some additional data.

**Q. I understand.**

A. So I know what it looks like, but I filed this purely as a protective claim.

**Q. I understand and I'm not trying to pick nits about it because I understand where you're coming from, but I'm trying to be clear about whether you believe that your duty to file documents with the IRS based on a good faith belief that they're accurate. That's not alleviated to any extent by the fact that a statute is about to run or you're filing a protective tax return. I mean, you still have to have a good faith belief in order to state something, right?**

A. How can I say yes to that. No. I think that if there isn't sufficient time, you know, I can file something like this to protect their right to have the discussion down the line.

**Q. Okay. Is your testimony, then, that you did not have a good faith belief that that was correct?**

A. I had -- I didn't have the facts. I did it purely to protect their right to have this issue discussed at a later point in time.

**Q. I'm going to hand you what I'll mark as Exhibit 25, and this is from that '99 tax file.**

**(Exhibit 25, Phone Memo, marked for identification.)**

**Q. (By Mr. Royse) And I'll go ahead and tell you we're not benefitted with a date on this phone memo, but this came from the '99 tax file and somehow it was copied along with a returned envelope dated November 14 of '00. So I'm not going to try and get you to say what the date of this was, but, in any event, I think it was probably around 2000 maybe. That phone memo there, is that your writing?**

A. Looks like it.

**Q. Do you have any recollection of what that was about?**

A. I'm having a little difficulty reading what it says. No, I don't. If it's the '99 file, it may have been around the time we had the conversation -- no. '99 file -- this is -- I can see from the postmark, there's -- I don't know what that is. Let me explain something. If I went back and prepared an amended return, this could be a phone slip from 2003.

**Q. Okay.**

A. So I can't tell you what this is.

**Q. And the documents that were provided to us out of your file, those were copied on the same page, and it may just be purely for space-saving reasons.**

MR. ROYSE: I guess yours probably looks the same on your computer, doesn't

it, Ron? I think I've got the same thing as you?

MR. GREEN: Yeah. You would have an exact copy.

**Q. (By Mr. Royse) Okay. So you think this phone note here could have been in 2003, could have been in 2000. There's no way to tell?**

A. Correct.

**Q. Do you know what it references there? I see Tidex at Chevroncam (phonetic) maybe?**

MR. GREEN: Dot com.

**Q. (By Mr. Royse) Yeah. Tidex2@chevron.com. Then it says, I think, maybe office for Richard or -- I can't read the rest of it. I see Rich name -- put Rich name. I guess what I'm getting at is do you have any recollection of making this note or what it referred to?**

A. No.

**Q. Move to tax year 2000 --**

MR. ROYSE: Oh, I lied. I told you I'd take a break. Let's go off the record.

(A brief recess was taken.)

MR. ROYSE: Let's go back on the record, please.

**Q. (By Mr. Royse) We are still in tax year 1999**

114

file, and I will hand you what I've marked as Exhibit 26.
(Exhibit 26, Hand-written Notes, marked for identification.)
Q. (By Mr. Royse) Can you read the date at the top of this on the top left?
A. 1/16/0 -- don't know. Could be a one, could be zero. Could be '00 or '01.
Q. Okay. I'm guessing that you did what I do, which is write the past year up through about February or March and then scratch over it. You wrote '00 and then made it '01. I won't hold you to that but --
A. Or this could be '02.
Q. I understand. It says, "Richard Jennifer Weyland" at the top. I can read that part. What does number one say?
A. "Send Richard," hyphen, looks like "Connus recap."
Q. What's Connus?
A. C-o-n-n-u-s. Connus is a set of tables for per diem allowances for meals.
Q. Let me step back and ask you, do you know if this was -- these are your notes, aren't they?
A. Appears to be my writing.
Q. Do you know if this -- these notes were the result of a meeting or a phone call with the Weylands?

115

A. No. This looks like it was the control sheet, so it would probably be, you know, observations I'm making looking through the return. Best I can give you at this point.
Q. All right. Down at the bottom, it says, "Richard physically present 345 days overseas. Change from physical residence." Do you know what that would have been about?
A. Yes. As I mentioned earlier, under Section 911, the foreign income exclusion, the two tests. In the past, he had a residency. That changed at some point in time, and we would, then, be looking at the other requirement: Was he physically present overseas for the requisite number of days?
Q. His physical residence overseas changed?
A. I think that the country that was providing him that status no longer gave it. I don't remember the exact details but I remember something changed vis-a-vis his qualification for the 2555s.
Q. And as best you can recall, these would have probably been your notes in reviewing the draft of the return or reviewing their --
A. Yeah.
Q. Okay. I'll hand you what we'll mark as Exhibit 27.

116

(Exhibit 27, Hand-written Note, marked for identification.)
Q. (By Mr. Royse) This appears to be a hand-written note from Jennifer Weyland, and what I want to focus on is kind of the middle there that says, "I want to ask a couple of questions. First, do I need to contribute to my IRA? Do I put in the full $2500." What issue is she getting at there?
A. I presume that that's whether she can make an IRA contribution.
Q. What advice would you have been giving her with respect to that?
A. I don't remember.
Q. Here's all I'm getting at. Would it have been normal for you to have given her certain direction as to how to take advantage of the IRA or what amount to put in or not put in?
A. Well, it appears I'm responding to her question.
Q. I'm not even sure you responded. All I know is that that's what she's asking. So that's -- my question is: She's obviously asking these kind of questions. In the course of your work with them, would you give those kind of answers; yes, do this with an IRA --
A. Yes. An IRA is related to tax preparation.

117

Q. Okay. I may have misspoken just a minute ago when I said -- when I jumped from the '99 tax file to the 2000 tax file. I believe starting with Exhibit 26, I'm in the 2000 tax file. That's correct. With Exhibit 26, I moved to the tax year 2000 tax file.
MR. GREEN: That makes your date theory work a little better.
MR. ROYSE: Yes.
Q. (By Mr. Royse) I'll hand you what I will mark as Exhibit 28.
(Exhibit 28, Letter, marked for identification.)
Q. (By Mr. Royse) This is a thick exhibit. I'm mainly concerned with the first page. This appears to be a letter from you to Mrs. Weyland. Does that seem accurate?
A. Yes.
Q. It says, "Dear Jennifer, I took the time to read the IRS publication on U.S. persons working abroad and the IRS Regulations on foreign income exclusion. My reading was focussed on the issue of attaining qualification for exclusion of future years earned income as a resident of a foreign country. It appears that the issue of residence is one of fact. A mere address does not seem to meet the requirement. I do not see Richard meeting the requirement

of physical presence or residence in the near future. See what you get out of the reading."

My first question is: Do you recall what spawned this letter?

A. I don't but I can look at the previous exhibit and it may have been -- let me just see here. I had a flash through my head here. There are -- as I said, his status changed. They took away his residency. So the only other way to qualify him for exclusion was on the basis of physical presence.

Q. Back earlier today you testified that there came a time when Richard raised an issue with you about shipmates not paying taxes. You looked at the statute, sent them some materials. Is that this or is that something different?

A. No. It's something different.

Q. All we're talking about here is exclusion from foreign -- foreign earned income exclusion from U.S. income tax?

A. This is the -- yeah, the income tax.

Q. Okay. That letter concludes, "See what you get out of the reading"?

A. Mm-hmm.

Q. And you attach what appears to maybe be an IRS

publication. I can't really tell. To your knowledge, is this how -- did this issue get any more treatment from you or was this kind of the conclusion of investigating the issue about foreign earned income exclusion?

A. It was not the conclusion.

Q. Still in tax year 2000 file, I'll hand you Exhibit 29.

(Exhibit 29, Letter, marked for identification.)

