# In The Matter Of:

*Richard Weyland & Jennifer Weyland v*
*Peter Birkholz and Birkholz & Company*

---

*June 26, 2006*

---

*An/Dor Reporting & Video Technologies, Inc.*
*179 East Maxwell Street*
*Lexington, Kentucky  40508*
*(859) 254-0568     (800) 837-5702*

Original File 5-26-06.txt, Pages 1-187



**Page 1**

[1]               UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OFKENTUCKY
[2]                 LEXINGTON KENTUCKY
[3]   RICHARD WEYLAND and            )
      JENNIFER WEYLAND,              )
[4]                                  )
            PLAINTIFFS    ) DEPOSITION TAKEN ON BEHALF
[5]   vs                  ) OF THE DEFENDANT,
                          ) BY:  NOTICE
[6]   PETER BIRKHOLZ and BIRKHOLZ    )
      & COMPANY,                     )
[7]                                  ) WITNESS:
            DEFENDANTS    ) RICHARD WEYLAND
[8]
[9]
[10]
[11]       The deposition of RICHARD WEYLAND was taken before
[12]  Kimberley Keene, Registered Professional Reporter and Notary
[13]  Public in and for the State of Kentucky at Large, at the
[14]  offices of Stoll, Keenon & Ogden, Suite 2100, 300 West
[15]  Vine Street, Kentucky on Friday, the 26th day of June 2006,
[16]  commencing at the approximate hour of 10:05 a.m.   Said
[17]  deposition was taken pursuant to Notice, heretofore
[18]  filed, to be read and used on behalf of the Defendant at the
[19]  trial in the above-captioned action and for all other purposes
[20]  as permitted by the Federal Rules of Civil Procedure.
[21]
[22]              * * * * * * * * * * *
[23]
[24]
[25]

**Page 3**

AN/DOR COURT REPORTING & VIDEO TECHNOLOGY
[1]              A P P E A R A N C E S
[2]
[3]  FOR THE PLAINTIFF:        STOLL KEENON & OGDEN
                               David Royce, Esquire
[4]                            Suite 2100
                               300 West Vine Street
[5]                    Lexington, Kentucky  40507
[6]
     FOR THE DEFENDANT:        BOEHL, STOPHER & GRAVES
[7]                            Ronald Green, Esquire
                               444 West Second Street
[8]                    Lexington, Kentucky  40507
[9]  ALSO PRESENT:             Jennifer Weyland
[10]
[11]              ***   ***   ***
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 2**

                AN/DOR COURT REPORTING & VIDEO TECHNOLOGY
[1]                 INDEX TO EXAMINATION
[2]
[3]      Examination by Mr. Green.....................    5
         Examination by Mr. Royce.....................  181
[4]
[5]
[6]                 INDEX TO EXHIBITS
[7]
       None.
[8]
[9]         INDEX TO CERTIFIED QUESTIONS AND/OR REQUESTS
[10]
       None
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
24]
[25]

**Page 4**

[1]       **MR. GREEN:**  We've just talked briefly, and -- and
[2]   there are a lot of documents that have been produced by both
[3]   parties in this case.  They're all Bates stamped.  And we may
[4]   talk about some of them today.  And we'll try to refer to them
[5]   as Bates stamp, but we won't be attaching them as exhibits,
[6]   partly to keep from cluttering our record and then, also, to
[7]   keep from cluttering the court's record.
[8]       Should the time come when any of them or all of them
[9]   are important in terms of any motion or whatnot, we both
[10]  understand that we'll be able to attach them in an appendix.
[11]  Having been Bates stamped, of course, that just shows where
[12]  they were produced.
[13]      The documents that I've produced begin with "PB,"
[14]  and the documents that Mr. Weyland has produced begin with
[15]  "W."  And we'll be both make a point of -- as additional
[16]  matters come, we'll Bates stamp them differently.  But that
[17]  just keeps us from having to make huge exhibits in this thing
[18]      **MR. ROYCE:**  Agreed.
[19]      **MR. GREEN:**  You're welcome to swear the witness, if
[20]  you would like, and we'll get it started.
[21]              ***  ***  ***
[22]      RICHARD J. WEYLAND, called on behalf of the
[23]  Defendants, after having been duly sworn, was examined and
[24]  testified as follows:
[25]

---

Page 5

**EXAMINATION**

BY MR. GREEN:

[3] Q. Sir, would you state your full name and your current address for the record, please?

[5] A. My full name is Richard Joseph Weyland. My address is 2366 New Layer Road, Cynthiana, Kentucky.

[7] Q. Okay. Before we go any further, I know you've spoken with your attorney at some length of what to expect here.

[10] Have you ever given a deposition before?

[11] A. Once, yes.

[12] Q. Okay. In what -- what context was that?

[13] A. It was in regard to the sinking of the SuperServant II in the Congo River.

[15] Q. Okay. I don't know.

[16] Was that in the United States court or elsewhere?

[17] A. Yes.

[18] Q. Okay. An Admiralty proceeding of some kind or --

[19] A. Yes.

[20] Q. Okay. Just in case they're different, let me tell you.

[22] We're -- we are in Federal court here, so it's probably the same kind of court, although this is probably not in magnitude in terms of the numbers of depositions and the numbers of questions and so forth.

---

Page 6

[1] Let me just tell you that this is very informal. It is being taken down, of course, as you know, and that creates a couple of things that we need to have an understanding about. And I'll be the first to tell you that I'm the one that's probably going to violate some of these, but I'll try not to.

[7] We need to both talk separately. And I have a tendency to maybe start before you're finished or think you're finished and you're not. You might have -- might or might not have the same tendency. She can only take one of us at a time, so we'll both have to kind of keep each other honest on that.

[13] She'll need an audible answer. A lot of times, you want to shake your head, and I know exactly what you mean. But she doesn't have a head nod button on her thing, so she needs a yes or a no, or something unambiguous. Uh-huh sometimes could be a yes or a no, and they can't tell on paper. So, we just need to watch that.

[19] As far as how I do these, I like to keep them very informal. I would prefer that you're comfortable. I didn't come here to put words in your mouth or to try to trick you in any manner. I'm interested in finding out what you know and what you don't know.

[24] In accordance with that, we are going to be here for a little while. If you need to take a break -- and we'll take

---

Page 7

[1] some breaks in the regular course of things, but if you need a break for whatever reason, just say so. I would only ask that if I have a pending question, that we go ahead and try to answer that before we take a break.

[5] If you need to talk to your attorney -- there may be issues that come up today about attorney-client privilege or other things.

[8] If you're at all concerned about whether you should answer something, I would prefer that you go ahead and talk to your attorney before you answer so we don't have some squabble about it, okay?

[12] A. Uh-huh.

[13] Q. I want to make sure -- and this is always a difficult proposition -- I want to make sure that you understand my questions. In other words, I know what I'm asking, and I want to try to make sure that you know what I'm asking and it's the same thing.

[18] Obviously, if you're convinced that you know what I'm saying and it's different, you don't have any way of knowing that, but I want you to be comfortable that you know what I'm saying.

[22] If you have any doubt or any question, because I do ask bad questions sometimes, we all do, take me to task. You will not hurt my feelings in any way. I will not get mad. I will not make the questions harder or meaner, or anything like

---

Page 8

[1] that. I can take constructive criticism.

[2] So, if there's any ambiguity or if you feel like I've phrased something that you're uncomfortable with, say so. Because at the end of the day, when this is all written down, I'm going to assume that when I asked Question A, you answered Question A and that was your -- your -- you meant for that to be your answer. So -- and so, feel free to stop me about anything like that.

[9] Other than that, I'm just going to ask you some questions, and all you need to do is answer, and you don't need to be nervous or anything like that, okay?

[12] A. Yes, sir.

[13] Q. And if -- if she needs a break, she'll tell us as well.

[15] What I would like to do first is kind of get a little personal history.

[17] Let me start out with: Do you have any relatives in Kentucky?

[19] A. My wife.

[20] Q. Okay. I mean, outside of your immediate family.

[21] A. No, sir.

[22] Q. Okay. Do you know if your wife does?

[23] A. Yeah. I know. She does not.

[24] Q. Okay. The only reason I'm asking is, is none of us want a lot of relatives on the jury, okay? So, if you don't

---

Page 9

[1] have any, then I don't have that problem.
[2]    A.  Yes, sir.
[3]    Q.  I know, from what I've looked at, that you've moved
[4] around some.
[5]        Let me start with:  How old are you today?
[6]    A.  I'm 55.
[7]    Q.  Okay.  Probably off the record, I want to get, like,
[8] Social Security and date of birth and stuff, but I -- you
[9] know, with HIPAA and everything, we'll leave it out of the
[10] record.
[11]    A.  Okay.
[12]    Q.  Where were you born?
[13]    A.  I was born in Medford, Massachusetts.
[14]    Q.  Okay.  Were you educated there?  Graduated high
[15] school there?
[16]    A.  No.  Actually, I graduated in high school in North
[17] Reading, Massachusetts.
[18]    Q.  Okay.  When did you go from Medford to North
[19] Reading?
[20]    A.  Actually -- let's see, my parents moved from
[21] Medford.  The year I was born, they moved to Everett.  And
[22] then we moved to North Reading in the early '60s.
[23]    Q.  Okay.
[24]    A.  I went to high school in Tewksbury.
[25]    Q.  Oh, very nice.  My mother currently lives in

Page 10

[1] Reading, but I've been to North Reading a number of times, but
[2] anyway.
[3]        You graduated from high school, then, in North
[4] Reading, and then did you go to college?
[5]    A.  Yes.
[6]    Q.  Okay.  And where did you attend?
[7]    A.  Massachusetts Maritime Academy.
[8]    Q.  Okay.  So, you knew at a fairly early age you wanted
[9] to go the sea route --
[10]    A.  Yes, sir.
[11]    Q.  -- career wise?  Okay.
[12]        And where -- where is that located?  Where is their
[13] campus?
[14]    A.  Buzzards Bay, Massachusetts.
[15]    Q.  What kind of program is that?  How many years and --
[16]    A.  It's a four-year accredited degree in marine
[17] transportation.
[18]    Q.  Okay.  And I assume you received the degree?
[19]    A.  Yes, sir.
[20]    Q.  Did you then go to work, or did you continue your
[21] education?
[22]    A.  No.  I went to work, sir.
[23]    Q.  Okay.  Where did you begin working?
[24]    A.  I worked for Empressa Hundrurian De Vaporas.
[25]    Q.  I, of course, understand exactly what you said, but

Page 11

[1] the court reporter might want you to kind of spell that.
[2]    A.  It means Hundrurian Steam Ship Company.
[3]    Q.  And with a four-year degree, what type of position
[4] do you start in, in the industry?
[5]    A.  Third mate.
[6]    Q.  Okay.  And on what kind of ship?
[7]    A.  It was approximately a 500 foot steam powered reefer
[8] ship.
[9]    Q.  I'm going to come back and ask you about ships and
[10] such because -- and I'll tell you right up front, I don't know
[11] much other than what I've seen on T.V. in war movies and such,
[12] so -- but I would like to go ahead and kind of get your
[13] employment history first.
[14]        About when did -- when was it you graduated from the
[15] maritime academy?
[16]    A.  1971.
[17]    Q.  Okay.  And did you then immediately go to work, or
[18] did -- was there anything intervening there?
[19]    A.  Immediately went to work, sir.
[20]    Q.  Okay.  So, you started there in '71, then?
[21]    A.  Yes, sir.
[22]    Q.  And how long did you work for the Hundrurian
[23] company?
[24]    A.  One year, sir.
[25]    Q.  Okay.  And then where did you go?

Page 12

[1]    A.  I went to a small container company, Maritime
[2] Coastal Containers.
[3]    Q.  What was your position there?
[4]    A.  Third mate, sir.
[5]    MR. GREEN:  Okay.  And off the record.
[6]    (There was a brief recess.)
[7] BY MR. GREEN:
[8]    Q.  Okay.  How long did you work for Maritime Coastal?
[9]    A.  Four months.
[10]    Q.  Okay.  And did you leave there to take a better job
[11] or --
[12]    A.  No., Ron.  They sold the vessel, and --
[13]    Q.  Okay.
[14]    A.  -- the people that were working on board were laid
[15] off.
[16]    Q.  Okay.  And then where did you go?
[17]    A.  I went to a company called Sea Horse, Inc.
[18]    Q.  Okay.  Third mate?
[19]    A.  Actually, there I was just a mate.  I was -- it's a
[20] different class of vessel.
[21]    Q.  Okay.  What -- what kind?
[22]    A.  It was a supply vessel working in the oil and
[23] mineral industry.
[24]    Q.  Is that the first job that you had on a vessel that
[25] was connected with energy?

Page 13

[1]   A.  Yes, sir.
[2]   Q.  Okay.  And how long did you work for Sea Horse?
[3]   A.  Approximately one year.
[4]   Q.  Okay.  Then who was your next employer?
[5]   A.  Zapata Marine Service.
[6]   Q.  Okay.  Now, if I'm figuring this right, Zapata,
[7] then, would have begun in 1973?
[8]   A.  Actually, it was --
[9]   Q.  Or you think it was '74?
[10]   A.  It was -- it was '75, I think.
[11]   Q.  '75.  Okay.
[12]   A.  I'm not sure.
[13]   Q.  So, the Hondrurian was one year plus -- well,
[14] Hondrurian and Sea Horse were probably one year plus, or were
[15] they an even year?
[16]   A.  Yeah.  Well, there was -- there was a time period of
[17] unemployment between each.
[18]   Q.  Okay.  When was that?  In between which of these?
[19]   A.  How long?
[20]   Q.  First, in between which employments.
[21]   A.  It was probably about -- I'm not sure at this point.
[22] I think three to four months of unemployment between each.
[23]   Q.  Okay.  Was that after Maritime --
[24]   A.  Yes.
[25]   Q.  -- you were laid off?

Page 14

[1]   A.  Yes.  Both.
[2]   Q.  Okay.
[3]   A.  It was a long time ago.  I can't give you the exact
[4] times.
[5]   Q.  Yeah.  And -- and I'm not -- I don't mean to suggest
[6] that I'm going to add these up and if -- and call you a liar
[7] if they don't add up.  I'm just trying to get the best I can.
[8]   A.  Uh-huh.
[9]   Q.  And so, I was trying to estimate.
[10]   A.  Uh-huh.
[11]   Q.  Okay.  And then you began with Zapata Marine.
[12]      Why did you leave Sea Horse?
[13]   A.  They wanted me to do some things that were
[14] unethical, so I just walked.
[15]   Q.  Can you give me a rough idea of what kinds of things
[16] those were?
[17]   A.  They wanted me to sign on the vessel as master and
[18] let somebody else run it, because the person that was going to
[19] run it did not have a license to do that.  I had the license.
[20] They wanted their other man to run the boat.
[21]   Q.  Okay.
[22]   A.  In other words, I would be taking the
[23] responsibility, and he would be getting --
[24]   Q.  And for all you know, having the drink?
[25]   A.  Well --

Page 15

[1]   Q.  Yeah.  I know --
[2]   A.  They said they would give me five dollars a day
[3] more.
[4]   Q.  Okay.  And at that time, you were a mate on that
[5] ship, but they wanted you to --
[6]   A.  Yes, Ron.
[7]   Q.  -- to be the master?  Okay.
[8]   A.  Yeah.
[9]   Q.  And for the jury -- I think I've picked up a little
[10] bit from this stuff that I've read, but tell the jury what a
[11] master is?
[12]   A.  A master is the man that runs the vessel.  He's the
[13] manager of the vessel.
[14]   Q.  Okay.  That your average layperson would think of
[15] the captain.
[16]      Would that be the -- the equivalent?
[17]   A.  Yes, Ron.
[18]   Q.  From a cruise ship or something?
[19]   A.  Yeah.
[20]   Q.  And then you've got different degrees of mates?
[21]   A.  Normally, on most ships, large ships, yes.  The
[22] smaller vessels, like supply vessels, generally you have a
[23] very much reduced crew manning level, so you're going to have
[24] fewer people to do the same number of jobs.
[25]      On supply vessels, we work a 12-hour day.  Usually,

Page 16

[1] the master and one mate run the -- run the vessel.
[2]   Q.  Okay.  I would like to get as much as you remember,
[3] and I realize 1975 is a long time ago.
[4]      Precisely -- okay.  You were working for Sea Horse.
[5]      Did you quit before you had anything lined up with
[6] Zapata, or did you look for employment and find Zapata while
[7] you were still employed?
[8]   A.  I left -- I left Sea Horse before I even started
[9] looking for employment.
[10]   Q.  Okay.  Because you had a problem?  You just didn't
[11] want to work with them anymore, for the ethical reason?
[12]   A.  That's correct.
[13]   Q.  Okay.
[14]   A.  It was unethical what they asked me to do, and I --
[15] I was happy there up until that point, and I just left.
[16]   Q.  I understand.
[17]   A.  Because I wouldn't do that.
[18]   Q.  I understand.
[19]   A.  -- and so, there was some -- it may have been
[20] brief, but some period of unemployment between Sea Horse and
[21] Zapata, then, as well?
[22]   A.  Yes, sir.
[23]   Q.  Okay.  Now, how did you -- how did you come in
[24] contact with Zapata?  How did you learn that there was an
[25] opening, or how did you -- who did you first talk to?

