Page 113

Q. Okay. Now, if you'll go with me to the document beginning at 00532. And your attorney may very well be correct that you have to defer on this. I just need to know if you know anything about all of this. And if you don't, that's -- that's perfectly fine.

This is a power of attorney that was executed in August of '97, and I'm assuming that this was to allow Mr. Birkholz to work with the I.R.S. on the issues that we just talked about with the '95 return.

But do you have any recollection of -- of, number one, signing this; and, number two, recalling why?

A. I have no recollection of -- of signing it or why.

Q. Okay. If you'll look at 00533, would you look and tell me if that appears to be your signature above your wife's?

A. Yeah. It looks like my signature, yes.

Q. Okay. Does that appear to be your wife's signature, assuming that you would recognize it?

A. Yes. Yes, sir.

Q. Okay. Now, there's a series of handwritten notes from your wife to Mr. Birkholz, and beginning -- beginning with 00534, relating to these -- for example, this note on that page refers to the I.R.S. situation.

Prior to today, had you ever seen those communications, or were you aware that your wife was working

Page 114

with Mr. Birkholz in '97 to try to resolve the '95 tax issues at that time?

A. I seem to recall that we were having problems, but I don't recall what they were because my wife handles all of this stuff while I'm away.

Q. Okay. And in August of '97 -- I think we just looked at something that said you were leaving in August, so you think you might have been gone to work at this point in time, in '97?

A. My wife was handling this, and --

Q. Okay.

A. -- I prefer that you ask her about this stuff.

Q. Well, wait a minute. Wait a minute. Wait a minute. No. She's leaving for Texas. Okay. She had a show coming up in Texas, apparently.

Would you look at 00539 quickly, or briefly, please. This is in July of '97. It's a letter your wife wrote to the I.R.S.

And it says, "Data was mailed to our accountant in Boston June 25th, '97, to prepare the returns." And you'll see it's regarding the status of the '95 tax return.

"We expect returns will be completed for '95 and '96 prior to August 15, '97."

Assuming that's true, I take it you'll agree with me that the '95 return was filed late, and the information hadn't

Page 115

been provided to Mr. Birkholz?

MR. ROYCE: Object to the form. You've asked two questions. One is that it was filed late; and, two, that the information hadn't been provided to Mr. Birkholz.

MR. GREEN: I've done that almost every question. Yes. It's two questions. We'll do it one at a time.

BY MR. GREEN:

Q. Assuming that what's in this letter, written by your wife -- and it's not signed, to be fair, but based on this, would you agree that the '95 return was not filed on time?

A. It would appear, yes, that it was not filed on time.

Q. And would you also agree that the information had not been sent to Mr. Birkholz for '95 in a -- in a time frame which would allow him to prepare them on time?

A. I don't know if I can agree with that. I have no recollection of when it was done.

Q. Okay. But you would agree that if it was sent June 25th, '97, that it was too late to prepare them on time?

A. If it was sent on June 5th, '97 (sic), that would be correct.

Q. Okay. And you just don't have any -- you don't have any personal knowledge one way or the other?

A. I don't remember. I do not recall.

Page 116

Q. Okay. If you'll look at -- and this is another one that you did not draft, but I'll just ask you to look at 00551.

And as I said, this is something that was written by your wife. I assume that maybe you didn't even see it at the time.

But would you look at it? And this has to do with underpayment, overpayment penalties on an estimated return.

Do you know what this was talking about and what -- I mean, at the time, were you involved at all in talking to your wife about what the issue was here?

A. Basically, I think what you're trying to address is why my pay fluctuates; is that correct? Am I making an assumption?

Q. No. I'm just trying to figure out what the concern is here, what's -- I mean, we know that there were penalties assessed and so forth. We've got the notices in here. And I just want to know if you were involved at all.

Is this something that you-all felt like Peter had messed up, or is this just something relating to the fact that your pay fluctuated and you were out of the country?

I'm just seeing if this is a problem I need to be concerned with, if you know.

And just out of curiosity, I kind of wondered what -- if you-all had a flood the first year you were in

Page 117

Kentucky. That's a terrible way to start.
**A.** We did. We did.
**MS. WEYLAND:** The flood of '97.
**THE WITNESS:** Yeah. You'll see that some of our documents are water stained.
**BY MR. GREEN:**
**Q.** Okay. I was going to ask if it affected your documents.
**A.** Yes, it did. Some of them --
**Q.** Did you lose any?
**A.** -- were destroyed. Yes.
**Q.** But -- but since you mentioned it, that's a good question: It does suggest that you would be making less this year, which I assume is '97, than you had in prior years.
    Is that just a matter of the assignments that are available, or did your arrangements change with the company?
**A.** No.
**Q.** Okay.
**A.** The arrangements didn't change. It -- it's -- it usually -- the amount of money I make is directly proportionate to the number of days that I -- I am on a ship, okay?
    So, if somebody quits, somebody gets sick, they have a special job that they need done and I'm the guy that does it, then I get more days at work. So, that's why my pay

Page 118

fluctuates.
**Q.** Okay.
**A.** It isn't that I get raises or -- or get reductions in salaries.
**Q.** So, this is not a complaint; it's an explanation.
    Is that the way you understand it, or -- and again, I'll ask your wife.
**A.** That's the way I'm looking at it.
**Q.** Okay.
**A.** But you'll have to speak to my wife about exactly what she meant about what she wrote.
**Q.** Yeah. I'm only looking for your understanding.
**A.** English is not my forte.
**Q.** Me, either. I just speak Kentucky.
    Okay. I think the rest of it we'll probably just wait and ask your wife about it when the time is right.
    Okay. We can put those to rest. You will recall I did promise you this would be tedious.
    Let's do the same drill with '96. Let me identify them.
    '96's file is PB390 through -- and the "PB" is missing again, but it's 00516. I think you'll find something that meets your criterion on the very first page, so that will make it a little easier.
**A.** Okay.

