**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
NO. 05-375-JBC

RICHARD WEYLAND AND
JENNIFER WEYLAND,

    PLAINTIFFS,       DEPOSITION TAKEN
                  ON BEHALF OF
                  DEFENDANTS
VS.                BY: NOTICE

PETER BIRKHOLZ AND BIRKHOLZ &
COMPANY,

    DEFENDANTS.      WITNESS:

            JENNIFER WEYLAND

. . . . . . . . . .

     The deposition of JENNIFER WEYLAND,
was taken before Barbara C. Kargel, CCR (KY),
Notary Public, in and for the State of Kentucky
at Large, on July 14, 2006, at 1:00 p.m. and
August 1, 2006, at 9:00 a.m. at Stoll,
Keenon & Ogden, 300 West Vine Street, Suite
2100, Lexington, Kentucky. Said deposition
was taken pursuant to Notice, heretofore filed,
for any and all purposes consistent with the
Federal Rules of Civil Procedure.

. . . . . . . . . .

**2**

APPEARANCES:

Hon. Ronald L. Green
BOEHL, STOPHER & GRAVES
444 West Second Street
Lexington, Kentucky 40507

ATTORNEY FOR DEFENDANTS

Hon. David T. Royse
STOLL, KEENON & OGDEN
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507

ATTORNEY FOR PLAINTIFFS

**3**

I N D E X

WITNESS: JENNIFER WEYLAND

JULY 14, 2006

DIRECT EXAMINATION
  BY: MR. GREEN        4-137

AUGUST 1, 2006

DIRECT EXAMINATION
  BY: MR. GREEN      137-202

REPORTER'S CERTIFICATE      203

EXHIBIT INDEX

NUMBER        DESCRIPTION

Defendant's
Exhibit No. 1    Certificate of Resolution

Defendant's
Exhibit No. 2    Lists

**4**

     Thereupon, the Witness, JENNIFER
WEYLAND, after having been first duly sworn,
was examined and testified as follows:
          DIRECT EXAMINATION
          BY: MR. GREEN:
    Q.   Ma'am, I'm Ron Green, and we've met
before today. You attended the deposition of
your husband as well as the deposition of
Mr. Birkholz, correct?
    A.   Yes, sir.
    Q.   So you're an old veteran at this
sort of thing now?
    A.   Oh, sure.
    MR. GREEN: You've heard both of us
give a little spiel on some of the dos and
don'ts just to make it a little smoother.
    THE WITNESS: Uh-huh (affirmatively).
    MR. GREEN: I hesitate to repeat them
much, but one is no uh-huhs.
    THE WITNESS: Sorry. I just realized
it.
    MR. GREEN: It's okay.
    THE WITNESS: How about yeps?
    MR. GREEN: Yeps may be better, but
she probably would prefer yes.

5

1    THE WITNESS: It might just slip out
2    as a yep.
3    MR. GREEN: It's okay. It's not a
4    big deal. It's just we got to make sure it
5    gets on the record.
6    THE WITNESS: Right, and it might be
7    spelled Y-E-P or Y-U-P. I'm not sure.
8    Q. Would you state your full name and
9    your address for the record, please?
10   A. I'm going to ask you if you -- I'm
11   not sure it's important. My name is different
12   on my license than it is --
13   MR. GREEN: It doesn't matter, just
14   whatever you're comfortable with.
15   A. The only difference is my driver's
16   license is my maiden name.
17   MR. GREEN: If the only thing I can
18   find is your name on your license is different
19   than the name you give me, then you're in good
20   shape.
21   THE WITNESS: I'm just telling you
22   because when I make airline reservations and
23   stuff, I have to use my driver's license name.
24   I'm checking with you to make sure.
25   MR. GREEN: Just go with what you

6

1    normally go by.
2    A. Jennifer Marie Reid -- I'm sorry.
3    Jennifer Marie Weyland.
4    Q. I take it Reid's your maiden name?
5    A. Yes, sir. Spelled R-E-I-D.
6    Q. Did you give me your address there?
7    A. I'm sorry. 2366 New, as in brand
8    new, Lair, L-A-I-R, Road, that's Cynthiana,
9    Kentucky, 41031.
10   Q. And you're the spouse of Richard
11   Weyland?
12   A. Yes, sir.
13   Q. And you're one of the two
14   plaintiffs in a lawsuit brought here against
15   Peter Birkholz and Birkholz & Company?
16   A. Yes, sir.
17   Q. Now, your husband testified, and
18   I'm not sure we're done with his deposition,
19   but that aside, to the extent that we did get
20   through some things, a lot of times he
21   indicated that you were the primary liaison or
22   between your family and Mr. Birkholz; is that
23   generally correct?
24   A. Yes, sir.
25   Q. Let me just start with one of the

7

1    key things. I want to go through, and we've
2    got a lot of years to cover is one thing that
3    makes this complicated, but I'll try not to be
4    too burdensome with that, but let me kind of
5    go to one of the points with you. What's your
6    understanding of who employs your husband at
7    this point and time?
8    A. Tidewater Crewing Limited.
9    Q. And why do you think that, or what
10   is it -- who told you that, I guess?
11   A. I can see it on his pay stubs. I'm
12   sure Richard told me.
13   Q. And what's your understanding of
14   him first being employed by Tidewater Crewing
15   Limited?
16   A. 1984.
17   Q. Now, we've obtained some documents
18   from the Tidewater Companies; have you seen
19   those?
20   A. I'm not sure.
21   MR. GREEN: Let me show you one.
22   MR. ROYSE: Did she say 1984 or '94?
23   MR. GREEN: She said '84. She may
24   have meant '94.
25   THE WITNESS: No. I said 1984, I

8

1    meant 1984.
2    MR. GREEN: Well, I'm real sure
3    that's wrong, but that's okay. We'll look at
4    it later.
5    THE WITNESS: You asked me what my
6    understanding was.
7    MR. GREEN: Your understanding may
8    have been that.
9    THE WITNESS: Right.
10   MR. GREEN: One of the things that --
11   this is Bates stamped 3. I gave you Bates
12   stamped copies, didn't I?
13   MR. ROYSE: I've got them, yes.
14   Q. This is something put together by
15   somebody who says he's assistant secretary of
16   Tidewater, Inc., a Michael Goldblatt. This
17   was in response to a subpoena, and he called
18   it a certificate of resolution. I'm not sure
19   what that means, or maybe in Louisiana that
20   means something, but if you would -- have you
21   seen this document before? It's Bates stamped
22   T00003.
23   A. Not that I'm aware of.
24   Q. Would you look at the third
25   paragraph and read that, please?

9

1    A.   I have no idea what this means.
2         MR. ROYSE:   He didn't ask you a
3    question yet.
4    Q.   Would you read that, please?
5    A.   Richard J. Weyland is currently an
6    employee of Tidewater Marine, LLC since 1997,
7    and has never been an employee of Tidewater,
8    Inc.
9    Q.   Do you know who Tidewater Marine,
10   LLC is?
11   A.   No.
12   Q.   To your knowledge -- but that's
13   not consistent with your understanding?
14   A.   No, sir.
15        MR. GREEN:   Let me see that back.
16   Actually, this is one, let's go ahead and make
17   this an exhibit, Exhibit 1.
18        (REPORTER MARKS A COPY OF CERTIFICATE
19        OF RESOLUTION AS DEFENDANT'S EXHIBIT
20        NO. 1 FOR PURPOSES OF IDENTIFICATION,
21        AND THE SAME IS ATTACHED HERETO AND
22        FILED HEREWITH)
23   Q.   Let me ask you to look at this.
24   This will be Bates stamp -- let's see.   That's
25   Marine Service.   Do you know who Tidewater

10

1    Marine, Inc. is?
2    A.   No.
3    Q.   Do you know if they're different
4    than Tidewater Marine, LLC?
5    A.   No.   I wouldn't know the
6    difference.
7    Q.   Let me ask you to look at Bates
8    stamp T, and skip the zeros, T207.   Now, I
9    believe this relates to the mailing of some
10   stuff regarding licensure and so forth.   Take
11   a look at it; do you recall ever seeing that
12   before including after the production?
13        THE WITNESS:   I'm sorry.   What was
14   the last comment?
15   Q.   Including after the production, I
16   mean, prior to today, prior to right now, have
17   you ever seen it before?
18        THE WITNESS:   Could you repeat the
19   question, please?
20   Q.   Yes.   Have you ever seen that
21   document before?
22   A.   No, sir.
23   Q.   Do you recall a time in -- what's
24   the date on that, something '94?
25        MR. ROYSE:   April '94.

11

1         THE WITNESS:   You're doing better
2    than me.   I can't see it.
3    Q.   Do you recall a time when your
4    husband had to get a visa for Angola?
5         THE WITNESS:   I'm sorry.
6    Q.   Do you recall your husband having
7    to get a visa for Angola at some point in
8    time, particularly in April '94?
9    A.   As for the specific date, no.
10   Q.   No, just the general date, and I'm
11   sure you don't remember what day; I'm not
12   asking you that.   I'm asking do you remember
13   about 1994, your husband getting a visa to go
14   to Angola?
15   A.   I'm not sure I understand the
16   question.
17   Q.   The question is do you remember
18   that; do you remember him ever having to get a
19   visa for Angola?
20   A.   Yes, sir.
21   Q.   Would that have been in 1994?
22   A.   Possibly.
23   Q.   Well, this appears from the context
24   of the documents, and if it will help, I'll
25   show you T208 as well, which is a letter that

12

1    has Tidewater Crewings heading on it, but it's
2    got a New Orleans address and relates to that
3    visa, correct?
4         MR. ROYSE:   Ron, I'm not going to
5    have her testify as to what their documents
6    that were produced are, but I'll concede on
7    the record that those two sequential documents
8    certainly appear to go together based on what
9    Tidewater produced.
10   A.   I would have said I don't know, you
11   know, I'm reading this.
12   Q.   Well, I'm trying to get you to see
13   if in '94 you recall it being when he needed
14   the visa.   Let me just skip to my next
15   question; do you know why this would have been
16   done by Tidewater Marine, Inc.?
17   A.   I have no idea.
18   Q.   And you don't know who they are?
19   A.   No.
20   Q.   Has anybody from any of the
21   Tidewater Companies told you he was an
22   employee at any time of Tidewater Crewing
23   Limited?
24   A.   I'm not sure I understand the
25   question.

13

1    MR. GREEN: Would you read it back to
2  her? I think it was pretty clear.
3        (READ BACK BY COURT REPORTER)
4        THE WITNESS: Do you mean did
5  somebody call me up?
6    Q.   No, I mean just what I said. Has
7  anybody with any of the Tidewater Companies
8  ever told you that? I don't care how they
9  told you.
10   A.   I mean, it wasn't a subject of
11  discussion.
12       MR. GREEN: But I need an answer to
13  my question.
14   A.   No.
15   Q.   Other than what may have appeared
16  on paychecks, do you have any other basis for
17  thinking he was ever employed by Tidewater
18  Crewing Limited?
19       MR. ROYSE: He's just asking for your
20  personal knowledge.
21   A.   It just wasn't a subject that came
22  up a lot.
23   Q.   But my question is other than what
24  you saw on paycheck stubs, do you recall
25  seeing anything else that made you think that

14

1  your husband was an employee of Tidewater
2  Crewing Limited at any time?
3    A.   It's -- I'm going to have to say
4  no.
5    Q.   And there were times when you would
6  contact people about him in terms of trying to
7  get ahold of him and that sort of thing?
8    A.   Yes, sir.
9    Q.   And you didn't call Tidewater
10  Crewing Limited, did you, you called another
11  Tidewater Company or people with Tidewater,
12  Inc. or Tidewater Marine?
13   A.   I had a list of phone numbers that
14  had a list of people to call in different
15  areas, and the list doesn't -- if it shows
16  some kind of Tidewater thing on there, I
17  didn't look at that. I was looking for
18  wherever my husband was located and whose
19  extension it was I needed to call. I always
20  had to call overseas.
21   Q.   Well, we'll look at those in a
22  minute. Now, I want to kind of just jump
23  ahead. Tell me the procedure that -- and I
24  know it may have changed through time, but the
25  procedure generally that you went through in

15

1  terms of preparing, submitting, tax
2  information to Mr. Birkholz, and then once
3  that's done, what would happen when he was
4  done and had returns, and you would receive
5  them, what would you do with them?
6        THE WITNESS: Well, you asked quite a
7  few questions there, so which thing do you
8  want me to answer first?
9        MR. GREEN: Well, as I said in my
10  question, I'd like for you to start with what
11  you did to prepare information and contact
12  Mr. Birkholz with information, and when you're
13  done with that, tell me what you did with
14  returns that he sent you.
15   A.   Okay. I had my own business, and I
16  kept track of receipts, expenses, paid bills,
17  kept track of bank statements, credit card
18  statements, that sort of thing, and then
19  Peter's advice was because Richard had the
20  computer, Richard would take care of the
21  actual tax work.
22   Q.   Did you hear that advice be given,
23  or is that something Richard told you?
24   A.   Hear, I'm sorry, I don't understand
25  the question.

16

1    Q.   Did you hear Mr. Birkholz tell
2  Richard that?
3        THE WITNESS: Tell Richard to prepare
4  the taxes?
5    Q.   What you just said that he made a
6  recommendation about how to do that; did you
7  hear that recommendation, or is that something
8  your husband told you?
9    A.   I guess, I'm still -- I'm sorry.
10       MR. GREEN: Could you read her back
11  her answer, and then maybe she'll understand
12  my question.
13       (READ BACK BY COURT REPORTER.)
14   A.   Peter gave me the advice.
15   Q.   So he didn't give it to Richard, he
16  gave it to you?
17   A.   Well, yes.
18   Q.   Do you know when that was?
19   A.   From the beginning.
20   Q.   Pre 1988?
21   A.   Yes, sir.
22   Q.   Wasn't that before he had a
23  computer?
24   A.   Yes, sir.
25   Q.   So it couldn't have been from the

17

1  beginning?
2      A.  Well, Richard has prepared the
3  taxes since we've been married.  Go ahead.
4      Q.  Maybe I don't understand what
5  you're talking about now.  I assumed when you
6  talked about, when you were talking about the
7  use of the computer, you were talking about
8  the preparation of spreadsheets versus the use
9  of the organizer, but that's not what you're
10  talking about?
11      A.  It was the first thing that
12  occurred to me, but Richard has always
13  prepared the taxes.
14      MR. GREEN:  But I'm talking about the
15  advice about using the computer.
16      THE WITNESS:  Peter -- I'm sorry.
17  Can you clarify that a little bit?
18      Q.  Yeah.  I got confused.  Are you
19  saying Peter told you that Richard should use
20  the computer to do the taxes?
21      A.  Yes, sir.
22      Q.  And when was that?
23      A.  I can't remember when Richard got
24  the computer.
25      Q.  Was it about the same time he

18

1  started doing spreadsheets?  Let me rephrase
2  the question.  Do you recall your husband ever
3  doing spreadsheets before he had a computer?
4      A.  I couldn't say for sure.
5      Q.  So Richard prepared the
6  information?
7      A.  Yes, sir.
8      Q.  And there were several years in the
9  '90s where the information came to Peter a
10  year or two years late; is that true?
11      A.  No.
12      Q.  That never happened?
13      A.  No.
14      Q.  And so if your husband said it
15  happened in a letter, then he's incorrect?
16      A.  I'm not sure what you're referring
17  to.
18      MR. GREEN:  I'm just asking ever.
19      THE WITNESS:  You asked me if the
20  information ever got to Peter late?
21      MR. GREEN:  Uh-huh (affirmatively).
22      MR. ROYSE:  What do you mean late?
23      MR. GREEN:  Too late to file the
24  return timely.
25      MR. ROYSE:  By April?

19

1      Q.  Or October.  Do you recall a big
2  rigamarole?  And we'll go through it in more
3  detail, so if you don't remember right now,
4  I'll refresh your memory as we go through it.
5      A.  I remember.
6      Q.  There were a lot of penalties with
7  not filing the returns on time, correct?
8      A.  I'm imagining, yes, there probably
9  was.
10      Q.  And that was from all the data not
11  being given to Peter, correct?
12      A.  No.
13      Q.  What do you think it was from?
14      A.  I know it was from the fact that we
15  sent him the data, we sent it before the
16  deadline of the extension, and somebody in
17  Peter's office filed it in the file cabinet
18  before Peter prepared a return.
19      Q.  Do you have anything that would
20  support that, any document or anything that
21  would indicate that you mailed it on time?
22      A.  No, sir.
23      Q.  And any statements and letters from
24  you our your husband to the contrary would
25  then be incorrect?

