141

A. Yeah.

Q. What was the problem you were discussing there?

A. I don't remember.

Q. You can't tell from the notice or the memo?

A. Well, I'm just reading what it says, which is I don't know what happened to all the money we've been sending them. It looks as though nothing has been straightened out. I'm sorry. I don't remember what that was in reference to.

Q. When you say -- I guess, the reason I'm asking the way I'm asking is because this is Social Security as opposed to the IRS, but is this back to the issue you were making payments, and they were allocating to the wrong years, that kind of thing?

A. I don't remember. I'm sorry, I don't remember.

MR. GREEN: Good enough. And let me back up just a little bit. The note itself is undated, but it's got a fax banner of 7-18-97, it's PB409, 410 and 411, which, I believe, go together. Why don't you look at those, and

142

then ask you if you can identify those as something you sent to Mr. Birkholz.

THE WITNESS: You're asking do they go together?

Q. Yeah. Can you identify that as something you received from the IRS and sent to Mr. Birkholz?

A. I would say so, yes, sir.

Q. These were showing amounts due, this was just for his information, or -- the note doesn't say a lot, so what were you contemplating in doing about those?

A. Any time I got something from the IRS, he told me to send him copies of it.

Q. But were you expecting him to do something with him or just wanted to be aware of them?

MR. ROYSE: Let me interrupt you just for a second. I'm sorry, Ron.

MR. GREEN: Sure.

MR. ROYSE: You've given her 409, is that right?

MR. GREEN: Yes, 409, through 411.

MR. ROYSE: For some reason, I don't have 409, but 408.

143

MR. GREEN: 408.

MR. ROYSE: I don't have 409, but that's probably my problem. I just want to make sure that what I was looking at didn't go with that, and it doesn't.

MR. GREEN: Or a copy was skipped?

MR. ROYSE: Yeah. You're fine.

Q. So this is really no more than you received these from the IRS and then forwarded them on to Birkholz?

A. As he has instructed me to do, yes, sir.

Q. I'm going to show you what's been marked as 412 and 413, again, PB. The note has no date, and there's no fax banner, but it's with a March 17, '97, tax notice which indicates that for a particular year, you'd overpaid five dollars. Again, can you identify that as something you sent Mr. Birkholz, and was there any significance to this, or was it simply you were advising him you received this notice?

A. This is my handwriting.

MR. GREEN: Right.

THE WITNESS: You're asking if I sent

144

these to him?

MR. GREEN: Yes.

A. Yes, I did.

Q. And would that have been, again, in just the ordinary course of keeping him advised, or would you have expected him to do something with this?

A. The ordinary course of keeping him advised, and if he needed me to do something, I would expect him to tell me.

Q. Well, on the last ones we looked at, those were ones where they were saying you owed money. You didn't need him to tell you what to do with those, did you?

A. I didn't owe them money as it turned out.

Q. And how is that determined; tell me about that?

A. They ultimately, if my memory serves me correctly, determined that I had overpaid another year because they allocated quarterly payments to the wrong years.

Q. Again, the problem we were just referring to where the IRS was misallocating your payments?

145

A. To the best of my memory, yes, sir.
Q. And who was it that got that resolved?
A. Peter.
MR. GREEN: This is a note dated January 29, 1998, it's marked PB408. I guess, first of all, if you can verify that that's a note that you sent to him.
THE WITNESS: This is my handwriting.
Q. And what's the reference to where it says hooray, talks about making a payment, the, I think, the last full paragraph above the signature?
A. I'm looking at this and assuming that I paid the fourth quarter.
Q. On time? Hadn't there been a problem with them being untimely; isn't that what you're referencing that this one was on time?
A. Could be. I don't remember.
Q. And then down at the bottom, let's see, what was the date on that again? I'm sorry. I've given you the only copy.
A. January 28, 1998.
Q. And we're talking about the '97 tax

146

year, so you had received materials, and you were waiting for Richard to get back from overseas; is that what that's talking about?
A. That's what it looks like, yes, sir.
Q. Very good. Show you what's been marked as 414. I asked you about the house before. Is this what you provided to Mr. Birkholz regarding capital gains on the sale of that house in New Jersey?
A. This is not my handwriting.
Q. Do you know whose it is?
A. I have no idea.
Q. Do you recall having a conversation with Mr. Birkholz about the sale of the house and reporting the capital gains?
A. Yes, sir.
Q. Does this information appear accurate based on your memory?
A. Looks that way.
Q. So this may be Peter's notes of your conversation or a conversation?
A. It could be. I have no idea.
MR. GREEN: These documents are PB412 and PB413. I may have showed you these

147

already.
MR. ROYSE: Uh-huh (affirmatively).
Q. Yeah, I showed you these. Nevermind. Getting out of order already. Let's look at 432. I'll show you a document that's marked as 432, which are some forms relating to, I assume, Mr. Weyland's pension; have you ever seen that before?
A. No, sir.
Q. Do you know one way or the other whether you sent that to Mr. Birkholz?
A. I didn't send it, but I don't recall sending this to him.
Q. Do you know one way or the other if your husband did?
A. It's possible.
Q. Did you ever have any involvement with the pension or pension documents Richard was participating in?
A. Not that I can recall.
Q. I know we talked about last time, but I can't remember if we talked about specific years or talked generally. Your copies of all the tax returns are also unsigned like Mr. Birkholz's, correct, you

148

don't have any signed copies that show what date they were sent or anything like that, I mean, for, let's talk now from '97 on?
A. I'm not sure. I don't think so. I think the copies that I have are the customer client copies provided by whoever was preparing taxes.
Q. I'm going to ask you to take a look at a document marked PB370, it's dated May 6, '98, and, I believe, this is relating to the '98 tax year; could you identify that, first of all?
A. This is my handwriting.
Q. And do you know what check you're talking about there?
MR. ROYSE: Does it go to 371?
MR. GREEN: It's possible. I'll let you look at that because it didn't say it included a document, I don't think, but it could have.
MR. ROYSE: Yeah, it does, second paragraph.
A. No, I don't. I'm sorry.
Q. Did the State of Kentucky audit your '98 return?

