# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Richard Weyland, et al. v. Peter Birkholz and Company

Transcript of the Testimony of:

# Peter Birkholz

# June 19, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)**

Nicole E. Guilbert   19686

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF KENTUCKY

3                   LEXINGTON DIVISION

4

5    -------------------------------x

6    RICHARD WEYLAND and JENNIFER

7    WEYLAND,

8                     Plaintiffs

9                                        Civil Action

10   vs.                          No. 05-375-JBC

11

12   PETER BIRKHOLZ AND COMPANY,

13                     Defendant

14   -------------------------------x

15

16           DEPOSITION OF PETER BIRKHOLZ, a

17       witness called by and on behalf of the

18       Plaintiffs, taken pursuant to Federal Rules of

19       Civil Procedure, before Nicole E. Guilbert, a

20       Notary Public in and for the Commonwealth of

21       Massachusetts, at Club Quarters, 161

22       Devonshire Street, Boston, Massachusetts, on

23       Monday, June 19, 2006, commencing at 8:15 a.m.

24

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

**2**

## A P P E A R A N C E S

DAVID T. ROYSE, ESQUIRE
Stoll Keenon Ogden
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507
(859) 231-3000
    Counsel for the Plaintiffs

RONALD L. GREEN, ESQUIRE
Boehl, Stopher & Graves
444 West 2nd Street
Lexington, Kentucky 40507
(859) 252-6721
    Counsel for the Defendant

RICHARD BLAND, ESQUIRE
Law Office of Richard Bland
110 Pleasant Street
Marlborough, Massachusetts 01752
    Counsel for the Defendant

Also Present: Jennifer Weyland

**4**

| (Exhibits Continued) | PAGE |
|---|---|
| 28 Letter | 117 |
| 29 Letter | 119 |
| 30 2000 Tax Return Documents | 120 |
| 31 2001 Tax Return Documents | 121 |
| 32 Federal Statement | 123 |
| 33 Application for Extension | 124 |
| 34 Application for Extension | 124 |
| 35 Letter | 126 |
| 36 Hand-written Notes | 129 |
| 37 E-Mail | 131 |
| 38 Letter | 133 |
| 39 Letter | 134 |
| 40 Letter | 136 |
| 41 E-mail String | 141 |
| 42 Correspondence | 147 |
| 43 Letter | 152 |

    (Exhibits were given to the court
    reporter to attach to the transcript.)

**3**

## I N D E X

| WITNESS | EXAMINATION |
|---|---|
| PETER BIRKHOLZ | |
| (By Mr. Royse) | 5 |
| (By Mr. Green) | 173 |

## E X H I B I T S

| NO. | PAGE |
|---|---|
| 1 Curriculum Vitae | 15 |
| 2 Hand-written Notes | 67 |
| 3 Letter | 70 |
| 4 Tax Preparation Form | 72 |
| 5 Cover Letter | 74 |
| 6 Cover Letter | 74 |
| 7 1988 Tax Return Documents | 76 |
| 8 1989 Tax Return Documents | 79 |
| 9 Letter | 84 |
| 10 1990 Tax Return Documents | 85 |
| 11 1991 Tax Return Documents | 86 |
| 12 1992 Tax Return Documents | 88 |
| 13 Letter | 88 |
| 14 Letter | 90 |
| 15 Report of Earnings Letter | 95 |
| 16 1993 Tax Return Documents | 96 |
| 17 1994 Tax Return Documents | 98 |
| 18 Time Table | 99 |
| 19 1995 Tax Return Documents | 100 |
| 20 1996 Tax Return Documents | 100 |
| 21 1997 Tax Return Documents | 100 |
| 22 1998 Tax Return Documents | 102 |
| 23 1999 Tax Return Documents | 103 |
| 24 1999 Tax Return Documents | 108 |
| 25 Phone Memo | 111 |
| 26 Hand-written Notes | 114 |
| 27 Hand-written Note | 116 |

**5**

## S T I P U L A T I O N S

    It is hereby stipulated and agreed
by and between counsel for the respective
parties that the deponent shall have thirty
(30) days in which to read and sign the
deposition transcript, after which time it
shall be deemed to have been signed, and that
the filing and sealing of the deposition
transcript are waived.
    It is further stipulated and agreed
that all objections, except objections as to
the form of the question, and all motions to
strike shall be reserved until the time of
trial.
    PETER BIRKHOLZ, having been
satisfactorily identified by the production of
his driver's license and duly sworn by the
Notary Public, was examined and testified as
follows in answer to direct interrogatories:

BY MR. ROYSE:
    Q.  Good morning, Mr. Birkholz.  My name is David
Royse.  I'm with the law firm of Stoll Keenon Ogden, and I
represent Richard and Jennifer Weyland in this matter.

2 (Pages 2 to 5)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

6

1 We're here for your deposition today, and I will talk to
2 you a little bit here before we start about some ground
3 rules that may make things go a little easier or at least
4 more quickly.
5 Have you ever given a deposition before?
6 A. Yes.
7 Q. More than once?
8 A. I don't think so. Just one.
9 Q. In what setting did you give a deposition?
10 A. What do you mean by "setting"?
11 Q. I mean what context. Were you in a case – were
12 you a defendant? Were you a witness in another civil case
13 or –
14 A. I gave the deposition for a client.
15 Q. As an expert witness?
16 A. No. I wasn't an expert witness. I was – it was
17 my client and they asked me to answer some questions.
18 Q. What kind of case was that?
19 A. Had to do with a client that was purchasing a
20 business and elected not to go through with the purchase.
21 Q. You weren't a party in that matter I assume; is
22 that right?
23 A. Pardon?
24 Q. You were not a party to that matter; is that

7

1 right?
2 A. I was brought into it at a later point in time.
3 Q. And what claim was made against you?
4 A. I'm not even sure I understand. I think – I
5 think they suggested I conspired with the client to – I
6 don't know what the word is – you know, that we were
7 planning on – from day one of not buying the business,
8 etc.
9 Q. I understand. How did that ultimately get
10 resolved, if it did?
11 A. Well, I wasn't involved with the case all the way
12 through, but I think it eventually was overturned in my
13 client's favor.
14 Q. Did you have any liability in that case?
15 A. My insurance company.
16 Q. What was the – if you recall, what was the name
17 of case or what was the – who were the parties?
18 A. I don't recall.
19 Q. You don't remember the name of the plaintiff?
20 A. Well, he's no longer a client. Rockwell,
21 something like that.
22 Q. Roughly when was that? Last five years? Ten
23 years?
24 A. Back a ways.

8

1 Q. Think it was more than ten years?
2 A. Could be.
3 Q. Let me back up and I'll have about – quit asking
4 that question to start because sometimes we got off into
5 things like that. What I wanted to say first was: In the
6 way of ground rules, you haven't done this much, so let me
7 tell you a few things. Number one, I want you to be
8 comfortable today. You've got two good lawyers with you.
9 They'll give you advice, if necessary, but don't ever feel
10 like you can't take a break if you want to. If there's
11 something you need to do, you just let me know. We're
12 going to be comfortable if nothing else.
13 Secondly, this is not an endurance test. So we'll
14 try and pace ourselves. I am going to leave here at four
15 o'clock today to get on a plane. I have every reason to
16 believe that we'll finish by then. We'll move at a good
17 pace, and I'll try and do my best, but you need to give
18 full and complete answers and not get rushed just because
19 I've got to leave. If we don't finish, we'll deal with it.
20 But I – like I say, I have every reason to believe we
21 will.
22 In the way of ground rules, first I'll tell you
23 that because the court reporter is here and she has to take
24 down everything we say, it's natural in conversation for us

9

1 to anticipate what one another are saying and sometimes
2 talk over each other. You'll start answering before I'm
3 done questioning or vice versa. It's impossible for her to
4 get down both people at once. So if we can, I'll do my
5 best, but if you'll try and keep that in mind not to talk
6 over one another.
7 Secondly, if there's a question that I ask you
8 that you don't understand, please just tell me. There's no
9 jury here. We don't have to be that formal. So if you
10 don't understand something, I certainly want you to tell
11 me. If you answer, I'm going to assume that you understood
12 the question. Is that fair?
13 A. Yes.
14 Q. That was going to be my next one was you, like me
15 and everyone else, nods and does, you know, turns our head
16 for yes and no. She can't take that down. So if you'd
17 please just say yes or no. What is your business address?
18 A. 434 Old Connecticut Path, Framingham, Mass.
19 Q. And how long has your business been at that
20 address?
21 A. '92, '93, somewhere around there.
22 Q. Where were you before that?
23 A. About three blocks around the corner.
24 Q. Do you remember that address?

3 (Pages 6 to 9)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**10**

1    A.  Speen Street.  I don't remember the --
2    Q.  You said Spain Street?
3    A.  Speen, S-p-e-e-n.
4    Q.  And how long, roughly, were you at that address?
5    A.  Approximately three years.
6    Q.  Are you from Massachusetts?
7    A.  You mean originally, no.
8    Q.  How long have you lived here?
9    A.  Since 1970.
10   Q.  Have you lived anywhere other than Massachusetts
11   since 1970?
12   A.  No.
13   Q.  What is your -- what's the highest level of
14   education you've attained?
15   A.  Master's.
16   Q.  And where did you obtain your master's?
17   A.  Bentley College.
18   Q.  Where's that?
19   A.  Waltham, Massachusetts.
20   Q.  And when did you obtain that degree?
21   A.  1975.
22   Q.  And what about your bachelor's, where did you
23   obtain that?
24   A.  Marquette University.

---

**11**

1    Q.  And when?
2    A.  1970.
3    Q.  Do you have any certifications that are attached
4    to your profession?  For example, are you an enrolled
5    agent?
6         MR. ROYSE:  Let's go off the record.
7         (Jennifer Weyland entered the room.)
8         MR. ROYSE:  Let's go back on the
9    record, please.  Can you read back the last
10   question.
11        (The question was read.)
12   Q.  (By Mr. Royse)  For example, are you an enrolled
13   agent?
14   A.  Yes.
15   Q.  Tell me what it means to be an enrolled agent.
16   A.  I don't understand the question.
17   Q.  Okay.  I don't know nearly as much about tax
18   practice as you do.  So if you were to say to me you're an
19   enrolled agent, and I say, what does that mean, how would
20   you explain it?
21   A.  It's a professional certification.  In order to
22   get it, you have to take a three-day exam before the
23   Internal Revenue Service on all tax issues, and you have to
24   maintain continuing education credits every year.  It falls

---

**12**

1    under the same practice requirements as an accountant
2    Circular 230.
3         Q.  How long have you had that status?
4    A.  I don't know.  Somewhere around the same time I
5    got my master's.
6         Q.  Aside from your master's and your bachelor's and
7    the studying that you did to get your status as an enrolled
8    agent, and the continuing education that you do, have you
9    had any other kind of specialized or formal training?
10   A.  No, not to my knowledge.
11        Q.  Can you -- you mentioned accountant a minute ago.
12   Can you explain to me the difference between a CPA and, for
13   example, an enrolled agent and a tax lawyer.  How are those
14   three different or the same?
15   A.  Well, I'm not sure about the tax lawyer, but the
16   CPAs and enrolled agents can be accountants.  And I am an
17   accountant and we just -- we take different exams and
18   follow different certifications.  CPA can deal largely with
19   financial statements and certifying their correctness.
20   Enrolled agent does not do that, depending on the different
21   state charters.  As far as the tax attorney, I can't help
22   you there.
23        Q.  I understand.  You say that you're also an
24   accountant.  Are you a CPA or CMA?

---

**13**

1    A.  No.
2    Q.  What type of entity is Birkholz & Company?
3    A.  A partnership.
4    Q.  Who are the partners?
5    A.  Peter Birkholz and Bill Birkholz.
6    Q.  And roughly when was that partnership formed?
7    A.  Which partnership?
8    Q.  Birkholz & Company.
9    A.  With the present partners?
10   Q.  Sure.
11   A.  I'd have to guess seventy -- maybe '81.
12   Q.  Your answer leads me to ask was there a prior
13   partnership known as Birkholz & Company?
14   A.  Yes.
15   Q.  And who were the partners in that?
16   A.  Arthur Birkholz and Peter Birkholz.
17   Q.  Okay.
18   A.  Later joined by William Birkholz.
19   Q.  Who is Arthur?
20   A.  My father.
21   Q.  Is Bill your brother --
22   A.  Yes.
23   Q.  -- or William your brother?  Have you always
24   worked for Birkholz & Company since attaining your master's

4 (Pages 10 to 13)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

14

1 degree?
2 A. No.
3 Q. Who did you work for before -- immediately before
4 Birkholz & Company?
5 A. I don't know how to answer that question. I
6 worked for somebody at the same time.
7 Q. Okay. Explain to me.
8 A. I worked for a company called Multi-Tax.
9 Q. And was that a company that you had an ownership
10 interest in?
11 A. No.
12 Q. You were an employee?
13 A. Yes.
14 Q. And what did that company do?
15 A. Offered a computerized tax preparation product to
16 accountants --
17 Q. Roughly --
18 A. -- accountants, lawyers, etc.
19 Q. Excuse me. Roughly what time period did you work
20 for Multi-Tax Corporation?
21 A. 1970 through 1983.
22 Q. And when did you first start with your father in
23 Birkholz & Company?
24 A. 1970.

15

1 Q. Have you ever left Birkholz & Company between 1970
2 and the present?
3 A. No.
4 Q. Have you ever worked for any other companies since
5 1970 other than Multi-Tax Corporation?
6 A. Not that I can recall.
7 Q. Do you have an ownership interest in any other
8 entities besides Birkholz & Company?
9     MR. GREEN: Are you -- did you say an
10 ownership in any other companies?
11     MR. ROYSE: I mean --
12     MR. GREEN: Relating to accounting or
13 you want his stock portfolio here?
14     MR. ROYSE: I don't want your stock
15 portfolio.
16     THE WITNESS: Thank you. No.
17 Q. (By Mr. Royse) Mr. Birkholz, I'll hand you what
18 the court reporter will mark as Exhibit 1.
19     (Exhibit 1, Curriculum Vitae, marked
20     for identification.)
21 Q. (By Mr. Royse) Mr. Birkholz, I've handed you what
22 was attached as Exhibit A to some discovery responses that
23 you and your attorney provided in this case. Is that your
24 current CV?

16

1 A. Yes.
2 Q. Take a second to review it. I'm sure you probably
3 have before, but, to your knowledge, is everything there
4 complete and accurate?
5 A. Some of the affiliations are no longer, such as
6 Framingham Rotary Club.
7 Q. Okay. Anything else you see?
8 A. Not off the top.
9 Q. Can you describe for me what services that
10 Birkholz & Company provides?
11 A. Tax and accounting services, divorce services.
12 Those are encompassing terms.
13 Q. I understand. Do you also do some sort of
14 business valuation work or does Birkholz & Company?
15 A. I no longer do that.
16 Q. Okay. I --
17 A. I didn't see it on here.
18 Q. That's okay. I'm going to strike through business
19 valuations, too, then. Will that be accurate to take that
20 off?
21 A. Yes. The allied professional consultations, I
22 still provide those. I omitted that.
23 Q. What is an allied professional consultation?
24 A. Practitioners call me up and ask questions, and I

17

1 respond to them or they ask me to do research.
2 Q. Are those on tax and accounting matters?
3 A. Yes.
4 Q. And I assume that your divorce work is also with
5 respect to tax and accounting?
6 A. Little wider. They're tax, accounting, and I
7 sometimes do role plays with attorneys.
8 Q. What are the types of tax and accounting services
9 that Birkholz & Company provides?
10 A. Tax preparation, tax consultation services,
11 bookkeeping. That's all that comes to me right now.
12 Q. Do you know -- well, strike that. Do you
13 represent both individual and corporate clients?
14 A. Yes.
15 Q. Do you have a rough idea of how many individual
16 clients you presently have?
17 A. Roughly, 650 -- excuse me. Clarify that. Is that
18 individual clients?
19 Q. Yes.
20 A. Six-fifty.
21 Q. And what about corporate clients roughly? And by
22 corporate, I mean business clients.
23 A. Explain that. You mean business meaning
24 noncorporation?

