Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

138

1    Q.  Okay.  So when it says, "I was told to wait for a
2    memorandum," you didn't believe this to be the memorandum,
3    meaning Exhibit 39?
4    A.  Correct.
5    Q.  Further down you say in paragraph 4, "Amended
6    returns for 2000 and 2001 have similar issues.  Due to no
7    response from my August 28, 2003 request for information, I
8    was unable to file a timely amended return for 2000 and the
9    Statute of Limitation has tolled.  A similar fate will
10   befall Tax Year 2001."  First, let me clarify something.
11   When you say, "the Statute of Limitation has tolled, I
12   think you mean something different than three lawyers would
13   mean.  You mean has expired?
14   A.  Yes.
15   Q.  Okay.  Just for clarification, I'm going to say
16   expired.  When it was almost time for the '99 amended
17   return statute of limitations to expire, you filed that
18   document as a protective return, you indicated.  That was
19   October of '03.  My question is:  Why, based on the same
20   information that allowed you to file that protective
21   return, you could not file protective returns for 2000 and
22   2001 prior to the statute expiring?
23   A.  That's a good question.  Because my belief was
24   that if the first amended return created a preparer penalty

---

139

1    for filing something that was said to be true without all
2    the facts, which it didn't -- I mean I didn't have all the
3    facts, didn't know if they qualified for an exemption --
4    and could have been subject to a preparer penalty, that's
5    just a dollar fine.  The second occurrence, it's my belief
6    that, then, you get referred to the director of practice
7    and you can lose your license to practice.
8        So I insisted in that letter that I sent -- I'm
9    not sure what the date was here -- August, that I get the
10   information.
11   Q.  Okay.  That was August of '03 that you sent that
12   letter to the Weylands with the memo or the notes to file,
13   I think you called them, technical notes to file.  That was
14   August of '03?
15   A.  Yes.  Yes, Exhibit 35.
16   Q.  Right.
17   A.  August '03.
18   Q.  Two months after this letter, October 10th of
19   2003, you filed the amended return for '99, right?
20   A.  Yes.
21   Q.  You had not --
22   A.  I believe that's the case.  I'd have to check the
23   file but --
24   Q.  You can take my word for it.  If I'm wrong, I'll

---

140

1    eat that one.  It was October 10th of 2003 that you filed
2    the amended return.  That was two months after this letter.
3    At that point, you had not received the information.  We're
4    in agreement?
5    A.  Yes.
6    Q.  Between that time and September 7th of -- excuse
7    me, August 4th of '04, did you have any correspondence with
8    the Weylands at all about that information, the status of
9    that information, filing amended returns, not being
10   comfortable with filing additional amended returns?
11   A.  Not to my recollection.
12   Q.  The last page says -- second page says, "I will
13   always appreciate our relationship but it is time for me to
14   withdraw from representing you in the future.  Once I'm
15   finished with the '99 return, my engagement will be
16   completed."  What did you mean in terms of being finished
17   with the '99 return?
18   A.  The '99 amended return that was before the
19   Internal Revenue Service.
20   Q.  The audit of that return?
21   A.  Yes.
22   Q.  When you say, "Once I am finished with it," did
23   you expect to continue to see that through till it
24   conclusion?

---

141

1    A.  No.  I knew from talking to Attorney Smith that he
2    was going to take it over.
3    Q.  Then why didn't you say -- I'm not trying to
4    wordsmith but I'm trying to get a substantive distinction
5    here.  If that was your understanding, it seems you would
6    have said, I understand Mr. Smith is handling the '99
7    return.  Therefore, my engagement is completed.  Instead,
8    you say, "Once I am finished with the '99 return, my
9    engagement will be completed"?
10   A.  You are wordsmithing.  That was -- I mean I -- I
11   had -- I think I had promised the internal revenue agent
12   that I would give her my notes, you know, and I think I
13   provided before that and Jeff Smith said, you know, I may
14   need you for something.  That's what I was trying to refer
15   to there.
16   Q.  Okay.  In any event, it's your testimony that your
17   language here in this letter of September 7, 2004 was not
18   intended to tell the Weylands that you would see them
19   through the audit.  It was simply to say, I'm here if I
20   need to provide some stuff.  Other than that, I'm finished?
21   A.  Yes.
22   Q.  Exhibit 41.
23       (Exhibit 41, E-mail String, marked
24       for identification.)

---

36 (Pages 138 to 141)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

142

1    Q.  (By Mr. Royse)  And you can read all of this if
2    you want to, but let me tell you what I'm going to ask you
3    about and that's the first three pages starting with the
4    third page backwards is the chronological order.
5    Everything beyond that is surplusage or just stuff that's
6    copied in the first three pages.  So try and save you some
7    time.  Have you had a chance to look over those couple of
8    pages?
9    A.  I'm not finished.
10   Q.  Please take your time.
11   A.  Okay.  I'm finished.
12   Q.  All right.  Let's go to the last page of what I'm
13   talking about, the first three pages, this is PB0008, and
14   this appears to be an e-mail from you to Jeff Smith on
15   September 7th of '04 that says, "Enclosed please find a
16   copy of a letter sent today to the Weylands.
17   Unfortunately, the IRS has imposed a deadline.  I'm doing
18   what I can without the value of facts.  Appreciate any help
19   you can provide."
20       Is that the September 7 letter that we were just
21   reading, Exhibit 40, that he referred to there?
22   A.  Say that again.  I'm lost.
23   Q.  Sure.  If you look at -- if you look at the date
24   on that e-mail, it's September 7th of 2004.  It starts by

