Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

## 106

1  A. You're asking me to generalize here because it --
2  it has come up in the past with other clients. You know,
3  number one, I can't talk to an employer unless I've been
4  given permission from the taxpayer. So normally I'd be
5  talking to the taxpayer.
6  Q. I understand. And what I'm getting at is it seems
7  reasonable to me that from time to time if this came up,
8  the taxpayer says, hell, I'm just a bricklayer; I don't
9  know all that; that it might make sense to say, well, let's
10 talk to your employer and find out whether it makes sense
11 or not. All I'm asking is have you ever had a situation
12 like that where you would do that kind of thing, call up
13 the employer with the taxpayer or make an inquiry in
14 writing with the taxpayer to the employer?
15 A. I don't think I've had a taxpayer that's given
16 permission for me to have a conversation about that issue
17 with the employer.
18 Q. Have you ever given information or questions to a
19 client and said you need to go to your employer and have
20 these specific questions answered. I don't understand
21 their structure. I don't understand what they're doing.
22 You need to have these answered?
23 A. Yes.
24 Q. Did you ever do that with Mr. Weyland, as far as

## 107

1  you recall?
2  A. My recollection is we talked early on, but I don't
3  know when that was.
4  Q. Do you recall ever putting anything in writing to
5  him to that effect?
6  A. I can't remember back that far.
7  Q. If you did, it would be in your file; is that fair
8  to say?
9  A. No. These files only start from '88 forward or
10 somewhere around there. There were files before that.
11 Q. Okay.
12 A. We used to receive a 1099 from Richard. I know it
13 would have come up, because I would have said, what's this
14 all about. I don't remember the exact context of the
15 discussion but I know it had to be well before 1988.
16 Q. Where are the files prior to '88? Do you know why
17 those are not around anymore?
18 A. I'm only required to keep three years.
19 Q. My question is: Do you know why the files before
20 '88 aren't around; and if what you're saying is, as a
21 practice, you destroy them, that's fine. I just need to
22 know?
23 A. There's a lot of bulk. We -- we actually maintain
24 files for longer than we're required to. We shred it

## 108

1  because we ran out of space.
2  Q. That's the answer to my question. They don't
3  exist anymore is what I wanted to know. Exhibit 24 -- and
4  the reason I'm giving this to you now is because I want to
5  stay in your tax file the way they're organized. This is
6  tax year '99.
7        (Exhibit 24, 1999 Tax Return
8        Documents, marked for identification.)
9        MR. GREEN: Probably wouldn't be a
10       bad idea to take a break whenever is
11       convenient for you.
12       MR. ROYSE: Let's do that right after
13       this document. Good idea. I could use
14       one.
15 Q. (By Mr. Royse) Mr. Birkholz, this is the first
16 part of a 1040X or amended return for tax year 1999. Is
17 that a document that you prepared?
18 A. Yes.
19 Q. If you look at the date down there, I think at one
20 time it said 10/10/00, but it actually now says 10/10/03
21 that's hand-written in there. Is that --
22 A. Yes.
23 Q. -- roughly when you think you would have filed
24 this document?

## 109

1  A. Yes.
2  Q. Is this a document that you prepare and file
3  yourself or do you send it for the taxpayer's signature?
4  A. We send it to the taxpayer for signature.
5  Q. On that box where it says, "Check if
6  self-employed," that's talking about you, isn't it?
7  A. Yes.
8  Q. The second page is the explanation page for the
9  change. Just take a second and read that paragraph that's
10 typed in there. It says, "Claimant (Richard Weyland)
11 initially filed returns subjecting Foreign wages to self
12 employment tax. Claimant captains a non American vessel
13 that does not dock at a U.S. port and works for a foreign
14 employer. See copy of 1040-1 & 2 plus Schedule SE."
15 What basis did you make that statement on?
16 A. Can you explain that?
17 Q. What factual basis did you make that --
18 A. I didn't make it on a factual. I made it on the
19 conversation I had with Richard and the fact that the
20 statute of limitations was about ready to expire. This was
21 a protective amended return.
22 Q. Okay. But did you believe at the time you filed
23 this, that statement under part 2 to be correct to the best
24 of your knowledge?

