165

1  THE WITNESS: Sorry.
2  MR. GREEN: Unless you've got more
3  answer.
4  THE WITNESS: No. I was thinking
5  about 2001.
6  Q. Let me show you what's been marked
7  as 166. It's dated August 21, 2002, and it
8  says it was attaching the 2001 federal income
9  tax return, I guess, the state tax return as
10 well; do you have any reason to doubt that
11 that's the time frame that the returns were
12 sent to you for tax year 2001 and August 2002?
13 THE WITNESS: You're asking me if
14 this was done?
15 MR. GREEN: I'm wanting to know -- I
16 mean, this indicates that that's when you sent
17 your tax returns.
18 THE WITNESS: Yeah. I would say
19 that's correct.
20 MR. GREEN: And let me show you real
21 quickly what I think is -- not sure where it
22 ends, show you documents marked as 130 through
23 148, and you just tell me whether it was you
24 or your husband that filled that out.
25 THE WITNESS: It's not me. It wasn't

166

1  me.
2  Q. So you think Richard would have?
3  A. It's possible.
4  MR. ROYSE: You mean the handwriting
5  on it?
6  MR. GREEN: Yeah.
7  MR. ROYSE: As opposed to the typed
8  entries?
9  THE WITNESS: Is there handwriting?
10 MR. ROYSE: Look through the whole
11 thing.
12 MR. GREEN: I don't know if
13 checkmarks have distinct characteristics or
14 not.
15 THE WITNESS: This sort of looks like
16 Richard's handwriting. It wasn't me, that's
17 all I know for sure.
18 Q. First of all, I'll ask you to look
19 at what's marked as PB46, dated October 7,
20 2003, and it's kind of the same question; do
21 you have any reason to doubt that that's when
22 your returns were sent to you for the tax year
23 2002?
24 A. No. I think I answered your
25 question.

167

1  Q. You don't have any reason to doubt
2  it?
3  A. No, I have no reason to doubt it,
4  no, sir.
5  MR. GREEN: There was some charts and
6  other types of materials relating to your
7  business that I hadn't seen anything like it
8  in other years. Let me just show you them,
9  and let you tell me what they are. It's 120
10 through 128.
11 THE WITNESS: Do you want this?
12 Q. Yeah. Thank you. Can you just
13 tell me what those are, and why you would have
14 sent those to Mr. Birkholz?
15 A. I can tell you I didn't produce
16 them.
17 Q. Okay. Do you know who did?
18 A. For sure, no.
19 MR. ROYSE: Tell him what you think.
20 THE WITNESS: I think it's possible
21 that Richard may have produced this. What
22 year was this?
23 MR. GREEN: This is out of the 2002
24 file, but it looks more business planning type
25 information, I mean, to me, and I'm just

168

1  curious where it came from and why it was
2  there, if you know, and if you don't know,
3  that's fine.
4  THE WITNESS: I don't know.
5  MR. ROYSE: That's 120 through 122
6  that you're talking about?
7  MR. GREEN: As far as the charts go,
8  and then there's a reproduction agreement.
9  THE WITNESS: I believe this is a
10 contract.
11 Q. Right. And why would you have sent
12 that to Peter?
13 A. I'm not sure.
14 Q. Let me ask you to look at a
15 document marked PB1, and, I think, PB2 is an
16 attachment to it; do you recall receiving that
17 letter?
18 A. Yes. I remember this.
19 Q. Do you recall what discussions led
20 up to that letter or preceded that letter?
21 A. A phone call.
22 MR. GREEN: Tell me about it.
23 THE WITNESS: I believe he was
24 calling to ask questions about the 2002
25 return, and in the middle -- the conversation

169
1  was going along, and then kind of out of the
2  blue, he said, gee, is Richard a foreign
3  employee, and my initial reaction was, well,
4  he works in a foreign country, yeah, he's
5  probably a foreign employee, and then there
6  was kind of an, ahoy, whatever. He could be
7  exempt from paying Social Security, and then
8  there was kind of a discussion about what that
9  meant, and then he sent this letter regarding
10 that situation.
11      Q.  What's the date on that letter?
12      A.  August 8, 2003.
13      Q.  So was that pretty close in time to
14 this conversation you just related?
15      A.  Yeah. I would say so.
16      Q.  And he initiated the call?
17      A.  Yes, sir.
18      MR. GREEN: We had produced some
19 records; have you been able to determine when
20 that call was?
21      MR. ROYSE: The day before -- well,
22 leave it on the record. What I saw, Ron, was
23 that there was a phone call the day before and
24 three days before.
25      MR. GREEN: So on the 7th and the

170
1  4th?
2      MR. ROYSE: Hold on. Let me tell you
3  for sure. 8-4-03, there's a telephone call,
4  and 8-5-03, and, I think, there's one --
5  that's it, 8-4 and 8-5. I'm not obviously
6  testifying that that was the phone call;
7  that's what I got from the record.
8      MR. GREEN: No. This is just an
9  informal. I'll go -- it will be my job to go
10 look and verify or whatever.
11     MR. ROYSE: That's what I saw in the
12 records.
13     Q.  Just seeing if you'd save me some
14 time because I have to admit, I haven't
15 studied them. And then you received this
16 letter, like, the 9th or the 10th, I take it?
17     A.  I think so, yes.
18     Q.  Within regular mailing time; is
19 that usually a day or two?
20     A.  It depends.
21     Q.  Three?
22     A.  Could be. I've had things take
23 three days to get to me from Louisville.
24     Q.  In your discussion on the telephone
25 call of the 7th, I think, we think that this