Q. (By Mr. Royse) This appears to be a letter from you to the Kentucky State Revenue Cabinet.

A. Mm-hmm.

Q. From what I can tell, Mr. Birkholz, it's addressing the treatment of a net operating loss. Do you know what this letter is about?

A. Yes.

Q. Can you explain it to me.

A. Around this time, Kentucky sent a letter to the Weylands questioning a net operating loss on their return, net operating loss being the excess of business expenses over business and nonbusiness income. I interceded, with their permission, and talked to Kentucky and found that Kentucky has a rule that is different from the federal. They only give net operating losses that were incurred

while you were a resident of Kentucky, and we made an adjustment in the carryover so that it would reflect the proper carryover on the Kentucky state return.

Q. Okay. Did this require you to file amended returns or state returns for --

A. No.

Q. -- a few years? How did it get corrected?

A. I just changed the carryover in the file. It had no impact on the tax liability.

Q. In the past?

A. Correct, to my recollection.

Q. I'll hand you Exhibit Number 30.

(Exhibit 30, 2000 Tax Return Documents, marked for identification.)

Q. (By Mr. Royse) And the first page of this, again, is the 2555. The last page I understand is an attachment that you would attach to the return. And, again, I'm just looking here and seeing that employer's name is listed for Mr. Weyland, Tedix Nigeria Limited, and on the last page it's Zapata Gulf Marine as the employer. And, again, I would just ask you if you agree with me that that's facially inconsistent?

A. Yes.

Q. Under Tedix Nigeria Limited, part 1, Question 5,

"Employer is," it says, "a foreign entity," checked. Do you know how that determination was made?

A. No.

Q. Is that a determination that you had any involvement in making?

A. No.

Q. I'm going to attach to your file 2001, Exhibit 31.

(Exhibit 31, 2001 Tax Return Documents, marked for identification.)

Q. (By Mr. Royse) My only question here is, again, the employer's name is Tedix Nigeria. It shows an employer's foreign address in Nigeria and it identifies employer as a foreign business. Do I understand you to say you would have not been involved in the determination that the employer was a foreign business?

A. Correct.

Q. How do you think that determination was made?

A. It wasn't made by me because I recollect that I was surprised in that conversation with Richard to learn that his employer was a foreign company. I mean, this is about the foreign income exclusion.

Q. Okay. I understand. You recollect when Richard talked to you and said the employer is foreign, that being noteworthy to you. Is that what you're saying?

122

A. Yeah.
**Q. Why is it noteworthy?**
A. Well, it was in the same conversation where he said, "My shipmates are chiding me for paying social security taxes," and I asked him why. He said, "I'm owned by a foreign company." If I'm not mistaken, I sent a letter to him at that asking for data.
**Q. The ownership by a foreign company, though, would have tripped a red flag in your mind, so to speak, of there may be an issue here?**
A. No. You know, it may be a factor, but I think more is indication that his shipmates said that they weren't subject to social security taxes. So I needed to check out the statute to see.
**Q. I understand. What I'm getting at, though, is when he mentioned this foreign business, you said you feel certain you had no role in that determination because when Richard mentioned that he was a foreign or -- owned by a foreign business, that that was noteworthy in your mind. And what I'm trying to get at is why it's noteworthy. I understand he said his shipmates don't pay taxes. That's noteworthy. But was it also noteworthy that this is a foreign entity?**
A. No. I mean, I wouldn't have picked up any special significance on that at the time.

123

**Q. Okay. The fact that someone is employed -- someone is a ship captain and is employed by a foreign entity wouldn't cause you to necessarily take any steps different than you otherwise would?**
A. For purposes of this form, no.
**Q. Well, for purposes of preparing their income tax return?**
A. I'm not sure that I would have -- you know, that it rings any bells for me. I -- I mean, it's very difficult to answer that. I know in the case at hand, it didn't ring any bells until I looked at 3121 in the context of how he presented it. It has no context in the 2555.
**Q. This is Exhibit 32.**
**(Exhibit 32, Federal Statement, marked for identification.)**
MR. ROYSE: It's the same return. I just, for some reason, copied the attachment separately here.
**Q. (By Mr. Royse) It still references Zapata Gulf Marine Corporation, and this is being completed in 2002. That is incorrect; is that right?**
A. I think we were using the word "inconsistent" before.

124

**Q. We were and I'm using "incorrect" now.**
A. Yes.
**Q. Go to '02, tax year '02. I'll hand you Exhibit 33.**
**(Exhibit 33, Application for Extension, marked for identification.)**
**Q. (By Mr. Royse) And I'll kill two birds with one stone and hand you Exhibit 34.**
**(Exhibit 34, Application for Extension, marked for identification.)**
**Q. (By Mr. Royse) Mr. Birkholz, you have in front of you applications for extension to file tax returns. Exhibit 33 is a Kentucky form, Exhibit 34 a federal form. Are these both forms that you submitted on behalf of the Weylands?**
A. I believe so.
**Q. Is it your testimony that you had to be specifically prompted by the Weylands to submit these returns -- applications for extension or you wouldn't have done so?**
A. That's my recollection.
**Q. Just a quick question, I notice the Kentucky form requires a reason for a request. Is there not an automatic first extension on a Kentucky form?**

125

A. I don't know.
**Q. I'm going to go through a section of your file that appears to be correspondence, and I say that because I'm not going to represent to you that I've got these organized by tax year. I'm not sure they were organized by tax year.**
A. Excuse me, just for clarification, can we go back to 2002 --
**Q. Yes, sir.**
A. -- on these extensions?
**Q. Yep.**
A. And without the aid of my file, this is near the period where I'm not preparing returns?
**Q. Okay.**
A. You have my files. Did I prepare a 2002 return?
**Q. Let's see -- yes.**
A. Okay.
MR. GREEN: The documents you're talking about being correspondence, are they like 40 and below numberwise?
MR. ROYSE: I think.
MR. GREEN: Yeah. Okay. I think that they'll all be in a certain time frame.

MR. ROYSE: They probably are. I just said that because I didn't confirm it.
MR. GREEN: There's no tax return for that year but --
MR. ROYSE: I didn't want him to think that I was tying it to a specific tax year, because I didn't know it to be true. But unlike you, Ron, I think they tend to be from about the same time.
**Q. (By Mr. Royse) I'll hand you what we marked as Exhibit 35.**
**(Exhibit 35, Letter, marked for identification.)**
**Q. (By Mr. Royse) This appears to be a letter from you to Jennifer Weyland in August of 2003. Does that sound correct?**
A. Yes.
**Q. This, I believe, is the letter that you referred to earlier when you said that you sent them a document asking for some more information about whether Section 3121 might exempt his income from social security tax; is that right?**
A. Yes.
**Q. The letter begins, "Since learning of Richard's**

**status change"; to what does that refer?**
A. That he told -- that was that conversation I had with him where he told me he was employed by a foreign company.
**Q. And do you recall where --**
A. Excuse me, let me correct that. He's not employed by a foreign company. You know, he told me that his company was owned by a foreign company, that Tidex, in fact, was a foreign company.
**Q. And do you recall whether he told you that on the phone or in person?**
A. Telephone.
**Q. Do you recall what the context of the conversation was to cause that to come up?**
A. Could you clarify that?
**Q. Mm-hmm. How did it come up, the conversation? Did he call you to specifically tell you Tidex was a foreign company or were you discussing --**
A. No. I think we had a short conversation, and it started off by saying his shipmates are -- you know, think he's stupid for paying social security taxes. And I said, "Oh, Richard, why is that?" This is the best of my recollection of the conversation. And he said, "Because the company I work" -- "Because Tidex is a foreign

company." And I was surprised by that, because he had previously told me that nothing was different, you know, with Tidex; that everything was the same as it was with Zapata. So that's the status I'm referring to.
**Q. So it's your testimony that that was the first time you learned that Richard had a different status than what you believed his status to be as a, I guess, a self-employed person performing work for a non-U.S. entity; is that --**
A. Well, I'm not even sure it's correct to say self-employed person working for -- it's the first time that there was even a suggestion that things weren't the same as with Zapata. My -- you know, I -- the foreign owned, I didn't know that.
**Q. Do you recall discussing this issue with Jennifer Weyland around that time, around the time of this letter?**
A. I think Jennifer and I had a separate conversation and may have been after that.
**Q. What do you recall about that conversation?**
A. Very little. I remember some discussion about, you know, like what do we do here. And I said first thing is to file an amended return and, you know, we'll go from there.
**Q. How long was it that this letter followed after**