---

**Page 17**

[1] Give me an idea, just in your own words, of how that
[2] came about.

[3]    A. Actually, I don't remember.

[4]    Q. Okay. Well, that's a perfectly good answer.

[5] Can you remember generally if you responded to an
[6] ad, or was it word of mouth that you learned that -- or did
[7] you just send out resumes to everybody, or --

[8]    MR. ROYCE: If you recall.

[9] BY MR. GREEN:

[10]    Q. If you recall.

[11]    A. I don't recall, but the process is normally, you
[12] talk to people, you send out resumes, and you look in the
[13] professional publications. You do all of it.

[14]    Q. Okay. Now, at that time, what was Zapata Marine's
[15] primary -- what did they do? What -- are they specialists, or
[16] are they -- in one type of marine work, or do they do a lot of
[17] different things?

[18]    A. Zapata Marine, the division that I went to work for,
[19] was in the oil and mineral service industry.

[20]    Q. Okay. And did -- did that division have a name?

[21]    A. Zapata Marine Service.

[22]    Q. Okay. And what was the name of the umbrella, the
[23] company?

[24]    A. Zapata Corporation.

[25]    Q. Just Zapata Corp.? Okay.

---

**Page 18**

[1] Because I don't know how it was in '75, but there's
[2] a number of Zapatas, so I'm just trying to figure out which
[3] ones.

[4] Okay. Zapata Marine Service.

[5] Now, when -- however you came in contact with them,
[6] before you were hired, did you interview with somebody?

[7]    A. Oh, boy. The process there was, I got the job and I
[8] had to go down for a physical, I believe. So, I went to the
[9] Houston office, and I was employed right away and sent to a
[10] vessel at the -- at that visit, at the time of that visit.

[11]    Q. Okay. Presumably, you passed your physical?

[12]    A. Yes, sir. That I did.

[13]    Q. Okay. Now, prior to that, had you spoken in person
[14] with anybody from Zapata?

[15]    A. On the telephone?

[16]    Q. I mean -- no. Face to face.

[17]    A. No, sir.

[18]    Q. Okay. Everything was by telephone or mail?

[19]    A. Yes, sir.

[20]    Q. We're not talking e-mail back then, I don't guess.

[21]    A. No, sir.

[22]    Q. Were the people that you talked to, in terms of if
[23] you -- on the telephone about the job prospects, I assume they
[24] asked you questions, was that person also in the Houston
[25] office?

---

**Page 19**

[1]    A. Yes, Ron. That's correct.

[2]    Q. And was Houston their primary headquarters,
[3] Zapata's primary headquarters, at that time?

[4]    A. Yes, Ron.

[5]    Q. Okay. They sent you to a vessel.

[6] Do you recall which vessel was your first with
[7] Zapata?

[8]    A. No. I do not recall.

[9]    Q. Okay. Do you recall what kind of vessel?

[10]    A. Yes.

[11]    Q. What kind was it?

[12]    A. It was an oil and mineral supply vessel, sometimes
[13] called an anchor handling tug supply vessel.

[14]    Q. Okay. Now, the work that this vessel does, is that
[15] related to drilling rigs, or is it -- what does it -- what
[16] does it service in the oil and energy field, oil and mineral
[17] field?

[18]    A. Supply vessels provide all marine support for
[19] offshore oil operations.

[20]    Q. Okay.

[21]    A. Anything that needs to be transported can be
[22] transported by a supply vessel. Plus, we do towing, anchor
[23] handling, and survey operations.

[24]    Q. Okay. I've seen the phrase "anchor handling"
[25] perhaps in some memos that you wrote at one time.

---

**Page 20**

[1] What is anchor handling?

[2]    A. Anchor handling is -- is placing the mooring gear on
[3] the ocean floor for moored offshore oil exploration rigs.

[4]    Q. Okay. On your first vessel, what was your position?

[5]    A. Mate.

[6]    Q. Okay. Did you enter into any kind of written
[7] contract at that visit with Zapata in the 1975 time frame?

[8]    A. I don't remember.

[9]    Q. If you did, you don't have a copy today going
[10] that far back, I take it?

[11]    A. No. No, I don't.

[12]    Q. Okay. And just -- just so we're clear, your
[13] attorney is exactly right. If you don't remember, that's a
[14] perfectly valid question (sic). It's -- don't think that I
[15] imply anything from it other than you don't recall, especially
[16] when we're talking 20, 30 years ago.

[17] In your meeting at the Houston office, where you
[18] were, I guess, actually hired and passed the physical,
[19] et cetera, did you fill out paperwork?

[20] Let me be more specific: Did you fill out paperwork
[21] relating to -- I can't think of the form now -- like W-4,
[22] things like that?

[23] What was your understanding with Zapata about your
[24] status relative to this?

[25]    A. I was an American employee for an American company,

---

Richard Weyland/Sheriff, Wayland    June 26, 2006
Peter Birkholz and Birkholz & Company

---

Page 21

[1] if that is what you're asking.

[2]     A. Well, that's --

[3]     A. I'm not really sure if that's what you're asking.

[4]     Q. Okay. I -- the word "employee" --

[5]     A. If you could rephrase the question.

[6]     Q. The word "employee" is -- I wasn't really getting

[7] into whether it was American or not at this point, but -- so,

[8] you were an actual employee. They -- it was an employment

[9] contract rather than as -- you were acting as a contractor at

[10] that time.

[11]     Is that your understanding?

[12]     A. Yes.

[13]     Q. Okay.

[14]     MR. ROYCE: Ron, let me interpose a clarification

[15] more than an objection. You're asking him what are

[16] technically legal questions, but I think you're asking him

[17] just as to his understanding.

[18]     MR. GREEN: Exactly.

[19]     MR. ROYCE: So long as that applies to all of these

[20] questions, I won't interpose that clarification.

[21]     MR. GREEN: That applies to all of them, and I

[22] surely wouldn't ask for a legal conclusion. And if factually

[23] it's not supported, then it's factually not supported. I just

[24] want to know what his understanding was.

[25]     MR. ROYCE: I understand.

---

Page 22

[1] BY MR. GREEN:

[2]     Q. Did you sign up -- did they have benefits for you at

[3] that time that they offered you?

[4]     A. Yes, Ron. They did.

[5]     Q. Okay. What kind of benefits?

[6]     A. Medical insurance.

[7]     Q. Okay.

[8]     A. And a stock program.

[9]     Q. Okay. Was Zapata a publicly traded company at that

[10] time? Do you know?

[11]     A. Yes. It was.

[12]     Q. So, the stock program, was that a -- was that an

[13] employee purchase-type thing, or was that your retirement

[14] plan?

[15]     A. I believe it was a retirement program.

[16]     Q. Okay. What would -- did -- I assume they made some

[17] contributions on your behalf to that, but did you also

[18] contribute? Was it set up like that?

[19]     A. So long ago, I don't remember.

[20]     Q. Okay. Do you recall the name of your first vessel

[21] with Zapata?

[22]     A. I can tell you what class it was.

[23]     Q. Okay. Good enough.

[24]     A. It was the Constitution Service class. It was

[25] either the Constitution Service, the Independence Service, the

---

Page 23

[1] Pioneer Service, or the Liberty Service, one of those four.

[2]     Q. Okay. You were a little faster than I can write.

[3]     You got Constitution?

[4]     A. Constitution, Independence, Pioneer, Liberty, all

[5] suffixed with "service."

[6]     Q. Okay. Almost sounds like a fund-raising program.

[7]     Okay. What I would like to do, because I have no

[8] idea what this means, and whoever reads this may not, is: Can

[9] you start with Constitution, and work your way towards

[10] Liberty, and just give us a rough idea of what basically that

[11] means, what it tells you about a particular ship, and how

[12] they're different?

[13]     A. Doesn't tell you anything about the ship.

[14]     Q. Okay.

[15]     A. It's just a name.

[16]     Q. Okay.

[17]     A. It's a label.

[18]     Q. Okay. What -- is this a -- is this an industry

[19] label, or is this a Zapata label?

[20]     A. It's -- all ships are named. It's part of the

[21] registering process. You just can't have that hull out

[22] there.

[23]     Q. Okay. Well, maybe I'm misunderstanding what -- I

[24] was understanding this was a class of ships, or are you saying

[25] these were ships?

---

Page 24

[1]     A. These are all ships.

[2]     Q. Oh, okay.

[3]     A. And they're all of the same class. They were all

[4] built from the same series.

[5]     Q. I see.

[6]     A. Like you would have a Toyota Corolla, they're all

[7] the same.

[8]     Q. I'm with you. Okay. I misunderstood. I

[9] misunderstood.

[10]     So, these are four ships that -- did you work on all

[11] of them at any given -- at some particular time, or you said

[12] you started out with the Constitution Service?

[13]     A. I didn't say I started out with the Constitution

[14] Service. I said I started out on that class. That's the

[15] first one of the class, Constitution, and then the

[16] Independence was built.

[17]     Q. Okay. The class being made up of Constitution,

[18] Independence, Pioneer, and Liberty?

[19]     A. Yeah. But there were more. There were eight

[20] vessels of that class.

[21]     Q. Okay. All right. What was the name of the vessel

[22] that you started on?

[23]     A. I'm not sure.

[24]     Q. Okay.

[25]     A. I don't remember which one it was.

---

Page 25

[1]  Q. And your first position was mate?

[2]  A. Yes.

[3]  Q. Okay. How long -- when did you cease becoming an

[4]  employee of Zapata?

[5]  A. It was when the merger, buyout, whatever it was,

[6]  between Tidewater and Zapata took place.

[7]  Q. Okay. Are there still companies that derive from

[8]  the original Zapata that exist at this time? Do you know?

[9]       That's a bad question.

[10]  A. I'm not sure. But several years ago, there was a

[11]  Zapata Corporation. I believe all they had was some offshore

[12]  gas business.

[13]  Q. But they're not related to Tidewater?

[14]  A. No.

[15]  Q. Okay. Are there any Tidewater subsidiaries that are

[16]  still called Zapata?

[17]  A. At the present time, I don't know of any.

[18]  Q. Okay. And at the time that this merger occurred,

[19]  you were still an employee of Zapata Marine Service? I mean,

[20]  immediately proceeding the merger.

[21]  A. Well, they had changed the name by that time. It

[22]  was Zapata Gulf Marine at that time.

[23]  Q. Okay. Do you recall when that happened, just

[24]  roughly?

[25]  A. Not really.

Page 26

[1]  Q. Do you remember what -- which decade? '80s? '90s?

[2]  A. It was either late -- the late -- late '70s or the

[3]  early '80s.

[4]  Q. Okay. And we may come up with some documents that

[5]  will help you, but as we sit here today, on the merger between

[6]  Zapata and Tidewater, was that in the '90s?

[7]  A. I believe it was in the mid '80s.

[8]  Q. Mid '80s?

[9]       At the time that -- well, let's see.

[10]       So -- well, what was your position with Zapata at

[11]  the time that the change occurred between -- with the merger?

[12]  A. I was a captain.

[13]  Q. Okay. Now, in that context, is a captain different

[14]  than a master, or is it another word for the same thing?

[15]  A. Actually, a captain is a man that commands a vessel.

[16]  A master is a -- is a rating that -- that you -- of license,

[17]  okay?

[18]  Q. Okay.

[19]  A. I hold a license as master mariner. When I'm signed

[20]  on a vessel, I'm -- I'm a captain. But when I'm not signed on

[21]  a vessel, I'm only a master mariner.

[22]  Q. Let's talk about that for a minute.

[23]       Who would -- particularly with respect to the master

[24]  certification, who makes that certification?

[25]  A. United States Coast Guard licensing.

Page 27

[1]  Q. Okay. Are there other -- in the licensing process,

[2]  are there other categories below master?

[3]  A. Yes, Ron. There are.

[4]  Q. Could you give me an idea of -- where would your

[5]  first certification have been?

[6]       What would you have been certification wise?

[7]  A. My first certification, coming out of the

[8]  Massachusetts Maritime Academy, was third mate, steam and

[9]  motor vessels, any gross tonnage, upon oceans.

[10]  Q. So, the third mate, second mate thing is also part

[11]  of the certification process?

[12]  A. Yes, Ron.

[13]  Q. Okay. And then it's qualified by certain types of

[14]  vessels, and I assume that as they get bigger, then you move

[15]  up to the next category of certification?

[16]  A. It's sort of like airplanes. You can get different

[17]  classes of licenses and different types of vessels.

[18]  Q. Okay.

[19]  A. So, I move straight -- directly from mate's license,

[20]  third mate's license, to a master 500 ton oceans license.

[21]  Q. And when do you think your certification as master

[22]  was?

[23]       When did you first become certified?

[24]  A. That would have been -- I believe I just finished

[25]  with Sea Horse when I took my master's examination. And that

Page 28

[1]  was the reason why I left, because I had gotten the

[2]  examination done, went back to work. They said, "You work as

[3]  mate. We'll put another man on as master."

[4]  Q. And use your -- yeah.

[5]  A. So, I said, "No."

[6]  Q. So, that was '74, '75?

[7]  A. Something like that.

[8]  Q. Yeah. Okay.

[9]  A. I'm not sure.

[10]  Q. Very early in your career, then?

[11]  A. Yeah.

[12]  Q. Now, the third mate certification, is there a test

[13]  involved with that, or is that pretty much automatic after

[14]  graduating from a maritime academy with --

[15]  A. There is -- there is an extensive test that's

[16]  involved in all licensing.

[17]  Q. Okay. So, it's like your version of the bar

[18]  examination.

[19]       You -- going through school isn't enough; you've got

[20]  to pass the test?

[21]  A. Yes, Ron. That's correct.

[22]  Q. Okay. And can you give me some idea of the process

[23]  for the master? Is it a one-day thing? Is it oral? Written?

[24]  Both?

[25]  Q. Tell me -- tell me what you had to go through to get

---

**Page 29**

[1] that.

[2] A. It took me -- let me think. I think it was the

[3] better part of two weeks testing to get that exam.

[4] Q. Eight hours a day or --

[5] A. Oh, no. No.

[6] Q. Okay.

[7] A. Sometimes they would only allow me in for four to

[8] the exam center. But every day, I would -- go down and

[9] take a test.

[10] Q. Now, is it -- I assume it's not typical for somebody

[11] to go from third mate to master, particularly four or five

[12] years out of school?

[13] A. Yes, it is.

[14] Q. Is it?

[15] A. If it's -- if you did it my route, yes.

[16] Q. Okay.

[17] A. Because I went with limited tonnage. I was a

[18] 500 ton master.

[19] Q. Okay.

[20] A. Later I upgraded to 1,500 tons, and then now I hold

[21] a 3,000 ton master's license.

[22] Q. Okay. When did you do the 1,500? Do you recall?

[23] A. I don't recall.

[24] Q. Okay. Can you give me a rough idea?

[25] A. Sorry. No.