Page 119

**Q.** Okay. Are you -- have you made it through those? Tell us what you found that you believe you sent to Mr. Birkholz for tax year 1996, you or your wife?
**A.** For '96. Okay.
    Okay. We have here, labeled 1996 income, PB00499, I guess it is. And 500, 501, 502, 503, 504, and it would appear to be 505. That's it for the '96 batch.
**Q.** Okay. In the tax year 1996, or leading up to the preparation of the '96, had anything changed about your employment as far as really affected you?
**A.** No.
**Q.** Yeah. I mean, you might have been at a different port or whatever, but I'm talking about in terms of who employed you and that sort of thing.
**A.** As far as I know, no. Nothing had changed.
**Q.** Okay. So, you would have related no changes to Mr. Birkholz, other than the amounts and the stuff that we've talked about here for that tax year?
**A.** Uh-huh.
**Q.** Okay. Would you look with me at PB478?
**A.** 478.
**MR. ROYCE:** It's not in that stack.
**MR. GREEN:** Huh?
**MR. ROYCE:** 478 is not in that packet you just gave him.

Page 120

**MR. GREEN:** Are we -- we're still on '96, aren't we?
**MR. ROYCE:** 390 to 441.
**THE WITNESS:** 390.
**MR. ROYCE:** You may have skipped '96 and gone to '97.
**MR. GREEN:** Maybe what I've got on paper doesn't match what's in the computer.
**MR. ROYCE:** I think that's probably true.
**BY MR. GREEN:**
**Q.** I tell you what, let me take a look and see at this, and I'll see if I can figure out what's going on.
**A.** There you go.
**Q.** I believe this is 390 to 516.
**A.** Oh, okay.
**MR. ROYCE:** Well, then, you've clipped two years together. 390 --
**MR. GREEN:** No. Because '97 starts with 410 and ends with -- 397 to 410. We're going backwards, but -- this is '96.
**MR. ROYCE:** Okay. I hear you. I don't want to -- it's your deposition, Ron, but 390 is what he's got in front of him.
**MR. GREEN:** Right.
**MR. ROYCE:** 390 is what I think you also just lifted up and looked at there.

Page 121

[1] Look at 390. I mean, it talks summary of '97
[2] checking account.
[3] MR. GREEN: Okay.
[4] MR. ROYCE: I think maybe you're -- you've got two
[5] years stacked together. My sets that were produced are
[6] clipped by you, from 390 to 464.
[7] MR. GREEN: Well, now, wait a minute. Now, '97
[8] is -- begins at 410 and goes to -- there's 414 -- they are out
[9] of order. 464.
[10] Now, what are these? 414. These are just
[11] duplicates.
[12] BY MR. GREEN:
[13] Q. Okay. So -- so we're clear, I think -- see if --
[14] see if what you have is 465 through 516.
[15] A. 465.
[16] 465. I have a Page 465.
[17] Q. Okay. Through 516 would be the last page. And I
[18] think it would be in your other stack there.
[19] MR. ROYCE: That's 1996?
[20] MR. GREEN: Yes.
[21] MR. ROYCE: That's -- that's correct.
[22] MR. GREEN: Okay.
[23] MR. ROYCE: But that's not all that is before him.
[24] You've got more than that before him. You've also got '97 in
[25] front of him.

Page 122

[1] MR. GREEN: Do you have anything between 410 and 464
[2] in front of you? Because that's '97.
[3] THE WITNESS: 464. I've got 390 through 409 right
[4] here.
[5] MR. GREEN: Well, somebody has put some extra pages
[6] in here. I don't know if they're duplicates or what.
[7] Let me see what you're -- what are you talking about
[8] that are -- that are out of that range?
[9] Oh, maybe what we're talking about is this sheet got
[10] put in the wrong place.
[11] Are these all '97? Tax period '96. Tax period '96.
[12] So, the -- what -- what you were going on was the
[13] fact that we've got a summary of '97 checking account; is that
[14] right?
[15] MR. ROYCE: Well, I mean, that was part of it. But,
[16] also, mine is -- the way mine is clipped together is, 390 to
[17] 441 is a set.
[18] Do you want to do this off the record so we can get
[19] it all put --
[20] MR. GREEN: Sure.
[21] (There was a brief recess.)
[22] MR. GREEN: We're in '96.
[23] MR. ROYCE: Documents PB465 to 516, according to
[24] what I've got and what he's got in front of him.
[25] MR. GREEN: Yeah. Yeah. That's what I meant for us

Page 123

[1] to be in. I don't know how the other documents got to you.
[2] MR. ROYCE: All right.
[3] BY MR. GREEN:
[4] Q. And so, what I need for you to do is look at 478.
[5] A. 478.
[6] Q. Do you see that?
[7] A. Yeah.
[8] There appears to be a mistake here.
[9] Q. Okay. That's why we're here.
[10] Tell me what you believe to be a mistake.
[11] A. It appears that Zapata Gulf Marine Corp. was written
[12] in, and it shouldn't have been.
[13] Q. Okay. And this is -- this is a -- a worksheet, or
[14] whatever, prepared by Mr. Birkholz's firm, or is this
[15] something that you got from Zapata, or whomever?
[16] A. This is from Mr. Birkholz's firm, I believe.
[17] Q. Okay. Do you know the source for that
[18] information?
[19] Is there anything in the documents that you sent
[20] that would refer to your employer?
[21] A. It should not be there. It was bad information.
[22] Q. Okay. And so, let's find out --
[23] A. I did not provide that information.
[24] Q. Okay. What did -- what -- did you provide any
[25] information as to who the employer was for that year?