20

1      THE WITNESS:  I'm sorry?
2      Q.  Statements and letters to the
3  effect that I'll get you the information you
4  need, that sort of thing, well after the fact,
5  you're saying those were just incorrect?
6      THE WITNESS:  That my husband said
7  that?
8      Q.  Well, I'll tell you what, let's
9  just hold off on that, and we'll get in to the
10  letters.  Now, he prepares the return, and he
11  would ordinarily return those to you and your
12  husband at whatever address he had along with
13  a sheet that said here's your return, here's
14  your estimated payment, that sort of thing,
15  correct?
16      A.  Correct.
17      Q.  Now, what would you do with the
18  return?
19      A.  There would be little -- I forget
20  what those things are called, little tabs,
21  sticky tabs that would be on the pages where
22  we needed to sign.  The instructions would be
23  sign returns and put them in the mail; that's
24  what I did, sign, date, put them in the mail.
25      Q.  Would you sign your husband's name

21

1   to them?

2       A.   Yes, sir.

3       Q.   Did you have a power of attorney?

4       A.   Yes, sir.

5       Q.   Did you read them before you signed

6   them?

7       THE WITNESS:  The returns?

8       MR. GREEN:  Uh-huh (affirmatively).

9       A.   No, sir.

10      Q.   Do you recall through all the years

11  prior to, let's say, prior to 2003, do you

12  recall ever looking and actually reading what

13  was on a form called a 2555?

14      A.   No, sir.

15      Q.   Would you have found it alarming if

16  you had done that and noted that according to

17  your husband, his employer was a company

18  called Tidex, I'm not sure how you pronounce

19  it, Nigeria Limited?

20      A.   I'm not sure what you're asking me.

21      Q.   Well, you'll agree that what I just

22  described is not Tidewater Crewing Limited?

23      A.   I will agree with you, yes.

24      Q.   So would you have found it alarming

25  if your husband had said that if you thought

22

1   that his employer was Tidewater Crewing

2   Limited, would you have found it alarming that

3   his tax returns say that it was a different

4   company?

5       MR. ROYSE:  Object to the form.  Go

6   ahead and answer.

7       THE WITNESS:  Alarming?

8       MR. GREEN:  Uh-huh (affirmatively).

9       A.   No.

10      Q.   Wouldn't have bothered you that

11  false information was given to the IRS?

12      MR. ROYSE:  Object, object to the

13  form.

14      MR. GREEN:  I'm not going to read it

15  at trial.  I just want to know.

16      MR. ROYSE:  She hadn't said that,

17  number one, it was false, Ron.  You can't put

18  that in a question.

19      MR. GREEN:  We know it's false.

20  These documents show it's false.  She said

21  it's Tidewater Crewing.  We know it's not

22  Tidex Nigeria.

23      MR. ROYSE:  But she didn't fill out

24  the form.

25      MR. GREEN:  But she didn't read it.

23

1   I'm talking about the reading of it.

2       MR. ROYSE:  Well, she's made clear

3   she didn't read it, she acknowledged it.

4       MR. GREEN:  I know, and I'm wanting

5   to see what the effect would have been had she

6   read it.

7       MR. ROYSE:  She said that she

8   wouldn't have realized there was any issue.

9       A.   It wouldn't have made any

10  difference to me, you know, it wouldn't have

11  had any impact on me at all.

12      Q.   So you weren't concerned about

13  that.  Did you ever have any conversations,

14  specific conversations prior to, and I hope

15  I'm picking the right cutoff date -- well,

16  let's say the end 2002, any specific

17  conversations with Peter Birkholz about who

18  employed your husband?

19      A.   Not to my recollection.

20      Q.   Do you recall, and I understand

21  some of this goes way back, okay, and I also

22  understand that all of this puts you in a

23  difficult situation, but your husband has said

24  you're the one that knows this stuff, okay, so

25  I've got to find out just what you know and

24

1   what you don't know, so if I'm asking you

2   questions you think are ridiculous, it's

3   because I need to know you don't know them.

4   Somebody needs to know them, and I need to

5   find out who.  Do you recall a time when your

6   husband received 1099s from an employer?

7       A.   No.

8       Q.   Never?  Do you recall a time when

9   they did withholdings?

10      A.   Yes.

11      Q.   When was that, and what company; do

12  you remember?

13      A.   Zapata Marine.  I'm not sure of the

14  exact --

15      Q.   Gulf and Marine?

16      THE WITNESS:  Yeah, it could be

17  Zapata Gulf Marine, and you're asking for the

18  years?

19      MR. GREEN:  Well, whatever you can

20  tell me.  I need to know what you remember.

21      A.   Well, he was working for Tidewater

22  Marine when we got married in 1980.

23      MR. ROYSE:  You just said Tidewater.

24      THE WITNESS:  I'm sorry.

25      Q.   Zapata Gulf and Marine?

25

1   A.   Zapata.

2       MR. GREEN:  I get confused, too.

3   A.   Yeah, it was Zapata, and they were

4   taking withholding at that time.

5   Q.   And do you have any -- you said

6   1980?

7   A.   Right.

8   Q.   Any feel for how long they

9   continued to do that?

10   A.   I know things changed drastically

11   in 1984.

12   Q.   When you say things changed

13   drastically, what changed, and I assume we're

14   talking about his employment, not things with

15   you personally or anything?

16   A.   Well, things changed with the

17   company Zapata Gulf Marine.

18   Q.   What changed?

19   A.   They were being taken over, and I'm

20   not sure that's the correct term, but they

21   were being taken over by Tidewater.

22   Q.   And do you recall having any

23   conversations with Peter Birkholz or anybody

24   in his office about that change?

25   A.   Peter Birkholz specifically.

26

1       MR. GREEN:  Tell me what you recall

2   being the conversation.

3   A.   I don't know if I recall specific,

4   you know, I can remember the topic of

5   discussion.  We were concerned about how this

6   was going to affect the, you know, the fact

7   that Richard's paycheck looked different, so

8   we wanted to know how this was going to affect

9   his returns.

10   Q.   What do you mean by look different?

11   A.   There was no withholding.

12   Q.   And how did you have, in what form

13   did you have this conversation?

14       THE WITNESS:  What form?

15       MR. GREEN:  Uh-huh (affirmatively).

16       THE WITNESS:  Can you be more

17   specific?

18       MR. ROYSE:  Did you have it in

19   person, did you have it over the phone,

20   written?

21   A.   I wanted to make sure.  We'd had it

22   in person.

23   Q.   Where was it at?

24   A.   The best of my knowledge, it was in

25   Natick, Massachusetts.

27

1   Q.   And what was in Natick,

2   Massachusetts?

3   A.   His office.

4   Q.   And who was present?

5   A.   Peter Birkholz.

6   Q.   Who else?

7   A.   As far as I know, there was nobody

8   else.

9   Q.   Just you and he?

10   A.   And Richard.

11   Q.   That's what I asked.  Anybody else;

12   Richard was there?

13   A.   I'm sorry.  I thought you meant,

14   like, a secretary or something.  Myself,

15   Richard, and Peter Birkholz.

16   Q.   Now, how sure are you about the

17   1984?

18       THE WITNESS:  1984?

19       MR. GREEN:  Being the time of the

20   change.

21       THE WITNESS:  Being the time of the

22   change?

23       MR. GREEN:  Uh-huh (affirmatively).

24       THE WITNESS:  You mean when things

25   changed with Zapata Gulf Marine?

28

1       MR. GREEN:  Uh-huh (affirmatively).

2   A.   Fairly certain.

3   Q.   Let me ask you to look at, this is

4   marked as what's marked a T14, and this is --

5   I don't know exactly what to make of it.  I

6   don't know if you've ever seen it before.

7   Before I get into this, let me ask you, what

8   if anything did you look at to prepare for

9   your deposition today?

10   A.   There was a multiple sheet of

11   instructions.

12       MR. ROYSE:  I'm going to object to

13   any conversations we had about giving a

14   deposition.

15   Q.   I sure don't want that.  What I'm

16   asking is what documents did you look at?

17   A.   There was a multiple sheet of

18   instructions.

19       MR. ROYSE:  No.  He's asking what

20   documents in this case did you review.

21   A.   There was the '03 letter from

22   Mr. Birkholz, August '03, we looked at.

23   Q.   So you didn't go through the

24   documents, for example, that you produced or

25   the documents Mr. Birkholz produced to refresh

29

1   your memory?

2       A.   No, sir.

3       Q.   Let me show you what's marked T14.

4   It's titled employee earnings deduction

5   register; have you ever seen this before?  If

6   you didn't look at the Tidewater documents,

7   you might not have.

8       MR. ROYSE:  Just so we're clear, Ron,

9   she can tell you whatever you want to ask her

10  about what her understanding was from time to

11  time, but you've got these Tidewater documents

12  in a subpoena to Tidewater, and I think you

13  noticed a deposition of a 30(b)(6) to ask them

14  about what these things mean.  So she can tell

15  you what her understanding is, she can tell

16  you what she thinks from time to time, but I

17  just want to interpose to make clear that

18  she's not going to interpret Tidewater

19  documents whether she's reviewed them or not.

20      MR. GREEN:  I'm not asking her to.

21  This is inconsistent with what she just said.

22  Anybody can be a year off or two years off or

23  whatever.  I'm just wanting to know if any of

24  this jogs her memory.

25      THE WITNESS:  You mean have I seen

30

1   it?

2       MR. GREEN:  That was my question on

3   the table, but that's not where I'm headed, I

4   mean, that's not the end of it.

5       A.   I don't recall ever seeing

6   something like this.

7       Q.   Now that indicates that if they're

8   using employer in the term that we are, which

9   I don't know that that's true, that indicates

10  that Zapata Golf and Marine was his employer

11  in at least part of '85, correct?

12      A.   I wouldn't --

13      MR. ROYSE:  He's asking you does this

14  indicate --

15      THE WITNESS:  Yeah.

16      MR. ROYSE:  -- Zapata Gulf Crews or

17  Zapata Golf Marine was his employer.

18      THE WITNESS:  Are you asking which

19  one it was?

20      MR. ROYSE:  No.  He's just saying

21  does it indicate Zapata --

22      A.   It looks that way.

23      MR. ROYSE:  That's all he's asking.

24      Q.   So could the date that you were

25  talking about have been in '85 instead of '84?

31

1       A.   Possibly.

2       Q.   Now, do you know who Zapata Gulf

3   Crew is?

4       A.   No.

5       Q.   Is it possible that the actual

6   Tidewater transaction was much later than '85,

7   and that this was simply a shift within

8   Zapata?

9       A.   I couldn't tell you.

10      MR. ROYSE:  Ron, I'm going to do this

11  on the record, but I'd be happy to do it off

12  because I don't want you to think I'm

13  testifying for her.  I think what she's

14  telling you is that change of the withholding

15  stuff happened in '84, and kind of was a

16  watershed moment.  Because I'm like you, I

17  think the actual change to formal Tidewater

18  came later, and I don't think she's trying to

19  mislead you about that.

20      MR. GREEN:  Oh, I know.  I just want

21  to know what she knows, and I wanted to give

22  her a chance to refresh her memory because she

23  hasn't reviewed anything, but frankly, just

24  from that record, it appears that '85 is the

25  year that they changed withholding by

32

1   switching to Zapata Gulf Crew, but Tidewater

2   came much -- really two different things --

3       MR. ROYSE:  I think you're right.

4       MR. GREEN:  -- and anybody can mix

5   things up 15 years ago, I understand that.  I

6   just want to get this as clear as I can and

7   know if there's a contest about it.

8       THE WITNESS:  As far as I know, I've

9   never seen that before.

10      MR. GREEN:  Well, I wish you had, and

11  it would make this a lot easier if you would

12  have looked at these before the depo, but

13  that's okay.  We'll go through them.

14      MR. ROYSE:  We don't have to fight

15  about that.

16      MR. GREEN:  I'm not.

17      MR. ROYSE:  She's prepared to give

18  her deposition, Ron, and she's not required to

19  testify about what Tidewater's produced.

20  She's prepared to give her deposition.

21      MR. GREEN:  No, but I'm told that she

22  is the one that has communicated with Peter

23  Birkholz, since she's the one that knows about

24  --

25      MR. ROYSE:  That's not a

33

1  communication with Peter.

2      MR. GREEN: -- and she knows about

3  this stuff, Richard didn't know much of

4  anything, and if she doesn't know, that's

5  fine. I just need to know.

6      MR. ROYSE: Richard didn't know much

7  of anything. He gave a deposition that lasted

8  all day.

9      MR. GREEN: I know, and most of it

10  was I don't know, you'll have to ask my wife.

11      MR. ROYSE: Okay.

12      MR. GREEN: You know, so I just need

13  to know what she knows, and it may turn out

14  that it's not anything close to what I think,

15  and then I'll move on.

16      MR. ROYSE: And that's fine.

17      MR. GREEN: But I want to know.

18      MR. ROYSE: And she's not a

19  30(b)(6). She's here to tell you what she

20  knows, and I'm not going to let her feel like

21  she should have been made to learn a bunch of

22  stuff about Tidewater.

23      MR. GREEN: I don't care. It's your

24  protocol about whether you did or not. I'm

25  not saying you should have, I'm just saying it

34

1  would have been helpful.

2      MR. ROYSE: I'm not sure it would

3  have, but go ahead.

4      THE WITNESS: I'm with him.

5      MR. ROYSE: This is us having our

6  discussion.

7      Q.  We're the only ones that have

8  looked at the documents, but I don't want to

9  make a fight out of this. It was just a

10  statement, I think it would have been helpful,

11  but, again, he's right. I'm not saying you

12  should have, you had to. I think it would

13  have been helpful you would have known what I

14  was coming about. So you don't know who

15  Zapata Gulf Crew is or whether that was the

16  employer of your husband for some period of

17  time?

18      A.  I couldn't say for sure. I mean,

19  it's -- I'm really not grasping the question.

20      MR. GREEN: All I know is, is that

21  documents that we got from Tidewater indicated

22  that, and I'll tell you what, we can go a

23  little further with it. Let's see, 86 is --

24  88, T88 -- no, no, I'm sorry. It's T15.

25      MR. ROYSE: Go ahead.

35

1      Q.  Yeah, I mean, I'm just saying we

2  got these documents that say that, I don't

3  know if it says who the employer is, but it

4  says the company paying him is Zapata Gulf

5  Crews in '86. It's not a Tidewater Company, I

6  don't think, but you've never heard of Zapata

7  Gulf Crews?

8      A.  If you're asking if I've ever heard

9  of Zapata Gulf Crews, I couldn't tell you for

10  sure.

11      Q.  Do you recall ever discussing with

12  Peter Birkholz that your husband's employment

13  had changed from Zapata Gulf and Marine to

14  Zapata Golf Crews? I have trouble saying

15  that. I'm sorry. Zapata Gulf Crews.

16      A.  I don't recall.

17      Q.  So if we find ourselves at trial,

18  is it safe that you're not going to tell the

19  jury that you told Peter Birkholz that your

20  husband's employment changed from Zapata Gulf

21  and Marine to Zapata Gulf Crews in 1985; you

22  don't know one way or the other whether you

23  discussed that with him, correct?

24      A.  I'm going to say no.

25      MR. ROYSE: You ask a question like

36

1  that, that's the answer you get.

2      Q.  That's true. No, I can't assume

3  that? Let me ask you this, there's

4  different -- let me tell you where I'm coming

5  from. There's different kinds of I don't know

6  or I don't remember. It's I don't remember

7  whether I did, or I specifically remember not

8  doing that. Are you just telling me you can't

9  recall one way or the other if you had any

10  discussions involving the changes Zapata Gulf

11  Crews, assuming there was one, with Peter

12  Birkholz?

13      MR. ROYSE: You mean specifically

14  referring to those entities? She's told you

15  she had that meeting, but you mean

16  specifically talking about those names?