149

A. No, Sir.
Q. Let me show you a document marked PB374, and maybe audit's the wrong word. Does that jog your memory or can you tell me what the state was doing with your '98 tax return?
A. I don't remember this.
Q. So as far as you know, nothing ever came of that?
THE WITNESS: No, sir, not that I can remember. You want these?
MR. GREEN: Yeah. Thank you.
MR. ROYSE: Off the record.
(OFF THE RECORD.)
MR. GREEN: I'm going to ask just a couple questions about '99 tax year. I'll show you a letter or note from you to Mr. Birkholz dated February 28, 2000, must have been about the time we went from 606 to 859. Take a look at that, first of all, and tell me if you recognize that.
MR. ROYSE: What's the PB number, PB360?
MR. GREEN: Yeah.
A. Yeah, that's my handwriting.
Q. When you say you enclosed a check

150

for future stuff, what's that talking about?
A. I have no idea.
Q. And then it mentions that you may be able to -- when it worked out, was there an annual appointment with Peter that you would have?
A. No, not an annual appointment, no.
Q. What's that referring to when it says it looks like I may be able to make our appointment this year? And I'm paraphrasing because I don't have that in front of me.
MR. ROYSE: This says but I think I should have an appointment to see you some time this year -- I think I should make an appointment to see you some time this year.
A. Yeah. If we were scheduling a trip up that way.
Q. Then you'd pop in?
A. Yeah.
Q. Did you do that, do you know, did you make an appointment in 2000?
A. I'm not sure what year it was, but we have been up there since we've moved to Kentucky to see him.
Q. Would you have anything that would

151

show when that was, any kind of document at home?
A. It's possible.
Q. Would you do me a favor -- well, you don't have to do it as a favor, but take a look, and if you can identify the times that you went to Massachusetts and you think you spoke to Mr. Birkholz or anybody else in his office, just let your attorney know when those were, and you can put that in a letter or whatever; would that be okay?
A. Yeah, sure.
Q. Now, after you moved to Kentucky, how many times do you think you did that?
A. At least twice.
Q. Focusing on the first time, can you recall any of the specifics of what was discussed at your meeting, or was it formal or informal? Let me ask you that first.
A. They were usually informal because we've known each other for a long time, so other issues would come up. On one occasion, it was wintertime, there was snow on the ground, and we'd been in his office talking for probably two hours, and we had our dogs

152

with us, and I remember this occasion in particular because we had a barrier, but it didn't go all the way up to the roof of the van, and this one dog apparently had wanted to climb into the front seat.
MR. GREEN: As any good dog would want to do.
A. This one's got a little, you know, she's a piece of work, and she got her foot caught between the barrier and the cooler that we had there. We figured with the cooler there also, this would really deter, you know, which it did, it deterred everybody except her, and so apparently, she got her foot caught, I mean, I was trying to put it together later on when I was able to study the injury, and when she pulled it out, she got an injury to her leg in such a place that -- and she curled up on the front seat and bled all over everything, and when I say all over everything, I mean, all over, and we were on our way to visit a friend of mine in New Hampshire, and I had described that to her the same way, and she didn't really comprehend when I said all over. The sheepskin sheet was

153

completely, I mean, the whole area where you would sit was soaked with blood. My husband's overcoat that he'd left in the van, soaked with blood. I suspect if we'd been in his office any longer, she may have bled to death, but as soon as I got out to the van and saw it, I remember running back in, and Peter called his veterinarian, and we got an emergency appointment and took her in immediately. We had to carry her in.

MR. GREEN: Sound like she cut an artery or something.

THE WITNESS: She did. I was in there with the vet when they were working on her. I can usually be assistance -- be of assistance to a veterinarian in something like this because I know my dogs, and I was watching them work on her, and it wasn't just an exterior type of laceration. They had to go in and sew up, I can't remember, it had to be a vein because it was on the outside as opposed to something much deeper, but they had to close that to stop the bleeding and then sew up the outside of her leg, and then we spent the time while I was up visiting my

154

friend in New Hampshire watching her very carefully, and having to -- but we had to feed her, like, beef. I had to get hamburger for her so she could build up her --

Q. Red blood cells?

A. Yeah, because the vet felt that she had probably lost quite a bit of blood, and I remember we had to pull -- well, we had pull all the -- we had pulled the seat covers off because we had to, and using my friend's bathtub to soak and try to clean. So I remember that occasion quite vividly because of that.

Q. Well, tell me about the meeting before you discovered the puppy, I mean, I know you're not going to remember every detail of what was discussed, but specifically, was there any discussion about who Richard's employer was, the kinds of issues we're talking about in this case?

A. No. It was general issues having to do with the stuff that we've always been dealing with, taxes and just the usual stuff. I think we primarily scheduled an appointment to see him at that time because we could and

155

felt as long as we were up that way, and we were up during business hours, that we would stop in and see him.

Q. Do you have any specific memories of a second meeting whether or not it was before or after the winter meeting? And I can see why that one sticks out.

A. No. I'd have to think, I'd have to really think and separate and try to remember what time of year.

Q. Do you have any specific recollection of that meeting having anything to do with determining who -- determining who your husband's employer was, those kinds of issues?

A. No. Most of the conversation was -- I'm trying to think of the right word. Not candid, but the kind of conversation you'd have with a friend just talking about how things are going, what's it like in Kentucky, how's the business going, you know, my business going, you know, he seemed to be interested in how my career was going and what I was doing, what shows I went to, that kind of thing.

156

Q. Yankees always ask you about the Derby; did he ask you about the Derby?

A. No. I don't recall that he did.

MR. GREEN: Just kidding. Like, of course, you went, oh, yeah, and I know everybody there, too.

THE WITNESS: I went to the Derby party.

MR. GREEN: Let me ask you about 364, it's PB364. Let me ask you, first of all, if that's a note you sent.

THE WITNESS: Yeah, I sent this. It's my handwriting.

Q. I saw a lot of references in here to problems with changes and change of address; what ended up being the problem there?

A. In about four years, Cynthiana, I don't know whether it was Cynthiana or the State of Kentucky, changed our address three times.

Q. To the wrong address?

A. No, no. They changed our address.

Q. Oh. They changed the address of your location?

157

A. Right. And we started out as, like, this was the second address, our eight box 104.

Q. Well, my main concern is -- so this is a problem that you and Pete were having, not a problem that Pete was causing you?

A. They were having trouble keeping up in their database. I would send them a change of address or let them know there was a change of address, and then it would take forever to get them to change it in their, I'm assuming, the term is database.

Q. You're talking about the Birkholz database?

A. Right, yes, sir.

Q. But this was something whoever decides what your house number or street name's going to be was doing?

A. I'm sorry. Could you --

Q. Whoever decides your house number and street name, those kinds of things, they're changing you all the time, you're not moving around; they're changing you?

A. Oh, no. We were in the same location, and in some period, like, three to

158

four years, our address changed three times, our address at the same place. We didn't move anywhere.