5 (Pages 14 to 17)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**18**

1      MR. GREEN:  Nonindividual, is that
2  what you mean?
3      MR. ROYSE:  That's what I mean.
4      Q.  (By Mr. Royse) I said corporate and, of course, I
5  would include partnership, sole proprietorship, businesses.
6      A.  Trust?
7      Q.  Sure.  Roughly how many nonindividual clients?
8      A.  I'm not real sure, maybe 50 to 70.
9      Q.  I understand.  Are you familiar with the
10  provisions of the U.S. tax code?
11      A.  What do you mean by "familiar"?
12      Q.  I mean do you have a general working knowledge of
13  the provisions of the United States tax code?
14      A.  Yes.
15      Q.  Do you have any particular area of expertise
16  within the tax code; for example, individual income tax
17  versus corporate tax?
18      A.  There's probably more emphasis on individuals
19  because I have more of them.
20      Q.  In your role as a -- strike that.  Is there any
21  certification required by the State of Massachusetts, as
22  far as you know, to be a tax preparer?
23      A.  No.
24      Q.  Any requirement by the federal government as far

---

**19**

1  as you know?
2      A.  No.
3      Q.  What about to provide accounting services, is
4  there any requirement of a certification to do that for a
5  non-CPA or CMA?
6      A.  Well, there are requirements with regard to
7  accounting services, but they have to do with who you hold
8  the product out to.
9      Q.  How do you mean?
10      A.  A certified public accountant can hold his product
11  out to the public in general.  An accountant may not.
12      Q.  Okay.  Who may an accountant hold his services out
13  to?
14      A.  A client.
15      Q.  Forgive my lack of understanding of the field, but
16  bookkeeping services, I assume you rely on your accounting
17  background somewhat to do that; is that right?
18      A.  Yes.
19      Q.  You're going to provide bookkeeping services for
20  Acme Company.  How do you get that engagement without
21  holding yourself out to the public?
22      A.  Maybe I missed something here but I don't do the
23  bookkeeping.  Birkholz & Company provides bookkeeping.
24      Q.  Okay.  Is there someone at Birkholz & Company who

---

**20**

1  is a CPA who does bookkeeping?
2      A.  No.
3      Q.  Then help me understand how Birkholz & Company
4  does bookkeeping for Acme Company without holding itself
5  out as a CPA?
6      A.  Acme Company -- almost all of our clients have
7  software called QuickBooks.  We don't actually do the
8  punching in the software of the data.  The client does
9  that.  We assist them in helping them with consultation to
10  properly categorize the items for tax purposes.
11      Q.  Are you required to maintain a familiarity with
12  the provisions of the U.S. tax code in order to maintain
13  your status as an enrolled agent?
14      A.  I'm required to take continuing educational
15  courses.
16      Q.  Let me ask it this way:  If someone is an enrolled
17  agent with the Internal Revenue Service, to your knowledge,
18  is that person required to be familiar with the tax code?
19      A.  Yes.
20      Q.  How did you first come to know Richard or Jen
21  Weyland, if you recall?
22      A.  I don't recall.  They lived in Massachusetts at
23  one point.
24      Q.  Do you recall whether you knew them on a personal

---

**21**

1  basis before a professional basis?
2      A.  No, I don't.
3      Q.  And you don't recall how they came to be clients,
4  then, I assume?
5      A.  No, I don't.
6      Q.  Do you know roughly how long you've done tax work
7  for the Weylands?
8      A.  Not exactly.
9      Q.  Roughly?
10      A.  Seventies, eighties I'm guessing.
11      Q.  Do you recall if you started doing work for one of
12  them and then the other or if they came in as a couple to
13  begin with?
14      A.  I don't recall.  I think I met them as a couple.
15      Q.  Who are the other employees of Birkholz & Company
16  that provide services to clients besides you and William
17  Birkholz?
18      A.  There are two:  Jeff Prost --
19      Q.  Yes, sir.
20      A.  -- P-r-o-s-t; and a receptionist who works
21  part-time.
22      Q.  Does he or she provide services to clients?
23      A.  Well --
24      Q.  Aside from answering the phone?

---

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

22

1    A. Answers phones, you know, may assist, assembles
2  the tax return. That's a service.
3    Q. Who is that?
4    A. I'm blanking right now. Jennifer --
5    Q. We won't tell her. Jennifer is good enough.
6    A. Thank you.
7        MR. GREEN: When you're not trying,
8      it will come to you.
9        MR. ROYSE: I know. Oh, man.
10   Q. (By Mr. Royse) I asked an interrogatory about
11  whether anyone -- let me just find it. I asked who
12  provided tax advice and preparation of tax returns for Mr.
13  and Mrs. Weyland. You all interjected an objection on the
14  grounds that you didn't do anything other than preparation
15  of tax returns. Let's put that aside. In terms of
16  preparation of tax returns, you indicated that the only
17  person that provided those services was yourself.
18      Is that correct to the best of your knowledge?
19   A. Yes, other than the ministerial duties, you know,
20  assembling a return.
21   Q. I saw William Birkholz's name on some documents,
22  and we may get to them in a little while, but, for example,
23  I know that one place I saw him was on requesting
24  extensions. Would you consider that just a ministerial

23

1  task as opposed to substantive services?
2    A. I prepared it. Bill puts the extensions in the
3  mail. So he would -- he may sign for me but I'm the only
4  one that worked on the Weylands.
5    Q. Has Birkholz & Company ever been accused in a
6  civil suit or an administrative action of negligence in
7  preparation of tax returns?
8    A. Not that I can recall.
9        MR. GREEN: Just for the record, I
10      assume you mean prior to this case?
11       MR. ROYSE: Absolutely.
12   Q. (By Mr. Royse) Your answer is not that you
13  recall. What about you personally? I assume if Birkholz &
14  Company hasn't, you haven't; is that right?
15   A. Correct.
16   Q. I am -- I want to ask you briefly some questions
17  about your liability insurance, and Ron has already told me
18  you may or may not know some of this stuff. So this isn't
19  a test. I can get this by way of document production. I'm
20  just trying to find out what you know, and I deal with
21  the rest with these fellas. Do you presently maintain
22  liability insurance for Birkholz & Company?
23   A. Yes.
24   Q. And who is that with?

24

1    A. Philadelphia Insurance Companies, I think.
2    Q. And does that insurance cover you and the members
3  and employees of Birkholz & Company or is that individual
4  insurance?
5    A. I think it covers Birkholz & Company.
6    Q. Roughly, how long have you had coverage in place
7  with Philadelphia?
8    A. I believe they -- I don't know for sure. A few
9  years.
10   Q. Okay. Do you recall who your carrier was before
11  that?
12   A. A company I think known as New York Marine.
13   Q. Do you recall roughly how long you were with them?
14   A. No.
15   Q. Was it more than a year or a few years?
16   A. I don't deal with the insurance.
17   Q. I understand. Who does?
18   A. We have an insurance broker. They send over the
19  forms. We sign them.
20   Q. Who is that insurance broker?
21   A. Wayside Insurance.
22   Q. Are they here in Massachusetts?
23   A. Yes.
24   Q. What town?

25

1    A. Framingham.
2    Q. Can you recall, besides what we think is New York
3  Marine and Philadelphia, do you recall any other insurance
4  companies that have provided coverage?
5    A. No.
6    Q. I believe I've seen a document where New York
7  Marine or whatever that marine company was indicates that
8  they were notified of the claim underlying this case. Did
9  you make that notification?
10   A. Yes.
11   Q. About when, if you recall?
12   A. I don't recall.
13   Q. Do you recall what spurred you to make that claim
14  or make that notice?
15   A. I don't recall the exact thing. I'd have to
16  guess.
17   Q. What is your best recollection?
18   A. A conversation with Attorney Jeffrey Smith or
19  could have been a conversation with Richard Weyland.
20   Q. Do you recall substantively what -- generally what
21  was said that would have spurred that?
22   A. Said to who or whom?
23   Q. Either way. I'm asking what part of the
24  conversation, what general concept came across that caused

7 (Pages 22 to 25)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

26

1  you to notify the carrier?
2      A.  That the -- that Richard -- we had filed returns
3  for Richard with self-employment tax on it, and there was a
4  question as to whether he was subject to it.
5      Q.  Okay.  Do you recall whether any lawsuit had been
6  threatened at that point?
7      A.  No.
8      Q.  It had not or you don't recall?
9      A.  I don't believe it was threatened, and I don't
10  recall.
11      Q.  Am I correct, as far as you know, that that New
12  York Marine or whomever it was was the insurance company
13  that was notified as opposed to Philadelphia?
14      A.  No.  I notified both.
15      Q.  At the same time?
16      A.  No.
17      Q.  Okay.  Who was it that you notified in the
18  conversation we just talked about?
19      A.  Talked to the insurance broker.  Insurance broker
20  said let's notify Philadelphia, my -- at the time, my
21  present carrier.
22      Q.  Okay.  So then Philadelphia was notified first,
23  and you did that as opposed to the broker?
24      A.  I don't recall.  I had a conversation with

27

1  somebody at Philadelphia.  The broker may have done the
2  paperwork on it and sent it over for me to sign.  My
3  recollection is they called and we had a conversation.
4      Q.  What do you recall about that conversation?
5      A.  That they weren't going to cover it.
6      Q.  Why?
7      A.  Because they were not liable to cover it.
8      Q.  Did they say why?
9      A.  Because on the application, we should have listed
10  the Weyland case as -- I don't know how to put this -- you
11  know, as --
12      Q.  An existing potential claim?
13      A.  Yeah.  As we applied for the insurance, and we did
14  not.  I later learned that even if we did, they'd exclude
15  coverage on it.
16      Q.  Why was that?
17      A.  I don't know why.  I just know that they don't
18  cover it either way.
19      Q.  Because they're an insurance company, right?
20  That's what they do.  They're not in the business of paying
21  claims.  I'm teasing.
22      MR. GREEN:  No profit in paying
23  claims.
24      MR. ROYSE:  That's right.  So I hear.

28

1      Q.  (By Mr. Royse)  What about New York or Mutual
2  Marine, did you later have a conversation with them?
3      A.  I'm a little vague on the recollection, but I
4  think I had a conversation but there was some
5  correspondence going back and forth.
6      Q.  I understand.  What was Mutual Marine's
7  communication to you in terms of whether they were going to
8  provide coverage.
9      A.  The same, they weren't going to provide coverage.
10      Q.  And why did they say they wouldn't provide
11  coverage?
12      A.  I don't -- I don't understand why but, you know,
13  in my mind, they're not covering it.
14      Q.  I'm certainly not asking you to agree with them.
15  I was just trying to get a feel for what your understanding
16  of what their allegation was as to why there was no
17  coverage.  You say you don't know?
18      A.  Yeah.  Insurance is not my bag.
19      Q.  Do you know whether you or Mr. Bland presently has
20  taken any action to contest that decision by Mutual Marine
21  or New York Marine?
22      A.  We had some correspondence back and forth.
23      Q.  Is that ongoing?
24      A.  Yeah.

29

1      Q.  That's good enough for me for right now.
2      A.  To my knowledge, Mr. Bland filed a lawsuit to
3  question their not covering.
4      MR. GREEN:  I mean I haven't seen it
5      but that's my understanding.  I just think
6      that was probably responsive to what you
7      asked.
8      MR. ROYSE:  Sure.  I appreciate you
9      adding that.
10      Q.  (By Mr. Royse)  Based on your
11  experience/relationship with the Weylands over the past
12  several years, do you know if either of them has any
13  knowledge or expertise with respect to tax preparation?
14      A.  I don't know how to answer that.  They came to me
15  to do their returns, so I would have to say no, they don't
16  have the expertise.
17      Q.  Did you hold yourself out to them to be an expert
18  in tax preparation?
19      A.  I held myself out as a tax preparer, period.  I
20  don't believe I ever put the word "expert" in.
21      Q.  And you were deriving a distinction there that I
22  was going to ask you about.  It would be your testimony
23  that you've never represented yourself as an expert, then?
24      A.  I need to explain something.  I might have missed

8 (Pages 26 to 29)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**30**

1  it before. Under my licensure as an enrolled agent and as
2  an accountant in the Commonwealth, to be an accountant in
3  the Commonwealth of Massachusetts, we may not put a
4  modifier in front of it, like expert accountant; and
5  there's even some question whether we could have in the
6  past used the initials E.A. because it might be acute --
7  confused with the term "expert accountant." That's since
8  been decided, so we can now put E.A. on our letterhead.
9      So you're asking me if we held ourselves out ever
10  as an expert, if I did, it was inadvertent and would not be
11  allowed under my licensure.
12      Q. And it would be inadvertent in the sense of using
13  E.A. and that could be misconstrued?
14      A. Well, that's not so much the problem because the
15  E.A. -- that case has been decided. We can do that.
16      Q. Okay.
17      A. But the word "expert" I don't believe we put that
18  any place. If we did, shame on me.
19      Q. Did you ever tell the Weylands that you had been
20  involved in creating tax software?
21      A. Yes.
22      Q. And you have been involved in creating tax
23  software, correct?
24      A. Yes.

**31**

1      Q. Did you ever tell the Weylands that you teach tax
2  courses?
3      A. Yes.
4      Q. And you do teach tax courses?
5      A. Yes.
6      Q. Did you ever tell the Weylands that you're not a
7  CPA but that you teach CPAs from time to time?
8      A. I don't recall that specific statement.
9      Q. Is that true?
10      A. That's true.
11      Q. Do you recall ever saying anything to the Weylands
12  along the lines of you're not a CPA but you have to fix
13  CPAs' mistakes?
14      A. Excuse me. Can I back up?
15      Q. Absolutely.
16      A. You asked two questions. I reacted to one of
17  them. You asked if -- did I ever tell the Weylands I was a
18  CPA or --
19      Q. That you're not a CPA but that you teach CPAs.
20      A. I may have had a conversation with them and there
21  would be times when I'm busy and I say I'm teaching and it
22  might have gotten around to that, but I teach -- you know,
23  that's what I'm reacting to. Yes, I do train CPAs in
24  taxation.

**32**

1      Q. I understand. Did you ever say anything to the
2  Weylands along the lines of the fact that you're not a CPA
3  but that you have to fix CPAs' mistakes?
4      A. I don't recall that.
5      Q. Is that something that would be typical for you to
6  maybe say?
7      A. No.
8      Q. Is it true?
9      A. Is what true?
10      Q. That you are not a CPA but that you do have to fix
11  CPAs' mistakes?
12      A. There's two questions there. I'm not a CPA.
13      Q. I understand.
14      A. And do I fix CPA mistakes?
15      Q. Uh-huh.
16      A. Vis-a-vis the Weylands?
17      Q. Just in general.
18      A. It's a very broad question. I don't know how to
19  answer it.
20      Q. Throughout the time that you were engaged by the
21  Weylands, was it your understanding that they were playing
22  trust -- placing trust and confidence in you to diligently
23  prepare their tax returns?
24      A. Can you state that again? I don't understand what

**33**

1  you're asking.
2      Q. Sure. What I'm asking is during your engagement
3  with the Weylands, was it your understanding that they were
4  placing trust and confidence in you to diligently prepare
5  their tax returns? Did you have that understanding?
6      A. I don't think I ever thought about it. I know
7  that they requested me to prepare their return. I don't
8  know what they were thinking.
9      Q. Well, let me make it a little more broad. In your
10  role representing some, approximately, 650 individual
11  clients, do you believe that those clients are placing
12  trust and confidence in you to diligently prepare their tax
13  returns.
14      A. Yes.
15      Q. Do you think that's an expectation they reasonably
16  have?
17      A. Yes.
18      Q. And if that is the expectation the Weylands had,
19  is that a reasonable expectation?
20      A. Yes.
21      Q. In preparing a tax return for an individual client
22  in general, if you think that there's a particular issue
23  that might be questionable or need further information or
24  raise a question, how do you deal with that individual

9 (Pages 30 to 33)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**34**

1    client on that?

2    A. If there's sufficient time, we would contact them

3 and ask them a question either by phone or by e-mail or by

4 letter.

5    Q. In preparing the tax return, if you identify

6 something that seems facially inconsistent, would you take

7 that up with the client generally?

8    A. Generally, yes.

9    Q. Were there occasions with the Weylands when you

10 saw issues or had questions where you raised those with the

11 Weylands?

12    A. Yes.

13    Q. During your years of representation of the

14 Weylands, did they meet with you in person on occasion?

15    A. Yes.

16    Q. And did they meet with you to discuss certain

17 issues with respect to their tax preparation or were these

18 just social visits?

19    A. Some were social. I don't recall too many

20 meetings where we -- you know, in the later years because

21 they're in Kentucky. I'm in Massachusetts. In the earlier

22 years, they were close enough. You know, it would be part

23 social, and they might have tax questions that would come

24 up in a meeting that we would have.

**35**

1    Q. And let me ask that. Did you maintain a social

2 relationship, a friendship with the Weylands over the

3 years?

4    A. Not that we'd go out and do things together, etc.,

5 but I'm friendly with all my clients.

6    Q. I understand. Do you recall any particular issue

7 that the Weylands would have ever brought up with you in

8 face-to-face meetings about their tax issues?

9    A. No.

10    Q. On occasion, would the Weylands call you to

11 discuss issues about their tax preparation?

12    A. Yes.

13    Q. Do you recall any particular issues that they

14 called you about?

15    A. Yes.

16    Q. Tell me -- first, I want to just jot down a little

17 laundry list here of issues that you remember being raised

18 in calls with them, and then we're going to go through them

19 and discuss them. So if you can just give me the topics

20 that you recall, and I recognize we're talking about a long

21 period of time. I'm not testing your memory. Just tell me

22 what you remember.

23    A. I don't remember exactly the time frame. I think

24 it was 2002 I had a conversation with Richard when I

**36**

1 learned it the first time that the company he was working

2 for was foreign owned, and he mentioned that his shipmates

3 were thinking it was stupid to be paying social security

4 taxes. And so I collected some information but not all

5 information, took a preliminary look at the statute. I

6 then sent him a letter.

7    Q. And what statute are we talking about?

8    A. That I looked at?

9    Q. Mm-hmm.

10    A. Well, I looked at several. I looked at four --

11 Section 1402 and I looked at Section 3121.

12    Q. Do you remember what you concluded about the

13 issue?

14    A. I haven't made a conclusion yet.

15    Q. As we sit here today? That's a yes?

16    A. Yes. I'm sorry.

17       MR. GREEN: Just note that the "I'm

18    sorry" was related to nodding, not to not

19    having reached a conclusion.

20       MR. ROYSE: Always on the ball.

21    Q. (By Mr. Royse) Do you -- based on what you just

22 said, which is that you still haven't made a conclusion, I

23 assume it's fair to say that you didn't reach a conclusion

24 at that point in 2002 when you looked at the issue; is that

**37**

1 right?