143

1    saying, "Enclosed please find a copy of a letter sent today
2    to the Weylands."  If you look at that September 7, 2004
3    letter, flip over to the second page, it says, "CC Jeff
4    Smith."  My only question is do I have the right letter
5    here that you're referring?
6    A.  No, I don't think so.  Give me a second.
7    Q.  Sure.
8    A.  I think I was referring there to the August 8,
9    2003 letter, which is Exhibit 35.
10   Q.  But why would you have said, "Enclosed please find
11   a copy of a letter sent today"?
12   A.  Well, good point.  I am lost here.
13   Q.  Well, take your time.  I'm not -- it's not a trick
14   question.  I'm just trying to make sure I've got the right
15   paired up.
16   A.  That probably has to be it then in September.
17   Thank you for pointing that out.
18   Q.  So we've got you sending this to Jeff saying the
19   IRS has imposed a deadline.  I'm doing what I can without
20   the value of facts.  Appreciate any help you can provide.
21   He, then, the following day at about five, six o'clock in
22   the afternoon sends an e-mail to you.  He says, "I had sent
23   you a letter in August of 2004 providing a legal opinion to
24   be provided to the IRS.  Richard will be coming in tomorrow

144

1    to sign an affidavit regarding the representations in the
2    letter.  Did you not receive this letter?  Please send all
3    files regarding the filing of tax returns to my office so
4    that the Weylands do not lose their rights to receive
5    refunds for their social security taxes.  Also, I will
6    receive a POA from the Weylands tomorrow to deal with the
7    IRS agent here in Lexington."
8        You respond the following morning, "Jeff, I did
9    not receive any letter.  I need the Weylands to remove me
10   from this engagement.  Don't know what you mean by send
11   files."  What I'm trying to figure out is that letter of
12   August 4th that he sent to you, I mean that came from your
13   files.  He seems to be referring to that in his e-mail, "I
14   sent you a letter in August of '04 providing a legal
15   opinion to be provided to the IRS."
16       Do you know why you would have said to him, "I did
17   not receive any letter"?
18   A.  You know, you're -- it's hard to kind of bring
19   myself back here, but I didn't really think that this was
20   the letter that we discussed on the phone.  On the phone it
21   talked about, you know, the logic behind, you know, why,
22   not just definitive statements they do, they do, but
23   explanation, etc.  That's what I was expecting.
24   Q.  "I need the Weylands to remove me from this

145

1    engagement.  Don't know what you mean by send files.  My
2    files have a copy of the tax return but so do the Weylands.
3    The issue is the same on all returns.  If you need anything
4    from me, be more specific.  I'm here to help if you wish."
5    Do I sense there that you didn't understand what he meant
6    when he said send the Weylands' files?
7    A.  It may have been.  You know, I think that he
8    thought that they had given me some documentation, but I --
9    I never got it.  I tried -- I know I talked to him about
10   that on the phone.
11   Q.  The following day he writes to you, "Who is going
12   to represent them in the audit that currently is being
13   performed?"  And that was about one in the afternoon.  And
14   at about 2:30 in the afternoon, you say, "I am in the
15   middle of representing the Weylands and have advised the
16   auditor that you are going to send memo and documentation.
17   If you are taking over, contact the POA.  It is not my call
18   but the Weylands.  Got letter from Richard and Jennifer by
19   express mail today asking if we filed an extension.  We
20   file extensions for clients that provide data such as
21   income and payments.  An extension is not effective if a
22   reasonable attempt is not made to ascertain tax liability.
23   Therefore, having received no information, we did not file
24   an extension.  Please talk to Richard and Jennifer."

37 (Pages 142 to 145)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

146

1      My question there is: He asked a question, "Who
2  is going to represent them in the audit that's currently
3  being performed"; I'm not sure if your e-mail answers that
4  but you begin by saying, "I'm in the middle of representing
5  them. If you're taking over, contact the POA. It's not my
6  call but the Weylands." Were you disengaged at this point
7  or were you going to represent them in the audit currently
8  being performed?
9      A.  You know, it's really tough on the chronology here
10  and I wish I could help you. Maybe you can help me by
11  looking at the e-mails. But in effect, I had a
12  conversation with Jeff and he's the one that suggested it
13  might be more convenient. Then we started getting e-mails
14  going back and forth and letters; and this is just a
15  recollection, I was a little surprised on his comment about
16  the representation because I thought he was the one that
17  suggested it.
18      That's why if you look up further about who
19  abandoning who, he mentioned in a phone call that Jennifer
20  and Richard had felt abandoned and, you know, I would – I
21  would have gone through here except for the fact that, you
22  know, I believed that he had volunteered and said it made
23  more sense, and I agreed with him. You know, they're
24  local. He's local with them. And September 7th, you know,

---

147

1  I, in effect, figured that I was just wrapping up
2  everything.
3      The September 7th letter, that – that stands. I
4  don't – the e-mails, beyond that may have gotten into that
5  confusion with – I'll have to look at the chronology here
6  but Richard not signing the POA, and I had to hold the
7  stopgap in between. And I think when Jeff first talked to
8  me, the IRS called in the middle of that and said, you
9  know, I got to put a deadline on this. Because, remember,
10  this happened in May on their records, I think, when they
11  first contacted, and we're in August.
12      Q.  Let me interject here Exhibit 42.
13          (Exhibit 42, Correspondence, marked
14      for identification.)
15      Q.  (By Mr. Royse) This is a September 9, 2004 piece
16  of correspondence from the Weylands in response to your
17  September 7 letter. It says, "Dear Peter, we've received
18  your letter of September 7, 2004 and have a question. In
19  the past, you," and this is, by the way, a – I'm not sure
20  this is from your file because it doesn't have a "PB" on
21  it. The copy that I grabbed last night is mine.
22      It says, "We have received your letter of
23  September 7, 2004 and have a question. In the past you
24  filed an extension for us with the IRS. We need to know as