28 (Pages 106 to 109)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

---

Page 110

1  A. I didn't have the facts to make that statement. I
2  -- what I believed at the time was if we didn't file this,
3  the statute would toll, and they wouldn't have a shot at
4  it. I also believe that, because this is a fairly unique
5  situation, definitely was going to get audited, so we'd
6  have time to get the facts, etc. I looked up the statute,
7  and I just took verbatim out of the statute 3121.
8  Q. Okay. I understand. And I don't want to get in
9  an argument with you about this, but I have to believe that
10 somebody of your credentials and your experience would not
11 just put something on a document that you file with the IRS
12 without at least having a good faith belief that the facts
13 were, in fact, true, and what I'm asking is did you have
14 that good faith belief or did you just simply put down what
15 was necessary in order to satisfy the statute of
16 limitations, true or not?
17 A. I didn't -- I filed this as a protective, meaning
18 -- take a look at the date, October 10th. The statute
19 tolls, I believe, October 15th. I've got to get this back
20 to them and get it in. I didn't have time to do the
21 research. I didn't have time to explore the facts. I'm
22 not even sure Richard was in the country to discuss the
23 facts. And I believe that around this time, I sent a
24 letter to him asking for some additional data.

Page 111

1  Q. I understand.
2  A. So I know what it looks like, but I filed this
3  purely as a protective claim.
4  Q. I understand and I'm not trying to pick nits about
5  it because I understand where you're coming from, but I'm
6  trying to be clear about whether you believe that your duty
7  to file documents with the IRS based on a good faith belief
8  that they're accurate. That's not alleviated to any extent
9  by the fact that a statute is about to run or you're filing
10 a protective tax return. I mean, you still have to have a
11 good faith belief in order to state something, right?
12 A. How can I say yes to that. No. I think that if
13 there isn't sufficient time, you know, I can file something
14 like this to protect their right to have the discussion
15 down the line.
16 Q. Okay. Is your testimony, then, that you did not
17 have a good faith belief that that was correct?
18 A. I had -- I didn't have the facts. I did it purely
19 to protect their right to have this issue discussed at a
20 later point in time.
21 Q. I'm going to hand you what I'll mark as Exhibit
22 25, and this is from that '99 tax file.
23    (Exhibit 25, Phone Memo, marked for
24    identification.)

Page 112

1  Q. (By Mr. Royse) And I'll go ahead and tell you
2  we're not benefitted with a date on this phone memo, but
3  this came from the '99 tax file and somehow it was copied
4  along with a returned envelope dated November 14 of '00.
5  So I'm not going to try and get you to say what the date of
6  this was, but, in any event, I think it was probably around
7  2000 maybe. That phone memo there, is that your writing?
8  A. Looks like it.
9  Q. Do you have any recollection of what that was
10 about?
11 A. I'm having a little difficulty reading what it
12 says. No, I don't. If it's the '99 file, it may have been
13 around the time we had the conversation -- no. '99 file --
14 this is -- I can see from the postmark, there's -- I don't
15 know what that is. Let me explain something. If I went
16 back and prepared an amended return, this could be a phone
17 slip from 2003.
18 Q. Okay.
19 A. So I can't tell you what this is.
20 Q. And the documents that were provided to us out of
21 your file, those were copied on the same page, and it may
22 just be purely for space-saving reasons.
23    MR. ROYSE: I guess yours probably
24    looks the same on your computer, doesn't

Page 113

1  it, Ron? I think I've got the same thing
2  as you?
3    MR. GREEN: Yeah. You would have an
4    exact copy.
5  Q. (By Mr. Royse) Okay. So you think this phone
6  note here could have been in 2003, could have been in 2000.
7  There's no way to tell?
8  A. Correct.
9  Q. Do you know what it references there? I see Tidex
10 at Chevroncam (phonetic) maybe?
11    MR. GREEN: Dot com.
12 Q. (By Mr. Royse) Yeah. Tidex2@chevron.com. Then
13 it says, I think, maybe office for Richard or -- I can't
14 read the rest of it. I see Rich name -- put Rich name. I
15 guess what I'm getting at is do you have any recollection
16 of making this note or what it referred to?
17 A. No.
18 Q. Move to tax year 2000 --
19    MR. ROYSE: Oh, I lied. I told you
20    I'd take a break. Let's go off the record.
21    (A brief recess was taken.)
22    MR. ROYSE: Let's go back on the
23    record, please.
24 Q. (By Mr. Royse) We are still in tax year 1999