171
1  is, but whenever it was, you had a discussion
2  of what that meant and that that had to do
3  with it; was there a discussion about if his
4  employer was a foreign company, or was it
5  talking about whether he worked overseas?
6      A.  The term I remember was he was
7  asking me is Richard a foreign employee.
8      Q.  And he suggested that being a
9  foreign employee would have something to do
10 with Social Security?
11     A.  Yes, sir.
12     Q.  Now, as you left that phone call
13 before you got this letter, how did you leave
14 it in terms of what either of you was going to
15 do?
16     A.  He asked me to find out from
17 Richard what the status was.
18     Q.  His status or his employer's
19 status?
20     A.  Well, he wanted -- he wanted me to
21 get information from Richard.
22     Q.  Did he describe any specifics,
23 like, documents that he wanted, anything like
24 that?
25     A.  I don't remember him asking for any

172
1  documents.
2      Q.  And at this time, was Richard
3  overseas?
4      A.  Yes, sir.
5      Q.  And then you got this letter. Now,
6  what did you do following this conversation?
7      A.  I put in a call to Africa.
8      Q.  And were you able to get ahold of
9  your husband?
10     A.  Eventually.
11     Q.  How long did that take?
12     A.  I couldn't tell you. I don't
13 recall.
14     Q.  I mean, was it a week or months?
15     A.  It could have been a matter of
16 days, it could have been a matter of weeks. I
17 couldn't tell you for sure.
18     Q.  And we talked briefly about this
19 connection with some Tidewater documents. You
20 had a list of numbers, and you already
21 indicated you weren't really concerned with
22 who they belonged to, they were the people you
23 got in touch with about things. So you call
24 them, and say I need to talk to my husband,
25 and then they try to get him to call you; is

173

1  that how that works?
2      A.   Yes, yes, sir.
3      MR. GREEN:  Bear with me just a
4  second.  I want to take a look at the
5  Tidewater.
6      MR. ROYSE:  Ron, what I'm doing
7  there, you asked her at that last deposition
8  to look at and see if she had those phone
9  lists that you just referenced.  She was able
10 to find at least a couple of them, and I'm
11 having her to go run and make a copy so you
12 can look at those if you want to ask her about
13 them, that way, you've got them at that point
14 in the deposition.
15     MR. GREEN:  Yeah.
16     MR. ROYSE:  I didn't Bates number
17 those.
18     MR. GREEN:  Let's go ahead and make
19 these an exhibit to the depo, and then we'll
20 all know what they were.  We'll go ahead and
21 mark these as 2, and we'll come back.  I may
22 or may not have questions.
23     (REPORTER MARKS A COPY OF LISTS AS
24     DEFENDANT'S EXHIBIT NO. 2 FOR
25     PURPOSES OF IDENTIFICATION, AND THE

174

1      SAME IS ATTACHED HERETO AND FILED
2      HEREWITH)
3      Q.   I was just looking here real quick
4  to see if, you know, last time we talked about
5  it, there was a couple sheets where somebody
6  with one of the Tidewater companies had a fax
7  going to somebody saying that you needed him
8  to call you, and we talked about some of
9  those, and I was just looking to see if there
10 was one for this time frame, and I don't see
11 one, but, so after this letter, you called the
12 people you call, and then he called you back?
13     A.   Eventually, yes, sir.
14     Q.   And we've established we're not
15 sure how much time elapsed, but in between the
16 time that you talked to Mr. Birkholz and he
17 said to contact him, and when he called you
18 back, did you have any other conversations
19 with Mr. Birkholz in that interim period?
20     THE WITNESS:  If I'm to understand
21 you, you're asking if there were any
22 conversations between the time, like, when I
23 talked with Richard?
24     Q.   No.  When you talked to Peter.
25 Between the time you talked to Peter, and he

175

1  said get me the status in the time that
2  Richard called you back; were there any other
3  discussions?
4      A.   I don't recall.
5      MR. GREEN:  Then Richard called you;
6  tell me about that conversation, what you can
7  remember.
8      THE WITNESS:  I remember asking him,
9  you know, Richard, are you a foreign employee,
10 and his immediate reaction was, yes, I'm a
11 foreign employee, and then I recall explaining
12 to him something about him being exempt from
13 self-employment tax, and that's the most I can
14 remember.
15     Q.   Was there any discussion in that
16 conversation between you and Richard as to who
17 Richard's employer was?
18     A.   I think there may have been a
19 discussion about whether or not Richard was
20 working for a foreign company.
21     Q.   Do you recall what he told you?
22     A.   Yes.  I work for a foreign company.
23     Q.   Did he say which one?
24     A.   I don't recall asking.
25     Q.   I'm going to show you what we've

176

1  marked as Exhibit 2, which you and your
2  attorney were kind enough to locate for us,
3  and for this situation, who would you have
4  called; who would you have called to say I
5  needed to talk to Richard?
6      A.   I think he was in Malongo at the
7  time, and I didn't call all that often, so I'm
8  not sure.  Usually the process was you call
9  this -- a number that goes to England, and
10 then you ask for Malongo and then give them an
11 extension number.
12     Q.   Which number are you talking about,
13 the one that goes to England?  Just so that if
14 somebody else reads this depo, they'll be able
15 to tell from that chart what you're talking
16 about.
17     A.   Well, it looks like the number
18 changed because at the top, there's a number
19 that says 011-44-122-429-3000, and then
20 there's another number here, and I remember
21 the number changed, 011-44-207-487-8100.
22     Q.   You wouldn't at that number ask for
23 any particular person, you'd just ask to be
24 relayed on to?
25     A.   The instructions are asked for.