**your conversation with Richard where this issue was first raised, if you know?**
A. I don't know for sure. I'd have to be guessing here. Reasonably close.
**Q. I'll hand you Exhibit 36.**
**(Exhibit 36, Hand-written Notes, marked for identification.)**
**Q. (By Mr. Royse) Does this appear to be some of your notes?**
A. Appears to be my writing, yes.
**Q. Can you tell what that date is?**
A. August 4, '04.
**Q. Do you recall what these notes were about? Do they reflect a phone call or a meeting or --**
A. Not a meeting. I've never met Jeff Smith. It was phone calls and e-mails.
**Q. Okay. So do you think this was your notes from a phone call with Jeff Smith?**
A. I can't tell. It says, "39 minutes," so that would suggest I had contact with him. So I -- since I didn't meet him, it has to be a phone call.
**Q. It has written there, "Docking of vessels." There's something below that that I can't read and then, dash, "Angola." Can you read that first word?**

130

A. Treaties maybe.
Q. Does that suggest to you that you all were discussing these very issues under the statute?
A. It would suggest it, yes.
Q. Do you recall that conversation, what -- how the -- what the conversation was about, what was said?
A. Well, I know what caused it.
Q. Okay. Go ahead.
A. In, I believe, it was May of '04, the IRS, as we thought, audited the amended return, the 1999 amended return. And I still, at that time, had not heard back from Richard or Jennifer with the information I requested. In May they sent the letter to me. I sent a power of attorney to them and I filed it with the IRS to have a conversation about it and I told the auditor -- I think it was Jennifer Fyffe or something like that --
Q. Cindy?
A. Cindy Fyffe, excuse me. Jennifer -- I'm still trying to remember my secretary's last name. I told her that I didn't have all the facts and, you know, Richard was going to be back in town and I'd get back to her. In the interim before completing that, Jeff Smith called me and told me that the Weylands had hired him to handle this, and we had some conversations about me not getting the data.

131

And he sent me some documentation, I believe is in the 203 file, that, you know, related to this and said he had interviewed them with regard to this information; and, you know, I don't know if this was in that conversation or not. And then we talked about who was going to take over the representation, and he said he'd take over the representation and also the preparation of the individual returns.
Q. Down at the bottom it says, "Checked file 8/4/04. Tax year 2000. Has social security tax. No record of amended return filed." What is that?
A. Well, it appears to be, you know, a note that there was no amended return for -- filed for 2000. I'm guessing on the same issue because that's my recollection.
(Exhibit 37, E-mail, marked for identification.)
Q. (By Mr. Royse) And as with most e-mails, you have to read this from the bottom up. So take a minute there, please. And it appears to me that the lower e-mail on this page from you to Mr. Birkholz or -- excuse me, from you to Mr. Smith clearly follows up on the telephone conversation you had of the same date, 8/4/04. Does that look like a fair interpretation to you?
A. Yes.

132

Q. You say to him, "Based on our conversation, you'll contact the agent assigned to the refund of social security taxes on Richard's exempt (we believe) income." My question there is: After your conversation with Mr. Smith, did you harbor the belief that Richard's income was, in fact, exempt from SE tax?
A. No.
Q. Why did you say that?
A. I had no belief. I still hadn't received all the facts.
Q. Well, is that statement incorrect then?
A. Which statement?
Q. "... taxes on Richard's exempt (we believe) income." I read that as --
A. Oh, I see what you're saying. I'm sorry. Thank you for clarifying.
Q. Sure.
A. I still hadn't -- you know, I was having the conversation with him about it because he was going to take over the representation, but I still had not received it. I -- in the conversation, he says, oh, I have that information and I've interviewed them. So that's where I left it. I mean I wasn't privy -- I -- you know, to all the documentation.

133

Q. The top e-mail is from Jeff to you and it says, I wasn't able to meet with Richard. He's apparently out of the country for work. Wasn't able to attain affidavit or POA, etc. "I will write you an opinion letter over the next few days explaining our position regarding the exemption from social security tax and the facts that Richard is willing to testify with -- testify to."
You indicated that in your conversation with Jeff, you discussed who would take over the representation, and he said he would and would take over the preparation of returns. My question is: Why, after that conversation, is he still talking about providing you with information with respect to the exemption?
A. Because Richard left town without signing the power of attorney for him. So he called me back and said can you buy some time with the IRS, which I did.
Q. I'll hand you Exhibit 38.
(Exhibit 38, Letter, marked for identification.)
Q. (By Mr. Royse) This appears to be a document from you to Cindy Fyffe, F-y-f-f-e, at the IRS in Lexington explaining the situation and saying, "I have provided backup documentation that you will need to allow the exemption from social security tax." Do you know what

backup documentation you provided?
A. I don't recall. I don't think there was anything extensive.
Q. The second paragraph, "You may need to look at section 3121(b)(4) for the area that Mr. Smith will be providing a more complete package of research. In the interim, the enclosed material was provided to," I think it's supposed to say, "me," "by the taxpayer to forward to you." Do you recall, again, without talking about the particular documents you provided, do you recall it being provided to you by the Weylands?
A. It was not. I think that's the few documents that Jeff Smith provided that are in the 2003 file.
Q. Exhibit 39.
(Exhibit 39, Letter, marked for identification.)
Q. (By Mr. Royse) And I'm jumping back a day. The conversation between you and Jeff was August 4th. You had the e-mail exchange. August 5th was the letter to Cindy. I'm now back to August 4th, a letter from Jeff to you. My question is: Is that information that's described there the same information that Jeff was discussing with you on the phone?
A. No. I don't think we got into it at this extent.

Q. Okay. If the facts stated there are true, do you have an opinion as to whether Richard would have been entitled to an exemption from the SE tax so long as those were true?
A. No.
Q. You don't have an opinion?
A. I don't have an opinion.
Q. Is there additional information you need beyond what's stated there?
A. I haven't really finished the --
Q. Take your time, please.
A. I haven't finished the research. I don't have the statute in front of me. I don't have documentation behind this. I couldn't make that call based on this. You're asking me in a very difficult statute to say whether these facts will fit it. You know, that was my problem. I never got a chance to do that.
Q. Well, your letter to Ms. Weyland that was Exhibit 35 was August 8th of 2003?
A. Yes.
Q. You certainly had an opportunity to review the statute between August 2003 and August 2004. I'm trying to understand what you mean you never had an opportunity?
A. I never received any information from them, so I