---

**Page 30**

[1] Q. Okay. How about the 3,000? Do you recall when that

[2] was?

[3] A. I don't recall that, either.

[4] Q. Do you recall if that was before or after the merger

[5] with Tidewater?

[6] A. I don't recall when it was. It was not a -- as

[7] intense an exam as the other one.

[8] Q. Okay. It's -- it's occurred to me that when you

[9] said 500 ton, and I thought huge, and that was fairly small

[10] for what you ultimately ended up doing; is that true?

[11] A. Well, presently, I'm working on a -- on a nearly

[12] 3,000 ton ship.

[13] Q. Okay.

[14]        MR. ROYCE: It's all relative.

[15]        MR. GREEN: Yeah. I mean, that's why I jumped to

[16] the conclusion, boy, that seems awful quick, but, yeah. Yeah.

[17] Okay.

[18]        THE WITNESS: Well, it depends upon which, you know,

[19] course you go. If you're like a pilot, and you start out in

[20] big airplanes, okay? You're going to be copilot for a long

[21] time, okay? But if you go from copilot of a really large

[22] airplane and you jump into a small two-engine plane, you might

[23] be able to qualify as a pilot rather quickly --

[24] BY MR. GREEN:

[25] Q. Okay.

---

**Page 31**

[1] A. -- would be the analogy that I would give you to

[2] explain how I went from third mate all the way to master in

[3] one quick jump.

[4] Q. Okay. Actually, I just thought it was probably

[5] because you were start. I didn't know.

[6]        MS. WEYLAND: He's being -- what's the word?

[7]        MR. GREEN: Modest?

[8]        MS. WEYLAND: Modest, yeah.

[9] BY MR. GREEN:

[10] Q. Okay. What's the -- do you have the highest master

[11] certification that you can get, or is there more to achieve?

[12] A. There's more.

[13] Q. Okay.

[14] A. But I'm limited by a ceiling because I am only

[15] working on vessels up to 3,000 tons. I cannot qualify for

[16] vessels over 3,000 tons.

[17] Q. You would have to go work on one of those vessels in

[18] another capacity?

[19] A. Yes.

[20] Q. Okay. If we -- let's limit ourselves to the kind of

[21] work that you do, which, as I understand it, since you went to

[22] Zapata, has all been related to the oil, energy, mineral type

[23] of area; is that true?

[24] A. Since Sea Horse.

[25] Q. Right.

---

**Page 32**

[1] A. Sea Horse was in the same industry.

[2] Q. Okay. In that subsection of the entire maritime

[3] industry, is -- is there really a need for a certification

[4] over 3,000 tons?

[5]        Does that industry use ships bigger than that?

[6] A. At the present time, yes, it does.

[7] Q. Okay.

[8] A. But I'm not working on one of them.

[9] Q. Okay. With the certification you've got, for some

[10] reason, I was under the impression that there weren't a lot of

[11] you, people with your certification.

[12]        Is that a mistaken impression?

[13] A. You're correct. There aren't a lot of people that

[14] do what I do.

[15] Q. Okay.

[16] A. It's -- it's very specialized.

[17] Q. Okay. And is that specialized because of the master

[18] 3,000 status, or specialized because of the work in the oil

[19] and mineral industry?

[20] A. It's the uniqueness of the work in the oil and

[21] mineral industry.

[22] Q. Okay. Skipping way ahead to today, could you give

[23] me a thumbnail sketch of what your current occupation

[24] involves? And I would like to look at it from a couple of

[25] different angles.

---

Richard Weyland-Jennifer Weyland                                            
Peter Birkholz and Birkholz & Company                                        June 26, 2006

---

**Page 33**

[1]           One is, is where you do your work.  Two is, what
[2] kind of work you do and what kind of work your ship does.
[3]           Is that too much?
[4]    **A.**  That's covering a lot --
[5]    **Q.**  Yeah.
[6]    **A.**  -- of ground.
[7]    **Q.**  I just want a real thumbnail sketch, but I would
[8] like just a little feel for it.
[9]    **A.**  Okay.
[10]    **Q.**  If you had to get up in front of your son's class
[11] and explain why you're man of the week, what would you tell
[12] them?
[13]    **A.**  Okay.  Well, let's start with the vessel that I work
[14] on.
[15]    **Q.**  Okay.
[16]    **A.**  Okay.  Presently, I work on a 60 meter by 17 meter
[17] 4,000 horsepower vessel that specializes in offshore marine
[18] support.
[19]           Am I going too fast for you?
[20]    **Q.**  No.  Go ahead.
[21]    **A.**  Okay.  We have on deck a 105 ton crane for platform
[22] construction work.  We support two ROVs, "ROV" meaning remote
[23] operated vehicle, which is a miniature submarine which runs on
[24] a cable.
[25]           We provide hotel services for the oil field support

---

**Page 34**

[1] personnel.  Our vessel has 100 births on board.  We can supply
[2] power, welding services, fabrication plant services,
[3] underwater construction support, and we even have a hospital
[4] on board.
[5]           And we're occasionally used as a heavy lift ship,
[6] for transporting special cargo, extra heavy lifts, from ports
[7] in Angola to the oil rigs and platforms.
[8]    **Q.**  Is Angola where, currently, your primary focus is?
[9]    **A.**  Yes, Ron.
[10]    **Q.**  How long has that been the case?
[11]    **A.**  Approximately eight years now.
[12]    **Q.**  Okay.  So, one of the functions that -- I assume a
[13] lot of these offshore rigs have, in addition to foreign
[14] employees, they have Americans working as well?
[15]    **A.**  Every rig is different.
[16]    **Q.**  Okay.
[17]    **A.**  You're talking about international conglomerates,
[18] okay?  Most of the time, you -- you go to a job and you can be
[19] working with any nationality on the globe.  There is no
[20] telling who you're going to meet when you go to one of these
[21] rigs.
[22]    **Q.**  Okay.
[23]    **A.**  Or who is going to join your vessel.
[24]    **Q.**  And one of your ship's functions is to provide
[25] R&R-type things to the people working on the offshore -- no?

---

**Page 35**

[1]    **A.**  No, sir.  We do not do rest and recreation.
[2]    **Q.**  Okay.
[3]    **A.**  We're there for work, work, work.
[4]    **Q.**  Okay.  Well, you mentioned hotel services.
[5]           What are those for?
[6]    **A.**  If you have a construction crew on a platform, we
[7] provide the extra bunking so that the people can have a place
[8] to sleep at night --
[9]    **Q.**  Okay.
[10]    **A.**  -- a place to eat their food, a place to be when
[11] they're not working.
[12]    **Q.**  So, that's strictly accommodations, then?
[13]    **A.**  Sometimes, yeah.
[14]    **Q.**  Okay.  Then do they, from time to time, go to port?
[15] I mean, do you -- do you ferry them to port for
[16] their -- where do they get their R&R?  I assume they've got to
[17] do something for fun every now and then.
[18]    **A.**  No.
[19]    **Q.**  None?
[20]    **A.**  None.
[21]    **Q.**  Okay.
[22]    **A.**  No.  There's no R&R in the oil industry.
[23]    **Q.**  Okay.  Well --
[24]    **A.**  You're either at work or you go home.
[25]    **Q.**  Well, let me tell you where my mind is coming from,

---

**Page 36**

[1] and then what I want to know is if there's something analogous
[2] in this context.
[3]           When I was a kid, it was in the Air Force, and I --
[4] I remember us living in Taiwan.  And there would be
[5] organizations, facilities, et cetera, where Americans would
[6] get together, and they would socialize, or whatever.
[7]           In your industry, whether in port or on your ship,
[8] do you have anything to do with any of that?  Do you know
[9] where -- where, if at all, expats would go?
[10]    **A.**  Malongo is a work camp.
[11]    **Q.**  Okay.
[12]    **A.**  It's -- people go there to work.
[13]    **Q.**  Okay.
[14]    **A.**  They work.  They sleep.  When they're finished
[15] working and sleeping, they go home.
[16]    **Q.**  Okay.
[17]    **A.**  There's -- there's nothing to do there.
[18]    **Q.**  There is nothing?
[19]    **A.**  Yeah.  It's a work camp.
[20]    **Q.**  Okay.  And that's true on your ship as well?
[21]    **A.**  Chevron does not provide -- no.  There is -- there
[22] is a recreation room on the ship.
[23]    **Q.**  Okay.
[24]    **A.**  Which means that you can go in and watch T.V. or you
[25] can go lift weights.  That's all we have.

---

Richard Weyland & Jennifer Weyland v.
Peter Birkholz and Birkholz & Company

June 26, 2006

---

**Page 37**

[1] Q. Okay. So, it's worse than the Air Force.

[2] MR. ROYCE: Sounds like it's just a ton of fun.

[3] BY MR. GREEN:

[4] Q. Okay. Have you been -- since the merger that we
[5] talked about, Zapata and Tidewater, have you been in -- did
[6] your employment just change over to Tidewater? All of a
[7] sudden, Tidewater was the one that was responsible for paying
[8] you, that sort of thing?

[9] A. Yes, Ron.

[10] Q. Okay. Tidewater has subsidiaries.

[11] Do you recall specifically who you were employed

[12] by?

[13] A. The exact whom I was employed by, I am not quite
[14] sure.

[15] Q. Okay. Do you know -- I assume that you have, with
[16] Tidewater, somewhere, a personnel file. I don't know if you
[17] know whether you do or not. I assume you know.

[18] A. Yes, sir.

[19] Q. Do you know where that would be located?

[20] A. I am not sure.

[21] Q. Okay. If you had a question about your employment
[22] status, say your check was the wrong amount, who would you
[23] call?

[24] A. I would call the Malongo office of Tidewater. It's
[25] called Sonatide.

---

**Page 38**

[1] Q. Okay. And do you know how they would find out?
[2] What's at the Malongo office?

[3] A. It's the operations manager that I work for. Port
[4] captains, port engineers, a few administrative personnel.

[5] Q. Okay. What's the operations manager that you
[6] currently work for? What's his name?

[7] A. Shawn Nicholson.

[8] Q. Do you know where he's from?

[9] A. I believe he's presently living in Thailand.

[10] Q. Okay. But do you know where he's from?

[11] A. From? Someplace in the south. I'm not really
[12] sure.

[13] Q. Okay.

[14] A. Of the United States, by the way.

[15] Q. We people that don't get out of the country much
[16] assume that.

[17] A. Well --

[18] Q. It's a bad assumption.

[19] Okay. Do you know who he would check with if there
[20] were a problem with your check?

[21] A. No, sir.

[22] Q. Okay. Do you know where your checks are issued?

[23] A. I'm not really sure.

[24] Q. Okay. Since the merger of Tidewater, have they come
[25] from the same place, or has that changed through time?

---

**Page 39**

[1] A. I'm not really sure.

[2] Q. Okay. Do you -- you spent a lot of time -- we
[3] haven't got into that.

[4] On average, how much time do you spend out of the
[5] country?

[6] A. Three to four months at a stretch, and then usually
[7] home a month to month and a half.

[8] Q. Okay. And does Tidewater pay your expenses to go to
[9] the site, or do you pay to go?

[10] A. Tidewater pays, Ron.

[11] Q. Okay. Did Tidewater ever issue you either -- well,
[12] 1099s?

[13] A. 1099?

[14] Q. Which is a form for an independent contractor saying
[15] we paid you "X" number of dollars.

[16] A. I don't believe, but I'm not sure.

[17] Q. Okay. Are you paid monthly, or biweekly, or --

[18] A. No. I'm paid twice a month. Bimonthly.

[19] Q. Okay. If you're on the ship, off of Angola, let's
[20] say, where does your check go? Does it go to you, or does it
[21] go to your home?

[22] A. It goes to my home here in Kentucky.

[23] Q. Okay. And I assume you have arrangements made with
[24] the bank, power of attorney, or whatever, to where your wife
[25] can then cash that or deposit it, or whatever?

---

**Page 40**

[1] A. Yes, sir.

[2] Q. Okay. So, is it -- so, generally, or at least
[3] often, you don't actually see the physical check that you get.
[4] You just know that they paid you.

[5] Is that true?

[6] A. That is true. My --

[7] Q. Okay.

[8] A. My wife handles the checks.

[9] Q. Let me kind of break off and go back to -- to an
[10] issue that I want to try to work out in terms of where your
[11] residence has been through time.

[12] We've established that you lived in Massachusetts
[13] through high school, you lived in Massachusetts through the
[14] maritime academy.

[15] Let me ask you: When did you get married?

[16] A. 1980.

[17] Q. Okay. Prior to that, was your residence anywhere
[18] than in Massachusetts?

[19] A. No.

[20] Q. Okay. When you -- and I take it you've been married
[21] once?

[22] A. That's correct.

[23] Q. Do you have children?

[24] A. No.

[25] Q. Okay. After you got married, where was your initial

---

Page 41

[1] residence? And by "residence," I just mean your regular
[2] dwelling. I don't want to get anything legal about it.
[3]    A. Ashland, Massachusetts.
[4]    Q. That doesn't ring a bell.
[5]        Is that in western Massachusetts, or is that --
[6]    A. Let's see, where is Ashland? It's -- you know where
[7] Framingham is?
[8]    Q. Yeah. Okay.
[9]    A. Okay. It's one town over from Framingham.
[10]   Q. Okay. And how long did you live there?
[11]   A. I'm not really sure.
[12]   Q. Okay. Is it while you lived there that you came in
[13] contact with Mr. Birkholz?
[14]   A. My wife made the initial contact with
[15] Mr. Birkholz.
[16]   Q. Okay. But was that while you lived there in
[17] Ashland?
[18]   A. Yes, it was.
[19]   Q. Because I'll have to tell you, it's not common to
[20] find folks in Kentucky with an accountant in Framingham,
[21] Massachusetts. So, I'm interested in how you came to -- I'm
[22] not saying it's wrong. I'm just saying it's unusual.
[23]   A. Okay.
[24]   Q. Okay. And you don't recall when you -- when you
[25] moved from Ashland or how long you were there, but where did

Page 42

[1] you go next in terms of your residence?
[2]   A. We went to New Jersey.
[3]   Q. Okay. Do you recall about when that was?
[4]   A. No. Not really.
[5]   Q. Okay. Was that in the '80s?
[6]       We can probably -- the tax returns may help you with
[7] that when we get to them.
[8]   A. I couldn't give you a date.
[9]   Q. Okay. And how long did you live in New Jersey?
[10]  A. Roughly, a decade.
[11]  Q. Okay. Did you live in the same place in
[12] New Jersey?
[13]  A. Yes, Ron.
[14]  Q. And during that period of time, you maintained your
[15] relationship with Mr. Birkholz?
[16]  A. Yes, Ron.
[17]  Q. Okay. And then did you move from New Jersey to
[18] Kentucky?
[19]  A. Yes, Ron.
[20]  Q. Okay. What prompted you to move to Kentucky?
[21]  A. The area was very nice. We loved the area. And my
[22] wife wanted to get involved in the equestrian art business.
[23] This is a very good location for that.
[24]  Q. That's true. She's probably looking forward to
[25] this -- I forget now what it's called that's coming up and

Page 43

[1] Lexington landed. The --
[2]       MS. WEYLAND: World games.
[3]       MR. GREEN: World games?
[4] BY MR. GREEN:
[5]   Q. Have you vacationed here before that or --
[6]   A. No, sir.
[7]   Q. Did you know people from here? How did --
[8]   A. No, sir.
[9]   Q. I mean, how did it get on your radar screen, I
[10] guess?
[11]  A. My wife was the first to suggest it. She brought me
[12] down here. We looked at a property. We purchased it.
[13]  Q. Okay. Do you recall when that was?
[14]  A. Roughly, mid '90s.
[15]  Q. And your residence has been the same since you moved
[16] to Kentucky?
[17]  A. Yes, Ron.
[18]  Q. Okay. And we've talked some about what you do, but
[19] your wife is an artist; is that --
[20]  A. Yes, Ron.
[21]  Q. Okay. And self-employed?
[22]  A. Yes, Ron.
[23]  Q. Okay. What -- what prompted you to move to
[24] New Jersey? Do you recall, from Massachusetts?
[25]       Having lived in Massachusetts, I don't see that as a

Page 44

[1] step up, but, you know, I don't understand New Jersey.
[2]   A. My wife was interested in doing book jacket
[3] illustration, and living close to New York City was a
[4] prerequisite to doing that sort of work.
[5]   Q. Okay. So, the real attraction was New York City,
[6] not New Jersey.
[7]       That's just a place to live near New York?
[8]   A. That's right, Ron.
[9]       MR. GREEN: Okay. Let's -- it's been just about an
[10] hour. Let's take about five minutes, and then I want to start
[11] in on your -- some of the documents and stuff.
[12]      MR. ROYCE: Okay.
[13]      (There was a brief recess.)
[14] BY MR. GREEN:
[15]  Q. It may turn out that an awful lot of my questions
[16] are going to end up more appropriately directed to your wife,
[17] depending on how you answer these, but I need to still go
[18] through the process of finding out what you know or don't
[19] know. So, if this becomes tedious sounding, it's -- there's a
[20] purpose to it.
[21]      I'm not doing it just to keep you here, okay?
[22]      But I do need to know what you know and what you
[23] recall about your -- how you first became involved with
[24] Mr. Birkholz and when you think that might have been.
[25]  A. My wife made the initial contact.