Page 124

[1] A. Peter Birkholz knew that I was working for Tidewater
[2] at that time.
[3] Q. Okay. But my question is, is: Did you provide any
[4] documents for '96 about what -- where -- who your employer was
[5] for that year?
[6] And you've identified the documents that you had
[7] provided. Just if you'll look in there and see if any of
[8] those --
[9] MR. ROYCE: Well, can't we just say that the -- that
[10] the documents will reflect whether he told him to put that
[11] or -- I mean, I think what you're asking him, Ron, is: Did
[12] you give him any documents that told him to put Zapata? He
[13] says he doesn't know. And you said, well, you've identified
[14] the documents you gave him.
[15] Can't we just say that the documents will say what
[16] they say?
[17] MR. GREEN: Yeah. If we can agree that that's all
[18] the documents that were provided, I guess that's true.
[19] MR. ROYCE: Well --
[20] MR. GREEN: I mean, this is just a worksheet, so it
[21] really -- it's not like a part of the tax return. I -- I just
[22] was curious as to where it had come from or if there had been
[23] discussions about it, but --
[24] THE WITNESS: Okay. Refer to PB476, please.
[25] BY MR. GREEN:

Page 125

Q. Okay.
A. Section 2.
Q. Okay.
A. Block six.
Q. Part 2?
A. Yes.
Q. Okay.
A. Okay?
   Clearly states: "Tidex Nigeria, Limited."
Q. Oh, I understand that.
A. Okay. So, there you go. There's the correct information there.
Q. Okay. But this isn't something you provided him?
A. No. I did not provide him with this information about Zapata Gulf Marine Corp.
Q. So -- so, my question is, is: Did you provide him any information as to who your employer was in 1996, as being any way different than prior years?
A. There's no change in my employment at the time.
Q. Okay. Now, while we're on 476, that appears to me to be identical to the prior year's 2555EZ, and I think you just indicated that that would be correct, your information would not have changed in terms of your employer, your permit, et cetera, between '95 and '96, correct?
A. I believe that it was all the same.

Page 126

Q. Okay.
A. To the best of my recollection.
Q. Okay. If you'll take a quick look at 481. This is a note from your wife, so, again, I understand that we'll need to talk to her about it, but in terms of any knowledge you may have.
   It says, "This time I know they are wrong."
   Do you know -- do you have any idea what was going on?
A. You'll have to talk to her about this.
Q. Okay. And if you'll look at -- start with 482.
   You'll see an I.R.S. final notice. It's actually dated August '97, which is kind of in the same time frame we were looking at in the last tax year, but it indicates that it's got 1,400 and some change that they're planning to levy on for the '93 tax year.
   Do you -- did you understand that to be a problem at that time?
A. I don't recall this.
Q. Okay. And so, you would not have had any conversations with Mr. Birkholz about it?
A. I did not have any conversations with Mr. Birkholz on this type of issue. This is something that my wife would have handled.
Q. Okay. And if you'll look at 483, just tell me if

Page 127

that's the same answer for the same kinds of questions.
   This is for tax year '94, apparently about 5,100 dollars they were about to levy on.
A. You'll have to speak to my wife on that also.
MR. GREEN: Okay. Off the record.
(There was a brief recess.)
MR. GREEN: Okay. Well, let's go ahead to '97.
   I'll trade you, if you would, but first let me tell them: '97's, and we've kind of talked about this, is marked as Bates stamp PB390 to PB464.
   Does that jive with what you've got?
MR. ROYCE: Mine is 441. I have a gap. I don't have any documents from you-all 442 through 465. But we can deal with that later. Let's -- you do what you need to do.
MR. GREEN: Yeah. I mean, they're -- they're actual returns.
MR. ROYCE: Yeah. They're just -- it's not in the set that I got. I can make a note. 442 to 464.
MR. GREEN: Well, then, I'll let you take a look at them too.
MR. GREEN: Actually, it's 2:59, so I kind of expect the phone to ring any second.
MR. ROYCE: Yeah.
   Before we do, before she calls, let me say this: I'm thinking, Ron, in the interest of time, and in fact, we've

Page 128

got a witness here who is about to leave the country for several months again, you go through your outline however you want to do it. I'll give you my word that Jennifer is going to be able to give you a lot more information about these packets and go through the exercise that you're doing with him right now than he is.
   If you want to go through every one of these and have him look through every page and then tell you what they sent, he can do his best. I think you're going to get more reliable information from her and not being as under as much time pressure.
MR. GREEN: Yeah. Ultimately, I mean, until we get into, perhaps, more recent things, the main thing -- my main point is to try to pin down what, if anything, was provided to him. I'm only concerned that if I don't let him see what we've got to refresh his memory, then later, because if his memory gets jogged and he's -- there's something new. That's my only real -- I'm not doing this just to bore everybody.
MR. ROYCE: No. I know. But I think that -- that what he's doing is, he's looking through here and picking out, as he sits here in 2006, what looks to him, based on his best recollection, of something that he might have been involved in sending.
   And I think that Jennifer can do the same thing for you, and they're both -- and she is probably the one who sent