17      Q.  But now we're not sure which time

18  frame that meeting is because it was talking

19  about Tidewater, I don't know which it was

20  dealing with, but you had a meeting -- let me

21  go back and try to clear this up. You had a

22  meeting discussing, I think, you said that the

23  paychecks were different --

24      A.  Right.

25      Q.  -- and the effect of that where

37

1  they weren't withholding?

2      A.   Yes, sir.

3      MR. GREEN:  Now, I think we've

4  established that that probably could not have

5  been also about a change to Tidewater if these

6  documents mean what it looks like they mean.

7      THE WITNESS:  I don't recall.

8      Q.   In that meeting, do you have a

9  recollection of telling Mr. Birkholz that the

10  person -- the company writing the check had

11  changed from Zapata Gulf and Marine to Zapata

12  Gulf Crews, Inc.?

13      THE WITNESS:  Do I recall us telling

14  him that?

15      MR. GREEN:  Yeah.

16      A.   No, I don't.

17      Q.   And do you recall what he told you

18  about the effect of changing the withholding;

19  what did he tell you that would do to you?

20      A.   He said, oh, you're an independent

21  contractor, you're going to have to pay both

22  halves of the self-employment tax.

23      Q.   And what did you all say?

24      A.   I don't recall.

25      Q.   Now, was there any discussion at

38

1  that time about how that might give you

2  another deduction?

3      THE WITNESS:  Another deduction?

4      MR. GREEN:  Uh-huh (affirmatively).

5  You have to pay it, but you deduct part of

6  it.

7      THE WITNESS:  I don't understand.

8      Q.   Was there any discussion of how

9  that might affect the other side of your

10  income tax?  Let me make it short.  That

11  didn't happen until '90, I just wanted to see

12  if you discussed it.

13      THE WITNESS:  It didn't happen until

14  '90.  What didn't happen?

15      MR. GREEN:  They changed the law

16  about deducting Social Security, half of

17  Social Security payments.

18      THE WITNESS:  I have no idea.

19      Q.   So you all didn't discuss anything

20  like that?

21      A.   Not that I recall.

22      Q.   Do you recall ever discussing an

23  offsetting deduction that you get if you pay

24  self-employment tax?

25      A.   No, I don't recall.

39

1      Q.   Now, do you not have copies, do you

2  and your husband not have complete copies of

3  your tax returns as you sent them in to the

4  IRS; did you not normally make a copy of

5  those?

6      A.   We got a copy from Peter.

7      Q.   And you signed it, and you sent it

8  on; did you keep a copy?

9      A.   He sent two copies, a client copy,

10  and a copy to sign and send on to the IRS.

11      Q.   Do you still have any of those?

12      MR. ROYSE:  We produced them.

13      MR. GREEN:  Not many, not all of

14  them, but maybe all they have.  That's what

15  I'm trying to see is what they have.

16      THE WITNESS:  We kept pretty much

17  everything.

18      Q.   But you would not have kept a copy

19  of the signature and date and things like that

20  to where we would know when they were sent

21  off?

22      A.   No, and I asked Peter about sending

23  things certified, and he told me not to do it.

24      Q.   To the IRS?

25      A.   Correct.

40

1      Q.   Right, you don't do that.  But you

2  didn't keep any kind of log or anything to

3  make a note anywhere about this was mailed to

4  the IRS on such and such a date?

5      A.   No, sir.

6      Q.   Did you have any involvement at

7  all, I'm going to show you just a copy, it

8  happens to be 1998, of a form called a 2555;

9  did you do that, or was that pretty much

10  exclusively your husband's bailiwick?

11      THE WITNESS:  Are you asking me if I

12  filled this out?

13      Q.   I'm saying, did you have anything

14  to do with providing the information or

15  filling out one of those forms?

16      A.   No.

17      Q.   Was that something your husband

18  took care of?

19      A.   I would assume so.

20      Q.   In this particular one, which is,

21  for the record, PB917, it shows -- the box is

22  checked for the employer being a U.S. company,

23  but it's blank as far as who the employer's

24  supposed to be; you would have never read this

25  even before you signed them, correct?

41

THE WITNESS: Is my signature on
there?

Q.   Well, nobody signs this particular
document. As we just talked about, we don't
have any copies that are signed, so we don't
know, but as part of the return that you would
have signed if you did it like you described
earlier, and you've indicated you didn't go
and read through it?

A.   No.

Q.   So you would have never even really
seen this type of form?

A.   Probably not, no, no, sir.

Q.   You may not -- I just need to know
if you know about this, PB954, and let me
just, as a prelude to this question, refresh
your memory that Peter had indicated in his
deposition, and you were present for that, but
you may not remember this, that your husband,
as far as you knew, your husband would fill
out a 2555 kind of in handwriting, and then it
would be typed up as he did it, and I'm going
to show you what's been marked as PB954 and
ask you first of all if that's husband's
handwriting, or is that yours?

42

A.   It's not mine.

MR. ROYSE: Object to the form just
on the characterization of the testimony, it's
inconsistent, but go right ahead and answer
it.

THE WITNESS: Answer you said?

MR. ROYSE: Answer what he asked you;
is that your handwriting or Richard's?

A.   It doesn't look like either of our
handwriting.

Q.   Now, this is '87, but you don't
know where that information would have come
from then, but it wasn't from you?

THE WITNESS: You mean did I provide
this information?

MR. GREEN: Uh-huh (affirmatively),
whether over the phone or anything else.

A.   No.

Q.   And just to show you briefly PB930
through PB943, appears to be for December 30,
1998, a letter to you with what we can call a
tax organizer; do you recall seeing something
like that? I know it's been a long time.

THE WITNESS: Are you asking if I've
seen these before?

43

MR. GREEN: Uh-huh (affirmatively).

MR. ROYSE: He asked you if you'd
seen that one.

MR. GREEN: Right.

A.   This one specifically, I couldn't
say for sure.

Q.   Do you recall getting something
like that from time to time?

A.   Yes, sir.

Q.   Now, was that something that your
husband handled in terms of filling those out
when they were filled out?

A.   To the best of any knowledge, yes.

Q.   Would you look at that one, and
there's some handwriting on it, I believe;
will you see if that's something that you
would recognize as your's or your husband's
handwriting?

A.   This looks like Richard's
handwriting. It could be my husband's
handwriting.

Q.   And speaking very generally, is it
correct that early on, you all used these
organizers and then switched to a spreadsheet
format?

44

A.   I don't remember when Peter started
sending organizers.

Q.   I'm not asking about that.
Initially, communication was done through the
organizer, and then it went to, like, a
spreadsheet format, correct?

A.   I'm not sure which came first.

Q.   And the spreadsheets, whenever they
are, those were things that were prepared by
your husband and not you, correct?

A.   Correct.

Q.   You only prepared information about
your business, correct?

A.   Well, and the household, in other
words, mortgage information, car payments.

Q.   Personal family stuff?

A.   Canceled checks, bills, that kind
of thing.

Q.   Let me ask you to take a look at a
document. It's been Bates stamped W7; do you
recall seeing that letter?

A.   No.

Q.   This was a document that you and
your husband produced; would your husband have
taken care of things like this, or would you

45

1  have been involved when you get mail
2  concerning his employment benefits and that
3  sort of thing?
4      A.  If I opened this, which I don't
5  remember if I did, I would have put it in his
6  mail pile.
7      Q.  Which he would then look at when he
8  got back?
9      A.  That's right.
10     Q.  So this stuff about them forming
11  Zapata Gulf Marine and all that, that would
12  have been something that didn't concern you
13  back at that time?
14     A.  No.
15         MR. GREEN:  Let me -- take a look at
16  PB948, maybe just to make it quicker, in
17  conjunction with 963.  I'm going to show you
18  these two documents and ask you if you recall
19  seeing those, if you recognize those and
20  whether or not you believe they go together
21  because they're both involving the tax year
22  1988, I believe.
23         THE WITNESS:  Okay.  What about
24  this?
25     Q.  Do you recall seeing those?

46

1      A.  I wrote it.
2      Q.  You didn't write the IRS notice,
3  did you?
4      A.  No, I didn't write that, no, but I
5  wrote this letter.
6      Q.  Right.  And do you have any reason
7  to think that's not the notice that you were
8  attaching?
9      A.  I don't remember.
10     Q.  And this is just an indication that
11  the amount that you had indicated on your
12  return that had been paid and estimated is
13  actually greater than the amount actually
14  paid; is that correct?
15     A.  Say that again, that they're -- I
16  mean, I remember the inheritance.  I don't
17  remember the specifics about what was paid and
18  all that other kind of stuff.
19     Q.  Well, do you recall having a
20  problem from time to time when the IRS would
21  correct your returns because the information
22  that you gave to Mr. Birkholz concerning how
23  much had been paid and estimated was different
24  than what the IRS showed as having been
25  actually been paid or allocated?  Usually

47

1  that's just an allocation issue.
2      A.  I'm not sure what you're referring
3  to in regard to this.
4         MR. GREEN:  Let me see it again, make
5  sure I'm correct.  If you'll look under
6  corrections explanations, I think you'll see a
7  statement is pretty much what I just said.
8         THE WITNESS:  Corrections,
9  explanations.
10        MR. ROYSE:  I'm sorry, Ron.  Maybe
11  I've lost track now.  What's the actual
12  question on the table?
13        MR. GREEN:  If there was a problem
14  from time to time where the information that
15  was given to Peter concerning the amount of
16  estimated taxes paid was different than what
17  the IRS indicated that was actually paid.
18        MR. ROYSE:  Do you remember that
19  happening from time to time?
20        THE WITNESS:  No.
21        MR. GREEN:  Are you saying you have
22  no recollection of this event, I mean, if
23  there's another explanation, that's what I
24  would like to hear.
25     A.  I have no idea.  I'm really not

48

1  sure what this is about.
2      Q.  I don't expect you to have a
3  specific memory of what happened in 1989.  I
4  really, I think this recurs through a number
5  of years.  I'm just wondering if you generally
6  remember a problem with the information you
7  giving to Mr. Birkholz not matching up with
8  the IRS --
9      A.  No, I don't remember.
10     Q.  -- leading to notices the different
11  years?
12     A.  No.  I don't remember.  If you're
13  asking me if I remember specific things, no, I
14  don't.
15     Q.  Do you remember generally that
16  being a problem?
17        THE WITNESS:  That we got notices?
18        MR. GREEN:  That changed the amount
19  that, for example, reduced your refund or
20  required you to pay more because the estimated
21  payments were adjusted.
22        THE WITNESS:  Okay.
23        MR. GREEN:  Go ahead.
24        THE WITNESS:  You go ahead.
25        MR. ROYSE:  No.  Let her answer if

49

1  you know what he means.
2       THE WITNESS: If you're -- let me put
3  it this way. Are you asking me, and I'm just
4  trying to make sure, that because we made
5  estimated payments, did we get notices from
6  the IRS at the end of the year saying you
7  either paid too much or you paid too little;
8  is that what you're asking me?
9       MR. GREEN: Not really.
10      THE WITNESS: Oh. That's what I'm
11 hearing.
12      Q. I'm talking about the amounts the
13 IRS says you paid were different than the
14 amounts that you told Peter Birkholz that you
15 had paid and he put on the return; that's what
16 that is about. Let me ask you this, we'll hit
17 some more of these, and maybe it will jog your
18 memory. Who was responsible between you and
19 your husband for providing that piece of
20 information to him, the amount that you had
21 paid towards your income taxes and Social
22 Security?
23      A. This has got a tape on it. We
24 never got -- this is -- apparently, I typed in
25 a ridiculous number, it's 35,000.00. I think

50

1  it's supposed to say $3,500, not $35,000, but
2  I don't remember.
3       MR. GREEN: Well, we'll mark you down
4  as a poor typist.
5       THE WITNESS: Yeah.
6       MR. ROYSE: Let's take a break, Ron.
7  You at a good spot?
8       MR. GREEN: I reckon.
9       (RECESS 2:00 - 2:17 P.M.)
10      Q. We were talking about these two
11 documents, which, I believe, are 948 and 963,
12 and, again, I just want to make sure. As we
13 sit here today at this point anyway, you don't
14 have a recollection of there being a problem
15 with the numbers that you were giving Peter
16 about your estimated payments not matching up
17 with what the IRS had?
18      MR. ROYSE: In that instance or just
19 generally?
20      Q. Just generally. And I'll show you
21 some more, I think, as we go, and if it --
22      THE WITNESS: I apologize. I think
23 what you're asking me is if in the course of
24 making estimated payments, was there -- are
25 you saying that the IRS is saying that they

51

1  didn't credit us the correct payment?
2       MR. GREEN: That's a possible
3  explanation, or your records were wrong, or
4  something -- they didn't match up.
5       MR. ROYSE: There were discrepancies
6  in what you all thought you paid versus what
7  the IRS thought you paid.
8       A. Yes, yes.
9       Q. And that happened on a number of
10 occasions?
11      A. Yes, sir.
12      MR. GREEN: You saved us hours of
13 questions.
14      THE WITNESS: I'm sorry. I was
15 trying to -- the thing that threw me was this
16 business with my inheritance, and I couldn't
17 understand what that had to do with --
18      MR. GREEN: No. The first sentence
19 is all that I was really asking you about.
20      MR. ROYSE: The rest of that was
21 totally unrelated.
22      THE WITNESS: Oh, okay.
23      Q. I assume this case doesn't have
24 anything to do with inheritance taxes?
25      A. No.

52

1       Q. So that's your business, I don't --
2       MR. ROYSE: If it keeps going on, it
3  might.
4       THE WITNESS: All right.
5       MR. ROYSE: You've answered it.
6       MR. GREEN: Yeah.
7       THE WITNESS: Sorry. I got mixed up
8  with that other part.
9       MR. GREEN: I swore I'd try to keep
10 these things in order unlike the last time.
11 This is W93 -- never mind. I didn't know that
12 that was state tax. I'm not particularly
13 interested this that. Sorry. Now, let me
14 talk with you just a little bit about 1989,
15 and of the file materials that we have
16 available, if you'll look at 869, which
17 I'll -- although -- okay, 892 is where the
18 actual spreadsheet is.
19      MR. ROYSE: 92?
20      Q. Yeah, 869 thought is what I'm going
21 to ask her about. It's just a letter about
22 892. Now, this letter is from your husband,
23 so, but this is the first indication that I
24 have seen concerning the preparation of the
25 transmittal of information to Peter Birkholz

53

1  through the use of a spreadsheet; do you have
2  any reason to doubt that's the first year, and
3  I don't know because we don't have '87, we
4  don't have '86, but in '88 there was no
5  spreadsheet; I can tell you that with some
6  certainty.
7      THE WITNESS: I'm sorry. Would you
8  repeat the question? You're asking me if this
9  is the first time we were sent a spreadsheet?
10     MR. GREEN: Actually, I'm giving you
11 a little more benefit of doubt than that. I'm
12 saying that from my review, this is the first
13 instance I can find where a spreadsheet was
14 used.
15     THE WITNESS: Spreadsheet was
16 completed, right.
17     Q.  Do you have any reason to think
18 that's not the first time?
19     A.  No.
20     Q.  And that would be in '89 -- or
21 actually, what's that letter dated, May 1990
22 for the '89 tax year; that fits with your
23 general recollection of when these things
24 happened when you got a computer, that sort of
25 thing?

54

1      A.  As I explained before, I don't
2  remember what year we got the computer.
3      Q.  Good enough. And maybe ask you
4  about 872, which is a cover letter for your
5  '89 tax returns. It's dated October 9th,
6  1990. I don't expect you to remember seeing
7  that specific document, but do you recall in
8  that time frame receiving, and various times,
9  receiving a cover letter with your returns
10 saying, you know, here's your returns, here's
11 what you need to do for estimated next year,
12 this is what you pay, that kind of thing; see
13 anything there look out of the ordinary to
14 you?
15     A.  Looks like it.
16     MR. GREEN: And, of course, I assume
17 that the returns would have been due no later
18 than October 15th. I don't know if that's
19 stated in that.
20     THE WITNESS: Yeah, it says right
21 down here (indicating).
22     Q.  Okay. I take it you don't have any
23 memory of actually if they were filed by the
24 15th or any reason to think they weren't?
25     A.  No.