Q. Those guys that make the markers for outside your house; it's a conspiracy with them?

A. Yeah. We don't have one, so, I think, it's a conspiracy with the people that print up business cards or letterhead because every time I had a business card with the new address on it, two weeks later, I'd get a notice from the post office saying, oh, by the way, your new address is such and such, or the phone company was changing the area code.

Q. And this indicates you didn't have any estimated tax forms, and -- let me see. And 365 to 368 are a set of forms; in response to that letter, did Peter send you some new forms for your estimated vouchers?

A. It's possible.

Q. What would tend to change, your box number or your route number?

A. Box number, route number, and then ultimately, we got a street address because of 911.

159

Q. The New Lair Road?

A. Yes, sir.

Q. So you've got friends at the post office I take it? It says here you chewed them out more than once. You're sure they're not changing your address because they're mad at you?

A. Can I say something off the record?

MR. GREEN: Yes.

(OFF THE RECORD.)

Q. Let me ask you a general question using this as more as an example, I'll reference PB295 through 304, but it's just a spreadsheet type thing which said something that -- and these are a number of years, and these deal with your business and other types of deductions, correct?

A. I assume so, yes.

Q. Now, is that something you or Richard prepared?

A. Richard.

Q. Do you still have those in electronic form in the computer?

THE WITNESS: I'm not sure. I couldn't tell you for sure. Do you know what

160

year this is?

MR. GREEN: That is '99, I think. I think it says in the upper left-hand corner.

THE WITNESS: Is that it, because it's '98? He's had more than one computer over the past six years.

Q. Would he copy files over onto the new one when he got one, or are these questions I should direct to him? What I'm getting at is -- let me back up. Do you know what software he used?

A. I couldn't say for sure.

MR. GREEN: What I'm getting at, Dave, is I wonder if there is a computer file which would show a last modified date that could give us a clue as to when these were prepared, and if you don't mind, if you'd just talk with her about however you might verify that without changing it or anything. Just let me know what you find out.

MR. ROYSE: Can you flag that, Barb?

Q. And then whatever's there is there. I'm going to show you 189, which is a letter from Birkholz & Company to you and your husband dated April 2, 2001, relating to your

161

1  2000 tax returns; any reason to doubt that
2  that's when the returns for 2000 were sent to
3  you?
4       THE WITNESS: You're asking me?
5       Q.  Any reason to doubt that that's
6  when the 2000 returns were sent to you and
7  your husband?
8       A.  No.
9       Q.  I notice that it was before April
10 15th, of the year following the tax year which
11 didn't seem to happen very often in these.
12 Was there any discussion leading up to that in
13 terms of the information getting there in time
14 to actually file before the 15th?
15      A.  It has a lot to do with Richard's
16 schedule.
17      Q.  And he just happened to be
18 available that year to get everything done?
19      A.  You know, maybe one out of six
20 years he's home for Christmas, that kind of
21 thing.
22      Q.  Let me show you what's marked as
23 202 dated April 11, 2001; looks like you're
24 asking a question about your IRA?
25      A.  That's what it looks like.

162

1       Q.  And the note at the bottom, my
2  reading of that is that he then called you
3  that afternoon; is that right, is that what
4  that's referring to, or am I misreading it?
5       A.  It could be, yeah, it could be.
6       Q.  And you don't have any memory of
7  him being slow to answer this or whatever?
8       A.  No. I don't remember.
9       MR. GREEN: Well, let me show you a
10 document marked PB222 -- well, I'm going to
11 include with it up through 232 maybe -- yeah.
12 But what I'm interested in is actually 222,
13 ask you if you recall receiving that letter
14 and the attachment.
15      THE WITNESS: Are you asking me do I
16 remember receiving this?
17      MR. GREEN: Uh-huh (affirmatively).
18      A.  No -- well, no, not really, no.
19      Q.  Then that may be the answer to the
20 rest of them, but do you have any recollection
21 of what led up to this letter?
22      A.  It's possible we've been asking
23 over the years why Richard was paying, and
24 other employees doing the same job were not
25 paying; that could be it.

163

1       Q.  You say over the years. This is
2  the first time I see a written reference of
3  it. Do you think that that came up in the
4  context of this is in response to that
5  discussion?
6       A.  It's possible.
7       Q.  I didn't -- the stack's pretty good
8  sized, so I'm not swearing, but I didn't see
9  anything, like, in a handwritten note saying
10 hey, what about this, why are we paying Social
11 Security or whatever; is this even about
12 Social Security, or is this about the income
13 exemption?
14      A.  I'm not sure.
15      Q.  But you don't recall a specific
16 conversation that you had that generated that
17 response?
18      A.  No, sir.
19      MR. ROYSE: Just so we're clear,
20 I don't think she's denied that that
21 happened. She just said she doesn't remember.
22      MR. GREEN: Yeah. I mean, if there
23 was a conversation, I want to know whatever
24 you can tell me about the conversation, but if
25 you don't have a memory of a specific

164

1  conversation, then you can't tell me that;
2  that's what I'm getting at. I don't want to
3  later hear that there was this extensive
4  conversation, and then this letter followed.
5       THE WITNESS: I don't recall.
6       Q.  Thank you. Let me show you a
7  document, this is out of the Birkholz files
8  for the tax year 2001, show you a document
9  marked 129, which it looks like it was faxed
10 from your studio April 9, 2002, and
11 specifically, it looks like this is a 2001
12 estimated payment as the check, but it's got
13 written on it World Trade Center problem; do
14 you know what that refers to?
15      THE WITNESS: Can I talk with my
16 attorney?
17      MR. GREEN: Sure. I'll tell you
18 what, I'll leave.
19      (OFF THE RECORD.)
20      A.  Yeah, Peter told me to put that on
21 there.
22      Q.  And in what context?
23      A.  I'm not really sure. I don't
24 remember exactly.
25      MR. GREEN: Let me have that.

165

THE WITNESS: Sorry.

MR. GREEN: Unless you've got more answer.

THE WITNESS: No. I was thinking about 2001.

Q. Let me show you what's been marked as 166. It's dated August 21, 2002, and it says it was attaching the 2001 federal income tax return, I guess, the state tax return as well; do you have any reason to doubt that that's the time frame that the returns were sent to you for tax year 2001 and August 2002?

THE WITNESS: You're asking me if this was done?

MR. GREEN: I'm wanting to know -- I mean, this indicates that that's when you sent your tax returns.

THE WITNESS: Yeah. I would say that's correct.

MR. GREEN: And let me show you real quickly what I think is -- not sure where it ends, show you documents marked as 130 through 148, and you just tell me whether it was you or your husband that filled that out.

THE WITNESS: It's not me. It wasn't

166

me.