2    A. I didn't have sufficient data to reach a

3 conclusion.

4    Q. Do you recall ever having a conversation with

5 either Richard or Jennifer, him raising this issue that

6 you've described about shipmates thinking it's stupid for

7 paying these taxes, and you saying something to the effect

8 of: Don't worry about them. The IRS will catch up with

9 them eventually?

10    A. No.

11    Q. Is it possible you said that?

12    A. I would think it highly unlikely if I hadn't

13 really looked into the statute to begin with. You mean in

14 that conversation?

15    Q. In that conversation or a conversation about that

16 topic.

17    A. That would not be a statement that I would

18 normally make.

19    Q. I sense what you're saying is that you wouldn't

20 make a statement like that because it infers that you know

21 what the tax outcome of that issue is; is that right?

22    A. I don't understand your question.

23    Q. Okay. It was poorly asked. Let me say it this

24 way: You said you didn't think it was likely you would

10 (Pages 34 to 37)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

38

1  make a statement like that because you hadn't researched it
2  yet; is that right?
3      A.  No.
4      Q.  Okay.  Correct me.
5      A.  You made the statement would it be likely for me
6  to deal with somebody else's tax issue in a comment; and if
7  I'm talking for the first time and learning for the first
8  time about this before I really even know what's behind it,
9  I think it highly unlikely in that conversation that I
10  would have said anything about somebody else.
11      Q.  To your knowledge, what is Mr. Weyland's
12  profession?
13      A.  A captain of a vessel.
14      Q.  Has that been the case as long as you've known
15  him?
16      A.  I can't think back that far.
17      Q.  As far as you know --
18      A.  Yes.
19      Q.  -- has he ever held another job?
20      A.  Yes.
21      Q.  Has it been your understanding, generally, over
22  the years that he performs his duties as a ship captain
23  outside of the U.S.?
24      A.  I'm not sure I really, you know, knew until the

39

1  later years, but in -- certainly, I think, from in the
2  eighties sometime and it may even have been before that.
3      Q.  Do you recall -- you indicated that roughly around
4  2002, you had this conversation with Richard about his
5  shipmates saying they weren't paying taxes --
6      A.  If I have the right year.
7      Q.  I understand.  What I was going to ask you was do
8  you recall any discussions prior to that one?
9      A.  About that issue?
10      Q.  Uh-huh.
11      A.  I don't recall any.
12      Q.  I think you just indicated that it was maybe
13  around the eighties when you came to get an understanding
14  that Richard performed his services outside the U.S., and
15  you qualified and said maybe it was before.  Whenever that
16  was, did you have a general understanding of where he
17  performed those services?
18      A.  Generally.
19      Q.  Where generally?
20      A.  Generally outside the United States.
21      Q.  No more specific than that though?
22      A.  If I looked at the returns, I probably could
23  refresh my memory.
24      Q.  Okay.  Are you familiar with Section 3121 of the

40

1  U.S. tax code?
2      A.  Yes.
3      Q.  Have you just become familiar with that section in
4  the last few years or is that something you've always been
5  generally familiar with?
6      A.  What do you mean by "familiar"?  I know what's in
7  the statute.
8      Q.  Okay.
9      A.  It's a very, very long section.
10      Q.  What does it generally deal with?
11      A.  Deals with liability for social security taxes for
12  employees.
13      Q.  Is that a section that you have had to refer to
14  over the years on occasion due to a particular client's tax
15  situation?
16      A.  Yes.
17      Q.  And what I'm getting at is I've got the impression
18  that the Weylands weren't the first time you ever had to
19  look at Section 3121; is that fair?
20      A.  Yes.
21      Q.  Is Section 3121 of the code a provision that you
22  are required to be familiar with in order to obtain your
23  certification as an E.A.?
24      A.  I don't recall.  That was a long time ago for the

41

1  exam.  You know, it is in the internal revenue code.  I
2  covered every code section.
3      Q.  And you indicated you're required to take
4  continuing education in order to maintain your status as an
5  enrolled agent.  Do you know if, in the course of the
6  various continuing education you've taken over the years,
7  that Section 3121 has ever been covered?
8      A.  Yes.
9      Q.  Do you remember any particular course or issue
10  that was addressed?
11      A.  Yes.  I took a course on payroll issues.
12      Q.  When did you take that roughly, if you recall?
13      A.  Prior to giving my course.
14      Q.  And I understand you give a course on payroll
15  issues.
16      A.  Employment issues.
17      Q.  When did you start?
18      A.  I gave that course.  I no longer give it.
19      Q.  When did you start giving that?
20      A.  That was really a one-year-only around 1975 -- '95
21  rather, excuse me.  On my resume is 1995.  I'll go with
22  that to help my memory.
23      Q.  That's National Society of Public Accountants
24  seminar on employment issues designed and taught by you; is

11 (Pages 38 to 41)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

42

1  that what you're referring to?
2      A.  Yes.
3      Q.  Under your "Boston Tax Institute" heading, Number
4  5 I see is "payroll and information reporting"?
5      A.  Yes.
6      Q.  Is that similar type issues as what we're
7  describing?
8      A.  No.
9      Q.  Section 3121 would not be involved in that course?
10     A.  3121 would be but --
11     Q.  Not before --
12     A.  -- the issue that they have isn't something that
13  would have been covered in that course.
14     Q.  Okay.
15     A.  Can I clarify that?
16     Q.  Please.
17     A.  If we go way back to the first years I started
18  preparation, I always used to receive documents from the
19  Weylands to prepare their returns, 1099s, etc. I received
20  1099s from Zapata Marine that would put the Weylands in a
21  different status as an independent contractor still subject
22  to the same social security taxes under Section 1402.
23     Q.  Okay.
24     A.  At some point in time, they stopped sending

43

1  documents and sent a spreadsheet instead of that.
2      Q.  Okay. What is self-employment tax or SE tax?
3  What is that to a layman?
4      A.  To a layman, social security taxes.
5      Q.  Is it FICA?
6      A.  Yeah.
7      Q.  On my paycheck probably looks like FICA?
8      A.  Yeah, except on your paycheck, you pay one-half,
9  your employer pays the other half. For self-employed
10  individuals, you pay both halves.
11     Q.  I'm with you. What is your understanding, as we
12  sit here today, as to what is required to qualify for
13  exemption from self-employment tax for a ship captain who
14  operates abroad?
15         MR. GREEN:  Just for the record, let
16     me object to the form because I think
17     that's a very difficult question. I mean
18     the code -- this is pretty complicated and
19     has a lot of angles. I mean I'm not going
20     to tell him not to try and answer, but I
21     don't know if that's enough information.
22         MR. ROYSE:  I think that's a fair
23     objection.
24     Q.  (By Mr. Royse)  And here's what I'm trying to get

44

1  at. Let me qualify it a little bit because I'm not trying
2  to give you a trick question. What I'm trying to get at
3  are, in your mind, what are the walking around type of
4  elements that you know have to be satisfied, if you know?
5      A.  Well, certainly I've looked at these, but I think
6  I'm much more comfortable with the statute, if you know
7  what I mean.
8      Q.  I understand. Do you have -- and perhaps you've
9  already answered this but let me ask it again, do you have
10  an understanding, as we sit here today, that Mr. Weyland
11  qualified at some point for an exemption from SE tax, at
12  least for some of the years for which you prepared his
13  returns?
14     A.  I do not have an understanding.
15     Q.  And tell me why you don't.
16     A.  Because I don't have all the facts.
17     Q.  Okay.
18     A.  And I didn't then.
19     Q.  And what are the facts that you don't have?
20         MR. GREEN:  I mean by definition, he
21     wouldn't necessarily know that.
22         MR. ROYSE:  I know but he says that
23     there's certain facts he would have to know
24     in order to make a decision or a conclusion

45

1      or a recommendation. So what I'm trying to
2      find out is what are those questions that
3      you need to have answered, what are the
4      facts that would satisfy your inquiry.
5         MR. GREEN:  Or what type of facts.
6      Is that fair?
7         MR. ROYSE:  Fair.
8         THE WITNESS:  Well, I put some of
9      them in a letter back, I'm thinking --
10     right after that conversation with him, and
11     I requested information which I never got
12     from them. Did get a couple sheets of
13     paper from Jeff Smith but they didn't --
14     they didn't satisfy me.
15     Q.  (By Mr. Royse)  Okay. Do you remember, as you sit
16  here today, or can you tell me, as you sit here today, what
17  type of facts you would need in order to make a
18  determination whether he's qualified for an exemption?
19     A.  We're dealing with a very -- very, very esoteric
20  question and I -- no. I'd have to refresh my memory.
21     Q.  You say we're dealing with a very, very esoteric
22  question. How do you mean?
23     A.  You put this question to the average person on the
24  street, he wouldn't have any idea that Section 3121 comes

12 (Pages 42 to 45)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

46

1  into play; and if they did, they wouldn't know what
2  provision -- you know, the provision that exists; and if
3  they knew the provision -- remember, it's a very long code
4  section, lot of pages -- it would be difficult to interpret
5  whether somebody is exempt from social security tax under
6  that statute.
7      Q.  Okay.  Let's take your answer and say instead of
8  asking a person on the street, we ask a reasonably prudent
9  tax preparer who's an enrolled agent whether the provision
10  even comes into play and whether the exemption applies.
11  Could that person, in my hypothetical, a reasonably prudent
12  tax preparer, make that determination with the proper
13  facts?
14     A.  With the proper facts, you know, yes.  I would
15  think that somebody that's proficient and has the facts
16  could make a determination.
17     Q.  Could you make that determination with the proper
18  facts?
19     A.  I could try.
20     Q.  Are you qualified to make that determination with
21  the proper facts?
22     A.  Yes.
23     Q.  Is it your understanding that the IRS has made a
24  final determination, at least with respect to one year of

47

1  tax returns, that Mr. Weyland was exempt?
2      A.  Yes.
3      Q.  Is the IRS the final authority as to a person's
4  eligibility for the exemption?
5      A.  No.
6      Q.  Who is the higher authority?
7      A.  Well, courts, Supreme Court, Congress.
8      Q.  Congress in the sense that they could revise the
9  code, right?
10     A.  And they do, yes.
11     Q.  Sure.  But aside from that, my question is:  In a
12  particular setting, if the IRS rules in favor of the
13  taxpayer on an issue, presumably the taxpayer is not going
14  to appeal.  Presumably the IRS isn't going to appeal its
15  own determination.  Is that the -- is there any reason to
16  think that's not the final authority in a situation like
17  that?
18     A.  Well, it might not be correct.
19     Q.  Okay.  In your opinion?
20     A.  No.  It might not be correct.  You're asking a
21  general sense here.  The IRS allows things many times but
22  they're incorrect.
23     Q.  Okay.  I'm asking -- I understand what you're
24  saying.

48

1      A.  Okay.
2      Q.  They're incorrect as you see them --
3      A.  You're posing a situation where you think the IRS
4  is -- once they say something, that it goes over the law,
5  and I can't agree with that.  The law is the law.
6      Q.  With respect to the taxpayer's liability, that
7  individual taxpayer's liability, the IRS decision is the
8  final authority assuming no appeal, correct?
9      A.  Assuming no appeal, yes.
10     Q.  Have you ever been employed by the IRS?
11     A.  No.
12     Q.  If Mr. Weyland paid -- strike that.  If
13  Mr. Weyland was exempt from self-employment tax in a
14  particular year but nonetheless paid it, would you agree
15  that he paid a tax he was not required to pay?
16     A.  If he was --
17     A.  If he was exempt.
18     A.  If he was exempt, yes.
19     Q.  If three years passed from that time, is it your
20  understanding -- and he doesn't do anything to correct it,
21  is it your understanding that he's barred from then seeking
22  a refund for that overpayment?
23     A.  That he is exempt -- barred from it, yes.  And
24  there may be some -- you know, there may be some unique

49

1  factors but I don't think it exists here.
2          MR. GREEN:  David, would it be close
3      to a good time to take -- it's been about
4      an hour and fifteen minutes --
5          MR. ROYSE:  Yes.
6          (A brief recess was taken.)
7          MR. ROYSE:  Back on the record,
8      please.
9      Q.  (By Mr. Royse)  Mr. Birkholz, I'm going to ask you
10  a hypothetical question here and just assume that I'm
11  providing you with the facts that you need to know to make
12  this determination.  I want to ask you, based on your
13  understanding, as you sit here today, of Section
14  3121(b)(4), if a person was employed by a non-U.S. company,
15  he didn't enter into an employment contract in the U.S.,
16  and he did not serve on any boat at any time that it
17  touched a U.S. port, if those facts were true, do you
18  believe that person would be qualified for the exemption
19  under that section?
20     A.  You're asking me if you've oversimplified this
21  and, you know, do I believe that's the case -- I think the
22  -- it's a little more involved.
23     Q.  Okay.  That's what I'm looking for.  Explain to me
24  how.

13 (Pages 46 to 49)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

50

1    A. Well, entering into a contract in the U.S. is not
2    the only indication. I think the term in there is
3    "American employer." You know, American employer can
4    encompass a lot of things. So based on those facts, if
5    somebody put that question, I wouldn't even hazard an
6    answer.
7    Q. So if I gave you the facts that my generic person
8    was employed by a non-U.S. company, did not enter into an
9    employment contract in the U.S., and did not serve on any
10   ship that any time touched a U.S. port, you would not
11   hazard an answer as to whether they were exempt based on
12   those facts?
13   A. You said just the contract? Because you're saying
14   something different than I believe is in the statute, and I
15   haven't looked at it in a little while but I thought I
16   remember the term "American employer." An American
17   employer is not indicated by where you enter into a
18   contract.
19   Q. That's why I began --
20   A. It may be but --
21   Q. And let me --
22   A. There are a number of factors.
23   Q. I'm giving you a few factors here, so let me be
24   clear. The first factor I gave you was a person who is

51

1    employed by a non-U.S. company and did not enter into an
2    employment contract in the United States. So I'm assuming
3    a non-American employer and did not serve on any boat at
4    any time that touched a U.S. port. Would that be enough
5    facts for you to make a decision?
6    A. Not having looked at 3121 recently, that sounds
7    vaguely like a good set of facts but, again, you're asking
8    me to answer without looking at the statute.
9    Q. Okay. Do you recall ever discussing with
10   Mr. Weyland whether he might qualify for an exemption from
11   the SE tax?
12   A. Whether he might?
13   Q. Mm-hmm.
14   A. There was some discussion in that conversation I
15   mentioned earlier. I said I'll look at the statute and,
16   you know, see if it might happen. And I think that's
17   the -- I think that's the last time I talked to Richard
18   about that, but I don't really recall.
19   Q. That would have been this conversation that you
20   think roughly happened around '02?
21   A. Yeah. That sounds like the right time period,
22   maybe August, somewhere around there.
23   Q. And you don't recall having discussions with him
24   about that issue before then, right?

52

1    A. No. I definitely do recall and I don't recall
2    discussing it -- the specific issue about the exemption
3    from social security tax?
4    Q. Yes.
5    A. That's the first time it came up.
6    Q. So you're saying you specifically recall that you
7    did not ever discuss that before that time?
8    A. Yes, because that's the first time I learned he
9    had a foreign employer.
10   Q. Was there ever any occasion during your tax
11   preparation work for Mr. and Mrs. Weyland where you would
12   have asked to see a pay stub from Mr. Weyland's employer or
13   the company that he was working for?
14   A. Can you be more specific with the time frame. You
15   mean prior to that conversation?
16   Q. Let's start with that, prior.
17   A. Prior to that conversation, I thought he was
18   self-employed.
19   Q. So the answer, then, would be prior to that
20   conversation, you would not have asked to see a pay stub?
21   A. Correct.
22   Q. And after that conversation, would you have asked
23   to see a pay stub?
24   A. Would I have?