---

148

1  soon as possible if this was done for 2003." Is that what
2  you were referring to there in the 9 or – September 10
3  e-mail that says, "Got letter from Richard and Jennifer by
4  express mail today asking if we filed an extension"?
5      A.  I believe so.
6      Q.  Okay. They say, "In the past you filed an
7  extension for us with the IRS. We need to know if this was
8  done for 2003." Again, just so we're clear, it's been your
9  testimony that you all only filed an extension if they
10  asked you to, and therefore I would assume you would take
11  the position they didn't ask you to in 2003?
12      A.  Yes.
13      Q.  Excuse me, in 2004 for tax year '03?
14      A.  Yes.
15      Q.  September 14th is the next e-mail of the chain.
16  It says – this is from Jeff Smith to you – "The Weylands
17  were under the impression that you were disengaging them.
18  Thus, they were feeling abandoned and needed someone to
19  take over in the meantime. They have signed a POA and I
20  have a meeting set up on Thursday with Cindy Fyffe at my
21  office. Because I have no information regarding your
22  audit, please send me everything you have necessary to
23  assist them with the audit and amended returns.
24      "Further, please provide me with written

---

149

1  procedural history and factual history of what you have
2  been doing regarding the Weylands so that I can attempt to
3  clean up any messes with the IRS. They are attempting in
4  every way to mitigate their damages."
5      Did you interpret this as, again, a request for
6  whatever you had in your files on this issue or how did you
7  – what did you – how did you interpret this?
8      A.  I don't recall.
9      Q.  Well, let's look at your e-mail about 40 minutes
10  later, September 14, '04. "The Weylands held my letter for
11  a year without responding, and they still have not
12  responded to the fact request. They contacted you, then
13  contacted – then you contacted me. Who abandoned whom?
14  If you're taking over the audit by meeting with Cindy, I
15  don't want to get in the way. I would not be able to
16  handle this as efficiently as you as I am here and you are
17  in driving distance to the IRS.
18      "You can ask the Weylands for a copy of my letter
19  and copies of returns. This is the only issue I'm aware of
20  on the returns. Please note, they never sent me tax data,
21  so we do not – we have not prepared a 2000 return or 2004
22  extensions. Ready, willing, and able to help but have not
23  had any word from the Weylands."
24      Now, you said a minute ago that it was Jeff Smith

38 (Pages 146 to 149)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

150

1   who suggested that it would be easier for him to handle the
2   audit in Lexington. I seem to take it here that you're
3   suggesting that?
4       A.  Well, we had a conversation and, you know, some of
5   this is him coming back and putting a different spin on it
6   but, you know, it's going in the right direction. We – I
7   attempted to disengage on September 7th. I'm not going to
8   leave them high or dry. I'm going to do everything I can
9   to help and that's what I told Jeff, and I told him in the
10  conversations we had before that there wasn't
11  documentation.
12      I never got an answer to the letter I referred to
13  before, which is back in August. You know, I mean still I
14  get the e-mails, etc. And this one about abandonment, I
15  remember being a little annoyed with him because we talked
16  about that in one of our phone conversations before, and he
17  suggested that he take it over. And then he's acting here
18  like it – but I'm going to let it go. It's no big deal.
19      Q.  He said, "Please send me everything you have
20  necessary to assist them with the audit and amended
21  returns. Further, please provide me with a written
22  procedural history and factual history of what you've been
23  doing regarding the Weylands so I can attempt to clean up
24  any messes." Did you ever send him either of those?

---

151

1       A.  I'm not sure what he was asking for and whether I
2   talked to him. I'd have to, if the phone records are
3   around, see if there's a conversation there.
4       Q.  He says, "Further, please provide me with a
5   written procedural history and a factual history of what
6   you have been doing. Do you recall ever providing him with
7   a written –
8       A.  No. I don't think – I probably wouldn't have
9   written. I think this is at – I mean you can look in my
10  files. I gave you everything that I have.
11      Q.  Okay. Your e-mail seems to be responsive to this.
12  It says, "You can ask the Weylands for a copy of my letter
13  and copies of returns. This is the only issue I'm aware of
14  on the returns." It seems to me that you're saying there,
15  I don't have any files to give you. They've got everything
16  I've got, so get it from them. I mean is that a
17  misinterpretation of what's being said there?
18      A.  No. You know, they have – we provide them with a
19  copy of the return.
20      Q.  If a client of yours – a taxpayer client of yours
21  has an issue that arises in connection with an IRS audit or
22  a handling of an issue at tax preparation, is it offensive
23  at all to you for that person to obtain a second opinion?
24      A.  Not at all.

---

152

1       Q.  Do some of your clients do that from time to time?
2       A.  I don't know because I – you know, I haven't
3   talked to them about that issue.
4       Q.  You would agree with me, would you not, that if
5   the Weylands used Jeff Smith to take a second look at this
6   issue, that would not be any breach of any kind of
7   professional or personal duty to you, would it? I mean it
8   wouldn't bother you at all?
9       A.  Not at all.
10      Q.  I'll hand you 43.
11          (Exhibit 43, Letter, marked for
12          identification.)
13      Q.  (By Mr. Royse) This appears to be an October 29,
14  1997 letter from Jennifer Weyland to you. It says, "Dear
15  Peter," and goes through some preliminary statements,
16  "Also, a potential employer told Rich that they don't pay
17  social security and that if Rich has worked 40 quarters, he
18  is totally vested and doesn't have to pay anymore. Is this
19  true?" Do you recall seeing this letter?
20      A.  Yes.
21      Q.  What do you recall your response to this letter
22  being?
23      A.  I don't really recall that much of the response.
24  I can tell you what my reaction is just looking to it –