29 (Pages 110 to 113)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

118

1  of physical presence or residence in the near future. See
2  what you get out of the reading."
3      My first question is: Do you recall what spawned
4  this letter?
5      A. I don't but I can look at the previous exhibit and
6  it may have been -- let me just see here. I had a flash
7  through my head here. There are -- as I said, his status
8  changed. They took away his residency. So the only other
9  way to qualify him for exclusion was on the basis of
10 physical presence.
11     Q. Back earlier today you testified that there came a
12 time when Richard raised an issue with you about shipmates
13 not paying taxes. You looked at the statute, sent them
14 some materials. Is that this or is that something
15 different?
16     A. No. It's something different.
17     Q. All we're talking about here is exclusion from
18 foreign -- foreign earned income exclusion from U.S. income
19 tax?
20     A. This is the -- yeah, the income tax.
21     Q. Okay. That letter concludes, "See what you get
22 out of the reading"?
23     A. Mm-hmm.
24     Q. And you attach what appears to maybe be an IRS

119

1  publication. I can't really tell. To your knowledge, is
2  this how -- did this issue get any more treatment from you
3  or was this kind of the conclusion of investigating the
4  issue about foreign earned income exclusion?
5      A. It was not the conclusion.
6      Q. Still in tax year 2000 file, I'll hand you Exhibit
7  29.
8          (Exhibit 29, Letter, marked for
9          identification.)
10     Q. (By Mr. Royse) This appears to be a letter from
11 you to the Kentucky State Revenue Cabinet.
12     A. Mm-hmm.
13     Q. From what I can tell, Mr. Birkholz, it's
14 addressing the treatment of a net operating loss. Do you
15 know what this letter is about?
16     A. Yes.
17     Q. Can you explain it to me.
18     A. Around this time, Kentucky sent a letter to the
19 Weylands questioning a net operating loss on their return,
20 net operating loss being the excess of business expenses
21 over business and nonbusiness income. I interceded, with
22 their permission, and talked to Kentucky and found that
23 Kentucky has a rule that is different from the federal.
24 They only give net operating losses that were incurred

120

1  while you were a resident of Kentucky, and we made an
2  adjustment in the carryover so that it would reflect the
3  proper carryover on the Kentucky state return.
4      Q. Okay. Did this require you to file amended
5  returns or state returns for --
6      A. No.
7      Q. -- a few years? How did it get corrected?
8      A. I just changed the carryover in the file. It had
9  no impact on the tax liability.
10     Q. In the past?
11     A. Correct, to my recollection.
12     Q. I'll hand you Exhibit Number 30.
13         (Exhibit 30, 2000 Tax Return
14         Documents, marked for identification.)
15     Q. (By Mr. Royse) And the first page of this, again,
16 is the 2555. The last page I understand is an attachment
17 that you would attach to the return. And, again, I'm just
18 looking here and seeing that employer's name is listed for
19 Mr. Weyland, Tedix Nigeria Limited, and on the last page
20 it's Zapata Gulf Marine as the employer. And, again, I
21 would just ask you if you agree with me that that's
22 facially inconsistent?
23     A. Yes.
24     Q. Under Tedix Nigeria Limited, part 1, Question 5,

121

1  "Employer is," it says, "a foreign entity," checked. Do
2  you know how that determination was made?
3      A. No.
4      Q. Is that a determination that you had any
5  involvement in making?
6      A. No.
7      Q. I'm going to attach to your file 2001, Exhibit 31.
8          (Exhibit 31, 2001 Tax Return
9          Documents, marked for identification.)
10     Q. (By Mr. Royse) My only question here is, again,
11 the employer's name is Tedix Nigeria. It shows an
12 employer's foreign address in Nigeria and it identifies
13 employer as a foreign business. Do I understand you to say
14 you would have not been involved in the determination that
15 the employer was a foreign business?
16     A. Correct.
17     Q. How do you think that determination was made?
18     A. It wasn't made by me because I recollect that I
19 was surprised in that conversation with Richard to learn
20 that his employer was a foreign company. I mean, this is
21 about the foreign income exclusion.
22     Q. Okay. I understand. You recollect when Richard
23 talked to you and said the employer is foreign, that being
24 noteworthy to you. Is that what you're saying?