never really looked at it further. If you'll notice down at the bottom, the last paragraph, it says, "Based on your response and my additional research, we can determine if any social security tax can be refunded."
Q. You're on your letter?
A. I looked at the -- I'm just -- I just caught it here on Exhibit 35, the last paragraph.
Q. Yeah. I'm with you. My question, though, is on this letter, you're saying that even this information provided to you wouldn't have been enough. Assuming these facts were true, this wouldn't have been enough to make a determination?
A. Maybe if I was more aware of 3121, but I haven't looked at the statute for a while. So, I mean, this isn't just a run of the mill statute that, you know, you look, okay, yeah. Fine. It's a very, very difficult statute to read.
Q. Let's go to Exhibit 40.
(Exhibit 40, Letter, marked for identification.)
Q. (By Mr. Royse) Do I correctly read that this letter was intended to be a disengagement letter?
A. Yes.
Q. Number one, "Your 2003 Federal and State tax data

was never received by this office. We were not engaged to prepare the return. If you have not filed the return it is due." What normal step would the Weylands take each year to engage you to prepare a return?
A. They would call me, and we would talk about what the approximate date is so we could make a reasonable computation of the tax. Then we would file an extension.
Q. Paragraph 3 about midway down says, "In a previous conversation with your attorney, Jeff Smith, I was told to wait for a memorandum and documentation supporting the position that Social Security Taxes were not due in tax years 1984 through present. I have received no such writing but did receive a call from the IRS today requesting information or the case be closed and the refund of Social Security Taxes denied."
My question is: This is a September 7th letter. Did you not consider the August 4th letter to be responsive to that?
A. No.
Q. Okay.
A. I'm sorry.
Q. Go ahead. Well, I think you answered --
A. I didn't consider it responsive. I still don't have the answer to the question.

Q. Okay. So when it says, "I was told to wait for a memorandum," you didn't believe this to be the memorandum, meaning Exhibit 39?
A. Correct.
Q. Further down you say in paragraph 4, "Amended returns for 2000 and 2001 have similar issues. Due to no response from my August 28, 2003 request for information, I was unable to file a timely amended return for 2000 and the Statute of Limitation has tolled. A similar fate will befall Tax Year 2001." First, let me clarify something. When you say, "the Statute of Limitation has tolled, I think you mean something different than three lawyers would mean. You mean has expired?
A. Yes.
Q. Okay. Just for clarification, I'm going to say expired. When it was almost time for the '99 amended return statute of limitations to expire, you filed that document as a protective return, you indicated. That was October of '03. My question is: Why, based on the same information that allowed you to file that protective return, you could not file protective returns for 2000 and 2001 prior to the statute expiring?
A. That's a good question. Because my belief was that if the first amended return created a preparer penalty

for filing something that was said to be true without all the facts, which it didn't -- I mean I didn't have all the facts, didn't know if they qualified for an exemption -- and could have been subject to a preparer penalty, that's just a dollar fine. The second occurrence, it's my belief that, then, you get referred to the director of practice and you can lose your license to practice.
So I insisted in that letter that I sent -- I'm not sure what the date was here -- August, that I get the information.
Q. Okay. That was August of '03 that you sent that letter to the Weylands with the memo or the notes to file, I think you called them, technical notes to file. That was August of '03?
A. Yes. Yes, Exhibit 35.
Q. Right.
A. August '03.
Q. Two months after this letter, October 10th of 2003, you filed the amended return for '99, right?
A. Yes.
Q. You had not --
A. I believe that's the case. I'd have to check the file but --
Q. You can take my word for it. If I'm wrong, I'll

eat that one. It was October 10th of 2003 that you filed the amended return. That was two months after this letter. At that point, you had not received the information. We're in agreement?
A. Yes.
Q. Between that time and September 7th of -- excuse me, August 4th of '04, did you have any correspondence with the Weylands at all about that information, the status of that information, filing amended returns, not being comfortable with filing additional amended returns?
A. Not to my recollection.
Q. The last page says -- second page says, "I will always appreciate our relationship but it is time for me to withdraw from representing you in the future. Once I'm finished with the '99 return, my engagement will be completed." What did you mean in terms of being finished with the '99 return?
A. The '99 amended return that was before the Internal Revenue Service.
Q. The audit of that return?
A. Yes.
Q. When you say, "Once I am finished with it," did you expect to continue to see that through till it conclusion?

A. No. I knew from talking to Attorney Smith that he was going to take it over.
Q. Then why didn't you say -- I'm not trying to wordsmith but I'm trying to get a substantive distinction here. If that was your understanding, it seems you would have said, I understand Mr. Smith is handling the '99 return. Therefore, my engagement is completed. Instead, you say, "Once I am finished with the '99 return, my engagement will be completed"?
A. You are wordsmithing. That was -- I mean I -- I had -- I think I had promised the internal revenue agent that I would give her my notes, you know, and I think I provided before that and Jeff Smith said, you know, I may need you for something. That's what I was trying to refer to there.
Q. Okay. In any event, it's your testimony that your language here in this letter of September 7, 2004 was not intended to tell the Weylands that you would see them through the audit. It was simply to say, I'm here if I need to provide some stuff. Other than that, I'm finished?
A. Yes.
Q. Exhibit 41.
(Exhibit 41, E-mail String, marked for identification.)

Q. (By Mr. Royse) And you can read all of this if you want to, but let me tell you what I'm going to ask you about and that's the first three pages starting with the third page backwards is the chronological order. Everything beyond that is surplusage or just stuff that's copied in the first three pages. So try and save you some time. Have you had a chance to look over those couple of pages?

A. I'm not finished.

Q. Please take your time.

A. Okay. I'm finished.

Q. All right. Let's go to the last page of what I'm talking about, the first three pages, this is PB0008, and this appears to be an e-mail from you to Jeff Smith on September 7th of '04 that says, "Enclosed please find a copy of a letter sent today to the Weylands. Unfortunately, the IRS has imposed a deadline. I'm doing what I can without the value of facts. Appreciate any help you can provide."

Is that the September 7 letter that we were just reading, Exhibit 40, that he referred to there?

A. Say that again. I'm lost.

Q. Sure. If you look at -- if you look at the date on that e-mail, it's September 7th of 2004. It starts by

saying, "Enclosed please find a copy of a letter sent today to the Weylands." If you look at that September 7, 2004 letter, flip over to the second page, it says, "CC Jeff Smith." My only question is do I have the right letter here that you're referring?

A. No, I don't think so. Give me a second.

Q. Sure.

A. I think I was referring there to the August 8, 2003 letter, which is Exhibit 35.

Q. But why would you have said, "Enclosed please find a copy of a letter sent today"?

A. Well, good point. I am lost here.

Q. Well, take your time. I'm not -- it's not a trick question. I'm just trying to make sure I've got the right paired up.

A. That probably has to be it then in September. Thank you for pointing that out.

Q. So we've got you sending this to Jeff saying the IRS has imposed a deadline. I'm doing what I can without the value of facts. Appreciate any help you can provide. He, then, the following day at about five, six o'clock in the afternoon sends an e-mail to you. He says, "I had sent you a letter in August of 2004 providing a legal opinion to be provided to the IRS. Richard will be coming in tomorrow

to sign an affidavit regarding the representations in the letter. Did you not receive this letter? Please send all files regarding the filing of tax returns to my office so that the Weylands do not lose their rights to receive refunds for their social security taxes. Also, I will receive a POA from the Weylands tomorrow to deal with the IRS agent here in Lexington."

You respond the following morning, "Jeff, I did not receive any letter. I need the Weylands to remove me from this engagement. Don't know what you mean by send files." What I'm trying to figure out is that letter of August 4th that he sent to you, I mean that came from your files. He seems to be referring to that in his e-mail, "I sent you a letter in August of '04 providing a legal opinion to be provided to the IRS."

Do you know why you would have said to him, "I did not receive any letter"?

A. You know, you're -- it's hard to kind of bring myself back here, but I didn't really think that this was the letter that we discussed on the phone. On the phone it talked about, you know, the logic behind, you know, why, not just definitive statements they do, they do, but explanation, etc. That's what I was expecting.