**Page 45**

[1]  Q.  Okay.

[2]  A.  And the time frame, I could not give you an idea of

[3]  that.

[4]  Q.  Yeah.  I understand that.

[5]  Can you tell me if you lived in Massachusetts at the

[6]  time the initial contact was made?

[7]  A.  That's correct.

[8]  Q.  Okay.  Do you recall whether Mr. Birkholz provided

[9]  any services while you still lived in Massachusetts?

[10]  A.  Yes, he did.

[11]  Q.  Okay.  The reason I ask is:  The -- and this only

[12]  reflects, of course, things that he still has records of.

[13]  In the documents that we produced, the earliest tax

[14]  return that I have is for 1998.

[15]  Did he do returns before that for you and your wife,

[16]  or am I wrong --

[17]  MR. ROYCE:  '98?

[18]  MR. GREEN:  '88.  '88.

[19]  Did I say '98?

[20]  MR. ROYCE:  Yeah.

[21]  THE WITNESS:  Yes, you did.

[22]  BY MR. GREEN:

[23]  Q.  I looked at '88 and said '98.  I apologize.

[24]  A.  I'm not sure.

[25]  Q.  Okay.  At that time, you were living in New Jersey,

**Page 46**

[1]  is the reason I was asking.  So, I'm just trying to get a feel

[2]  for -- I mean, it's been -- that's -- that, by itself, is

[3]  quite a while ago, so it wouldn't surprise me if somebody just

[4]  didn't have records.  I'm just wanting to know if there might

[5]  be more out there.

[6]  But in 1988, when the returns were filed, this

[7]  showed you and your wife as living at Road Number 6, Box 341A,

[8]  Newton, New Jersey.

[9]  Does that sound like the residence you had in

[10]  New Jersey?

[11]  A.  Yes, it does.  Yes.

[12]  Q.  Okay.  And it also shows her as an illustrator.

[13]  So, at that point, she was working, as you described

[14]  earlier, in terms of her desire to become involved with doing

[15]  book jackets and so forth; is that correct?

[16]  A.  Yes.  That sounds correct.

[17]  Q.  Okay.  Now, I only brought one copy of these.  I

[18]  think, for obvious reasons, but I want to show you what -- let

[19]  me, first of all:  The -- the 1988 tax return information that

[20]  was provided by Mr. Birkholz is PB912 through PB967.

[21]  And I want to show you, and I'll show your attorney

[22]  first, the Schedule C from that return.

[23]  MR. ROYCE:  Give me just a second, Ron.

[24]  Off the record.

[25]  (There was a brief recess.)

**Page 47**

[1]  BY MR. GREEN:

[2]  Q.  Now, I'm not even going to ask you if you remember

[3]  this because it was too long ago, but I'm kind of curious.

[4]  This shows -- shows you as a self-employed mariner

[5]  and gives the business address as -- I can't read that from

[6]  here, but it's not the United States.

[7]  A.  Uh-huh.

[8]  Q.  At that point in time, were you working for Zapata

[9]  or for Tidewater?  Do you know?

[10]  A.  I'm not really sure what that was.

[11]  I'm not really sure.  You know, that's somewhere in

[12]  that '80s area when the changeover took place, so --

[13]  Q.  Okay.

[14]  A.  I'm not really sure what -- whether that would have

[15]  been Zapata or Zapata Gulf Marine Service or Tidewater at the

[16]  time.

[17]  MR. ROYCE:  We're looking at PB915.

[18]  MR. GREEN:  Yes.  I appreciate that.

[19]  BY MR. GREEN:

[20]  Q.  Now, in that general time frame, and, again, I don't

[21]  expect you to remember 1988 to be precise, but the general

[22]  time frame, were you making estimated tax payments at that

[23]  time, quarterly?

[24]  A.  Yes.

[25]  Q.  Okay.  Was there ever a time when you -- well,

**Page 48**

[1]  after -- after beginning with Zapata, was there ever a time

[2]  when you did not make quarterly payments, where they withheld

[3]  taxes?

[4]  A.  I believe Zapata withheld taxes.

[5]  Q.  And then Tidewater didn't?

[6]  A.  And Tidewater didn't.

[7]  Q.  Okay.  Would that help us, then, that perhaps the

[8]  Tidewater merger had happened sometime before tax year 1988?

[9]  A.  Yes.  That would be a good assumption.

[10]  Q.  Okay.  Tell me how -- from the standpoint of your

[11]  position, how -- how did that change occur?

[12]  What did they tell you to trigger you to go from

[13]  being an employee with taxes withheld to a person who had to

[14]  pay estimated and calculate your taxes as self-employed?

[15]  A.  They just told us they weren't going to take any

[16]  money out of our pay for taxes.

[17]  Q.  Okay.

[18]  A.  After the changeover.

[19]  Q.  And I mean, how did they do that?

[20]  Did they send out a memo, or was it a --

[21]  A.  I don't remember exactly.

[22]  Q.  Okay.  Do you recall if you shared that -- if it was

[23]  in writing, assuming it was in writing, do you recall if you

[24]  shared that with Mr. Birkholz?

[25]  A.  I recall that we went to a meeting to discuss the

Page 49

[1] new tax situation with Mr. Birkholz.

[2]    Q.  Okay.

[3]    A.  And I explained what they were doing, and that's --
[4] that's as far as -- that's -- that was my part.  You know, I
[5] just went to him and said, "What do we do now?"

[6]    Q.  Okay.  Tell me -- tell me what you explained to him
[7] they were doing.

[8]    How -- as best you remember.

[9]    A.  Okay.  I told him I was working in Nigeria at the
[10] time, and they weren't taking taxes out.  "What are we going
[11] to do now, Peter?" sort of thing.

[12]    Q.  Okay.  And then what did he tell you?

[13]    A.  Well, I'm not really remembering exactly what the
[14] conversation was, but the outcome of it was, we were filing
[15] the Schedule C forms after that.

[16]    Q.  Okay.  Now, once that started, how did you -- what
[17] did you give him to show how much you had earned so he would
[18] know the numbers?

[19]    A.  Spreadsheet.

[20]    Q.  Okay.  Is that something that your wife prepared?

[21]    A.  I would do the spreadsheets annually.

[22]    Q.  Okay.  And where did you get the information as to
[23] how much they had paid you?

[24]    A.  The payroll stubs that are -- they're around
[25] someplace.  We've got them, I believe.

Page 50

[1]    MR. GREEN:  Was that in the -- that's in the -- that
[2] stack of documents?

[3]    MR. ROYCE:  I assume it's in that stack.  It was in
[4] the production documents.  It was that notebook.

[5]    MR. GREEN:  The ledger?  Or the checkbook?

[6]    MR. ROYCE:  No.  It was that binder that had all of
[7] the payroll stubs in it.  You -- you've reviewed it, and I
[8] think you had it produced.

[9]    MR. GREEN:  Yeah.  Okay.

[10] BY MR. GREEN:

[11]    Q.  Well -- so, you're talking about the stubs that came
[12] with your checks?

[13]    A.  That's correct.

[14]    Q.  Okay.  At the end of the year, Tidewater didn't send
[15] you a thing saying, we have paid you "X" number of dollars?

[16]    A.  You mean W-2?

[17]    Q.  It would actually be a 1099.

[18]    A.  No.

[19]    Q.  Okay.  Did they send you any kind of -- well, let me
[20] jump out of my order here just for a second.  I think it's at
[21] the very top.

[22]    I did see, and this may be what you're referring to,
[23] for some years, a statement, and I'm going to show you W3.
[24] This is Bates stamp numbered W3, not tax form W-3.  But let me
[25] show you a W3 as an example.

Page 51

[1]    At some point, did you begin getting those from
[2] Tidewater

[3]    A.  Tidewater would send me these, yes.

[4]    Q.  Okay.  Was that true for the entire time, or just
[5] more in the '90s?

[6]    A.  Sometimes I wouldn't see these.

[7]    Q.  Okay.

[8]    A.  And I don't recall if I was getting these the
[9] whole time, but I did receive these sometimes.

[10]    Q.  Now, you would -- you would -- whether you
[11] calculated -- well, let me ask you this:  When you did get
[12] these, did you use this as the number for your spreadsheet?

[13]    A.  No.  What I would do is, I would calculate from my
[14] payroll stubs what they paid me and then compare it to this.

[15]    Q.  Okay.  Did it -- do you recall it ever being
[16] different?

[17]    A.  No.  I cannot recall that.

[18]    Q.  Okay.  And then whether you received one of these or
[19] whether you had to rely entirely on your payroll stubs, what
[20] you would send Mr. Birkholz was your spreadsheet, correct?

[21]    A.  Yes.

[22]    Q.  And it would set forth on there the income?

[23]    A.  Yes, sir.

[24]    Q.  I mean, you wouldn't forward him a copy of things
[25] like W3?

Page 52

[1]    A.  I don't believe I did.

[2]    Q.  Okay.  And through this entire period of time that
[3] you were with Tidewater, it's your testimony they did not send
[4] you 1099s.  So, I was going to show you some documents where
[5] he would send something, and one of the things it asked for is
[6] 1099s and things like that.

[7]    A.  Uh-huh.

[8]    Q.  If I can accelerate this a little bit, I assume
[9] your -- your response to my questions about those are going to
[10] be, you didn't send 1099s because you weren't sent 1099s.

[11]    Does that sum that up?

[12]    A.  I had no 1099s to send.

[13]    Q.  Okay.  And so, what you sent was your spreadsheet,
[14] which had -- did your spreadsheets contain information about
[15] just your situation, or did they also include your wife's
[16] business?

[17]    Is that separate?

[18]    A.  They contained all of our financial information.

[19]    Q.  Okay.

[20]    MR. ROYCE:  Ron, I -- I don't -- I'm going to
[21] interpose this even though I hate to interject.

[22]    He's talking about doing these spreadsheets, and you
[23] are talking about it, and I think you're talking about the
[24] time frame all the way back to '88.

[25]    Before we keep doing that over and over and over,

Page 53

[1] you may want to clarify whether he's done the spreadsheets all
[2] the way back to '88. I don't know the answer to that. I
[3] think the answer --
[4]     MR. GREEN: I have no problem with clarifying.
[5] You don't have to worry about it. This isn't one of
[6] those --
[7]     MR. ROYCE: I know. I just -- I don't want there to
[8] be a misunderstanding because of the time period you're
[9] talking about.
[10]     MR. GREEN: Yeah. And that is a good question based
[11] on something I remember Pete telling me.
[12] BY MR. GREEN:
[13]     Q. And I know you're not going to remember the year,
[14] but I'm kind of told that -- that there was a point at which
[15] you kind of went computerized, you and your wife did, and
[16] these spreadsheets started.
[17]     A. Yes.
[18]     Q. Can you give me a rough idea of when that was?
[19]         Is that as far back as '88, or was that even before
[20] Tidewater?
[21]     A. I couldn't -- I couldn't tell you because I've been
[22] operating with computers for a very long time. So, I'm not
[23] really sure when I started doing the spreadsheets.
[24]         The reason I gave him spreadsheets was because he
[25] felt that it was an easy format for him to be able to work

Page 54

[1] with. It was a matter of convenience between myself and
[2] Mr. Birkholz.
[3]     Q. Okay. Do you recall if -- and I'll tell you what
[4] I'll do here is, I will show you the entire set of documents
[5] that we described earlier as being PB912 to PB967, which I'll
[6] represent to you was given to me by Mr. Birkholz as his file
[7] for that year.
[8]         Just glance through those real quick and see if
[9] anything in there appears to be what you would call a
[10] spreadsheet that you prepared.
[11]     A. Okay. PB945 -- 44, 45, 46, and 47 appear to be
[12] printed out copies of a spreadsheet as I had made at that
[13] time. It appears to be the type of thing that I would have
[14] done.
[15]     Q. Okay. And so, it appears that, at least as of '88,
[16] you were sending your information to Mr. Birkholz in the form
[17] of the spreadsheet?
[18]     A. An electronic spreadsheet, yes, sir.
[19]     Q. Okay. Did you print that out and mail it to him
[20] or -- in '88? Gosh.
[21]     MR. ROYCE: Al Gore hadn't invented the Internet yet
[22] at that point, Ron.
[23]     MR. GREEN: Well, yeah. But some other people had
[24] invented something close to it, but you had to be pretty
[25] clever to know how to use it. CompuServe may have started

Page 55

[1] about then.
[2]     THE WITNESS: My recollection would be, I would have
[3] sent it on a disk, mailed it or delivered it in person on a
[4] disk.
[5] BY MR. GREEN:
[6]     Q. Okay. Would you -- and I want to talk about the
[7] early stages of this.
[8]         At this point, you're -- you're -- he's in
[9] Massachusetts, and you're in New Jersey.
[10]         Would you, once a year, visit personally about your
[11] taxes, or were there -- were there -- would a lot of this be
[12] done by phone, mail and, as you mentioned, on a disk?
[13]     A. I couldn't say that we went up regularly, but we
[14] have seen Mr. Birkholz on occasion.
[15]     Q. Okay.
[16]     A. Because we have relations and friends in
[17] Massachusetts that we go up. And if we went up there, we
[18] would see Mr. Birkholz if there was a need.
[19]     Q. Okay. I'm going to show you now documents PB869
[20] through PB911, and I'll represent to you that that's -- this
[21] is his file for 1989.
[22]         And I'll specifically keep separate something
[23] beginning on 892, and ask you if that's the same kind of
[24] spreadsheet, or appears to be to you.
[25]         And if you would, if you would hand me that one

Page 56

[1] page, I think that goes in the other stack.
[2]     A. Yes, it does.
[3]         PB892 through 895 appears to be another paper copy
[4] of an electronic spreadsheet that I would give Peter.
[5]     Q. Okay. And I'm -- off the record just for a second.
[6]         (There was a brief recess.)
[7] BY MR. GREEN:
[8]     Q. You may need that just for a few minutes.
[9]         Look at 869, and do you have any reason to doubt
[10] that that's the transmittal letter that you would have made
[11] that year?
[12]     A. That looks like something I would write.
[13]     Q. Okay.
[14]     A. Probably did, because it's got my signature.
[15]     Q. And that does appear to be your signature?
[16]     A. Yep.
[17]     Q. Okay. There is a comment here. It says you put
[18] some things on some of the forms, and that's no big deal. It
[19] says, "The spreadsheet will have to be amended for 1990, as
[20] you have recommended."
[21]         Do you recall what that would have referred to?
[22]     A. Sorry. No.
[23]     Q. Okay. It's possible there will be something in the
[24] '90 documents that will jog your memory.
[25]         And then, again, and I think this is probably true

Page 57

[1] going forward, then, your income was treated as
[2] self-employment, self-employed -- self-employed business
[3] income?
[4]    A.  I believe that's the way -- the way they were
[5] handling it.
[6]    Q.  Okay.  You've looked at what he says is in his file.
[7]    Do you have any reason to believe that there were
[8] other documents that you sent to him that are not in that
[9] file?
[10]    A.  I'm not sure.
[11]    Q.  Okay.  But, I mean, is there anything that pops out
[12] at you, like, no, I'm sure I would have sent something else?
[13] Anything like that?
[14]    I understand you don't have a direct memory.
[15]    I'm just saying, as we sit here, did you see -- did
[16] you feel like something was missing that you would have
[17] normally sent?
[18]    Just so we're clear, if we come across a letter
[19] that's in -- you know, in the time frame, we're not going to
[20] say, well, you fibbed or anything.  I just want to know if
[21] looking at it, it looks -- you have any reason to think there
[22] was more being discussed.
[23]    A.  To the best of my knowledge, I can't see anything
[24] that's missing.
[25]    Q.  Okay.  Now, if you'll look with me at 885, it's a

Page 58

[1] form called a 2555, or 2555.
[2]    A.  885, foreign earned income?
[3]    Q.  Yes.  And it's a 1988 form.  And it's in the '89
[4] file, but I noticed that the '88 file has an '87 form, so
[5] maybe that's the way it's supposed to be.
[6]    But do you recall any conversations at this point in
[7] time with Peter about this particular form and what it was
[8] about and so forth?
[9]    A.  About the only thing that I can remember about
[10] this -- this form, and not this year, but generally he was
[11] always concerned about arrival and departure dates from the
[12] United States.
[13]    Q.  Okay.
[14]    A.  But other than that, I can't think of anything
[15] specific that he was asking about.
[16]    Q.  If you'll look at -- just a -- it's kind of -- you
[17] see how it's kind of broken into two parts?
[18]    Above the Part 1 there --
[19]    A.  Uh-huh.
[20]    Q.  -- where it says "complete either," it says, list
[21] your tax -- well, I can't read my computer version very
[22] good.  "List your tax home, or homes, during your tax year
[23] and dates established," and it shows "1 Swamp Road, Warri,
[24] Nigeria."  I assume that's May 16th, '85, to present.
[25]    A.  Uh-huh.