**Page 129**

[1] it, in most cases.
[2]     MR. GREEN: Well, but my method in asking him to do
[3] that is to make sure that he's had a chance to look at it, and
[4] so his memory is as fresh as it can be.
[5]     MR. ROYCE: That's fine.
[6]     MR. GREEN: Now, you know, if -- if -- you know, if
[7] there's some kind of -- if the fact is that -- other than the
[8] documents in here, that he didn't have anything to do with
[9] communicating with Birkholz about numbers, employment,
[10] et cetera -- I think later we'll get into some stuff where he
[11] may have. There may have been some discussions.
[12]     But I guess I can -- I can push ahead past that if I
[13] know that to be the case. But if I were him, I wouldn't want
[14] to make that kind of a blanket statement.
[15]     MR. ROYCE: Well, and I don't think he is. But
[16] that -- you really haven't been asking him -- have you had --
[17] about conversations. You've asked him, look through these
[18] documents and tell me what you sent to him.
[19]     MR. GREEN: Beginning in '96, I did. I said, "Did
[20] you give any information of any change in any employment?"
[21] And that's going to be a question from now on.
[22]     MR. ROYCE: Okay. Well -- and I think you can do
[23] that without -- and again, it's your deposition. I want you
[24] to do whatever you want to.
[25]     MR. GREEN: Yeah.

**Page 130**

[1]     MR. ROYCE: I'm just trying to think of a way to get
[2] finished with this today.
[3]     MS. WEYLAND: I don't think it's going to.
[4]     MR. ROYCE: Well, the --
[5]     MR. GREEN: I'm -- I mean, going in, I wasn't sure
[6] that would happen. What I was interested in was making sure I
[7] needed -- got what I needed first, initially.
[8]     MR. ROYCE: Yeah. Well -- let's go off the record.
[9]     MR. GREEN: Yeah.
[10]     (There was a brief recess.)
[11] BY MR. GREEN:
[12]     Q. Okay. If you'll look at -- yeah, take a look at
[13] that.
[14]     That first sheet is the summary of '97 checking
[15] account.
[16]     Is that something that you prepared or your wife
[17] prepared?
[18]     Is that for your wife's business, or is that for
[19] your income?
[20]     A. This is -- this is everything. This is --
[21]     Q. A combination?
[22]     A. -- my wife's business, my income, her -- all of our
[23] family expenditures. Everything.
[24]     Q. Okay. So, are we back to doing kind of a
[25] spreadsheet-type thing for him at this point?

**Page 131**

[1]     A. Yes, Ron.
[2]     Q. Okay. And was that at his request, or did you
[3] decide to do it that way, or how did that happen? Do you
[4] know?
[5]     A. As best I can remember, he liked this format.
[6]     Q. Okay. All rightee. Let's put that one back here, I
[7] think.
[8]     Or did we -- I can't remember now what we've done on
[9] '97.
[10]     MR. ROYCE: I think it may have been --
[11]     MR. GREEN: That's where we were getting ready to
[12] start, wasn't it? Okay.
[13]     MR. ROYCE: Yeah. But I can't remember. It may
[14] have been in the pack that he went through with '96. I
[15] just -- oh, hell if I know.
[16]     MR. GREEN: Yeah. I don't think we actually went
[17] through it. Let me see here.
[18] BY MR. GREEN:
[19]     Q. Now, let's -- let me ask a couple of questions as of
[20] the end of '96, okay?
[21]     Do you know if the Tidewater Zapata merger happened
[22] before or after that?
[23]     A. I'm fairly sure that it happened before that.
[24]     Q. Okay. Having gone through any of these, do you --
[25] has your memory been refreshed about when that would have

**Page 132**

[1] been?
[2]     Would that have been in -- you said earlier it might
[3] have been in the '80s, but we had Zapata on there for some
[4] period of time, and I understand that later you said it was
[5] erroneous to be on one of the worksheets.
[6]     But do you have any better memory at this point of
[7] when you think that was, even within a few years?
[8]     A. You're getting back into the maze of names again.
[9]     Q. Okay. But I'm talking about just between Zapata
[10] companies and Tidewater companies and their merger, when that
[11] happened.
[12]     A. The best I can do is sometime in the '80s.
[13]     Q. Okay. So, the timing of your change of your permit
[14] won't have anything to do with that issue.
[15]     Did the -- did the merger change your working
[16] relationship in any way? Did it change who you reported to,
[17] where your -- I'll tell you what, let's do this: Just going
[18] back a little bit, I'm going to show you what's marked as --
[19] what's Bates stamped as W003.
[20]     You'll remember the one year we had a -- a -- an
[21] income -- a report of earnings from a Zapata-type company and
[22] a Tidewater-type company? We talked about all that?
[23]     A. Uh-huh.
[24]     Q. This is from '93. This is in the records that --
[25] that you produced.

Page 133

[1] And that shows Tidewater Crewing, Limited,
[2] correct?
[3] A. Uh-huh.
[4] Q. And that's a subsidiary of Tidewater, Inc., or
[5] whatever the main company is for Tidewater? That's one of
[6] their subsidiaries?
[7] A. Yeah. Let's see, most of the time, we refer to
[8] Tidewater as Tidewater Marine International, LLC.
[9] Q. Okay.
[10] A. When we're sailing up and down the coast. So, there
[11] is another name for you.
[12] Q. Okay. Now, this document here, is this something
[13] you would have just used to prepare your worksheet or
[14] spreadsheet?
[15]    You would not have provided this to Mr. Birkholz?
[16] Because there wasn't a copy of this in his file.
[17]    Do you --
[18] A. Not an official document, as far as I can tell.
[19] Q. Okay.
[20] A. So, I just -- I used it to check my numbers against
[21] what they were saying. You know, my -- my -- my pay stub
[22] summaries against that.
[23] Q. Okay. So, if he doesn't have a copy in his file,
[24] you're not surprised? I mean, that's what I'm getting at.
[25] A. I may have provided it some years. I may not have