55

1      Q.  Because I didn't see any indication
2  of any penalties or anything. You don't
3  recall going that far back why you would have
4  needed extensions that year?
5      A.  Usually an extension was filed
6  because Richard was out of the country.
7      Q.  And I know that you've already told
8  me that you didn't look at these forms, but
9  if -- let me show you 907, which is, again,
10 the 2555, and I'm just going to ask you if you
11 know why something is. On the 2555 for 1989,
12 and this is a handwritten document -- first
13 let me ask you; is that either your's or your
14 husband's handwriting?
15     A.  It's possibly Richard's, but it
16 looks funny, so I couldn't tell you for sure.
17     Q.  You'll notice that it shows on
18 there Zapata Gulf and Marine as the employer?
19     A.  Okay.
20     Q.  You see it?
21     A.  Yeah.
22     Q.  And this is, of course, well after
23 the change we talked about with Zapata Gulf
24 Crew and all that, but that's okay. But what
25 struck me as odd, if I remember correctly from

56

1  just seconds ago, isn't that now checked as
2  Zapata Gulf and Marine being a foreign company
3  or a foreign affiliate?
4      A.  It looks like it is.
5      Q.  I'm not aware of any change in
6  their status; are you aware of anywhere they
7  changed their country of origin? They were
8  initially a U.S. company out of Texas; do you
9  have any memory of them changing? Forget
10 about them being bought by somebody. Do you
11 remember them actually changing their office
12 or anything else prior to being bought by
13 Tidewater?
14     A.  I'm trying to think.
15     MR. ROYSE: He's asking you if you
16 have any particular knowledge that they
17 changed from a U.S. entity to a foreign entity
18 in these years; do you have any specific
19 knowledge?
20     THE WITNESS: No, no.
21     Q.  So you don't know why that would
22 have changed or if that's a mistake or what;
23 you just don't know?
24     A.  No.
25     Q.  This may be less important, but

57

```
 1   I'll go ahead and ask you just briefly.  This
 2   is, I believe, similar to that last notice.
 3   It's PB804.  It's for the tax year 1990.  It's
 4   dated March 30th, '92, and it basically again
 5   just says that the amount that was put on the
 6   return as having been paid was different than
 7   what the IRS had, but you've already indicated
 8   that happened from time to time; I assume that
 9   got resolved?  Let me help you with another
10   document 806, which is your note that goes
11   with it, I believe.  I believe all those go
12   together.
13        A.   Okay.  We got a refund check.
14        Q.   But you also got a notice that says
15   you owed money or that they were making an
16   adjustment, I should say.  I don't know.  I
17   didn't look closely.  Do those three things go
18   together with that note, those two things go
19   with that note?
20        THE WITNESS:  I'm not sure I'm seeing
21   the date.  Is this 12-90, on this check, is
22   that the year, '90?
23        Q.   What's the date on the handwritten
24   note?
25        A.   April 24th, 1992.
```

58

```
 1        MR. GREEN:  Yeah, I'd say not.  Let
 2   me see the check again.  I'd say 3-27-92 is
 3   the date up here, but I don't know that.  I
 4   can't read their stuff any more than you can.
 5        THE WITNESS:  If you are having a
 6   hard time, trust me, I'm not going to --
 7        Q.   But your handwritten note talks
 8   about you got a check, right?
 9        A.   Yeah.
10        Q.   And all I know is that's the only
11   one in that file, in Pete's file for that
12   year, so, and then you also got a notice about
13   the estimateds, correct?
14        A.   That's what this looks like, yes.
15        Q.   To your knowledge, did all that get
16   resolved?
17        THE WITNESS:  As far as I know,
18   yeah.  Did I answer your question for you?
19        MR. GREEN:  Yes.  And if you'll look
20   at 819, Mr. Birkholz wrote you a letter which
21   either is patronizing or complimentary, I'm
22   not sure which.
23        THE WITNESS:  Right.  I was going to
24   tell you that he has commented on the fact
25   that I don't run to the bank and cash out a
```

59

```
 1   refund check and go and blow it on stuff.  I
 2   hold on to it until I'm sure everything is
 3   okay.
 4        Q.   I think that's probably said more
 5   than once.  But do you have any independent
 6   recollection of what the discrepancy was; that
 7   letter may or may not help you refresh your
 8   memory?
 9        THE WITNESS:  Discrepancy?
10        Q.   In terms of what you had reported
11   to Peter, when I say you, I mean, you and your
12   husband, had reported to Peter as the amount
13   you had paid in estimated versus what the IRS
14   had recorded; do you remember what the problem
15   was?
16        MR. ROYSE:  This goes with what you
17   just showed her, right?
18        MR. GREEN:  Uh-huh (affirmatively).
19   It's a response to those things, and I'm just
20   letting her see it to see if it refreshes her
21   memory.
22        THE WITNESS:  It sounds like we
23   overpaid, that's what it looks like, but
24   you're asking me if the amount that we told
25   Peter was higher?
```

60

```
 1        Q.   It doesn't matter whether it was
 2   higher or lower; it was just different than
 3   what the IRS had?
 4        A.   It's possible.
 5        MR. GREEN:  Well, I mean, the IRS
 6   statement says that's the case.  I'm just
 7   remembering if you recall what caused the
 8   discrepancy.
 9        THE WITNESS:  What caused the
10   discrepancy.  I'm going to say that it's
11   possible that when -- I'm trying to think.
12   I'm not sure why in this year.
13        Q.   Okay.  That's fine.  Let me show
14   you the 2555.  It's a handwritten version for
15   the 1990, it's 814, 815; can you tell me
16   whether you recognize the handwriting on that
17   form?
18        A.   It's possible it's Richard's, but I
19   couldn't tell you for sure.
20        Q.   Would you read there for the record
21   what's listed as the employer for 1990?
22        A.   This says Zapata Marine Service
23   Nigeria Limited.
24        Q.   Have you ever heard of that name
25   before?
```

61

1    A.    Occasionally.

2    Q.    In what context?

3    A.    Well, Richard worked in Nigeria for

4  a long time, and I probably heard it in

5  reference to him working over there.

6    Q.    Was there a time when there was

7  another employment change that you're aware of

8  to go from Zapata Gulf Crew to -- I mean, do

9  you know why this changed?

10    THE WITNESS:  Why Zapata Marine?

11    MR. GREEN:  Why your husband put a

12  different name down this time than he did in

13  '89.

14    THE WITNESS:  I have no idea.  If

15  that's who filled it out.

16    MR. GREEN:  Well, I mean, even if

17  somebody in Peter's office filled it out, I

18  mean, that would be tough just to make up.  I

19  assume there is a company of that name.

20    THE WITNESS:  As far as I know, yeah.

21    Q.    And their main office is in

22  Houston, Texas?

23    A.    I have no idea.

24    Q.    I mean, there's some -- I think in

25  some of the documents you all produced, as

62

1  well as Tidewater did, there's a letter or two

2  that relates to business in terms of what's

3  going on in a ship.  You wouldn't have been

4  privy to any of that; he wouldn't have copied

5  you on that sort of thing?

6    THE WITNESS:  My husband?

7    Q.    Yeah.  And the reason is, is the

8  only source that I can find in the Tidewater,

9  collective Tidewater documents that refers to

10  Zapata Marine Service, Nigeria, is a single

11  letter in 1993 which your husband wrote

12  involving somebody stealing a sextant, and you

13  wouldn't know anything about that?

14    A.    I don't recall anything.

15    Q.    In staying in tax year 1990, I'll

16  ask you to look at 837 briefly.  It's a letter

17  you wrote to, Dear IRS, unless you've got a

18  relative named Irs, and I couldn't, from what

19  I'd seen, put that into any kind of context.

20  Do you recall what that was about; what was

21  the delay?

22    A.    Looks like I was sick.

23    Q.    But what did you delay doing that

24  you were telling everybody you were sorry

25  about?

63

1    A.    Couldn't tell you.  I don't even

2  see a date on here.

3    Q.    Let me ask you to look at W19.

4  Again, when it says W, those are documents

5  that either you or your husband put together

6  for us.  And it's a letter on Zapata Gulf

7  Crews, Inc., stationery dated June 14, 1990,

8  saying that Zapata Gulf Marine Corporation is

9  increasing it's daily compensation; do you

10  recall ever seeing that?

11    A.    No.

12    Q.    And you wouldn't have any idea why

13  in the same year that Zapata Gulf Marine was

14  writing to your husband on Zapata Gulf Crews

15  stationery he was putting a different name

16  down as an employer on his tax return?

17    A.    I have no idea.

18    Q.    When was it that you moved from New

19  Jersey, to Kentucky?

20    A.    1997.

21    MR. GREEN:  So it was later than

22  that.  Let me ask you to look at the document

23  that starts with 854.

24    THE WITNESS:  Do you need this back,

25  by the way?

64

1    Q.    Probably better, huh?

2    A.    Yeah.

3    Q.    Thank you.  And it looks like it

4  goes to 868.  It's the 1990 income tax

5  organizer, and -- well, first of all, let me

6  let you take a look at it and see if you

7  recall having seen that, and were you involved

8  in filling it out?

9    A.    Well, usually when these came in,

10  I'd put them in Richard's mail, so I would not

11  open them up, I mean, if I did open it, I'd

12  look at it, and say, oh, that's what that is,

13  and put it in Richard's mail.

14    Q.    If you'll look inside, does that

15  appear to be Richard's handwriting?  And if he

16  says it's not, then I won't hold you to it if

17  you say it looks like it.  I just want to know

18  if I'm chasing a dead horse.

19    A.    It does.  That does anyway.

20    Q.    Let me look at that just a second.

21  The thing that I had a question about, I

22  didn't write the page number down, so let me

23  find it real quick.  If you'll look at the

24  page that's marked 858, there's two bits of

25  handwriting on there, there's some up here in

65

1   parentheses, and then there's what is filled
2   in the form. Am I correct in assuming that
3   what's filled in the form is your husband's,
4   and what's up there may be something
5   different, somebody's else's?
6       A.   This looks like his handwriting.
7   I'm not sure about this.
8       Q.   What's in parentheses up there?
9       A.   Right.
10      Q.   And that's not yours in
11  parentheses?
12      A.   No.
13      Q.   And, again, would you have seen
14  this before it was sent to Mr. Birkholz?
15      A.   No, not necessarily.
16      Q.   So you don't know why he put Zapata
17  Gulf Marine down as his employer in that year?
18      A.   No.
19      MR. ROYSE:  You mean as opposed to
20  Zapata Crewing.
21      Q.   Or Tidewater or anybody else, or
22  what was it?
23      A.   Zapata Nigeria.
24      MR. GREEN:  Zapata Nigeria.
25      MR. ROYSE:  Got ya.

66

1       Q.   And then, do you have any reason to
2   believe that that organizer wasn't sent on by
3   him to Mr. Birkholz since we know it showed up
4   in his file?
5       A.   To the best of my knowledge, it got
6   sent to him.
7       Q.   Well, this is in the category of
8   where I just need to know if you don't know,
9   but look at 772, which is the 1991. I'm just
10  going to show you the first page. If you want
11  to see the whole thing, you're welcome to,
12  2555 that's in handwriting; does that appear
13  to be Richard's handwriting?
14      A.   No.
15      Q.   Does that show Zapata Gulf Marine
16  as the employer that year?
17      A.   Looks that way.
18      Q.   And you wouldn't have any knowledge
19  as to why it switched from Zapata Nigeria back
20  to Zapata Gulf Marine?
21      A.   Have no idea.
22      Q.   I don't know, just tell me if you
23  know anything about the subject matter of that
24  letter. Your husband indicates -- I'm sorry,
25  what's the Bates stamp, 771, said you got a

67

1   new computer and hadn't had time to do a
2   spreadsheet, and he used some tax program; do
3   you remember any of that, or did he do that
4   kind of on his own?
5       A.   I don't really remember him doing
6   this.
7       MR. GREEN:  That's fine. If you
8   can't shed any light, then I don't need to
9   worry you with it. Let me show you, and I
10  really kind of want you to compare, title
11  letter document T20, and, again, just so the
12  record's clear, when I say Tidewater document,
13  that doesn't mean any particular Tidewater
14  Company or Zapata or anybody else. It's just
15  the ones we got in the production, just so in
16  case anybody reads this. This particular
17  document, T20 is another employee earnings
18  statement which indicates Zapata Gulf Crews,
19  and I want to ask you to look at that in
20  comparison with W20, T20 and W20, and the
21  combination of documents raises a number of
22  questions, but I'll let you look at them first
23  so you're comfortable with them.
24      THE WITNESS:  Okay.
25      Q.   First of all, his paycheck,

68

1   according to that one document, is coming from
2   Zapata Gulf Crews, but Zapata Gulf Marine is
3   giving him a bonus; do you have any knowledge
4   as to why that would be?
5       A.   This says Zapata Gulf Marine out of
6   Great Yarmouth, Norfolk.
7       Q.   But they put a lot of addresses on
8   their letters, but you don't have any reason
9   to know why that would be, why one company
10  would be giving him a bonus and another
11  actually issuing his checks?
12      A.   I have no idea.
13      Q.   And then the other part of this is
14  does that letter refresh your memory as to
15  when the Tidewater Zapata acquisition or
16  merger or whatever --
17      A.   Yeah. I have a different
18  recollection of how things went.
19      Q.   Than is reflected in that letter?
20      A.   Yes, sir.
21      MR. GREEN:  Well, tell me how your
22  recollection is different.
23      A.   I remember there was a big change
24  in 1984, and in 1984, '85, and part of '86, we
25  were living in New Jersey and getting ready to

69

1   buy a home, and this was when things started
2   to, you know, when there was a real big change
3   in Richard's paycheck, and in the process of
4   getting ready to buy a home, he received a
5   substantial pay cut because of something that
6   was going on with Zapata Marine, Crewing
7   Limited, Nigeria Limited, I couldn't tell you
8   which one, and we had serious doubts about
9   whether or not we could afford to buy a house
10  because of this huge pay cut.
11      Q.   Do you think that began in '84?
12      A.   Yeah, in '84, because I remember we
13  decided we could do it and bought a house in
14  New Jersey in 1986.
15      Q.   But you don't know if all that
16  change was as a result of Tidewater versus
17  something going on in Zapata internally?  I
18  know that initially you thought it was
19  Tidewater because we went over that bridge,
20  but as we sit here now, do you see that the
21  Tidewater part is later?
22      A.   I see what that says, but my
23  recollection is that there were things going
24  on long before what that letter indicates.
25          MR. GREEN:  Well, I don't have, and

70

1   therefore, I'm pretty sure your attorney
2   doesn't have, any data from the Tidewater
3   Company that goes back to '84.  '85 is the
4   earliest that I can see here.  Here's a check
5   in '83.  This deals with the stock ownership
6   plan.
7           MR. ROYSE:  Ron, she is not trying to
8   contest that the actual merger or the official
9   change from Zapata to Tidewater happened in
10  '92.  What she is saying is she remembers that
11  there was changes in the works, and she
12  remembers that it was affecting him.  Prior to
13  that, and her recollection is that it may have
14  even involved some upcoming merger even years
15  before it actually happened, but I don't want
16  you to think she's trying to --
17          MR. GREEN:  Oh, no.  I understand
18  that she's concerned that this is maybe a
19  little at odds with her memory, and I think
20  that she's entitled to have her memories.
21          MR. ROYSE:  But I don't think she's
22  contested that that is when the actual merger
23  took place.
24      Q.   And, I guess, this is as good as
25  point as any to revisit the question that the

71

1   conversation or conversations with
2   Mr. Birkholz, and you know the one we're
3   talking about we talked about at the very
4   beginning.  The other conversation where they
5   were doing withholdings, they didn't do
6   withholdings, the check looked different, you
7   went to him and says how does this affect us,
8   and he said you're self-employed?
9       A.   Yes.
10      Q.   You're pretty sure that that was in
11  the '84 or '85 time frame.  I think we
12  established '85 is actually when that change
13  occurred, but forget about that for a minute.
14  With your memory, that's the time frame that
15  you had that conversation, correct?
16      A.   I would say yes because that was
17  the kind of thing that we would immediately
18  contact Peter about.
19      Q.   Whenever it occurred, without
20  asking you to commit to any particular time
21  frame for that, when this merger occurred and
22  there was a change over in ownership or
23  whatever, obviously, that didn't affect how
24  things were being taken out of your check, or
25  maybe it did, but do you recall having a

72

1   second conversation with Mr. Birkholz about
2   that change, you personally?
3       A.   No, I don't.
4       Q.   Let me ask you real quickly, is one
5   of your notes, it's 793, and, I think, it's
6   dated February 24, '93.  I believe it's
7   relating to the '91 tax year because it's in
8   that file, but let me just ask you if you
9   recall that, and I'd just kind of like to know
10  generally, in other words, what that was
11  about; what was the problem there?
12          THE WITNESS:  And you're asking me
13  what this is about?
14      Q.   Yeah.  What were you discussing
15  with him, if you remember?
16      A.   It sounds like a refund and what to
17  do with it.  Let's see.  Just asking a simple
18  question.
19      Q.   So you think you'd gotten a refund
20  check?
21      A.   I started getting refund notices
22  and checks, and I was asking him should I
23  deposit the checks or hang on to them.
24      Q.   Give me the date of that; is that
25  February '93?