Q. So you think Richard would have?

A. It's possible.

MR. ROYSE: You mean the handwriting on it?

MR. GREEN: Yeah.

MR. ROYSE: As opposed to the typed entries?

THE WITNESS: Is there handwriting?

MR. ROYSE: Look through the whole thing.

MR. GREEN: I don't know if checkmarks have distinct characteristics or not.

THE WITNESS: This sort of looks like Richard's handwriting. It wasn't me, that's all I know for sure.

Q. First of all, I'll ask you to look at what's marked as PB46, dated October 7, 2003, and it's kind of the same question; do you have any reason to doubt that that's when your returns were sent to you for the tax year 2002?

A. No. I think I answered your question.

167

Q. You don't have any reason to doubt it?

A. No, I have no reason to doubt it, no, sir.

MR. GREEN: There was some charts and other types of materials relating to your business that I hadn't seen anything like it in other years. Let me just show you them, and let you tell me what they are. It's 120 through 128.

THE WITNESS: Do you want this?

Q. Yeah. Thank you. Can you just tell me what those are, and why you would have sent those to Mr. Birkholz?

A. I can tell you I didn't produce them.

Q. Okay. Do you know who did?

A. For sure, no.

MR. ROYSE: Tell him what you think.

THE WITNESS: I think it's possible that Richard may have produced this. What year was this?

MR. GREEN: This is out of the 2002 file, but it looks more business planning type information, I mean, to me, and I'm just

168

curious where it came from and why it was there, if you know, and if you don't know, that's fine.

THE WITNESS: I don't know.

MR. ROYSE: That's 120 through 122 that you're talking about?

MR. GREEN: As far as the charts go, and then there's a reproduction agreement.

THE WITNESS: I believe this is a contract.

Q. Right. And why would you have sent that to Peter?

A. I'm not sure.

Q. Let me ask you to look at a document marked PB1, and, I think, PB2 is an attachment to it; do you recall receiving that letter?

A. Yes. I remember this.

Q. Do you recall what discussions led up to that letter or preceded that letter?

A. A phone call.

MR. GREEN: Tell me about it.

THE WITNESS: I believe he was calling to ask questions about the 2002 return, and in the middle -- the conversation

169

was going along, and then kind of out of the blue, he said, gee, is Richard a foreign employee, and my initial reaction was, well, he works in a foreign country, yeah, he's probably a foreign employee, and then there was kind of an, ahoy, whatever. He could be exempt from paying Social Security, and then there was kind of a discussion about what that meant, and then he sent this letter regarding that situation.

Q. What's the date on that letter?
A. August 8, 2003.
Q. So was that pretty close in time to this conversation you just related?
A. Yeah. I would say so.
Q. And he initiated the call?
A. Yes, sir.

MR. GREEN: We had produced some records; have you been able to determine when that call was?

MR. ROYSE: The day before -- well, leave it on the record. What I saw, Ron, was that there was a phone call the day before and three days before.

MR. GREEN: So on the 7th and the

170

4th?

MR. ROYSE: Hold on. Let me tell you for sure, 8-4-03, there's a telephone call, and 8-5-03, and, I think, there's one -- that's it, 8-4 and 8-5. I'm not obviously testifying that that was the phone call; that's what I got from the record.

MR. GREEN: No. This is just an informal. I'll go -- it will be my job to go look and verify or whatever.

MR. ROYSE: That's what I saw in the records.

Q. Just seeing if you'd save me some time because I have to admit, I haven't studied them. And then you received this letter, like, the 9th or the 10th, I take it?
A. I think so, yes.
Q. Within regular mailing time; is that usually a day or two?
A. It depends.
Q. Three?
A. Could be. I've had things take three days to get to me from Louisville.
Q. In your discussion on the telephone call of the 7th, I think, we think that this

171

is, but whenever it was, you had a discussion of what that meant and that that had to do with it; was there a discussion about if his employer was a foreign company, or was it talking about whether he worked overseas?
A. The term I remember was he was asking me is Richard a foreign employee.
Q. And he suggested that being a foreign employee would have something to do with Social Security?
A. Yes, sir.
Q. Now, as you left that phone call before you got this letter, how did you leave it in terms of what either of you was going to do?
A. He asked me to find out from Richard what the status was.
Q. His status or his employer's status?
A. Well, he wanted -- he wanted me to get information from Richard.
Q. Did he describe any specifics, like, documents that he wanted, anything like that?
A. I don't remember him asking for any

172

documents.
Q. And at this time, was Richard overseas?
A. Yes, sir.
Q. And then you got this letter. Now, what did you do following this conversation?
A. I put in a call to Africa.
Q. And were you able to get ahold of your husband?
A. Eventually.
Q. How long did that take?
A. I couldn't tell you. I don't recall.
Q. I mean, was it a week or months?
A. It could have been a matter of days, it could have been a matter of weeks. I couldn't tell you for sure.
Q. And we talked briefly about this connection with some Tidewater documents. You had a list of numbers, and you already indicated you weren't really concerned with who they belonged to, they were the people you got in touch with about things. So you call them, and say I need to talk to my husband, and then they try to get him to call you; is

173

1   that how that works?
2       A.   Yes, yes, sir.
3       MR. GREEN:  Bear with me just a
4   second.  I want to take a look at the
5   Tidewater.
6       MR. ROYSE:  Ron, what I'm doing
7   there, you asked her at that last deposition
8   to look at and see if she had those phone
9   lists that you just referenced.  She was able
10  to find at least a couple of them, and I'm
11  having her to go run and make a copy so you
12  can look at those if you want to ask her about
13  them, that way, you've got them at that point
14  in the deposition.
15      MR. GREEN:  Yeah.
16      MR. ROYSE:  I didn't Bates number
17  those.
18      MR. GREEN:  Let's go ahead and make
19  these an exhibit to the depo, and then we'll
20  all know what they were.  We'll go ahead and
21  mark these as 2, and we'll come back.  I may
22  or may not have questions.
23          (REPORTER MARKS A COPY OF LISTS AS
24          DEFENDANT'S EXHIBIT NO. 2 FOR
25          PURPOSES OF IDENTIFICATION, AND THE