53

1    Q. Or did you?
2    A. I may have but I -- you know, you do this in
3    slices. I never got the answers to the first range of
4    questions, so I could never get to the Nth range of
5    questions.
6    Q. And let me -- I understand what you're saying.
7    Let me ask it more specifically though. Do you recall ever
8    asking him for a pay stub?
9    A. I don't recall.
10   Q. Okay. Do you recall ever asking him where he
11   entered into the contracts with the companies that he
12   worked with or worked for?
13   A. How do I answer this? In 2002 I had the
14   conversation with Richard. That was the last conversation.
15   I sent a letter because he left town. I could not ask the
16   question, and I waited for the responses to the preliminary
17   questions and never got them. So I never -- I never got to
18   the other facts that may have been helpful in making the
19   determination.
20   Q. Okay. Let me probe this a little further. What I
21   hear you saying is that this issue came up with Richard in
22   or about 2002 and that the questions that you posed as a
23   result of the issue coming up were put in a letter by you
24   to Richard and Jennifer, and that would encompass the only

14 (Pages 50 to 53)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

54

1  questions you ever asked about this, and you didn't get a
2  timely response. Is that a fair characterization of what
3  you're saying?
4      A.  That sounds -- that sounds fair.
5      Q.  And the reason --
6      A.  I may have missed something there. You know, I
7  hope you're not trying to trick me.
8      Q.  I'm not trying to trick you. I'm trying to make
9  sure that I don't have to come back and do this and make
10  you go through it -- if you say something, I want to make
11  sure -- I may not be as sharp as you are, so I'm going to
12  try and understand, and it forces me to sometimes repeat
13  what I think I'm hearing.
14          I was going to ask you the question: Did you ever
15  take any steps to determine whether the countries where
16  Richard worked had totalization agreements with the U.S.
17  and I believe the answer to that would be that if you did
18  ask that question, it would be in that correspondence you
19  sent; is that right?
20      A.  Everything -- everything sent to clients and
21  received from clients should be in my files.
22      Q.  Okay. And just so we're clear, it's your
23  recollection that the only time the Weylands ever inquired
24  whether Richard might be entitled to some exemption from

55

1  self-employment tax was in this occasion around 2002?
2      A.  Can you state that again, please.
3      Q.  Is it your testimony that the only time that the
4  Weylands inquired about whether he might be entitled to
5  that self-employment tax was on this occasion around 2002?
6      A.  Entitled to the self-employment -- you mean the
7  exemption?
8      Q.  Entitled to the exemption.
9      A.  Yes, because that's the -- up to that point, I
10  thought he was a 1099 and that's the first time I learned.
11  So that it couldn't have happened before that.
12      Q.  In your experience with the Weylands, do you
13  recall ever a time when you identified to them or directed
14  them as to how a certain item needs to be reported on a tax
15  return where they disregarded your advice and insisted that
16  it be reported some other way?
17      A.  If I insisted that it be handled one way and they
18  said they --
19      Q.  Disregarded your advice.
20      A.  Well, I'm the one preparing the returns. So I
21  don't understand your question.
22      Q.  Well, they're signing the returns, right?
23      A.  Correct.
24      Q.  So all I'm asking is did you all ever have a fight

56

1  about Peter says we need to report X this way on the return
2  and the Weylands say, no, we think it ought to be reported
3  Y? Do you ever recall anything like that?
4      A.  No.
5      Q.  You rely on your clients to provide you with
6  accurate information to prepare their returns; is that
7  correct?
8      A.  Yes.
9      Q.  Do you ask them certain questions and rely on
10  their answers in preparing those returns?
11      A.  Yes.
12      Q.  How do you decide what questions are appropriate
13  to ask a client in the preparation of a return?
14      A.  I'm confused. You know, we send an organizer out
15  to clients with the general categories of information and
16  recap of what they had in their return for the prior year
17  to assist them in collecting their data, and they choose to
18  send that back to us when we prepare the return based on
19  that data.
20      Q.  Okay. I'm going to come back to that in a second.
21  So the first thing we have is the organizer you send them.
22  In the course of preparing their returns, I think you
23  indicated earlier that certain questions may come up that
24  you need to address with them; is that also accurate?

57

1      A.  Yes.
2      Q.  With respect to the general categories of
3  information that you said you ask in that tax organizer,
4  how do you decide what questions to put in there?
5      A.  I don't.
6      Q.  Who does?
7      A.  That's a software product. It prints out
8  questions or information based on what was in the software
9  file from the prior year.
10      Q.  Is that a third party's software that you use or
11  is that software that you have some proprietary interest
12  in?
13      A.  Third party software. Excuse me, can I -- prior,
14  you know, in the early years, we had software that we
15  created but it was owned by somebody else. Well, I guess
16  that would still be third party software, yes.
17      Q.  What about the software that you use now, is it
18  software that you created?
19      A.  No.
20      Q.  So to follow up on that question, here's what I'm
21  getting at. I assume that within this tax questionnaire or
22  organizer, it will ask a question like: Do you own your
23  home; do you have a mortgage; did you pay mortgage
24  interest. Is that fair, something along those lines?

15 (Pages 54 to 57)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

58

1  A. Well, it doesn't really ask the question. It
2  might have a category that says, home mortgage interest,
3  and space to fill in; and because we may have that
4  information from the prior year, the category, you know,
5  let's say you had XYZ mortgage company, that may appear
6  there and there'd be a blank for this year and then there'd
7  be a column for the prior year amount. It's just to assist
8  the taxpayer.
9      It does not mean that that -- that every client I
10  have fills that out. We just send it out as a -- as an
11  aid.
12  Q. I have -- I use Turbo Tax, maybe to my detriment,
13  but it will ask me a question like: Did you own a hybrid
14  car this year. So it can determine if I'm entitled to that
15  credit. Does your tax organizer ask questions like that?
16  A. Yes. There's maybe two sheets that have
17  questions.
18  Q. And do you know how those questions are arrived at
19  that are included in that section? I mean I assume there's
20  certain things that are asked about and some that aren't?
21  A. We broke or we turned down into the types of items
22  that almost everybody has. The question portion of it
23  would be items that are harder to handle, and they don't
24  necessarily envision that somebody's going to fill out

59

1  everything. They're questions to know whether somebody is
2  in an area and then you have to develop from there.
3  Q. And when you say you would have to develop from
4  there, is that done through follow-ups with that client or
5  is it done actually in that tax organizer document?
6  A. Do you want an example?
7  Q. Sure. Please.
8  A. In the Weylands' case, Richard works overseas and
9  there's a separate provision in the statute that says if
10  you earn income abroad, you can -- earned income, you can
11  exclude a portion of it from income taxation as opposed to
12  social security tax. We're talking about the income taxes.
13  There's a form that's submitted to back that up. It's Form
14  2555.
15      Richard normally prepared that and sent it, you
16  know, in the earlier years. That data would be in the
17  computer. And from year to year, he'd just have to update
18  the changes to it. If that gives you an idea how the
19  process works. So at some point in time before that, you
20  know, we may have -- we would have to have had a
21  conversation about the existence of the statute that allows
22  you to exclude foreign income under, you know, if you
23  qualified for it.
24  Q. Let me ask you a question. You've said that

60

1  Richard sometimes would fill out either a spreadsheet or
2  even fill out a mocked up 1040 or whatever the particular
3  tax form --
4  A. Not a 1040.
5  Q. Okay.
6  A. Just a 2555.
7  Q. Oh, okay.
8  A. It has a lot of questions that are -- I mean it --
9  they're, you know, how many days were you out of the United
10  States or in the United States, you know, something that
11  the taxpayer would have to come up with.
12  Q. All right. So he would not or they would not try
13  and pencil in items on the 1040 --
14  A. No.
15  Q. -- to send to you? That's what you would then do
16  for them?
17  A. Yes. And if he did, I'd have them in the files,
18  and there's nothing like that in my files.
19  Q. Okay.
20  A. Except for -- I think there's a 2555 in there.
21  Q. From time to time when these issues come up in the
22  tax organizer or if you're otherwise made aware of issues
23  that may exist on the client's tax return, are there
24  occasions when you'll ask them for further documentation so

61

1  that you can figure out an issue?
2  A. Yes.
3  Q. And does that depend on the particular
4  circumstance of a client?
5  A. Yes.
6  Q. I believe you testified that on one occasion,
7  Mr. or Mrs. Weyland -- I think Mr. Weyland specifically
8  inquired to you about why he was being required to pay
9  certain taxes and some of his shipmates were not; is that
10  right?
11  A. Yes.
12  Q. It's your recollection that occurred on one
13  occasion and only one?
14  A. That's my recollection.
15  Q. Okay. And it's your recollection, at that point,
16  you took a look at the statute and provided a writing to
17  them with some questions about --
18  A. Some preliminary questions, yes.
19  Q. You indicated that you had roughly 650, roughly,
20  individual clients; is that right?
21  A. Yes.
22  Q. Is it fair to assume that you prepare roughly 650
23  individual tax returns every year?
24  A. Yes.

16 (Pages 58 to 61)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

62

1    Q.  Do you prepare every one of those carefully and
2    diligently?
3    A.  What do you mean by "prepare"?
4    Q.  Do you prepare each of those tax returns carefully
5    and diligently?
6    A.  There's two phases to preparation.
7    Q.  Explain please.
8    A.  We use software, so entering the data in a
9    computerized system, and then there's a review process.
10   For the 650, I'm — I do not do most of the input into the
11   software.  I am — I do more review.
12   Q.  Okay.
13   A.  Except in the Weylands' case.
14   Q.  Okay.  In the Weylands' case, did you do both?
15   A.  Yes.
16   Q.  Who does — aside from the Weylands' case, who
17   generally does the entry in the computerized system, that
18   first phase you described?
19   A.  The other people in the office, Jeff Prost and
20   Bill Birkholz.
21   Q.  And you review every return that your name goes on
22   as preparer; is that correct?
23   A.  I can't make that statement.
24   Q.  Are you required to?

---

63

1    A.  If I take a material position — material part in
2    the return, I'm required to sign the return.
3    Q.  If you sign the return, are you indicating that
4    you took a material part in the preparation?
5    A.  Yes.
6    Q.  My question was:  Do you prepare every return
7    carefully and diligently, and you, then, explained to me a
8    little better that there's two phases to preparation.  So
9    let me ask it this way:  To your knowledge, is every tax
10   return that is prepared by Birkholz & Company in terms of
11   the entry in the computerized system done carefully and
12   diligently?
13   A.  Yes.
14   Q.  To the extent that you review tax returns, do you
15   review every tax return carefully and diligently?
16   A.  Yes.
17   Q.  Help me understand.  To your knowledge, when
18   Birkholz & Company prepares a tax return, is it intended to
19   be done in such a manner that the taxpayer pays the least
20   amount of taxes that they're reasonably expected to owe?
21   A.  Yes.
22   Q.  I think I understood from your interrogatory
23   answers that you all do not have any sort of written
24   policies or procedures at Birkholz & Company; is that

---

64

1    correct?
2    A.  Relative to?
3    Q.  Tax preparation, treatment of clients.
4    A.  Correct.
5    Q.  Do you have written policies and procedures for
6    other matters?
7    A.  We have policies and procedures regarding
8    employment issues, such as vacation days and sick days
9    and —
10   Q.  I understand.
11   A.  — things of that nature.
12   Q.  With all due respect, I don't care about those.
13   Do you recall — strike that.  Do you know what Jennifer
14   Weyland's profession is?
15   A.  I believe she's an illustrator and an artist.
16   Q.  And what is her tax status?  That's a bad word,
17   but what I'm trying to say is, is she an independent
18   contractor, her own business, an employee of somebody?  How
19   do you —
20   A.  She's an independent contractor, self-employed.
21   Q.  Okay.  As part of that, is she required to keep
22   records, fairly detailed records as to expenses and
23   business expenses and things like that?
24   A.  Yes.

---

65

1    Q.  To your knowledge, has she been careful in her
2    dealings with you in terms of providing those kind of
3    documents?
4    A.  How do you mean "careful"?
5    Q.  I mean —
6    A.  Has she provided the documents that I would have
7    liked to have seen?
8    Q.  Yes.
9    A.  No.
10   Q.  Tell me what she has not provided, generally, that
11   you —
12   A.  Well, it's easier to say what she has provided.
13   Q.  Okay.
14   A.  A spreadsheet with numbers representing expenses.
15   Q.  And what would you have liked to have had instead
16   of just that spreadsheet?  Receipts?
17   A.  Backup.
18   Q.  Were there times when you requested that backup?
19   A.  Yes.
20   Q.  Did you ever do that in writing?
21   A.  Yes.
22   Q.  And that would be in your files if you requested
23   it in writing, correct?
24   A.  No.

---

17 (Pages 62 to 65)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

66

1    Q. Why not?
2    A. It's part of the tax organizers, the cover sheet
3  that goes out. They never sent the organizer back in, so I
4  wouldn't get that letter. It's a general letter that goes
5  out to clients.
6    Q. Okay. I'm following –
7    A. It's part of that tax organizer package.
8    Q. So this standard tax organizer document that goes
9  to everyone has a cover letter that says, please send
10  backup, or something along those lines?
11    A. Yeah. It asks for 1099s and things like that.
12    Q. Do you recall ever having any discussion verbally
13  or in writing with Jennifer asking her to provide backup
14  other than that general standard cover letter?
15    A. I don't recall.
16    Q. If it was in writing, it would be in the file,
17  right?
18    A. Right, but not everything goes in writing.
19    Q. I understand. If Mrs. Weyland recalls you
20  complimenting her on her recordkeeping and her
21  thoroughness, do you think that her recollection would be
22  incorrect?
23    A. Well, I don't recall that, so yes.
24    Q. Do you recall ever saying anything to her along

67

1  the lines of you wish that more of your clients were like
2  her in their recordkeeping?
3    A. No.
4    Q. And is a statement like that inconsistent with
5  your feelings about her recordkeeping?
6    A. Yes.
7    Q. When you put your name on a tax return as
8  preparer, what are you attesting to?
9    A. To the best of our knowledge, everything is true
10  and correct.
11    Q. This stack of documents looks worse than it is.
12  We'll make it through pretty quickly.
13    MR. GREEN: That's right up there
14  with: I only have one more question.
15    MR. ROYSE: Will you mark that,
16  please.
17    (Exhibit 2, Hand-written Notes,
18  marked for identification.)
19    Q. (By Mr. Royse) I'm going to hand you what I have
20  marked as Exhibit 2 – excuse me, what the court reporter
21  has marked as Number 2 to your deposition, and this is a –
22  let me go ahead and tell you. Those documents that have a
23  "PB" down in the bottom right were from the files that you
24  produced to us. So if we're looking at a document and you

68

1  see the PB, you can be assured that that came from your
2  files.
3    Is that your handwriting at the top?
4    A. Looks like it.
5    Q. I see there at the top 1988 "Weyland" and over
6  written at the side is "3/15/89"?
7    A. Yeah.
8    Q. Would it be a fair assumption that this is a
9  conversation that took place 3/15 of '89 with respect to an
10  '88 tax return based on those notes?
11    A. I — no. It could be. It might not be. It might
12  just be notes, you know, as I'm reviewing the return.
13    Q. Okay. That phone number up there, "201-579-7620,"
14  is that a phone number you're familiar with?
15    A. No.
16    Q. That's not a business phone of yours?
17    A. No. It looks like a New Jersey — I think 201 is
18  New Jersey.
19    Q. If you go down there under Number 4, you see, "1
20  Swamp Road, Nigeria"; "pay taxes to Nigeria"; "paid
21  direct"; "don't know if it's gross or net"; establish
22  residence 10/87." Do you have any recollection of what any
23  of that was about?
24    A. I don't have recollection but I could tell from

69

1  looking at the notes what it may be about.
2    Q. Okay. Tell me as best you can.
3    A. Pay taxes to New Jersey may be about Section 901
4  foreign tax credits.
5    Q. Nigeria?
6    A. Nigeria.
7    MR. GREEN: Same difference.
8    MR. ROYSE: I haven't been in either
9  so –
10    MR. GREEN: Sorry about that.
11    THE WITNESS: And the second item,
12  "don't know if it's gross or net," is that
13  what you're asking?
14    Q. (By Mr. Royse) Yeah. Just that section there.
15    A. Established residence, that may be about the
16  foreign income exclusion.
17    Q. And what is a foreign income exclusion, just to a
18  layman?
19    A. It's what I mentioned earlier. It's the ability
20  on foreign earned income to have it excluded from U.S.
21  taxes.
22    Q. What's that – down by an arrow, it says, "Paid
23  est," I believe that's estimated, "tax to fed"?
24    A. Paid estimated taxes to federal. And the part to

18 (Pages 66 to 69)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

70

1 the right probably goes with that, two thousand – it could
2 be 2000 or 2001 per quarter. Check – check in file. That
3 might be look in the file. That may be a note, check to
4 see if they paid it. It's, you know...
5    Q. I'll hand you what we'll mark as Exhibit 3.
6      (Exhibit 3, Letter, marked for
7      identification.)
8    Q. (By Mr. Royse) Mr. Birkholz, I've handed you a
9 document that appears to be a letter from Richard Weyland,
10 and I will tell you that this comes from your 1989 tax file
11 – excuse me, your 1988 tax year file. So I would have
12 reason to believe this was probably written sometime in
13 1989, and I'm not asking you to confirm that but just to
14 give you some context. Do you have a recollection of why
15 this letter would have been sent to you?
16    A. Well, I see by the instructions, you know, that it
17 was in response to a question asked, and I can tell by the
18 data that it's for the foreign income exclusion we just
19 talked about.
20    Q. That's the 2555?
21    A. Yes.
22    Q. And why are these dates important or –
23    A. There's a request for them on the tax return, on
24 the Form 2555.

71

1    Q. Do those dates determine your qualification for
2 that exclusion?
3    A. They may.
4    Q. Does it depend on how long –
5    A. They may knock your qualification out.
6    Q. Okay. The issue is when and how long you were in
7 and out of the country; is that what this goes to?
8    A. That's one of the issues, but it's not – it may
9 not be applicable in Richard Weyland's case because two
10 ways to qualify for it: One is to be a resident of a
11 foreign country where they are actually residents; and the
12 other is physical presence.
13    Q. He goes through here and lays out the days that he
14 was in Nigeria or departed for Nigeria, and he says down
15 there, if you follow through those indented, and he gets
16 back to regular spacing and says, "The number of days in
17 the U.S. on business is nil. The income earned in the U.S.
18 is none." Does that indicate that he's – that all of his
19 income is coming outside of the U.S.?
20    A. All his earned income?
21    Q. Yes.
22    A. Yes.
23    Q. Go down a couple and he says, "For line 6B, a
24 Residents Visa and STR Work Permit from the Nigerian

72

1 Government was issued." Do you know what that's about or
2 why is that important?
3    A. It's questions on the form.
4    Q. And all of this relates to the potential exclusion
5 of foreign earned income; is that right?
6    A. From –
7    Q. From income tax?
8    A. Yes.
9    Q. And was that an issue that you identified to
10 Mr. Weyland that there may be this potential, we need to
11 gather this information?
12    A. Yes.
13    Q. I'll hand you what we'll mark as Exhibit 4.
14      (Exhibit 4, Tax Preparation Form,
15      marked for identification.)
16    Q. (By Mr. Royse) Certainly take as long as you want
17 to look at that but what I want to ask you is just what
18 this document is, and you get ready to answer.
19    A. In a generic sense, this is what we call our
20 control sheet. We make notations here of time, although
21 the office isn't very good about filling it in diligently,
22 questions that we may have of the taxpayers so that we need
23 to only call them back once to get all the questions
24 together.