---

153

1   looking at it, that the 40 quarters, you know, once you
2   attain that, that doesn't necessarily qualify and then you
3   can go someplace else. Social security is based on your
4   entire earning history.
5       Q.  Do you recall responding to Jennifer Weyland about
6   this letter?
7       A.  I think we talked on the phone.
8       Q.  What do you recall about that conversation?
9       A.  I responded to the questions. It's –
10      Q.  What did you say about, "A potential employer told
11  Rich they don't pay social security"?
12      A.  I don't recall.
13      Q.  Do you recall answering any of this letter in
14  writing at all?
15      A.  No.
16      Q.  If you did, it would be in your files, I presume?
17      A.  Yes.
18          MR. ROYSE: Off the record.
19          (A brief recess was taken.)
20          MR. ROYSE: Back on the record,
21      please.
22      Q.  (By Mr. Royse) Without marking it, I'm going to
23  hand you a copy of your interrogatory answers, which I'm
24  not going to burden the file with because they're already a

---

39 (Pages 150 to 153)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

154

1    part of the record. Do I understand that these answers to
2    interrogatories and responses to requests for admission and
3    production of documents were signed by you, Mr. Birkholz?
4        A. Yes.
5        Q. And they were signed -- I understand these were
6    probably prepared with the assistance of one or more of
7    your counsel and let me begin by saying I don't want to ask
8    anything your counsel said to you or vice versa in
9    connection with the preparation. So I don't think I'll ask
10   anything like that. But if you think I call for it, you
11   need to consult with Mr. Green before answering.
12           Interrogatory Number 2, your attorney has
13   interposed an objection there because I use the phrase "who
14   was responsible for rendering tax advice and preparing
15   federal and/or state income tax returns." And he
16   interposes an objection that qualifies your answer because
17   he says, "To the extent that the question implies defense
18   undertook anything other than the preparation of tax
19   returns," and you all weren't ever engaged to do such a
20   thing, tax planning or other services.
21           Long way of saying were you not in the business of
22   providing tax advice to the Weylands?
23       A. What do you mean by tax advice? I mean it's such
24   a broad term. I --

155

1            MR. GREEN: Normally I don't talk
2        about my objections in a depo but just
3        because we're -- I mean all I'm saying
4        there is the word "tax advice" can be very
5        broad and could imply undertaking, like,
6        estate planning or anything like that or
7        even tax shelters. And so all I did was I
8        just wanted to make it clear that we
9        weren't admitting him as a broader
10       engagement.
11           MR. ROYSE: I'll skip that because
12       that clarifies it.
13       Q. (By Mr. Royse) I wanted to make sure that you
14   didn't have some very narrow construction of tax
15   preparation that basically just said all you were engaged
16   to do was fill in blanks, and I think I understand that you
17   were engaged to do more than just fill in blanks?
18       A. Anything that it took to get a true and correct
19   return, yes.
20       Q. We've talked about who did the work on the
21   returns. Interrogatory Number 5 asks for "Any contracts,
22   agreements, or other documents in your possession that
23   address the terms of your engagement with the Weylands."
24   And you all responded by providing blank copies of

156

1    materials, and I think what you gave me was kind of a John
2    Doe letter that -- it's the blank form that you would
3    normally send to people.
4            And my question is, first, do you have any
5    specific engagement letter like this with the Weylands?
6        A. Such as the John Doe blank which I'm going to
7    refer to as the cover letters and the organization in the
8    tax organizer?
9        Q. Yes, sir.
10       A. Never received that information to my knowledge.
11   I don't think there's anything in my file. My
12   recollection --
13           MR. GREEN: No. He's wanting to know
14       if you've got a copy of this as it might
15       have been sent specifically to the
16       Weylands.
17           THE WITNESS: No. It's a blanket --
18       you know, the software spits these out with
19       name and address. It goes out to
20       everybody. Even -- it even goes out to
21       people that are no longer clients, because
22       we're just giving the data to them.
23       Q. (By Mr. Royse) Now, the organizer that you send
24   out, are you saying that you never got a completed

157

1    organizer back from the Weylands?
2        A. No. I think I only got a spreadsheet. I don't
3    think they ever filled out the organizer itself.
4        Q. If they did, it would be in your file, I presume?
5        A. Yes.
6        Q. I asked you in Interrogatory 6 about insurance and
7    I'll stop at that. It's what we discussed earlier. I'm
8    going to hand you -- again, without making it a piece of
9    the record -- exhibit -- the first part of Exhibit C to
10   your interrogatories, interrogatory responses, and this is
11   what we usually call a dec. page, a declarations page for
12   an insurance policy, and it appears to be with New York
13   Marine issued on February 16, 2005.
14           Just so I make sure I understand, your former
15   insurance was with New York Marine. Your present insurance
16   is with Philadelphia. Am I right about that?
17       A. Yes.
18       Q. But at least during 2005, from what I can see on
19   the face of this policy, as of February 16, 2005, the
20   insurance was placed with New York Marine; is that right?
21   If you don't know, say so.
22       A. I really don't know. Insurance is not...
23       Q. I'll take it up with these gentleman. We'll work
24   that out.

40 (Pages 154 to 157)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

158

1    A.  Please do.
2    Q.  The second page of that dec. page is an
3  endorsement. It's got an excluded claims endorsement. It
4  excludes a claim for New England Veterinary Specialists
5  from either January of '96 or January of '98. Do you know
6  what that is about?
7    A.  No, I don't.
8    Q.  Do you recall any such claim by New England
9  Veterinary Specialists?
10   A.  I don't think a claim was made. This is my
11 brother's client. I really don't know anything about what
12 the issue is or I don't recall it. I'm sure he mentioned
13 it to me at one point.
14   Q.  You know what, in the interest of time and
15 courtesy to you and your lawyers, I think I'm just going to
16 take some of this up informally through written deposition
17 questions, if I need to, about some of this other insurance
18 stuff. Is that fair?
19       MR. GREEN: Actually, I don't want to
20    speak for him but I think that Dick would
21    probably talk with you about it any time
22    you want to.
23       MR. ROYSE: Appreciate it.
24       MR. GREEN: Let you know what the