31 (Pages 118 to 121)

Peter Birkholz 6-19-2006
Richard Weyland, et al. v. Peter Birkholz and Company

### 122

1  A. Yeah.
2  Q. Why is it noteworthy?
3  A. Well, it was in the same conversation where he
4  said, "My shipmates are chiding me for paying social
5  security taxes," and I asked him why. He said, "I'm owned
6  by a foreign company." If I'm not mistaken, I sent a
7  letter to him at that asking for data.
8  Q. The ownership by a foreign company, though, would
9  have tripped a red flag in your mind, so to speak, of there
10 may be an issue here?
11 A. No. You know, it may be a factor, but I think
12 more is indication that his shipmates said that they
13 weren't subject to social security taxes. So I needed to
14 check out the statute to see.
15 Q. I understand. What I'm getting at, though, is
16 when he mentioned this foreign business, you said you feel
17 certain you had no role in that determination because when
18 Richard mentioned that he was a foreign or -- owned by a
19 foreign business, that that was noteworthy in your mind.
20 And what I'm trying to get at is why it's noteworthy. I
21 understand he said his shipmates don't pay taxes. That's
22 noteworthy. But was it also noteworthy that this is a
23 foreign entity?
24 A. No. I mean, I wouldn't have picked up any special

### 123

1  significance on that at the time.
2  Q. Okay. The fact that someone is employed --
3  someone is a ship captain and is employed by a foreign
4  entity wouldn't cause you to necessarily take any steps
5  different than you otherwise would?
6  A. For purposes of this form, no.
7  Q. Well, for purposes of preparing their income tax
8  return?
9  A. I'm not sure that I would have -- you know, that
10 it rings any bells for me. I -- I mean, it's very
11 difficult to answer that. I know in the case at hand, it
12 didn't ring any bells until I looked at 3121 in the context
13 of how he presented it. It has no context in the 2555.
14 Q. This is Exhibit 32.
15    (Exhibit 32, Federal Statement,
16    marked for identification.)
17    MR. ROYSE: It's the same return. I
18    just, for some reason, copied the
19    attachment separately here.
20 Q. (By Mr. Royse) It still references Zapata Gulf
21 Marine Corporation, and this is being completed in 2002.
22 That is incorrect; is that right?
23 A. I think we were using the word "inconsistent"
24 before.

### 124

1  Q. We were and I'm using "incorrect" now.
2  A. Yes.
3  Q. Go to '02, tax year '02. I'll hand you Exhibit
4  33.
5    (Exhibit 33, Application for
6    Extension, marked for identification.)
7  Q. (By Mr. Royse) And I'll kill two birds with one
8  stone and hand you Exhibit 34.
9    (Exhibit 34, Application for
10   Extension, marked for identification.)
11 Q. (By Mr. Royse) Mr. Birkholz, you have in front of
12 you applications for extension to file tax returns.
13 Exhibit 33 is a Kentucky form, Exhibit 34 a federal form.
14 Are these both forms that you submitted on behalf of the
15 Weylands?
16 A. I believe so.
17 Q. Is it your testimony that you had to be
18 specifically prompted by the Weylands to submit these
19 returns -- applications for extension or you wouldn't have
20 done so?
21 A. That's my recollection.
22 Q. Just a quick question, I notice the Kentucky form
23 requires a reason for a request. Is there not an automatic
24 first extension on a Kentucky form?

### 125

1  A. I don't know.
2  Q. I'm going to go through a section of your file
3  that appears to be correspondence, and I say that because
4  I'm not going to represent to you that I've got these
5  organized by tax year. I'm not sure they were organized by
6  tax year.
7  A. Excuse me, just for clarification, can we go back
8  to 2002 --
9  Q. Yes, sir.
10 A. -- on these extensions?
11 Q. Yep.
12 A. And without the aid of my file, this is near the
13 period where I'm not preparing returns?
14 Q. Okay.
15 A. You have my files. Did I prepare a 2002 return?
16 Q. Let's see -- yes.
17 A. Okay.
18    MR. GREEN: The documents you're
19    talking about being correspondence, are
20    they like 40 and below numberwise?
21    MR. ROYSE: I think.
22    MR. GREEN: Yeah. Okay. I think
23    that they'll all be in a certain time
24    frame.

32 (Pages 122 to 125)