Q. "I need the Weylands to remove me from this

engagement. Don't know what you mean by send files. My files have a copy of the tax return but so do the Weylands. The issue is the same on all returns. If you need anything from me, be more specific. I'm here to help if you wish." Do I sense there that you didn't understand what he meant when he said send the Weylands' files?

A. It may have been. You know, I think that he thought that they had given me some documentation, but I -- I never got it. I tried -- I know I talked to him about that on the phone.

Q. The following day he writes to you, "Who is going to represent them in the audit that currently is being performed?" And that was about one in the afternoon. And at about 2:30 in the afternoon, you say, "I am in the middle of representing the Weylands and have advised the auditor that you are going to send memo and documentation. If you are taking over, contact the POA. It is not my call but the Weylands. Got letter from Richard and Jennifer by express mail today asking if we filed an extension. We file extensions for clients that provide data such as income and payments. An extension is not effective if a reasonable attempt is not made to ascertain tax liability. Therefore, having received no information, we did not file an extension. Please talk to Richard and Jennifer."

My question there is: He asked a question, "Who is going to represent them in the audit that's currently being performed"; I'm not sure if your e-mail answers that but you begin by saying, "I'm in the middle of representing them. If you're taking over, contact the POA. It's not my call but the Weylands." Were you disengaged at this point or were you going to represent them in the audit currently being performed?

A. You know, it's really tough on the chronology here and I wish I could help you. Maybe you can help me by looking at the e-mails. But in effect, I had a conversation with Jeff and he's the one that suggested it might be more convenient. Then we started getting e-mails going back and forth and letters; and this is just a recollection, I was a little surprised on his comment about the representation because I thought he was the one that suggested it.

That's why if you look up further about who abandoning who, he mentioned in a phone call that Jennifer and Richard had felt abandoned and, you know, I would -- I would have gone through here except for the fact that, you know, I believed that he had volunteered and said it made more sense, and I agreed with him. You know, they're local. He's local with them. And September 7th, you know,

I, in effect, figured that I was just wrapping up everything.

The September 7th letter, that -- that stands. I don't -- the e-mails, beyond that may have gotten into that confusion with -- I'll have to look at the chronology here but Richard not signing the POA, and I had to hold the stopgap in between. And I think when Jeff first talked to me, the IRS called in the middle of that and said, you know, I got to put a deadline on this. Because, remember, this happened in May on their records, I think, when they first contacted, and we're in August.

Q. Let me interject here Exhibit 42.

(Exhibit 42, Correspondence, marked for identification.)

Q. (By Mr. Royse) This is a September 9, 2004 piece of correspondence from the Weylands in response to your September 7 letter. It says, "Dear Peter, we've received your letter of September 7, 2004 and have a question. In the past, you," and this is, by the way, a -- I'm not sure this is from your file because it doesn't have a "PB" on it. The copy that I grabbed last night is mine.

It says, "We have received your letter of September 7, 2004 and have a question. In the past you filed an extension for us with the IRS. We need to know as

soon as possible if this was done for 2003." Is that what you were referring to there in the 9 or -- September 10 e-mail that says, "Got letter from Richard and Jennifer by express mail today asking if we filed an extension"?

A. I believe so.

Q. Okay. They say, "In the past you filed an extension for us with the IRS. We need to know if this was done for 2003." Again, just so we're clear, it's been your testimony that you all only filed an extension if they asked you to, and therefore I would assume you would take the position they didn't ask you to in 2003?

A. Yes.

Q. Excuse me, in 2004 for tax year '03?

A. Yes.

Q. September 14th is the next e-mail of the chain. It says -- this is from Jeff Smith to you -- "The Weylands were under the impression that you were disengaging them. Thus, they were feeling abandoned and needed someone to take over in the meantime. They have signed a POA and I have a meeting set up on Thursday with Cindy Fyffe at my office. Because I have no information regarding your audit, please send me everything you have necessary to assist them with the audit and amended returns.

"Further, please provide me with written

procedural history and factual history of what you have been doing regarding the Weylands so that I can attempt to clean up any messes with the IRS. They are attempting in every way to mitigate their damages."

Did you interpret this as, again, a request for whatever you had in your files on this issue or how did you -- what did you -- how did you interpret this?

A. I don't recall.

Q. Well, let's look at your e-mail about 40 minutes later, September 14, '04. "The Weylands held my letter for a year without responding, and they still have not responded to the fact request. They contacted you, then contacted -- then you contacted me. Who abandoned whom? If you're taking over the audit by meeting with Cindy, I don't want to get in the way. I would not be able to handle this as efficiently as you as I am here and you are in driving distance to the IRS.

"You can ask the Weylands for a copy of my letter and copies of returns. This is the only issue I'm aware of on the returns. Please note, they never sent me tax data, so we do not -- we have not prepared a 2000 return or 2004 extensions. Ready, willing, and able to help but have not had any word from the Weylands."

Now, you said a minute ago that it was Jeff Smith

who suggested that it would be easier for him to handle the audit in Lexington. I seem to take it here that you're suggesting that?

A. Well, we had a conversation and, you know, some of this is him coming back and putting a different spin on it but, you know, it's going in the right direction. We -- I attempted to disengage on September 7th. I'm not going to leave them high or dry. I'm going to do everything I can to help and that's what I told Jeff, and I told him in the conversations we had before that there wasn't documentation.

I never got an answer to the letter I referred to before, which is back in August. You know, I mean still I get the e-mails, etc. And this one about abandonment, I remember being a little annoyed with him because we talked about that in one of our phone conversations before, and he suggested that he take it over. And then he's acting here like it -- but I'm going to let it go. It's no big deal.

Q. He said, "Please send me everything you have necessary to assist them with the audit and amended returns. Further, please provide me with a written procedural history and factual history of what you've been doing regarding the Weylands so I can attempt to clean up any messes." Did you ever send him either of those?

A. I'm not sure what he was asking for and whether I talked to him. I'd have to, if the phone records are around, see if there's a conversation there.

Q. He says, "Further, please provide me with a written procedural history and a factual history of what you have been doing. Do you recall ever providing him with a written --

A. No. I don't think -- I probably wouldn't have written. I think this is at -- I mean you can look in my files. I gave you everything that I have.

Q. Okay. Your e-mail seems to be responsive to this. It says, "You can ask the Weylands for a copy of my letter and copies of returns. This is the only issue I'm aware of on the returns." It seems to me that you're saying there, I don't have any files to give you. They've got everything I've got, so get it from them. I mean is that a misinterpretation of what's being said there?

A. No. You know, they have -- we provide them with a copy of the return.

Q. If a client of yours -- a taxpayer client of yours has an issue that arises in connection with an IRS audit or a handling of an issue at tax preparation, is it offensive at all to you for that person to obtain a second opinion?

A. Not at all.

Q. Do some of your clients do that from time to time?

A. I don't know because I -- you know, I haven't talked to them about that issue.

Q. You would agree with me, would you not, that if the Weylands used Jeff Smith to take a second look at this issue, that would not be any breach of any kind of professional or personal duty to you, would it? I mean it wouldn't bother you at all?

A. Not at all.

Q. I'll hand you 43.

(Exhibit 43, Letter, marked for identification.)

Q. (By Mr. Royse) This appears to be an October 29, 1997 letter from Jennifer Weyland to you. It says, "Dear Peter," and goes through some preliminary statements, "Also, a potential employer told Rich that they don't pay social security and that if Rich has worked 40 quarters, he is totally vested and doesn't have to pay anymore. Is this true?" Do you recall seeing this letter?