Page 59

[1]    Q.  Was there any time when your wife was with you in
[2] Nigeria?
[3]    A.  No.
[4]    Q.  Okay.  So, this is a -- this is a place -- this is
[5] where you were staying?  You had an apartment or something --
[6]    A.  No.
[7]    Q.  -- in Nigeria?
[8]    A.  No.
[9]    Q.  What is this address?
[10]    A.  I had a foreign residence permit.
[11]    Q.  Okay.
[12]    A.  And the address on the foreign residence permit was
[13] 1 Swamp Road.
[14]    Q.  Okay.
[15]    A.  Any American that worked in Nigeria had to have a
[16] foreign residence.
[17]    Q.  Okay.
[18]    A.  So, that was the -- the address on the permit.
[19]    Q.  Okay.
[20]    A.  It was a legal requirement.
[21]    Q.  If you'll look under Part 1, and this is what I
[22] understand to be the test for whether you can use the
[23] residence.  It has checked "quarters furnished by employer."
[24]    Was at that address a -- was there at that address a
[25] residence that you stayed at?

Page 60

[1]    A.  No.  I didn't stay there.
[2]    Q.  Okay.
[3]    A.  But that's where the staff that worked the shore did
[4] stay.
[5]    Q.  Okay.
[6]    A.  It was a compound.
[7]    Q.  If I can have those back, I'll swap you.
[8]    Q.  Okay.
[9]    Q.  I'll give you what -- well, let me -- let me tell
[10] her what they -- I'm sorry.
[11]    This is PB804 through PB868, which I'll kind of
[12] represent to be a copy of Mr. Birkholz's file for the 1990 tax
[13] year.
[14]    And let's start with:  Can you see if you can
[15] identify any kind of spreadsheet, or so forth, that he
[16] provided for that tax year?
[17]    A.  I do not see a copy of the electronic spreadsheet in
[18] this series of documents.
[19]    Q.  Okay.  Do you believe that you would have sent one
[20] for 1990, or would you have had, from time to time, a
[21] different method of transmitting financial information?
[22]    A.  Normally, I always sent one.  But to be perfectly
[23] honest with you, I couldn't say if I did send one or not.
[24]    Q.  Well, and I can't tell you --
[25]    A.  I have no recollection.

Page 61

[1]  Q.  I can't tell you that there's not one in your
[2] documents. I'm just -- this is just his file, so --
[3]  A.  Yeah. I have no recollection of that particular
[4] year sending one.
[5]  Q.  Okay. Well, I'm going to ask you a question or two
[6] about the 2555 again. It's in that same stack, but it's
[7] PB814, and I'll open this to it for your convenience.
[8]       And this is for the year '90. It shows the name of
[9] employer as Zapata Marine Service --
[10]  A.  Nigeria, Limited.
[11]  Q.  -- Nigeria, Limited.
[12]       Is this a subsidiary of Zapata gulf and marine,
[13] or --
[14]  A.  It's a joint venture company.
[15]  Q.  Okay. Had your -- had your employment changed
[16] between '89 and '90?
[17]  A.  No. The way a joint venture company works, it's an
[18] independent entity that exists under the law of the country
[19] which it's in -- i.e., Nigeria, okay?
[20]       You can't just dissolve these companies at the drop
[21] of a hat, because under Nigerian law, sometimes it's difficult
[22] to do these things.
[23]       I'm not familiar with the ins and outs of law, or
[24] even -- or anything about the Nigerian law, but the way that
[25] it was explained to me was, it was an independent entity in

Page 62

[1] itself, so --
[2]  Q.  Okay.
[3]  A.  And that was what my residence permit was listed as.
[4] So, in order to not mix things up with the residence permit,
[5] for justification for my overseas employment, I had to use the
[6] same name that was on the residence permit.
[7]  Q.  Okay. But -- but it's a different name, if I'm not
[8] mistaken, than was used previously. And that's what I'm --
[9] I'm just trying to see what changed, if anything, or if this
[10] is a bookkeeping thing.
[11]  A.  I think it was probably sloppy bookkeeping on my
[12] part.
[13]  Q.  Well, I wouldn't be so quick to blame yourself. It
[14] might have been Zapata.
[15]  A.  Well, no. It's me. I -- I'm lackadaisical about
[16] these things sometimes. I'm not the neatest person in the
[17] world.
[18]  Q.  Okay. Do you think, then, that -- that the prior --
[19] previously, and I'll go back and show you, for example, '88,
[20] it shows Zapata Gulf Marine Corp., which you had previously
[21] indicated was -- had, at one point, changed to that, your
[22] employment had changed to that.
[23]       And then in '90, which is two years later, I'm not
[24] sure where '89 is, it shows Zapata Marine Service, Nigeria,
[25] which you've already said was a joint venture and a separate

Page 63

[1] entity.
[2]  A.  As far as how your check was made out, any of that
[3] kind of stuff, did any of your stuff change between those two,
[4] or was that just a matter of the title put on the --
[5]  A.  I couldn't -- I couldn't actually tell you. I'm not
[6] sure.
[7]  Q.  Okay. But there wasn't a time where you just -- you
[8] went and was actually terminated from one and re-employed with
[9] another entity?
[10]  A.  No.
[11]  Q.  Okay. This is just the best information you were
[12] given from -- by Zapata?
[13]  A.  Well, there's so many names that fly around
[14] overseas, you -- every ship is a different company.
[15]  Q.  Okay.
[16]  A.  And so --
[17]  Q.  Well, there's zillions of names that fly around in
[18] these documents, so I sympathize with that.
[19]  A.  I -- I -- it's a mind-boggling maze.
[20]  Q.  Okay.
[21]  A.  So, if I put one name down one time, and another
[22] name down the other time, I could probably sit here and
[23] justify it to you for half an hour.
[24]  Q.  Okay. Well, I'm not so much --
[25]  A.  I don't want to.

Page 64

[1]  Q.  I'm not so much worried about which one is correct,
[2] if at all, I'm just wanting to know if anything dramatic
[3] changed --
[4]  A.  No, sir.
[5]  Q.  -- to cause that. Okay.
[6]       And the last couple we've looked at involved
[7] extensions and so forth.
[8]       Was that pretty normal to at least go the first
[9] extension and sometimes the August to October extension?
[10]  A.  Yes, sir.
[11]  Q.  Is that because you were out of town -- or, out of
[12] the country so much or --
[13]  A.  Certainly.
[14]  Q.  Okay. And from time to time, there would be
[15] penalties, and I think this may be one of those times --
[16] penalties and interest where the extensions, the right amount
[17] hadn't been paid.
[18]       I take it -- I mean, do you fault Mr. Birkholz for
[19] any of those situations?
[20]       MR. ROYCE:  Repeat the question, please.
[21]       MR. GREEN:  Yeah. I'll be clearer.
[22] BY MR. GREEN:
[23]  Q.  In the packet for 1990, for example, there were some
[24] penalties and interest assessed for -- because the full amount
[25] hadn't been paid even though there was an extension. And as

**Page 65**

[1] you know, you got to pay at the certain time. The extension
[2] is just to file the return.
[3]     And I'm just wondering if part of your claim relates
[4] in any way to those kinds of assessments where you paid
[5] late?
[6]     MR. ROYCE: I'll -- let me answer for him, Ron.
[7]     We're not -- if there was an amount due that accrued
[8] interest or penalty that was due because the Weylands didn't
[9] file something on time or didn't provide Mr. Birkholz
[10] something on time, we're not laying that liability at his
[11] feet.
[12]     MR. GREEN: Okay. Yeah. That's all my question is.
[13] And if there's something else, then there's something else,
[14] but -- okay.
[15]     MR. ROYCE: Is that a fair characterization?
[16]     THE WITNESS: Yeah. I think that would be
[17] reasonable.
[18]     MR. GREEN: Well, off the record.
[19]     (There was a brief recess.)
[20]     MR. ROYCE: Let me clarify further.
[21]     To the extent that there was a penalty incurred on
[22] an amount that we say never should have been paid to begin
[23] with, then I guess that would also be a part of the claim.
[24]     MR. GREEN: Yeah. That's not what I'm talking
[25] about.

**Page 66**

[1]     MR. ROYCE: I understand you're not, but I think
[2] that -- that clarification is --
[3]     MR. GREEN: Yeah. And I can be more specific.
[4]     If you look in this 1990 packet, there's a notice, a
[5] notice of adjustment, for example, from the state of
[6] New Jersey, that makes an adjustment for interest for failure
[7] to pay all or part of any required estimated tax payments on a
[8] timely basis. And it makes changes.
[9]     And then there's -- if you look at the other
[10] documents, there's -- that's ultimately resolved. It's that
[11] kind of thing specifically that I'm referring to. I mean --
[12]     MR. ROYCE: We're on the same page.
[13]     MR. GREEN: Okay. Very good.
[14] BY MR. GREEN:
[15]     Q. The 1991 file, Mr. Birkholz, is PB761 through 803,
[16] and I'll ask you to just kind of skim through this again and
[17] if you can identify what you might have provided him
[18] information wise.
[19]     And if there's something you think is glaringly
[20] missing from the file that you think you submitted, if you
[21] would let me know what that might have been.
[22]     This is year -- I wasn't sure which one. If you
[23] look at 771, that may help you.
[24]     A. 771?
[25]     Q. Right. Which is a little bit of a letter.

**Page 67**

[1]     MR. ROYCE: There you go. Right there.
[2]     THE WITNESS: Yeah. It looks like something that I
[3] wrote. It has my signature on it.
[4] BY MR. GREEN:
[5]     Q. So -- so, that may help you.
[6]     The form of -- and so, what I need to know, to the
[7] extent you can, is if you can identify what it was you
[8] provided him versus what he prepared --
[9]     A. Well, that was --
[10]     Q. -- with the understanding that it's going to be a
[11] different form than we had.
[12]     A. I believe that was one year that I tried using a
[13] computerized tax return form.
[14]     Q. Yeah. That's what I read from the --
[15]     A. Never do that again.
[16]     Q. Can you identify them?
[17]     A. No. Sorry.
[18]     Q. Okay. But they would have been in the form of the
[19] actual tax returns from your computer program, if that's the
[20] right year?
[21]     A. I'm not really sure of whether that was the year or
[22] not. The letter would indicate that it was, but I can't sit
[23] here and testify under oath that it --
[24]     Q. Okay. Let me -- let me just change the parameters a
[25] little bit. Let's forget about which year it was.

**Page 68**

[1]     But the year that you did that, instead of a
[2] spreadsheet, I take it, with this tax program, you would have
[3] plugged in some numbers, and it would have printed it out in
[4] the form of a tax form. It just wouldn't have been executed
[5] and final.
[6]     Is that right?
[7]     A. That's --
[8]     Q. Whatever year that was?
[9]     A. Best of my recollection, yeah, that's -- that's --
[10] that's what it was. And I -- it was -- it was a total
[11] fiasco that year, as far as I'm concerned. I went back to the
[12] spreadsheet after that, I believe. I'm not really sure.
[13]     Q. Okay. We'll find out in a second.
[14]     A. One or two years. But it had less than favorable
[15] results, if I remember correctly, with both myself and
[16] Peter.
[17]     Q. Okay. But I just want to make sure --
[18]     A. He wanted the spreadsheet.
[19]     Q. But I just want to make sure that whatever year that
[20] was, what we're going to see is, in lieu of a spreadsheet,
[21] things in the form of tax returns but not executed.
[22]     A. Yes.
[23]     Q. It would be typewritten and not handwritten,
[24] correct? The machine would have done all that?
[25]     A. Yeah. I believe so.

Page 69

[1]    Q.  Okay.
[2]    A.  Unless there was amendments made later on.
[3]    Q.  Okay.
[4]    A.  I don't know.
[5]    Q.  And --
[6]    A.  I don't remember.
[7]    Q.  -- and leaving aside that you may have had something
[8] that he doesn't have, you didn't see anything like that in
[9] that stack, correct?
[10]   A.  I couldn't identify it, to tell you the truth.
[11]   Q.  Okay.  No, no.
[12]        Any amendments, any handwritten letters from you, or
[13] anything like that, you didn't see anything in writing that
[14] you had sent him in there changing any numbers?
[15]   A.  No.  I did not.
[16]   Q.  Okay.  So, if you did, it was oral?
[17]   A.  I believe so, yeah.
[18]   Q.  Okay.  I'll go ahead and put those up, and we'll --
[19]        MR. ROYCE:  Off the record.
[20]        (There was a brief recess.)
[21]        MR. ROYCE:  Well, on the record.
[22]        Just so there's no question, I'm sorry -- Ron, I
[23] don't want to get you off where you are, but I'm looking at
[24] that very first document of that stack that you just had, and
[25] right up at the top of the right of the first page -- Richard,

Page 70

[1] look at what I'm talking about -- it says, "Prepared by
[2] Richard Weyland."
[3]        I didn't know if you saw that and wondered if that
[4] might just help while he's got it in front of him.
[5]        MR. GREEN:  It may.  I assume that's Peter's
[6] handwriting, so I'm really -- you know, I don't -- at this
[7] point, I wanted to know if there's any --
[8]        THE WITNESS:  It's not my handwriting.
[9]        MR. GREEN:  Yeah.
[10]        MS. WEYLAND:  That's a lousy copy.
[11]        MR. ROYCE:  Yeah.
[12]        I'm sorry.  I just -- I thought before you went on,
[13] I might point that out.
[14]        MS. WEYLAND:  It's not my handwriting, either.
[15]        MR. GREEN:  Yeah.  Because I think that's probably
[16] what's going to turn out to be the ones.  I just want to see
[17] if --
[18]        THE WITNESS:  You're right.  It's unexecuted,
[19] unsigned.  No client stamps on any of this, which Peter puts
[20] on his client copies, so --
[21] BY MR. GREEN:
[22]    Q.  So --
[23]    A.  This might -- this might be what I generated, but I
[24] can't --
[25]    Q.  Let me ask you this:  Barring some --

Page 71

[1]    A.  I can't say 100 percent.
[2]    Q.  Barring something that pops up that makes us think
[3] otherwise, do you have any reason to think that's not what you
[4] prepared and sent?
[5]    A.  I -- I have no -- no reason to think otherwise.
[6]    Q.  Okay.  Perfect.  Say, that's as good as you can do
[7] or be asked to do.
[8]        We'll next look at what purports to be his file for
[9] '92.  For the record, it's PB706 through PB760.
[10]        And I'll ask you just to -- let's initially just --
[11] I'll just ask you to take a look through there and see if you
[12] can identify what it was that you provided to him with your
[13] data and information.
[14]        And there's a letter, I think, at the top of the
[15] memo.  No, no.  It may not.
[16]    A.  Okay.  Well, the ones that I can say for sure and I
[17] probably provided were PB744, PB743, PB742, PB716.  But this
[18] is odd because PB717 looks to be part of the same document
[19] done differently.  I'm not really sure what this is or how
[20] this was done.  I have no recall what happened there.
[21]        PB718 would be something I would have provided.
[22] PB719.  I'm not sure about PB732 through 737, but they appear
[23] to be part of a computerized tax program, again.
[24]        I may have done that.  It looks familiar, but I
[25] can't say for sure.