Page 134

[1] provided it some years.
[2] Q. Okay. And then you've got '94 and you've got '96.
[3]    And if we're missing years like that, is that
[4] because of the flood, do you think, or --
[5] A. It might be, and it might be poor bookkeeping on my
[6] part. And it may be that it got lost in the mail. That's
[7] hard to tell.
[8] Q. Okay.
[9]    MR. ROYCE: Let's go off the record for just a
[10] second.
[11]    MR. GREEN: Yes. Sure.
[12]    (There was a brief recess.)
[13] BY MR. GREEN:
[14] Q. Let me show you what has been marked as W7, 007.
[15] It's a September 30th, 1985 letter to you and addressed to New
[16] Jersey and ask you, first of all, if you recall seeing that.
[17] A. I don't recall seeing it, but, obviously, it's to
[18] me.
[19] Q. Okay. And it's talking about your -- at the very
[20] beginning, we talked about it -- if I recall correctly, that
[21] the umbrella was Zapata Corporation; is that right?
[22] A. Yeah.
[23] Q. And -- and I think you mentioned that at some point,
[24] you became an employee of Zapata Gulf Marine. And this
[25] indicates that they're terminating the Zapata Corporation

Page 135

[1] pension plan at the beginning. I assume the Zapata Gulf
[2] Marine pension plan.
[3]    Is that your recollection of what happened?
[4] A. I can't recall exactly what happened, but if it's
[5] there, it's there.
[6] Q. Okay.
[7] A. I'm not going to deny it.
[8] Q. Well, I'm -- I'm, again, trying to get into when all
[9] of this happened. This -- that's '84.
[10]    So, at least as of '84, you're still working for
[11] Zapata, correct? The Tidewater merger had not happened at
[12] that point.
[13] A. No. Not at that point.
[14] Q. Okay. In your pension plan, have you, from time to
[15] time, seen documents about it, whether it's Zapata, Zapata
[16] Gulf Marine, Tidewater, whatever it's called through the
[17] years?
[18]    Have you seen -- do they send you documents from
[19] time to time about it?
[20] A. Yeah.
[21] Q. Okay. And I mean, is it a -- is it a qualified plan
[22] under American law do? You know?
[23]    Have you seen words to that effect or?
[24] A. I would have to go look.
[25] Q. Okay. I'll show you W10. It's a document you

Page 136

[1] produced, also regarding your pension plan after the last
[2] letter.
[3]    And the main thing is, there's a human resources
[4] office listed on it.
[5]    Do you see that?
[6] A. Yeah. I see the human resources.
[7] Q. Is that the same Houston office that you talked
[8] about before, where you went and had your physical, and they
[9] hired you, et cetera?
[10] A. This is listing a post office box.
[11] Q. I'm sorry.
[12] A. So, I'm -- I couldn't tell you if that was the same
[13] building or not.
[14] Q. Okay. When you -- when you were working for Zapata,
[15] is the human resources in Houston where you would take your
[16] issues with if you had them for human resources?
[17] A. All of the offices for Zapata were in Houston except
[18] for the local port offices.
[19] Q. Okay. Is -- is Tidewater a publicly traded company?
[20] I know you said Zapata was.
[21] A. Yes, it is.
[22] Q. Is it symbol TDW?
[23] A. TDW, I believe, yes.
[24] Q. Okay.
[25] A. It's traded on the New York Stock Exchange.

Page 137

[1] Q. Okay. So, if this -- is this their web site? Maybe
[2] I'll take you back to --
[3] A. It certainly looks like it. The Ebb Tide. Yes. I
[4] know the Ebb Tide.
[5] Q. Does that sound right?
[6] A. Yeah. I know the EBB TIDE.
[7] Q. Okay.
[8] A. Never worked on it, but I know it.
[9] Q. And did -- Tidewater's primary office is in
[10] New Orleans; is that correct?
[11] A. Corporate headquarters is in New Orleans.
[12] Q. Okay. Well, on the web site, they call it worldwide
[13] headquarters.
[14]    Have you ever heard it referred to as that?
[15]    MR. ROYCE: I'm going to make a clarification.
[16]    You're saying "Tidewater," and we've talked about
[17] all kinds of different Tidewaters today; Tidewater Crewing,
[18] Limited; Tidewater Corporation, all of that.
[19]    Are you just talking about what you're viewing as
[20] the big umbrella, so to speak?
[21]    MR. GREEN: Tidewater Corporation is the way I -- or
[22] Tidewater, Inc. I'm not sure.
[23]    MR. ROYCE: It's just you said Tidewater, and I
[24] don't want him to get hamstrung with later you said, well, you
[25] said Tidewater was a New Orleans company.