73

1   A.   Yes, sir.
2       MR. ROYSE:  Go off the record.
3       (OFF THE RECORD.)
4   Q.   Did you ever find out why they were
5   giving you refunds, or did that turn out to be
6   a problem, or did that get resolved?
7   A.   I can't remember.
8   Q.   Now, the letter that we just talked
9   about that it dealt with the bonus, but it
10  also talked about the merger of Zapata Gulf
11  Marine and Tidewater, do you have any reason
12  to believe you forwarded that to Mr. Birkholz?
13  A.   I couldn't tell you.
14  Q.   And let me show you, I know you're
15  going to be tired of seeing 2555 considering
16  that you said that you didn't review them, but
17  let me show you this one for '93.  It's got
18  some handwriting; does that appear to be your
19  husband's handwriting?
20      MR. ROYSE:  What's your number there?
21  A.   No.  This is not his handwriting.
22      MR. GREEN:  718.
23  A.   I'm not 100 percent sure, but this
24  does not look like his handwriting.
25  Q.   You don't know why that shows as

74

1   the employer as Zapata Gulf Marine?
2   A.   Don't know why.
3       MR. ROYSE:  Hold on.  That's not 718.
4       MR. GREEN:  709.  I'm sorry.
5       MR. ROYSE:  I really just wanted it
6   for the record, Ron.
7   Q.   I'm maybe trying to speed a little
8   bit too much.  Let me show you a document
9   marked PB744.  It's a letter dated December 4,
10  1993.  It's actually from your husband to
11  Mr. Birkholz, but let me ask you first of all
12  if you recall ever seeing that letter?
13  A.   No.
14      MR. GREEN:  Do you recall him having
15  a -- he describes a situation in there where
16  he lost his passport or visa or something, see
17  at the very beginning, or maybe it's in the
18  fifth paragraph.  I'm not sure.
19      THE WITNESS:  Number five.
20  Q.   Do you recall that happening and
21  being a problem?
22  A.   Vaguely.
23  Q.   But this is providing information
24  for the 1992 tax year?
25  A.   Looks like it.

75

1   Q.   Do you know why that's being done
2   in December '93?
3   A.   Probably because he was out of the
4   country.  I don't know for sure, but that
5   would be my assumption.
6   Q.   Is it true that the '92 tax return
7   was filed late?
8       THE WITNESS:  I don't know.  Was it?
9       MR. GREEN:  Well, it would have been
10  due October 15th, 1993, at the latest, and
11  this is December '93, so...
12      THE WITNESS:  I don't know that I can
13  tell from this.  I'm sorry.  Does it say here
14  that he was late?
15  Q.   Well, doesn't it say there that
16  he's providing information for the tax
17  returns?
18  A.   It says --
19      MR. GREEN:  If you don't know, that's
20  fine.
21      MR. ROYSE:  This is in December, it
22  would have been due in October.  All he's
23  asking is do you recall it being late that
24  year.
25      THE WITNESS:  No.

76

1   Q.   Let me show you a letter that, I
2   think, I probably should have shown you first,
3   745, 746.  This is probably what that's
4   responding to, it's November 3, '93.  Did you
5   have any involvement with the '92 tax year
6   providing information for the returns, I
7   guess, something I should ask you?
8   A.   Well, I usually provide it, you
9   know, if Richard had any questions, I provided
10  information as best I could.
11  Q.   Okay.  But at the beginning of the
12  depo, you indicated that you were never late,
13  and if you were late, it was because somebody
14  in Pete Birkholz's office filed things away;
15  remember that?  And, I think, we're going to
16  get to where the IRS was sending notices which
17  ended up -- and sent a brochure and everything
18  else saying that returns hadn't been filed
19  timely, and this is where it starts, but
20  you're telling me, and if this doesn't refresh
21  your memory, fine, but you're telling me you
22  do not recall whether the '92 tax return was
23  filed timely?
24  A.   I don't recall, no.
25  Q.   Well, we'll come back to that when

77

1  it's appropriate. And this is something your
2  husband took care of obviously; would you have
3  any input into responding to that letter?
4      A.  I don't remember. Well, it looks
5  like this says we paid in advance.
6      MR. GREEN: But that's different than
7  filing the return.
8      THE WITNESS: Okay. But we paid, and
9  Peter told us paying was a good thing even if
10  the return's late.
11      Q.  But he didn't say that it was an
12  excuse for filing a return late, correct?
13      A.  No. That wasn't -- no.
14      Q.  Just better than not filing the
15  return and not paying?
16      A.  Right.
17      Q.  Let's go to, I guess, first I'll
18  show you, it's 655 through 673, and it appears
19  to be an organizer for 2003, and it's just the
20  very first two pages, I think, are the only
21  ones that have anything written on them, but
22  could you identify the handwriting on there,
23  if you know whose it was?
24      A.  It could be Richard's.
25      MR. GREEN: I mean, see if you're

78

1  comfortable that the first two pages are all
2  that's filled out. There's nothing in there
3  about a change to Tidewater or any Tidewater
4  Company becoming an employer is what my
5  question is going to be.
6      MR. ROYSE: Stipulate there's nothing
7  in that document reflecting that.
8      MR. GREEN: Perfect.
9      THE WITNESS: Do I need to keep --
10      Q.  No. He's taken care of it. Let's
11  see here, 674. This particular -- I'll have
12  to give you something else to go with it, but,
13  I guess, first of all, I'll just ask you, it's
14  July 31, '94; do you recall writing that note?
15      A.  1994, I'm not sure which brochure
16  was in there.
17      Q.  I'll help you with that. That's
18  you're handwriting?
19      A.  Yeah, yes, sir.
20      MR. GREEN: I don't think I have a
21  copy of the actual brochure, but I do have --
22  apparently Mr. Birkholz knew what you were
23  talking about. I'll ask you if you remember
24  receiving 675 which is an August 15th, '94
25  letter to you.

79

1      THE WITNESS: Are you -- I'm sorry.
2  Are you asking me if I remember what this is
3  about?
4      Q.  Well, initially I'm just asking if
5  you remember seeing that, getting that
6  letter?
7      A.  It looks familiar.
8      Q.  And does that refresh your memory
9  about the brochure that you we're talking
10  about, or you were talking about?
11      A.  It looks like the brochure was --
12  had to do with a late return or a return not
13  being filed.
14      Q.  Then let me show you 676, which is
15  an August 15th, letter. It's unsigned but
16  indicates it's from you to the IRS; do you
17  recall drafting that letter and sending it to
18  the IRS?
19      A.  I'm going to -- I would say that
20  Richard -- not Richard, but Peter probably
21  coached this letter, and I'm thinking that
22  this was a year that the return didn't get
23  filed because the information we sent to Peter
24  didn't get put into a return.
25      Q.  Actually, it's the year we were

80

1  just talking about, correct, where your
2  husband was providing information in December?
3      A.  I remember Richard providing the
4  information, filling it all out, and we sent
5  it off, and then I got a call from Peter
6  asking where was our stuff, and I contacted
7  Richard about it or asked him about it
8  somehow, and he said we sent it, and it turned
9  out that somebody in Peter's office had filed
10  it away in a file cabinet before he prepared a
11  return. Now, I'm not sure what year it was,
12  but this sounds like that's the year that it
13  happened.
14      MR. GREEN: I think we're going to
15  find we had a lot of years that we were late.
16      THE WITNESS: It happened more than
17  once.
18      Q.  And do you have anything in writing
19  indicating that you ever thought that at the
20  time?
21      THE WITNESS: Thought?
22      Q.  That somebody had filed away
23  something; do you have any documents that
24  would support that?
25      A.  No. When I talked with Peter, he

81

1  told me what happened.

2     Q.  Do you have an explanation for why
3  after the return is due that your husband
4  would have been providing information and
5  didn't say something like why didn't -- I
6  already provided this or anything else?

7     A.  Well, when we got notices from the
8  IRS, or when Peter called, we realized there
9  was a problem. We sent the information, and
10  no return was prepared. No return was
11  prepared because somebody in his office put
12  our stuff in the file cabinet.

13     Q.  Let me pull those letters out again
14  because you'll notice that they were before
15  all this; what were they?

16     MR. ROYSE:  They were December '93,
17  and then this is August '94, showing IRS still
18  hadn't received a return.

19     MR. GREEN:  Right, but they're saying
20  it was late anyway.

21     MR. ROYSE:  No.

22     MR. GREEN:  Are they saying they
23  still hadn't received a return?

24     MR. ROYSE:  That's why it's never too
25  late. I think the brochure is saying we don't

82

1  have a return from you. I'm sorry.

2     MR. GREEN:  That's okay, I don't have
3  a problem with discussing it, and, I think,
4  one of the things was, if you look at his
5  letter, he couldn't provide information for
6  the 2555. I don't know where that ultimately
7  came from.

8     MR. ROYSE:  But then that's that
9  response letter you showed Mr. Bill Birkholz
10  writes in November 1993.

11     MR. GREEN:  What were the numbers?

12     MR. ROYSE:  I'm sorry. It would have
13  been '90 --

14     MR. GREEN:  '92 file?

15     MR. ROYSE:  Yeah.

16     MR. GREEN:  Okay. It's 744, and
17  745. I'll get those out for you.

18     THE WITNESS:  This one's not even
19  signed.

20     MR. GREEN:  That's why I'm asking you
21  if you sent it.

22     THE WITNESS:  No. This is from them,
23  this is from Birkholz & Company, and they
24  didn't sign it.

25     MR. GREEN:  When we went off in this

83

1  tangent, my question that I had for you was do
2  you recall sending that August 15th letter to
3  the IRS, and you told me that Peter had
4  written it, but that wasn't really my
5  question.

6     THE WITNESS:  I don't remember
7  sending it, but I remember the problem.

8     Q.  I mean, do you remember if it was
9  sent, or do you have any way of knowing?

10     A.  Oh, it was sent. To the best of my
11  knowledge, it was sent.

12     Q.  To put this in perspective, I'll
13  let you look at these, 744 is the response
14  letters, these are in reverse order, November
15  3, '93, is Peter's request for additional
16  information to try to complete the return, of
17  course, this is after it was the last
18  extension that you could get. December 4th,
19  your husband responded, but in paragraph four,
20  he says that he can't help with the dates, he
21  was in the U.S., and he's going to extract
22  those records. I assume at some point those
23  were extracted, but are these two things not
24  connected, the late return in '92, and the
25  question about the return being filed in '94?

84

1     THE WITNESS:  The late return in
2  '92?

3     MR. GREEN:  It hadn't been filed as
4  of December.

5     THE WITNESS:  Right, okay. And then
6  you're saying there's something to do with
7  '94?

8     Q.  These letters in '94, are they not
9  connected?

10     A.  They could be.

11     Q.  And do you know if your husband
12  ever provided the information for the --

13     A.  Oh, yeah, I mean, to the best of my
14  knowledge, eventually he provided it.

15     Q.  And do you have any reason to think
16  that once that was provided that the return
17  wasn't filed?

18     A.  It's possible.

19     Q.  I assume that what he's describing
20  in paragraph five is a difficult thing, I
21  mean, he's lost his best source of
22  information, and he's got to go extract it
23  from payroll, and I assume that's a bit of
24  trouble?

25     A.  I have no idea.

85

1   Q.   So that's best addressed to him?

2   A.   Yeah, you know, wouldn't have

3   anything to do with me.

4   Q.   You'll agree that his letter to

5   Peter doesn't mention that, oh, I thought this

6   return was filed or anything like that?

7   A.   No.  We had a discussion about it.

8   Q.   Who is we?

9   A.   Richard and I.  He was rather upset

10  about it, and I covered for Peter, I said, you

11  know, he's a good guy, let's not make an issue

12  out of this.

13  Q.   How can it be Peter's problem when

14  you still can't provide your information after

15  the return's already due?

16  A.   I'm not exactly sure that this is

17  pertaining to that specific thing.  I don't

18  remember the exact years that the returns were

19  late.  There were two of them that were late

20  due to the fact that Peter or somebody in his

21  office put our information that we sent off to

22  him ahead of schedule into the file cabinet.

23  The second time it happened, Richard wanted to

24  fire him, and, again, I stuck up for him.

25  Q.   So you think that -- you don't know

86

1   which year?

2   A.   No, no, I don't recall exactly.

3   Q.   And you'll agree with me that this

4   particular year, you had not provided all the

5   information before they were due?  When I say

6   you, I mean you and your husband, not

7   necessarily you personally.

8   A.   I would say that's what it looks

9   like.

10  MR. GREEN:  Fair enough.  I'm not

11  even saying it's a bad thing.  I just want to

12  see what happened.

13  MR. ROYSE:  These are yours.

14  THE WITNESS:  I think these are his,

15  too.

16  MR. GREEN:  I'm on the path to file

17  lock here.  I think I've maybe scrambled my

18  files here.

19  MR. ROYSE:  Take your time.

20  MR. GREEN:  '92's too thick, and this

21  one isn't thick enough.  Off the record.

22  (OFF THE RECORD.)

23  THE WITNESS:  Is it possible to add

24  something?

25  MR. GREEN:  Sure.  I only want the

87

1   truth.

2   A.   I remember those events happening

3   in terms of the returns not being filed

4   because our information that we sent in got

5   put in the file cabinet by somebody in Peter's

6   office.  As to the sequence of the letters and

7   all that stuff that you've shown me, I don't

8   remember the sequence exactly the way it

9   happened.  I do remember though that it

10  happened at least twice because of that

11  reason, and in regard to sending a letter

12  saying something negative to Peter about it, I

13  know I did not do that.  We'd known him a long

14  time, he was, you know, we considered him a

15  good friend, and let it go at that.

16  Q.   This got quite distressful for you,

17  didn't it?

18  A.   The year -- well, there was --

19  yeah, it was stressful, yeah.

20  Q.   But it was never mentioned that he

21  had any culpability in it?

22  A.   He mentioned it over the phone.

23  Q.   By you, it was never mentioned in

24  any of your letters; you wrote a lot of

25  letters about this, right, handwritten notes?

88

1   A.   Well, we were inquiring about what

2   happened to our stuff, why wasn't this filed

3   or what happened to the file or why are we

4   getting notices from the IRS saying that we

5   didn't file that kind of thing, so, yeah, I

6   wrote letters about that.

7   MR. GREEN:  Let's see here.  I'm

8   going to ask you to look at 678 dated March

9   25th, '93.  I believe this relates to the '93

10  tax year, and see if you recall receiving that

11  letter.  Actually, this may have been with it,

12  679, and 680.

13  MR. ROYSE:  Do you remember seeing

14  that?

15  THE WITNESS:  Do I remember what this

16  is about?

17  Q.   Do you remember seeing that; does

18  it look familiar to you?

19  A.   I don't remember seeing it.  It

20  doesn't mean that I didn't see it at one

21  point.

22  Q.   At least for the '93 tax year at

23  this point, he didn't have the information to

24  do the returns, and he was doing an extension

25  and sent you forms; is that right?

89

1      MR. ROYSE: Stipulate that's what

2 that letter says.

3      A.   Yes.

4      Q.   But you were living in Kentucky at

5 that point, correct?