174

1           SAME IS ATTACHED HERETO AND FILED
2           HEREWITH)
3       Q.   I was just looking here real quick
4   to see if, you know, last time we talked about
5   it, there was a couple sheets where somebody
6   with one of the Tidewater companies had a fax
7   going to somebody saying that you needed him
8   to call you, and we talked about some of
9   those, and I was just looking to see if there
10  was one for this time frame, and I don't see
11  one, but, so after this letter, you called the
12  people you call, and then he called you back?
13      A.   Eventually, yes, sir.
14      Q.   And we've established we're not
15  sure how much time elapsed, but in between the
16  time that you talked to Mr. Birkholz and he
17  said to contact him, and when he called you
18  back, did you have any other conversations
19  with Mr. Birkholz in that interim period?
20      THE WITNESS:  If I'm to understand
21  you, you're asking if there were any
22  conversations between the time, like, when I
23  talked with Richard?
24      Q.   No.  When you talked to Peter.
25  Between the time you talked to Peter, and he

175

1   said get me the status in the time that
2   Richard called you back; were there any other
3   discussions?
4       A.   I don't recall.
5       MR. GREEN:  Then Richard called you;
6   tell me about that conversation, what you can
7   remember.
8       THE WITNESS:  I remember asking him,
9   you know, Richard, are you a foreign employee,
10  and his immediate reaction was, yes, I'm a
11  foreign employee, and then I recall explaining
12  to him something about him being exempt from
13  self-employment tax, and that's the most I can
14  remember.
15      Q.   Was there any discussion in that
16  conversation between you and Richard as to who
17  Richard's employer was?
18      A.   I think there may have been a
19  discussion about whether or not Richard was
20  working for a foreign company.
21      Q.   Do you recall what he told you?
22      A.   Yes.  I work for a foreign company.
23      Q.   Did he say which one?
24      A.   I don't recall asking.
25      Q.   I'm going to show you what we've

176

1   marked as Exhibit 2, which you and your
2   attorney were kind enough to locate for us,
3   and for this situation, who would you have
4   called; who would you have called to say I
5   needed to talk to Richard?
6       A.   I think he was in Malongo at the
7   time, and I didn't call all that often, so I'm
8   not sure.  Usually the process was you call
9   this -- a number that goes to England, and
10  then you ask for Malongo and then give them an
11  extension number.
12      Q.   Which number are you talking about,
13  the one that goes to England?  Just so that if
14  somebody else reads this depo, they'll be able
15  to tell from that chart what you're talking
16  about.
17      A.   Well, it looks like the number
18  changed because at the top, there's a number
19  that says 011-44-122-429-3000, and then
20  there's another number here, and I remember
21  the number changed, 011-44-207-487-8100.
22      Q.   You wouldn't at that number ask for
23  any particular person, you'd just ask to be
24  relayed on to?
25      A.   The instructions are asked for.

177

 1  Here's one that says ask for Malongo and then
 2  an extension number, and here's one that says
 3  ask for Angola and then an extension number.
 4      Q.  And then the other phone numbers
 5  and so forth would be for different things,
 6  like, if you had a question about, say, you
 7  had a question about his pension, who would
 8  you call?
 9      A.  I never called about his pension.
10      Q.  But is there information on there
11  that would tell you who to call?
12      A.  No, sir.
13      Q.  So this is strictly how to contact
14  Richard?
15      A.  That's all I used it for.
16      Q.  Is this a set of documents that
17  Richard may have had other uses for that you
18  weren't involved with, I mean, this was given
19  out by somebody to, I assume, him?
20      A.  All I know is I got a copy of this
21  to use if I needed to contact him.
22      Q.  After your conversation with
23  Richard then, what did you do?
24      A.  I don't recall if I called Peter or
25  not.  It would seem like a logical thing to

178

 1  do, but I couldn't tell you for sure.
 2      Q.  Well, other than calling Peter,
 3  what else did you do?
 4      A.  I remember calling my prepaid legal
 5  service.
 6      Q.  Is that how you came up with
 7  Mr. Smith?
 8      A.  Yes, sir.
 9      Q.  And who is your prepaid legal
10  service?
11      A.  O'Koon & Hintermeister.
12      Q.  You don't happen to know how to
13  spell that, do you?
14      MR. ROYSE:  It's Marvin O'Koon, I
15  think, in Louisville.
16      Q.  Who did you send your -- I take it
17  you enrolled in the prepaid legal service as
18  planned?
19      A.  Yes, sir.
20      Q.  Who did you send premiums to, who
21  was your agreement with; was it the firm?
22      A.  I have an automatic deduction made
23  on my credit card.  When I call the 800
24  number, I get O'Koon & Hintermeister and a
25  message that says your prepaid legal provider.

179

 1      Q.  Is there a company that runs the
 2  plan and then hires them, or are they running
 3  the plan?
 4      A.  I honestly couldn't tell you.
 5      Q.  How did you first get enrolled in
 6  this?
 7      THE WITNESS:  Are you asking me how
 8  did I find out about them?
 9      MR. GREEN:  Yeah.
10      A.  A friend of mine who lived in
11  Pennsylvania told me about it with a small
12  business, and she had the service, and she was
13  telling me how convenient it was to handle a
14  lot of, you know, kind of small things that
15  come up when you're dealing with customers and
16  that sort of thing.
17      Q.  And how did she know -- is this a
18  Kentucky plan, or is this a nationwide thing?
19      A.  I believe it's nationwide.
20      MR. GREEN:  And my guess is that that
21  firm has got an agreement with whoever runs
22  the plan to do stuff in Kentucky, so I'm
23  trying to get a feel for who runs the plan.
24      THE WITNESS:  I'm not sure.  She gave
25  me -- gee, I can't remember if she gave me a

180

 1  general 800 number or a number that was in
 2  Pennsylvania because it was something to do
 3  with them getting credit for referring a
 4  customer to the prepaid legal service, so
 5  there was a specific number I called, and a
 6  specific -- I think, it was an attorney, I'm
 7  not sure, who basically did the sign up, and
 8  then I got referred out to O'Koon &
 9  Hintermeister.
10      MR. ROYSE:  Ron, it's pretty clear to
11  me that she doesn't understand or doesn't know
12  how the thing's run.  If I did, I'd tell you,
13  but if you want us to, if Barb will flag that,
14  I'll find out the answer to your question.
15      MR. GREEN:  Yeah, if you can just
16  take a look at any information you have, and
17  then give me some clue as to who's involved in
18  it.  It's not a bad thing, I mean, I work with
19  the policemen's prepaid thing.
20      MR. ROYSE:  I'll find out for you.
21      THE WITNESS:  I honestly don't know.
22  All I know is I called that 800 number, and
23  that's who I talked to.
24      Q.  If you can find something on it
25  fine, but, I guess, the important thing here

181

1  is that ultimately that then led you to
2  Mr. Smith?
3     A.  Yeah.
4     Q.  And that would have been shortly
5  after you talked to your husband, or can you
6  give me some feel for, and feel free to use
7  this August 8, 2003, as a point of reference,
8  we know it's after that, but do you have a
9  feel for how long after that?
10       THE WITNESS:  That I talked with
11 Mr. Smith?
12       MR. GREEN:  Or the attorneys at the
13 prepaid.
14    A.  You have to give me a minute.  I'm
15 trying to remember.
16       MR. GREEN:  No problem.
17    A.  I talked with Richard, and then I
18 called prepaid legal pretty quickly, and they
19 gave me a referral.  I wanted a tax attorney,
20 and I can't remember the length of time.
21       MR. ROYSE:  His question is how long
22 after this roughly did you call an attorney,
23 if you recall.
24       THE WITNESS:  I'd say within a couple
25 of weeks.