73

1    Q. Do you all still use these type of forms?
2    A. Yes.
3    Q. Missing data down there on the bottom right I
4 assume is information that you need from the person, data
5 you need from the person to be able to further complete the
6 return?
7    A. Yes.
8    Q. It says there, "2555 Qualification Data," and it
9 has a check under "Arrived." Would the letter that we
10 looked at as Exhibit 3 perhaps be what we're referring to
11 there?
12    A. Perhaps.
13    Q. Look up above that and under "Special Notes for
14 Cover Letter," it says, "Jennifer, Please fill in name and
15 address of Richard's employer on Form 2555." This document
16 does not go to the client, correct?
17    A. No, it does not.
18    Q. What would – when it says, "Special Notes for
19 Cover Letter," what is – what's that for? I think I know.
20    A. When the tax return is delivered to the client,
21 there's a cover letter on it with instructions, filing
22 instructions, and I would – Jennifer is my receptionist.
23 We would have asked her to put a note on the cover letter
24 such as I said in there.

19 (Pages 70 to 73)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

74

1    Q.  Show you what's marked as Exhibit Number 5.
2         (Exhibit 5, Cover Letter, marked for
3    identification.)
4    Q.  (By Mr. Royse) Is this such a cover letter?
5    A.  Yes.
6    Q.  What's the stamp at the top right "Reviewed"?
7    What does that indicate?
8    A.  Reviewed is — that stamp is only in my office.
9    It means that I reviewed the return that — the draft
10   return that I prepared.
11   Q.  This letter is dated February 2, 1989.  Do you see
12   anywhere in that letter — and I've looked at it — I don't
13   see, do you see anywhere where it follows the special notes
14   for cover letter, fill in name of — and address of
15   Richard's employer?
16   A.  No.
17   Q.  I'm going to show you Exhibit 6.
18        (Exhibit 6, Cover Letter, marked for
19   identification.)
20   Q.  (By Mr. Royse) And you might want to keep 5 handy
21   there.  Five was February 2, '89.  This is April 1, '89.
22   It's another cover letter.  Both of them begin by saying,
23   "Enclosed are your completed federal and state income tax
24   returns for 1988."  Can you explain to me why there would

75

1    be a subsequent letter like this?
2    A.  Yes.
3    Q.  Okay.  Please do.
4    A.  These are software generated, so they're
5    boilerplate-type letters.  The one that is marked
6    "Reviewed" is one that I print out to review the return,
7    meaning the one marked reviewed did not go out the door to
8    the Weylands.  The one that isn't marked with review may
9    have gone out with the return.
10   Q.  I'm not sure I'm understanding the procedure about
11   what you were just describing.  When it's stamped
12   "Reviewed," it means you need to still review the return?
13   A.  No.  It would mean that I've gone through a
14   preliminary review.  That may not be the final return.
15   I've just reviewed it and I may request additional data
16   from there.
17   Q.  Okay.
18   A.  And, you know, normally the letter that goes to
19   the client does not end up in the file.
20   Q.  You don't keep a copy of the letter that goes to
21   the client?
22   A.  When the software prints out returns, in the older
23   days there would be three copies printed.  One copy to stay
24   in our records, one for their records, and one the

76

1    government filing copy.  There would be a cover letter on
2    it.  Normally, the software on the review copy would not
3    put out.  If you look at all the files that exist, let's
4    say in the Weylands' case, I don't think you'll find too
5    many cover letters in the file.  That's because it isn't —
6    we can select which items — I don't normally review the
7    cover letter per se because it's boilerplate items.
8    Q.  Okay.  If you look at what we marked as Exhibit 6,
9    will you agree with me there's no reference in there to
10   filling out the employer name and address; is that correct?
11   A.  That's correct.
12   Q.  I'm going to hand you what we'll mark as
13   Exhibit 7.
14        (Exhibit 7, 1988 Tax Return
15        Documents, marked for identification.)
16   Q.  (By Mr. Royse) And let me say before I go on, I'm
17   going to do this with several of these documents.  In a
18   previous deposition that Ron and I did, we didn't even put
19   these documents in the record.  We just referred to the
20   number.  What I've done for ease of reference is copied a
21   piece of the return so that we would have it in front of us
22   to discuss.  I've got the original returns here with me.
23   So if there's one that you say, well, I don't agree that
24   that's actually what was in the return, I can pull it out

77

1    and you can look through it.  I'm happy to do that.
2         But what I've done for ease of reference and so
3    that we don't have no 600-page record is to pull out just
4    the pertinent portion that I'm interested in.  This first
5    document, this is a — is this a Schedule C?
6    A.  Yes.
7    Q.  And what is a Schedule C for?
8    A.  This is a document that is required to be filed
9    with the return to detail income and expenses for an
10   individual that's self-employed.
11        MR. GREEN:  Just a second, you said
12   this document is a Schedule C, but it's
13   actually two things.  That may confuse —
14        MR. ROYSE:  I'm talking about the
15   first page.  I'm sorry.  I'm just talking
16   about the first page.
17   Q.  (By Mr. Royse) If line A references principal
18   business or profession — it has name of proprietor,
19   Richard J. Weyland; principal business, mariner; business
20   name and address, Richard J. Weyland, 1 Swamp Road,
21   Nigeria.  Would it be typical for a person who is
22   self-employed for the business name and address to be that
23   person's name?
24   A.  You're asking in a general sense?

20 (Pages 74 to 77)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

78

1    Q.  Yeah.
2    A.  Yeah.
3    Q.  Okay.  Unless they have some kind of DBA or sole
4    proprietorship like, you know, We Do Windows or something,
5    that they just are personally, right?
6    A.  Correct.
7    Q.  So there's nothing -- all I'm getting at,
8    Mr. Birkholz; is there's nothing that facially jumps off of
9    the page about the fact that you've got a name of
10   proprietor, Richard J. Weyland, or name of business,
11   Richard J. Weyland?
12   A.  No.
13   Q.  If you flip over to the third page, is this
14   document the 2555 that you've been referring to some?  Is
15   it a 2555?
16   A.  Well, there may be multiple pages to this form,
17   but it's the first page of the 2555, yes.
18   Q.  All right.  Again, that indicates foreign address,
19   1 Swamp Road, Nigeria; occupation, mariner.  Down at the
20   bottom, it says, "Spouse lives in U.S.  Taxpayer lives in
21   Nigeria," and it gives a New Jersey address there.  Am I
22   correct that at this time, at least at the time that this
23   document was prepared, you were well aware that Mr. Weyland
24   spent time in Nigeria or maybe even lived in Nigeria?

79

1    A.  Yes.
2    Q.  Okay.  And also that he was a mariner, right?
3    A.  Well, that's the information from him, so I relied
4    on it, yes.
5    Q.  It says, "Employer is (check all that apply)"; "A
6    U.S. company."  Do you know how that determination was
7    made?
8    A.  No.  That's probably a default in the software.
9    Q.  Now I'll move onto Exhibit 8.
10         (Exhibit 8, 1989 Tax Return
11         Documents, marked for identification.)
12         THE WITNESS:  Excuse me, can I
13   correct that?
14   Q.  (By Mr. Royse)  Please.
15   A.  I'm just looking at the responses here.  It says
16   the employer is a foreign entity, a foreign affiliate,
17   self, a U.S. company, other.  The one thing that I always
18   -- and I recall this all the way through all the 2555s that
19   I prepared, that it's -- they really aren't measured for --
20   made for the self-employed individual, so you have to get
21   the information in.  We know under the statute that earned
22   income includes self-employment income, but I -- you know,
23   you don't really see a lot of self-employment-type setup
24   here.

80

1    You see the word "employer"?
2    Q.  Mm-hmm.  What about the box "self"?
3    A.  I see the box "self."
4    Q.  That would be a reasonable interpretation that
5    that's for self-employed, isn't it?
6    A.  Mm-hmm.
7    Q.  Let's move to Number 8.  I have now moved to your
8    tax file for tax year 1989.  Is this first page another
9    Schedule C --
10   A.  Yes.
11   Q.  -- for Mr. Weyland?
12   A.  Yes.
13   Q.  Again, it indicates what we saw in the last one,
14   which is Richard Weyland, mariner, and business name is
15   Richard Weyland, right?
16   A.  Yes.
17   Q.  If you'll flip over to the fourth page of this
18   document, I think the last page, now -- and this is a 2555,
19   correct?
20   A.  Yes.
21   Q.  It has Richard Weyland, name of taxpayer; foreign
22   address, 1 Swamp Road, Narri, Nigeria; and then it provides
23   name of employer, Zapata Gulf Marine Corp., and it gives a
24   U.S. address, a foreign address, and identifies it as a

81

1    foreign affiliate of a U.S. company is now checked.
2         My first question is:  Do you recall how that
3    determination was made to input that information?
4    A.  No.  I don't think I made a determination on it.
5    Q.  Well, how -- then how did it --
6    A.  Either, you know, it just may have been -- these
7    are little checks in the computer, you know, and we might
8    not have been that careful on which box got checked here.
9    Q.  What about the Zapata Gulf Marine Corporation for
10   name of employer, do you remember how that got -- how that
11   decision was made to include that?
12   A.  Richard told me.
13   Q.  Can you explain to me how a person who is
14   self-employed filing a Schedule C would likewise identify
15   an employer on the 2555?
16   A.  I'm not sure I can explain it.  I'll try to give
17   some backup on this.
18   Q.  Please.
19   A.  Zapata Marine, in the earlier years -- and I
20   testified earlier that I received 1099s from Richard --
21   classified people working for them as independent
22   contractors.  Now, I make no judgment whether that is
23   correct or not, because on Richard's return, you know, if,
24   in fact, he has been put into that status, he's subject to

21 (Pages 78 to 81)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

82

1  social security taxes. And if the IRS wants to question
2  it, then they will question Zapata Marine and, you know,
3  Richard then can -- actually, the IRS would automatically
4  correct that situation.
5      But, you know, that's the status that he gave us
6  way back when, so -- and we're filing Schedule Cs to go
7  consistent with the fact that he received 1099s and, you
8  know, do -- well, the statement says what it says.
9      Q. I understand.
10     A. So it's difficult to explain this.
11     Q. I guess my question remains, and if you can't
12 answer it, I -- that's fine. Even based on what you just
13 said, why would you identify an employer on the 2555 if
14 he's self-employed? I recognize Zapata may have him as an
15 independent contractor sending him 1099s but they wouldn't
16 be his employer. I mean, that's certainly a term of art,
17 right?
18     A. Yes. It was an oversight. You can see the
19 oversight in two years. I mean, it can't be both. It was
20 an oversight.
21     Q. It couldn't be both, that he was self-employed and
22 had an employer, at least with respect to this same income?
23     A. I can't -- you know, you got a 1099. They're
24 treating him as though he's self-employed and that's the

---

83

1  status. It's not my job to question Zapata Marine.
2      Q. You're an independent tax preparer who's never
3  seen this fella, never seen this document. Your buddy tax
4  preparer walks in and hands you this and says, could you
5  just look at this and see if you see any errors. Would it
6  -- would you say there's a question here? You're
7  identifying this guy as a Schedule C self-employed person
8  but you're identifying an employer over here. Is that
9  something that would be facially inconsistent that you
10 might say there's a problem here?
11     A. I'd say yes and no. I mean is it inconsistent,
12 yes; is it a problem, maybe not.
13     Q. You would at least inquire further?
14     A. Well, I'm not sure it's going to change the
15 result; and if this particular return came late in the
16 season and we're fighting to get it in, I'll tell you, a
17 little check box on the form, the worst that could happen
18 is the IRS says is that true and you correct it at that
19 point in time.
20     Q. I understand. And all I'm trying to get at is --
21 and I'm not just talking about the check mark. I'm talking
22 about including employer information. I'm just asking are
23 those two facially inconsistent?
24     A. Yes.

---

84

1      Q. Okay. That's fair enough. I'll hand you what
2  we'll mark as Exhibit Number 9.
3          (Exhibit 9, Letter, marked for
4          identification.)
5      Q. (By Mr. Royse) And I can be very quick here but
6  take all the time you want to look at it. My question is
7  simply that the first sentence indicates that Peter or --
8  Richard has just returned from Nigeria and has created a
9  1989 spreadsheet. Is that the spreadsheet that you
10 referred to from time to time that he would send you?
11     A. Once a year, yes.
12     Q. And again, it has a note at the bottom, "Working
13 Nigeria," and it has a note. Do you have any idea what
14 that would have referred to?
15     A. Where is that note?
16     Q. At the bottom, you'll see a hand-written note down
17 there.
18     A. Looks like my writing and I have no idea.
19     Q. It just says, "Working Nigeria." I assume you
20 have no clue what that referred to?
21     A. No.
22     Q. But we've established that, at least in that 1988
23 return, you were aware he was working in Nigeria, right?
24     A. Well, I don't know that for a fact. I mean I just

---

85

1  have to depend on his statement, yes.
2      Q. Move on to your 1990 tax year file. Exhibit 10.
3          (Exhibit 10, 1990 Tax Return
4          Documents, marked for identification.)
5      Q. (By Mr. Royse) I apologize for this copy. That's
6  about the state that I got it in. But if you'll just look
7  at that document for a moment. This is for tax year 1990,
8  and I believe that first page is another Schedule C; is
9  that correct?
10     A. Yes.
11     Q. It identifies Richard Weyland as the individual,
12 and mariner as his profession, and then business name is
13 Richard Weyland; is that right?
14     A. Yes.
15     Q. If you'll flip over to the third page, again, I
16 acknowledge that it's fairly difficult to read. I think
17 this is a 2555, isn't it?
18     A. It appears to be. I can't see the --
19     Q. It says, "Foreign earned income"?
20     A. I can't make out the form but it looks like a 2555
21 from 1990.
22     Q. It says, Richard Weyland; foreign address, 1 Swamp
23 Road; name of employer, Zapata Gulf Marine; employer is,
24 and again it has checked a foreign affiliate of U.S.

---

22 (Pages 82 to 85)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**86**

1   company. That is similar to the information we saw in the
2   last document, correct?
3     A. Correct.
4     Q. And would you agree that, again, at least on its
5   face, that appears inconsistent?
6     A. Yes.
7     Q. What -- please educate me. What is a tax home?
8   When it says list your tax home during your tax year?
9     A. Well, it's a term of art. I'm not sure I can
10  educate you because there's probably a technical definition
11  which I don't know off the top of my head, but it's the
12  home that is looked at for tax purposes that you work out
13  of.
14     Q. Go to tax year '91 file. This will be Exhibit 11.
15       (Exhibit 11, 1991 Tax Return
16       Documents, marked for identification.)
17     Q. (By Mr. Royse) Again, this is a -- the first page
18  is a Schedule C. I think it has the same information as
19  the last in terms of the business and the business name.
20  And then the third page is another 2555 -- excuse me, the
21  fourth page is another 2555 identifying Zapata Gulf Marine
22  as the employer and identifying as a foreign affiliate of a
23  U.S. company. Again, this is similar to the documents
24  we've looked at before. Would you agree that's facially

**87**

1   inconsistent?
2     A. Well, they're all the same because it's being
3   brought forward from the statute. So because I said they
4   were consistent in prior years, it would be inconsistent.
5     Q. When you say it's being brought forward from the
6   statute --
7     A. I believe that data is one of the -- I mean we
8   have -- you know, not only does the information print out
9   of those tax organizers, but some of the data from year to
10  year that repeats will stay in what's called the pro forma
11  file. Good example might be the taxpayer's name, address,
12  social security number. This information, I mean, once it
13  got in there, if it was an oversight to begin with, we may
14  never see it to change it.
15     Q. You mean brought forward from the software?
16     A. Yes.
17     Q. You said from the statute. I didn't --
18     A. Oh, I'm sorry.
19     Q. Brought forward from the software. But
20  nonetheless, you would review the document every year,
21  right?
22     A. Yes.
23     Q. Go to tax year '92 and show you what we'll mark as
24  Exhibit 12.

**88**

1       (Exhibit 12, 1992 Tax Return
2       Documents, marked for identification.)
3     Q. (By Mr. Royse) Again, it appears that the same
4   information appears on these documents. It would appear to
5   be facially inconsistent, I think you would agree, and I
6   think your answer is that it may have gotten carried
7   forward from the software entries. Is that all fair?
8     A. The inconsistency isn't the software's problem.
9   You know, the -- what we're talking about is the
10  inconsistency as a self-employed individual who works
11  overseas and qualifies for an exclusion on earned income.
12  Because they put employer's name and it's filled in and
13  they're self-employed, that's the inconsistency.
14     Q. I'm with you. What I meant was the software
15  carried it forward. I thought that was --
16     A. I believe so. I see it's the same three years
17  running here. That's probably why. I'm not sure that we
18  ever get into -- the way this data comes in, there's no
19  time to -- you know, you do the best job you can. There's
20  no time to check this. So I can see if it was in there one
21  year, it will probably just -- a carried forward item.
22     Q. Hand you what we'll mark as Exhibit 13.
23       (Exhibit 13, Letter, marked for
24       identification.)