159

1    status is and whatnot.
2    Q.  (By Mr. Royse) Interrogatory Number 7 has to do
3  with the defense that was asserted in the answer that was
4  filed in the case by you where the allegation was made that
5  the Weylands and their agents were guilty of negligence.
6  And what I ask in that interrogatory was tell me how it is
7  that the Weylands were negligent, and your lawyers and your
8  response qualifies the answer and says discovery is ongoing
9  and so forth. It says, "The plaintiffs failed to provide
10 timely and complete information as requested." Let's stop
11 right there.
12      Is that what you've been talking about earlier
13 today in their failures to get you information as you
14 requested it or is there something we haven't talked about
15 today that you're describing there?
16   A.  No. That's correct.
17   Q.  And with respect to changes in his employment,
18 "The defendants were given what may have turned out to be
19 misleading or false information. What that means is that
20 with respect to changes in Richard's employment, you and
21 Birkholz & Company were given what may have turned out to
22 be misleading or false information. Do you know what that
23 refers to, what you may have been provided that was
24 misleading or false?

160

1    A.  Yes.
2    Q.  Please.
3    A.  I mentioned it to you earlier. In the early days,
4  we used to get documents from them and one of those
5  documents was a 1099 and 1099s specifically put you on
6  notice that you're dealing with a self-employed individual
7  and it's not an issue on, you know, self-employment tax per
8  se. Because of that conversation I had with Richard, and
9  I'm lost on my chronology here but, you know, long before
10 the conversation -- I know, the conversation when Tidex
11 took over Zapata and he told me that nothing had changed,
12 you know, with regard to his employment. I'm -- at that
13 point, you know, we talked a little bit about it. I -- you
14 know, I'm thinking he's still getting a 1099 and it's the
15 same as it was with Zapata Marine, everything there.
16      So I had no inkling, you know, until the
17 conversation in 2002 that we're not dealing with, you know,
18 him reporting to a -- I'm going to say American employer.
19 This is, you know, gratuitous there but that he -- that he
20 was not a 1099 person.
21   Q.  Let me ask you about that early discussion when
22 you said that he indicated that Tidewater or Tidex or
23 whomever had taken over Zapata but nothing had changed.
24 Did you still continue to seek 1099s every year after that?

161

1    A.  You have my file. I mean once I started to --
2  once he got his computer and started preparing
3  spreadsheets, I didn't even get 1099s for bank interest. I
4  got nothing but a spreadsheet.
5    Q.  Okay. So the fact that you no longer got 1099s
6  did not indicate to you anything about the change of his
7  employment or self-employed status?
8    A.  No. I mean he told me -- he said, "Everything is
9  the same." I asked the question. He said, "Everything is
10 the same."
11   Q.  You asked what question?
12   A.  I asked has anything changed in terms of the
13 status. He said, no. No. No. I still -- I think he said
14 he was going out of Houston. I'm not sure. He still
15 reported to Houston, you know, everything -- everything is
16 exactly the same.
17   Q.  Okay.
18   A.  My status has not changed.
19   Q.  It says -- the continuation of this answer here
20 says, "Further, they or their agent apparently made
21 unreasonable assumptions concerning the filing of an
22 extension and/or amended return at a time they knew they
23 had not requested same or furnished information on which to
24 base same." Are you talking about their -- that it was

41 (Pages 158 to 161)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

162

1 unreasonable for the Weylands to assume you would file an
2 extension for them if they hadn't requested it or furnished
3 you information to do so?
4    A.  Yes.
5    Q.  And are you saying that it would have been
6 unreasonable for the Weylands to have assumed that you
7 would file an amended return if they hadn't provided --
8 requested you to do so and provided you information?
9    A.  Yes.
10    Q.  Interrogatory Number 12 asks about any complaints,
11 claims, actions. Your attorney has imposed or interposed
12 an objection there for relevance but then answers, "There
13 have been no complaints similar to the actions set forth
14 herein." And I just want to make sure I fully understand,
15 have there been no complaints of any type with respect to
16 your service as a tax preparer or --
17        MR. GREEN:  At the very beginning, he
18    mentioned one that --
19        MR. ROYSE:  Yeah.
20        MR. GREEN:  -- was not similar to
21    this.
22        THE WITNESS:  But that was more --
23    that wasn't really for tax.
24        MR. ROYSE:  Right.

163

1        MR. GREEN:  Right. That's what I --
2    Q.  (By Mr. Royse)  That was more business?
3    A.  Yeah.
4    Q.  Is there anything else out there?
5    A.  I once was summoned to the small claims court by a
6 client who said that I advised her to not pay estimated
7 taxes, but I never met the woman until after the year was
8 over, February.
9    Q.  When was that roughly?
10    A.  I don't know.
11    Q.  Year ago? Five years ago? Ten years ago?
12    A.  No. No. No. It was a long time ago.
13    Q.  Anything else like that?
14    A.  No.
15    Q.  Request for Production of Document Number 5, I
16 asked for all versions of resumes, marketing materials,
17 anything else that described the education, training,
18 qualifications, etc., of you and your company. Do you all
19 not have any kind of marketing materials, brochures,
20 anything like that?
21    A.  For clients etc., no.
22    Q.  Nothing in the way of -- and I don't mean an
23 advertisement in the newspaper, I don't guess. Do you do
24 any advertising like that?