A. Yes.

Q. What do you recall your response to this letter being?

A. I don't really recall that much of the response. I can tell you what my reaction is just looking to it --

looking at it, that the 40 quarters, you know, once you attain that, that doesn't necessarily qualify and then you can go someplace else. Social security is based on your entire earning history.

Q. Do you recall responding to Jennifer Weyland about this letter?

A. I think we talked on the phone.

Q. What do you recall about that conversation?

A. I responded to the questions. It's --

Q. What did you say about, "A potential employer told Rich they don't pay social security"?

A. I don't recall.

Q. Do you recall answering any of this letter in writing at all?

A. No.

Q. If you did, it would be in your files, I presume?

A. Yes.

MR. ROYSE: Off the record.

(A brief recess was taken.)

MR. ROYSE: Back on the record, please.

Q. (By Mr. Royse) Without marking it, I'm going to hand you a copy of your interrogatory answers, which I'm not going to burden the file with because they're already a

154

part of the record. Do I understand that these answers to interrogatories and responses to requests for admission and production of documents were signed by you, Mr. Birkholz?

A. Yes.

Q. And they were signed -- I understand these were probably prepared with the assistance of one or more of your counsel and let me begin by saying I don't want to ask anything your counsel said to you or vice versa in connection with the preparation. So I don't think I'll ask anything like that. But if you think I call for it, you need to consult with Mr. Green before answering.

Interrogatory Number 2, your attorney has interposed an objection there because I use the phrase "who was responsible for rendering tax advice and preparing federal and/or state income tax returns." And he interposes an objection that qualifies your answer because he says, "To the extent that the question implies defense undertook anything other than the preparation of tax returns," and you all weren't ever engaged to do such a thing, tax planning or other services.

Long way of saying were you not in the business of providing tax advice to the Weylands?

A. What do you mean by tax advice? I mean it's such a broad term. I --

155

MR. GREEN: Normally I don't talk about my objections in a depo but just because we're -- I mean all I'm saying there is the word "tax advice" can be very broad and could imply undertaking, like, estate planning or anything like that or even tax shelters. And so all I did was I just wanted to make it clear that we weren't admitting him as a broader engagement.

MR. ROYSE: I'll skip that because that clarifies it.

Q. (By Mr. Royse) I wanted to make sure that you didn't have some very narrow construction of tax preparation that basically just said all you were engaged to do was fill in blanks, and I think I understand that you were engaged to do more than just fill in blanks?

A. Anything that it took to get a true and correct return, yes.

Q. We've talked about who did the work on the returns. Interrogatory Number 5 asks for "Any contracts, agreements, or other documents in your possession that address the terms of your engagement with the Weylands." And you all responded by providing blank copies of

156

materials, and I think what you gave me was kind of a John Doe letter that -- it's the blank form that you would normally send to people.

And my question is, first, do you have any specific engagement letter like this with the Weylands?

A. Such as the John Doe blank which I'm going to refer to as the cover letters and the organization in the tax organizer?

Q. Yes, sir.

A. Never received that information to my knowledge. I don't think there's anything in my file. My recollection --

MR. GREEN: No. He's wanting to know if you've got a copy of this as it might have been sent specifically to the Weylands.

THE WITNESS: No. It's a blanket -- you know, the software spits these out with name and address. It goes out to everybody. Even -- it even goes out to people that are no longer clients, because we're just giving the data to them.

Q. (By Mr. Royse) Now, the organizer that you send out, are you saying that you never got a completed

157

organizer back from the Weylands?

A. No. I think I only got a spreadsheet. I don't think they ever filled out the organizer itself.

Q. If they did, it would be in your file, I presume?

A. Yes.

Q. I asked you in Interrogatory 6 about insurance and I'll stop at that. It's what we discussed earlier. I'm going to hand you -- again, without making it a piece of the record -- exhibit -- the first part of Exhibit C to your interrogatories, interrogatory responses, and this is what we usually call a dec. page, a declarations page for an insurance policy, and it appears to be with New York Marine issued on February 16, 2005.

Just so I make sure I understand, your former insurance was with New York Marine. Your present insurance is with Philadelphia. Am I right about that?

A. Yes.

Q. But at least during 2005, from what I can see on the face of this policy, as of February 16, 2005, the insurance was placed with New York Marine; is that right? If you don't know, say so.

A. I really don't know. Insurance is not...

Q. I'll take it up with these gentleman. We'll work that out.

158

A. Please do.
Q. The second page of that dec. page is an endorsement. It's got an excluded claims endorsement. It excludes a claim for New England Veterinary Specialists from either January of '96 or January of '98. Do you know what that is about?
A. No, I don't.
Q. Do you recall any such claim by New England Veterinary Specialists?
A. I don't think a claim was made. This is my brother's client. I really don't know anything about what the issue is or I don't recall it. I'm sure he mentioned it to me at one point.
Q. You know what, in the interest of time and courtesy to you and your lawyers, I think I'm just going to take some of this up informally through written deposition questions, if I need to, about some of this other insurance stuff. Is that fair?
MR. GREEN: Actually, I don't want to speak for him but I think that Dick would probably talk with you about it any time you want to.
MR. ROYSE: Appreciate it.
MR. GREEN: Let you know what the

159

status is and whatnot.
Q. (By Mr. Royse) Interrogatory Number 7 has to do with the defense that was asserted in the answer that was filed in the case by you where the allegation was made that the Weylands and their agents were guilty of negligence. And what I ask in that interrogatory was tell me how it is that the Weylands were negligent, and your lawyers and your response qualifies the answer and says discovery is ongoing and so forth. It says, "The plaintiffs failed to provide timely and complete information as requested." Let's stop right there.
Is that what you've been talking about earlier today in their failures to get you information as you requested it or is there something we haven't talked about today that you're describing there?
A. No. That's correct.
Q. And with respect to changes in his employment, "The defendants were given what may have turned out to be misleading or false information. What that means is that with respect to changes in Richard's employment, you and Birkholz & Company were given what may have turned out to be misleading or false information. Do you know what that refers to, what you may have been provided that was misleading or false?

160

A. Yes.
Q. Please.
A. I mentioned it to you earlier. In the early days, we used to get documents from them and one of those documents was a 1099 and 1099s specifically put you on notice that you're dealing with a self-employed individual and it's not an issue on, you know, self-employment tax per se. Because of that conversation I had with Richard, and I'm lost on my chronology here but, you know, long before the conversation -- I know, the conversation when Tidex took over Zapata and he told me that nothing had changed, you know, with regard to his employment. I'm -- at that point, you know, we talked a little bit about it. I -- you know, I'm thinking he's still getting a 1099 and it's the same as it was with Zapata Marine, everything there.
So I had no inkling, you know, until the conversation in 2002 that we're not dealing with, you know, him reporting to a -- I'm going to say American employer. This is, you know, gratuitous there but that he -- that he was not a 1099 person.
Q. Let me ask you about that early discussion when you said that he indicated that Tidewater or Tidex or whomever had taken over Zapata but nothing had changed. Did you still continue to seek 1099s every year after that?