Page 72

[1]    Q.  Okay.  There's several interesting things in this
[2] year that I want to ask you about.
[3]    A.  Uh-huh.
[4]    Q.  And let's go with -- you just mentioned them, and
[5] you've got them right in front of you, so if you would look at
[6] 718 and 719 for a minute.
[7]    A.  Uh-huh.
[8]    Q.  I notice in the documents you produced, there were
[9] some of these where it's like a typewritten statement, and I
[10] think we talked briefly about one minute ago -- at the very
[11] beginning.
[12]        But this is the earliest that I think I've seen one,
[13] and there's actually two of them, but this is a typewritten
[14] statement of how much you earned.
[15]        These would have been provided to you by your
[16] employer?
[17]    A.  Yes.
[18]    Q.  And what's particularly interesting to me, not
[19] knowing the details on this, is that it splits your year not
[20] necessarily in half, but among two different companies.
[21]        Is -- is it possible that this is the year that the
[22] merger took place?
[23]    A.  To say for sure, I do not know.
[24]    Q.  Okay.  Was there a year where you worked part of the
[25] year for Zapata Gulf Cruise and then the other half for

**Page 73**

[1] Tidewater Crewing, Limited?

[2] A. We're getting into the maze of names again.

[3] Q. Okay.

[4] A. Okay? And I am not sure exactly where the paychecks
[5] came from. What I know is when I was in Nigeria, I was
[6] working for a company that had a sign outside that said
[7] "Zapata Nigeria, Limited," when I was in Nigeria.

[8] When I moved to Angola, the sign outside the office
[9] said "Tidewater," until a few years ago, when they put up the
[10] sign that said "Sonatide." But as I found out through the
[11] various pieces of education I've gotten lately on
[12] international financing, I'm paid by Tidewater Crewing,
[13] Limited.

[14] Q. Okay. And again, '92 is still 14 years ago, so I
[15] understand that.

[16] A. Uh-huh.

[17] Q. I mean, other than the fact that we've got on paper
[18] two different names, did anything change about your job in
[19] '92?

[20] A. No. Not as far as I can recall, no.

[21] Q. Okay. When you -- when you got these in the mail --
[22] well, I assume you got them in the mail. They may have handed
[23] them to you.

[24] But when you got these, did you ask anybody about
[25] any of this? In other words, why you were getting things with

**Page 74**

[1] two different names on them.

[2] A. I don't recall asking anybody. That doesn't mean
[3] that I didn't do it.

[4] Q. Okay. Now, at -- in '92, would -- maybe it will
[5] help if we go to your 2555, which I'll give you the Bates
[6] number of in just a second -- I believe that starts on 727.

[7] A. 727. 727.

[8] Q. And this goes back to using Zapata Gulf Marine, and
[9] we've already talked about that issue.

[10] But in terms of the foreign address, it still shows
[11] Nigeria, which is what we've been looking at in the past few
[12] years.

[13] Did you, in '92, do you think, work part of the time
[14] in Nigeria and then part of the time in Angola, or --

[15] A. '92? To the best of my recollection, I don't
[16] believe I left Nigeria until '95.

[17] Q. Okay.

[18] A. But that could be off by a year or two.

[19] Q. But you -- so, you don't think that this -- this
[20] issue of having 718 and 719 with two different names on it,
[21] has anything to do with physically moving where you were
[22] working?

[23] A. I do not believe that I moved, no.

[24] Q. Okay.

[25] A. Not that year.

**Page 75**

[1] Q. Okay.

[2] A. I'm almost positive.

[3] Q. Okay. Now, did you see anything that -- well,
[4] you've listed the documents that you think you provided, and
[5] with the exception of the two documents, 718 and 719, they
[6] didn't seem to have to do specifically with giving information
[7] to plug into the tax returns.

[8] So, do you think 718 and 719, unless we find
[9] something else in your stack, was what you provided that
[10] year?

[11] A. One moment.

[12] MR. ROYCE: What is the question again, Ron? What
[13] he provided that year?

[14] MR. GREEN: Yeah. I -- and to put it into context,
[15] okay, we've -- we've went up to '91 with spreadsheets. In
[16] '92, we think in '92, based on the letter, that we tried
[17] the --

[18] THE WITNESS: Computer program?

[19] MR. GREEN: -- computer program.

[20] And I don't really see either in this batch, so I'm
[21] wondering -- but I do see these two documents, 718 and 719.

[22] BY MR. GREEN:

[23] Q. So, I guess I'm wondering just if you have any
[24] memory or can puzzle out if you provided any other information
[25] than --

**Page 76**

[1] A. I believe -- I'm not 100 percent positive, but I
[2] believe that this -- that the documents that I mentioned
[3] earlier, which were the ones with these gray borders -- I
[4] believe may have been --

[5] Q. 732 to 37?

[6] A. 732 to 37. I believe they may have been computer
[7] program things. And I'm not really sure, but it might have
[8] been.

[9] Q. Okay. Yeah. I mean, I think I agree with you, they
[10] came from a computer program. I'm just not sure if they're an
[11] accountant's program or the --

[12] MR. ROYCE: He's not, either.

[13] THE WITNESS: I'm not sure.

[14] BY MR. GREEN:

[15] Q. Okay.

[16] A. It looks like something that -- that was generated
[17] that -- it's not something -- I don't believe it's anything
[18] that Peter generated, but --

[19] Q. Okay.

[20] A. But that's -- that may have been the documentation
[21] that I provided.

[22] Q. Okay.

[23] A. I'm not trying to be evasive. I'm just -- I'm just
[24] not sure.

[25] Q. Well, your attorney -- neither your attorney nor I

**Page 77**

[1] want you to say you know something you don't know, so --

[2] A. Right.

[3] Q. -- that's -- don't feel like you're being evasive.

[4] Take a look at the documents that begin with 709

[5] just for a second.

[6] A. 709.

[7] Q. Towards the front. Maybe the fourth document,

[8] fourth page.

[9] A. Got it.

[10] Q. Is -- is that your handwriting on that document?

[11] A. I don't believe so.

[12] Q. Okay. And then you mentioned the -- I'll give you

[13] the number in a second here -- 716 and, I think, 717.

[14] What this looks like to me is, is 717 is a -- a

[15] letter that you wrote to Mr. Birkholz dated May 25, and it

[16] looks like 716, you just reprinted the prior letter along with

[17] some additional stuff.

[18] Does that look right?

[19] A. Yes. I believe your summation is correct.

[20] Q. Okay. It says here, "The same thing happened to me

[21] last year."

[22] Do you recall what that referred to?

[23] A. No, sir.

[24] Q. Okay. And there's some correspondence I want to ask

[25] you about. I'll get you the number here in a second.

**Page 78**

[1] Okay. If you'll look at -- we'll start with 745.

[2] It's a letter asking for some information. And then

[3] I think that you mentioned 744 as one of the documents you

[4] recognized. That appears to me to be a response to that.

[5] So, you might want to look at those two together.

[6] A. Uh-huh. Go ahead.

[7] Q. Okay. Now, reading between the lines, when -- when

[8] you responded to this, you were not in the United States. You

[9] were working.

[10] Is that right?

[11] A. That's impossible to tell where I was, to tell you

[12] the truth.

[13] Q. I thought I saw something in your response.

[14] Presently, I'm in the -- if you look in Paragraph 5,

[15] "Presently, I'm in the Cabinda Enclave in west Africa."

[16] A. Okay. Yeah.

[17] Q. What is the Cabinda Enclave in west Africa? Is that

[18] in Nigeria?

[19] A. No. It's a -- it's a strip of land that lies --

[20] well, at the time, it was called Zaire.

[21] Q. Okay.

[22] A. It lies on the -- on the seacoast of Zaire, but it

[23] was an Enclave that was owned by Angola. It was in the

[24] possession of Angola.

[25] Q. Okay. And -- and --

**Page 79**

[1] A. My ship moves -- sales up and down the coast

[2] sometimes.

[3] Q. And -- and this is one of the reasons I -- now let

[4] me take you back to 718 and 719.

[5] Since it appears that in -- by '93, you were in an

[6] Enclave that appears to have something to do with Angola, let

[7] me go back and see if that helps you any with respect to

[8] during '92, did you go from Nigeria to Angola.

[9] A. My ship moves all over the place.

[10] Q. Okay.

[11] A. Okay? We're in the transportation business.

[12] Sometimes we went to another port, and then you go back.

[13] Q. So, the fact that you were, at this particular

[14] moment, in this Enclave has nothing to do with where you were

[15] based?

[16] A. That's correct.

[17] Q. So, as far as you know, you were still based in

[18] Nigeria?

[19] A. That's correct.

[20] Q. Okay. And the first paragraph of your response

[21] talks about the computers -- he had asked you questions about,

[22] you know, why -- you're listing as a mariner. He wanted you

[23] to explain why you needed a computer, and you're explaining in

[24] that paragraph why.

[25] A. Yeah.

**Page 80**

[1] Q. One other thing. He notes that your wife had

[2] showed -- shown no income expenses and so forth for that year,

[3] and you indicate that was a slow year.

[4] Was she active at all that year, or did she take

[5] some time off, or do you recall what was involved with that?

[6] A. I don't recall.

[7] Q. Okay. The -- you say, "The computer is used for

[8] Tidewater paperwork."

[9] A. Uh-huh.

[10] Q. And then you talk about that they won't supply you

[11] with one.

[12] Did Zapata supply you with one?

[13] A. No.

[14] Q. Okay. So, when you say "It was extremely hard to

[15] function without one," you're saying under Zapata?

[16] A. Whoever I was working with at the time. I

[17] specifically mention Tidewater here, so evidently I was

[18] working either on a Tidewater-owned vessel or -- or I was

[19] being paid by Tidewater at the time, or I was working for a

[20] subsidiary of Tidewater at the time.

[21] I do not recall exactly, but I'm mentioning

[22] Tidewater here, so obviously I was working under the Tidewater

[23] flag at that time.

[24] Q. The reason I bring it up is, is going back to my

[25] question of we've got the two different documents, 718, 719.

Page 81

[1] And again, I'm not trying to trap you. I'm just seeing if
[2] this will help refresh any memories.
[3] Is it possible that that signal, the change from a
[4] Zapata craft to a Tidewater craft, and that by the time you
[5] got to this, you're working on a Tidewater ship or -- or are
[6] these -- am I just -- these just don't have anything to do
[7] with each other? I'm not sure why we're going from Zapata to
[8] Tidewater. I'm just kind of trying to figure that out.
[9] **A.** Okay. Let me -- let me explain it this way:
[10] Every -- every boat is an individual company.
[11] **Q.** Okay.
[12] **A.** Okay? That's to limit liability and accidents.
[13] **Q.** Okay.
[14] **A.** So, if -- if you have a major collision and there's
[15] a major claim, then the company can only be taken for its
[16] assets.
[17] And if each one of these vessels is worth just
[18] off -- just say, for sake of argument, 5 million dollars, that
[19] would be the liability for the company, okay?
[20] So, every single one of these boats has papers on
[21] board that names an owner, okay? And then you fly the house
[22] flag for that particular owner. Sometimes I worked on a
[23] Tidewater vessel, which would be, like, Tidewater Panama,
[24] Tidewater Camen Islands, Tidewater you name it. They have
[25] dozens of names. As many names as they have boats.

Page 82

[1] Same with Zapata. Zapata did the same thing. They
[2] limited their liability. So, instead of changing all of these
[3] hundreds of company names, they kept these company names for
[4] each of the vessels. That doesn't mean that the -- that the
[5] corporation still existed, okay?
[6] It was bought out or merged, or whatever they did.
[7] I don't know. I'm not a lawyer. I'm not an accountant. I
[8] don't know the fancy stuff that you people do. It's all magic
[9] to me.
[10] **Q.** Or we wish we did.
[11] **A.** Okay. It's all magic to me.
[12] So, here I am sitting here. One day I'm on a
[13] Tidewater vessel. Next month I'm on another -- different
[14] vessel for Zapata again. And then back to Tidewater, back to
[15] Zapata. And so, I've got this maze of names that I'm living
[16] in.
[17] **Q.** Okay. I think I understand that.
[18] And I guess what makes me, in my mind, think this is
[19] different is just unlike prior years, where you may have gone
[20] from ship to ship, this time they changed who was paying you.
[21] **A.** Yeah. Well, that's --
[22] **Q.** And I'm just asking you why that happened.
[23] **A.** That's just part of the maze of the names. I don't
[24] know. It's part of the magic.
[25] **Q.** Okay.

Page 83

[1] **A.** Okay?
[2] **Q.** But as far as you can recall, in this tax year, '92,
[3] there was not anything that -- that changed from your
[4] standpoint? You were just doing the same job and reporting to
[5] the same people?
[6] **A.** Of course. Yes.
[7] **Q.** Okay.
[8] **A.** Exactly.
[9] **Q.** And your -- your health insurance and retirement
[10] plan and all, that hadn't changed, as far as you know? And
[11] we'll look at some documents.
[12] **A.** It may have. I'm not sure. I could not say for
[13] sure on that.
[14] **Q.** Okay. Well, we'll -- we'll deal with that a little
[15] later.
[16] We'll have to look at documentation on that.
[17] **Q.** Okay. But you're pretty comfortable that it's
[18] incorrect to imply, from these two documents, that this was
[19] the time of the merger and it all -- everything changed?
[20] Okay. Good enough for now.
[21] **MR. ROYCE:** He's gesturing that he doesn't know.
[22] **MR. GREEN:** Yes.
[23] **THE WITNESS:** I don't know.
[24] **MR. GREEN:** Okay. If we can gather those up, we'll
[25] move on.

Page 84

[1] **MR. ROYCE:** Here, just give them to me, and I'll get
[2] them back in order.
[3] **THE WITNESS:** Okay.
[4] **BY MR. GREEN:**
[5] **Q.** This is what purports to be the -- his file, Pete's
[6] file, for 1993. And if I can do this without getting a paper
[7] cut, it's PB00653, through PB705.
[8] And just take a quick gander through that and see if
[9] you can identify what you provided him in the way of
[10] information for that tax year that's in that file.
[11] Before you formulate a precise answer, I'll change
[12] the question a little bit, but I wanted to give you a chance
[13] to familiarize yourself with that, okay?
[14] **A.** Uh-huh.
[15] **Q.** The original question was: Is there anything in
[16] there that shows what you sent?
[17] This is the year that, I think, changed, and I want
[18] to confirm that with you, where he sent a brochure -- or, not
[19] a brochure, a schedule and forms form you to fill out; is that
[20] correct?
[21] **A.** As best I remember, Peter always sent a packet.
[22] **Q.** Okay.
[23] **A.** Okay? But --
[24] **Q.** Is this the first time you used that packet to
[25] provide the information, then, I guess is the question.