Page 138

[1]    MR. GREEN: Oh, okay. No. No. I'm talking about
[2] this -- according to their web site, it's Tidewater, Inc.
[3] BY MR. GREEN:
[4] Q. Does that -- do you take any quarrel with that?
[5] A. Yes. I do. Because they call themselves Tidewater,
[6] LLC, in most of their literature.
[7] Q. Okay. Well, you can't publicly trade an LLC.
[8] A. Well, that's what they call it.
[9] Q. You would know more than me, but --
[10] A. Well, maybe I'm talking about a different
[11] Tidewater.
[12] Q. Okay. That's what I'm trying to pin down.
[13] A. Maybe this is part of the -- the -- the -- our
[14] wonderful mosaic of an international conglomerate.
[15] Q. Well, is it possible that a -- that Tidewater,
[16] whatever, LLC, is a partnership or a venture that Tidewater
[17] has with somebody and they've called it that?
[18] A. I think you're going to have to talk to somebody in
[19] Tidewater Corporation.
[20] Q. Okay. But one thing that I cannot do today is leave
[21] here without knowing what Tidewater to talk to.
[22]    MR. ROYCE: Well, let me see if I can help you
[23] clarify that.
[24]    MR. GREEN: Okay.
[25]    MR. ROYCE: If you look -- if you look at the sheet,

Page 139

[1] Ron, that you just showed him -- w3 is one of them, but you
[2] saw a couple others.
[3]    MR. GREEN: Of course, those are Zapata, but --
[4]    MR. ROYCE: No. Not WO3.
[5]    MR. GREEN: Oh, okay. Yeah.
[6]    MR. ROYCE: It's Tidewater Crewing Limited.
[7]    MR. GREEN: Yeah. That's a subsidiary.
[8]    MR. ROYCE: Now, what I've shown you -- well, that's
[9] your word. I'm not sure that's technically right, but --
[10]    MR. GREEN: Okay.
[11]    MR. ROYCE: What I showed you, and I think -- I
[12] don't know if this was part of what you had produced or not
[13] from us, but I've got payroll stubs upon payroll stubs here
[14] from Tidewater Crewing, Limited. Every payroll stub he's got,
[15] that I can see here, back to 1992, is Tidewater Crewing,
[16] Limited, is the entity on every one.
[17]    MR. GREEN: Okay.
[18]    MR. ROYCE: That '92, when you -- when you showed
[19] that in, I think, '92, where he had one from Zapata and then
[20] one from tide -- that was Tidewater Crewing, Limited.
[21]    MR. GREEN: I agree.
[22]    MR. ROYCE: So, I just want to be clear when we talk
[23] about Tidewater, that's who he was being paid by, was
[24] Tidewater Crewing, Limited. And I think that maybe when he
[25] says "LLC," or "Limited," that could be part of what he's

Page 140

[1] talking about.
[2]    MR. GREEN: Could be. I -- and that's what -- I
[3] mean, that's what I need to know.
[4]    MR. ROYCE: I understand.
[5]    MR. GREEN: Because -- well, let's -- let's see if
[6] this takes us anywhere first.
[7] BY MR. GREEN:
[8] Q. Let me show you W12, which is -- we're jumping ahead
[9] to 1992. These are documents, again, that you produced.
[10]    And specifically, it talks about Tidewater Crewing,
[11] Limited, but it's on Tidewater, Inc. stationery.
[12]    And first let me ask you if you recall receiving
[13] that or anything like that.
[14]    MR. ROYCE: If these documents were produced from
[15] our files, which this is, we'll stipulate that this has come
[16] through Richard or Jennifer's hands. It had to have.
[17]    THE WITNESS: Okay.
[18]    MR. GREEN: Okay.
[19] BY MR. GREEN:
[20] Q. Yeah.
[21] A. One thing I would like to point out to you is, the
[22] address down here, on the bottom left-hand corner of W012, is
[23] not correct anymore.
[24] Q. Yes. They -- they --
[25] A. They moved from this 1440 Canal Street. They're no

Page 141

[1] longer there.
[2] Q. Right. I noticed their web site had a different
[3] current address.
[4] A. Yeah.
[5] Q. But in 1992, that was the correct address,
[6] correct?
[7] A. I believe so. Yeah. They were there at one time.
[8] Q. Okay. And let me see if the bottom of this one says
[9] the same thing so I won't -- and -- and if -- and it says at
[10] the bottom, "If you have any questions concerning the
[11] information on this statement, please contact your personnel
[12] department."
[13] A. Uh-huh.
[14] Q. And that's the address and phone number for the
[15] personnel department at that time, correct?
[16]   1440 Canal Street, New Orleans?
[17] A. Actually, no. That's not the number that I use.
[18] Q. Okay. But is that the address?
[19] A. I have an 800 number. No. Actually, I -- the
[20] personnel department is -- is now located in Morgan City,
[21] Louisiana. Yeah.
[22] Q. Personnel department?
[23] A. That's pretty -- pretty close.
[24] Q. Well, let's see if -- but, now, in '92, was it in
[25] New Orleans on Canal Street?

Page 142

[1] A. I've never talked or gone to New Orleans for -- for
[2] anything, or talked to anybody in New Orleans. It's always
[3] been someplace like -- like Morgan City.
[4] Q. Morgan City?
[5] A. Could be listed as Larose. It's a town next to
[6] Morgan City. Something similar to that.
[7] Q. Okay. Now we'll get to where I'm confused.
[8]   Let me show you -- I'll just go ahead and show you
[9] 15 and 16 at the same time. Maybe there's more.
[10]   And this kind of ties in where you indicated that --
[11] that Peter was erroneous in having Zapata gulf and marine on
[12] some of those sheets.
[13] A. Uh-huh.
[14] Q. These are in the '90, '91 time frame, which, as I
[15] understand it, was after the merger and after you became an
[16] employee of Tidewater. Yet, you're still getting stuff from
[17] Zapata Gulf Marine.
[18]   And I'm just wondering if you can explain to me why.
[19]   Let's take a look at -- oh, let me tell them. It's
[20] 15 through 20. W15 through 20.
[21] MR. ROYCE: I'm going to object to the form. And I
[22] don't think you're trying to pin him down, Ron, but he -- he
[23] said he doesn't remember when the merger was. He has given
[24] you his best guess. And now you're asking him to explain why
[25] this came after the merger. I'm not sure that it necessarily