6      A.   No.  It says New Jersey.

7      Q.   Oh, I'm sorry.  I'm looking at the

8 '97 thing.  You're right.  And I assume as we

9 sit here, you won't know when any of these

10 were in the '90s, so they're closer, but

11 they're still ten years ago, you won't know

12 when any of these tax returns were actually

13 filed; you don't have anything to refresh your

14 memory on that?

15      A.   No.

16      MR. GREEN: This is 681, is a letter

17 dated April 23, '97.  It's in his '93 file, so

18 I assume it -- let me look real quick to see

19 if there's something that puts this into

20 context.

21      MR. ROYSE: It's 653.

22      MR. GREEN: Yeah, 653 maybe, because

23 I'm looking at the very first page.  Yeah,

24 good point.  Let's see if you agree that these

25 go together, 681 and 653, the dates would kind

90

1 of indicate that's possible, but I'm not sure

2 the text matches up.

3      MR. ROYSE: He's asking do you think

4 those two are related to one another; do you

5 remember?

6      A.   They're a lot of years apart -- oh,

7 okay, I see.  Yeah, they could be related.

8      MR. GREEN: In your handwritten note,

9 the reason I was wondering about that is your

10 handwritten note expresses a lot of concern,

11 and I'm reading the IRS notice, it's just

12 another instance where the estimated that was

13 reported to Peter was different than what the

14 IRS had record of, and it wasn't something

15 saying that you'd forgotten to file a return

16 or anything, but you think they -- if you're

17 comfortable that they match up, I'm

18 comfortable.

19      THE WITNESS: You're asking me if I

20 think they're related; yeah, it's possible.

21      MR. GREEN: Okay, good.  Let's credit

22 David with a big assist on that one.

23      MR. ROYSE: I just kept seeing '97.

24 On the first page, it was '93, and I couldn't

25 figure out why.

91

1      Q.   Well, that's another thing that

2 throws you off, and on top of that, the Bates

3 stamps are backwards, but I'm pretty sure

4 that's not Jennifer's problem.  Let me show

5 you 701.  I think that's all you need -- no,

6 let's start with 703 here, please.  It's a

7 letter from Mr. Birkholz from his file, and I

8 ask if you recall seeing that letter, and tell

9 the record, is it October 25th?

10      MR. ROYSE: 25th, 1995.

11      MR. GREEN: '95.

12      THE WITNESS: I'm sorry.  The

13 question was?

14      Q.   Do you recall receiving that

15 letter?

16      A.   Specifically, no, but I'm sure I

17 received it.

18      Q.   Now, this would have been a year

19 and ten days after the '93 returns would have

20 been due, and ten days after when the '94

21 returns would have been due, and you'll agree

22 that he's asking for more information to

23 complete those, the '93 return, correct?

24      A.   It sounds like he's asking for the

25 information rather lately.  He's asking for

92

1 more information on October 25th.

2      MR. GREEN: Right.

3      THE WITNESS: Okay.

4      Q.   Now, did you respond to this

5 letter?

6      A.   I'm sure we did because the return

7 got filed.  Now, as to it being filed late,

8 this could easily be one of the years that our

9 stuff got put in the file cabinet.

10      Q.   Then would you look at 701, which

11 is, for the record, dated May 16th, '96, and

12 tell me if you recall getting that?

13      A.   Well, this is for May.

14      Q.   Of '96?

15      A.   Right, for --

16      Q.   It's a follow-up to the --

17      A.   Yeah.  It looks to me, I would say

18 that he was -- he -- he had the stuff, and

19 he's waiting for the information that we

20 already sent.

21      Q.   And six months later, he still

22 didn't have it?

23      A.   That's what he says, he had it.

24      Q.   Did you write a letter back saying

25 you already had it?

93

1     A.   We talked on the phone because I
2   remember.
3     Q.   Do you have anything to indicate
4   that that occurred?
5     A.   No.  I remember the phone call.  I
6   called him up, and I said we sent this stuff a
7   long time ago, and he said -- he made some
8   kind of comment, and either during that call
9   -- more likely he called me back and said, oh,
10   we found it in the file cabinet.  Somebody put
11   it in the file and filed it away before I
12   prepared a return.
13     Q.   After which of these letters was
14   that phone call?
15     A.   I don't remember.
16     MR. GREEN:  Let me show you 702 and
17   ask you if you received this invoice and if
18   you recall whether you paid it.
19     THE WITNESS:  You're asking if I
20   recall receiving this?
21     MR. GREEN:  And whether you paid it.
22     A.   I would assume that I did pay it.
23   I don't remember.
24     Q.   You didn't question the charge in
25   November '05?

94

1     A.   Question the charge, no, I didn't
2   question it.
3     Q.   Okay.  Do you deny that there was a
4   conversation in November '95 to discuss the
5   data needed to complete the '93, '94 tax
6   returns?
7     THE WITNESS:  No.  I don't -- do I
8   deny that the phone call took place?
9     Q.   Right, and that that's what was
10   discussed, I mean, was it that, or was it, oh,
11   my God, we forgot all your stuff, would you
12   send it again?
13     A.   That could have happened.
14     MR. ROYSE:  Let her see that, if you
15   don't mind, Ron, to give her a chance.
16     MR. GREEN:  Sure, no, I don't mind.
17     A.   No.  I don't dispute it.
18     MR. ROYSE:  Tell me if you want me to
19   stop, but I think it's helpful to move us
20   along.
21     MR. GREEN:  Yeah, in general, I don't
22   usually mind that.  It depends on if it's
23   something real sensitive.  Although -- off the
24   record.
25     (OFF THE RECORD.)

95

1     Q.   Do you want to take a little
2   break?  It's been over an hour, about an hour
3   and a half.
4     A.   Yeah.
5     (RECESS 3:40 - 3:50 P.M.)
6     Q.   You ready?
7     A.   Yes.
8     MR. GREEN:  Do you recall just before
9   the break, we were talking about this invoice,
10   and I'll put it back in front of you in case
11   you want to look at it, and specifically the
12   11-28 entry of '95 entry discussed data needed
13   to complete '93 and '94 tax returns, and we'd
14   already talked about how that's after both the
15   '93 and '94 would have been due at the
16   latest.  Let me show you three documents
17   beginning with PB617, and I'm basically -- I
18   think they kind of -- it kind of speaks for
19   itself to me, but I want to give you an
20   opportunity to explain why if the problem was
21   that somebody had filed the information away
22   and that's why the returns weren't filed, why
23   on November 29th, you provided in handwriting
24   some information for the '93 and '94 tax
25   returns?

96

1     A.   Okay.
2     MR. ROYSE:  Read that before you
3   answer.
4     MR. GREEN:  Yeah, take your time and
5   look at it.  It's important.
6     THE WITNESS:  So my understanding is
7   the question is why is this letter being sent
8   in 1995 in reference to the tax years '93 and
9   '94?
10     MR. GREEN:  Uh-huh (affirmatively),
11   if it's not because he's called and said I
12   don't have the information, and you said, oh,
13   I'll get it to you, if there's an explanation
14   that's different than that.
15     THE WITNESS:  If this was -- if a
16   return was filed late because information had
17   been filed away in his file cabinet, and it
18   wasn't realized until too late, and this is to
19   the best of my recollection.  He didn't look
20   at it, he didn't see that information.
21   Somebody took the information that we sent to
22   his office and just put it in the file
23   cabinet, so after the fact, this is what I'm
24   gathering from looking at this, he looks at
25   the information we sent, and it's not enough

97

```
 1  stuff, so he asks me for more information, and
 2  that's what this looks like, is additional
 3  information that he requested.
 4      Q.  So you're saying that it wasn't
 5  until this time frame that you realized that
 6  you had not gotten the 1993 tax return; did
 7  you not inquire about that?
 8      A.  Well, I don't remember exactly when
 9  the IRS sent a notice saying we don't have
10  your return.
11      MR. GREEN:  Well, forget about the
12  notice, I mean, you had the notice that nobody
13  sent you one to sign and sent to the IRS, if
14  that's the case.
15      THE WITNESS:  Well, what I remember
16  is Peter calling and saying where's the
17  information, we need to file the return, and
18  --
19      Q.  And that's what this says?
20      A.  And the conclusion was that we had
21  sent it.
22      Q.  It doesn't say that there, correct?
23      A.  No.  I'm not sure, as I mentioned
24  before, the sequence of events.  I'm not sure
25  when it took place, but it did happen at least
```

98

```
 1  once.
 2      Q.  But on this occasion, first of all,
 3  in October '94, you would have known that you
 4  didn't get a return for '93, correct, a year
 5  before this?
 6      A.  It was Peter who called me, and I
 7  don't remember when he called.
 8      Q.  But, I mean, a lot of things come
 9  and go.  With tax returns, people usually keep
10  their eye on.  You had the notice that you had
11  not signed and sent off a tax return for '93
12  without somebody telling you that, correct?
13      A.  He did tell me, he called.
14      Q.  In '95?
15      A.  I don't remember.  I remember the
16  phone call.  He was calling to ask where was
17  our information, where was, you know, this
18  spreadsheet or whatever it was, and it turned
19  out that we had sent it.
20      Q.  If you had sent it, then why did
21  you need to send it again?
22      A.  This doesn't look like a
23  spreadsheet to me.
24      MR. GREEN:  No, but it's all your
25  information going back to '93.
```

99

```
 1      THE WITNESS:  Well, if he found the
 2  stuff in the file cabinet, and there wasn't
 3  enough of what he needed, then this is
 4  possibly that information.
 5      Q.  Or it's possible that you all
 6  hadn't provided the information, and he asked
 7  you for it, and you sent it?
 8      A.  This is only part -- this is just
 9  stuff that has to do with details about my
10  business.  There was something in one of his
11  letters that said don't summarize, which is
12  possibly what happened in the original set of
13  information, and he wanted more specific
14  stuff.  This is it, more specific stuff.
15      Q.  Do you have a copy of what you sent
16  him before this?
17      A.  I don't know.  This is not a
18  complete -- this information here is not a
19  complete set of information for a tax return,
20  unless I'm mistaken.
21      Q.  Right, which is why he sent another
22  letter in '96 saying I still need more
23  information, but that's what you sent him in
24  response to that phone call in November '95
25  saying I need the information for '93, '94,
```

100

```
 1  correct?
 2      A.  I don't remember the sequence.
 3      MR. GREEN:  Well, look in front of
 4  you; they're right there.
 5      THE WITNESS:  All right.  It says
 6  discussed data needed to complete 1993 and '94
 7  tax returns.
 8      Q.  And the next day, you sent that
 9  three-page letter with all the data, correct?
10      A.  That's what it looks like, but this
11  doesn't say anything about, gee, we found your
12  stuff in the file cabinet.
13      MR. GREEN:  Yeah.  I wonder why that
14  is.
15      THE WITNESS:  Well, yeah, I wonder
16  why.
17      Q.  I'm sorry.  That was a smartass
18  thing for me to do, and I shouldn't have said
19  that.  Let me show you just briefly --
20      MR. ROYSE:  Note my objection to his
21  course language.
22      MR. GREEN:  Well, that was used in
23  the genteel form of the expression, kind of
24  the same way they describe fans.  Okay, 629 to
25  652.
```

101

1    THE WITNESS:  Well, what I will point
2  out is I certainly was accommodating and
3  turned this around as quickly as I could is
4  what it looks like.
5    Q.    This appears to be an organizer for
6  1994, and do you recognize the handwriting?
7    A.    Looks like Richard's handwriting.
8    Q.    I mean, would you have had any
9  input into that information, preparation of
10  that?
11    A.    He may have asked me for my Social
12  Security number.
13    Q.    You don't know why he put on there
14  that he was self-employed, correct?
15    A.    Yeah.  Why he would put that he was
16  self-employed, because Peter told him he was
17  self-employed.
18    Q.    Not why he did, why he would have
19  -- not why he would have, why he did.  Did he
20  discuss that with you; do you know why it
21  changed that year?
22    A.    I would say Peter told him to put
23  that in there.
24    Q.    Do you know that, or is that
25  something you would say?

102

1    A.    I remember Peter telling him he was
2  self-employed a long time ago.
3    MR. GREEN:  Well, I understand that.
4  But the prior year, your husband wrote down
5  that he was working for Zapata Nigeria or
6  something like that, and this year he wrote
7  something different; I'm just wondering if you
8  know why.
9    A.    I would guess, the best of my
10  knowledge, Peter told him to put it in there
11  that way.
12    Q.    And that could be a really good
13  guess, but I need to know; do you know?
14    A.    For sure?  Based on --
15    Q.    Let me rephrase the question.  Did
16  Richard tell you why he changed that?
17    A.    No.
18    Q.    Did you talk to Mr. Birkholz about
19  that change?
20    THE WITNESS:  No, sir -- you talking
21  me personally?
22    MR. GREEN:  Yes.
23    A.    No.
24    Q.    Thank you.  And this is one, maybe
25  I missed it, but I didn't see a date on this

103

1  in terms of when it was prepared or when it
2  was sent, and I don't think there was a copy
3  of it in the documents that you produced, but
4  if you had a copy that was dated or something,
5  that would be in the documents you produced;
6  is that fair?
7    MR. ROYSE:  Nod affirmatively.
8    MR. GREEN:  By the ancillary witness.
9    MR. ROYSE:  Objection.
10    MR. GREEN:  Off the record.
11    (OFF THE RECORD.)
12    Q.    Let's go to '95 real quick here,
13  and when I say that, I mean, Mr. Birkholz's
14  file for '95 -- well, let me jump a little
15  bit, if I don't, I'll forget this.  The T142,
16  and this reminds me that you had said
17  previously that you weren't sure who you
18  called when you needed to call somebody, but
19  you had a list of contacts, and you weren't
20  worried about what company they were with; do
21  you remember that or something close to that?
22    MR. ROYSE:  Do you remember telling
23  him that?
24    A.    I'm sorry.  Yes, I remember telling
25  him that.

104

1    Q.    Do you still have that list?
2    A.    It's changed over the years.
3    Q.    Do you have any old lists?
4    A.    I have a new list.
5    Q.    Did you keep any of the old lists?
6    A.    It's possible.
7    MR. GREEN:  Let me show you T142, and
8  you would not have seen this if you didn't
9  look at the Tidewater documents, but you may
10  recall the circumstances.  That's dated
11  3-11-96.
12    THE WITNESS:  Is that bullet holes in
13  there?
14    MR. GREEN:  No.  An incompetent hole
15  puncher, one of my pet peeves.  Off the
16  record.
17    (OFF THE RECORD.)
18    THE WITNESS:  You're asking me if I
19  know what this is?
20    Q.    No.  Actually, I know you haven't
21  seen it, but do you recall, did that happen
22  from time to time that you would call somebody
23  and try to get ahold of your husband when he
24  was out of the country?
25    A.    Yes, sir.