182

1     Q.  Prior to you doing that, had you
2  had any other conversations with Mr. Birkholz?
3     A.  I can't recall.
4     Q.  Now, we're going to get -- you can
5  see that your attorney is sitting at the front
6  of his seat because we're going to get into
7  stuff that's potential privilege and so forth,
8  and he's paying close attention now, which is
9  good.  No matter how I phrase a question, it's
10 not my intent to try to encroach upon
11 privilege, okay?
12       THE WITNESS:  I'll just be listening.
13       MR. ROYSE:  And you answer his
14 question that he asked you, period, because
15 that will help me.  I don't want you to go off
16 into something -- he may ask you a question
17 that doesn't involve the privilege, and in the
18 course of answering it, you may get
19 sidetracked and start talking about privilege,
20 and I'll have to stop you, so I just want you
21 to pay attention to what he asks.
22       THE WITNESS:  All right.
23    Q.  And for the record, I don't know
24 that ultimately, I mean, I may take the
25 position that privilege doesn't apply for

183

1  whatever reason, but for today's purpose,
2  we'll just assume it does, but I want to know
3  a little bit about how this all came about.
4  So let me ask you, you called the prepaid,
5  they then gave you the number for the O'Koon
6  firm, or how did you get Mr. Smith's name,
7  from who?
8     A.  From O'Koon & Hintermeister.
9     Q.  Did they call you?
10    A.  No.  They sent me a letter.
11    Q.  Do you still have a copy of the
12 letter?
13    A.  I think so.
14    Q.  And that letter told you you need
15 to contact Mr. Smith?
16    A.  Yes, sir.
17    Q.  And gave you a phone number and so
18 forth?
19    A.  Yes, sir.
20    Q.  And did you do that promptly?
21    A.  Yes, sir.
22    Q.  Did you decide to retain him?
23    A.  Yes, sir.
24    Q.  How did, to your knowledge -- at
25 some point, did you tell Mr. Birkholz that you

184

1  had retained Mr. Smith?
2     A.  Yes, sir.
3     Q.  Do you know when?
4     A.  I believe it was in July '04.
5     Q.  Was that on the phone?
6     A.  Yes, sir.
7        MR. GREEN:  Tell me about the
8  conversation to the extent you remember.
9        THE WITNESS:  I believe we were in
10 the middle of an audit with the IRS, and, I
11 think, Peter had called me and needed
12 information for the audit, and that's when I
13 told him that I'd had a tax attorney do the
14 research.
15    Q.  What did he say?
16    A.  He said I did the research, too.
17 And then, at some point, I gave him
18 Mr. Smith's phone number and just said you
19 need to talk to him.
20    Q.  Now, the audit that was ongoing,
21 was that for 1999?
22    A.  Yes, sir.
23    Q.  And is that related to the filing
24 of an amended return?
25    A.  Yes, sir.

185

Q. So prior to July '04, Mr. Birkholz would not have known that Mr. Smith was involved on your behalf, correct?

A. I'm going to say, yes, sir; no, he didn't know.

Q. Prior to that, had Mr. Smith been involved at all with the IRS on your behalf?

THE WITNESS: Directly in contact with them?

MR. GREEN: Yeah.

A. No, sir.

MR. GREEN: Let me show you a document marked PB3 and 4. It's a letter dated September 7, 2004. Let me ask you if you know one way or the other whether you received that letter from Mr. Birkholz.

THE WITNESS: Yes. I remember receiving this.

Q. In paragraph three, he's asking about information for the audit; was that the same information that he was talking about in the July 4 conversation?

A. It's possible.

MR. ROYSE: July 4th conversation?

Q. I'm sorry. July '04 conversation.

186

I just thought I'd sneak something in showing he was hard working. When you got this letter September 7th, 2004, what did you do?

A. Actually, I think, if my memory serves correctly, I think, I heard from Mr. Smith before I got this letter telling me that he basically bailed out.

Q. Because he was shown as a recipient of copy, correct?

THE WITNESS: A recipient of copy?

Q. He's shown on the cc?

A. Oh, yes, sir.

Q. And what did -- well, after you talked to Mr. Smith, what did you do?

THE WITNESS: What did I do?

Q. After you talked to Mr. Smith and you received a copy of this letter, what did you do?

A. Well, I needed to get somebody to handle the audit, and I don't remember whether Mr. Smith said he would do it or whether I needed to ask him to do it. I don't recall.

Q. What about, this mentions a return has not been filed, and no data's been received; what did you do about that?

187

A. That was the first we knew that after all these years of him automatically filing an extension that he hadn't filed one. He hadn't filed one, and he didn't tell us he hadn't filed one.

MR. ROYSE: His question's and what did you do.

THE WITNESS: Oh, and what did I do?

MR. ROYSE: Uh-huh (affirmatively).

A. Oh, we needed to get a tax guy right away, so we asked Jeff Smith to recommend somebody.

Q. And who did you get?

A. A guy named Ron Haas.

Q. Where is he from?

A. Kentucky.

Q. Whereabouts in Kentucky?

A. I believe his office is over on Monarch Drive.

Q. In Lexington?

A. In Lexington.

Q. Is he with a firm?

A. I believe so. I think it's Facts, LLC.

Q. F-A-C-S?

188

A. F-A-C-T-S.

Q. That's an accounting firm?

A. I'm not sure.

Q. And what returns did Mr. Haas prepare for you?

A. 2003.

Q. Has he prepared subsequent returns for you?

A. I think he did 2004.

Q. Have you filed 2005 yet?

A. Yes, sir.

Q. And who prepared that?

A. I think they're called Breeding -- Dulworth, Breeding, & Cox.

Q. From Lexington also?

A. Yes, sir.

Q. With respect to Mr. Haas, have you discussed with him this case, and has he shared with you opinions or anything?

A. Not really.

Q. How about, I guess, you didn't say which fellow at Dulworth, Breeding, but have you talked with them about this case, or do you consider them a witness for you in this case?