**89**

1     Q. (By Mr. Royse) This is a letter from your file,
2   Mr. Birkholz, that appears to be dated November 3. I
3   notice it's signed by William Birkholz?
4     A. Yes.
5     Q. And it raises some questions to be asked. My
6   first question is this: Is this the type of inquiry that
7   we discussed earlier, where if you see a client's return
8   has certain issues or there's certain data you need, you
9   would inquire like this?
10     A. Yes.
11     Q. And the second question is: Your brother's
12  involvement in that, is that a typical ministerial duty for
13  him or is this somewhere where he was standing in for you
14  or --
15     A. Well, he actually is a better letter writer than I
16  am. I may have given him the questions and prepped it for
17  him, prepped the letter because I may have been involved.
18  This is -- November 3rd is in my teaching season, so I
19  could be pretty jammed up for time here, meaning I don't
20  think we can infer that Bill is involved in these issues.
21  I don't recall him ever working on their return. He may
22  have helped me with a letter.
23     Q. Okay. I'll hand you what we'll mark as
24  Exhibit 14.

23 (Pages 86 to 89)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

90

1    (Exhibit 14, Letter, marked for
2    identification.)
3    Q.  (By Mr. Royse)  This is a letter from Mr. Weyland
4  back to Bill about a month after the prior letter that was
5  Exhibit 13.  From what I can see here, it appears that he's
6  responding to Bill's questions; is that a fair
7  representation?
8    A.  It appears so.
9    Q.  The first question he identifies there, he says,
10  "The computer is used for Tidewater paperwork."  Are you
11  familiar with what Tide -- with who Tidewater is generally?
12    A.  Am I familiar now?
13    Q.  Mm-hmm.
14    A.  Was I familiar then?
15    Q.  Well, let's ask it now.
16    A.  Yes.
17    Q.  What's your understanding now as to who Tidewater
18  is generally?
19    A.  It's a company that bought Zapata Marine.
20    Q.  Did you know at that time what or who Tidewater
21  was?
22    A.  I had a conversation around this time with Richard
23  about Tidewater, and I'm not sure I ever understood that --
24  at that time that they took over because he said it's just

91

1  a name change.  Everything is exactly the same as it was
2  with Zapata.  And I carried that all the way until the 2002
3  conversation when I learned that they were a foreign
4  company.
5    Q.  So Tidewater was the new entity that he was
6  working for, but your understanding was that it was simply
7  a -- your understanding from him was it was simply a name
8  change and no real substantive change; is that fair?
9    A.  Well, we talked about it, and he said everything
10  is exactly the same.
11    Q.  Okay.  Do you recall how that issue arose?  I
12  mean, you say you talked about it --
13    A.  My recollection is that we were talking about the
14  2555; and he said, you know, you've been carrying Zapata
15  Marine on that form and it's actually -- the name of the
16  company changed.
17    And I said, What's that all about?
18    He said, It's just a name change.  Nothing is
19  different.
20    So that -- the same context as I said before.
21    Q.  So it was not, to the best of your recollection,
22  as if Richard came in or called and said, I've had kind of
23  a change here in terms of my corporate body that I work
24  with.  We need to investigate whether there's any tax

92

1  issues with this?
2    A.  No.
3    Q.  You don't recall any such meeting?
4    A.  To the contrary.  It was, you know, I took out of
5  it, you know, we had a conversation and he assured me
6  everything was the same and that, you know, I'm still
7  thinking of him as a self-employed individual.
8    Q.  Was -- do you recall whether that conversation was
9  in person?
10    A.  I believe it was on the phone.
11    Q.  Okay.  Let me just take a little detour here and
12  ask you, we're looking at a couple letters from November
13  and December '93 talking about a 1992 tax return.  Was it
14  fairly regular for the Weylands' tax return to be filed
15  much later than Ron and I file ours every year, right, on
16  April 15th?
17    A.  I don't know -- oh, you file yours -- thank you
18  for putting that in.  Yes.
19    MR. GREEN:  He apparently doesn't
20    know when I file mine either.
21    Q.  (By Mr. Royse)  Do you know why it was usually
22  late?
23    A.  Well, they normally got the information to us very
24  late.

93

1    Q.  Do you know why?
2    A.  No.
3    Q.  Do you think it had anything to do with the fact
4  that -- let me ask you this way:  Did you know that Richard
5  was at sea for sometimes four or five, six months at a
6  time?
7    A.  Yes.
8    Q.  Did you know whether the delay in getting
9  information to you and preparing filing the returns was in
10  any way related to that?
11    A.  I don't know.  You know, it always -- it, over
12  time -- earlier it was early and then it got later and
13  later and sometimes even after the extended due date.
14  Yeah.
15    Q.  In any event, that was a practice that you were
16  fairly familiar with with the Weylands; is that fair?
17    A.  Fair --
18    Q.  Late information?
19    A.  Yes.
20    Q.  Would you file extensions for them on a regular
21  basis?
22    A.  Yes.
23    Q.  Would you do that only at their request or would
24  you do that as a normal practice?

24 (Pages 90 to 93)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

94

1    A.  I would only file it at the request if I had
2  information, because you can't file an extension unless you
3  make a reasonable attempt to ascertain the tax.  It's not a
4  good extension.
5    Q.  So if an extension was requested in any given tax
6  year, is it your testimony that it was at the specific
7  request of the Weylands?
8    A.  Yes.
9    Q.  Was that request ever in writing?
10    A.  No.  It was normally a phone call.  I don't know
11  if it was in writing, maybe there's something in the file,
12  but I have it in my head that normally I'd receive a phone
13  call, you know, telling me to file an extension because the
14  data wasn't ready.
15    Q.  In any event, is your testimony that you never
16  would have unilaterally obtained an extension for them
17  knowing that they were usually late?
18    A.  I wouldn't -- no.  I wouldn't normally do that,
19  no.
20        MR. ROYSE:  I'm going to pass this
21      one around before I hand it to you because
22      I'm afraid I only have one copy and it's my
23      original and I'm going to put it in the
24      record.

95

1        (Exhibit 15, Report of Earnings
2      Letter, marked for identification.)
3    Q.  (By Mr. Royse)  Mr. Birkholz, that is a letter
4  that came from your file for the same tax year 1992, and
5  the heading at the top is "Tidewater Crewing Limited" and
6  it says, Report of earnings to employees for year ending
7  '92.  To your knowledge, is that a document that would have
8  been provided to you by Mr. Weyland?
9    A.  I don't recall this document.  If you're telling
10  me it came from my file, it had to come from him because
11  I -- I wouldn't type it up myself.
12    Q.  Right.  What does that -- and perhaps you've never
13  seen it before, but based on what you're seeing there, if
14  you got a document like that for a client, what kind of
15  statement is that?  What does that information show you?
16    A.  Well, it would seem to show wages, you know, and
17  it's not a traditional type of pay stub but it, you know,
18  it has the term "regular wages" on it.
19    Q.  If you got a document like that that said
20  Tidewater Crewing Limited and had Cayman Islands up at the
21  top, would that be of any significance to you at all in
22  making a determination about the self-employment tax issue?
23    A.  Well, it might except I had a conversation that I
24  just talked about with Richard and he told me there was

96

1  nothing -- nothing was different.  I really don't recall --
2  are you sure this came from my files?
3        MR. ROYSE:  You can look on your
4      computer and make sure.
5    Q.  (By Mr. Royse)  But he's going to confirm that
6  that number at the bottom --
7    A.  All right.  I don't recall seeing it.
8    Q.  If you'll hold that out so Ron can look at it
9  there.  It's going to take his computer a minute to get
10  going.  I'm going to move on to tax year '93, and I'll hand
11  you what I marked as Exhibit Number 15.
12        MR. GREEN:  That was 15.
13        MR. ROYSE:  Thank you.  Sixteen.
14        (Exhibit 16, 1993 Tax Return
15      Documents, marked for identification.)
16    Q.  (By Mr. Royse)  On the first page of this -- this
17  is a -- is this a Form 2555 on top here?
18    A.  First page, yes.
19    Q.  This one shows employer name, Tidex Nigeria
20  Limited.  Is that information that Richard would have
21  provided to you?
22    A.  Yes.
23    Q.  And it identifies it as a foreign entity.  Do you
24  know how that determination --

97

1    A.  No.
2    Q.  -- would have been made?
3    A.  Excuse me, no.
4    Q.  Flip over, if you would, to the last page.  Can
5  you tell me what this document is?
6    A.  It is a statement that gets attached to the
7  return.
8    Q.  This identifies Zapata Gulf Marine wages.  Do you
9  have any recollection, as you sit here, as to why that
10  would have been on there with the employer being shown as
11  Tidex on the front?
12    A.  I seem to remember a change in the -- how the
13  software handled the 2555s and trying to get this, you
14  know, the income in to be excluded.  So we may have put it
15  under a different cell.
16    Q.  Okay.
17    A.  Do you follow what I'm saying?  In the software,
18  there are little places that you put information.
19    Q.  Is that -- in any event, that's facially
20  inconsistent, isn't it?
21    A.  Facially inconsistent with?
22    Q.  The employer on the first page and the wages on
23  the last page --
24    A.  Yes.

25 (Pages 94 to 97)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

98

1    Q.  – appear different?  Let me go to your '94 file,
2    and I will show you a document we'll mark as Exhibit 17.
3         (Exhibit 17, 1994 Tax Return
4         Documents, marked for identification.)
5    Q.  (By Mr. Royse)  This is -- the first page of this
6    document, Mr. Birkholz, is a little different than what
7    I've been seeing on those Form 2555s.  This is an EZ --
8    what's the -- do you know why the difference?
9    A.  This may have been the service trying to simplify
10   the 2555 forms, so they created an EZ form.  It's
11   automatically selected by the software.  So I don't recall
12   getting in any decision process 25 -- should we use a 2555
13   EZ or a 2555.
14   Q.  I hear you.  It's got employer's name, T-E-D-I-X.
15   I'm assuming that's just probably an entry error.  The last
16   one was T-I-D-E-X.  I think that's probably correct?
17   A.  Probably, you know, looking at Richard's writing,
18   that's the way it went in.
19   Q.  The last page, is this a statement also that the
20   software generates for attachment to the return?
21   A.  Yes, and here's an -- the Zapata Marine that you
22   asked before that shows there is an example of something
23   that carries forward from year to year.
24   Q.  That wouldn't be the fault of Richard's

99

1    handwriting, I assume?
2    A.  No, but it may have been that -- the way it
3    originally got in there as -- when he saw it, he didn't
4    bring it to my attention, because I -- I know that was the
5    2555 issue that we were carrying Zapata Marine and probably
6    because this was in two places and we only got one of them.
7    Q.  When you review those returns -- you say he didn't
8    bring it to your attention.  Is it the client or the tax
9    preparer's ultimate responsibility to make sure that a tax
10   return is facially consistent?
11   A.  Both.
12   Q.  I'll hand you what I'll mark as Exhibit 18.
13        (Exhibit 18, Time Table, marked for
14        identification.)
15   Q.  (By Mr. Royse)  And very quickly, my only question
16   here, Mr. Birkholz, is this another one of these documents
17   that shows his time working outside the U.S. for purposes
18   of that 2555?
19   A.  It appears to be, yes.
20   Q.  Is this a document you would have relied on in
21   preparing the return to some extent?
22   A.  Yes.  It's information that we normally would
23   either attach or include in if they requested it.
24   Q.  I'll move on to tax year '95 file, and I'll hand

100

1    you what I'll mark as Exhibit 19.
2         (Exhibit 19, 1995 Tax Return
3         Documents, marked for identification.)
4    Q.  (By Mr. Royse)  And, again, my only question here
5    is in 19 -- in tax year 1995, calendar '96, we're still
6    identifying Tedix/Tidex as the employer on the first page
7    of the document 2555 EZ and Zapata Gulf Marine as the
8    source of the foreign earned income on that last document;
9    is that correct?
10   A.  Yes.
11   Q.  Move on to tax year '96 and show you Exhibit 20.
12        (Exhibit 20, 1996 Tax Return
13        Documents, marked for identification.)
14   Q.  (By Mr. Royse)  I would ask the same question and
15   I assume the answer would be the same?
16   A.  Yes.  On the Tidex and the --
17   Q.  Yes.
18   A.  -- Zapata, yes.
19   Q.  I'll move on to tax year '97 and show you Exhibit
20   21.
21        (Exhibit 21, 1997 Tax Return
22        Documents, marked for identification.)
23   Q.  (By Mr. Royse)  If you would flip to the fourth
24   page of this and it has PB447 at the bottom.

101

1    A.  Yes.
2    Q.  That's the application for an extension; is that
3    correct?
4    A.  Yes.
5    Q.  And it's your testimony that you would have only
6    filed this type of extension request if the Weylands had
7    specifically directed you to?
8    A.  That's my recollection.
9    Q.  If you'll flip to the next page, this is one of
10   those attachments for the returns from 1997, and it says,
11   wages, employer, Zapata Gulf, pensions, taxpayer, Whitax
12   Tidewater Inc.  Do you know what that would have been
13   about, that Tidewater?
14   A.  The Whitax Tidewater Inc.?
15   Q.  Mm-hmm.  That's under pensions.
16   A.  Well, it's a pension that was given, you know, to
17   Richard and appears based on this.
18   Q.  And the payer was Tide -- Whitax Tidewater.  Is
19   that what that indicates?
20   A.  Well, that's what it indicates.
21   Q.  The employer that we're showing still for tax year
22   1997 is Zapata Gulf Marine Corp.  Just so we're clear, your
23   testimony was that you knew several years before that,
24   according to Richard, that the name of the employer had

26 (Pages 98 to 101)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

## 102

1  changed; is that right?
2      A.  Yes.
3      Q.  I'll go to tax year 1998 file and show you Exhibit
4  22.
5          (Exhibit 22, 1998 Tax Return
6          Documents, marked for identification.)
7      Q.  (By Mr. Royse)  First, I would just ask you the
8  same question I've been asking; and that is, there's an
9  inconsistency between the first page of the documents I've
10  handed you showing Tedix Nigeria as employer and the last
11  page showing Zapata Gulf Marine; is that correct?
12     A.  Yes.
13     Q.  And the page before that last page is an
14  application for an extension, and it says, "Explain why you
15  need extension:  Awaiting requested data from third party
16  in order to prepare proper return."  Again, it's your
17  testimony that you would have only done this at the
18  specific direction of the Weylands; is that right?
19     A.  This is a second extension.
20     Q.  Okay.
21     A.  The first extension would have been at the
22  request.  The second extension, we may have been waiting
23  for the dates for the 2555.
24     Q.  Okay.  What -- Question Number 3 says, "Have you

## 103

1  filed Form 4868 to request an automatic extension of time
2  filed for this tax year?"  What is that?
3      A.  4868, we looked at previous, is the first
4  requested extension to go beyond April 15th to the second
5  extension due date.
6      Q.  And the first extension doesn't require any
7  justification.  The second does; is that right?
8      A.  It doesn't require justification.  The first one
9  requires a request for extension but it can be null and
10  voided -- if that's proper English -- null and voided if
11  reasonable attempt isn't made to ascertain the tax.
12     Q.  I'm going to move to tax year 1999 and hand you
13  what I'll mark as Exhibit 23.
14         (Exhibit 23, 1999 Tax Return
15         Documents, marked for identification.)
16     Q.  (By Mr. Royse)  I'm just showing you the first
17  page of this one because my question relates to the
18  information there at the bottom.  It's the same as what
19  we've been seeing and it still says Tedix Nigeria as the
20  employer's name.  My question is, right under that under
21  Question 9, "Employer is," and it identifies three boxes.
22  The one that's checked is a foreign business.  Do you have
23  any idea how that determination was made?
24     A.  No.

## 104

1      Q.  Do you know how it came that Richard stopped
2  filing Schedule Cs for self-employment or did he continue
3  to file Schedule Cs?
4      A.  In my mind, he was subjected to self-employment
5  tax all the way through because I -- because of the
6  inconsistency in the documentation that the -- his employer
7  gave him a 1099.
8      Q.  So there will be, with each one of these that
9  we're looking at, a Schedule C as well in the return?
10     A.  There should, but there might not be because that
11  still doesn't -- you know, if you're subject to
12  self-employment tax, there are situations -- I can't think
13  of one off the top of my head -- where you might have a
14  Schedule SE but not a Schedule C.
15     Q.  Okay.  How do you make a determination whether a
16  taxpayer who is one of your clients is an independent
17  contractor or an employee?  Is that simply a matter of do
18  they get 1099?  Do they get W-2s?
19     A.  It's lesser of all evils here.  You know, if
20  they're given a 1099, we will follow through with that and
21  present it on a Schedule C.  Now, that doesn't necessarily
22  say that they're subject or not subject.  For instance, if
23  I'm an employee of a corporation and I'm a real employee
24  but they give me a 1099, you have a choice of not putting

## 105

1  that on a Schedule C, in which case there'll be an inquiry
2  from the Internal Revenue Service.  That may bring up an
3  issue and now they go back to your employer and, you know,
4  it may affect your work status.
5          So there are -- I'm not saying that happened here
6  but there are -- there is some factual determinations and
7  there's, you know, nothing to stop an individual from --
8  hard to explain this.  I mean, I've always had problems
9  with the 1099 from Zapata on, but, you know, the
10  determination of whether they're self-employed is whether
11  they provide services for a fee.
12     Q.  Do you have that issue come up with other clients
13  from time to time?
14     A.  Yes.
15     Q.  Do you ever, either in conjunction with the client
16  or on your own, make an inquiry to the employer or the
17  company that they're working with to try and figure that
18  out?
19     A.  Normally I talk to the taxpayer because that may
20  be a very sensitive issue with an employer that might
21  affect their employment status.
22     Q.  I understand.  Do you ever say to a taxpayer, why
23  don't we call this employer, or whatever it is, and figure
24  this out?