164

1    A.  Occasionally I get a call from the police
2 association that says, you know, we've got a calendar.
3 Will you give a contribution. I think it more as giving a
4 contribution. If you consider that marketing and
5 advertising, yes, but we do not market and advertise.
6    Q.  No website?
7    A.  No.
8        MR. GREEN:  Since we're about there,
9    at the risk of messing up your nice time
10    frame, mentioned in here that we were --
11    you had requested some additional records.
12        MR. ROYSE:  All right. We can deal
13    with that.
14    Q.  (By Mr. Royse)  Request for Admission Number 5
15 says, "Admit you have no facts to dispute that Richard
16 Weyland has not worked for an American employer between '85
17 and '04," and the answer says, "The defendants cannot --
18 the defendants can neither admit nor deny because the
19 nature of his employment is not known following his
20 employment by Zapata, and Mr. Weyland told Mr. Birkholz two
21 (years after the fact) that while his employer changed,
22 nothing had changed substantively."
23    I'm curious about the two years after the fact
24 because I think you said that earlier. Mr. Weyland told

165

1 Mr. Birkholz two years after the fact of what?
2    A.  Two years after the fact -- I'm not really that
3 clear. I think we went back to the returns and looked at
4 the 2555. The first time that a name different than Zapata
5 appears on the 2555, Richard, in a conversation, says, you
6 know, the company changed and I -- this is out of
7 recollection -- the company was taken over two years ago
8 and that's when we had this conversation about nothing's
9 changed.
10    Q.  So you think that that was -- that you had -- you
11 were looking at the returns with Richard and he said, wait
12 a second. That's changed?
13    A.  I don't know what you mean by looking at the
14 returns with Richard. Richard, I believe, called me, maybe
15 because we -- he really, in effect, prepared the 2555s.
16 He'd give me all the data for it just typed in. I'm
17 thinking that he called back with data, maybe it was a
18 separate conversation, I don't know, but he -- it was more
19 like a correction. Pete, you know, Zapata is not the name
20 anymore, etc.
21    Q.  You think, though, that -- I'm just trying to get
22 clear on two years after the fact, what that means. You're
23 saying that's two years after the company changed from one
24 to the other?

42 (Pages 162 to 165)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

166

1    A.  I don't have facts when it changed, so it's a
2   guess. I — that is my recollection of the conversation.
3       Q.  Okay.
4       A.  I think he said, you know, you've been carrying
5   this for a couple years, and a couple to me means two.
6       Q.  I had requested phone records and I got some and
7   then your counsel has just provided me with some more.
8       A.  Jennifer Levine.
9       Q.  Did it without leaving, good for you.
10          MR. GREEN:  That will be years before
11      you forget her name again.
12      Q.  (By Mr. Royse) I'll be honest with you, I've
13  looked through the records that you gave me and have
14  identified some phone calls that I think I can tell who the
15  numbers are on each of them, and I'm not inclined to spend
16  a lot of time going through here and asking about them
17  because you were going to have to provide me with others
18  and it looks like Ron has just provided me with at least
19  some of those and I don't want to do a spotty job of trying
20  to piece them together.
21          I think what I'll do is to the extent I can't
22  figure something out, I believe I'll just do it in writing.
23  The phone number that ends in four digits is your cell; is
24  that right?  I mean ends in the four digits 1611 is your

167

1   cell?
2       A.  Yes.
3       Q.  And the one that ends in 6052 is your office?
4       A.  Yes.
5       Q.  Is 6242 an office extension or is that a fax?
6       A.  I can't tell.  There's a rotary so --
7       Q.  Fine.
8       A.  I'm going to guess that's not a fax because I
9   think there's a four line rotor and the fourth one is the
10  fax, but I don't know.
11      Q.  Call to IRS Innocent Spouse Program in Covington,
12  totally unrelated I presume?
13      A.  I don't know what you're talking about.
14      Q.  One of your call records -- I can show it to you,
15  if you want me to -- there's an October 24, '02 call at
16  4:12 p.m. three minutes to the IRS Innocent Spouse Program
17  in Covington.  I can't think of an innocent spouse issue in
18  this case, but you have very few calls to 859 so that one
19  popped up and I was just curious --
20      A.  That was probably on a different case.
21      Q.  You don't have any specific recollection of that
22  being related to this case?
23      A.  It's not related.
24      Q.  Good enough.  Do you -- would you have had any

168

1   occasion to deal with the IRS in Lexington, as far as you
2   can recall, on any matter other than the Weylands?
3       A.  I can't recall.  You know, the IRS -- when you
4   call the IRS, you could be calling Lexington, Kentucky.
5   You could be calling Texas.  They have a rotor that just
6   brings you to wherever you go.  So I can't answer that.
7       Q.  Let me see if I can tack it down this way.  Have
8   you handled any matters in recent memory for clients in
9   Kentucky other than the Weylands?
10      A.  Matters in Kentucky -- I have no Kentucky clients
11  other than the Weylands.  If there was a call to the IRS in
12  Kentucky, it might be because that's where the department
13  that handled that -- the matter that I was doing, but I
14  don't have any other clients, to my knowledge, in Kentucky.
15      Q.  All right.  I noticed in going through the
16  Weylands' files that they seem to have a lot of issues with
17  either overpayments or underpayments to the IRS and that
18  kind of thing, and it looked like most of them eventually
19  got worked out.  Do you attribute those problems to -- and
20  I'm being general by design but they seem to have a lot of
21  interaction with the IRS.  Do you attribute those to
22  something that the Weylands did in particular or did they
23  just have bad luck in terms of the IRS making errors from
24  time to time or what -- do you have a feel -- seemed to me

169

1   they had more than normal interaction with the IRS.  Would
2   you agree with that statement?
3       A.  Yes.
4       Q.  Do you have any feeling as to why they had that
5   level of interaction?
6       A.  My recollection is that most of those are
7   attributable to timing issues of the Weylands, you know,
8   late payment of estimates, multiple payments that cross
9   years, which really gets the IRS confused, multiple
10  estimates.  You know, most clients would pay one estimate.
11  They tended to pay a little bit, you know, multiple
12  payments for the same quarter and that -- it's just
13  difficult for the IRS system to handle that.
14      Q.  Did you ever give any direction to the Weylands to
15  change the way they made those payments?
16      A.  I don't recall.
17      Q.  Do you recall ever having a conversation with
18  Jennifer about there being a mistake with respect to the SE
19  tax and telling her that it didn't matter in the long run
20  because they would get the money back eventually anyway?
21      A.  No.
22      Q.  So you don't recall ever indicating to her that if
23  there was an error, it would ultimately be a wash, so to
24  speak, because it's social security and it would be paid