161

A. You have my file. I mean once I started to -- once he got his computer and started preparing spreadsheets, I didn't even get 1099s for bank interest. I got nothing but a spreadsheet.
Q. Okay. So the fact that you no longer got 1099s did not indicate to you anything about the change of his employment or self-employed status?
A. No. I mean he told me -- he said, "Everything is the same." I asked the question. He said, "Everything is the same."
Q. You asked what question?
A. I asked has anything changed in terms of the status. He said, no. No. No. I still -- I think he said he was going out of Houston. I'm not sure. He still reported to Houston, you know, everything -- everything is exactly the same.
Q. Okay.
A. My status has not changed.
Q. It says -- the continuation of this answer here says, "Further, they or their agent apparently made unreasonable assumptions concerning the filing of an extension and/or amended return at a time they knew they had not requested same or furnished information on which to base same." Are you talking about their -- that it was

162

unreasonable for the Weylands to assume you would file an extension for them if they hadn't requested it or furnished you information to do so?
A. Yes.
Q. And are you saying that it would have been unreasonable for the Weylands to have assumed that you would file an amended return if they hadn't provided -- requested you to do so and provided you information?
A. Yes.
Q. Interrogatory Number 12 asks about any complaints, claims, actions. Your attorney has imposed or interposed an objection there for relevance but then answers, "There have been no complaints similar to the actions set forth herein." And I just want to make sure I fully understand, have there been no complaints of any type with respect to your service as a tax preparer or --
MR. GREEN: At the very beginning, he mentioned one that --
MR. ROYSE: Yeah.
MR. GREEN: -- was not similar to this.
THE WITNESS: But that was more -- that wasn't really for tax.
MR. ROYSE: Right.

163

MR. GREEN: Right. That's what I --
Q. (By Mr. Royse) That was more business?
A. Yeah.
Q. Is there anything else out there?
A. I once was summoned to the small claims court by a client who said that I advised her to not pay estimated taxes, but I never met the woman until after the year was over, February.
Q. When was that roughly?
A. I don't know.
Q. Year ago? Five years ago? Ten years ago?
A. No. No. No. It was a long time ago.
Q. Anything else like that?
A. No.
Q. Request for Production of Document Number 5, I asked for all versions of resumes, marketing materials, anything else that described the education, training, qualifications, etc., of you and your company. Do you all not have any kind of marketing materials, brochures, anything like that?
A. For clients etc., no.
Q. Nothing in the way of -- and I don't mean an advertisement in the newspaper, I don't guess. Do you do any advertising like that?

164

A. Occasionally I get a call from the police association that says, you know, we've got a calendar. Will you give a contribution. I think it more as giving a contribution. If you consider that marketing and advertising, yes, but we do not market and advertise.
Q. No website?
A. No.
MR. GREEN: Since we're about there, at the risk of messing up your nice time frame, mentioned in here that we were -- you had requested some additional records.
MR. ROYSE: All right. We can deal with that.
Q. (By Mr. Royse) Request for Admission Number 5 says, "Admit you have no facts to dispute that Richard Weyland has not worked for an American employer between '85 and '04," and the answer says, "The defendants cannot -- the defendants can neither admit nor deny because the nature of his employment is not known following his employment by Zapata, and Mr. Weyland told Mr. Birkholz two (years after the fact) that while his employer changed, nothing had changed substantively."
I'm curious about the two years after the fact because I think you said that earlier. Mr. Weyland told

165

Mr. Birkholz two years after the fact of what?
A. Two years after the fact -- I'm not really that clear. I think we went back to the returns and looked at the 2555. The first time that a name different than Zapata appears on the 2555, Richard, in a conversation, says, you know, the company changed and I -- this is out of recollection -- the company was taken over two years ago and that's when we had this conversation about nothing's changed.
Q. So you think that that was -- that you had -- you were looking at the returns with Richard and he said, wait a second. That's changed?
A. I don't know what you mean by looking at the returns with Richard. Richard, I believe, called me, maybe because we -- he really, in effect, prepared the 2555s. He'd give me all the data for it just typed in. I'm thinking that he called back with data, maybe it was a separate conversation, I don't know, but he -- it was more like a correction. Pete, you know, Zapata is not the name anymore, etc.
Q. You think, though, that -- I'm just trying to get clear on two years after the fact, what that means. You're saying that's two years after the company changed from one to the other?

A. I don't have facts when it changed, so it's a guess. I -- that is my recollection of the conversation.
Q. Okay.
A. I think he said, you know, you've been carrying this for a couple years, and a couple to me means two.
Q. I had requested phone records and I got some and then your counsel has just provided me with some more.
A. Jennifer Levine.
Q. Did it without leaving, good for you.
MR. GREEN: That will be years before you forget her name again.
Q. (By Mr. Royse) I'll be honest with you, I've looked through the records that you gave me and have identified some phone calls that I think I can tell who the numbers are on each of them, and I'm not inclined to spend a lot of time going through here and asking about them because you were going to have to provide me with others and it looks like Ron has just provided me with at least some of those and I don't want to do a spotty job of trying to piece them together.
I think what I'll do is to the extent I can't figure something out, I believe I'll just do it in writing. The phone number that ends in four digits is your cell; is that right? I mean ends in the four digits 1611 is your

cell?
A. Yes.
Q. And the one that ends in 6052 is your office?
A. Yes.
Q. Is 6242 an office extension or is that a fax?
A. I can't tell. There's a rotary so --
Q. Fine.
A. I'm going to guess that's not a fax because I think there's a four line rotor and the fourth one is the fax, but I don't know.
Q. Call to IRS Innocent Spouse Program in Covington, totally unrelated I presume?
A. I don't know what you're talking about.
Q. One of your call records -- I can show it to you, if you want me to -- there's an October 24, '02 call at 4:12 p.m. three minutes to the IRS Innocent Spouse Program in Covington. I can't think of an innocent spouse issue in this case, but you have very few calls to 859 so that one popped up and I was just curious --
A. That was probably on a different case.
Q. You don't have any specific recollection of that being related to this case?
A. It's not related.
Q. Good enough. Do you -- would you have had any

occasion to deal with the IRS in Lexington, as far as you can recall; on any matter other than the Weylands?
A. I can't recall. You know, the IRS -- when you call the IRS, you could be calling Lexington, Kentucky. You could be calling Texas. They have a rotor that just brings you to wherever you go. So I can't answer that.
Q. Let me see if I can tack it down this way. Have you handled any matters in recent memory for clients in Kentucky other than the Weylands?
A. Matters in Kentucky -- I have no Kentucky clients other than the Weylands. If there was a call to the IRS in Kentucky, it might be because that's where the department that handled that -- the matter that I was doing, but I don't have any other clients, to my knowledge, in Kentucky.
Q. All right. I noticed in going through the Weylands' files that they seem to have a lot of issues with either overpayments or underpayments to the IRS and that kind of thing, and it looked like most of them eventually got worked out. Do you attribute those problems to -- and I'm being general by design but they seem to have a lot of interaction with the IRS. Do you attribute those to something that the Weylands did in particular or did they just have bad luck in terms of the IRS making errors from time to time or what -- do you have a feel -- seemed to me

they had more than normal interaction with the IRS. Would you agree with that statement?
A. Yes.
Q. Do you have any feeling as to why they had that level of interaction?
A. My recollection is that most of those are attributable to timing issues of the Weylands, you know, late payment of estimates, multiple payments that cross years, which really gets the IRS confused, multiple estimates. You know, most clients would pay one estimate. They tended to pay a little bit, you know, multiple payments for the same quarter and that -- it's just difficult for the IRS system to handle that.
Q. Did you ever give any direction to the Weylands to change the way they made those payments?
A. I don't recall.
Q. Do you recall ever having a conversation with Jennifer about there being a mistake with respect to the SE tax and telling her that it didn't matter in the long run because they would get the money back eventually anyway?
A. No.
Q. So you don't recall ever indicating to her that if there was an error, it would ultimately be a wash, so to speak, because it's social security and it would be paid