Page 85

[1]  A. To the best of my recollection, I started by -- when
[2] we first worked with Peter, by filling out these packets. But
[3] I had done most of my work on a spreadsheet, and as I remember
[4] it, I had mentioned to him that I was using a spreadsheet to
[5] formulate this, and I believe it was his suggestion that I
[6] give him a copy of the electronic spreadsheet.
[7]      He said it would be -- it would facilitate matters
[8] for him to be able to manipulate the data more easily on a --
[9] in a spreadsheet format than to take it from a hard copy on
[10] paper.
[11]  Q. Okay.
[12]  A. So, I've gone from doing it on paper, to doing it in
[13] spreadsheet, to trying a computer program. And obviously,
[14] here, with PB655 through PB658, it appears I've filled out
[15] part of one of his spreadsheets and sent him back some data.
[16]  Q. Okay. And -- and -- well, let me ask you the
[17] open-ended way: Did you find any indication of a spreadsheet
[18] you performed in addition to this material in that group of
[19] documents?
[20]  A. In this group of documents --
[21]  Q. Right.
[22]  A. -- I did not see anything.
[23]  Q. And did you see anything that indicated that this
[24] year, also, you did your tax program and printed out kind of
[25] dry run forms in terms of providing information?

Page 86

[1]  A. I didn't recognize anything like that.
[2]  Q. Okay. And so, you've indicated that you had -- he
[3] had sent out these forms before, and earlier you used them.
[4]      Now, we've only been looking from '88 on, and you
[5] have not seen a form like that that you filled out in that
[6] time frame, correct?
[7]      The very first one I think had a spreadsheet.
[8]  A. That's correct, yes.
[9]  Q. So, if you filled out those forms, it was before
[10] '88?
[11]  A. Yes. I -- I believe you are correct in that
[12] assumption.
[13]  Q. Okay. Let's see what David is concerned about that.
[14]      MR. ROYCE: I'm not sure that's right, Ron, because
[15] I thought in the documents you've been going through, I saw
[16] some documents called "income tax organizer."
[17]      MR. GREEN: I think this is the first year, but I
[18] could be wrong.
[19]      MR. ROYCE: Okay. Well, go ahead, and I'll look
[20] here. I thought I had seen it in some of the packets we just
[21] went through.
[22]      MR. GREEN: To be honest, if it's one year or two
[23] years off, it's not critical to me.
[24]      MR. ROYCE: Okay.
[25]      MR. GREEN: I think I -- I'm just looking here real

Page 87

[1] quick. There are worksheets, but I think those are Pete's
[2] worksheets.
[3]      MR. ROYCE: Well, if you look at, like -- look back
[4] to the very first set that you had, which was PB912,
[5] et cetera. If you go to PB930 --
[6]      MR. GREEN: Okay. Well, you're right.
[7]      MR. ROYCE: I think that there are similar documents
[8] to that in each packet.
[9]      MR. GREEN: Well, I didn't --
[10]      MR. ROYCE: I don't see one for --
[11]      MR. GREEN: There wouldn't have been in the recent
[12] ones. Let's see. Maybe the early ones.
[13]      See, '89 has a spreadsheet in it.
[14]      MR. ROYCE: Uh-huh.
[15]      MR. GREEN: Yeah. I don't see one in '89.
[16]      MR. ROYCE: Yeah. And then on the next set, look at
[17] starting at PB854.
[18]      MR. GREEN: Well, right. But that's the only --
[19] from the first page.
[20]      MR. ROYCE: Keep flipping behind it, after 854.
[21]      MR. GREEN: Well, you're right. So, we missed
[22] those.
[23]      BY MR. GREEN:
[24]  Q. Just to -- then to clear up the record, where
[25] there's an organizer that's filled out, we can add those to

Page 88

[1] the documents that you provided him?
[2]      Is that correct, Mr. Weyland?
[3]      I'll help you. It's correct.
[4]      MR. ROYCE: You or your wife probably ought to
[5] clarify, him or his wife.
[6]      MR. GREEN: Yeah. That's true. But we went through
[7] these, and he pulled out documents that he thought he had
[8] provided, and so we'll just add those.
[9]      THE WITNESS: Okay.
[10]      MR. GREEN: We'll understand that those are included
[11] within your answers.
[12]      THE WITNESS: It's been a long time.
[13]      MR. GREEN: Yeah. Yeah.
[14]      BY MR. GREEN:
[15]  Q. Okay. So, scratch the whole -- you received one of
[16] these each year as far back as you can remember; is that
[17] fair?
[18]  A. That's a fair assumption, yes.
[19]  Q. And then we'll just rely on the documents as to when
[20] they were filled out and so forth.
[21]      But, again, you did not find a spreadsheet in this
[22] one, correct?
[23]  A. I did not find a spreadsheet. Not in this -- these
[24] papers.
[25]  Q. Okay. If you'll look at 654, which is, I believe,

---

**Page 89**

[1] the second page there. And maybe you need to look at 653 with
[2] it. And maybe you don't know the answer to this. Maybe it's
[3] your wife.

[4] But there's a note primarily talking about the
[5] application of a thousand dollar refund.

[6] Do you know anything about that?

[7] **A.** No.

[8] **Q.** Then there's a series of documents. I'll start you
[9] at 674. But you may or may not remember. Again, I think your
[10] wife was primarily involved in this, but I would guess it's
[11] something you would have heard about.

[12] Apparently, you and your wife received a brochure
[13] from the I.R.S. about, it's never too late, and there was
[14] communications back and forth concerned about whether a return
[15] had not been filed.

[16] **A.** I think you better talk to my wife about this
[17] because I'm not directly involved in some of this stuff
[18] because of my absence from the country.

[19] **Q.** I understand. And I wasn't -- because of that, I
[20] wasn't going to get into a lot of detail with you about it,
[21] but I do have a couple of questions bearing on it.

[22] I just wanted to know: Do you remember that coming
[23] up and being concerned about a brochure like that?

[24] **A.** I don't recall it.

[25] **Q.** Okay. Do you have any knowledge of ever finding out

---

**Page 90**

[1] that a return was not filed?

[2] Did that turn out to be a false alarm, I guess I'm
[3] asking you, as far as you know.

[4] **A.** I can't remember ever having not filed, ever.

[5] **Q.** Okay. And let me ask you about the procedure for
[6] this.

[7] We've been talking primarily on the information that
[8] you gave to Mr. Birkholz and then his preparation of the
[9] returns.

[10] But procedurally, what was your -- how did this
[11] work?

[12] He would prepare the forms.

[13] Did he then mail them to you for execution?

[14] **A.** What do you mean "execution"? You mean --

[15] **Q.** Signature.

[16] **A.** Signature? Just signature?

[17] **Q.** Yeah.

[18] **A.** Yes.

[19] **Q.** You have to sign them before you can file them.

[20] **A.** Yes.

[21] **Q.** And then would you go ahead and send them to the
[22] I.R.S. or would you return them to him?

[23] **A.** The best of my recollection, he would send us a
[24] client copy and a copy to send to the I.R.S., and we would
[25] mail directly to the I.R.S.

---

**Page 91**

[1] **Q.** Okay. The -- and you've got to understand that as
[2] an attorney, I -- we tend to be a nervous sort.

[3] So, in case there's an issue about filing, I mean,
[4] actually putting -- physically putting them in the mail after
[5] they're signed, is something that either you or your wife did
[6] routinely, correct?

[7] **A.** That's correct.

[8] **Q.** I'm going to want to take you now to the
[9] 2555. I'll give you the number here in a minute. It's 691.

[10] Do you have it there?

[11] **A.** Uh-huh.

[12] **Q.** Up here, where we talk about foreign address and
[13] employer's name and, in fact, the employer's foreign address,
[14] this is all totally different from the prior year.

[15] **A.** Port Harcourt, Nigeria, yeah. What happened was, I
[16] got -- I was issued a new work permit out of Port Harcourt.

[17] **Q.** Okay. And that's a new work permit from the
[18] government of Nigeria?

[19] **A.** Yes, Ron.

[20] **Q.** Okay. If I had to guess, I would have said it was
[21] one of those different ship things, but -- okay. So -- so,
[22] there was a change there.

[23] Now, other than an issuance of a permit, what -- did
[24] anything physically change with your employment or --

[25] **A.** No. I'm still working on boats, still working out

---

**Page 92**

[1] of Nigeria.

[2] **Q.** Reporting to the same people?

[3] **A.** Going to various ports, reporting to the same
[4] people.

[5] **Q.** Okay. You may have told me something that should
[6] tell me the answer to this, and maybe I'm just slow, but:
[7] The -- the employer's foreign address changes to this Bentinim
[8] Opara Road, Port Harcourt, Nigeria. But down here, it says,
[9] list your -- I can't read it -- "List your tax homes during
[10] your tax year end and dates established." But it's still
[11] 1 Swamp Road, Warri, Nigeria, which was the address on your
[12] prior permit.

[13] What -- does that mean anything to you? Do you know
[14] why that is?

[15] **A.** Well, we're still working, basically, out of one
[16] port. The operations manager is still in 1 Swamp Road. My
[17] boss is still there. The permits are now issued from another
[18] place. So, I've got to -- I've got to follow the permit for
[19] this -- for -- you know, for -- to keep things in line, I
[20] believe. Foreign address. So, I've got to follow the
[21] permit's address for where the -- for the -- the
[22] authorization, if you want to call it that, authority.

[23] **Q.** Okay.

[24] **A.** The authority is drawn from the office that issues
[25] the permit, but most of the time, I may have been in Warri

---

**Page 93**

[1] with the vessel.

[2] Q. Okay.

[3] A. I could have been working for Chevron or Shell out
[4] of Warri at that time.

[5] Q. Okay. You wouldn't have had two permits at the same
[6] time, one would supercede the other?

[7] A. Oh, no, no, no, no, no, no, no, no.

[8] Q. Okay. But why would the permit change your employer
[9] name?

[10] A. We're back into the maze of names again.

[11] Q. Okay.

[12] Q. Okay?

[13] Q. Okay. I don't want to go too deep in there. I
[14] might not be able to get back out.

[15]     Now, Tidex Nigeria, Limited, is that a joint venture
[16] or a particular ship or --

[17] A. That's another joint venture.

[18] Q. Okay. Is it a Tidewater versus a Zapata joint
[19] venture or --

[20] A. Yes. It is.

[21] Q. Is there any chance this is post merger?
[22] I think you were saying you thought that was '95 or
[23] so.

[24] A. Oh. I'm not sure. It's --

[25] Q. Okay.

**Page 94**

[1] A. I'm not sure when we — when we're going to start
[2] talking about this merger.

[3] Q. Okay. For the information on the 2555, and we can
[4] focus on this time frame, if you want, how would Pete have
[5] known about this change?

[6]     What -- what would have -- what would you have given
[7] him to tell him that this is the thing to put in that blank,
[8] or would you have filled out a form and had that already typed
[9] in, based on what you had been sent?

[10] A. Well, these are -- these are actual addresses and
[11] names of places that I worked in, or things that I've been
[12] involved with over the years.

[13]     So, I know that the addresses are correct. Old
[14] Power Road is -- is where the Port Harcourt compound is
[15] located.

[16] Q. Okay. I'm not questioning that.

[17]     I'm just wondering: How would Peter have known
[18] these addresses?

[19] A. I must have given him the information one way or the
[20] other. I'm not sure exactly how I did that.

[21] Q. And that sort of thing could have been done
[22] orally?

[23] A. It could have been done orally.

[24] Q. Okay. Okay.

[25]     MR. GREEN: David, it's 12:47. Do you -- what do

**Page 95**

[1] you want to do? You want to take just a short break, or do
[2] you want to take a half hour and grab a sandwich?

[3]     MR. ROYCE: If you are at a good point, why don't we
[4] just grab something quick to eat.

[5]     MR. GREEN: Yeah. I would just as soon take as
[6] little time as possible just because there's so much here,
[7] but --

[8]     MR. ROYCE: Yeah. Because we're running up against
[9] that 3:00 hearing we got to do with Judge Collins.

[10]     MR. GREEN: Yeah.

[11]     MR. GREEN: Why don't we just --

[12]     MR. GREEN: Yeah.

[13]     MR. ROYCE: Why don't we -- you want to just meet
[14] back here at 15 after?

[15]     MR. GREEN: Or just as quick as we can.

[16]     MR. ROYCE: Yeah.

[17]     (There was a brief recess.)

[18] BY MR. GREEN:

[19] Q. While we're in -- I guess, for the record, we just
[20] came back from a little short lunch break, and while we're in
[21] the year 1993, I'm going to jump over to the stack that
[22] you-all provided to me and ask you about a document. It's
[23] W329 and 330.

[24]     It's this '93 working agreement.

[25]     MR. ROYCE: Okay.

**Page 96**

[1] BY MR. GREEN:

[2] Q. And for starters, let me just ask you to take a look
[3] at that and see if you can identify that for me.

[4] A. Uh-huh. It looks like a work agreement for -- that
[5] I signed or I had during '93. Tidewater.

[6] Q. Okay. That's -- that's the -- well, first of all,
[7] if you look at the second page, it's not executed, or it
[8] doesn't appear to me to be executed.

[9]     Did this all get executed?

[10] A. Oh, yeah. They just -- they just sort of like send
[11] these things to you in an envelope when you're offshore.

[12] Q. Okay. So --

[13] A. Sometimes I never went -- I never even got -- go
[14] into the office, because the office would be in one place and
[15] I'll be joining the boat in another.

[16] Q. Okay.

[17] A. And then the office is in Warri, which is 80 miles
[18] away.

[19] Q. Okay.

[20] A. So, I may just get this in an envelope coming down
[21] from the office, and that's it.

[22] Q. All right. This is the earliest one I -- I have
[23] seen.

[24]     Do you think before '93 that you had executed
[25] working agreements like this?

Page 97

[1] A. I could well have, yes. But documents received
[2] overseas are -- are -- I hadn't -- I hadn't -- I don't have as
[3] good of file on documents I received overseas as I do
[4] documents received in the United States.
[5] Q. That's what I'm getting at, is: I'll tell you, and
[6] then I'll show you when we get to it, that I saw three of
[7] these called -- things called working agreements. The other
[8] two were in '95.
[9] And so, I'm kind of curious about if they were of
[10] some special significance, or were they routine?
[11] A. They were routine, and we were required to have them
[12] on board for all employees on the vessel.
[13] Now, part of the problem is: On the vessels, most
[14] of the time, we don't have copy machines.
[15] Q. Okay. So, every time you went on a vessel, you
[16] would be under one of these working agreements?
[17] A. Yes.
[18] Q. Okay. And -- and would that go all the way back to
[19] your initial employment, or was there a time when that
[20] started?
[21] A. No, it did not go back all the way to the initial
[22] employment.
[23] Q. Okay. Did it go with the Zapata companies? These
[24] are all -- that we have copies of, are all Tidewater Crewing.
[25] A. I -- I don't remember doing a working agreement with

Page 98

[1] Zapata Marine Service.
[2] Q. Okay. And keeping in mind that this is the year
[3] where we have two different documents, one of them from
[4] Tidewater Crewing and one from Zapata, would the Tidewater
[5] document that showed your earnings from Tidewater reflect
[6] these -- this Tidewater agreement?
[7] MR. ROYCE: Hold on. '95?
[8] MR. GREEN: '93.
[9] MR. ROYCE: You're look --
[10] MR. GREEN: We're --
[11] MR. ROYCE: I'm sorry. You're on 329.
[12] MR. GREEN: Yeah.
[13] MR. ROYCE: Okay. Sorry.
[14] MR. GREEN: There are two of them in '95, but I just
[15] referred to them, but I didn't bring them out.
[16] MR. ROYCE: Are you sure that -- that that's the
[17] same year that the two -- I thought that was '92. And I don't
[18] want to change your question, Ron. It's just that you had
[19] indicated in your question, so I didn't want to be
[20] incorrect.
[21] MR. GREEN: No. Take a look at it so you --
[22] Are you talking about -- was it the same year that
[23] we had those two documents?
[24] MR. ROYCE: That's what you were saying, I thought,
[25] in your question, and that was '92.