Page 143

[1] was, but he's answered the best he knows.
[2] MR. GREEN: Okay. And if he thinks it's correct,
[3] then I'll accept that. I -- I do not mean to pin him down on
[4] that. You're correct.
[5] THE WITNESS: Okay.
[6] BY MR. GREEN:
[7] Q. Does that help you in terms of -- or, do you know
[8] why, in the '90, '91 range, you would have been getting
[9] materials from Zapata Gulf Cruise, and I think another one was
[10] gulf marine?
[11] A. Well, I've looked through this stuff, and I'll point
[12] this out to you because you're going to see it anyway sooner
[13] or later, of course.
[14]   Obviously, I was mistaken about the date of the
[15] merger because there is a reference to the up-and-coming
[16] merger right here in this document, which is W20.
[17] Q. Okay.
[18] A. The second from the last paragraph. If you read
[19] it --
[20] Q. Okay. I saw that earlier and it escaped my --
[21] you're right.
[22] A. That is -- that, obviously, is the time frame when
[23] the merger took place.
[24] Q. Okay. So, it was worth something. We -- because
[25] you never said you were positive, so it was not a --

Page 144

[1] A. I was not positive, but now we have found written
[2] evidence of when it was -- or --
[3] Q. Or close?
[4] A. -- coming up -- coming up to the point of the
[5] merger. It actually did happen.
[6] Q. Perhaps sometime in '92, or whatever.
[7] A. Okay.
[8] Q. Anyway, okay.
[9]   So, with that time frame, that explains those
[10] documents. That's no problem.
[11]   Now, in the general time frame when this occurred,
[12] when you got word that there was going to be a merger, and I
[13] take it your employer prior to that was Zapata, or this -- one
[14] of the Zapata companies, or whatever?
[15] A. Yeah. There was -- there were many.
[16] Q. Yes. I understand.
[17]   What, if any, conversations did you personally have
[18] with Mr. Birkholz about this merger, whether it was that it's
[19] coming up, how it impacted you, anything like that, other than
[20] what we've seen in writing?
[21] A. I'm sure my tax status had changed well before that,
[22] because I've been paid by an overseas entity, because I've
[23] been paying self-employment tax for a long time by that
[24] point.
[25] Q. Okay. Now, I'm not really talking about

**Page 145**

[1] self-employment tax. I'm -- I'm talking about -- well, let me
[2] just retract what I just said and say that I need to go back
[3] to my question.
[4]     What, if any -- when you heard there was going to be
[5] a merger, or there was a merger and you became aware that it
[6] was, what, if any, conversations did you have with
[7] Mr. Birkholz about the merger and the impact it might have on
[8] you?
[9]   A. I recall telling Mr. Birkholz that there was going
[10] to be a change in companies.
[11]   Q. Okay.
[12]   A. But what exactly I said, I do not remember.
[13]   Q. Okay. Fair enough.
[14]     Let me get those back before I lose them.
[15]   A. Okay. There you go.
[16]   Q. Thank you.
[17]     And then just for continuity, W12 is a statement of
[18] account, September 30th, '92, and it's on Tidewater
[19] stationery. We may have even talked about it some.
[20]     But that indicates that sometime in '92, the -- you
[21] went from Zapata to Tidewater, because prior to that, your
[22] pension was Zapata gulf and marine, correct?
[23]   A. It would appear so.
[24]   Q. Okay. Now, I'm going to show you what has been
[25] marked as W22. It's also on -- well, no. It's not also on --

**Page 146**

[1] it's on Tidewater Marine stationery, okay? It's Tidewater
[2] Marine, Inc.
[3]     And do you know if that's a subsidiary of Tidewater,
[4] Inc.?
[5]   A. I'm not sure.
[6]   Q. Okay.
[7]   A. I'm -- we're looking at the maze of names again.
[8]   Q. Okay. Now, you mentioned Morgan City and Larose, I
[9] believe.
[10]     Could it be Amelia?
[11]   A. Amelia, yeah.
[12]   Q. Okay.
[13]   A. Yeah.
[14]   Q. So, when you said Morgan City before, and Larose --
[15]   A. Amelia is very close to Morgan City. It's in the
[16] same general area.
[17]   Q. Okay. The important thing to me is, that's what you
[18] were referring to, it turns out, Amelia, having seen this
[19] document?
[20]   A. Yeah.
[21]   Q. Okay. So, I don't need to go looking in Morgan City
[22] for anything, is what I'm getting at.
[23]   A. Well, if you were in Morgan City, all you would have
[24] to do is take a cab for two dollars and you would be in
[25] Amelia.

**Page 147**

[1]   Q. Okay. And this appears to be a guy in a department,
[2] international personnel.
[3]     At this point in time, was Tidewater Marine, Inc.,
[4] your employer, as far as you know? Or do you know?
[5]   A. I don't know.
[6]   Q. Okay. He's inquiring about your coast guard license
[7] and -- what's a Z card?
[8]   A. A Z card is a seaman's document card. It contains
[9] information like your Social Security number, your picture,
[10] your current address, your status as a mariner, whether you're
[11] deck engine. It gives you ratings, whether you're -- when
[12] you're a lifeboat man, tanker man, various other ratings.
[13] It's just a few examples.
[14]   Q. What's your STCW78?
[15]   A. That is an international requirement for a watch
[16] keeping officer.
[17]   Q. Okay. I assume you had those and got them to them,
[18] or whatever?
[19]   A. I've got all that stuff.
[20]   Q. Do you -- did you ever find out why they didn't have
[21] these on file? Had they moved?
[22]     In other words, at some point, they went from -- I'm
[23] sorry.
[24]   A. I'm not sure where they -- why they wouldn't have
[25] them on file. They should have had all of my stuff on the