105

1  Q.  And would -- that refers to a Matt
2  Comotto?
3  A.  Yes, sir.
4  Q.  Is that who you would have called?
5  A.  At that time.
6  Q.  And is he in New Orleans?
7  A.  No, sir.
8  Q.  Where is he at?
9  A.  Right now, I'm not sure where he
10  is.  At the time of this, the date on here, I
11  can't remember whether he was in Angola or
12  some other West African office.
13  Q.  I'm sorry.  I've got this
14  backwards.  He's the one that this is directed
15  to, but it came from a 504 area code.  Isn't
16  that where whoever you called would have
17  been?  Can you read the signature down at the
18  bottom?
19  A.  It looks like Phyllis.
20  Q.  Does that ring a bell for you?
21  A.  No.
22  Q.  But this fax was sent from the
23  United States over to Nigeria?
24  A.  It's possible that if I couldn't
25  get through, I called this local, you know,

106

1  this number in New Orleans.  I'm not sure why,
2  if I've tried a number of times, and I can't
3  get through, that may be why I called this
4  person in New Orleans.
5  Q.  This is '96, but you wouldn't have
6  your contact list still that would have been
7  in effect at that point in time?
8  A.  It's possible, I may have it.
9  Q.  Could you take a look and see if
10  you have things like that?  That could be real
11  helpful for me to get an idea of who was where
12  and that sort of thing, and may help your
13  attorney, too.
14  A.  I'll look.
15  MR. GREEN:  Sorry.  Matt Comotto's
16  the wrong guy.  C-O-M-O-T-T-O.
17  THE WITNESS:  I don't even think
18  that's the correct spelling.
19  MR. GREEN:  Well, that's the spelling
20  on the fax, so we'll blame
21  Tidewater/Zapata/Nigeria.  Let me show you
22  T143.  I think this is an internal document
23  that you might not have ever seen, but let me
24  ask you if you would have seen this in
25  monitoring your husband's financing and so

107

1  forth.  It's a personal action form.  I think
2  it's giving him a raise.  It's -- but it lists
3  the company name as Tidewater Marine.
4  THE WITNESS:  Says from Tidewater
5  Egypt.
6  MR. GREEN:  Look where it says
7  company.
8  THE WITNESS:  I see it now.
9  Q.  I'm not asking you to figure all
10  this out who's who.  Would you have received
11  copies of things like that, or would your
12  husband have received?
13  A.  If he received them --
14  MR. ROYSE:  Let me just interpose.
15  Ron, this may be a fluke.  Look at the name,
16  it's Albert J. Weyland.  I don't think this is
17  the right one.
18  THE WITNESS:  Yeah.  I'm wondering,
19  and then who's this guy down here?  I don't
20  know who this guy is.
21  MR. ROYSE:  Well, but you wouldn't
22  know that.
23  THE WITNESS:  Well, what I'm saying
24  is, this doesn't mean anything.
25  MR. GREEN:  This could have got in

108

1  the wrong file you're saying?
2  MR. ROYSE:  I'm just guessing that
3  maybe -- let me look at the Social Security
4  number, and I'll tell you.
5  THE WITNESS:  No, it's not.
6  MR. GREEN:  Another assist for the
7  big guy.  Well, we're taking that raise right
8  back then, missy.  He just talked him out of a
9  raise.
10  MR. ROYSE:  Yeah, that's not his
11  Social Security number.
12  THE WITNESS:  No.
13  Q.  We'll note that, and put that aside
14  then.  But typically, would you have gotten
15  things like this or seen him where he would
16  have gotten them, and I don't know that he
17  would have gotten them; have you ever seen
18  stuff like this before?
19  A.  No, sir.
20  MR. GREEN:  We'll blame that one on
21  Phyllis again.
22  THE WITNESS:  I don't think that was
23  Phyllis's signature on there.
24  MR. GREEN:  But she probably misfiled
25  it.

109

1  MR. ROYSE: That's right. She's not
2  here to defend herself.
3  MR. GREEN: Let's see. Let me ask
4  you about 517. This a letter dated -- well,
5  it's not dated, I don't think, but it was put
6  in the '95, tax file, and there maybe
7  something here that -- this is regarding the
8  '95 and '96 returns, okay, and it's got you
9  and your husband down here, but, I think, it's
10 your husband that signed it, but just tell me
11 first of all, if you recall sending that
12 letter.
13 THE WITNESS: And the question was?
14 MR. ROYSE: Do you recall sending
15 that letter?
16 A.  No. I don't recall sending it, no.
17 Q.  Do you recall if your husband
18 showed it to you before he sent it?
19 A.  It's possible.
20 Q.  It says here I have been remiss in
21 the past in filling out these papers for the
22 taxes; do you dispute that?
23 A.  No. He was being apologetic
24 because he's a nice guy, and he should have
25 said I've been late filing because I've been

110

1  out of the country.
2  MR. GREEN: Well, he said he'd been
3  out of the country, and he had malaria.
4  THE WITNESS: Right.
5  MR. GREEN: But he also admitted that
6  he had been late in getting the things filled
7  out.
8  THE WITNESS: He was being
9  apologetic.
10 Q.  Well, that's appropriate, isn't it,
11 if you, in fact, were late in getting the
12 things filled out?
13 A.  Right, but there was a good reason.
14 MR. GREEN: No, but, I mean, I'm
15 speaking in the context of you were testifying
16 before that it was Mr. Birkholz's fault that
17 these things were filled out late.
18 THE WITNESS: In some cases it was.
19 Q.  Now, this is undated, so we don't
20 know what the significance is, but it relates
21 to, he's sending some information for the '95
22 and '96 tax returns, correct?
23 A.  That's what it says.
24 Q.  You don't have any reason to
25 dispute that?

111

1  A.  No, sir.
2  MR. GREEN: Let me show you 518 which
3  is dated June 10th, 1997, and it's to the both
4  of you, but let me ask you if you recall
5  seeing that.
6  THE WITNESS: And you're asking me if
7  I remember this?
8  MR. GREEN: Receiving or reading
9  that.
10 A.  I don't remember.
11 Q.  Do you doubt that you did; I mean,
12 do you think it's a fake or anything?
13 A.  No, I don't.
14 Q.  And you'll notice in there that he
15 specifically states that the returns had not
16 been filed because he doesn't have
17 information, and that it needs to be taken
18 care of, correct?
19 A.  Yes, sir. As I said earlier
20 though, the filing of our information into the
21 file cabinet happened more than once.
22 Q.  But there's nothing where you
23 didn't respond to that and say, oh, well, it
24 must be in your filing cabinet, or we already
25 sent it in; instead, your husband said he was

112

1  remiss for not filing things, correct?
2  A.  He says -- this is from Peter
3  Birkholz, so Richard's not saying anything in
4  here.
5  MR. GREEN: Well, in the letter we
6  just looked at.
7  THE WITNESS: On occasion, Richard
8  was remiss.
9  Q.  Okay, and --
10 A.  Peter didn't help anything by
11 putting our stuff in the file cabinet though.
12 Q.  What's the date of that letter?
13 A.  June, 1997.
14 Q.  And you'd known for some time that
15 the '95 return had not been filed, correct,
16 when you got that?
17 A.  I don't remember what year.
18 MR. GREEN: Let me let you look at
19 W478, and that notice from the IRS tells you
20 they haven't gotten your '95 return.
21 MR. ROYSE: What's the question?
22 Q.  Isn't that a notice telling you
23 that they don't have your '95 return?
24 A.  That's what it is, yes.
25 Q.  And you received it, correct?

113

1    A.   As far as I know, yes.
2         MR. GREEN:   And it was in the
3    documents you all produced to me.
4         THE WITNESS:   Okay.
5    Q.   Do you have any reason to think
6    that you sent that to Mr. Birkholz or talked
7    to him about it?
8    A.   I'm sure sent a copy.  I sent
9    copies of everything from the IRS to
10   Mr. Birkholz.
11   Q.   Is there any letter saying what
12   happened to the information we gave you or
13   anything like that?
14   A.   If I sent this to him asking what
15   does this mean, I may not have put together
16   that, once again, he may have filed our stuff
17   in the file cabinet.
18   Q.   There are notes, and some of them
19   are undated and so forth, so let's go through
20   them and see what, if anything, can be tied to
21   this, okay, because I want to get clear what
22   communications were back and forth about this
23   issue, okay?
24   A.   Uh-huh (affirmatively).
25   Q.   Let's start, I guess, with 534, and

114

1    you may want to keep these out as we go
2    because you may want to cross-refer to them to
3    put things in context.  Now, this is an
4    undated letter, so all I know is that it was
5    in his 1995 file, and the fax banner indicates
6    it was August 22, '97, but do you recognize
7    that as being your handwriting in something?
8    A.   Yes, sir.
9    Q.   Is that your fax banner where you
10   sent that to Mr. Birkholz?
11   A.   Looks like it, yes, sir.
12   Q.   Now, to put that in context, that's
13   six months after the IRS told you that you
14   didn't have a '95 return, correct?
15   A.   This is just a letter telling him
16   how tired I am.
17   Q.   I'm just asking you --
18        MR. ROYSE:   The date of this is five
19   and a half months after that; is that correct?
20        THE WITNESS:   Yes.
21   Q.   And it's after he told you he had
22   no data for '95 or '96?
23   A.   Yes.
24   Q.   Is there any phone conversation
25   that this -- that you can recall that would

115

1    help explain what this is about, I mean, there
2    had to be a reason that you're saying that
3    you're covered up and busy.  Had he requested
4    your information or anything like that?
5    A.   It's possible.
6    Q.   Just no recollection as we sit
7    here?
8    A.   There were a lot of things that
9    took place on the telephone.
10   Q.   Now, 535 is a handwritten letter,
11   August 19, '97, it's got the same date for the
12   fax banner though, 819 -- was this 819?
13   A.   It's 822.
14   Q.   So this actually precedes this, and
15   it appears that you all have been trying to
16   communicate and whatnot, but do you recall, is
17   that your handwriting, and did you send him
18   that note in that time frame?
19   A.   Yes, sir.
20   Q.   And would that banner in its
21   similarity to the other banner indicate to you
22   that that's probably when the other letter was
23   dated?
24   A.   Yes, sir.
25   Q.   Now, let me show you what's 537,

116

1    538, appears to be a signed power of attorney
2    dated July 9, '97; can you verify if that's
3    your's and your husband's signature on that?
4         MR. ROYSE:   Ron, can you introduce
5    those however you want, but I think those are
6    a part of document 539.
7         MR. GREEN:   Well, they may be.  I
8    assumed they weren't because he would have had
9    that to do this.
10        MR. ROYSE:   He specifically refers to
11   them in 539.
12   Q.   Right.  He would have needed that
13   to do this, but they would have signed it
14   before this, I think.  What's the date on the
15   signature?
16   A.   07-09-97.
17        MR. GREEN:   That's the same day.
18   Well, you may be right.  Let me go ahead and
19   let you look at 539 as well.  Maybe that was a
20   letter for you to send at the same time.  You
21   tell me what you think it is.  Although, those
22   may have been faxed.  He could have done a
23   letter the same day.
24        THE WITNESS:   And -- I'm sorry.  Your
25   question about this is?

117

1    Q.    Is that your's and your husband's
2  signature on the power of attorney?
3    A.    Looks like it.
4    Q.    Well, how about your's?
5    A.    Yeah, mine's on here.
6    Q.    Do you recall why he asked you for
7  a power of attorney?
8    A.    I'm thinking that it's because he
9  needed a power of attorney in order to deal
10 with something with the IRS.
11   Q.    And was that something the fact
12 that '95 tax returns hadn't been filed?
13   A.    I don't know.
14   Q.    Let me see those again real quick,
15 and I'll give them back to you.  The more I
16 look at this, I think, David may have been
17 half right, and I may have been half right.
18 Does 539 appear to be a letter that he drafted
19 for you to sign to send to the IRS?
20   A.    Yes, sir.
21   Q.    And did you sign this and send it
22 on to the IRS?
23   A.    I would think so.
24   Q.    And it says data was mailed to our
25 accountant in Boston June 25th, '97, to repair

118

1  the returns; is that an untrue statement?
2    A.    I couldn't say.
3    Q.    Well, you wouldn't have signed it
4  and sent it to the IRS if it was false, would
5  you?
6    A.    No.
7    Q.    You would have read it before you
8  signed it?
9    A.    Right, but I don't remember.
10   Q.    But if your data was mailed to your
11 accountant in June 25th, '97, then the returns
12 weren't late because something was in the file
13 cabinet; it was because the data was late,
14 correct?
15   A.    I'm not sure what years.
16   Q.    Well, '95 would have been due at
17 the latest October 15, '96, so if you send the
18 data in in '97, then he didn't have the data
19 to do any returns in time, correct, for '95?
20   A.    If that's true, yes.
21   Q.    And you signed it and sent it to
22 the IRS?
23   A.    As best I can recall.
24        MR. GREEN:  This is another
25 handwritten 544, it's undated, but it's the

119

1  same kind of fax banner, 8-11-97.  I just ask
2  if that's your handwriting -- I'm sorry.  I
3  think this is the second page of that fax.
4  Sorry, I keep doing that.  I held it out
5  there, and then I look at it again, you'd
6  think I'm trying to keep it out of your
7  fingers.
8        MR. ROYSE:  That's -- 545 is the
9  second page?
10       MR. GREEN:  Yeah.
11       MR. ROYSE:  I'm sorry, Ron.  What did
12 you ask her?
13   Q.    My first question was, I think it
14 was, is that your handwriting on that?
15   A.    On this, yes.
16   Q.    And when it says in there, you
17 attached to that a copy of another notice from
18 the IRS, but it's from a different office than
19 before, correct?
20   A.    I think so, yes.
21   Q.    And when you say should I send the
22 same letter to Philadelphia, the same letter
23 you're talking about is this one that was 539
24 that we were talking about whether you
25 actually sent it, correct --

120

1    A.    I think so.
2    Q.    -- the one that Mr. Birkholz
3  prepared for you?
4    A.    That would be my guess, yes.
5    Q.    At least, time sequence-wise, that
6  makes sense?
7    A.    Correct.
8    Q.    And I'm not sure, but you tell me
9  if this has any significance, 546 is an
10 undated handwritten note, but the fax banner
11 says 7-28-97, seems to have to do with payment
12 vouchers and a question that you had about
13 that, but it also deals with the Philadelphia
14 thing.  Would the Philadelphia address thing
15 again be related to where to send things or --
16   A.    I'm sorry.  I get caught up reading
17 these things, and then I don't remember what
18 you asked.
19       MR. GREEN:  That's okay.
20       MR. ROYSE:  You're not the first
21 person.
22   Q.    That's just part of being an
23 unremarkable speaker.  I mean, to me, this is
24 a totally separate question than what we've
25 been talking about except for the mention of

121

1  Philadelphia; you're the one who wrote the
2  notes, and I know it's been awhile, but does
3  that have some significance to you as dealing
4  with what we've been talking about, that is
5  the filing of '95 and '96, or is that a
6  separate question that came up?
7      A.   I think this is a separate issue.
8      Q.   Then we don't have to worry about
9  it.  Now, I'm going to show you a document
10  stamped 551, still from the '95 file of
11  Mr. Birkholz, and it's a handwritten note
12  dated June 25, '97.  To put this in context, I
13  think the date of the first IRS notice that we
14  saw was -- I'm not very good at reading upside
15  down, but what's the date on that, the date of
16  the notice rather than the tax?
17      A.   03-97 is the date of this notice.
18      MR. GREEN:  So it's March, and this
19  is in June.  Apparently, there had been a
20  phone conversation, but take a look at this,
21  refresh your memory, and then I might have a
22  question or two for you about it.
23      THE WITNESS:  And the question was?
24  I'm sorry.
25      Q.   The initial question is, is that

122

1  your handwriting; do you recall sending that
2  note?
3      A.   Yes, sir.
4      Q.   Let me look at it again real
5  quick.  Now, this is related to the same
6  question of whether you have to pay -- well,
7  actually, excuse me.  This relates to your
8  concern about penalties on estimated taxes; is
9  that what that says?
10      A.   That's what it says, yeah.
11      Q.   And there's talk here about we've
12  talked about in various years problems with
13  the IRS numbers not matching up with what your
14  records showed in terms of estimated payments,
15  and you talk here about I expect this
16  situation with payments going to the wrong
17  year will carry over to '95 and '96; can you
18  tell me what it is you're referring to there?
19      A.   I'm thinking that they got the
20  payments for -- the quarterly payments, and
21  they applied them to the wrong quarter.
22      Q.   And here it talks about a payment
23  plan being necessary, and you had mentioned
24  earlier there was a period where your
25  husband's earnings decreased dramatically.

123

1  This indicates that it was in '97; is that
2  correct?
3      A.   I don't recall about his earnings
4  as far as that year is concerned.  The payment
5  plan was in reference to Peter saying, you
6  know, basically, if the IRS says you owe them
7  money, you're going to have to pay it, and it
8  turned out, we didn't owe them any money.
9  They had just applied the wrong quarter or
10  they applied money to the wrong quarters.
11      Q.   So that dealt with the potential
12  penalties for if you had not paid sufficient
13  estimateds, not whether or not you were going
14  to be penalized for failing to file the
15  returns?
16      A.   As far as I can understand and
17  remember, yes.
18      Q.   Now, this was in June 25, '97, and,
19  of course, we've already established in March
20  is when you learned that there was no '95 tax
21  return filed.  You state here I want to
22  express my appreciation for your invaluable
23  help, knowing you're on the job puts my mind
24  at ease, I really love it here, and I'm
25  probably oversensitive to this kind of

124

1  challenge, and then it talks about the flood,
2  and, I think, we agree there was a huge flood.
3  At this point in time, you didn't think you
4  had sent him documents, and they got filed
5  away, correct?
6      A.   I would say that what was I going
7  to do, yell at the guy and say, you know, rag
8  on him after he'd done something like that?  I
9  didn't bring it up.
10      MR. GREEN:  Well, I'm not going to
11  suggest the possibilities, but there are a lot
12  other than saying he's doing a great job.
13      THE WITNESS:  Well, it's better to be
14  encouraging when you want somebody to help you
15  than to say hey, bonehead, you need to fix
16  this.
17      MR. GREEN:  Well, we'll keep going
18  and see if we can find one that says
19  anything.  552, July 9, '97.  Actually, let me
20  just give you these all together because we
21  may want to try to get them in order, 553,
22  554, there's a notice 555, and then, I think,
23  a fax that this letter's going to refer, July
24  8, '97, begins at 556, and it's lengthy.  I'm
25  not sure where it ends.