189

MR. ROYSE: No.

MR. GREEN: Your voice got deep there for a minute. Okay.

MR. ROYSE: I figured I was in a position to make that stipulation to save you time.

Q. Now, in your 2003, 2004, 2005 returns, do you know who was listed as your husband's employer?

A. No. I couldn't say.

Q. Do you know if Social Security was paid in those years?

A. Yes, it was -- well, I'm not sure. I'm really not sure.

MR. GREEN: Do you have, and if they're in here, just tell me; do you have copies of those returns?

MR. ROYSE: I don't think so, Ron.

MR. GREEN: I don't remember seeing them.

MR. ROYSE: I'll make a note here, 2003 to 2005, returns. Let me look real quick. I believe the answer to your question you just asked, by the way, is taxes have been withheld since that time, Social Security is

190

actually withheld now. I don't see anything after '02.

MR. GREEN: I don't remember ever seeing anything other than the amended return for '99.

MR. ROYSE: Yeah, and everything I had was copied. Well, we can get those to you.

Q. Okay. Did your husband's employment status change at some point?

A. I'm not sure exactly what happened.

Q. Does he now get, what are they, W2's?

A. I believe so, yeah.

Q. Do you know when that started?

A. I think it was 2005.

Q. So in 2003 and 2004, there would not have been withholdings, you don't think?

A. I don't think.

Q. But you think you did pay Social Security tax?

A. Yes, sir -- well, I'm not really sure. I couldn't tell you for sure.

Q. I mean, I understand anything you say is going to be subject to what the returns

191

say. I'm just trying to get a feel on what I can do here on the subject. Did you participate in any of the discussions between Mr. Smith and Ms. Pfeiff or anybody else at the IRS concerning the '99 tax year?

THE WITNESS: You mean, like, was I there?

MR. GREEN: Yeah.

A. Oh, no, sir.

Q. Or participated by phone?

A. No, sir.

Q. So you have no firsthand knowledge of what Mr. Smith told the lady from the IRS or anything like that?

A. No, sir.

Q. Would you have been present or participated by phone in any conversations Mr. Birkholz had with Ms. Pfeiff or anybody else at the IRS concerning your audit or your returns?

A. No, sir.

Q. Same question. Do you have any firsthand knowledge of what he told them or what they told him?

A. No, sir.

192

MR. GREEN: Let me show you a document which is one you and your husband produced, W360, dated May 30th, 2005, addressed to the IRS, and ask you if you recognize that. If I can get those back and get them in my stack before I -- those go to the court reporter. Thank you. I'll put these back while you're looking at that.

THE WITNESS: You're asking me if I sent this?

MR. ROYSE: He's asking you to review it.

THE WITNESS: Oh, okay.

MR. GREEN: And if you can identify it.

A. Oh, I can identify it. I did this letter.

Q. Do you recall when your 2003 return was filed?

A. Not exactly, no.

Q. The letter that we looked at, and if you need to look at it again, just tell me, as of September, Mr. Birkholz said that he didn't have the data for the year 2003; was that an accurate statement?

193

1  A. Yes.
2  Q. So he couldn't have filed the
3  return. You're saying he should have filed an
4  extension?
5  A. Yes, sir.
6  Q. Do you know if, at the time of this
7  letter you're looking at now, you had filed
8  the return?
9  A. Yes, sir, I believe so.
10 Q. There were a number of emails back
11 and forth between Mr. Birkholz and Mr. Smith
12 in the summer of 2004 that don't show a copy
13 to you; did Mr. Smith tend to forward those on
14 to you, or do you know if you ever saw them
15 before this case?
16 A. I think I have.
17 Q. You think he would have then
18 forwarded the emails on to you as they came
19 in?
20 A. I believe so.
21 Q. Do you know what -- did the IRS
22 assess a penalty for 2003 based on late
23 filing?
24 A. Yes, sir.
25 Q. Do you recall how much that was?

194

1  A. I would be -- it would be a guess.
2  Q. What would be your guess
3  understanding that it is just that?
4  A. Oh, like, $3,000.
5  Q. Now, was that entirely for late
6  filing, or was that also including late
7  payment?
8  A. I don't recall.
9  Q. If we have a copy of the IRS notice
10 concerning the tax year 2003, I missed it. It
11 could very well be in the stack, but it
12 doesn't show up in my list. Could you take a
13 look, and if you have that, make sure your
14 attorney has a copy of it?
15 A. Okay.
16 MR. GREEN: Whatever notices you got
17 for the tax year 2003.
18 THE WITNESS: Okay.
19 Q. And then you would have had
20 Mr. Smith handle those in terms of other than
21 this letter, would he have dealt with him
22 about that; did he try to negotiate that down
23 or anything like that?
24 A. What he told me to do was --
25 MR. ROYSE: Hold on. I don't want

195

1  you to testify what he told you to do. His
2  question to you is did Jeff Smith deal with
3  that penalty with the IRS.
4  THE WITNESS: No.
5  Q. You handled that yourself?
6  A. Yes, sir.
7  Q. Other than this letter, did you
8  have any discussions or so forth with the IRS
9  about it?
10 A. No, sir.
11 Q. So you paid it as they assessed it,
12 or did they negotiate it down?
13 A. They gave me an abatement.
14 Q. So you didn't have to pay it?
15 A. I had to pay the interest.
16 Q. But you didn't have to pay the
17 actual penalty?
18 A. No, sir.
19 Q. Was that reflected in a notice or
20 anything from them; did they send you one back
21 saying we're correcting our prior notice, this
22 is what you owe?
23 A. Yes, sir.
24 Q. Could you also see if you have
25 copies of those?