27 (Pages 102 to 105)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

106

1   A.   You're asking me to generalize here because it --
2   it has come up in the past with other clients. You know,
3   number one, I can't talk to an employer unless I've been
4   given permission from the taxpayer. So normally I'd be
5   talking to the taxpayer.
6   Q.   I understand. And what I'm getting at is it seems
7   reasonable to me that from time to time if this came up,
8   the taxpayer says, hell, I'm just a bricklayer; I don't
9   know all that; that it might make sense to say, well, let's
10  talk to your employer and find out whether it makes sense
11  or not. All I'm asking is have you ever had a situation
12  like that where you would do that kind of thing, call up
13  the employer with the taxpayer or make an inquiry in
14  writing with the taxpayer to the employer?
15  A.   I don't think I've had a taxpayer that's given
16  permission for me to have a conversation about that issue
17  with the employer.
18  Q.   Have you ever given information or questions to a
19  client and said you need to go to your employer and have
20  these specific questions answered. I don't understand
21  their structure. I don't understand what they're doing.
22  You need to have these answered?
23  A.   Yes.
24  Q.   Did you ever do that with Mr. Weyland, as far as

107

1   you recall?
2   A.   My recollection is we talked early on, but I don't
3   know when that was.
4   Q.   Do you recall ever putting anything in writing to
5   him to that effect?
6   A.   I can't remember back that far.
7   Q.   If you did, it would be in your file; is that fair
8   to say?
9   A.   No. These files only start from '88 forward or
10  somewhere around there. There were files before that.
11  Q.   Okay.
12  A.   We used to receive a 1099 from Richard. I know it
13  would have come up, because I would have said, what's this
14  all about. I don't remember the exact context of the
15  discussion but I know it had to be well before 1988.
16  Q.   Where are the files prior to '88? Do you know why
17  those are not around anymore?
18  A.   I'm only required to keep three years.
19  Q.   My question is: Do you know why the files before
20  '88 aren't around; and if what you're saying is, as a
21  practice, you destroy them, that's fine. I just need to
22  know?
23  A.   There's a lot of bulk. We -- we actually maintain
24  files for longer than we're required to. We shred it

108

1   because we ran out of space.
2   Q.   That's the answer to my question. They don't
3   exist anymore is what I wanted to know. Exhibit 24 -- and
4   the reason I'm giving this to you now is because I want to
5   stay in your tax file the way they're organized. This is
6   tax year '99.
7       (Exhibit 24, 1999 Tax Return
8       Documents, marked for identification.)
9       MR. GREEN:   Probably wouldn't be a
10  bad idea to take a break whenever is
11  convenient for you.
12      MR. ROYSE:   Let's do that right after
13  this document. Good idea. I could use
14  one.
15  Q.   (By Mr. Royse)   Mr. Birkholz, this is the first
16  part of a 1040X or amended return for tax year 1999. Is
17  that a document that you prepared?
18  A.   Yes.
19  Q.   If you look at the date down there, I think at one
20  time it said 10/10/00, but it actually now says 10/10/03
21  that's hand-written in there. Is that --
22  A.   Yes.
23  Q.   -- roughly when you think you would have filed
24  this document?

109

1   A.   Yes.
2   Q.   Is this a document that you prepare and file
3   yourself or do you send it for the taxpayer's signature?
4   A.   We send it to the taxpayer for signature.
5   Q.   On that box where it says, "Check if
6   self-employed," that's talking about you, isn't it?
7   A.   Yes.
8   Q.   The second page is the explanation page for the
9   change. Just take a second and read that paragraph that's
10  typed in there. It says, "Claimant (Richard Weyland)
11  initially filed returns subjecting Foreign wages to self
12  employment tax. Claimant captains a non American vessel
13  that does not dock at a U.S. port and works for a foreign
14  employer. See copy of 1040-1 & 2 plus Schedule SE."
15      What basis did you make that statement on?
16  A.   Can you explain that?
17  Q.   What factual basis did you make that --
18  A.   I didn't make it on a factual. I made it on the
19  conversation I had with Richard and the fact that the
20  statute of limitations was about ready to expire. This was
21  a protective amended return.
22  Q.   Okay. But did you believe at the time you filed
23  this, that statement under part 2 to be correct to the best
24  of your knowledge?

28 (Pages 106 to 109)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

110

1    A.  I didn't have the facts to make that statement.  I
2    -- what I believed at the time was if we didn't file this,
3    the statute would toll, and they wouldn't have a shot at
4    it.  I also believe that, because this is a fairly unique
5    situation, definitely was going to get audited, so we'd
6    have time to get the facts, etc.  I looked up the statute,
7    and I just took verbatim out of the statute 3121.
8    Q.  Okay.  I understand.  And I don't want to get in
9    an argument with you about this, but I have to believe that
10   somebody of your credentials and your experience would not
11   just put something on a document that you file with the IRS
12   without at least having a good faith belief that the facts
13   were, in fact, true, and what I'm asking is did you have
14   that good faith belief or did you just simply put down what
15   was necessary in order to satisfy the statute of
16   limitations, true or not?
17   A.  I didn't -- I filed this as a protective, meaning
18   -- take a look at the date, October 10th.  The statute
19   tolls, I believe, October 15th.  I've got to get this back
20   to them and get it in.  I didn't have time to do the
21   research.  I didn't have time to explore the facts.  I'm
22   not even sure Richard was in the country to discuss the
23   facts.  And I believe that around this time, I sent a
24   letter to him asking for some additional data.

111

1    Q.  I understand.
2    A.  So I know what it looks like, but I filed this
3    purely as a protective claim.
4    Q.  I understand and I'm not trying to pick nits about
5    it because I understand where you're coming from, but I'm
6    trying to be clear about whether you believe that your duty
7    to file documents with the IRS based on a good faith belief
8    that they're accurate.  That's not alleviated to any extent
9    by the fact that a statute is about to run or you're filing
10   a protective tax return.  I mean, you still have to have a
11   good faith belief in order to state something, right?
12   A.  How can I say yes to that.  No.  I think that if
13   there isn't sufficient time, you know, I can file something
14   like this to protect their right to have the discussion
15   down the line.
16   Q.  Okay.  Is your testimony, then, that you did not
17   have a good faith belief that that was correct?
18   A.  I had -- I didn't have the facts.  I did it purely
19   to protect their right to have this issue discussed at a
20   later point in time.
21   Q.  I'm going to hand you what I'll mark as Exhibit
22   25, and this is from that '99 tax file.
23        (Exhibit 25, Phone Memo, marked for
24        identification.)

112

1    Q.  (By Mr. Royse)  And I'll go ahead and tell you
2    we're not benefitted with a date on this phone memo, but
3    this came from the '99 tax file and somehow it was copied
4    along with a returned envelope dated November 14 of '00.
5    So I'm not going to try and get you to say what the date of
6    this was, but, in any event, I think it was probably around
7    2000 maybe.  That phone memo there, is that your writing?
8    A.  Looks like it.
9    Q.  Do you have any recollection of what that was
10   about?
11   A.  I'm having a little difficulty reading what it
12   says.  No, I don't.  If it's the '99 file, it may have been
13   around the time we had the conversation -- no.  '99 file --
14   this is -- I can see from the postmark, there's -- I don't
15   know what that is.  Let me explain something.  If I went
16   back and prepared an amended return, this could be a phone
17   slip from 2003.
18   Q.  Okay.
19   A.  So I can't tell you what this is.
20   Q.  And the documents that were provided to us out of
21   your file, those were copied on the same page, and it may
22   just be purely for space-saving reasons.
23        MR. ROYSE:  I guess yours probably
24        looks the same on your computer, doesn't

113

1    it, Ron?  I think I've got the same thing
2    as you?
3        MR. GREEN:  Yeah.  You would have an
4    exact copy.
5    Q.  (By Mr. Royse)  Okay.  So you think this phone
6    note here could have been in 2003, could have been in 2000.
7    There's no way to tell?
8    A.  Correct.
9    Q.  Do you know what it references there?  I see Tidex
10   at Chevroncam (phonetic) maybe?
11       MR. GREEN:  Dot com.
12   Q.  (By Mr. Royse)  Yeah.  Tidex2@chevron.com.  Then
13   it says, I think, maybe office for Richard or -- I can't
14   read the rest of it.  I see Rich name -- put Rich name.  I
15   guess what I'm getting at is do you have any recollection
16   of making this note or what it referred to?
17   A.  No.
18   Q.  Move to tax year 2000 --
19       MR. ROYSE:  Oh, I lied.  I told you
20       I'd take a break.  Let's go off the record.
21       (A brief recess was taken.)
22       MR. ROYSE:  Let's go back on the
23       record, please.
24   Q.  (By Mr. Royse)  We are still in tax year 1999

29 (Pages 110 to 113)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

**114**

1    file, and I will hand you what I've marked as Exhibit 26.
2         (Exhibit 26, Hand-written Notes,
3         marked for identification.)
4    Q.  (By Mr. Royse) Can you read the date at the top
5    of this on the top left?
6    A.  1/16/0 -- don't know.  Could be a one, could be
7    zero.  Could be '00 or '01.
8    Q.  Okay.  I'm guessing that you did what I do, which
9    is write the past year up through about February or March
10   and then scratch over it.  You wrote '00 and then made it
11   '01.  I won't hold you to that but --
12   A.  Or this could be '02.
13   Q.  I understand.  It says, "Richard Jennifer Weyland"
14   at the top.  I can read that part.  What does number one
15   say?
16   A.  "Send Richard," hyphen, looks like "Connus recap."
17   Q.  What's Connus?
18   A.  C-o-n-n-u-s.  Connus is a set of tables for per
19   diem allowances for meals.
20   Q.  Let me step back and ask you, do you know if this
21   was -- these are your notes, aren't they?
22   A.  Appears to be my writing.
23   Q.  Do you know if this -- these notes were the result
24   of a meeting or a phone call with the Weylands?

**115**

1    A.  No.  This looks like it was the control sheet, so
2    it would probably be, you know, observations I'm making
3    looking through the return.  Best I can give you at this
4    point.
5    Q.  All right.  Down at the bottom, it says, "Richard
6    physically present 345 days overseas.  Change from physical
7    residence."  Do you know what that would have been about?
8    A.  Yes.  As I mentioned earlier, under Section 911,
9    the foreign income exclusion, the two tests.  In the past,
10   he had a residency.  That changed at some point in time,
11   and we would, then, be looking at the other requirement:
12   Was he physically present overseas for the requisite number
13   of days?
14   Q.  His physical residence overseas changed?
15   A.  I think that the country that was providing him
16   that status no longer gave it.  I don't remember the exact
17   details but I remember something changed vis-a-vis his
18   qualification for the 2555s.
19   Q.  And as best you can recall, these would have
20   probably been your notes in reviewing the draft of the
21   return or reviewing their --
22   A.  Yeah.
23   Q.  Okay.  I'll hand you what we'll mark as Exhibit
24   27.

**116**

1         (Exhibit 27, Hand-written Note,
2         marked for identification.)
3    Q.  (By Mr. Royse) This appears to be a hand-written
4    note from Jennifer Weyland, and what I want to focus on is
5    kind of the middle there that says, "I want to ask a couple
6    of questions.  First, do I need to contribute to my IRA?
7    Do I put in the full $2500."  What issue is she getting at
8    there?
9    A.  I presume that that's whether she can make an IRA
10   contribution.
11   Q.  What advice would you have been giving her with
12   respect to that?
13   A.  I don't remember.
14   Q.  Here's all I'm getting at.  Would it have been
15   normal for you to have given her certain direction as to
16   how to take advantage of the IRA or what amount to put in
17   or not put in?
18   A.  Well, it appears I'm responding to her question.
19   Q.  I'm not even sure you responded.  All I know is
20   that that's what she's asking.  So that's -- my question
21   is:  She's obviously asking these kind of questions.  In
22   the course of your work with them, would you give those
23   kind of answers; yes, do this with an IRA --
24   A.  Yes.  An IRA is related to tax preparation.

**117**

1    Q.  Okay.  I may have misspoken just a minute ago when
2    I said -- when I jumped from the '99 tax file to the 2000
3    tax file.  I believe starting with Exhibit 26, I'm in the
4    2000 tax file.  That's correct.  With Exhibit 26, I moved
5    to the tax year 2000 tax file.
6         MR. GREEN:  That makes your date
7         theory work a little better.
8         MR. ROYSE:  Yes.
9    Q.  (By Mr. Royse) I'll hand you what I will mark as
10   Exhibit 28.
11        (Exhibit 28, Letter, marked for
12        identification.)
13   Q.  (By Mr. Royse) This is a thick exhibit.  I'm
14   mainly concerned with the first page.  This appears to be a
15   letter from you to Mrs. Weyland.  Does that seem accurate?
16   A.  Yes.
17   Q.  It says, "Dear Jennifer, I took the time to read
18   the IRS publication on U.S. persons working abroad and the
19   IRS Regulations on foreign income exclusion.  My reading
20   was focussed on the issue of attaining qualification for
21   exclusion of future years earned income as a resident of a
22   foreign country.  It appears that the issue of residence is
23   one of fact.  A mere address does not seem to meet the
24   requirement.  I do not see Richard meeting the requirement

30 (Pages 114 to 117)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

## 118

1 of physical presence or residence in the near future. See
2 what you get out of the reading."
3      My first question is: Do you recall what spawned
4 this letter?
5      A. I don't but I can look at the previous exhibit and
6 it may have been -- let me just see here. I had a flash
7 through my head here. There are -- as I said, his status
8 changed. They took away his residency. So the only other
9 way to qualify him for exclusion was on the basis of
10 physical presence.
11      Q. Back earlier today you testified that there came a
12 time when Richard raised an issue with you about shipmates
13 not paying taxes. You looked at the statute, sent them
14 some materials. Is that this or is that something
15 different?
16      A. No. It's something different.
17      Q. All we're talking about here is exclusion from
18 foreign -- foreign earned income exclusion from U.S. income
19 tax?
20      A. This is the -- yeah, the income tax.
21      Q. Okay. That letter concludes, "See what you get
22 out of the reading"?
23      A. Mm-hmm.
24      Q. And you attach what appears to maybe be an IRS

## 119

1 publication. I can't really tell. To your knowledge, is
2 this how -- did this issue get any more treatment from you
3 or was this kind of the conclusion of investigating the
4 issue about foreign earned income exclusion?
5      A. It was not the conclusion.
6      Q. Still in tax year 2000 file, I'll hand you Exhibit
7 29.
8      (Exhibit 29, Letter, marked for
9      identification.)
10      Q. (By Mr. Royse) This appears to be a letter from
11 you to the Kentucky State Revenue Cabinet.
12      A. Mm-hmm.
13      Q. From what I can tell, Mr. Birkholz, it's
14 addressing the treatment of a net operating loss. Do you
15 know what this letter is about?
16      A. Yes.
17      Q. Can you explain it to me.
18      A. Around this time, Kentucky sent a letter to the
19 Weylands questioning a net operating loss on their return,
20 net operating loss being the excess of business expenses
21 over business and nonbusiness income. I interceded, with
22 their permission, and talked to Kentucky and found that
23 Kentucky has a rule that is different from the federal.
24 They only give net operating losses that were incurred

## 120

1 while you were a resident of Kentucky, and we made an
2 adjustment in the carryover so that it would reflect the
3 proper carryover on the Kentucky state return.
4      Q. Okay. Did this require you to file amended
5 returns or state returns for --
6      A. No.
7      Q. -- a few years? How did it get corrected?
8      A. I just changed the carryover in the file. It had
9 no impact on the tax liability.
10      Q. In the past?
11      A. Correct, to my recollection.
12      Q. I'll hand you Exhibit Number 30.
13      (Exhibit 30, 2000 Tax Return
14      Documents, marked for identification.)
15      Q. (By Mr. Royse) And the first page of this, again,
16 is the 2555. The last page I understand is an attachment
17 that you would attach to the return. And, again, I'm just
18 looking here and seeing that employer's name is listed for
19 Mr. Weyland, Tedix Nigeria Limited, and on the last page
20 it's Zapata Gulf Marine as the employer. And, again, I
21 would just ask you if you agree with me that that's
22 facially inconsistent?
23      A. Yes.
24      Q. Under Tedix Nigeria Limited, part 1, Question 5,

## 121

1 "Employer is," it says, "a foreign entity," checked. Do
2 you know how that determination was made?
3      A. No.
4      Q. Is that a determination that you had any
5 involvement in making?
6      A. No.
7      Q. I'm going to attach to your file 2001, Exhibit 31.
8      (Exhibit 31, 2001 Tax Return
9      Documents, marked for identification.)
10      Q. (By Mr. Royse) My only question here is, again,
11 the employer's name is Tedix Nigeria. It shows an
12 employer's foreign address in Nigeria and it identifies
13 employer as a foreign business. Do I understand you to say
14 you would have not been involved in the determination that
15 the employer was a foreign business?
16      A. Correct.
17      Q. How do you think that determination was made?
18      A. It wasn't made by me because I recollect that I
19 was surprised in that conversation with Richard to learn
20 that his employer was a foreign company. I mean, this is
21 about the foreign income exclusion.
22      Q. Okay. I understand. You recollect when Richard
23 talked to you and said the employer is foreign, that being
24 noteworthy to you. Is that what you're saying?