43 (Pages 166 to 169)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

170

1   back to them. You didn't say anything to that effect?
2      A.  I don't recall a conversation.
3      Q.  Am I correct that you did not file amended returns
4   for '00 or '01?
5      A.  Correct.
6      Q.  Do you know if those got filed by anyone?
7      A.  I don't. I assumed, from my conversation with
8   Jeff, that he was going to do that once he got all the
9   information.
10          MR. ROYSE:  Ron, if you can give us
11       just two minutes by ourselves outside, I
12       think I can be finished.
13          (A brief recess was taken.)
14     Q.  (By Mr. Royse) Mr. Birkholz, without getting into
15  all the language of the statute, I seem to recall that, at
16  some point in your discussions with the Weylands or
17  Mr. Smith or someone, that there was an issue about where a
18  ship -- whether a ship that the taxpayer is on touches a
19  U.S. port, and my understanding of the pertinent provision
20  of the reg. is to mean that does it touch a port -- a U.S.
21  port while the taxpayer is on it.
22       I seem to recall that you may have drawn a
23  distinction with Jeff or the Weylands that you had some
24  question about whether it could mean whether the ship ever

---

171

1   touches a U.S. port, either before or after the -- I guess
2   before the taxpayer has been on it. Are you -- does that
3   issue at all sound familiar to you?
4      A.  Well, I know that in the statute, and the
5   regulations are just a recap of the statute, it's -- it is
6   not clear.
7      Q.  Okay. So you think, at least in your mind, there
8   is some question as to whether if a ship touches a U.S.
9   port in 1970 and 20 years later when the ship is in
10  Nigeria, a taxpayer works on that ship, whether that 20
11  year prior contact with a U.S. port could actually destroy
12  the exemption?
13     A.  You know, I'm not even sure I can discuss this
14  because I never had that information so --
15     Q.  Well, we're just talking hypothetically now.
16     A.  Hypothetically, without the statute in front of
17  me, you know, I don't see the wording there so it's hard to
18  discuss it.
19     Q.  Well, I went to print off a copy of the statute
20  this morning in my hotel but I couldn't find a printer, and
21  what I have is one of the IRS bulletins and I can't
22  represent to you that this is the exact language of the
23  statute. What it says is, in listing the criteria, it
24  lists several, "You perform the services on or in

---

172

1   connection with an American vessel or aircraft and either,
2   A, you entered into your employment contract within the
3   United States; or B, the vessel or aircraft touches at a
4   U.S. port while you are employed on it."
5          That seems clear to me that it -- the taxpayer has
6   to be on the ship when it touches the U.S. port. It also
7   seems to fail the rule of reason that somebody could get on
8   a ship 20 years after it touches a U.S. port and that
9   somehow disqualified them from the exemption. I'm not
10  really asking you to decide that question. I'm just asking
11  is that an issue that you thought existed under the
12  statute, of whether he even possibly qualified because you
13  didn't know everywhere his ships may have touched?
14          MR. GREEN:  Let me object to this
15       technical question, it seems the rule of
16       reason that was applicable to tax law. But
17       go ahead.
18          MR. ROYSE:  Spoken like a true
19       republican.
20          THE WITNESS:  I never really finished
21       the research so I'm not sure. You know,
22       there's several issues. I stated before
23       the 3121 is probably one of the toughest
24       statutes out there, and the wording isn't

---

173

1          that good on it. There may be several
2          issues. I never really got to the time
3          that I actually had to start working with
4          it.
5      Q.  (By Mr. Royse) Okay. Do you recall that being an
6   issue that you identified as saying, well, gosh, I even
7   wonder what this means? Would you ever have said that to
8   Mr. Smith or the Weylands?
9      A.  No.
10          MR. ROYSE:  That is, I believe, all I
11       have. Thank you for your time.
12          MR. GREEN:  Could we go off for just
13       a minute.
14          (Discussion off the record.)
15
16  BY MR. GREEN:
17     Q.  Sir, I've just got a couple of questions for you
18  and I want to take you back. Do you recall some questions
19  about putting your insurance companies on notice, who your
20  insurance companies were, etc.? Do you recall being asked
21  that earlier today?
22     A.  Yes.
23     Q.  And you mentioned that you had spoken with New
24  York Marine as well as Philadelphia Insurance?

---

44 (Pages 170 to 173)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

174

1  A. Yes.

2  Q. Okay. Now, I want to just make clear the timeline

3  on that, so I'm going to ask you a few questions about

4  that. You had -- we had talked -- you had been asked

5  questions about -- and I believe Exhibits 37 and 38 pin

6  down the time frame, if you want to take a look at those --

7  in August of 2004 -- yeah, in August. Now, is that the

8  time frame where, in your conversations with either of the

9  Weylands or Mr. Smith, you became concerned that there was

10  a potential claim?

11  A. Yes.

12  Q. And at that point in -- and at that point, New

13  York Marine was your insurance carrier, correct?

14  A. Yes.

15  Q. Now, what did you do when you got the sense that

16  there may be a potential claim here?

17  A. I called the -- our insurance broker, Wayside.

18  Q. Okay.

19  A. And asked -- and told them, you know, I have this.

20  What do I do? And the agent gave me a phone number for New

21  York Marine. I called them. I told them what I -- you

22  know, where I was at this point in time. There was a

23  potential claim. And they gave me a phone number of an

24  attorney in the Boston area that consulted with them. I

175

1  believe his name was Attorney Ralph Picard. I spoke with

2  him and that was the end of that situation at that point.