170

back to them. You didn't say anything to that effect?
A. I don't recall a conversation.
Q. Am I correct that you did not file amended returns for '00 or '01?
A. Correct.
Q. Do you know if those got filed by anyone?
A. I don't. I assumed, from my conversation with Jeff, that he was going to do that once he got all the information.
MR. ROYSE: Ron, if you can give us just two minutes by ourselves outside, I think I can be finished.
(A brief recess was taken.)
Q. (By Mr. Royse) Mr. Birkholz, without getting into all the language of the statute, I seem to recall that, at some point in your discussions with the Weylands or Mr. Smith or someone, that there was an issue about where a ship -- whether a ship that the taxpayer is on touches a U.S. port, and my understanding of the pertinent provision of the reg. is to mean that does it touch a port -- a U.S. port while the taxpayer is on it.
I seem to recall that you may have drawn a distinction with Jeff or the Weylands that you had some question about whether it could mean whether the ship ever

171

touches a U.S. port, either before or after the -- I guess before the taxpayer has been on it. Are you -- does that issue at all sound familiar to you?
A. Well, I know that in the statute, and the regulations are just a recap of the statute, it's -- it is not clear.
Q. Okay. So you think, at least in your mind, there is some question as to whether if a ship touches a U.S. port in 1970 and 20 years later when the ship is in Nigeria, a taxpayer works on that ship, whether that 20 year prior contact with a U.S. port could actually destroy the exemption?
A. You know, I'm not even sure I can discuss this because I never had that information so --
Q. Well, we're just talking hypothetically now.
A. Hypothetically, without the statute in front of me, you know, I don't see the wording there so it's hard to discuss it.
Q. Well, I went to print off a copy of the statute this morning in my hotel but I couldn't find a printer, and what I have is one of the IRS bulletins and I can't represent to you that this is the exact language of the statute. What it says is, in listing the criteria, it lists several, "You perform the services on or in

172

connection with an American vessel or aircraft and either, A, you entered into your employment contract within the United States; or B, the vessel or aircraft touches at a U.S. port while you are employed on it."
That seems clear to me that it -- the taxpayer has to be on the ship when it touches the U.S. port. It also seems to fail the rule of reason that somebody could get on a ship 20 years after it touches a U.S. port and that somehow disqualified them from the exemption. I'm not really asking you to decide that question. I'm just asking is that an issue that you thought existed under the statute, of whether he even possibly qualified because you didn't know everywhere his ships may have touched?
MR. GREEN: Let me object to this technical question, it seems the rule of reason that was applicable to tax law. But go ahead.
MR. ROYSE: Spoken like a true republican.
THE WITNESS: I never really finished the research so I'm not sure. You know, there's several issues. I stated before the 3121 is probably one of the toughest statutes out there, and the wording isn't

173

that good on it. There may be several issues. I never really got to the time that I actually had to start working with it.
Q. (By Mr. Royse) Okay. Do you recall that being an issue that you identified as saying, well, gosh, I even wonder what this means? Would you ever have said that to Mr. Smith or the Weylands?
A. No.
MR. ROYSE: That is, I believe, all I have. Thank you for your time.
MR. GREEN: Could we go off for just a minute.
(Discussion off the record.)

BY MR. GREEN:
Q. Sir, I've just got a couple of questions for you and I want to take you back. Do you recall some questions about putting your insurance companies on notice, who your insurance companies were, etc.? Do you recall being asked that earlier today?
A. Yes.
Q. And you mentioned that you had spoken with New York Marine as well as Philadelphia Insurance?

174

A. Yes.
Q. Okay. Now, I want to just make clear the timeline on that, so I'm going to ask you a few questions about that. You had -- we had talked -- you had been asked questions about -- and I believe Exhibits 37 and 38 pin down the time frame, if you want to take a look at those -- in August of 2004 -- yeah, in August. Now, is that the time frame where, in your conversations with either of the Weylands or Mr. Smith, you became concerned that there was a potential claim?
A. Yes.
Q. And at that point in -- and at that point, New York Marine was your insurance carrier, correct?
A. Yes.
Q. Now, what did you do when you got the sense that there may be a potential claim here?
A. I called the -- our insurance broker, Wayside.
Q. Okay.
A. And asked -- and told them, you know, I have this. What do I do? And the agent gave me a phone number for New York Marine. I called them. I told them what I -- you know, where I was at this point in time. There was a potential claim. And they gave me a phone number of an attorney in the Boston area that consulted with them. I

175

believe his name was Attorney Ralph Picard. I spoke with him and that was the end of that situation at that point.
When I talked to the New York Marine, I asked them if I had -- to put a claim or something, and they said, well, you just did, you know. You know, just contact Attorney Picard's.
Q. Now, this was before there was a lawsuit?
A. Yes.
Q. Okay. And subsequent -- and at that time, again, Philadelphia Insurance you had no relationship with them at that time?
A. Correct. No. They weren't our insurance company.
Q. Now, how did you come to change from New York Marine to Philadelphia Insurance?
A. At some point after that, New York Marine either contacted my insurance agent or they sent a letter to us, I don't know which, telling us that they're withdrawing from the malpractice coverage area; and at that point, our insurance agent gave us an application for Philadelphia Insurance Company.
Q. And did you get that in place prior to the expiration of the New York Marine policy? I think we've -- I don't know if it was attached, but I think it was August 1, 2005 --

176

A. Yes. I remember doing the application before. I think the date was August 1st when it --
Q. All right. And then in fall of 2005, you were served with a copy of the complaint in this case, the complaint filed by the Weylands, correct?
A. Yes.
Q. And then what did you do?
A. I called the broker again, and the broker wasn't sure which company I should bring the claim with. So she told me to call the Philadelphia insurance and she gave me the phone number and I called them and they said, you know, write this up and send it in and then they got back to me saying, you know, you should have put this in the application as a prior contact item and, you know, basically they declined to cover it. So I went back to the insurance broker and said, okay, now we'll file with New York Marine.
So we filed a claim with New York Marine.
Q. And then just to make the story a little shorter, they then called me and introduced us, correct?
A. No.
Q. That's not how -- okay.
A. There's something that happened in between.
Q. All right.

177

A. Philadelphia said you need to respond to this because there's a time frame, and I called several attorneys in Kentucky off a list that Philadelphia Insurance provided me. I -- I may have put a call into you --
Q. Actually, you did, you're right. I'd forgotten about that?
A. The other person -- you got back to me, let's say, on a Monday or Tuesday, but the other person got back to me on a Friday, and I can't remember her name but she did a little work and I believe we paid her for that work. Then New York Marine came into play and had us contact you, because there was an issue which attorney I was going to use. I called the other attorney and explained that the case had been assigned to you, and I thanked them and told them to send a bill.
Q. I do remember that now. And then, ultimately, they decided that they didn't want to continue providing the defense and then Mr. Bland is handling it from there, correct?
A. New York Marine?
Q. Yes.
A. Yes.
MR. GREEN: Thank you.

178

MR. ROYSE: No further questions. Thank you.

(The witness was excused.)

(Whereupon, the deposition concluded at 2:06 p.m.)

(Exhibits 1 through 43 were marked in today's proceedings.)

179

COMMONWEALTH OF MASSACHUSETTS MIDDLESEX, SS.

I, NICOLE E. GUILBERT, a Certified Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 19th day of June, 2006, at 8:15 a.m., the person hereinbefore named, PETER BIRKHOLZ, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

My Commission Expires: May 7, 2010

Nicole E. Guilbert
CSR/Notary Public

180

ERRATA SHEET DISTRIBUTION INFORMATION
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Ronald L. Green, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to David T. Royse, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

181

PLEASE ATTACH TO THE DEPOSITION OF PETER BIRKHOLZ
CASE: 05-375-JBC
DATE TAKEN: JUNE 19, 2006

ERRATA SHEET

Please refer to Page 180 for Errata Sheet instructions and distribution instructions.

PAGELINE CHANGE REASON

________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of ____________, 2006.

______________________