Page 99

[1] MR. GREEN: Was it?
[2] MR. ROYCE: If you look at PB719.
[3] MR. GREEN: Okay. Could be.
[4] So -- so, then -- so, that's a very good point,
[5] then.
[6] BY MR. GREEN:
[7] Q. So, this does not match up with -- with the two
[8] documents that we looked at where you had a part of the year
[9] was Zapata and part of the year was Tidewater, because this --
[10] this would have been for work done in '93, not '92.
[11] A. Normally, the work agreement date on the top is the
[12] date that they -- they fill this out.
[13] Q. All right.
[14] A. And then the -- basically, the -- it -- it -- it
[15] sets the day rate for -- for us that work on the boats, more
[16] than anything else. Because if you read it, it's -- I once
[17] asked somebody to read this, and he laughed at it, and he
[18] threw it down, and he said, "That's not really a legal
[19] document," you know. It's -- don't worry about it.
[20] Q. Okay. If -- if '92 shows that you did some work for
[21] Tidewater Crewing, I guess, do you suppose that there's one of
[22] these for '92; you just don't have a copy of it?
[23] A. I don't know.
[24] Q. Okay. Were there circumstances where you would do
[25] work for Tidewater and not have a working agreement in

Page 100

[1] place?
[2] A. Yes.
[3] Q. Under what circumstances?
[4] A. Managerial inefficiencies.
[5] Q. Okay. In other words, screw ups?
[6] A. No. When I was working in Nigeria -- not Nigeria,
[7] excuse me -- when I was working in Malongo, one manager in
[8] particular did not fill these out. More recently -- well,
[9] I've been receiving them again. But he was lax in his duties,
[10] and pay raises were given in amounts agreed upon verbally
[11] before joining the vessel. But a work agreement would not be
[12] executed.
[13] Q. Okay.
[14] A. So, it depended upon the quality of the individual
[15] running the office.
[16] Q. When this says -- and this has rate of pay and that
[17] sort of thing on it, but when this says that it's envisioned
[18] to have 90 days -- let me get the precise --
[19] A. Ninety and 30.
[20] Q. Yeah.
[21] A. The leave rotation -- not in stone --
[22] Q. Ninety days of work followed by 30 days of unpaid
[23] leave, that envisions 120 days.
[24] If that were normal, would you expect one of these
[25] to be -- assuming we don't have managerial inefficiencies, you

Page 101

[1] would expect to find one of these somewhere for every
[2] 120 days?
[3]    A.  No.
[4]    Q.  Okay.  How often would this be executed normally?
[5] Something like this.  Not this particular document.
[6]        I tell you what, in your own words, tell me how this
[7] works.  What does this mean to you, and what does this have to
[8] do with -- what does this tell me?
[9]    A.  My own words, what does it mean to me?
[10]       It sets the day rate, and it sets the bonus rate.
[11]    Q.  Okay.
[12]    A.  That is all.
[13]    Q.  Doesn't give you any idea about when you're supposed
[14] to work or --
[15]    A.  You see the 90 days there, work?  That is a minimum.
[16]    Q.  Okay.
[17]    A.  They will not let you off before then, unless it is
[18] compassionate leave.
[19]    Q.  So, if we think of the 90-30 as a cycle, okay, just
[20] visualize it with me as a cycle, this one agreement could be
[21] multiple cycles of 90-30; is that right?
[22]    A.  I would not say that.
[23]    Q.  Okay.
[24]    A.  Quite often, I've had to work 120 or more days on --
[25] on a single work cycle, okay?  Because in my occupation, you

Page 102

[1] cannot leave the vessel without a proper relief.
[2]    Q.  Right.
[3]    A.  So, I am obliged to stand by -- well, stand by --
[4] continue to work until my employer provides me with a
[5] qualified licensed relief, even if I have to train him.
[6]    Q.  Okay.  Let me rephrase the question just a little
[7] bit.
[8]        Let's think of "X" days work, "Y" days off as a
[9] cycle.  Forget about which -- the precise numbers those are.
[10]       Would one written agreement cover a multitude of
[11] cycles, or would you normally have a specific agreement each
[12] time you came off of your -- your off days and began a new
[13] work session, however many days that turned out to be?
[14]    A.  One work agreement has covered multiple cycles in
[15] the past.
[16]    Q.  So, it could be either way?
[17]    A.  Yeah.
[18]    Q.  You can't read from this that this is this period of
[19] time, and then there would be another one at a certain time?
[20] Okay.
[21]    A.  No, sir.
[22]    Q.  All right.  Let me stick that back in here before I
[23] lose it.
[24]        I'm going to show you a -- what purports to be the
[25] file for 1994 beginning with PB598.  I apologize for some of

Page 103

[1] these being on yellow paper.  It's just where the copier ran
[2] out of white, probably.  Going to PB652.
[3]        Let me ask you just to look through that, first of
[4] all, and then we'll ask you some questions.  Again, we're
[5] going to be interested in what you -- the method by which and
[6] what you sent to Mr. Birkholz in terms of information for your
[7] tax returns.
[8]        You've gone through those, and tell me what you've
[9] isolated there, and then we'll go from there.
[10]    A.  Okay.  It would appear that PB629 through PB652 is
[11] one of Peter Birkholz's organizers, tax organizers, for the
[12] year 1994.  And some of it has been filled out, and it appears
[13] to be my handwriting
[14]    Q.  Okay.  And then there's other material that relates
[15] to your wife's business, correct?
[16]    A.  Uh-huh.  And then --
[17]    Q.  Which I assume while it's important, it's not
[18] necessarily relevant to what we're talking about here.
[19]    A.  Three more pages --
[20]    Q.  Okay.
[21]    A.  -- pertaining to your question --
[22]    Q.  Yeah.
[23]    A.  -- of things that I recognize.  PB618, PB625, and
[24] PB626.
[25]        They appear to be summaries.  The first two are

Page 104

[1] summaries of I.R.S. payments, and then PB626 is a summary of
[2] time spent overseas and in the United States, a breakdown of
[3] my time.
[4]    Q.  Okay.  Let me ask you about the -- the file we're
[5] looking at is '94, but this is all happening in '95, of
[6] course.
[7]        Let me ask you about a document that you-all
[8] produced.  It's W467.
[9]        And do you recall we talked about the -- the
[10] brochure, the communication back and forth, about it's not too
[11] late and whether or not a tax -- let me show you this document
[12] here and ask you if that refreshes your memory at all about if
[13] there was a missing tax return or -- or an issue about a
[14] missing tax return, or an allegedly missing tax return, I
[15] should say.
[16]    A.  It does not jog my memory.
[17]    Q.  Okay.  So, you don't know what came of that issue?
[18]    A.  I don't remember.
[19]    Q.  Okay.  And for the tax year -- and feel free to look
[20] at any of these that you need.
[21]        For the tax year '94, had there been any changes at
[22] all in your employment or anything that you think you
[23] communicated to Mr. Birkholz about any changes in your
[24] employment?
[25]        Everything looks the same to me, but I want you to

Page 105

[1] have a chance to refresh your memory as much as possible.
[2]    A.  We were doing the same things the same way.
[3]       Peter Birkholz was aware of what I -- what I did,
[4] where I -- when I came into the country, when I left, how I
[5] was paid. He knew that I didn't get U.S. tax papers. It's
[6] still the same.
[7]    Q.  Okay. The -- I believe it is the prior year, was
[8] the year that you couldn't give when you came in and when you
[9] came out because your Visa had been stolen or lost.
[10]      Do you recall that?
[11]   A.  Passport was stolen? Oh, yes.
[12]   Q.  Passport, yes.
[13]   A.  I was robbed.
[14]   Q.  Okay. When -- when you reported to Mr. Birkholz
[15] that you couldn't provide that information, what did -- did he
[16] tell you what he thought was significant or not significant
[17] about that?
[18]   A.  I don't recall.
[19]   Q.  Okay. Do you recall any conversations about
[20] those -- missing that information on that tax year?
[21]   A.  No.
[22]   Q.  Do you recall it being any kind of problem holding
[23] up the preparation of your tax returns?
[24]   A.  I don't recall that.
[25]   Q.  Okay. And you -- and -- okay.

Page 106

[1]      And if you'll look at, just briefly, the 2555. It's
[2] the same information that we just talked about on the last
[3] one. The Tidex, where you changed your permit.
[4]    MR. ROYCE:  What number?
[5]    MR. GREEN:  I'm looking for the number right now.
[6]    I just had it a minute ago. Here we go.
[7]      If you look at PB -- beginning on PB608. This time
[8] it's a slightly different form. You're filing a 2555EZ form.
[9] So, it looks a little different, but it still talks about
[10] Tidex, or however you pronounce it -- Tidex Nigeria, Limited,
[11] at Bentimium Opara Road.
[12]   A.  Yes.
[13]   Q.  Is that the same -- same -- there's no change there
[14] in terms of the prior year?
[15]      That's based on your new permit, correct?
[16]   A.  It would be, yes.
[17]   Q.  All right.
[18]   A.  The -- the -- the address is always based on -- on
[19] the work permit.
[20]   Q.  Okay. And here it says, it -- when it says "enter
[21] the date your bona fide residence begin," previously, it had
[22] been, like, 1985. This now says "11-19-93."
[23]      Is that because that's when your permit changed?
[24]   A.  I don't know. I'm not sure. I don't remember.
[25]   Q.  Okay. In what respect, in '93, would your

Page 107

[1] residence -- your bona fide residence have changed, other than
[2] that?
[3]    A.  It would be with the issuance of a -- of a new
[4] permit.
[5]    Q.  Okay. That's what I thought you had said earlier.
[6]      So, would that indicate that's when your permit
[7] changed?
[8]    A.  I'm not sure.
[9]    Q.  Okay.
[10]   A.  I don't remember the -- the circumstances for that
[11] number being put down there.
[12]   Q.  Okay. Was there anything else that changed in '93
[13] concerning your residence, that you can think of?
[14]   A.  I don't believe so.
[15]   Q.  Okay.
[16]   A.  I don't remember anything changing.
[17]   Q.  Okay. Let me ask you generally:  When -- when you
[18] would receive the forms that have been prepared and they're
[19] ready for your signature, before you signed them, did you look
[20] at them? Read them? Check them? Do anything?
[21]   A.  Of course, it's -- I would scan over them, take a
[22] look at them, and -- and -- and then sign them, if -- if I
[23] didn't see anything that I thought was a mistake.
[24]   Q.  Okay. Did you, on occasion, find what you thought
[25] was a mistake and call Peter up and say, you know, what's the

Page 108

[1] deal on this, anything like that?
[2]    A.  To be quite honest with you, I don't remember.
[3]    Q.  Okay. Let me have those back, and we'll move right
[4] along.
[5]      Okay. I'll show you what has been Bates stamped
[6] as -- well, the "PB" disappeared on a few of these, but it's
[7] 00517 to PB00596. And it purports to be the 1995 file of
[8] Mr. Birkholz.
[9]      If you'll take a quick gander at those. And
[10] initially, again, I'm interested in anything that you think
[11] you provided to him in the way of information to prepare those
[12] returns.
[13]   A.  I've looked at it briefly. Go ahead.
[14]   Q.  Yeah.
[15]      Can you identify what information you sent to Peter
[16] for the tax year 1995 that's reflected in his file?
[17]   A.  This first letter here is mine, which is PB517.
[18]   Q.  Okay. Well, let's -- let me break this down a
[19] little bit.
[20]      This is a little different because it -- while it's
[21] the tax year '95, there's -- apparently, there were a lot of
[22] issues with '95. And -- well, some of -- that's got
[23] correspondence as late as '97 in dealing with it.
[24]      But that letter, I don't think the -- 517 doesn't
[25] have a date; is that correct?

---

Page 109

[1]    A. That's correct. There is no date on there.

[2]    Q. Okay. It does indicate, however, a Cynthiana,

[3] Kentucky address.

[4]       Would that put you in '97? Do you think?

[5]    A. Yeah. I believe we were there in '97, yes, at least

[6] part of the year.

[7]    Q. Okay. And in '95, when the tax return was filed --

[8] or, the year for which the tax -- you were in New Jersey,

[9] correct?

[10]    A. Yes. That would be our previous residence.

[11]    Q. Okay. When you say you had been "remiss in the past

[12] in filling out these papers for the taxes," are you talking

[13] about the -- the forms that Peter sends, or are you talking

[14] about something else?

[15]    A. I'm not sure. It was a long time ago.

[16]    Q. Okay. It talks about having malaria and being out

[17] of the country working the last few years. Then it says,

[18] "That is no excuse for not filing on time."

[19]       Are you talking about the tax returns being filed?

[20]    A. I would imagine getting the papers to him would be

[21] what I was referring to.

[22]    Q. Okay. Says, "But you've been paying the government

[23] as required."

[24]       Now, an issue that came up regarding this tax

[25] year -- and this may have more to do with your wife, and, if

---

Page 110

[1] so, just tell me. I just need to know what, if anything, you

[2] know about it.

[3]       Apparently, the I.R.S. was questioning the amount of

[4] estimateds that were paid compared to the number of

[5] estimated -- the amount of estimated that was claimed.

[6]       Do you recall anything about that for the tax year

[7] '95?

[8]    A. No.

[9]    Q. Did any of that refresh your memory?

[10]       Did you see notes and so forth from your wife to

[11] Peter about that and tax I.R.S. forms?

[12]    A. I didn't have time to read it all. I'm -- I would

[13] like to defer to Jennifer about things that she wrote.

[14]    Q. Okay. If this letter that -- and we're still

[15] talking about the first one on -- on the first page, being

[16] 517.

[17]       If this is in '97 -- it says, if you look at the

[18] last paragraph, "I hope the enclosed information is all you

[19] need for the '95 and '96 returns."

[20]       Do you recall the '95 returns being late?

[21]       Is that what this is talking about?

[22]    A. I don't recall what that was about.

[23]    Q. Okay. If you'll look at 518, which is a letter from

[24] Mr. Birkholz to you and your wife, it says -- and this is the

[25] last paragraph -- "Regarding the second notice on 1995, the

---

Page 111

[1] I.R.S. is requesting you file a return. We have no data to

[2] prepare a return for '95 or '96 in our files."

[3]       Does that ring any bells about whether you timely

[4] filed in '95?

[5]    A. I know I made paperwork out every year for this --

[6] for taxes.

[7]    Q. Okay.

[8]    A. So, if this letter was issued in '97 about '95, then

[9] this has to be incorrect. Because every year, even if I'm

[10] late, I do the taxes, every year.

[11]    Q. Okay. Do you recall, in '95, the I.R.S. being

[12] concerned that they hadn't gotten a tax return? Or, actually,

[13] it would have been in '96 or '97, but --

[14]    A. I don't recall that.

[15]    Q. Okay. Are you sure that this letter we talked about

[16] first, which is 517, is not in response to the letter we were

[17] just talking about, which is 518?

[18]    A. Am I sure?

[19]    Q. Yeah.

[20]    A. No. I'm not sure.

[21]    Q. Okay. Could it be that when you -- when it says

[22] here, "I hope the enclosed information is all you need for '95

[23] and '96," that that was in response to the I.R.S. saying, we

[24] haven't heard from you for '95?

[25]    A. I have no idea.

---

Page 112

[1]    Q. Okay. You'll agree that if you were providing

[2] information in '97 for the '95 tax year, it was too late to

[3] file it timely, correct?

[4]    A. If that were the case, yes.

[5]    Q. Okay. You're just not sure because we don't have a

[6] date on that letter?

[7]    A. Uh-huh.

[8]      MR. GREEN: Okay. Go off the record for a minute.

[9]      (There was a brief recess.)

[10] BY MR. GREEN:

[11]    Q. I'm going to ask you to take a look at the document

[12] beginning 00528, which is the 2555 for that year, for '95.

[13]       And I'll tell you that it looks to me to be

[14] identical to the one we just looked at for '94, and I just

[15] want to know if -- if -- from your recollection, if anything

[16] changed about your employment at all during the calendar year

[17] 1995, and if this accurately reflects the -- your status at

[18] that time, and your permit that was in place at that time.

[19]    A. To the best of my recollection, yes. That's --

[20]    Q. Okay.

[21]    A. -- correct.

[22]    Q. And when I say it's the same, I should point out

[23] that Part 3 is where you were in and out of the country.

[24] Those obviously changed. But they don't -- that's not what --

[25]    A. Uh-huh.

---