**Page 148**

[1] Zapata entities before.
[2]   Q. Well, at some point, it looks like to me, and you
[3] correct me if you think it's different -- it appears to me
[4] that in '92, they're sending you stuff on Tidewater, Inc.
[5] stationery with a -- the heading "Tidewater Crewing, Limited,"
[6] like David referred to, in -- actually, in New Orleans. And
[7] then by '99, which is seven years later, they're talking to
[8] you out of a different office with a different name.
[9]     Did they -- did -- what changed between these two,
[10] if anything, that you know of?
[11]   A. I don't know.
[12]   Q. Okay. All you know is, all of a sudden, Amelia,
[13] Louisiana, was more important than New Orleans to your
[14] personnel business, or --
[15]   A. New Orleans was never important to my personnel
[16] business.
[17]   Q. Okay. Well, your -- your retirement plan was there.
[18]   A. Yeah. Well --
[19]   Q. That's pretty important.
[20]   A. My entire -- my retirement plan is handled by
[21] Merrill Lynch.
[22]   Q. Okay. Your health care came out of there, right?
[23]   A. I guess so.
[24]   Q. Did that change too? Did that go to Tidewater
[25] Marine, Inc., in Amelia?

**Page 149**

1  A. My health care is taken care -- was taken care of,
2  at the time, by Blue Cross Blue Shield of Louisiana.
3  Q. Okay. Well, who purchased --
4  A. Those are the people that I -- Tidewater
5  something.
6  Q. One of the tide -- but you don't know if it
7  changed --
8  A. Tidewater something.
9  Q. Okay. Do you recall it changing to a different
10 policy at some point or --
11 A. Yeah. It just changed last year.
12 Q. Okay. From what company to what company?
13 A. Blue Cross Blue Shield of Louisiana to --
14 Q. No. I don't mean that.
15    I mean --
16    MR. ROYCE: He's trying to ask which -- which --
17 which Tidewater entity was supplying your insurance, and what
18 I think you've said --
19    THE WITNESS: I don't know.
20    MR. ROYCE: -- several times is, you don't know
21 which entity was doing it.
22    THE WITNESS: I don't know.
23 BY MR. GREEN:
24 Q. Okay.
25 A. Yeah.

**Page 150**

1  Q. Okay. Kind of out of curiosity, as much as anything
2  else, while I'm looking at them, there are some photos that
3  I've got photocopies of, and I think they were actually
4  scanned.
5     What are these of?
6     MR. ROYCE: Jennifer's office.
7     MR. GREEN: Okay.
8  BY MR. GREEN:
9  Q. Okay. Let me show you what has been marked as W187.
10    This is a note from your wife to Peter Birkholz, but
11 I want to ask -- it refers to you, so I want to know what, if
12 anything, it's referring to.
13    Let you take a look at it.
14    Do you recall ever seeing that before?
15 A. This particular letter?
16 Q. Yeah.
17 A. No.
18 Q. Okay. Do you recall having a conversation with --
19 were you looking for work in that time frame?
20 A. We're always looking for work, you know? We ask
21 around.
22 Q. Okay. But were you specifically talking to a
23 potential employer in that time frame?
24 A. I make inquiries occasionally. I could have at that
25 time.

**Page 151**

1  Q. Okay. Did you specifically talk to somebody who
2  told you that after working 40 quarters, you were totally
3  vested and didn't have to pay any more Social Security?
4  A. Under certain conditions, yes.
5  Q. Okay. Who told you that?
6  A. A fellow mariner that works in west Africa.
7  Q. A fellow mariner?
8  A. Uh-huh.
9  Q. Is he a potential employer?
10 A. No. But you asked me who told me that.
11 Q. Okay.
12 A. You didn't ask me if a potential employer --
13 Q. No. But that's what we're talking about.
14 A. Okay. Well, I didn't understand it that way.
15 Q. Okay. Well, the -- the note says, "Also, a
16 potential employer told Rich."
17 A. She got it wrong.
18 Q. Okay. Fair enough, then.
19    What's his name?
20 A. That would be Butch, Butch Calais.
21 Q. C-A-L-A-I-S?
22 A. I'm sorry.
23 Q. Is Butch his real name?
24 A. I talked to -- I talked to --
25 Q. Maybe that's --

**Page 152**

1  A. That's all I've ever called him. I've met the man
2  once in person. I talk to him on the VHF radio.
3  Q. Okay. Is this just a casual conversation you had,
4  then, and she thought it was --
5  A. He told me that he doesn't pay Social Security taxes
6  because he's fully vested.
7  Q. I wish that were true.
8  A. He worked for a company called Bourbon Offshore.
9  Q. Okay. Do you recall what, if any, response you or
10 your wife got to this?
11 A. I don't recall any response.
12 Q. Okay. As we sit here, do you have any reason to
13 believe that's true, that after you paid 40 quarters into
14 Social Security, you don't have to pay any more?
15 A. Well, Butch said that it was true, that he didn't
16 pay. I mean, that's -- I can only tell you what the man said,
17 so --
18 Q. Okay. But my question --
19 A. I passed it -- obviously, I passed it on to my wife,
20 and my wife has passed the question on to Peter.
21 Q. And my question is: As we sit here today, do you
22 have an understanding, one way or another, on whether it's
23 true?
24    I understand the guy said it, but --
25    MR. ROYCE: You mean -- you mean, for somebody who