125

1    MR. ROYSE:  It's 567.

2    MR. GREEN:  Yeah.  Let's do this one

3  first.  I've got it to 574.

4    MR. ROYSE:  There's copies in there.

5  It stops at 567 the first time.  There's some

6  duplications.

7    MR. GREEN:  Some duplicates, okay.

8  Well, then there's a June 24, there's a

9  separate deal here.  Okay.  Let's start with

10  -- this makes sense.  Let's start with 554,

11  it's dated June 23, '97.  It's a handwritten

12  note from you dated the same day and attached

13  as a notice from the IRS dealing with the

14  estimated issue that we talked about before;

15  is that your handwriting?

16    A.  Yes, sir.

17    Q.  And you sent that letter by fax, et

18  cetera -- you're right, there's two of those.

19  Let me go next to 570, and it looks like to me

20  571 is actually the first page of the same

21  fax, but take a look at that and tell me if

22  you think that's wrong.  Take a look at that,

23  if you would, for a moment.  Was that June

24  10th, '97?

25    A.  Yes, sir.

126

1    Q.  Okay.  And this says that you

2  understand what went wrong with the taxes or

3  something.  Can you paraphrase in your own

4  words what your understanding was?  And when

5  we say taxes, we're talking about the

6  estimateds.

7    THE WITNESS:  You're asking me what

8  this means?

9    MR. GREEN:  No.

10    THE WITNESS:  I can tell you what it

11  means.

12    MR. GREEN:  Your note.  Feel free to

13  tell me anything you want to.

14    MR. ROYSE:  Answer his question.

15    THE WITNESS:  This?

16    MR. ROYSE:  What does that mean?

17    A.  What I explained earlier about the

18  IRS crediting quarters to the wrong year or

19  the wrong quarter, crediting payments to the

20  wrong quarter, and we had overpaid, that's

21  what it looks like it says here, we overpaid,

22  and we're due a refund, and I was asked if I

23  wanted it credited towards our future taxes or

24  did I want a refund, and I chose that I wanted

25  to credit it towards our taxes, and

127

1  apparently, we made an overpayment that was

2  never credited.

3    MR. GREEN:  And then let me -- I

4  think related to that is 568, the following

5  day, that relates to the same thing, or if it

6  doesn't, tell me what you think it relates

7  to.

8    THE WITNESS:  Are you asking me if

9  this relates to this (indicating)?

10    Q.  Yeah.  Does it follow-up to that

11  (indicating)?

12    A.  It's possible.

13    Q.  It's the only fax I could find from

14  the prior day including in your documents

15  assuming that's correct; do you have any

16  reason to think it's not?

17    A.  I couldn't say for sure.

18    Q.  Was it normal to fax him to see if

19  you could call him, or were you just checking

20  to see if he'd be in?

21    A.  I wanted something in paper, that's

22  what I'm thinking is, I sent something in

23  paper.  Sometimes he wasn't there, sometimes

24  he was on another line or some other kind of

25  thing, so I would send a fax.

128

1    Q.  What were you wanting on paper?

2    A.  That I sent this.

3    MR. GREEN:  Okay.  Let me look at

4  that real quick.  We've got, I believe, let's

5  see, what's the date here?  Those were what,

6  June 10th.  Here's a June 9th one as well.

7  This is 575 through 597, and it says they're

8  faxing those again, although, I'm not sure

9  I've seen anything faxing them before, but

10  when you sent faxes, would you keep a copy?

11    THE WITNESS:  As a rule, yes.  And

12  you're asking me about all these documents, or

13  by document by document?

14    Q.  No.  I just want -- is that a

15  letter you sent on that day?

16    A.  Yes.

17    Q.  And it was faxed.  Were those

18  documents behind it faxed with it; can you

19  tell?

20    A.  Looks like it, yes, because they

21  have a banner at the top.

22    Q.  And this is something you received

23  from the IRS?

24    A.  Sure looks that way.

25    Q.  Does it show a date that it was

129

1  sent out?

2      A.    December 31st --

3      MR. ROYSE:  No.

4      A.    I'm sorry.  It's March 17th, 1997.

5      MR. GREEN:  They do that just to

6  trick you, put the tax year up there.

7      THE WITNESS:  And you want me to look

8  through them all?

9      MR. GREEN:  No.  You sent that on to

10  Mr. Birkholz on that day, that's the real

11  question.

12      THE WITNESS:  Here's one that says I

13  have written three times, sent copies of stuff

14  from the IRS, did you receive them.

15      Q.    Then I've given you more than one

16  thing.  What's the Bates stamp of the last

17  page there?

18      MR. ROYSE:  581.

19      Q.    Does that indicate that that's the

20  last part of that fax, or have we moved on to

21  another fax?  I don't have them in front of

22  me.

23      A.    0607, and this is 0609.

24      MR. ROYSE:  Hold on.  Wait a second

25  here.  The last page of the prior document was

130

1  580.  This is all new stuff.

2      THE WITNESS:  I don't know even know

3  if it's all the same stuff.

4      MR. GREEN:  Let me look at it again.

5  They're out of order, these just switched

6  around.

7      MR. ROYSE:  There you go.

8      Q.    And then this June 7th, '97; is

9  that something you sent?  You said you hadn't

10  heard, faxed stuff, and, I think, we've looked

11  at all that.

12      A.    Looks like I sent it.

13      Q.    And that related again to the

14  notices that we just talked about?

15      A.    Well, I see the notices here, at

16  least this one here (indicating).

17      MR. GREEN:  Right, but, I think, it

18  refers to more than just that.

19      THE WITNESS:  Right, I agree.

20      Q.    And then, before I do this to you,

21  let's make sure I haven't -- here's a note

22  that begins 556, and attachments, I believe,

23  in 560; did you send that fax?

24      A.    If you're asking if this is my

25  handwriting, yes, this is my handwriting.

131

1      Q.    And you sent that as a cover sheet

2  to the fax that you're holding?

3      THE WITNESS:  This is my handwriting,

4  and it looks like it was sent on the same day,

5  same time, and, I'm sorry, can you -- I've

6  looked at these, and the question is?

7      Q.    And you mailed those.  Let me take

8  a quick look at the notices that were

9  attached, and this notice relates to the fact

10  that the '95 tax return had not been filed,

11  correct; is that what that's -- you were -- it

12  was a repeat of the notice that you got in

13  March?

14      A.    Right, they kept sending.

15      Q.    Because it still wasn't filed,

16  right?

17      A.    I'm not sure.  What I remember is

18  getting a notice -- I'm trying to think.  I'm

19  not sure which situation this is -- there was

20  a situation where we had an underpayment and

21  an overpayment year.  First we got notices

22  about -- for underpayment for a certain year,

23  and I called Peter about it, and we discussed

24  it, and my recollection is I had made the

25  payments, but they credited them to the wrong

132

1  year.  Then he -- I kept getting notices,

2  called Peter again every time I got one, and

3  he said don't worry about it until you get one

4  that comes certified mail.  So to answer your

5  question, I don't know that this necessarily

6  is -- this says your tax return is overdue.

7  I'm not sure our tax return was overdue.

8      MR. GREEN:  I think we already

9  established that.

10      MR. ROYSE:  The return, not the

11  payment, that they're saying, they received

12  the return.

13      THE WITNESS:  Right, and I don't

14  recall whether or not the return was done or

15  not.  I just remember that they were saying we

16  owed them a big bunch of money.  That was what

17  I was remembering.

18      MR. GREEN:  Now, let me get this

19  straight.  You got them in March '97, you got

20  a notice that there was no '95 return filed,

21  okay, we've established that.  And then this

22  last notice was -- sorry, share with me the

23  date on that again.

24      THE WITNESS:  This one here says

25  07-08.

133

1   MR. GREEN:  No.  The date on the
2   notice.
3       THE WITNESS:  Let's see, 07-07-97.
4       Q.   Okay.  And then on June 10, we've
5   already talked about this, and I can pull it
6   up for you again if you want, and this is from
7   your documents W489, Mr. Birkholz wrote you a
8   letter saying that I can't file a '95 return
9   because you haven't given me the data for '95
10  or '96, correct?
11      A.   I assume that's correct, I mean, I
12  remember seeing the paper that you handed me.
13      MR. GREEN:  Yeah.  I don't mind
14  getting it out if I put it back.
15      THE WITNESS:  Well, this refers to
16  '92, '93, and '94.
17      MR. GREEN:  Look at the bottom.
18  There's a problem in every year.
19      THE WITNESS:  That's right.  There
20  was apparently, and as I stated before, it's
21  possible that he had the information, and it
22  was filed away.
23      Q.   Well, we're still looking for that,
24  but here he's telling you that he doesn't have
25  the data to do one, correct, in June, in

134

1   response to your second notice from the IRS?
2       A.   That's what it looks like.
3       MR. GREEN:  And then we've already
4   talked about the letters where information was
5   provided.  I think my '95 file is worse off
6   then Humpty Dumpty; it's not going back
7   together.  Let's take a look at 465, I think.
8   I guess, what I better do is gather all those
9   up.
10      THE WITNESS:  Yeah, if you want to
11  get these back.
12      MR. GREEN:  I give up on that.  I'm
13  just going to try to keep them in the same
14  general stack, and I'll let somebody do that.
15  Off the record.
16      (OFF THE RECORD.)
17      Q.   On 465, it's dated October 14th,
18  '97.  This is a cover letter for your '96
19  return; do you recall getting your '96 return
20  in a timely fashion and getting it filed?
21      A.   I don't remember.  This looks like
22  a cover letter for our federal income tax
23  return on October 14, 1997, for a 1996 return.
24      Q.   Uh-huh (affirmatively), but you
25  don't remember if you received it or not?

135

1       A.   No.
2       MR. ROYSE:  Off the record.
3       (OFF THE RECORD.)
4       MR. GREEN:  I'm going to show you
5   some documents, and I'm making an assumption
6   these are together, so you may have to help me
7   on that, and 487 through 494, I put together,
8   but what causes me a problem is, I guess,
9   these were mailed because there's no fax
10  banner, and it's also undated, but there is an
11  article dated March 4, '97, concerning the
12  flood, and there's an IRS statement dealing
13  with the estimated tax issue for the tax year
14  '93, dated March 17, '97, and a notice dated
15  March 3, '97, which, I believe, we've already
16  seen for the tax year '95, saying that your
17  tax return has not been filed.  So I don't
18  know if that -- see if you can tell what goes
19  with that.  I know the article does, and it
20  refers to some notices.  It's not real clear
21  to me whether both of the notices go with
22  that, but if you can help find it, if not,
23  then you've done your best.
24      THE WITNESS:  I want to make sure I
25  understand.  Your question is?

136

1       Q.   Can you help me with what would
2   have come with that note?
3       THE WITNESS:  Of this note?
4       MR. GREEN:  Yeah.  Potentially, if
5   all I'm going on is the order of the file, all
6   of those could be responsive.  If you can't
7   tell, I understand, but if you do know, if the
8   context of that letter gives you some context
9   to tell what you sent with it, I'd appreciate
10  knowing that.
11      THE WITNESS:  Oh.  I'm going to say
12  it's this stuff, and it looks like the same
13  stuff they sent before because they sent it,
14  if I remember correctly, they sent it many
15  times.
16      Q.   And that's dealing with the
17  estimated tax issue from '93, and then the no
18  return from '95?
19      A.   Something like that.
20      MR. GREEN:  And just briefly, if you
21  can look at this note, September 9, '97, it's
22  497, appears to be talking about the estimated
23  issue again.  If you can confirm that, that
24  that's what that's dealing with, that helps
25  me.

137

1    THE WITNESS: Well, this looks like
2  I'm referring to something I asked him about
3  before, and I'm asking again.
4    Q.   But that's dealing with the
5  estimated tax issue?
6    A.   Yes.
7    MR. GREEN: Okay.
8    THE WITNESS: These are two separate
9  things.
10   MR. GREEN: Yes, they are. Thank
11 you. Well, I think this is as good as place
12 as any. I mean, if you want to go more, we
13 can, but I agree with you that it's -- even if
14 it were fruitful to do that, I'm sure she's
15 getting as tired as I am, and that's when we
16 start getting grumpy. We agree to adjourn?
17   MR. ROYSE: Yeah.
18   (WHEREUPON, THE DEPOSITION OF
19 JENNIFER WEYLAND WAS CONCLUDED FOR THE DAY AT
20 5:10 P.M. AND CONTINUED ON AUGUST 1, 2006,
21 9:00 A.M.)
22       DIRECT EXAMINATION
23       BY: MR. GREEN:
24   Q.   Yes, ma'am, I'm Ron Green again.
25 How are you?

138

1    A.   Hi.
2    MR. GREEN: And this is a resumption
3  of your deposition between the other day. I
4  just want to remind you, you're still under
5  oath from the prior deposition, so we don't
6  have to go through all that again. I just
7  want to remind you that you are, and I know
8  that won't make a lot of difference because
9  you're going to tell the truth anyway.
10   THE WITNESS: Yes, sir.
11   Q.   I just want to remind you on the
12 record, and as I mentioned before, I'm going
13 to try real hard not to backtrack anything,
14 but, I believe, we had just at the end of the
15 day finished up with '96 tax returns, we were
16 talking about those. So I'm going to go to
17 some '97 documents relating to the '97 tax
18 returns, and, I believe, was it '97 when you
19 moved to Cynthiana, or maybe when you sold
20 your house in New Jersey, or have you lived in
21 two places in Cynthiana?
22   A.   Oh, no.
23   Q.   Just one?
24   A.   Only one place, and I'm thinking.
25   Q.   It's tough when the first question

139

1  is a date question, but --
2    THE WITNESS: I'm thinking, wasn't
3  the flood in '97, I mean --
4    MR. ROYSE: That's even a harder
5  question.
6    A.   We'd been there for something for
7  like four or six weeks.
8    MR. GREEN: I can answer that
9  question for you. Normally I don't answer
10 questions in depos, but I will this one
11 because there was an article we talked about
12 at the end of the depo the other day about the
13 flood, and it was in the '96 file, but that
14 doesn't mean it happened in '96. I'll show
15 you a document we looked at last time. It
16 says flood of '97, so it's document 488, I
17 guess, it should be of the Weyland documents.
18   A.   Yeah. We just -- I remember we
19 moved in in January, and that was also why it
20 was kind of hard to remember because it was
21 the beginning of the year, and I was pretty
22 sure it was '97, but I wanted to clarify it
23 with this.
24   Q.   So if there's references in the
25 file to you having sold a house, it's your

140

1  house in New Jersey that was sold in '97?
2    A.   I would assume so.
3    Q.   Let me show you a document marked
4  as -- I'm sorry, that would have been PB
5  instead of Weyland document, that article we
6  looked at. PB416, if I can find it real
7  quick, and we'll include 417 and 418 which, I
8  believe, were attached, but we'll let the
9  witness verify that. So 416 through 419; do
10 you have those?
11   Q.   It's a handwritten note that refers
12 to a Social Security statement, and, I
13 believe, the subsequent pages are a Social
14 Security statement; is that correct, do those
15 go together?
16   A.   I'm still looking at them.
17   MR. GREEN: I thought you were
18 looking at me. I'm getting a lot of glare on
19 your glasses, so I can't see your eyes.
20   THE WITNESS: Okay. So are you
21 asking do these papers go together?
22   MR. GREEN: Yes.
23   A.   It looks as though they do, yes.
24   Q.   And your note indicates that, I
25 think, the word is screwed up?