196

1  A. Yes, sir.
2  MR. GREEN: Just any copies you have
3  in connection with how the 2003 tax returns
4  were handled, I would appreciate it if you
5  could see what you have, and just contact your
6  attorney.
7  THE WITNESS: Yeah.
8  MR. ROYSE: Ron, I gave you their
9  2003 file which is why I'm not sure if there's
10 anything else, but we'll look, though.
11 Q. Yeah, again, I could have missed
12 it, but it's just not showing up on my chart,
13 and I'll look, too, to make sure it's not in
14 here. I'll call you so you don't waste your
15 time. After the September 7th, 2004, letter
16 from Mr. Birkholz in which he says he's
17 withdrawing his representation other than the
18 '99 return, you know the letter I'm talking
19 about?
20 A. I believe so.
21 Q. Did you subsequent to that have any
22 other conversations with Mr. Birkholz or
23 anybody associated with Birkholz & Company?
24 A. No, sir.
25 Q. So from that point on, any

197

1  conversations relating to you or your husband
2  were through Mr. Smith or the IRS or some
3  third person?
4      A.   Yes, sir.
5      Q.   Did you file any additional amended
6  returns for any of the years prior to 2003?
7      A.   Yes, sir.
8      Q.   Do you recall for which years?
9          THE WITNESS: Well, it was too late
10 to file for 2000. Can I talk to my attorney?
11         MR. GREEN: Yes. Here, let me step
12 out.
13         (OFF THE RECORD.)
14     A.   And I have to confess that I'm
15 stupid because when Peter told me that the
16 amended returns could go back to 1999 and that
17 we could recover 1999, 2000, and 2001, I
18 assumed when he overnighted these returns,
19 there were two envelopes, and the one he
20 explained for 1999 had to be mailed
21 immediately, and he instructed me to get a
22 certificate of mailing, which I did. The
23 other envelope, I assumed, had the 2000 and
24 2001 returns in them, he said didn't need to
25 be mailed by, you know, there was time left on

198

1  them. So I sent them both at the same time,
2  they show up on the receipt of the certificate
3  of mailing, and I had always assumed that he
4  had done the amended returns for 2000 and
5  2001, and that they had been sent in.
6      Q.   Did you sign the returns before
7  they went?
8      A.   Yes, sir.
9      Q.   So you signed the returns in both
10 envelopes?
11     A.   Yes, sir.
12     Q.   And just didn't notice that they
13 were -- what does it turn out the other
14 envelope was, just another copy of the '99?
15     A.   I'm not sure. I think it was
16 probably the 2002 return.
17     Q.   The actual return?
18     A.   I'm -- you know, that's what I'm
19 thinking happened.
20     Q.   So the 2001 and 2002, no amended
21 return was filed?
22     A.   No, 2000 and 2001 didn't get
23 amended.
24     Q.   That's what I'm saying. There was
25 no amended returns for those years?

199

1      A.   Yeah, that's correct.
2          MR. ROYSE: '00 and '01?
3      A.   Yeah, '02 got done.
4      Q.   '02 did get amended?
5      A.   Well, okay, yeah.
6      Q.   There was an amended return, but
7  '01 did not, and that's the story you just
8  told me; you thought that the other envelope
9  was '00 and '01 or whatever?
10     A.   Yes, yes.
11     Q.   But you had pulled them out, and
12 you did sign them before you sent them?
13     A.   Yes. I was in a hurry because the
14 deadline was, like, within a matter of days.
15     Q.   Do you still have a copy of the
16 letter that would have come with those
17 envelopes that would have explained what to do
18 with them and so forth?
19     A.   I believe he told me over the
20 phone, but, no, I don't remember seeing a
21 letter.
22     Q.   And who prepared the '02 amended
23 return?
24     A.   He did, Peter did.
25     Q.   So there are no amended returns

200

1  other than those that Peter prepared?
2      A.   That's correct. Okay, what
3  happened was, I assumed that Peter had done
4  them, and we came to find out later that they
5  had not been done, so -- well, Mr. Smith
6  attempted, because of the way the receipt was,
7  I assumed that the 2000 and 2001 amended
8  returns were in that envelope, and based on
9  that, Mr. Smith wrote a letter to the IRS
10 saying that, you know, what happened to these
11 returns, they were amended, something to that
12 effect.
13     Q.   And do you have a copy of that
14 letter?
15     A.   I think so.
16     Q.   Let me ask you, it's my
17 understanding that Mr. Smith has departed for
18 colder grass or whatever, Michigan or some
19 whereabouts. Prior to his leaving, did you or
20 did anybody for you secure a copy of his file
21 that related to you?
22         MR. ROYSE: I did.
23         MR. GREEN: Okay. I haven't seen
24 that, have I?
25         MR. ROYSE: I don't think so.

201

1  MR. GREEN: Well, we can talk about
2  that off the record.
3  MR. ROYSE: Okay.
4  MR. GREEN: But as far as you know,
5  you've got a complete copy of what Mr. Smith
6  had at the time that he departed?
7  MR. ROYSE: Correct, and, Ron, maybe
8  we can talk about it when we go off the
9  record. I don't -- I think anything in there
10 that looked pertinent, it was either
11 duplicative of things you already -- it wasn't
12 produced separately, but I'll go back and look
13 at it and make sure there's not anything there
14 based on what you're asking about now.
15 Q. Okay. Did you discuss with
16 Mr. Smith the subject of amended returns,
17 without what you talked about, did you bring
18 up that subject, or did you limit your
19 discussions with him about the audit?
20 MR. ROYSE: You discussed the '01 and
21 -- excuse me, '00 and '01 amended returns with
22 Jeff?
23 THE WITNESS: Yes, sir.
24 Q. Did you engage him to try to --
25 well, you mentioned there was a letter written

202

1  that explained what you described here about
2  the packages?
3  A. Yes, sir.
4  MR. GREEN: Mr. Smith wrote that, and
5  then copied you, and would that be in that
6  file, do you know?
7  MR. ROYSE: I don't remember seeing
8  it, but it may be.
9  Q. Okay. I think I just have one more
10 question. How would you like to get some
11 lunch?
12 THE WITNESS: Is that it? We're
13 done?
14 MR. GREEN: Yeah. I'm done.
15 (WHEREUPON, THE DEPOSITION OF
16 JENNIFER WEYLAND WAS CONCLUDED AT 12:00 P.M.)

203

1  STATE OF KENTUCKY)
2  COUNTY OF BOYLE)
3  I, BARBARA C. KARGEL, CCR (KY), the
4  undersigned Notary Public in and for the State
5  of Kentucky at Large, certify that the facts
6  stated in the caption hereto are true; that at
7  the time and place stated in said caption,
8  JENNIFER WEYLAND hereto personally appeared
9  before me, and that after being by me duly
10 sworn, was examined by counsel for the
11 parties; that said testimony was taken down in
12 realtime stenotype by me and later reduced to
13 transcription by me, and the foregoing pages
14 is a true record of the testimony given by
15 said witness. No party to said action nor
16 counsel for said parties requested in writing
17 that said deposition be signed by the
18 testifying witness.
19 My Commission Expires: November 9,
20 2007. IN TESTIMONY WHEREOF, I have hereunto
21 set my hand and seal of office on this the
22 _____ day of _____, 2006.
23
24 _____
     BARBARA C. KARGEL, NOTARY PUBLIC,
25   STATE AT LARGE, KENTUCKY