31 (Pages 118 to 121)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

122

1    A.  Yeah.
2    Q.  Why is it noteworthy?
3    A.  Well, it was in the same conversation where he
4    said, "My shipmates are chiding me for paying social
5    security taxes," and I asked him why.  He said, "I'm owned
6    by a foreign company."  If I'm not mistaken, I sent a
7    letter to him at that asking for data.
8    Q.  The ownership by a foreign company, though, would
9    have tripped a red flag in your mind, so to speak, of there
10   may be an issue here?
11   A.  No.  You know, it may be a factor, but I think
12   more is indication that his shipmates said that they
13   weren't subject to social security taxes.  So I needed to
14   check out the statute to see.
15   Q.  I understand.  What I'm getting at, though, is
16   when he mentioned this foreign business, you said you feel
17   certain you had no role in that determination because when
18   Richard mentioned that he was a foreign or -- owned by a
19   foreign business, that that was noteworthy in your mind.
20   And what I'm trying to get at is why it's noteworthy.  I
21   understand he said his shipmates don't pay taxes.  That's
22   noteworthy.  But was it also noteworthy that this is a
23   foreign entity?
24   A.  No.  I mean, I wouldn't have picked up any special

123

1    significance on that at the time.
2    Q.  Okay.  The fact that someone is employed --
3    someone is a ship captain and is employed by a foreign
4    entity wouldn't cause you to necessarily take any steps
5    different than you otherwise would?
6    A.  For purposes of this form, no.
7    Q.  Well, for purposes of preparing their income tax
8    return?
9    A.  I'm not sure that I would have -- you know, that
10   it rings any bells for me.  I -- I mean, it's very
11   difficult to answer that.  I know in the case at hand, it
12   didn't ring any bells until I looked at 3121 in the context
13   of how he presented it.  It has no context in the 2555.
14   Q.  This is Exhibit 32.
15       (Exhibit 32, Federal Statement,
16       marked for identification.)
17       MR. ROYSE:  It's the same return.  I
18   just, for some reason, copied the
19   attachment separately here.
20   Q.  (By Mr. Royse)  It still references Zapata Gulf
21   Marine Corporation, and this is being completed in 2002.
22   That is incorrect; is that right?
23   A.  I think we were using the word "inconsistent"
24   before.

124

1    Q.  We were and I'm using "incorrect" now.
2    A.  Yes.
3    Q.  Go to '02, tax year '02.  I'll hand you Exhibit
4    33.
5        (Exhibit 33, Application for
6        Extension, marked for identification.)
7    Q.  (By Mr. Royse)  And I'll kill two birds with one
8    stone and hand you Exhibit 34.
9        (Exhibit 34, Application for
10       Extension, marked for identification.)
11   Q.  (By Mr. Royse)  Mr. Birkholz, you have in front of
12   you applications for extension to file tax returns.
13   Exhibit 33 is a Kentucky form, Exhibit 34 a federal form.
14   Are these both forms that you submitted on behalf of the
15   Weylands?
16   A.  I believe so.
17   Q.  Is it your testimony that you had to be
18   specifically prompted by the Weylands to submit these
19   returns -- applications for extension or you wouldn't have
20   done so?
21   A.  That's my recollection.
22   Q.  Just a quick question, I notice the Kentucky form
23   requires a reason for a request.  Is there not an automatic
24   first extension on a Kentucky form?

125

1    A.  I don't know.
2    Q.  I'm going to go through a section of your file
3    that appears to be correspondence, and I say that because
4    I'm not going to represent to you that I've got these
5    organized by tax year.  I'm not sure they were organized by
6    tax year.
7    A.  Excuse me, just for clarification, can we go back
8    to 2002 --
9    Q.  Yes, sir.
10   A.  -- on these extensions?
11   Q.  Yep.
12   A.  And without the aid of my file, this is near the
13   period where I'm not preparing returns?
14   Q.  Okay.
15   A.  You have my files.  Did I prepare a 2002 return?
16   Q.  Let's see -- yes.
17   A.  Okay.
18       MR. GREEN:  The documents you're
19   talking about being correspondence, are
20   they like 40 and below numberwise?
21       MR. ROYSE:  I think.
22       MR. GREEN:  Yeah.  Okay.  I think
23   that they'll all be in a certain time
24   frame.

32 (Pages 122 to 125)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

**126**

1     MR. ROYSE: They probably are. I
2  just said that because I didn't confirm it.
3     MR. GREEN: There's no tax return for
4  that year but --
5     MR. ROYSE: I didn't want him to
6  think that I was tying it to a specific tax
7  year, because I didn't know it to be true.
8  But unlike you, Ron, I think they tend to
9  be from about the same time.
10  Q.  (By Mr. Royse) I'll hand you what we marked as
11  Exhibit 35.
12     (Exhibit 35, Letter, marked for
13     identification.)
14  Q.  (By Mr. Royse) This appears to be a letter from
15  you to Jennifer Weyland in August of 2003. Does that sound
16  correct?
17  A.  Yes.
18  Q.  This, I believe, is the letter that you referred
19  to earlier when you said that you sent them a document
20  asking for some more information about whether Section 3121
21  might exempt his income from social security tax; is that
22  right?
23  A.  Yes.
24  Q.  The letter begins, "Since learning of Richard's

**127**

1  status change"; to what does that refer?
2  A.  That he told -- that was that conversation I had
3  with him where he told me he was employed by a foreign
4  company.
5  Q.  And do you recall where --
6  A.  Excuse me, let me correct that. He's not employed
7  by a foreign company. You know, he told me that his
8  company was owned by a foreign company, that Tidex, in
9  fact, was a foreign company.
10  Q.  And do you recall whether he told you that on the
11  phone or in person?
12  A.  Telephone.
13  Q.  Do you recall what the context of the conversation
14  was to cause that to come up?
15  A.  Could you clarify that?
16  Q.  Mm-hmm. How did it come up, the conversation?
17  Did he call you to specifically tell you Tidex was a
18  foreign company or were you discussing --
19  A.  No. I think we had a short conversation, and it
20  started off by saying his shipmates are -- you know, think
21  he's stupid for paying social security taxes. And I said,
22  "Oh, Richard, why is that?" This is the best of my
23  recollection of the conversation. And he said, "Because
24  the company I work" -- "Because Tidex is a foreign

**128**

1  company." And I was surprised by that, because he had
2  previously told me that nothing was different, you know,
3  with Tidex; that everything was the same as it was with
4  Zapata. So that's the status I'm referring to.
5  Q.  So it's your testimony that that was the first
6  time you learned that Richard had a different status than
7  what you believed his status to be as a, I guess, a
8  self-employed person performing work for a non-U.S. entity;
9  is that --
10  A.  Well, I'm not even sure it's correct to say
11  self-employed person working for -- it's the first time
12  that there was even a suggestion that things weren't the
13  same as with Zapata. My -- you know, I -- the foreign
14  owned, you know, that.
15  Q.  Do you recall discussing this issue with Jennifer
16  Weyland around that time, around the time of this letter?
17  A.  I think Jennifer and I had a separate conversation
18  and may have been after that.
19  Q.  What do you recall about that conversation?
20  A.  Very little. I remember some discussion about,
21  you know, like what do we do here. And I said first thing
22  is to file an amended return and, you know, we'll go from
23  there.
24  Q.  How long was it that this letter followed after

**129**

1  your conversation with Richard where this issue was first
2  raised, if you know?
3  A.  I don't know for sure. I'd have to be guessing
4  here. Reasonably close.
5  Q.  I'll hand you Exhibit 36.
6     (Exhibit 36, Hand-written Notes,
7     marked for identification.)
8  Q.  (By Mr. Royse) Does this appear to be some of
9  your notes?
10  A.  Appears to be my writing, yes.
11  Q.  Can you tell what that date is?
12  A.  August 4, '04.
13  Q.  Do you recall what these notes were about? Do
14  they reflect a phone call or a meeting or --
15  A.  Not a meeting. I've never met Jeff Smith. It was
16  phone calls and e-mails.
17  Q.  Okay. So do you think this was your notes from a
18  phone call with Jeff Smith?
19  A.  I can't tell. It says, "39 minutes," so that
20  would suggest I had contact with him. So I -- since I
21  didn't meet him, it has to be a phone call.
22  Q.  It has written there, "Docking of vessels."
23  There's something below that that I can't read and then,
24  dash, "Angola." Can you read that first word?

33 (Pages 126 to 129)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

130

1    A.  Treaties maybe.
2    Q.  Does that suggest to you that you all were
3  discussing these very issues under the statute?
4    A.  It would suggest it, yes.
5    Q.  Do you recall that conversation, what -- how the
6  -- what the conversation was about, what was said?
7    A.  Well, I know what caused it.
8    Q.  Okay.  Go ahead.
9    A.  In, I believe, it was May of '04, the IRS, as we
10  thought, audited the amended return, the 1999 amended
11  return.  And I still, at that time, had not heard back from
12  Richard or Jennifer with the information I requested.  In
13  May they sent the letter to me.  I sent a power of attorney
14  to them and I filed it with the IRS to have a conversation
15  about it and I told the auditor -- I think it was Jennifer
16  Fyffe or something like that --
17    Q.  Cindy?
18    A.  Cindy Fyffe, excuse me.  Jennifer -- I'm still
19  trying to remember my secretary's last name.  I told her
20  that I didn't have all the facts and, you know, Richard was
21  going to be back in town and I'd get back to her.  In the
22  interim before completing that, Jeff Smith called me and
23  told me that the Weylands had hired him to handle this, and
24  we had some conversations about me not getting the data.

131

1        And he sent me some documentation, I believe is in
2  the 203 file, that, you know, related to this and said he
3  had interviewed them with regard to this information; and,
4  you know, I don't know if this was in that conversation or
5  not.  And then we talked about who was going to take over
6  the representation, and he said he'd take over the
7  representation and also the preparation of the individual
8  returns.
9    Q.  Down at the bottom it says, "Checked file 8/4/04.
10  Tax year 2000.  Has social security tax.  No record of
11  amended return filed."  What is that?
12    A.  Well, it appears to be, you know, a note that
13  there was no amended return for -- filed for 2000.  I'm
14  guessing on the same issue because that's my recollection.
15        (Exhibit 37, E-mail, marked for
16        identification.)
17    Q.  (By Mr. Royse)  And as with most e-mails, you have
18  to read this from the bottom up.  So take a minute there,
19  please.  And it appears to me that the lower e-mail on this
20  page from you to Mr. Birkholz or -- excuse me, from you to
21  Mr. Smith clearly follows up on the telephone conversation
22  you had of the same date, 8/4/04.  Does that look like a
23  fair interpretation to you?
24    A.  Yes.

132

1    Q.  You say to him, "Based on our conversation, you'll
2  contact the agent assigned to the refund of social security
3  taxes on Richard's exempt (we believe) income."  My
4  question is:  After your conversation with Mr. Smith,
5  did you harbor the belief that Richard's income was, in
6  fact, exempt from SE tax?
7    A.  No.
8    Q.  Why did you say that?
9    A.  I had no belief.  I still hadn't received all the
10  facts.
11    Q.  Well, is that statement incorrect then?
12    A.  Which statement?
13    Q.  "... taxes on Richard's exempt (we believe)
14  income."  I read that as --
15    A.  Oh, I see what you're saying.  I'm sorry.  Thank
16  you for clarifying.
17    Q.  Sure.
18    A.  I still hadn't -- you know, I was having the
19  conversation with him about it because he was going to take
20  over the representation, but I still had not received it.
21  I -- in the conversation, he says, oh, I have that
22  information and I've interviewed them.  So that's where I
23  left it.  I mean I wasn't privy -- I -- you know, to all
24  the documentation.

133

1    Q.  The top e-mail is from Jeff to you and it says, I
2  wasn't able to meet with Richard.  He's apparently out of
3  the country for work.  Wasn't able to attain affidavit or
4  POA, etc.  "I will write you an opinion letter over the
5  next few days explaining our position regarding the
6  exemption from social security tax and the facts that
7  Richard is willing to testify with -- testify to."
8        You indicated that in your conversation with Jeff,
9  you discussed who would take over the representation, and
10  he said he would and would take over the preparation of
11  returns.  My question is:  Why, after that conversation, is
12  he still talking about providing you with information with
13  respect to the exemption?
14    A.  Because Richard left town without signing the
15  power of attorney for him.  So he called me back and said
16  can you buy some time with the IRS, which I did.
17    Q.  I'll hand you Exhibit 38.
18        (Exhibit 38, Letter, marked for
19        identification.)
20    Q.  (By Mr. Royse)  This appears to be a document from
21  you to Cindy Fyffe, F-y-f-f-e, at the IRS in Lexington
22  explaining the situation and saying, "I have provided
23  backup documentation that you will need to allow the
24  exemption from social security tax."  Do you know what

34 (Pages 130 to 133)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

134

1  backup documentation you provided?
2      A.  I don't recall. I don't think there was anything
3  extensive.
4      Q.  The second paragraph, "You may need to look at
5  section 3121(b)(4) for the area that Mr. Smith will be
6  providing a more complete package of research. In the
7  interim, the enclosed material was provided to," I think
8  it's supposed to say, "me," "by the taxpayer to forward to
9  you." Do you recall, again, without talking about the
10  particular documents you provided, do you recall it being
11  provided to you by the Weylands?
12      A.  It was not. I think that's the few documents that
13  Jeff Smith provided that are in the 2003 file.
14      Q.  Exhibit 39.
15          (Exhibit 39, Letter, marked for
16          identification.)
17      Q.  (By Mr. Royse)  And I'm jumping back a day. The
18  conversation between you and Jeff was August 4th. You had
19  the e-mail exchange. August 5th was the letter to Cindy.
20  I'm now back to August 4th, a letter from Jeff to you. My
21  question is:  Is that information that's described there
22  the same information that Jeff was discussing with you on
23  the phone?
24      A.  No.  I don't think we got into it at this extent.

135

1      Q.  Okay. If the facts stated there are true, do you
2  have an opinion as to whether Richard would have been
3  entitled to an exemption from the SE tax so long as those
4  were true?
5      A.  No.
6      Q.  You don't have an opinion?
7      A.  I don't have an opinion.
8      Q.  Is there additional information you need beyond
9  what's stated there?
10      A.  I haven't really finished the --
11      Q.  Take your time, please.
12      A.  I haven't finished the research. I don't have the
13  statute in front of me. I don't have documentation behind
14  this. I couldn't make that call based on this. You're
15  asking me in a very difficult statute to say whether these
16  facts will fit it. You know, that was my problem. I never
17  got a chance to do that.
18      Q.  Well, your letter to Ms. Weyland that was Exhibit
19  35 was August 8th of 2003?
20      A.  Yes.
21      Q.  You certainly had an opportunity to review the
22  statute between August 2003 and August 2004. I'm trying to
23  understand what you mean you never had an opportunity?
24      A.  I never received any information from them, so I

136

1  never really looked at it further. If you'll notice down
2  at the bottom, the last paragraph, it says, "Based on your
3  response and my additional research, we can determine if
4  any social security tax can be refunded."
5      Q.  You're on your letter?
6      A.  I looked at the -- I'm just -- I just caught it
7  here on Exhibit 35, the last paragraph.
8      Q.  Yeah. I'm with you. My question, though, is on
9  this letter, you're saying that even this information
10  provided to you wouldn't have been enough. Assuming these
11  facts were true, this wouldn't have been enough to make a
12  determination?
13      A.  Maybe if I was more aware of 3121, but I haven't
14  looked at the statute for a while. So, I mean, this isn't
15  just a run of the mill statute that, you know, you look,
16  okay, yeah. Fine. It's a very, very difficult statute to
17  read.
18      Q.  Let's go to Exhibit 40.
19          (Exhibit 40, Letter, marked for
20          identification.)
21      Q.  (By Mr. Royse)  Do I correctly read that this
22  letter was intended to be a disengagement letter?
23      A.  Yes.
24      Q.  Number one, "Your 2003 Federal and State tax data

137

1  was never received by this office. We were not engaged to
2  prepare the return. If you have not filed the return it is
3  due." What normal step would the Weylands take each year
4  to engage you to prepare a return?
5      A.  They would call me, and we would talk about what
6  the approximate date is so we could make a reasonable
7  computation of the tax. Then we would file an extension.
8      Q.  Paragraph 3 about midway down says, "In a previous
9  conversation with your attorney, Jeff Smith, I was told to
10  wait for a memorandum and documentation supporting the
11  position that Social Security Taxes were not due in tax
12  years 1984 through present. I have received no such
13  writing but did receive a call from the IRS today
14  requesting information or the case be closed and the refund
15  of Social Security Taxes denied."
16          My question is:  This is a September 7th letter.
17  Did you not consider the August 4th letter to be responsive
18  to that?
19      A.  No.
20      Q.  Okay.
21      A.  I'm sorry.
22      Q.  Go ahead. Well, I think you answered --
23      A.  I didn't consider it responsive. I still don't
24  have the answer to the question.

35 (Pages 134 to 137)