3  When I talked to the New York Marine, I asked them

4  if I had -- to put a claim or something, and they said,

5  well, you just did, you know. You know, just contact

6  Attorney Picard's.

7  Q. Now, this was before there was a lawsuit?

8  A. Yes.

9  Q. Okay. And subsequent -- and at that time, again,

10  Philadelphia Insurance you had no relationship with them at

11  that time?

12  A. Correct. No. They weren't our insurance company.

13  Q. Now, how did you come to change from New York

14  Marine to Philadelphia Insurance?

15  A. At some point after that, New York Marine either

16  contacted my insurance agent or they sent a letter to us, I

17  don't know which, telling us that they're withdrawing from

18  the malpractice coverage area; and at that point, our

19  insurance agent gave us an application for Philadelphia

20  Insurance Company.

21  Q. And did you get that in place prior to the

22  expiration of the New York Marine policy? I think we've --

23  I don't know if it was attached, but I think it was August

24  1, 2005 --

176

1  A. Yes. I remember doing the application before. I

2  think the date was August 1st when it --

3  Q. All right. And then in fall of 2005, you were

4  served with a copy of the complaint in this case, the

5  complaint filed by the Weylands, correct?

6  A. Yes.

7  Q. And then what did you do?

8  A. I called the broker again, and the broker wasn't

9  sure which company I should bring the claim with. So she

10  told me to call the Philadelphia insurance and she gave me

11  the phone number and I called them and they said, you know,

12  write this up and send it in and then they got back to me

13  saying, you know, you should have put this in the

14  application as a prior contact item and, you know,

15  basically they declined to cover it. So I went back to the

16  insurance broker and said, okay, now we'll file with New

17  York Marine.

18  So we filed a claim with New York Marine.

19  Q. And then just to make the story a little shorter,

20  they then called me and introduced us, correct?

21  A. No.

22  Q. That's not how -- okay.

23  A. There's something that happened in between.

24  Q. All right.

177

1  A. Philadelphia said you need to respond to this

2  because there's a time frame, and I called several

3  attorneys in Kentucky off a list that Philadelphia

4  Insurance provided me. I -- I may have put a call into

5  you --

6  Q. Actually, you did, you're right. I'd forgotten

7  about that?

8  A. The other person -- you got back to me, let's say,

9  on a Monday or Tuesday, but the other person got back to me

10  on a Friday, and I can't remember her name but she did a

11  little work and I believe we paid her for that work. Then

12  New York Marine came into play and had us contact you,

13  because there was an issue which attorney I was going to

14  use. I called the other attorney and explained that the

15  case had been assigned to you, and I thanked them and told

16  them to send a bill.

17  Q. I do remember that now. And then, ultimately,

18  they decided that they didn't want to continue providing

19  the defense and then Mr. Bland is handling it from there,

20  correct?

21  A. New York Marine?

22  Q. Yes.

23  A. Yes.

24  MR. GREEN: Thank you.

45 (Pages 174 to 177)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

178

1    MR. ROYSE:  No further questions.
2  Thank you.
3        (The witness was excused.)
4        (Whereupon, the deposition concluded
5  at 2:06 p.m.)
6        (Exhibits 1 through 43 were marked in
7  today's proceedings.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

180

1        ERRATA SHEET DISTRIBUTION INFORMATION
2        DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5        ERRATA SHEET DISTRIBUTION INFORMATION
6
7      The original of the Errata Sheet has been delivered
8  to Ronald L. Green, Esquire.
9      When the Errata Sheet has been completed by the
10  deponent and signed, a copy thereof should be delivered to
11  each party of record and the ORIGINAL forwarded to
12  David T. Royse, Esquire, to whom the original deposition
13  transcript was delivered.
14
15        INSTRUCTIONS TO DEPONENT
16
17      After reading this volume of your deposition, please
18  indicate any corrections or changes to your testimony and
19  the reasons therefor on the Errata Sheet supplied to you
20  and sign it.  DO NOT make marks or notations on the
21  transcript volume itself.  Add additional sheets if
22  necessary.  Please refer to the above instructions for
23  Errata Sheet distribution information.
24

179

1  COMMONWEALTH OF MASSACHUSETTS        MIDDLESEX, SS.
2
3      I, NICOLE E. GUILBERT, a Certified
   Shorthand Reporter and Notary Public duly
4  commissioned and qualified in and for the
   Commonwealth of Massachusetts, do hereby
5  certify that there came before me on the 19th
   day of June, 2006, at 8:15 a.m., the person
6  hereinbefore named, PETER BIRKHOLZ, who
   provided satisfactory evidence of
7  identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of
8  the Commonwealth of Massachusetts, was by me
   duly sworn to testify to the truth and nothing
9  but the truth of his knowledge concerning the
   matters in controversy in this cause; that he
10  was thereupon examined upon his oath, and his
   examination reduced to typewriting under my
11  direction; and that this is a true record of
   the testimony given by the witness to the best
12  of my ability.
       I further certify that I am neither
13  attorney or counsel for, nor related to or
   employed by, any of the parties to the action
14  in which this deposition is taken, and
   further, that I am not a relative or employee
15  of any attorney or counsel employed by the
   parties hereto or financially interested in
16  the action.
17
18  My Commission Expires:  May 7, 2010
19
20
21
22        Nicole E. Guilbert
          CSR/Notary Public
23
24

181

1  PLEASE ATTACH TO THE DEPOSITION OF PETER BIRKHOLZ
2  CASE: 05-375-JBC
3  DATE TAKEN:  JUNE 19, 2005
4        ERRATA SHEET
5  Please refer to Page 180 for Errata Sheet instructions and
6  distribution instructions.
7  PAGELINE CHANGE        REASON
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15      I have read the foregoing transcript of my
16  deposition, and except for any corrections or changes noted
17  above, I hereby subscribe to the transcript as an accurate
18  record of the statements made by me.
19
20    Executed this _____ day of _____, 2006.
21
22        _____
23
24

46 (Pages 178 to 181)